UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 00-6227-CIV-MORENO
Magistrate Judge Dubé

JACQUELINE IAIA,

    Plaintiff,

v.

COLUMBIA HEALTHCARE
CORPORATION d/b/a PEMBROKE
PINES HOSPITAL, a foreign cor-
poration,

    Defendant.
_____/

### DEFENDANT'S MOTION FOR LEAVE TO FILE AMENDMENT TO ANSWER

Defendant GALEN HOSPITAL—PEMBROKE PINES, INC., f/d/b/a PEMBROKE PINES HOSPITAL, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, respectfully requests leave to file an Amendment to its Answer to reflect information recently obtained in the course of Defendant's diligent pursuit of discovery. The proposed amendment is limited to paragraph 6 of Defendant's answer. Defendant respectfully requests that the court grant this motion and deem Defendants' proposed Amendment to Answer, which is annexed hereto as Exhibit 1, filed as of the date of this motion. The grounds for the motion are fully set forth in the accompanying memorandum of law.

NON-COMPLIANCE OF S.D. fla. L.R. 7.1.A.4

## INTRODUCTION

This is an action for age discrimination pursuant to the Florida Civil Rights Act of 1992, Fla. Stat. Ch. 760, and the Age Discrimination in Employment Act, 28 U.S.C. § 621 *et seq.* The events underlying these claims took place nearly seven years ago in 1993. Plaintiff's Charge of Discrimination was filed with, but subsequently lost by, the Florida Commission on Human Relations ("FCHR"). For reasons presently unknown, the FCHR did not notify Defendant of Plaintiff's Charge of Discrimination for more than three years. *See* Affidavit of Alexander D. del Russo (annexed hereto as Exhibit 2), ¶ 2. During the intervening period, the Defendant entered into a 25-year lease agreement with the South Broward Hospital District, to which Defendant leased the Hospital and all of its assets. As a result, Defendant ceased to manage, operate or control the Hospital or any of its employees. All Hospital employees, subject to the Worker Adjustment and Retraining Notification Act, ceased being employees of Defendant and had to seek positions with the new operator. These events took place before Defendant was notified of Ms. Iaia's Charge alleging age discrimination, and before any steps could be taken to identify witnesses or preserve a record to defend the decisions made in the 1993 Reduction in Workforce. As a result of this time lapse, Defendant has encountered significant difficulties in conducting pretrial discovery, both in terms of locating witnesses and in assembling records to present a defense. *Id.*, ¶ 3.

The Plaintiff, Jacqueline Iaia, was employed by Pembroke Pines Hospital until 1993, when she was laid off as part of a Reduction in Force ("RIF"). In her complaint, Plaintiff alleges that in connection with the RIF, Defendant combined her position with that of another, younger employee, who was chosen instead of Plaintiff to receive the resulting new position.

*See* Complaint, ¶¶ 6-7. In its answer, Defendant, stating the best of its knowledge at the time, admitted that it had undertaken a reduction in force "and made the management decision to combine Plaintiff's position with the position of Director of Senior Friends." *See* Answer, ¶ 6. It is this phrase which Defendant seeks to delete through the proposed Amendment.

Defendant's admission was based on its counsel's review of documents reflecting that another employee later held a combined position that appeared to include Plaintiff's former position. *See* Affidavit of Alexander D. del Russo, ¶ 4. It was not until the July 24, 2000 deposition of Mr. Jerry Sutphin, the CEO of the Hospital at the time of the RIF, that Defendant learned that Plaintiff's position was simply eliminated in connection with the RIF. *See* 7/24/00 Deposition of Jerry Sutphin (excerpted and annexed hereto as Exh. 3). At the time of the RIF, the consolidation of the two positions had not occurred and had not yet even been discussed or considered. *Id.* Only later did a different management group decide to change the position held by Ms. Monteiro to include the title and duties of Plaintiff's former position. *See* Affidavit of Alexander D. del Russo, 4. Thus, Defendant herein seeks the Court's permission to amend its answer to paragraph 6 of the complaint in order to reflect accurately the newly discovered information.

## MEMORANDUM OF LAW

Pursuant to the Court's revised scheduling order dated July 6, 2000 (D.E. #25), the deadline to amend the pleadings was July 28, 2000, one week prior to the date of the present motion. Because the deadline for amending the pleadings has just expired, Defendant must show good cause for leave to amend pursuant to Fed.R.Civ.P. 16(b). *See Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417, 1418 (11th Cir. 1998). The good cause inquiry focuses on the

diligence of the party seeking extension of the deadline. *Id.* Because, in the present case, the deadline to amend the answer could not "be met despite the diligence" of Defendant in seeking the relevant information, Defendant shows good cause and its motion for leave to amend should be granted. *Id.*

In the present case, Defendants' efforts at fact-gathering have been difficult and time-consuming due to the transfer of the Hospital out of Defendant's control, and due to the seven years that have passed since the underlying events took place. Unlike in other cases, defense counsel cannot travel to the location of the employer, meet with its representatives, interview potential witnesses, and review documents. Instead, there is no Hospital to visit and no employees to meet. Defendant has had to undertake extensive searches in order to locate former employees who are potential fact witnesses but who have long since moved on. Mr. Sutphin, the former CEO who supplied the crucial information about the status of Plaintiff's former position at the time of the challenged Reduction in Force, was traced first to Lewisburg, West Virginia, and then to Pompano Beach, Florida and Fairfax, Virginia, and finally to Virginia Beach, Virginia, where Defendant was able to take his deposition on July 24, 2000. *See* Affidavit of Alexander D. del Russo, ¶ 5. (As a courtesy to all involved, Defendant felt constrained to give thirty days' notice before taking the out-of-state deposition of Mr. Sutphin. *Id.*) It is therefore clear that Defendant was completely diligent in pursuing the information possessed by Mr. Sutphin. Because Defendant was diligent, it meets the "good cause" standard of Rule 16(b) for the modification of scheduling order, and the present motion should be granted.

Having satisfied the requirements of Rule 16(b), Defendant's petition for leave to amend its answer is now governed by Rule 15(a). *See Sosa*, 133 F.3d at 1419. Under Rule 15(a), leave to amend a pleading "should be liberally granted when necessary in the interest of justice." *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1319 (11th Cir. 1999). "Unless there is a substantial reason to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Id.*

> In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be "freely given."

*Id.* In the present case, Defendant's motion for leave to amend should be granted because there is no "substantial reason" to deny it. As set forth herein, Defendant has been diligent and has displayed no bad faith or dilatory conduct. Moreover, the granting of this motion would cause no prejudice to Plaintiff. The amended answer would be deemed filed only one week after the expiration of the deadline to amend pleadings. The extra one-week interval would not prejudice Plaintiff in any way. Further, Plaintiff's counsel was afforded full opportunity to cross-examine Mr. Sutphin concerning the information discovered during his deposition, and did cross-examine him extensively. Because Defendant has been diligent in pursuing the subject matter of this motion, and because the granting of the motion would not be prejudicial to Plaintiff, the motion should be granted.

## Certification of Good Faith

Pursuant to Local Rule 7.1, the undersigned has attempted to contact opposing counsel in a good faith effort to see if the parties could resolve by agreement the issues raised in this

5

Motion. However, the undersigned has been advised that both Messrs. Jankowski and Hannah are on vacation and will not be returning until next week.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendant leave to amend its answer to the complaint, and deem the proposed amended answer annexed hereto as Exhibit 1 filed as of the date of this motion.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was mailed this 4th day of August, 2000, to Roderick V. Hannah, Esq., Becker & Poliakoff, P.A., P.O. Box 9057, Ft. Lauderdale, Florida 33310-9057; and to John F.Jankowski, Jr., Esq, John F. Jankowski, Jr., P.A., 2 South University Drive, Suite 265, Plantation, Florida 33324.

LEVY, KNEEN, MARIANI, CURTIN, KORNFELD & DEL RUSSO, P.A.

By: _____
Alexander D. del Russo
1400 Centrepark Boulevard
Suite 1000
West Palm Beach, Florida 33401
(561) 478-4700
(561) 478-4744
Fax (561) 478-5811
Florida Bar No. 350273

1. JEREL-lata\leave to amend.doc

ATTACHMENT / EXHIBIT



ATTACHMENT / EXHIBIT 2





UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

CASE NO. 00-6227-CIV-MORENO
Magistrate Judge Dubé

JACQUELINE IAIA,

    Plaintiff,

v.

COLUMBIA HEALTHCARE
CORPORATION d/b/a PEMBROKE
PINES HOSPITAL, a foreign cor-
poration,

    Defendant.
_____/

## AFFIDAVIT OF ALEXANDER D. DEL RUSSO IN SUPPORT OF DEFENDANT'S MOTION FOR LEAVE TO AMEND ANSWER

| | |
|---|---|
| STATE OF FLORIDA | ) |
|  | )ss. |
| COUNTY OF PALM BEACH | ) |

BEFORE ME, the undersigned authority, personally appeared Alexander D. del Russo who upon being duly sworn, deposes and says:

    1.    My name is Alexander D. del Russo. I am an attorney licensed to practice in the State of Florida, and I represent Defendant as trial counsel in this action. I make this affidavit based on my personal knowledge.

    2.    Defendant was not notified of Plaintiff's Discrimination Charge, filed with the Florida Commission on Human Relations, for almost four years after it was filed.



3. During the intervening period, the Defendant entered into a 25-year lease agreement with the South Broward Hospital District, to which Defendant leased the Hospital and all of its assets. As a result, Defendant ceased to manage, operate or control the Hospital or any of its employees. All Hospital employees, subject to the Worker Adjustment and Retraining Notification Act, ceased being employees of Defendant and had to seek positions with the new operator. These events took place before Defendant was notified of Ms. Iaia's Charge alleging age discrimination, and before any steps could be taken to identify witnesses or preserve a record to defend the decisions made in the 1993 Reduction in Workforce. As a result of this time lapse, my office has encountered significant difficulties in conducting pretrial discovery, both in terms of locating witnesses and in assembling records to present a defense.

4. Defendant's admission in its answer that the challenged Reduction in Force combined Plaintiff's position with that of another employee was based on counsel's review of documents showing the latter employee with a combined title that appeared to include Plaintiff's former position. Since taking the Deposition of Jerry Sutphin in Virginia Beach, Virginia on July 24, 2000, Defendant has learned that Plaintiff's position was simply eliminated as a result of the pertinent Reduction in force. Only later did a different management group decide to change the position held by the other employee to include the title and duties of Plaintiff's former position.

5. Mr. Sutphin, the CEO of Pembroke Pines Hospital at the time of the Reduction in Force that eliminated Plaintiff's position, was located only after an extensive search on the part of Defendant, which traced Mr. Sutphin first to Lewisburg, West Virginia, and then to Pompano Beach, Florida and Fairfax, Virginia, and finally to Virginia Beach, Virginia, where

Defendant was able to take his deposition on July 24, 2000. As a courtesy to all involved, we provided thirty days' notice before taking the out-of-state deposition of Mr. Sutphin.

_____
Alexander D. del Russo

SWORN TO AND SUBSCRIBED before me this 4th day of August, 2000, by Alexander D. del Russo, who is personally known to me.

(NOTARY SEAL)

_____
NOTARY SIGNATURE

I:\JEREL\Iaia\ADD affidavit.doc



NANCY TIDWELL-RARDIN
MY COMMISSION # CC 860778
EXPIRES: Aug 4, 2003
1-800-3-NOTARY   Fla Notary Service & Bonding Co.

3

ATTACHMENT / EXHIBIT ____



RECYCLED PAPER

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2              FT. LAUDERDALE DIVISION

 3                          CASE NO. 00-6227-CIV-MORENO
                            Magistrate Judge:  Dube'
 4

 5    - - - - - - - - -
                                 :
 6    JACQUELINE IAIA,
                                 :
 7              Plaintiff,
                                 :
 8       -vs-
                                 :
 9    COLUMBIA HEALTHCARE CORPORATION :
      d/b/a PEMBROKE PINES HOSPITAL,  :
10    a foreign corporation,
                                 :
11              Defendant.
                                 :
12    - - - - - - - - -

13

14         Videotaped deposition of JERRY SUTPHIN

15         Taken on behalf of the Defendant

16         Date:    July 24, 2000

17         Place:   Norfolk, Virginia

18

19         APPEARANCES:

20         BECKER & POLIAKOFF, P.A.
           By:  RODERICK V. HANNAH, ESQUIRE
21              Counsel for the Plaintiff

22         LEVY, KNEEN, MARIANI, CURTIN,
           KORNFELD & DEL RUSSO, P.A.
23         By:  CHRISTOPHER C. COPELAND, ESQUIRE
                and
24         By:  SUE WILLIS-GREEN, ESQUIRE
                Counsel for the Defendant
25
           Reported by:  Penny Commander Wile, RMR
```

EXHIBIT 3

ORIGINAL

```
 1   positions?
 2        A.     Positions.
 3        Q.     I want to go back and talk a little
 4   bit about Pembroke Pines and your history with
 5   them.
 6        A.     Fine.
 7        Q.     Do you recall when you started as the
 8   CEO at Pembroke Pines Hospital?
 9        A.     Approximately January of '92, if I
10   recall.
11        Q.     And at the time you started as CEO do
12   you know which -- was the hospital still owned by
13   Humana?
14        A.     Yes.
15        Q.     Okay.  What were your duties and
16   responsibilities as the CEO at Pembroke Pines?
17        A.     Basically the same function that I
18   would have as CEO of any other facility; however,
19   in this particular case when I agreed to accept
20   the position because of the relationship with
21   Humana between its hospitals, if you will, and its
22   insurance operations it presented a little
23   different operating challenge, if you will, in
24   that we needed to try to accommodate as many
25   Humana patients as we could from that particular
```

```
 1   any way tied to your decision to eliminate the
 2   director of marketing position?
 3        A.    Not that I recall.
 4        Q.    Did you subsequent to making the
 5   decision to eliminate the director of marketing
 6   position make any subsequent decisions to combine
 7   any of those functions in conjunction with the
 8   Senior Friends?
 9        A.    Sir, I cannot remember doing that.
10        Q.    Okay.  Now, I want to get into the
11   specifics.
12              Who was the individual at the
13   hospital which would advise Mrs. Iaia that she was
14   being included in the reduction in force?
15        A.    That she was being included or in
16   fact she had been?
17        Q.    Had been included.
18        A.    Probably would have been me.
19        Q.    Okay.  Do you recall having a meeting
20   with her in order -- in what time you advised her
21   she was being included in --
22        A.    I don't recall the specifics of it,
23   but I'm sure I did meet with her.
24        Q.    Okay.  What is it that leads you to
25   believe that you did in fact meet with her?
```

```
 1        A.      Well, it would have been my
 2   responsibility to talk to her, to -- as a --
 3   because her job was being eliminated.
 4        Q.      I'll show you what I'll have marked
 5   Defendant's Exhibit 2.  It's previously
 6   Defendant's Exhibit Number 8 to Miss Iaia's
 7   deposition.
 8                      (Defendant's Exhibit 2 was
 9                       marked for identification.)
10
11   BY MR. COPELAND:
12        Q.      I'm going to ask you, Mr. Sutphin, if
13   you recall ever seeing this memo I've handed to
14   you dated November 11th, 1993?
15        A.      This specific one, no.  I think it
16   was a letter or a memo that was put out kind of of
17   a general nature in terms that everyone that was
18   in the RIF got a memo of this nature to explain
19   the benefits and what happened.
20        Q.      On the third page or fourth page -- I
21   apologize -- there is an acknowledgment page
22   with -- is that your signature under witness?
23        A.      Yes, sir.
24        Q.      And it's dated 11-11-93.  Does this
25   refresh your recollection as to whether or not
```

```
 1        A.     It was sporadic.  It might be on a
 2   daily basis.  It might be on a weekly basis
 3   depending on the schedule and appointments and so
 4   forth.
 5        Q.     How often would you have contact with
 6   Miss Monteiro during that period of time?
 7        A.     No more so --
 8        Q.     Daily basis?
 9        A.     Daily, weekly, whatever.
10        Q.     Did you see them every day?
11        A.     It depends.  The Seniors Program was
12   located in a building completely across the
13   driveway from the hospital.
14        Q.     With regard to the actual reduction
15   in force, isn't it true that Miss Iaia's position
16   was not actually eliminated?
17        A.     I don't recall that being anything
18   but that.
19        Q.     Well, she was director of
20   marketing/public relations, correct?
21        A.     Uh-huh.
22        Q.     Isn't it true that that position was
23   combined with the director of Senior Friends
24   position?
25        A.     I do not recall that happening, sir.
```

```
 1        Q.      You have no idea if that happened or
 2   not?
 3        A.      No, sir.  I don't recall it
 4   happening.
 5        Q.      Okay.  Isn't it true Miss Monteiro
 6   after this so-called reduction in force became the
 7   director of marketing/public relations and Senior
 8   Friends?
 9        A.      I have no idea.
10        Q.      You have no idea if that happened?
11        A.      No, sir.  I did not -- I left there
12   probably within a week and-a-half to two weeks of
13   this.
14        Q.      All right.  When this reduction in
15   force decision came down, okay, do you know if
16   Miss Monteiro was going to continue her employment
17   at Pembroke Pines Hospital in any kind of
18   position?
19        A.      Mrs. Monteiro?
20        Q.      Ms. Monteiro.
21        A.      As far as I knew, yes.
22        Q.      Okay.  What was your understanding
23   what position she was going to continue in?
24        A.      She reported to me.  She was the
25   director of the Senior Program.
```

```
 1        Q.    So you had no idea what that
 2   position -- whether or not that position was going
 3   to stay the same or change after this reduction in
 4   force?
 5        A.    I just don't recall the circumstances
 6   involving the director of public relations aspect
 7   of it.
 8        Q.    So you don't know if Ms. Monteiro
 9   assumed the duties and responsibilities of the
10   director of marketing and public relations after
11   Miss Iaia was taken out of that position?
12        A.    I cannot recall the circumstances
13   behind that, no.
14        Q.    Was that your responsibility to
15   select the position of the person who was going to
16   continue on in the position of director of
17   marketing/public relations or Senior Friends?
18        A.    Yes.
19        Q.    Did you consider Miss Iaia for
20   continued employment in that position?
21        A.    As the Seniors Program?
22        Q.    No.  As director of marketing and
23   public relations and Senior Friends?
24        A.    Possibly eliminate the position.
25        Q.    It's your understanding the entire
```

89

```
 1   position was eliminated?
 2        A.     Yes, sir.
 3        Q.     Okay.  And when did you leave
 4   Pembroke Pines Hospital?
 5        A.     November of '93.
 6        Q.     So it was your understanding that
 7   Pembroke Pines Hospital was no longer going to
 8   have anyone doing any kind of marketing or public
 9   relations for the hospital?
10        A.     I do not recall, while I was there, a
11   conversation assigning responsibilities for that
12   position after Ms. Iaia left.
13               MR. HANNAH:  Let's have this marked.
14                    (Plaintiff's Exhibit 2 was
15                    marked for identification.)
16
17   BY MR. HANNAH:
18        Q.     Why don't you take a look at what's
19   been marked Plaintiff's Exhibit Number 2?  Why
20   don't you read that document?
21        A.     (Witness complied.)
22        Q.     All I'm asking is for you to read
23   that document.
24        A.     Okay.
25        Q.     Now that you've read it, is that an
```