1             UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2                FORT LAUDERDALE DIVISION

3             CASE NO. 00-6227-CIV-MORENO

4
     JACQUELINE IAIA,
5
                            Plaintiff,
6
     vs.
7
     COLUMBIA HEALTHCARE CORPORATION
8    d/b/a PEMBROKE PINES HOSPITAL,
     a foreign corporation,
9
                            Defendant.
10
     ------------------------------------/
11

12              DEPOSITION OF JACQUELINE IAIA

13

14            Taken before Richard Bursky, Registered

15   Merit Reporter and Notary Public in and for the

16   State of Florida at Large, pursuant to Notice of

17   Taking Deposition filed by the Defendant in the

18   above cause.

19                        - - -

20

21   Wednesday, June 28, 2000
     Suite 700
22   One East Broward Boulevard
     Fort Lauderdale, Florida
23   10:30 a.m. - 5:15 p.m.

24                     - - -

25

                INTERIM COURT REPORTING
                   (561) 478-0401

```
 1   Appearances:

 2

         On Behalf of the Plaintiff:
 3
             JOHN F. JANKOWSKI, JR., ESQ.
 4           Suite 265
             2 South University Drive
 5           Plantation, Florida 33324
             (954) 370-1026
 6

 7       On Behalf of the Defendant:

 8           LEVY KNEEN MARIANI CURTIN
             KORNFELD & DEL RUSSO, P.A.
 9           Suite 1000
             1400 Centrepark Boulevard
10           West Palm Beach, Florida 33401
             (561) 478-4700
11           BY:  ALEXANDER D. DEL RUSSO, ESQ.

12                     -   -   -

13                  I N D E X

14                     -   -   -

15   Witness                 Direct
     JACQUELINE IAIA
16
         By Mr. Del Russo        4
17
                     -   -   -
18

19

20

21

22

23

24

25
```

INTERIM COURT REPORTING
(561) 478-0401

```
 1   EXHIBITS:                                    IDENTIFIED:

 2   Defendant's Exhibit No. 1.....................  28
     Defendant's Exhibit No. 2.....................  35
 3   Defendant's Exhibit No. 3.....................  39
     Defendant's Exhibit No. 4.....................  44
 4   Defendant's Exhibit No. 5.....................  49
     Defendant's Exhibit No. 6.....................  61
 5   Defendant's Exhibit No. 7.....................  69
     Defendant's Exhibit No. 8.....................  94
 6   Defendant's Exhibit No. 9.....................  99
     Defendant's Exhibit No. 10....................  99
 7   Defendant's Exhibit No. 11.................... 106
     Defendant's Exhibit No. 12.................... 110
 8   Defendant's Exhibit No. 13.................... 111
     Defendant's Exhibit No. 14.................... 112
 9   Defendant's Exhibit No. 15.................... 115
     Defendant's Exhibit No. 16.................... 116
10   Defendant's Exhibit No. 17.................... 124
     Defendant's Exhibit No. 18.................... 134
11   Defendant's Exhibit No. 19.................... 136
     Defendant's Exhibit No. 20.................... 137
12   Defendant's Exhibit No. 21.................... 139
     Defendant's Exhibit No. 22.................... 140
13   Defendant's Exhibit No. 23.................... 140
     Defendant's Exhibit No. 24.................... 143
14   Defendant's Exhibit No. 25.................... 148
     Defendant's Exhibit No. 26.................... 149
15   Defendant's Exhibit No. 27.................... 150
     Defendant's Exhibit No. 28.................... 150
16   Defendant's Exhibit No. 29.................... 151
     Defendant's Exhibit No. 30.................... 152
17   Defendant's Exhibit No. 31.................... 154
     Defendant's Exhibit No. 32.................... 155
18   Defendant's Exhibit No. 33.................... 164
     Defendant's Exhibit No. 34.................... 165
19   Defendant's Exhibit No. 35.................... 169
     Defendant's Exhibit No. 36.................... 172
20   Defendant's Exhibit No. 37.................... 173

21

22

23

24

25
```

## $

**$10** 9:15
**$10,000** 168:18
**$10.30** 9:12
**$11,336** 171:18
**$19,706** 172:17
**$2,000** 168:2
**$2,186.78** 115:23
**$20,000** 168:20
**$250** 110:11
**$4,000** 168:14, 15
**$42,000** 175:6
**$42,044** 170:8
**$6,618** 171:21
**$8,228** 171:15
**$8,617** 172:2
**$9** 13:8
**$9,719** 172:5

## 1

**1** 18:21, 25; 28:21; 29:4;
166:3
**10** 39:18; 40:7, 15, 20;
41:7; 99:20, 24; 100:14;
106:15; 141:18; 142:22
**10/19** 36:8, 12
**10/21/91** 40:22
**1040** 170:15
**11** 92:10, 11; 94:18;
97:23; 98:18; 101:21;
106:17, 21; 112:9; 146:7
**11/7/94** 143:6
**1107** 164:23
**1113** 4:11
**1151** 164:23
**1161** 165:4
**1162** 165:4
**1189** 29:8
**11:40** 50:10, 14
**12** 110:3, 7; 144:13
**12700** 10:17
**13** 28:3; 110:14; 111:19,
23
**14** 112:22; 113:1
**15** 105:5; 115:13, 17;
118:24; 122:18
**16** 99:25; 100:14; 116:2, 6
**17** 124:8, 9; 153:3
**17th** 4:12
**18** 134:12, 16; 138:5
**19** 5:23; 136:24; 137:2;
157:14
**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** 5:10
**1969** 23:20
**1970** 19:25
**1972** 24:10
**1974** 5:6; 25:6; 27:19
**1981** 20:15

**1982** 6:11; 20:15; 21:10
**1983** 32:20
**1987** 27:15, 19; 28:20;
32:20, 24; 33:4
**1990** 35:19; 36:15; 72:22;
74:17
**1991** 6:13; 16:4; 18:4;
35:19; 36:12, 15, 16, 18;
37:13; 40:2; 43:4; 75:5
**1992** 49:16, 24; 50:19;
61:6
**1993** 32:24; 33:4; 69:13;
84:17; 97:23; 99:25;
112:9; 116:15; 146:7;
156:16; 170:7
**1994** 18:21; 25:21; 47:11;
84:15; 104:17; 111:25;
112:25; 114:7; 131:3;
138:6; 144:10; 170:11, 12;
171:15
**1995** 105:21; 137:3;
158:12; 166:14; 171:17
**1996** 10:24; 12:11; 14:1,
12, 18; 15:14, 15; 17:6, 14;
18:5; 19:12; 139:11, 23;
141:10; 157:17; 171:20
**1997** 140:6; 141:18;
144:14; 149:3, 16; 151:4;
157:17, 21; 171:23; 172:2
**1998** 8:16; 9:8, 14; 10:19,
24; 12:11, 24; 14:24;
15:14, 19; 150:15; 153:3;
157:16; 172:4
**1999** 154:24; 159:9;
172:11, 14, 16
**1:00** 83:16
**1:05** 83:19

## 2

**2** 35:21, 25; 145:23, 24;
150:15; 170:25
**20** 34:6; 74:9; 93:12;
135:11; 137:20, 24; 138:7;
139:11; 141:10; 174:1, 3
**200** 27:4
**2000** 104:24; 105:25;
159:9; 174:25
**21** 139:6, 11; 141:9; 151:3
**22** 118:25; 140:1, 5
**23** 140:21, 25; 142:20;
144:17
**24** 143:17, 21; 145:20
**25** 50:14; 148:22; 149:1
**26** 140:6; 149:3, 12, 16
**27** 69:13; 137:3; 150:9, 13
**28** 149:16; 150:24; 151:3;
154:24
**29** 45:17; 151:20, 24
**2:10** 84:2
**2:40** 100:10

## 3

**3** 39:24, 25; 145:22;
147:17
**3,000** 169:1
**30** 64:25; 66:9; 152:24;
153:3
**300** 42:25; 43:1, 2
**31** 49:16; 154:19, 23
**32** 155:17; 156:2
**33** 164:9, 13; 165:12
**33325** 10:18
**33486** 4:12
**34** 165:1, 5; 169:4
**35** 169:23, 24, 25
**36** 169:22; 172:7, 11
**37** 173:1, 6
**39** 91:23
**3:15** 122:18

## 4

**4** 44:11, 14; 112:25;
144:10
**4,000** 169:1
**40** 85:18; 86:6; 87:16;
88:10; 91:21, 22; 92:2;
105:17, 18, 18; 119:18
**400** 27:5; 39:4, 9
**42** 106:16
**45** 116:15
**4:50** 169:18

## 5

**5** 49:8, 12; 111:25; 114:7
**50** 157:23
**550** 157:12; 158:10
**577** 159:6
**578** 159:6
**5:05** 177:21
**5:15** 179:11
**5th** 25:6

## 6

**6** 60:25; 61:2; 166:14
**6,000** 142:10
**6/28/48** 5:8
**65** 174:3
**66** 19:13

## 7

**7** 69:11, 14; 101:7
**74** 27:18
**75** 5:23
**76** 5:23
**77** 6:3

**78** 6:3

## 8

**8** 13:8; 94:14, 18

## 9

**9** 99:11, 15
**9/1/87** 29:22
**90** 31:9; 164:24
**904** 164:23
**905** 164:24
**906** 164:24
**91** 18:22; 31:10; 44:23;
46:6; 64:16
**92** 6:13
**93** 17:4; 32:21; 50:4;
64:16; 84:16; 85:10;
94:18; 146:13; 156:22;
157:20
**94** 18:22; 27:16; 63:1;
84:12; 95:11; 123:18;
156:24
**95** 18:25
**96** 11:2; 13:11; 17:4, 9;
19:1
**98** 11:3; 13:11; 14:19;
21:1; 157:16
**987** 164:23
**99** 174:25

## A

**a.m** 50:14
**abandoned** 178:23, 23,
24
**Able** 35:12; 39:13; 66:18;
132:21; 169:10
**aboard** 18:8; 56:24
**absence** 98:1; 112:5, 12
**access** 148:17
**accident** 137:15
**according** 68:10
**account** 68:24
**accountability** 71:19
**accrual** 114:17
**accrued** 113:8, 11, 18,
23, 25; 114:22
**accurate** 135:6, 12, 13;
157:7
**achieve** 165:15; 167:3
**achieved** 167:5
**achievement** 167:6
**acquired** 37:14; 83:8;
84:5; 85:7; 86:10, 21; 87:5,
17, 25; 89:24; 90:19;
111:9; 146:8
**acquiring** 84:10, 19;
88:14
**acquisition** 84:25; 85:1,
1; 87:15

**acted** 57:19, 20
**acting** 99:4
**action** 40:3; 62:19
**actions** 124:14; 131:18;
132:10; 133:2, 11, 14;
139:1
**activities** 33:25; 70:3
**activity** 31:25; 44:6; 70:8;
76:10
**acts** 175:3; 176:8
**actual** 107:7
**actually** 18:24; 19:22;
22:11; 31:23; 32:14; 41:2;
45:13; 131:20; 141:23;
151:10; 171:4
**acute** 26:24, 25
**Adamson** 86:5; 94:19;
124:1
**add** 124:23
**addiction** 24:3
**addition** 102:19; 133:19
**additional** 73:9, 25
**address** 4:10, 13, 23;
10:15; 158:15
**adequate** 61:14
**adjacent** 65:6
**administration** 65:7;
118:11; 120:1
**administrative** 48:18,
19; 76:19; 102:14, 21
**administrator** 30:16, 21;
62:18; 64:1; 75:13
**Adrian** 5:19
**adversely** 57:17
**advice** 99:16; 116:7
**advised** 139:16
**advising** 124:2
**advisory** 69:23; 70:1, 9
**affect** 92:8
**affected** 57:17; 89:5, 9;
91:17, 20; 102:16; 103:2;
119:8; 178:22
**affidavit** 106:6; 143:6, 12,
22; 144:3, 13, 20, 22;
145:4, 19; 146:4; 147:17
**affidavits** 152:15
**affiliation** 52:2; 169:14
**affiliations** 22:6, 18; 23:2
**AFTERNOON** 84:1
**again** 7:16; 16:18; 32:25;
39:2; 81:17; 113:17;
121:3; 129:7; 133:16;
142:13; 143:15; 171:23;
177:9, 17
**against** 6:23; 116:19;
117:4, 23, 25; 118:6;
120:23; 121:6, 11, 16;
122:4, 8; 124:14, 15;
125:2, 17; 131:18; 132:11;
133:3, 24; 134:2, 9; 147:22
**age** 47:18; 51:23; 60:14;
65:10, 11, 14, 16, 19, 21;
66:10, 17; 85:18; 87:1;
96:15; 103:22; 106:14;
116:13, 20; 117:5, 23;

118:1, 7; 120:23; 121:7,
11, 16; 122:4, 8; 124:15;
125:3, 18; 131:18; 132:10;
133:3, 13, 24; 134:2
**agencies** 151:19
**agency** 109:20; 138:13
**aggressive** 97:15; 118:3
**ago** 47:8, 9; 91:3; 104:23;
118:9; 119:6; 126:3; 137:7
**agree** 107:17; 126:12;
127:3, 13; 131:6; 159:13;
161:21, 23; 162:5
**agreed** 115:10
**agreeing** 115:24
**ahead** 124:6
**alleges** 130:3
**allow** 128:11, 24
**allowed** 125:12
**almost** 95:11
**along** 43:20; 82:13;
142:8; 153:18, 24
**altruistic** 161:12; 162:13
**alumni** 23:4
**always** 121:20; 122:6;
135:17; 153:14; 178:18
**ambiguous** 112:20
**amended** 137:10, 25
**American** 22:23; 135:15
**amortization** 175:11
**analysis** 173:16
**anniversary** 95:12;
113:12, 15; 114:8, 13
**announce** 63:12
**announced** 56:24; 98:23
**annual** 46:5
**answered** 69:2; 113:13;
127:16; 129:5, 9; 133:5
**Anthony** 6:7
**anticipating** 37:22;
112:18
**apologize** 105:14
**appeared** 121:21
**appears** 45:6; 60:25;
107:10; 156:12
**applicable** 160:4
**applied** 109:25
**apply** 125:10, 13
**approximate** 12:2;
13:13; 18:18; 60:14;
73:19; 80:5
**approximately** 12:23;
24:20, 23; 28:18; 29:24;
42:19, 23; 43:12; 60:16;
66:9; 76:25; 84:8
**area** 20:16; 21:11; 52:6;
62:13; 67:6
**areas** 32:3; 64:20
**around** 6:13; 14:1; 20:15;
21:11; 23:20; 24:10; 37:1;
46:25; 62:13; 66:2; 67:5;
84:11; 105:21, 23; 110:16,
18; 117:12; 146:21; 147:4;
154:8
**arrangement** 41:21, 22

**artfully** 162:8
**article** 123:14
**arts** 15:7
**ashamed** 108:23
**aside** 91:25; 179:2
**aspect** 161:3, 4
**aspects** 77:9, 10
**assess** 55:3; 77:15; 81:7;
119:5
**assessment** 78:4; 81:22;
83:4; 131:19
**assessments** 27:25;
77:23; 78:1; 81:18
**assigned** 150:7
**assist** 8:22
**assistant** 48:19; 102:4
**assisted** 38:14
**assisting** 106:12
**associate** 40:13, 16
**Association** 22:9, 23
**assume** 77:19
**assuming** 99:1
**assurance** 58:8, 9
**attach** 18:18
**attempt** 68:8
**attend** 11:12, 15
**attended** 12:3; 13:9; 66:7
**attending** 12:16
**attention** 116:6
**attitude** 66:1, 12, 15;
82:2; 117:13, 17; 132:16
**attorney** 6:20; 29:1;
141:25; 143:1; 144:5;
152:7; 154:1, 12; 173:9, 18
**attorney's** 142:23
**attributes** 34:8
**audibly** 7:14
**audio-visual** 64:18
**August** 11:2; 12:11;
13:11
**auto** 137:15
**available** 9:20; 30:12;
163:8
**Aventura** 51:15, 16;
53:20; 54:13
**avoid** 67:8
**away** 39:18; 40:7, 11;
62:20, 23

**B**

**B** 5:21; 10:14; 170:25
**bachelor's** 20:5
**back** 13:9; 14:23; 19:6;
67:21; 73:19; 78:16; 80:5;
81:12; 90:7; 95:17; 97:19;
98:8; 112:19; 115:1;
123:12; 126:21; 129:8, 10;
131:15; 139:23; 141:9;
160:9; 169:11, 12; 175:24
**background** 19:10;
33:16; 109:8; 159:17, 20;
160:23; 163:23

**bad** 57:17; 62:4, 22;
63:22; 167:20, 23
**Baron** 52:10, 11, 16, 19;
53:21
**Baron's** 96:9
**Barry** 177:1
**base** 120:21; 125:1, 16;
134:1
**based** 59:3, 7; 63:14;
68:9, 18; 77:21; 82:9;
114:3, 10; 115:5; 120:11,
14; 163:22
**bases** 132:9
**basis** 9:5; 11:13; 12:9, 20;
23:22; 24:12; 25:2; 46:11;
51:5; 64:10; 66:23, 23;
67:4; 76:16; 117:3, 22;
119:20, 24; 121:15;
124:13; 130:8; 148:8
**Bates** 45:17; 157:11;
164:21; 165:3
**Beach** 26:23; 42:12
**Beachside** 6:20, 25;
13:4, 12; 14:2, 20
**beauty** 18:8, 21
**became** 9:19; 18:11, 14,
20, 23; 28:15; 29:25; 31:1;
49:5; 50:18; 76:3; 90:15,
24; 95:15; 105:9; 158:5;
166:21
**become** 48:23; 49:22;
90:3; 157:25; 165:13;
167:25; 175:22
**becomes** 7:12
**bed** 48:8
**beds** 27:1, 2, 4; 42:24
**began** 9:13; 11:1; 14:2,
13, 18, 19; 15:16; 17:6, 10,
13; 18:4; 25:21; 27:9;
56:15; 76:4
**begin** 4:9; 8:14; 16:2;
23:21
**begun** 36:24
**belief** 117:22, 24; 120:22;
124:14; 125:2, 17; 134:1;
148:8
**believing** 117:3; 121:15;
132:10
**BellSouth** 178:6
**belong** 22:4, 9, 10
**belonged** 22:5
**below** 148:1
**benefit** 39:22; 114:16, 17;
115:4
**benefits** 9:16; 79:23;
80:2; 98:2, 4; 107:22;
135:17
**Bercaw** 10:14; 176:24
**best** 7:23; 47:22; 101:25;
135:6
**bet** 122:17
**better** 59:2, 4, 12, 20;
60:19; 124:19; 131:22
**Bible** 11:6, 9; 12:3, 16;
13:10; 14:24; 20:8, 24

**big** 112:15, 16; 125:5;
168:8
**bigger** 42:15
**birth** 5:7
**bit** 7:5; 37:2; 42:9; 45:20;
155:3, 6
**blatant** 128:18
**blood** 30:9
**board** 46:6; 69:23, 24;
70:1, 9; 160:20
**Boca** 4:12
**bold** 110:24
**bond** 79:6
**bonus** 14:8
**bonuses** 148:11, 11
**born** 19:22
**Borrego** 5:19, 22; 6:1
**boss** 30:13, 14; 50:24;
52:3; 57:4; 93:13
**bosses** 59:1
**both** 7:5; 32:14, 17;
36:23; 37:24; 40:19;
81:19, 23; 99:4; 129:21,
25; 130:1; 151:18, 19
**bother** 142:2
**bottom** 45:17; 134:22;
157:12; 158:10
**bought** 48:7; 178:5
**Boulevard** 10:17; 26:23
**boyfriend** 4:25
**boyfriend's** 106:12
**brain** 160:1
**break** 50:17; 83:10, 11,
16; 100:7
**breakfast** 48:8
**breaks** 23:18
**breasts** 60:5, 9
**brief** 18:2; 19:9; 25:16;
152:20
**briefly** 177:1
**bring** 13:4; 168:10
**brings** 19:6
**broad** 65:20
**brochures** 160:21, 22
**broke** 168:21
**brought** 9:23; 25:9;
47:18; 111:14; 121:18
**Broward** 10:17; 20:10,
14; 23:5; 25:7, 22; 26:21;
27:10; 28:10; 30:17; 31:7,
10, 25; 32:11; 33:17;
34:22; 36:4, 10; 37:8, 21;
38:5, 10, 11, 17, 20; 39:1,
4, 9; 40:17, 23, 25; 42:1,
17; 69:5; 72:10, 15, 19, 24;
73:16; 74:1; 80:6, 20, 24;
81:13; 82:6, 21, 22
**Brown** 177:1
**brunches** 168:4
**budget** 148:10
**build** 79:8
**building** 34:16; 76:20, 21
**bullet** 42:9

**bulletin** 125:4
**burgundy** 167:10, 10
**burnt** 163:18, 19
**business** 8:11; 13:19;
64:20; 175:21; 176:18;
178:16
**businesses** 108:16

**C**

**C** 4:1; 10:14
**cafeteria** 77:1
**Calhoun** 137:15
**call** 95:9; 150:20; 160:17
**called** 22:12; 23:4; 30:19;
85:5; 92:12, 13; 95:15;
97:24; 100:17; 101:4;
106:5; 112:19; 130:16;
131:4, 4; 141:23; 142:14;
151:10; 160:16
**calling** 108:15; 136:13;
141:20; 151:13, 18;
161:11; 162:13
**came** 18:8; 40:21; 51:15;
52:3; 56:23; 61:13; 65:24;
82:22; 83:7; 85:7; 88:18;
117:6; 121:18; 136:11;
146:7, 25; 174:11, 19
**campaign** 68:6, 9
**campaigns** 34:19, 20
**Campbell** 40:14
**can** 4:9; 5:20; 7:25; 10:15,
25; 12:10; 16:14, 16; 18:2,
18; 19:9; 22:19; 26:20;
32:4; 37:3; 42:10; 44:2, 20;
45:16; 47:22; 50:21; 62:7;
64:2, 4, 6, 8; 65:20; 69:3;
83:10; 90:6; 93:5, 21;
100:7; 101:25; 107:8;
109:11; 114:6; 120:7;
122:16, 24; 123:1; 126:17;
128:20, 20; 129:8; 131:6;
133:4; 138:19; 141:25;
143:25; 145:18; 147:15,
16; 151:25; 154:6; 157:8,
12; 159:7; 161:21; 164:20;
166:5, 6; 170:17; 171:9;
176:3, 21; 177:19
**capacity** 175:18
**Cape** 48:4
**caption** 45:18
**car** 18:11, 14; 50:11;
165:14, 17, 17, 18, 21, 24,
25; 166:1, 2; 167:10; 169:2
**card** 168:17; 169:15
**cards** 168:20
**care** 26:24, 25; 106:13;
159:22; 174:15, 20
**career** 159:23; 160:8;
161:1; 162:11; 168:4
**Carol** 87:16; 88:20;
89:16; 118:14
**cars** 163:13; 167:11
**case** 106:6; 115:5; 141:8,
21; 143:5; 150:7, 21;
151:8; 152:7; 153:24;

177:9

**Cash** 141:5; 142:15; 143:9; 144:17, 21, 22; 150:5, 8

**Cathy** 115:1

**caused** 25:11; 141:16

**caveat** 25:9

**cease** 154:3

**ceased** 78:24

**census** 37:17, 18; 38:6; 63:4; 68:10, 12, 16, 21, 24; 69:8; 79:8, 14, 15

**Center** 23:15, 17, 25; 24:7; 160:13

**CEO** 30:21, 22; 43:8; 62:4; 76:5

**certain** 30:10; 81:9; 136:20; 165:15, 23; 167:4, 5

**Certainly** 49:24; 53:3; 56:25; 119:11; 148:6; 161:19

**certified** 136:3

**chamber** 22:25; 33:22, 24; 108:16; 123:6

**ChamberChips** 122:24; 123:5, 17; 124:7

**chambers** 23:2

**chance** 94:20; 133:8; 143:24; 146:1; 170:3

**change** 31:17; 135:20; 159:14; 161:1; 178:10

**changeable** 68:19

**changed** 28:13; 29:19; 41:11, 24; 73:6; 76:3, 7

**changes** 135:14

**charge** 70:21; 134:17; 135:23; 136:9, 9, 12, 19, 23; 137:8, 25; 139:1; 149:9; 153:25

**charges** 138:4, 9, 14

**Charleston** 20:2, 3; 23:12

**charts** 27:24

**chat** 57:24; 122:6

**chatting** 57:25; 58:15; 121:20, 20; 124:17; 131:21

**check** 170:17, 19; 171:2; 172:19

**cheerleaders** 121:18

**Cheryl** 104:3, 5, 6, 8

**chief** 30:16; 75:8; 86:8, 12, 22; 87:3, 24

**children** 6:18

**choice** 162:9

**choose** 79:7

**chose** 124:21

**Christian** 15:7; 22:24; 162:4, 9

**chronological** 15:13

**chronology** 15:6

**Church** 8:8; 10:16

**churches** 13:3

**Cindy** 73:18

**circulating** 157:3

**circumstances** 46:22; 78:23; 100:15; 150:18

**citizens** 78:4; 79:5, 11, 18

**City** 24:9, 11; 25:13

**claim** 26:8; 47:18; 116:11; 152:13; 173:13; 176:7; 178:1

**claiming** 173:21

**clarify** 129:23

**class** 136:3; 152:5

**classes** 11:16

**classroom** 11:24

**Claudia** 41:6, 17, 23; 42:4; 70:25; 71:7; 88:21; 89:15; 103:24; 104:14; 118:13

**clear** 55:7; 128:14

**clerical** 24:19

**client** 174:13, 19

**clients** 28:1; 69:7

**clinic** 158:20

**close** 63:7, 11, 15; 120:9; 132:17, 22; 147:4, 5, 23

**closed** 31:8; 39:1; 40:24; 62:10; 63:19; 69:6; 82:21, 25; 125:6, 8, 21; 126:5, 8, 13, 24; 127:1; 132:1

**closing** 31:12, 13; 37:8, 11; 63:13; 92:19, 23, 24; 96:1; 112:14; 128:7, 12; 130:14; 163:6

**clothing** 167:5

**Cod** 48:4

**collection** 164:12

**College** 11:6, 9; 12:3, 17; 13:10; 14:24; 19:24, 25; 20:8, 10, 24; 23:11, 19, 22; 24:1

**Columbia** 65:24; 83:7; 84:5, 9, 18, 22; 85:7, 16; 86:10, 21; 87:5, 17, 25; 88:13; 89:18, 24; 90:3, 15, 19, 24; 111:7, 9, 14, 15, 16; 117:6; 135:12, 18, 19; 146:8, 24; 150:23

**Columbia's** 87:14; 91:7, 12; 117:16

**column** 110:20; 172:1

**combine** 98:14; 129:17

**combined** 98:21; 99:10; 102:9; 125:8; 128:5; 131:13; 156:10; 160:22

**combining** 128:9, 13; 138:25

**comfort** 176:19

**comfortable** 7:24

**coming** 155:9

**commence** 88:15

**commencing** 141:12

**comment** 53:10, 13; 54:9, 23; 55:18; 66:17; 165:7

**commented** 53:19; 96:8

**comments** 51:3; 53:8, 15, 24; 54:11, 14; 65:10, 13, 21, 21; 66:10, 20; 96:7; 117:10; 132:12, 23; 133:1

**commerce** 22:25; 23:3; 33:23, 24; 108:16; 123:7

**commission** 14:8, 9; 58:7; 134:18; 135:25; 136:8; 137:4, 19; 138:1, 10; 139:17; 141:2, 6, 11, 12, 17; 144:4, 6; 145:4; 149:4, 17, 25; 151:14

**commit** 6:15

**committee** 44:6

**communicate** 141:16

**communicated** 139:23

**communicating** 58:22

**communication** 57:2, 10, 25; 58:15; 150:23

**communications** 99:2

**community** 8:20; 20:10, 14; 33:18; 34:7; 65:1; 69:23; 70:1, 9; 71:11; 79:18; 108:14; 175:14

**company** 6:24; 9:21; 13:21; 24:16, 18; 93:12; 111:10, 17; 146:7; 168:16, 21; 169:11, 12

**compare** 162:16

**compensated** 113:11

**compensation** 14:6; 36:23, 24; 74:1; 94:6, 10

**competent** 62:4; 82:1

**competing** 38:1

**complacent** 65:25; 66:1; 132:16, 18

**complain** 41:16; 61:15

**complained** 41:18; 42:3

**complaint** 26:9; 130:3; 137:10; 139:18; 141:13

**completed** 14:25; 23:9, 22

**Composite** 156:1, 4

**compound** 156:8

**comprise** 172:20

**concern** 42:7; 47:17

**Concerning** 6:23

**conclude** 54:1, 15

**concluded** 56:15; 63:14; 179:12

**conclusion** 147:12

**conditions** 138:19

**condominium** 4:16

**conduct** 130:4; 133:11; 139:2

**confer** 77:7

**conference** 176:17

**confirming** 150:22

**confront** 41:25

**confusing** 128:17

**confusion** 112:11, 16

**connection** 26:10, 10; 31:12; 38:9; 46:14; 53:21; 61:21; 64:5; 98:13; 110:9;

111:6; 134:3

**connections** 34:5; 163:24

**Connie** 102:23; 105:20; 118:15

**consequently** 7:4

**consist** 173:13

**consistent** 29:24

**consists** 156:2; 157:10; 159:6

**consolidated** 101:10; 125:22; 126:9; 131:7

**consultant** 18:8, 21; 155:13

**consultants** 168:10

**contact** 108:19, 21; 151:16

**contacted** 136:17

**contacts** 33:16; 34:4, 6

**contest** 100:5

**continue** 31:2; 48:25; 98:3

**continued** 167:8; 174:21, 24

**continuously** 9:7

**Convent** 19:18

**conversation** 48:1; 98:5; 107:4, 7

**conversations** 80:13; 139:25; 151:19

**converse** 107:6

**conversely** 7:10

**conveyed** 78:18

**copies** 156:5; 171:12

**copy** 22:14; 99:16; 124:7; 140:10, 13; 150:19; 179:8

**Corliss** 86:19; 97:10, 14; 116:25; 117:4, 22, 25; 118:4, 5; 120:22; 121:5, 14; 133:21

**corporate** 32:2, 2, 6; 37:19, 20; 38:4; 62:15; 79:1; 89:8; 111:6

**corporation** 46:24; 111:8; 135:15

**corporations** 163:7

**correctly** 110:12

**Corvette** 165:19

**Cosmetics** 16:1, 3, 11, 23; 17:10, 18; 19:3; 155:11

**counsel** 47:25; 135:2; 152:20; 154:16; 161:5; 177:15

**Counseling** 8:8, 12, 12, 13, 15, 24; 9:11; 10:3, 12, 16; 11:11; 15:8, 10; 21:19, 20, 21; 159:11, 15, 18, 25, 25; 160:10, 13, 18, 23; 161:7, 10; 162:4, 10; 164:2; 176:21

**counselor** 8:19; 159:10; 160:16; 161:10; 162:9; 176:25

**counselors** 10:2; 22:24; 176:6, 23, 24

**couple** 25:4; 27:1; 36:9; 63:2; 123:12; 154:9

**course** 11:12; 14:25; 117:14; 124:20

**courses** 20:10, 14, 17

**court** 7:2

**cover** 45:8; 80:6; 95:6, 9, 15; 107:17

**coverage** 107:11; 115:25

**covered** 72:24; 74:4; 80:16, 19, 24; 107:23

**coworkers** 67:19; 101:22

**create** 125:11

**created** 79:1; 178:14

**creating** 125:11

**credentials** 159:24; 160:9

**credit** 168:17, 20; 169:15

**crooked** 128:23

**crying** 93:16

**current** 159:22, 23; 160:11, 25; 161:9; 174:4

**currently** 8:5; 154:17

**cut** 45:19; 66:18; 132:22

## D

**D** 4:1; 5:21

**daily** 64:9; 66:23; 67:1, 4; 68:15; 76:15

**damage** 178:1

**damaged** 175:2, 5

**damages** 152:18; 173:14, 20; 176:7; 177:6

**date** 5:7; 29:22; 36:7, 19, 24; 40:22; 72:8; 74:16; 95:12; 113:12, 16; 114:3, 8, 9, 12, 13, 15, 16, 17, 18; 115:7; 123:16; 140:14; 144:16; 166:14

**dated** 49:15; 99:24; 111:25; 112:25; 137:3; 139:11; 140:5; 149:3, 16; 150:14; 151:3; 153:3; 154:23

**dates** 145:9

**David** 87:22

**Davie** 4:25; 156:15

**day** 55:18; 66:24; 92:16

**days** 11:23, 24; 63:2, 3; 178:19

**dead** 160:1

**deal** 77:3; 82:20

**dealing** 52:12; 78:3

**dealings** 82:14

**debt** 168:20; 169:16

**debut** 168:9

**December** 18:24; 44:23

**decided** 98:14

**decipher** 142:24

**decision** 37:20, 21; 38:4; 62:14, 15; 63:7, 8, 10, 14; 97:4, 9, 11; 130:9

**decisionmaking** 62:22; 97:17

**decisions** 57:17; 62:4, 16; 63:21, 22; 89:8; 133:13

**decreasing** 68:16, 24

**defendant** 98:14

**Defendant's** 28:21; 35:21; 39:25; 44:14; 49:8; 61:2; 69:14; 94:14; 99:11, 20; 106:17; 110:3; 111:19; 112:22; 115:13; 116:2; 124:8, 9; 134:12, 16; 136:24; 137:20; 139:6, 10; 140:1, 5, 21, 25; 143:17; 148:22; 149:12; 150:9, 24; 151:20, 24; 152:24; 154:19; 155:17; 156:1; 164:9; 165:5; 169:25; 172:7; 173:1

**degree** 11:10; 15:4; 20:4, 7, 17, 23; 23:11; 157:15; 159:24; 160:8; 162:4; 164:1

**DEL** 4:8; 8:3; 11:22; 14:16, 17; 15:21, 22; 16:13, 19; 18:1; 19:16; 22:22; 23:1; 24:25; 28:23; 29:9, 11, 13; 33:1; 35:23; 40:2, 5; 44:17; 45:9, 12; 49:10; 50:12, 16; 61:4; 64:13; 69:9, 17; 74:18; 75:21; 78:10, 16, 20; 79:22; 83:11, 15, 18; 84:3; 90:10; 94:16; 99:13, 22; 100:9, 12; 104:7; 106:19; 110:5; 111:21; 112:24; 113:14; 115:15; 116:4; 118:23; 122:20; 123:1, 8, 24; 124:6, 11; 126:20; 127:2, 20; 129:1, 6, 13; 130:2; 131:14; 132:8; 134:14; 137:1, 22; 139:8; 140:3, 23; 142:4, 20, 21; 143:19; 145:8; 146:13, 15; 148:24; 149:14; 150:11; 151:1, 22; 153:1; 154:21; 155:19, 23, 25; 156:8, 12, 19; 158:8; 160:5, 24; 161:17; 162:1, 18, 19; 164:3, 11, 19, 23; 165:9; 169:20; 170:2, 22; 171:3, 8, 13; 172:9, 19; 173:3; 176:2; 177:16, 20, 23, 24; 179:3, 6, 9

**demanding** 57:14

**dental** 107:10, 10, 15, 18, 23; 175:8

**department** 23:14; 28:6; 35:3; 54:24; 71:15, 16, 17; 72:12; 92:20, 25; 96:2, 3, 4, 5, 8, 8, 10, 12; 112:14, 15; 125:6, 7, 21, 22; 126:5, 8, 9, 10, 13, 14, 23, 24, 25; 127:1; 128:8, 9, 10; 130:14, 15; 132:1; 134:11

**departments** 125:9; 131:12; 138:25

**deposition** 28:24; 29:5; 36:1; 39:24; 44:11; 60:25; 130:18; 153:8; 134:5; 169:22; 179:11

**derogatory** 56:1

**describe** 42:10; 43:18; 50:5, 21

**descriptions** 45:22

**desperate** 176:1

**details** 142:16

**determination** 154:23

**determine** 114:18

**determined** 164:1

**devote** 16:9, 21

**diagnosis** 158:20

**diagnostic** 158:19

**died** 42:7

**difference** 135:15

**different** 17:20, 21; 18:3; 27:6; 34:14; 64:19; 108:16; 115:2; 120:21; 121:5; 128:5, 8; 131:17; 138:18; 161:15; 163:7

**differently** 57:19; 58:2, 13, 19

**difficult** 7:12

**diploma** 15:4; 20:18

**DIRECT** 4:7; 116:6

**direction** 57:5

**directly** 96:19; 120:3, 4; 122:2

**director** 10:11; 18:15, 24; 27:12, 14, 22; 28:9, 15; 29:19, 20, 25; 30:9, 12, 18, 23; 31:1, 6; 32:8, 12, 16; 33:2; 34:9; 40:13, 17, 19; 41:6, 19; 51:9; 58:3, 9; 64:7, 15; 71:1, 3, 5, 11, 19, 20, 23; 72:2, 11, 25; 73:10, 15, 23, 24; 74:3, 4, 21, 25; 75:17, 18, 23, 25; 76:2, 4; 77:3, 5, 22; 80:7; 81:4, 5; 85:17, 24; 87:13; 98:15, 25; 99:4, 7, 7; 101:11, 12; 102:6; 103:25; 104:4, 8; 105:11; 117:9; 127:1, 6, 7, 9, 11, 22, 24; 129:11; 130:12, 17, 25; 131:4; 147:22; 148:12, 13; 158:1, 6, 13; 161:21; 166:16, 21, 24; 167:1, 2, 7, 9; 168:1, 8

**directors** 52:24; 57:20; 58:1, 13, 19; 59:4, 11, 14, 14, 21, 22; 60:20; 69:24; 81:19; 111:13; 167:13

**directorship** 166:7; 169:2, 6

**disability** 105:4, 9

**disabled** 105:6, 8

**disbelief** 92:18

**discharge** 24:2; 27:25; 33:18

**discipline** 61:24

**discriminated** 116:19; 117:4, 22, 25; 118:6; 120:22; 121:6, 11, 15; 122:4, 8; 124:15; 125:7, 17; 133:24; 134:2, 9

**discriminating** 125:2

**discrimination** 26:9; 47:18; 103:23; 104:16; 131:18; 132:11; 133:3, 13; 134:17; 135:24; 136:9; 137:25; 138:9; 149:10

**discriminatory** 139:3

**discuss** 47:1; 77:7; 91:2

**discussed** 47:23; 146:3

**discussing** 62:3

**discussion** 42:7; 47:16, 17; 50:13; 106:3; 114:25; 172:25

**disk** 179:8, 9

**disloyalty** 57:2

**dismissive** 55:24

**display** 160:20

**disruption** 178:14

**dissolved** 6:1, 12

**distance** 67:5

**distinction** 125:20; 126:7, 11

**district** 174:9, 10

**division** 79:12; 85:2, 3, 5, 6

**divorced** 161:6

**divorces** 26:14, 14

**doctor's** 25:4, 17

**document** 29:3, 14, 17, 23; 35:24; 36:2; 41:24; 44:13; 49:11; 61:13; 69:10; 99:14; 106:20; 110:6; 111:22; 122:21, 23; 134:15; 135:1; 139:9; 140:4; 148:25; 149:6; 151:25; 152:2; 154:25; 155:20; 158:3; 165:2, 8; 173:5, 12

**documentation** 143:8

**documents** 28:25; 130:19, 20; 131:9; 142:10; 143:12; 156:3; 164:12; 165:3, 11; 172:20

**dog** 162:24, 25; 163:2; 164:14

**Dolphin** 121:18

**done** 41:1; 46:7; 61:6, 9; 131:2; 138:7; 159:9

**Dorothy** 88:21; 118:14

**double** 110:17, 19; 171:2

**down** 7:3, 13; 25:9; 37:21; 38:5, 10, 16; 39:8; 45:19; 62:20, 24; 69:8; 82:25; 92:14, 19, 24; 96:1, 2; 109:23; 112:14; 125:6, 8, 21; 126:5, 8, 13, 24; 127:1; 128:7, 13, 23; 130:14; 132:1; 147:21; 155:23, 24; 176:14; 178:13

**downsize** 147:23; 165:20

**draft** 137:9

**draw** 125:20; 126:6

**drive** 79:14

**drives** 30:10

**drug** 24:3

**dual** 158:19, 19

**duly** 4:5

**during** 12:2; 13:13; 23:18; 28:24; 54:25; 68:14, 21, 22, 25; 70:10; 73:7; 74:2; 90:3, 13, 21, 24; 108:5; 113:19; 147:6; 162:2

**duties** 82:1; 129:17

**duty** 73:9

# E

**E** 4:1, 1; 5:21; 10:14

**earlier** 17:5; 37:3; 39:3; 53:5; 56:13; 60:18; 62:2; 67:22; 75:17, 22; 80:4; 81:2; 82:5; 91:16; 96:7, 23, 25; 108:1; 119:20; 120:16; 128:6; 129:21; 132:15; 173:9

**earn** 14:10

**earned** 173:23

**earning** 175:18

**easier** 5:7

**Ed** 41:18; 43:7; 75:7; 80:9

**education** 20:6, 20; 23:10

**educational** 13:5; 19:10

**Edwards** 149:17; 150:15

**EEOC** 138:10, 12; 139:19; 141:14; 151:16; 154:23

**effective** 29:22; 79:6

**effectiveness** 55:3

**effects** 97:20

**efforts** 16:10, 10, 22; 68:4; 108:4; 154:13; 155:4; 160:14

**Eight** 94:12

**eighties** 21:12

**either** 13:8; 22:22; 31:9; 39:8; 91:24; 104:21; 138:9; 174:25

**elaborate** 50:24; 92:15

**elaborated** 132:2, 4

**eligible** 114:14; 167:11

**eliminate** 97:4, 11; 121:25; 130:9

**eliminated** 16:20; 49:2; 88:4; 101:23; 102:2; 107:21; 116:12; 127:4; 131:7; 156:21; 162:3

**eliminating** 95:24; 96:14

**else** 56:7; 58:1, 18; 63:25; 71:24; 93:25; 94:3; 95:3, 19, 20; 102:19; 103:7, 17; 104:2, 11; 116:24; 117:1; 125:19; 137:16; 147:5, 11

**else's** 145:14

**embarrassed** 108:23

**emergency** 68:6, 7, 9

**emotional** 176:7; 178:13

**emotionally** 178:15

**employed** 12:6; 25:6; 155:14

**employee** 31:24; 43:11; 44:5, 8, 21; 48:12; 54:22; 89:18, 21; 90:2, 3, 15, 15, 24, 25; 103:11; 105:6; 113:10; 127:4

**employees** 9:25; 27:3, 5; 38:11; 39:4; 41:3; 67:19; 71:12; 89:4, 9; 91:14, 17, 19; 97:6; 113:22; 119:7; 174:17

**employer** 52:7; 110:20

**employment** 8:4; 9:17; 10:20; 12:2; 13:14; 14:21; 15:17, 25; 16:8, 10, 20, 22; 19:4; 23:9, 13; 31:18; 41:1; 47:14; 74:13; 96:14; 97:12; 103:8; 108:6; 110:9; 112:6; 113:15; 114:1; 123:20, 21; 124:3; 127:15, 21; 129:3; 130:5, 9; 131:7; 134:3; 138:19; 153:20; 154:12; 155:5; 158:22; 173:24; 174:18

**enclosed** 137:9; 153:20, 21

**end** 7:12; 64:16, 16; 131:3; 149:24; 155:21; 157:20; 168:18; 169:8

**ended** 38:25; 39:10, 11; 97:18; 114:2; 138:25

**endurance** 100:4

**engineering** 105:11

**enjoy** 163:23, 23, 24

**enjoyed** 43:23; 59:2

**enough** 7:24; 56:10; 142:12; 145:17

**enrolled** 14:11

**ensuing** 162:2

**entire** 170:11, 13, 16

**entitled** 98:2; 113:11, 24

**entrances** 67:7

**entryway** 67:9

**envelope** 94:8; 136:5

**Epes** 40:14; 41:8, 24, 25

**essentially** 37:25; 71:14; 169:9

**evaluate** 67:24; 119:5

**evaluated** 44:7; 61:17; 68:3

**evaluation** 44:8, 21, 22; 45:1, 14, 15; 46:2, 5, 6, 10, 14, 16; 60:22; 61:1, 6, 12, 16, 21; 131:2

**evaluations** 77:18

**even** 7:8; 46:10; 67:15; 108:23; 109:17

**event** 34:22; 55:20; 171:10

**events** 30:10; 65:11; 167:5

**eventually** 162:12

**everybody** 33:15; 142:7

**everyone** 7:3; 38:19

evident 117:16
ex-husband 175:24
exact 21:13; 22:13
exactly 9:24; 53:1; 58:6; 70:4; 73:4; 136:20; 149:23; 175:1
EXAMINATION 4:7
examined 4:6
excellent 33:11
excerpt 61:1
exciting 168:11
exclusive 16:22
exclusively 16:10
excuse 19:12; 21:11; 50:7; 59:25; 78:8; 103:5; 106:10; 160:1
excused 179:10
execs 146:25
executive 30:18; 41:19; 75:8; 87:24
executives 117:7
exhaust 133:9
exhausted 120:20, 24; 121:1, 4; 131:16
Exhibit 28:21; 29:4; 35:21, 25; 39:24, 25; 44:11, 14; 49:8, 12; 60:25; 61:2; 69:11, 14; 94:14, 18; 99:11, 15, 20, 24; 100:14; 106:17, 21; 110:3, 7; 111:19, 23; 112:22; 113:1; 115:13, 17; 116:2, 6; 124:8, 9; 134:12, 16; 136:24; 137:2, 20, 24; 138:5, 7; 139:6, 10; 140:1, 5, 21, 25; 141:9; 142:19; 143:17, 21; 144:17; 145:19; 148:22; 149:1, 12, 15; 150:9, 13, 24; 151:3, 20, 24; 152:24; 153:3; 154:19, 23; 155:17; 156:2; 157:11; 160:20; 164:9, 13; 165:1, 5, 12; 169:4, 22, 25; 172:7, 11; 173:1, 6
exhibits 160:19
expenses 79:25; 168:3, 6, 7
experience 31:21, 22, 24; 101:18, 18, 19; 122:10; 124:19, 19; 131:22; 174:2
experiences 52:12
expired 110:16, 18
explain 37:3; 40:9; 54:18; 62:7; 107:8; 108:23; 165:11
explained 6:20; 55:11
explaining 64:9
explanation 55:14; 95:24; 137:13
express 54:18; 63:17
expressed 54:13; 55:8
extent 48:1; 71:5; 77:2; 161:9; 162:8, 12
Ezzo 135:2; 136:1; 143:2; 154:1

Ezzo's 142:23; 144:24

F

face 110:24; 117:11; 146:23; 147:3
facilities 42:20
facility 11:5; 26:25; 27:6; 42:2, 15, 18; 46:23; 64:22
fact 31:13; 56:19; 68:20, 23; 77:21; 90:22; 101:23; 102:1; 103:21; 104:15; 125:7, 8; 136:21; 137:14; 139:23; 162:10; 163:6; 164:6, 14, 25
facts 117:24; 120:21, 24, 25; 125:1; 131:17; 133:25
Fair 7:24; 14:12; 38:24; 39:7; 43:22, 23; 46:3, 10; 58:23; 59:3, 9; 61:13; 74:8, 10, 14; 79:11; 107:24; 109:13; 112:3; 124:3; 145:17; 146:19; 173:21
fairly 61:18
fake 167:17
fall 75:5
families 28:2
family 8:19; 11:11; 15:8; 25:14; 159:16; 162:9; 164:2; 175:22
far 37:16; 45:23; 129:10; 134:4; 157:8
fast 7:10
feared 90:8; 91:4, 10
February 17:14; 25:6, 21; 27:16, 18, 19; 85:3, 4; 95:11; 114:7
feel 7:22, 24; 33:9; 34:3, 8; 41:13; 43:22, 23; 46:2, 9; 50:25; 51:8, 10, 12; 53:11; 54:5; 61:12; 63:22, 25; 82:4; 120:18; 176:11, 12; 177:3, 17
feeling 176:11
felt 60:19; 61:24; 62:3; 101:9, 14; 178:22
Female 59:14, 19
few 7:4
field 176:21
fifth 45:16
figure 175:16
figures 89:6
file 61:16; 109:9; 122:23; 130:22, 25; 136:18, 22; 137:8, 13; 142:6; 143:14; 145:7, 10; 150:1, 2
filed 134:18; 138:1, 8, 11, 13; 153:25; 170:25
files 108:17; 109:9
filing 143:4
finally 131:24; 168:23; 169:3
financial 87:3
find 57:11; 108:5; 143:12; 154:11; 178:25

fine 93:15, 17; 122:9; 126:20; 142:5
finish 7:7, 10; 11:19; 78:8
finished 78:11
finishing 34:14
fired 25:24; 26:2
first 4:5; 5:17; 8:8; 10:16; 18:9; 27:10, 10; 29:1; 32:10; 37:5; 40:10; 44:25; 45:5; 72:13, 18; 82:5; 84:9; 88:18; 92:7; 98:20; 125:5; 131:19; 134:8; 136:2, 9; 138:8, 16; 144:12; 146:6, 13; 149:8; 151:7, 10; 153:25; 156:5; 157:2, 19; 165:14; 167:16; 170:6
firsthand 80:22; 90:1, 12; 131:10
Fisichella 6:7, 8, 10
five 11:18, 23, 24; 72:16; 100:10; 153:23; 169:18
fixing 178:5
flattering 55:25; 56:1
flirt 59:20, 22, 23, 24
flirted 60:1
flirting 59:23
floor 102:15
Florida 4:12; 5:3, 5; 10:18; 11:6, 9; 12:3, 16; 13:10; 14:23; 20:8, 23; 21:15; 22:5; 25:3, 9, 12, 14; 134:18; 135:24; 137:4; 138:1, 9; 141:2, 17; 144:4, 6; 149:3; 151:13
fluctuate 68:18
fluff 96:6, 8
focus 81:17
folder 142:6
follow 155:9
followed 81:25; 151:11
following 141:17
follows 4:6
fond 58:4
force 88:16; 89:5, 10; 91:18, 20; 92:8; 98:13; 102:17; 103:3; 105:16; 112:13; 119:8, 14; 138:24
forever 169:14
forgot 160:6
form 15:18; 16:12; 73:25; 74:15; 79:10, 17, 20; 90:5; 110:12; 123:23; 126:15; 131:8; 161:13; 162:16, 23
formal 20:6, 20
former 101:22
forth 115:2
forward 161:17
forwarded 135:24; 136:1
four 70:5; 119:3, 13, 15, 17
fourth 95:1
frame 12:10; 23:16; 31:5; 49:22; 72:21; 154:6; 157:12; 159:7
frames 18:18

frankly 108:22
free 7:22; 165:25; 166:1
freestanding 76:21
frequently 124:17; 131:21; 160:16
Friday 178:18
friend 12:7, 7; 120:9
Friends 70:17; 71:18, 19, 21; 72:3, 11, 15, 17, 25; 73:16, 23; 74:4; 75:17, 23; 76:10, 11; 77:5; 79:2, 24; 80:1, 7, 16, 20, 24; 81:5; 82:11, 12, 17, 22; 98:15; 99:8; 101:11, 19; 122:10; 124:20; 125:23; 126:10; 127:10, 12, 24; 129:12, 18; 131:5
friendship 48:6
front 170:10, 15, 20
fruit 62:20
fuel 83:14
full 4:10; 39:20; 46:6; 114:16; 150:1
full-time 9:5; 11:13; 23:21; 24:12; 25:2; 46:11
function 127:24
functioning 112:15
functions 130:15
fund 175:10
further 132:2, 4; 178:22; 179:4
future 173:23

G

G 4:1; 5:21
Galen 85:4, 5, 7, 16; 110:24; 111:7, 9; 178:10
gap 17:8
garage 168:19
Gardens 12:6, 20; 13:1, 4, 12; 14:3, 20
Garnett 115:1
gates 41:2; 73:18
gather 97:19
gauge 67:23
gave 94:8; 107:14; 109:9; 122:13; 130:15; 159:24; 160:8
general 25:19; 26:24, 25; 43:2; 64:11; 66:10; 103:20
gentleman 7:2, 13; 60:12; 88:6
gentleman's 5:1
girls 57:6, 7; 121:17; 122:6; 124:17; 131:20
given 39:21; 48:16; 93:11, 12; 101:7; 125:12; 127:7, 9, 14, 17; 138:18; 149:9; 173:17
giving 49:21; 133:14
glamorous 163:14
glom 79:4
glowing 178:11

goals 82:18, 20; 165:16
gobbled 163:7
god 176:19, 19
Gold 22:12; 166:12, 17; 167:13
golf 33:25
good 33:9; 50:25; 58:24; 62:18; 70:9; 83:17; 118:21, 22, 25; 119:4; 167:20; 173:4
gossip 57:2
graduate 15:2; 20:22; 159:24; 160:8
graduated 11:2; 19:11, 12, 25; 23:25; 157:16
Grand 165:13, 20; 167:10
grandmother 25:15
grant 115:10
gravy 168:1, 2
great 82:20; 163:14; 166:17, 18
green 123:11
grew 178:20
grid 173:18
grievance 61:16
group 82:24
groups 13:4
guess 40:22; 55:19; 59:25; 64:14; 95:12; 99:16; 142:15; 163:3
guessing 60:16
guests 168:10
guidelines 55:2, 5; 67:23; 68:3
Guiffre 23:15, 17, 25; 24:7

H

Hallandale 26:23, 23; 42:12
hand 29:1
handed 108:2
handle 40:16; 101:10; 178:13, 16, 17
handled 34:18; 102:5
handling 30:9; 141:7; 151:8
handwriting 49:18; 134:24; 158:2, 4
handwritten 158:9
hang 167:25
Happen 32:5; 41:9; 128:25
happened 85:13; 135:20; 137:13; 174:17
happening 84:22; 141:21; 163:4
hard 88:11
harsh 82:2
harshness 120:17
hats 130:1
hazardous 102:10

**head** 55:24; 72:12; 75:1, 17; 129:25

**heads** 66:19; 132:22

**Health** 9:19, 22, 25; 10:1; 98:3; 106:12; 109:20; 159:22; 174:15, 20; 175:8; 176:6

**Healthcare** 111:8; 158:18

**healthy** 13:22

**hear** 47:24; 55:14; 67:14, 18; 177:16

**heard** 65:13, 17; 66:11; 98:22; 99:2; 141:19, 20

**Heart** 19:19

**held** 18:3; 21:4, 8; 22:1; 27:13; 30:6; 53:7; 54:12, 16; 55:10, 16; 56:16; 127:5; 129:21, 25

**help** 22:15; 29:17; 35:2; 36:14; 49:21; 143:21; 144:21

**helped** 152:10

**helping** 13:2; 35:7

**helps** 36:3

**high** 19:11, 12; 167:6

**himself** 145:15

**hire** 72:8; 73:24; 74:17

**hired** 73:23; 147:22

**hiring** 163:5

**history** 23:9

**Hoffman** 55:17; 56:4; 88:22; 91:22; 92:2; 103:10, 13; 104:20; 105:16

**hold** 21:2; 58:5

**holds** 141:6

**home** 4:15, 17, 17; 106:11, 11; 109:19; 158:15; 175:14; 178:5

**homes** 28:1

**hopeful** 112:17, 18

**hopes** 38:6

**hoping** 98:8

**horror** 93:10

**hospital** 6:24; 16:6, 9, 21; 19:7; 21:11; 25:7; 26:4, 20, 24; 27:7, 9; 28:10; 31:7, 8, 11, 11, 13; 32:1, 17; 33:17; 34:18, 21, 23, 24; 35:1, 15; 36:4, 5, 10, 11, 20; 37:8, 11, 14, 14, 17, 18, 22, 23; 38:5, 6, 7, 10, 11, 17, 20; 39:1, 4, 9, 14; 40:13, 17, 21, 23, 25; 41:6, 19; 42:2, 11, 13, 17, 21; 43:9, 12; 45:2; 46:25; 47:6, 14; 48:13, 15; 49:23; 51:15, 16, 16; 52:4, 23; 53:20; 54:1, 13; 55:4, 20; 57:18; 62:5, 9, 13, 17; 63:4, 9, 23; 64:1, 6, 10, 16, 19, 20, 22; 65:2; 66:24, 25; 67:25; 68:12, 15; 69:1, 5, 25; 70:13, 20; 71:10; 72:6, 6, 9, 11, 15, 20; 73:11, 22;

74:2, 13; 75:3, 5, 24; 76:21; 78:24, 25; 79:5, 7, 8, 10, 13, 14, 17, 24, 25; 80:2, 6, 20, 25; 81:13, 20, 24; 82:6, 10, 17, 21, 23; 83:8; 84:4, 10, 19; 85:2, 4, 5, 11, 14, 15, 22; 86:9, 10, 22; 87:4, 9, 14, 18, 25; 88:14, 15; 89:4, 7, 24; 90:14, 18; 91:15; 96:9; 98:14; 102:1, 24; 103:11; 105:10; 107:21; 109:17; 110:24; 111:4, 7, 16, 17; 113:22; 114:21; 116:18; 117:7, 9; 118:24; 119:21; 121:19; 127:5; 129:22; 130:1, 4; 134:1, 9; 135:14; 139:2; 146:8, 23; 148:2, 9, 10, 14; 149:9; 155:6, 15; 161:21; 163:8; 173:25; 174:5, 10, 14, 18, 19; 175:4; 178:6, 9

**hospital's** 116:8; 148:18

**hospitals** 32:15, 18; 36:23; 37:15, 25; 40:16, 19; 72:16; 85:8; 111:9; 158:21; 163:5, 5

**hour** 9:12, 15; 13:8; 114:24

**hourly** 12:8, 19

**hours** 113:8, 12, 18, 23; 114:11, 14, 22

**house** 4:20; 178:17, 24

**household** 13:9

**Howard** 24:15, 17

**HR** 41:6; 71:2; 103:25

**hug** 93:9, 13

**huge** 34:22

**hugged** 93:15

**human** 61:17; 70:25; 85:17, 24; 134:18; 135:25

**Humana** 19:5; 25:6, 22; 26:3, 20; 27:7, 9; 30:17; 31:7; 32:1, 10, 11; 37:13, 15, 16; 38:13, 21, 22; 39:1, 8; 40:17; 41:19; 42:16; 72:16; 74:8; 79:4, 7; 84:22; 85:1, 6, 15; 90:2, 8, 14, 25; 135:16, 19; 146:9; 159:22; 163:1; 178:10

**hundred** 27:1

**hurting** 161:6

**husband** 5:17; 6:6

**I**

**IAIA** 4:4, 11; 17:5; 33:12; 98:12; 100:4; 111:22; 116:11; 117:21; 120:20; 121:4; 126:6; 130:3; 135:10; 136:7; 155:4; 165:2; 169:21; 173:4

**idea** 79:4; 83:17

**identification** 28:22; 29:4; 35:22, 25; 40:1; 44:15; 49:9, 12; 61:3; 69:15; 94:15; 99:12, 21;

106:15, 21; 104:7; 112:20, 23; 112:23; 115:14; 116:3; 124:10; 134:13; 136:25; 137:21; 139:7, 10; 140:2, 22; 143:18; 148:23; 149:1, 13; 150:10, 25; 151:21, 24; 152:25; 154:20; 155:18; 164:10; 165:6; 170:1; 172:8; 173:2

**identify** 44:20; 122:24; 123:1; 151:25; 156:5; 164:16; 165:11; 172:13

**ill** 51:17

**image** 117:19; 146:17, 23; 147:7, 13

**immaturity** 78:3; 81:10; 82:5

**immediate** 10:11; 43:16; 49:5

**impact** 177:13

**impaired** 105:9

**implement** 34:19

**improvement** 82:7

**inappropriate** 61:25

**Inc** 135:16

**incident** 26:5

**inclination** 70:4; 122:12

**inclined** 112:17

**include** 59:7

**included** 77:8

**income** 12:1, 15; 13:14; 14:21; 17:1, 3; 170:7; 171:14, 17, 20; 172:1, 2, 5, 16; 176:1

**incompetent** 57:15; 64:1

**Incorporated** 13:18, 25

**increase** 38:7; 39:19, 21; 40:7, 9, 15, 20; 61:20; 68:22

**increased** 36:22

**increases** 68:21

**increasing** 68:16, 25

**indeed** 126:13

**independent** 18:15, 23; 157:24, 25; 158:6, 12; 167:2

**indicated** 108:3

**indicates** 107:5

**indicating** 7:16, 16, 19, 20; 9:2; 10:7; 17:22; 52:20, 21; 55:22; 66:4; 86:1; 110:25; 132:18; 157:4

**Indirectly** 79:21; 96:21

**individual** 70:21, 24; 97:4

**individual's** 10:13

**individuals** 119:13; 133:23; 161:5

**influenced** 162:13

**information** 48:10; 68:11; 133:25; 152:16

**informed** 41:6; 125:12; 136:17; 154:10

**injured** 175:3

**injury** 72:12; 73:1, 17;

**inquiries** 151:12

**instance** 61:15; 68:5

**instances** 63:21

**instead** 62:15; 73:22

**institute** 44:3

**instituting** 43:25

**instrumental** 97:17

**insurance** 9:18, 19, 22; 79:8, 12; 85:3, 6; 95:7, 10; 98:3; 107:11, 24; 165:22; 175:8, 9

**intended** 7:18; 126:2; 139:17

**intent** 21:18

**intention** 177:5

**intentionally** 65:20

**interact** 67:17; 71:6; 77:2

**interacted** 67:12; 81:6

**interaction** 71:8; 97:13

**interim** 87:22

**interpreting** 115:2, 3

**interrogatories** 173:8

**interrogatory** 100:20

**interview** 109:19

**interviewing** 108:10

**into** 52:11; 62:9; 67:7; 68:23; 79:5; 82:23; 92:13; 117:7; 121:19; 128:4, 12, 16; 141:13; 164:21; 165:20; 167:11, 15; 168:16; 176:20; 177:4

**inventory** 168:19

**investigated** 139:19

**investigation** 139:18; 141:13

**investigator** 149:22; 150:3, 5; 151:9

**involuntary** 97:25

**involve** 27:22

**involved** 33:19, 20, 22; 77:17, 18; 84:9

**involvement** 97:11

**irritant** 52:21

**issue** 123:16; 143:11

**issues** 47:19; 104:22; 161:8

**items** 13:21

**J**

**Jack** 41:6, 17; 42:4; 70:25; 71:7; 85:19; 88:24; 103:24; 104:14

**jacket** 60:3

**jackets** 167:14

**Jackie** 49:19

**JACQUELINE** 4:4, 11

**James** 5:23; 15, 17, 24; 24:6

**JANKOWSKI** 8:2; 11:20; 14:14; 15:18; 16:12, 16; 17:23; 19:14; 22:20;

**129:25**

24:22, 29:7, 10, 12, 32:25; 45:7; 50:10; 64:12; 69:2; 74:15; 75:19; 78:8; 79:20; 83:17; 90:5; 104:5; 113:13; 122:25; 123:3, 23; 126:15; 127:16; 128:1; 129:5, 8, 20; 131:8; 132:2, 6; 142:1, 19; 146:12, 14; 155:22, 24; 156:10, 17; 157:23; 160:4; 161:13, 24; 162:15, 22; 164:18, 20; 169:17; 170:17; 171:2, 6, 11; 172:22, 23; 177:19; 179:5, 7

**January** 17:4, 8, 14; 18:5, 25; 19:1; 49:15, 24; 50:19; 150:14; 166:14, 22

**Jeff** 11:1; 176:24

**Jerry** 48:24; 51:24; 52:12; 75:12; 80:18, 23; 83:3; 86:11; 89:11; 92:12; 107:12; 112:13; 116:21

**Jim** 175:13; 177:7

**job** 16:24; 17:17; 23:24; 24:12; 25:24; 26:2; 27:10, 14, 21, 21; 33:9, 11; 34:12; 45:22; 47:6; 49:2; 55:11; 56:16; 58:6; 60:22; 61:6; 62:17; 64:5, 23; 67:21, 21; 73:6; 77:8, 11, 16, 18, 24; 80:7, 20, 24; 81:7, 18, 22; 95:25; 97:5; 101:1, 23; 102:2; 107:21; 108:15; 109:22; 118:22, 25; 119:4; 121:25; 122:9, 11; 124:22; 127:14; 131:23; 133:15; 155:4, 10; 158:16; 160:12, 25; 161:9; 174:21; 175:6; 177:12; 178:6, 23

**jobs** 17:21; 38:12, 17, 25; 109:2, 4, 14; 158:16; 159:21; 161:7; 163:8

**John** 172:20

**join** 168:12

**joined** 79:25

**joint** 58:7

**Julie** 58:3, 4, 16; 59:8

**July** 12:24; 16:4; 18:4, 21; 69:12

**June** 8:16; 9:8, 13; 10:19; 11:2; 12:11, 23; 13:11; 14:24; 37:1; 137:3

**jury** 160:5

**justify** 128:17

**justifying** 128:23

**K**

**Kay** 16:1, 2, 11, 23, 25, 25; 17:2, 9, 18; 19:3; 155:11, 13; 158:13; 162:25; 163:12, 13; 164:4, 15; 165:3, 14, 19, 20; 166:15; 167:9; 168:3, 7, 12; 169:9, 14; 175:20; 176:15, 25; 178:16

**keep** 166:7; 169:2

kiddo 92:15

kind 20:18; 55:21; 57:1; 72:21; 92:14; 142:12; 152:20; 153:18, 19

kinds 161:7; 176:15

knew 33:15, 17; 34:2; 51:23; 52:1, 3; 67:22; 80:11, 12, 23; 91:7, 17; 98:9; 108:14, 14; 119:11, 11, 13, 17; 167:23

knowledge 80:22; 88:23; 89:1; 90:1, 12, 22, 23; 91:1, 2; 111:5; 118:20; 119:2; 135:7

known 46:8

# L

labeled 110:20
labor 154:11
ladder 166:19, 19
ladies 119:12
lady 86:18
lapse 21:24
large 71:8
larger 42:18
last 40:24; 92:16; 104:3, 9, 14, 21; 105:19; 132:3, 5, 7; 133:5; 146:16; 159:5, 6; 168:25; 172:4; 173:4, 12
late 21:11; 87:12
later 22:15; 40:11; 46:7; 63:2; 64:3; 98:22; 104:10; 117:14; 131:24; 171:9
law 154:11, 12
lawsuit 6:23; 26:6, 10, 13; 47:19, 20; 98:12; 101:6; 116:11; 173:9, 21
layperson's 84:23
lead 20:17; 133:2, 12
Leadership 23:5
leading 96:3
leads 79:6; 108:15; 155:9
learn 84:18; 88:18; 92:7; 98:20; 136:8, 11
learned 84:9, 14; 88:3, 13, 14; 112:4; 123:20, 21; 134:10; 151:7; 156:21, 24
leave 2; 40:24; 93:20, 21; 97:20, 25; 98:4; 108:3; 112:5, 12
led 53:16; 54:1, 15; 147:12
left 30:7, 12; 32:16; 41:3; 46:23; 48:22; 49:5; 62:25; 63:2, 2; 75:10; 88:3; 175:1
legal 102:5, 7; 152:20
less 50:1; 55:24; 56:1; 70:7; 73:5; 115:25; 161:19
lesser 71:21
letter 93:19; 97:25; 98:6, 11; 99:23, 24; 100:1, 14; 101:3, 4, 5; 108:1; 111:24, 25; 112:4, 10, 25; 113:3; 115:7, 18, 20, 22; 124:1;

137:2, 4; 139:11, 21; 140:5, 10, 14, 15, 17, 19, 24; 141:2, 11, 11, 18; 142:17, 22; 144:16, 20, 23; 149:2, 2, 16, 18, 20, 21, 24; 150:2, 12, 13, 14, 19; 151:2, 3, 5; 152:4; 153:2, 3, 5, 9, 16; 165:12; 166:15
letting 103:18
level 38:5; 56:22; 62:15; 76:10; 78:3; 81:9; 82:4, 8; 89:8; 167:6
levels 165:15
license 21:14, 18, 24
licensed 21:9; 42:24
licenses 21:2, 5, 7; 22:1
lie 112:15; 125:5
lied 125:4; 126:4; 131:25
lieu 26:2; 122:13
life 19:23; 93:12; 94:23; 177:4
lift 117:11; 146:23; 147:4
light 135:19
likable 120:15, 18
liked 51:22; 55:15; 57:6, 6; 82:11; 118:2; 120:17; 121:17, 23; 124:16; 131:20
Linda 149:22; 150:4, 6, 7, 15, 20; 151:7; 152:4
line 114:6; 128:15; 138:17; 148:1
lines 82:13
list 133:16
little 7:5; 33:6; 37:2; 50:1; 64:8; 83:13; 97:13; 122:16; 123:11; 155:3, 6
live 4:10, 11, 20; 175:15; 178:24, 25; 179:1
lived 4:13
living 4:25; 8:8, 12, 14; 9:10; 10:3, 16; 15:10; 25:13; 156:15; 159:11; 161:10; 162:10; 178:4
LOA 114:7; 138:23
located 26:21, 22; 65:4; 76:18
locked 41:3
Lockwood 74:21, 23
lodged 26:8
logs 108:8
loneliness 176:13
long 4:13; 5:5; 24:6, 20; 43:15; 47:8, 9; 73:3; 110:14; 166:2; 174:22; 176:14
longer 26:22; 42:1
look 29:2, 14; 36:1; 49:13; 55:21; 56:2; 69:12; 106:22; 113:2; 114:5; 139:12; 140:7; 141:1, 9; 145:9; 170:3, 21
looked 16:24; 92:17; 93:10; 163:14, 14
looking 20:10; 22:25;

29:17; 34:15; 49:21; 50:8; 60:4; 98:10; 107:5; 109:2, 13; 144:19; 147:9; 152:18; 164:22; 171:25; 172:1
lose 161:7
losing 38:25; 84:14; 148:2, 5, 9
loss 39:21; 148:18; 177:12
lost 38:11, 17; 47:6, 14; 115:4; 136:8, 12, 18; 137:14; 143:14; 145:4, 7, 10, 11, 12; 153:19; 175:5, 6, 8, 8, 9, 10, 11, 11, 13, 14, 14, 15, 18, 19; 177:6; 178:1
lot 33:20; 34:2; 57:9, 24; 58:14; 62:22; 96:6; 148:6; 161:19
loud 142:18
low 37:17, 18; 63:4
loyalty 56:25; 93:11
lunch 83:16
luncheon 83:19
lunches 70:6

# M

Ma'am 4:9, 22; 5:7; 6:21; 8:4; 14:12; 19:9; 29:9; 31:17; 35:24; 38:3; 39:7; 40:6; 47:10; 49:11; 50:17; 55:7; 56:10, 15; 60:24; 62:2; 63:6; 67:21; 68:2; 75:17, 22; 81:2, 16; 90:11; 91:19; 94:17, 25; 95:18; 97:1; 100:13; 101:6; 102:22; 105:15; 107:20; 110:6; 114:5; 122:21; 124:12; 129:7; 133:7; 134:15; 139:9; 143:25; 155:20; 159:13; 162:7; 170:14; 177:25
Maas 41:18; 42:4; 43:7, 15; 44:7; 45:1; 46:2, 20; 47:13, 16, 17, 23; 48:17, 22; 49:4; 75:7, 10; 80:9, 15
mail 136:3, 3; 143:7
mailed 143:6
mailer 68:7
main 67:8
maintain 48:6; 108:8; 166:2; 168:14, 16
maintained 85:6
majority 38:13
makes 115:22; 148:10
making 62:16; 117:10; 163:24; 175:6
male 59:14, 21, 21
malicious 130:5, 10, 11
man 93:10
managed 72:12
management 85:14; 102:6, 7; 118:16; 148:14
manager 18:12, 20; 58:9;

85:21; 97:8; 102:8
managerial 141:7
managers 52:24; 56:24; 57:1; 63:12; 65:23; 66:3, 7; 67:19; 84:20; 88:22; 96:22, 25; 97:8; 98:24; 99:3; 132:13; 148:20, 21; 175:3
managing 96:11
manner 61:24
manual 115:4, 6
many 14:10; 27:2, 2; 33:25; 41:3; 42:19, 23; 52:24; 53:1; 66:7; 92:5; 139:25; 156:10, 17; 164:18
Marcella 142:25; 143:4
March 139:11; 141:10; 153:3
Maria 103:10, 11, 15; 104:25
mark 39:23; 44:10; 60:24; 69:10; 122:22; 124:7; 143:20; 149:16; 156:3, 4; 165:1; 169:22
marked 28:21; 29:4; 35:21, 25; 39:25; 44:14; 49:8; 61:2; 69:14; 94:14, 17; 99:11, 14, 20, 23; 100:14; 106:17, 21; 110:3, 7; 111:19, 23; 112:22; 113:1; 115:13, 16; 116:2, 5; 124:1; 9; 134:12; 136:24; 137:20, 23; 138:5, 6; 139:6, 10; 140:1, 4, 21, 25; 143:6, 17; 145:19; 148:22, 25; 149:12, 15; 150:9, 12, 24; 151:3, 20; 152:24; 153:3; 154:19, 22; 155:17; 164:9, 13; 165:5; 169:25; 172:7, 10; 173:1, 5
market 8:23; 13:2; 34:20, 23; 35:6, 7; 79:3
marketed 77:11
Marketers 22:11
marketing 8:22; 28:16; 29:21; 30:1; 31:1, 6, 16, 21, 22; 32:12, 14, 17; 33:3, 13, 19; 34:9, 12, 19, 19; 35:1, 2; 40:19; 51:2, 6, 9, 10, 17; 52:2; 53:12, 19; 54:2, 6, 24; 55:3; 64:7, 15; 67:25; 68:4; 71:6, 11, 17, 20, 23; 73:10; 74:3, 22, 25; 75:18, 25; 76:2, 4; 77:4, 9, 10; 79:10, 17; 81:4; 92:25; 96:2, 5; 98:25; 99:5, 7; 101:12, 18; 109:4, 14; 117:8; 122:9; 124:19; 125:21, 22; 126:7, 8, 12, 23; 127:8, 10, 12, 23; 129:11; 130:12, 17, 25; 131:4; 147:22; 148:13; 158:24; 159:4, 15; 160:11, 18, 23; 161:2, 4, 20; 162:11; 163:16, 17, 19, 23; marketing/public 53:6, 17; 54:19; 56:20; 127:6

marking 49:12; 122:25; 134:16; 151:23; 156:1
marriage 6:1, 12; 8:19; 11:11; 15:7; 164:2; 176:20
married 5:11, 13; 6:2, 10, 11, 16; 74:20
marry 5:22
Mary 16:1, 2, 11, 23, 25, 25; 17:2, 9, 18; 19:3; 155:10, 13; 158:13; 162:25; 163:12, 13; 164:4, 15; 165:3, 14, 19, 20; 166:15; 167:8; 168:3, 7, 12; 169:9, 14; 175:20; 176:15, 25; 178:16
master's 11:10; 15:7; 20:7, 23; 158:7; 162:4
matching 175:10
materials 35:1; 102:11
Mathis 149:22; 150:4, 6, 7, 15; 151:4, 8; 152:4, 11, 17; 153:4, 5, 9
matter 163:6; 164:25
may 7:18; 8:25; 12:23; 14:19; 15:14; 36:25; 37:1; 39:9; 55:15; 59:11; 91:4; 94:3; 95:20, 21; 97:16; 104:12; 109:11; 110:16, 18; 111:25; 117:4; 118:6; 120:22; 121:6; 123:2, 18; 124:23; 144:22; 154:6; 156:24
maybe 22:15; 60:16; 62:21; 72:21; 74:20; 76:22; 100:19; 112:18; 143:21; 168:2, 3; 177:10
mayors 33:20
McElrath 142:14
mean 8:21; 17:13; 26:15; 62:7, 11; 91:12; 93:2; 96:20; 132:14; 133:16; 147:7; 153:22; 164:6; 176:11; 178:2
meaning 136:22
means 55:2, 5; 68:3
meant 165:1
medal 166:12, 17
medals 167:13
media 34:17
mediation 152:5
medical 20:11; 23:15, 17, 25; 24:7; 27:23, 24; 95:7, 9; 104:4, 4, 8; 107:9, 10, 15, 17, 23; 115:25; 135:16
meet 28:1
meeting 56:24; 65:24; 66:3; 84:20; 93:23; 94:4; 95:4, 17, 19; 96:13; 97:7, 18, 23; 98:18, 24; 101:21; 132:13; 158:21
meetings 63:12; 66:8; 96:22; 97:1; 148:20, 21
Melaleuca 13:17, 17, 25; 14:4, 7, 15, 16, 18, 20; 15:14, 16, 24; 17:6, 11, 14; 163:2, 16

member 123:9

members 79:23; 82:11

memo 49:15; 69:13; 70:8; 94:18

Memorial 174:9, 9, 15, 20

memory 6:15; 22:16; 29:18, 24; 36:3, 14; 120:20, 25; 121:4; 131:16; 133:9; 139:22; 144:21

memos 69:22

men 59:21; 60:20

mental 176:6

mentally 105:9

mentioned 42:11; 46:20; 62:2; 80:4; 85:25; 91:3; 96:25; 109:25; 118:9; 120:16; 121:9, 10; 122:5; 126:3; 137:7; 143:13; 177:5, 6, 25

mentioning 143:9

mess 94:23

message 112:21

met 70:5; 72:13, 19; 82:19, 20

Miami 121:18

Michael 87:6

middle 110:19

might 7:5, 8, 16; 47:3; 66:14; 157:19; 164:24

mill 98:23

mind 23:6; 77:24; 107:6; 121:1; 125:20; 126:7; 127:13

mine 141:4

minimal 71:9

ministry 8:13

minority 167:2

minute 23:8; 50:14; 100:10; 122:18; 169:18; 177:21

mischaracterize 55:23

misplaced 137:14; 138:8

misrepresentation 128:24

misrepresentations 128:18

missed 169:5

mix 160:1

mixed 112:20

moment 44:12; 49:13; 69:11; 91:3; 106:22; 113:2; 118:9; 119:6; 126:3; 135:4; 137:7; 140:6; 147:17; 164:7, 8

money 14:10; 148:2, 5, 7, 9; 161:19; 163:21; 168:6; 169:13; 175:25

Monique 57:25; 58:15; 59:8; 72:2, 14, 17; 74:7; 75:5, 11; 81:3; 83:4; 97:16; 98:24; 99:3; 101:8; 118:2, 3; 120:6, 17; 121:20, 22, 23; 122:6; 127:7; 134:10

month 10:25; 70:11; 80:5; 89:21, 24; 90:3, 13,
19, 21, 25; 107:18; 160:17; 165:23; 168:3, 15, 25

monthly 165:21, 21

months 24:23; 25:4; 36:9, 18; 46:7, 11; 73:4, 20; 94:11; 98:1; 104:23; 107:14, 15, 22, 24; 108:4, 5; 110:17

Montiero 57:25; 58:15; 59:8; 72:2; 74:8; 75:6, 11; 81:3; 83:4; 98:24; 99:3; 101:8, 15; 120:6, 8; 124:18, 20, 22; 131:22, 24; 147:24; 174:21

Montiero's 129:3; 130:21

Moran 74:20, 21, 24; 76:1; 78:21, 24

More 5:15; 31:23; 33:7; 37:5; 48:21; 53:3; 54:7; 58:14, 21, 22; 64:8; 70:7; 73:5; 74:7, 12; 93:1; 96:4; 102:5; 124:21; 137:12; 147:14; 165:3; 176:3; 178:25

morning 172:12

most 19:23

motel 12:7; 13:3

motivated 161:10; 162:10

move 28:1; 37:22; 46:24; 153:23; 159:23; 160:8

moved 5:6; 24:11; 25:3; 31:10; 46:25; 102:14; 158:14

movement 69:7; 82:24

moving 47:3

much 37:18; 40:25; 57:5; 178:23

mustard 66:18; 132:22

myself 153:24; 163:9; 176:11, 12, 15, 22

### N

N 4:1; 5:21

name 4:10; 5:1, 17; 6:5; 10:13; 11:4; 25:5; 30:14; 40:14; 45:5; 48:9; 52:9; 73:15; 85:6; 86:4, 18; 88:6; 104:3, 9; 110:21; 135:14, 20; 141:22; 142:7, 24; 178:10

named 119:3, 15

names 108:11

Naples 87:16; 89:1

narrative 165:10

Nashville 72:15, 17; 78:2; 81:9, 12

national 167:7

nature 8:10; 11:8; 14:6; 31:17; 106:3; 108:22; 109:18

Neal 107:4

necessarily 7:18; 57:13

necessity 147:23

need 8:25; 35:2; 83:14; 93:1, 18, 18; 94:8; 101:2, 3; 117:12; 143:16; 147:4

needed 159:23, 25

negative 52:16, 18; 171:18, 21; 176:16

neglected 100:19

network 103:1

new 9:25; 19:22; 24:9, 11; 25:13; 30:7, 8; 43:4, 6, 24; 44:2; 50:18; 66:13; 73:23, 24; 85:10; 98:24; 101:7, 10, 15; 118:10; 119:21; 120:1; 125:10, 11; 136:19, 23; 138:6; 158:15

news 173:4

newsletter 64:17; 123:6

newspaper 108:12, 13

next 6:5; 7:11; 20:6; 25:1; 78:9; 147:16; 155:10; 166:9, 21

nights 178:18, 19

nine 24:23

None 65:15, 17; 92:2

nor 163:9

Nos 159:6

notarized 135:1; 144:9

Notary 4:5

notation 158:9

noted 69:3

notes 7:25; 143:16

notice 149:8; 158:1

notwithstanding 167:14

November 9:20; 17:4; 32:20, 24; 33:4; 50:3, 4; 92:10, 11; 94:18; 97:23; 98:18; 99:25; 100:14; 101:21; 112:9, 25; 116:15; 144:10; 151:3; 156:22

number 4:24; 5:9; 91:17; 119:7, 11; 146:3

numbered 45:17

nursing 28:1; 87:14

### O

O 4:1; 5:21, 21

O'Connell 88:8, 9; 113:4; 115:8, 10, 18, 24

OB 34:21, 25; 35:2; 44:4; 62:10

object 15:18; 16:12; 74:15; 75:19; 79:20; 90:5; 123:23; 126:15; 128:15, 18; 131:8; 161:13; 162:15, 22

objection 69:4; 127:16

obligated 177:17

observation 82:15

observations 59:8; 82:9, 13; 85:13; 120:11, 14

observe 67:11

observed 59:4; 60:8; 83:1

observing 60:8

obvious 51:3; 53:7

occasion 47:13; 48:16; 54:7; 145:6

occasions 6:16; 54:4, 8

occupational 159:20

occurs 36:25; 104:10

October 31:9; 36:18; 40:2; 43:4; 46:6; 149:16

Odessky 58:3, 16; 59:8

off 45:20; 50:12, 13; 60:3; 83:18; 121:1; 163:20; 169:17; 172:23, 25

offer 95:6, 6, 8, 23; 122:10; 131:23; 137:12

offered 30:13; 39:18; 100:18; 125:9; 128:14; 163:12

offers 109:22

office 8:24; 24:19; 25:4, 5, 17, 19, 19; 65:2, 4, 6; 67:6, 8, 15; 76:18; 79:1; 92:13, 15; 93:23; 97:19; 100:21; 102:12; 142:23; 144:24; 145:15; 151:17; 159:25

officer 75:8; 86:9, 12, 22; 87:4, 24

officers 111:12, 14

offices 35:8; 44:5

official 36:7

officially 36:21; 40:23; 43:3

often 64:21; 66:22; 69:22; 76:15

ogling 121:19

old 51:19, 20, 21; 66:1, 13; 86:24; 87:11; 116:15; 117:18; 118:3; 119:18; 120:2; 122:1; 129:22; 132:16

older 60:11, 13; 91:13, 14; 117:16; 118:11; 119:22

oldness 117:13

once 5:15; 23:11; 88:12; 143:24; 160:17; 167:9, 25; 169:11

one 32:15; 34:4; 37:24; 38:5; 40:24; 41:8; 53:10, 13, 18; 54:4, 7; 55:18; 59:25; 65:6; 71:14, 16; 77:22; 80:15, 23; 82:24; 89:13; 90:3; 101:3; 102:14; 127:4, 14; 129:16; 138:5, 6, 6, 16; 145:11; 146:19; 156:4, 14; 157:19, 21, 22; 158:10; 161:3, 5, 5; 162:14; 165:2

ones 154:16

only 6:2; 17:1, 3; 46:5, 10, 21; 47:12; 52:1; 62:12; 88:11; 97:14; 133:7; 170:14, 15; 171:23

open 37:25

operating 86:8, 12, 22

operations 86:13

opportunities 16:24; 158:23

opportunity 67:11, 14; 77:15; 81:7; 125:9, 13; 161:11; 162:11

order 15:13

ordering 179:5

orders 168:25

organization 8:10; 13:19; 135:22

organizations 13:3; 22:6, 18

organized 34:18; 160:21

original 143:5; 144:20

originally 19:20, 22; 154:10

OSHA 102:10

others 35:12; 55:9, 14; 63:17; 65:14, 15, 17

otherwise 177:11

out 62:11, 12; 66:13; 67:3, 4; 68:9; 72:11, 25; 73:16; 105:7; 106:10, 11; 108:7, 12; 109:3; 123:6; 137:16; 142:18; 143:7; 155:8; 160:18; 163:8, 18, 19, 19; 175:16; 178:18, 18

outgoing 35:9; 120:12

outside 16:25; 55:19; 64:21; 76:21

over 7:12; 31:11; 34:25; 35:15; 37:4; 39:13, 17; 42:7; 43:3; 51:17; 72:1; 75:4; 80:10; 85:18; 86:6; 87:16; 88:10; 93:14, 16; 105:17; 117:6; 119:18; 133:16; 134:11; 135:16, 18, 19; 137:17, 18; 168:9; 175:18, 25

oversaw 72:24

own 77:24; 111:14; 145:9

owned 12:7; 111:15, 16, 17

owner 13:2; 85:10

ownership 174:5

owns 4:19; 174:10

### P

P 4:1

p.m 83:19; 84:2; 100:10; 122:18; 169:18; 177:21; 179:11

pack 93:5, 21

package 94:6, 10

page 45:5, 8, 16; 95:1; 110:19; 114:5; 123:11; 135:10; 144:1, 12; 145:18, 22, 23, 24; 147:16, 17; 157:7, 11, 23; 158:10; 166:3, 11, 12, 21; 168:13; 170:6, 10, 10, 15, 20, 23, 23, 24; 171:14; 172:4

pages 123:12; 142:10;

156:17; 159:6; 164:17, 18, 19; 170:4; 171:24; 173:12

**paid** 9:17; 13:6; 36:22; 95:13, 14; 107:22; 110:11; 113:7, 22; 114:11; 115:11; 165:21

**pained** 161:6

**Pam** 86:18; 97:10, 13; 116:25; 117:25; 118:4, 5; 121:5

**paper** 94:23

**papers** 109:10; 145:5, 14; 153:19, 20, 21

**paperwork** 41:10, 11; 94:9, 21

**paragraph** 101:7; 138:17; 142:17; 145:21; 147:18

**part** 30:10; 34:11; 61:5; 71:21; 91:6; 132:7; 155:14; 159:4, 21; 163:25

**particular** 10:5, 25; 123:16

**party** 26:13, 15; 176:14

**past** 22:21; 173:22

**pastoral** 8:13

**Pat** 48:11; 102:3, 20; 105:22, 24; 106:4, 15

**path** 128:23; 159:14

**patient** 68:12, 16, 24; 79:15

**patients** 24:3; 28:1; 37:22; 69:7; 109:21

**pattern** 119:23

**Patty** 87:21

**Paula** 86:5

**Pause** 12:22; 29:6; 36:6; 37:12; 40:4; 44:16; 45:24; 49:14; 61:7; 69:16; 86:14; 94:22; 99:18; 100:2; 106:24; 112:1; 113:5; 115:19; 123:4; 134:6, 20; 135:8; 137:5; 138:2, 21; 139:14; 140:9; 141:3; 143:23; 145:25; 147:19; 149:5, 19; 150:16; 152:1; 153:6; 155:1; 156:13; 173:10

**pay** 46:13, 17; 61:20; 94:11; 95:10, 14; 98:3; 99:17; 115:25; 165:24; 169:1; 175:9

**paycheck** 163:15; 164:4

**paychecks** 167:15

**paying** 163:20; 169:16

**payment** 114:22; 115:22; 116:8; 165:22, 22

**pediatric** 35:4, 5, 6; 62:10, 11, 12; 63:8, 11, 13, 15, 18

**peds** 62:11, 12

**Pembroke** 19:7; 26:4; 27:7; 31:11; 32:11, 17; 34:24, 25; 35:15; 36:5, 10, 19; 37:5, 7, 14, 17, 23; 38:7; 39:14, 20; 40:21;

41:5, 19; 42:10, 13, 20; 43:9, 12, 45; 46:17; 47:6, 14; 48:12; 49:23; 52:23; 53:25; 55:4; 68:15; 70:13; 71:10; 72:1, 5, 9, 20; 74:13, 19; 75:3, 4, 24; 78:7, 25; 80:10; 81:4, 20, 23; 82:10, 17, 23; 83:8; 84:4; 85:10, 14; 86:9; 87:23; 90:14; 110:24; 111:4, 7, 15, 17; 174:5

**pending** 152:7

**Pennsylvania** 19:21

**pension** 175:11

**people** 8:25; 14:10; 33:17; 34:2; 38:13, 14, 25; 39:9; 40:24; 46:24; 66:7; 67:12, 18; 77:11; 79:6; 82:15, 24; 92:3, 5; 96:11; 103:19; 108:13, 14, 24; 117:15; 118:12, 16, 17, 23; 119:15, 17, 22; 120:2, 5, 17; 153:12; 158:22; 160:17; 161:6, 7; 163:23, 24, 25; 167:18; 168:9, 12; 169:1

**perceive** 35:9; 58:12, 18; 160:25

**percent** 39:19; 40:7, 15, 20; 41:8; 64:25

**percentage** 64:23

**perception** 56:20; 66:15; 146:20

**performance** 77:16, 24; 81:7, 19, 23; 83:5

**performed** 44:8

**performing** 67:22; 82:1

**perhaps** 143:12; 156:6; 162:7

**period** 10:22; 12:11; 13:9, 13, 24; 17:7; 20:12, 13; 25:16; 27:13; 32:15; 33:6; 37:13; 40:18; 46:7, 21; 55:1; 64:12; 70:11, 20; 72:13, 23; 73:3, 7, 20; 74:2; 80:5, 19; 90:4; 95:7; 107:18; 113:19; 129:20, 23; 162:2

**periods** 28:7

**permanent** 112:5

**person** 9:25; 10:5, 10; 35:10; 43:25; 51:17; 54:12; 57:11; 71:14, 16; 73:13; 117:19; 120:12, 15, 18; 121:9; 129:24; 130:16; 141:7; 142:7

**person's** 142:6

**personal** 13:23; 56:22; 88:23; 89:1; 90:21, 23; 91:1, 2; 118:20; 119:2

**personally** 52:5; 65:12; 91:11; 92:4, 9; 120:19

**personnel** 40:3; 130:21

**perspective** 31:17; 42:6

**pest** 175:22

**Ph.D** 177:2

**Philadelphia** 19:18, 23;

23:15

**phone** 107:7; 115:1; 151:11, 12, 18

**physical** 27:6

**physically** 64:21; 90:23

**physician** 33:15; 34:11, 12; 102:25; 109:7

**physicians** 27:24; 34:13; 35:7; 44:5

**Pierce** 48:11, 12; 102:3, 20; 105:24; 106:4

**pigeonhole** 128:12

**Pines** 19:7; 27:7; 31:11; 32:11, 17; 34:24, 25; 35:15; 36:5, 10, 20; 37:5, 7, 14, 18, 23; 38:7; 39:14; 40:21; 41:5; 42:10, 13, 20; 43:9, 12; 45:2; 46:17; 47:6, 14; 48:13; 49:23; 52:23; 53:25; 55:4; 68:15; 70:13; 71:10; 72:2, 5, 9, 20; 74:13, 19; 75:3, 5, 24; 78:7, 25; 80:10; 81:4, 20, 24; 82:10, 17, 23; 83:8; 84:4; 85:11, 14; 86:9; 87:23; 90:14; 110:24; 111:4, 7, 16, 17; 174:5

**pink** 163:11, 13; 167:11

**pity** 176:14

**place** 37:5; 40:10; 92:11; 93:23; 105:16; 117:11; 147:3; 168:15; 178:25

**placed** 38:13, 20, 22, 23; 79:2; 112:12, 12; 114:6; 138:23

**places** 34:14, 15; 64:20; 108:9

**plaintiff** 26:16

**plan** 9:22; 175:10, 10

**planners** 33:18

**planning** 24:2; 27:25; 62:19

**Plantation** 10:17

**pleading** 115:5

**please** 4:9; 5:18, 20; 6:6; 7:7, 22; 10:13; 12:5; 16:18; 22:8; 44:12; 49:13; 69:11; 78:14; 81:17; 121:3; 125:24; 126:19, 21

**point** 15:9, 15; 16:9, 21; 17:19; 22:19; 28:12; 35:14; 37:24; 49:1; 59:19, 19; 62:25; 80:16, 23; 83:7; 84:4; 98:22; 119:1; 122:22; 132:3, 5; 136:7; 154:3, 15; 166:15; 167:12; 168:23; 176:4

**points** 133:9

**Poirier** 142:25; 143:4

**policies** 114:21

**policy** 113:22; 114:24

**politicians** 33:21

**Pontiac** 165:20

**population** 68:20

**portions** 145:7

**position** 8:17; 17:17;

23:24; 27:11; 28:12; 30:6, 7, 8, 12, 13; 32:19; 33:10; 45:19, 25; 48:15; 51:3, 7, 11; 53:7, 12, 17, 20; 54:3, 6, 12, 16, 20; 55:9, 15; 56:16, 21; 58:5; 71:21, 22, 23; 79:2, 3; 86:16; 88:4; 96:9; 98:15, 16; 101:7, 11, 16; 102:24; 105:10; 116:12; 125:10, 11, 13; 127:5; 129:16; 156:21; 158:19, 24; 162:3

**positions** 17:21; 18:3, 19; 98:21; 99:1, 4, 9; 109:5; 118:16; 129:22, 25; 131:6; 159:2

**possession** 114:25

**Possibly** 116:25

**postgraduate** 20:9, 14

**PR** 30:11; 32:16; 34:12; 40:19; 43:25; 51:3, 9, 17; 52:2; 53:19; 71:17, 20, 23; 161:4, 21

**practices** 34:16; 91:8, 12

**prepare** 69:22

**prepared** 69:20; 156:7, 15, 16, 20; 157:20, 21; 158:5, 11; 159:8; 173:2

**preparing** 55:19; 130:18

**presence** 63:18; 147:12

**present** 22:20; 93:25; 158:3

**presently** 157:15

**press** 34:18; 166:11

**pretty** 57:7, 8; 121:17; 122:5; 124:16; 129:10; 131:20

**previous** 26:14; 30:11; 43:25; 174:1

**previously** 21:8; 30:6; 124:1; 135:21

**price** 168:20

**pride** 178:12

**printed** 110:23

**Printing** 24:15, 18

**Prior** 4:22; 10:19; 15:14, 15, 24; 19:3; 31:20; 36:8, 8, 18, 24; 37:13; 41:3; 84:25; 85:1, 3; 87:4, 14; 89:19; 114:7, 17; 119:1; 138:18; 158:6

**private** 21:19, 21

**probably** 23:20; 27:5; 47:11; 60:15; 64:3, 25; 76:17; 83:17; 87:12; 105:21; 154:9; 176:3

**problem** 137:18

**procedure** 29:1

**proceed** 152:8

**proceedings** 149:25

**process** 97:17; 136:15, 16; 153:12, 22; 176:21

**prod** 153:18, 19

**produced** 41:23, 23; 170:24; 172:12

**product** 14:5; 169:11, 12

**production** 29:8

**products** 13:22, 22

**professional** 21:2, 4, 7; 22:5; 43:19; 50:5, 21; 56:14; 108:19; 159:14; 161:11; 162:14

**professor** 152:6, 21

**profit** 148:18

**program** 11:15; 32:5; 70:14, 17, 22; 71:3, 7, 21; 72:25; 74:5; 75:23; 76:10, 11; 79:24; 80:1; 82:12, 17, 25; 158:7; 176:17

**programs** 34:15; 35:6; 43:24; 44:2; 176:16

**project** 64:18

**projects** 77:6, 6, 13, 22; 81:6

**promote** 64:20; 68:7

**promoted** 160:12

**promoting** 44:4; 62:10

**promotion** 30:3

**promotional** 64:18

**proper** 22:11

**proud** 178:7, 8

**proved** 117:15

**proven** 118:10, 12; 119:21

**provided** 17:3; 34:9; 57:5; 68:11; 150:19; 160:1; 173:7

**prying** 177:3

**psychiatrists** 176:6

**psychologists** 176:5

**psychosocial** 27:25

**psychotherapist** 21:10; 22:2; 159:20

**psychotherapy** 21:19

**Public** 4:5; 22:10; 28:15; 29:20, 25; 30:10; 31:2, 6, 16, 21, 23; 32:4, 6, 13; 33:3, 13, 19; 34:10; 51:6, 10; 53:12; 54:2, 6, 24; 64:7, 15; 71:6; 73:11; 74:3, 22; 75:1; 77:4; 92:25; 96:3, 6; 98:25; 101:18; 109:14, 16; 127:8, 12, 23; 129:12; 130:13, 17; 131:1, 5; 148:13; 159:15; 161:2; 162:12

**purchase** 37:15

**purchased** 84:5

**purpose** 101:5; 152:3

**pursuing** 157:15; 158:17, 23

**put** 12:10; 34:22; 55:22; 63:25; 123:6, 11; 142:15; 152:10, 19; 154:6; 157:12; 159:7; 160:3, 19; 173:18

**putting** 34:21; 35:5; 62:19; 64:18; 163:9; 168:17

**Q**

qualification 166:7
qualifications 165:16
qualified 101:10, 15, 20; 122:13
quality 58:8, 9
quarterly 70:3, 6, 8
quit 154:5, 7
quite 108:22
quota 168:14
quotas 165:23; 166:2; 169:5
quote 53:11; 132:15, 17, 21, 23; 141:12, 146:17; 147:1, 4, 5, 13, 23; 148:1
quotes 147:9

**R**

R 4:1; 5:2, 21, 21, 21; 10:14
radio 160:12, 15
raise 46:14, 18
raised 47:19
Ralph 135:1; 136:1; 142:23; 153:25
ran 63:9; 71:3; 110:14; 123:14
raped 25:13
rather 156:2
Raton 4:12
re-faxing 144:25
re-mailed 145:2, 3
re-mailing 145:1
re-sent 144:15; 145:13
reach 165:23
reached 77:23
Read 78:16, 17; 110:11; 115:5; 126:21, 22; 129:8; 135:4; 142:18; 145:20; 146:1; 147:17; 160:5; 164:20; 179:7
reading 139:22
reads 114:6; 138:17; 142:17; 146:6, 16; 147:21; 148:1
realize 167:13
really 4:12; 46:5; 57:5, 9; 62:20; 64:2, 4; 82:14; 128:22; 136:6; 152:8, 20; 159:23; 161:15; 165:17; 166:4; 177:15
reason 47:3; 95:23; 96:14; 97:23; 116:12; 118:5; 121:24; 124:13; 145:3; 152:14; 153:8; 170:14
reasons 25:9, 11; 63:18; 117:24; 121:5; 122:3, 7; 125:1, 16; 131:17; 161:12; 162:17
recall 11:1; 22:19; 24:22;

29:15; 45:23; 46:16; 47:22; 49:7; 54:14, 17; 58:20; 64:2; 66:15, 20; 68:15, 23; 70:4; 73:4; 80:2; 84:5; 86:17; 94:3; 95:3, 18; 101:25; 105:15; 107:1; 109:12; 111:24; 115:20; 120:7; 125:19; 133:2; 137:3; 139:12, 16; 140:10; 141:1, 15; 145:12; 147:15; 151:5; 154:25
recalled 124:2; 156:25
recalling 107:6, 13
receipt 112:4; 143:8
receive 9:16; 15:4; 20:21; 46:17; 61:20; 73:25; 109:22; 114:14
received 20:7; 21:14; 23:11; 46:13; 79:24; 99:17; 110:8; 112:10; 115:18; 123:25; 131:24; 140:16, 18; 144:13; 170:15, 16
receiving 46:16; 107:1; 111:24; 115:20; 137:4; 139:13; 151:5; 154:25
reception 178:11
recess 50:14; 83:19; 100:10; 122:18; 169:18; 177:21
recognize 36:2; 44:13, 18, 19; 49:15; 61:5; 69:12, 18; 99:15, 25; 106:23; 110:8; 113:3; 115:17; 134:17; 137:24; 143:25; 150:1; 152:2; 153:4, 7; 154:25; 155:2; 173:7
recollection 37:4; 71:2; 107:3; 136:4
recommendation 98:7, 11
record 50:12, 13; 78:17; 83:18; 108:9; 121:2; 124:8; 126:22; 150:14; 164:21; 169:17; 172:23, 25; 177:23
records 104:4, 4, 8
recoup 175:19
recovered 105:3
recruiter 108:25; 109:1
recruiters 108:20, 20
recruiting 34:13; 168:4
recruits 165:13; 168:4
reduced 39:20; 41:12
reducing 41:7; 112:13
reduction 39:16; 42:8; 88:15; 89:5, 9; 91:18, 20; 92:8; 98:13; 102:16; 103:3; 119:8, 14; 138:23
reductions 105:16
reference 29:23; 115:22; 144:20; 146:8, 10, 24
references 146:4
referral 102:25
referred 137:9
referring 7:17; 40:6;

51:12, 14; 71:10; 132:23; 147:24; 157:23; 166:13; 177:12
refers 138:20
reflect 114:23; 139:1; 172:16
reflected 140:14
reflecting 99:17; 170:7; 173:13
reflects 116:7; 171:14
refrain 139:17; 141:12
refresh 22:15; 29:18; 36:3, 14; 139:22; 143:16; 144:21
regarding 113:22; 114:22
Regardless 114:1
regional 79:1, 3
registered 143:7
regular 136:2; 160:15
rehire 93:9
reimbursed 107:9; 115:25; 173:22
relate 164:14
related 16:10; 42:4; 48:9; 53:10; 56:11; 65:19, 21; 66:10, 17; 81:8; 109:17; 159:1
relation 109:8
relations 8:20; 22:10; 28:16; 29:20; 30:1, 11; 31:2, 7, 16, 21, 23; 32:4, 7, 12; 33:3, 14, 19; 34:10, 11, 12; 51:6, 10; 53:7, 12, 17; 54:2, 6, 19, 24; 56:21; 59:21; 64:8, 15; 71:6, 11; 73:11; 74:3, 22; 75:1; 77:4; 92:25; 96:3, 6; 98:25; 101:18; 109:15, 16; 127:6, 8, 12, 23; 129:12; 130:13, 17; 131:1, 5; 134:19; 135:25; 148:13; 159:15; 161:2; 162:12
relationship 43:19; 50:6, 22; 51:1; 56:14, 21; 58:24; 59:2, 5, 12; 60:19; 111:6; 120:10; 115:13; 177:7, 13; 178:2
release 166:11
religious 13:3; 161:12; 162:13
relocate 25:12; 34:16
relocated 24:9
remain 43:15; 48:25; 87:1
remained 49:25; 90:2, 13, 14; 161:3, 4
remark 66:17
remarks 65:19, 21
remember 4:24; 5:25; 6:9; 22:13; 25:5; 27:2; 28:18; 42:23; 44:7; 46:13; 49:4; 63:20, 24; 64:3, 4; 70:19; 73:21, 22; 80:21; 84:8; 86:8, 16, 18; 87:3, 13, 20; 88:6; 104:12; 133:4; 139:24; 140:13, 16,

18; 141:24; 142:1, 2, 3, 5, 15; 143:10; 145:8, 10, 16; 149:21; 150:18; 164:8; 166:18
remembered 143:4
remind 7:18
remittance 99:16; 116:7
remuneration 152:23
rent 4:18
rental 165:21
reorganize 175:19
repeat 7:23
repetitive 146:5; 155:7
rephrase 7:23; 125:24
replaced 85:22, 25; 87:8, 17, 20; 88:7; 115:8; 127:4
replacement 86:4
report 10:6; 30:24; 31:2; 70:6; 71:24; 73:13; 74:19; 75:6, 18; 76:4
reported 28:9; 52:24; 71:12, 22; 75:11, 13, 14; 76:1
reporter 7:2; 126:21
reporting 75:24
represent 6:24, 25; 170:6; 174:14
represented 154:15; 159:14
representing 154:1, 17
represents 169:4
reprimand 61:23
reps 109:6, 7, 14
request 40:3; 115:10
requesting 113:7; 145:5
required 56:25; 82:19
residency 34:15
resident 5:3, 5
residential 4:23
resign 26:1
resource 70:25; 85:17
resources 61:17; 85:24
respect 71:7; 74:13; 93:11; 120:10; 121:14; 159:1
respectful 56:23; 57:3
respective 38:17
Responsibilities 45:19, 23; 46:1; 129:17
responsible 24:2
rest 172:20
restate 128:20; 161:14
result 38:16; 103:22; 104:16; 175:3; 176:8
results 62:23
resume 22:13; 35:20; 156:6; 157:2, 8, 10, 13, 18; 158:11, 17, 24; 159:5
resumes 108:7, 12; 109:3; 155:8; 156:2
retail 168:19
retain 47:25
retained 102:18; 135:17

18; 141:24; 142:1, 2, 3, 5, 15; 143:10; 145:8, 10, 16; 149:21; 150:18; 164:8; 166:18
retirement 175:11
return 170:11, 11, 16; 171:1; 172:11, 14
returns 171:5; 172:21
revenue 79:9
reverse 15:12
review 27:24; 44:12; 94:20; 130:19, 21; 143:24; 148:17
reviewed 142:8
reviewing 130:24
rewrite 136:21
rewritten 137:8; 160:22
rewrote 136:21
Rick 88:8
rid 91:13; 117:15; 118:11; 119:22; 120:2; 130:14
Right 5:12; 6:4; 7:2; 13:6; 15:21; 18:16; 42:15; 62:20, 23; 84:15, 17; 100:9; 107:8; 110:20; 126:20; 139:21; 144:7; 166:10; 179:3
risk 102:6, 7, 8; 163:9
road 62:21, 24
rolling 66:19; 132:22
Ron 55:17, 18; 88:22; 91:22, 25; 103:10; 104:20, 23; 105:3
room 68:6, 7, 9; 176:13
rooms 65:6
rough 173:19
roughly 173:17
rounds 27:24
rumor 98:23
rumored 86:25
run 110:15; 164:15; 174:19
rung 166:9
running 174:6
RUSSO 4:8; 8:3; 11:22; 14:16, 17; 15:21, 22; 16:13, 19; 18:1; 19:16; 22:22; 23:1; 24:25; 28:23; 29:9, 11, 13; 33:1; 35:23; 40:2, 5; 44:17; 45:9, 12; 49:10; 50:12, 16; 61:4; 64:13; 69:9, 17; 74:18; 75:21; 78:10, 16, 20; 90:10; 94:16; 99:13, 22; 100:9, 12; 104:7; 106:19; 110:5; 111:21; 112:24; 113:14; 115:15; 116:4; 118:23; 122:20; 123:1, 8, 24; 124:6, 11; 126:20; 127:2, 20; 129:1, 6, 13; 130:2; 131:14; 132:8; 140:3, 23; 142:4, 20, 21; 143:19; 145:8; 146:13, 15; 148:24; 149:14; 150:11; 151:1, 22; 153:1; 154:21; 155:19, 23, 25; 156:8, 12, 19; 158:8; 160:5, 24; 161:17; 162:1, 18, 19;

164:3, 11, 19, 23, 165:9;
169:20; 170:2, 22; 171:3,
8, 13; 172:9, 19; 173:3;
176:2; 177:16, 20, 23, 24;
179:3, 6, 9

# S

**S** 4:1; 5:2
**Sacred** 19:19
**safety** 102:10
**salary** 9:10, 13, 17; 14:7;
36:22; 39:16; 40:7, 15, 20;
41:7, 12; 42:8; 107:23
**sales** 18:15, 23; 109:6, 7,
14; 157:25; 158:6, 13;
159:1, 3, 15; 162:11;
166:15; 167:2, 7, 25;
168:16
**same** 42:16; 67:6; 68:17,
25; 75:13; 76:18; 82:4, 8;
84:13; 104:22; 105:1;
121:13; 127:25; 144:16;
161:3, 4; 164:8; 171:4
**satellite** 158:20
**Saturday** 178:18, 19
**savings** 175:20
**saw** 82:5; 96:10; 131:2;
177:1
**saying** 51:5; 56:10;
66:16; 77:17; 89:23;
150:6; 166:4
**Schedules** 170:25, 25
**Schialdone** 87:6, 11
**school** 10:21, 23; 11:1, 4;
14:14; 19:11, 12; 20:1, 11,
22; 152:5; 157:14, 16;
158:3
**Schubert** 24:15, 17
**science** 20:12
**sciences** 20:12
**search** 108:9; 155:4
**season** 68:21, 22
**second** 6:6; 102:15;
114:5; 123:20; 131:21;
135:10; 137:25; 138:16,
17; 142:17; 143:15; 145:7,
11, 12, 18; 157:10, 20;
166:11, 12; 169:17;
170:10, 23; 172:24;
177:19
**secretary** 28:7, 8; 48:20,
21; 73:14
**Security** 5:9
**seeing** 29:15; 140:10
**seek** 177:1
**seem** 164:13
**seemed** 59:4; 122:5;
137:17
**self-esteem** 176:16;
178:22
**self-talk** 176:17
**self-worth** 176:16
**sell** 14:5
**selling** 84:22

**sells** 13:21
**semantics** 128:4, 12, 17
**seminars** 13:5
**Seminary** 11:7; 162:3
**send** 142:12; 150:1;
152:12; 169:10, 11
**sending** 141:2
**senior** 30:21; 70:17;
71:18, 19, 20; 72:2, 11, 14,
17, 25; 73:16, 23; 74:4;
75:17, 23; 76:10, 11; 77:5,
11; 78:4; 79:2, 4, 11, 18,
24; 80:1, 7, 16, 20, 24;
81:5; 82:11, 12, 16, 22;
85:14, 21; 98:15; 99:8;
101:11, 19; 122:10;
124:20; 125:23; 126:9;
127:10, 12, 24; 129:12, 18;
131:5; 148:14
**seniority** 74:7, 12;
124:21; 131:23; 135:18,
22
**sense** 64:11
**sent** 32:2; 68:6; 108:7, 11;
109:3; 113:3; 136:2, 6;
141:17; 144:22; 149:21,
24; 150:3, 21; 152:3, 11,
21; 153:5, 8; 155:8
**sentence** 146:6, 13, 16
**separate** 70:16; 76:20;
111:10; 126:13, 24, 25;
156:3; 162:14
**September** 32:9, 23,
24; 33:3; 84:12; 85:10;
140:6; 141:18; 142:22;
144:13; 146:7, 12; 149:3;
154:24
**served** 28:9; 32:10; 33:2;
173:8
**service** 23:14; 30:9;
135:11
**services** 9:1; 13:7; 27:12,
14, 22; 28:6, 10; 29:20;
30:24; 31:15; 32:7; 154:4
**SESSION** 84:1
**set** 160:19
**setback** 153:14
**setting** 48:2
**seventies** 21:12
**several** 36:18; 82:5;
104:23
**severance** 94:12; 99:17;
107:14, 22
**shared** 148:19
**shell** 168:21
**Sheridan** 42:14
**shift** 69:6
**shocked** 41:8
**shored** 46:21
**short** 12:8; 43:17; 46:4, 7;
60:3; 97:14; 131:11
**shortly** 88:3
**show** 22:14; 28:24; 29:2,
3; 35:24; 39:23; 44:10;
49:11; 60:24; 64:19;
69:10; 94:17; 99:14, 23;

106:20; 110:6; 111:22;
112:25; 115:16; 116:5;
122:21; 134:15; 137:2, 23;
139:9; 140:4, 24; 143:20;
148:25; 149:15; 150:12;
151:2, 23; 153:2; 154:22;
155:20; 160:15; 164:12,
25; 172:10; 173:5
**showed** 108:1
**showing** 152:22; 159:3;
169:21
**shown** 82:7; 138:5, 14
**shows** 144:13
**shut** 37:21; 38:5; 39:8
**shutting** 38:10, 16; 96:2
**sick** 178:20
**side** 110:20
**sight** 118:4
**sign** 94:8, 21; 108:2;
136:19, 23
**signature** 45:4; 94:25;
134:22; 144:1, 9
**signed** 41:10, 12
**significance** 114:9, 12
**signify** 166:23
**similar** 111:12
**sister** 4:21; 179:1
**sister's** 4:17; 158:14
**sit** 92:14
**situation** 98:1; 163:10
**situations** 66:16
**Six** 4:14; 33:7; 73:4, 20;
80:5; 98:1; 101:17; 108:3,
5; 110:17; 153:23; 164:19
**sketchy** 72:21
**skills** 160:10, 11
**sleeveless** 60:4
**slip** 163:11
**slow** 7:9; 153:11
**small** 167:2
**smaller** 42:16
**snapshot** 70:9
**snowbirds** 68:19
**Social** 5:9; 22:9; 23:14;
24:4; 27:12, 14, 22, 23;
28:6, 10; 29:19; 30:9, 23;
31:15; 32:1, 7; 33:16; 48:2;
109:18, 18; 159:17, 18, 19
**Society** 22:10
**sociology** 20:5
**sold** 85:15; 165:19;
174:14
**sole** 14:20
**somebody** 137:16;
145:14
**somehow** 174:14
**someone** 26:17; 30:6;
67:1; 87:8; 121:21
**Sometimes** 7:9, 9; 69:7,
8
**somewhere** 62:24;
142:9; 154:8
**son** 4:21
**sorry** 5:24; 6:13; 12:13;

14:16; 16:17; 21:12;
27:19; 39:2; 47:24; 74:23;
78:11, 14; 86:15; 90:16;
99:6; 100:6, 8; 113:15, 17;
126:19; 139:24; 143:16;
145:9; 166:16, 18; 169:24;
176:11, 12, 16; 177:3
**sort** 61:16; 137:18;
152:12; 153:14
**source** 12:1, 15; 13:14;
14:21; 15:16; 17:1, 3; 19:4
**South** 11:6, 9; 12:3, 16;
13:10; 14:23; 20:8, 23;
25:7, 22; 26:21; 27:10;
28:10; 30:17; 31:7, 10, 25;
32:10; 33:17; 34:22; 36:4,
10; 37:8, 21; 38:5, 10, 11,
17, 20; 39:1, 4, 8; 40:17,
23, 25; 42:1, 16; 69:5;
72:10, 15, 19, 24; 73:16;
74:1; 80:6, 20, 24; 81:13;
82:6, 21, 22; 174:9
**Southwest** 4:11
**speak** 47:9, 13; 51:24;
83:3; 104:14
**speaking** 100:13;
124:12; 129:23
**special** 34:22; 55:20
**specialist** 8:18
**specific** 37:6; 63:6; 64:8;
65:15; 82:18; 90:11;
117:21; 119:13; 126:5;
147:7
**specifically** 65:10;
103:18, 21
**speculation** 91:5
**spell** 5:20
**spending** 58:21; 148:6
**spent** 19:23
**split** 85:2, 4
**spoke** 51:16; 52:5, 11;
83:6; 102:3; 104:21, 23;
105:19; 106:1; 142:23;
155:6
**spoken** 47:5; 97:22;
101:22; 102:1, 19; 103:7;
133:21, 22; 139:4; 144:24
**spokesperson** 34:17
**spreadsheet** 173:13
**squeaky** 95:16
**stack** 155:24
**staff** 56:25; 73:12, 13
**staffed** 37:25
**staffing** 137:18
**Stait** 177:13; 178:2
**stale** 117:17
**stamped** 45:17; 157:11;
165:4
**stamps** 164:21
**stands** 26:22
**start** 7:11; 9:21; 34:16
**started** 23:19; 37:1;
39:19; 44:3, 5; 88:20
**starting** 19:10
**starts** 62:18

**State** 99:20; 21:15; 98:12;
101:6; 113:17
**stated** 143:5
**statement** 59:9; 74:8, 10,
14; 79:11; 107:24; 119:21;
124:4; 148:18; 152:13;
170:7, 16
**statements** 62:8; 133:11
**states** 135:11
**stating** 139:20
**station** 160:15
**stations** 160:12
**stature** 175:14
**status** 112:8; 150:21;
153:20; 167:3; 174:4
**stay** 79:25; 80:3; 176:13
**stayed** 90:18, 25; 174:2
**staying** 68:17, 25;
136:14, 15
**Steve** 30:15
**still** 14:4; 15:20; 16:5, 14;
48:6; 81:13; 82:2; 155:14;
160:10; 162:22; 169:15
**stock** 111:16
**stomach** 92:21
**stop** 24:7
**stopped** 15:19; 17:9;
18:4; 24:10
**Strait** 5:2; 175:13; 177:7
**Street** 4:12, 24
**strength** 34:9; 154:11;
159:3
**strengths** 33:13; 34:4
**stress** 168:24
**stretch** 122:16
**stride** 166:18
**structure** 71:17
**struggling** 163:20
**stuck** 176:14
**studied** 162:3
**studies** 11:8, 12; 12:12;
13:10; 14:25; 23:22
**stuff** 108:17
**Subject** 15:23; 26:6; 46:9
**submit** 166:5
**submitted** 144:4, 5, 8
**subsequent** 153:9;
154:16
**subsequently** 88:14;
138:25
**succeed** 127:22
**success** 67:24; 166:19;
167:8
**successful** 68:4; 82:16
**Sue** 52:10, 11, 16, 19;
53:21
**sued** 26:17, 17
**suffer** 39:16
**suffered** 176:7
**suffering** 37:17
**suggestions** 7:4
**suite** 65:7; 67:9; 76:19;
102:13

**suits** 167:1

**summary** 18:2; 19:9

**summer** 23:18

**supervise** 118:17

**supervised** 55:1; 57:20; 76:13

**supervisor** 10:6, 11; 43:4, 6, 16, 20; 46:21; 48:23; 49:1, 6, 23, 25; 50:18, 23; 53:25; 65:5; 78:19; 121:10; 141:7

**supervisor's** 141:22

**supervisors** 116:18

**support** 117:24

**supporting** 153:20; 175:23

**supposed** 75:18, 24

**Sure** 8:2; 9:24; 39:3; 74:16; 117:11; 126:1; 131:16; 133:9; 147:3; 149:23; 172:22; 175:1

**Sutherland** 30:15, 24

**Sutphin** 48:24, 25; 49:5, 22; 50:18, 22; 51:25; 52:12, 15, 25; 53:6; 54:1, 23, 25; 55:15, 18, 20; 56:5, 7, 14; 58:25; 59:5, 13; 61:10, 23; 62:3; 65:5, 9, 14, 22; 66:11; 67:23; 75:12; 76:19; 80:18, 23; 83:3; 86:11; 88:1; 89:11, 17; 92:13; 94:1; 95:20, 21; 97:3, 22; 98:17; 99:24; 100:15; 108:2; 115:8; 116:22, 23; 121:12, 15; 124:12; 125:2, 17; 126:4; 128:7; 131:15; 133:12, 22

**Sutphin's** 132:10

**switch** 31:15

**sworn** 4:6

**system** 38:21, 23; 74:8; 124:21; 174:15, 15, 20

## T

**T** 5:2, 2

**tab** 123:11

**table** 92:22

**takeover** 89:19

**talk** 7:9, 9; 23:8; 67:1; 92:4; 103:19; 155:3; 171:9

**talked** 107:12; 142:7; 175:25

**talking** 7:12; 34:13; 45:7; 67:18; 81:2; 152:6, 17

**taught** 167:18

**tax** 170:11; 171:1, 4; 172:11, 14, 21, 21

**team** 18:11, 20; 148:14

**tedious** 153:12, 22

**telephone** 102:25; 139:24

**telling** 4:9; 56:15; 80:21; 166:3

**Tenet** 158:18, 20

**terminated** 16:8; 26:5; 63:1; 85:18; 89:13, 15, 15; 103:9; 112:6; 114:4; 118:13, 14, 15, 15; 123:21; 124:3; 127:15, 22; 129:4; 130:12; 131:12; 138:22; 155:5; 169:6; 173:24

**terminates** 169:13

**terminating** 130:4

**termination** 114:18; 134:3

**terms** 8:4; 9:16; 10:20; 15:24; 16:22; 19:6, 24; 23:13; 28:25; 33:13; 79:24; 107:21; 109:17; 114:10; 138:18; 152:18, 22; 156:7; 173:20; 174:5, 18

**testified** 4:6; 128:6; 129:21, 24; 132:15; 176:8

**testify** 105:12

**testifying** 92:1

**testimony** 15:19; 75:20, 22; 96:24; 101:9, 14; 129:14; 130:6, 8, 24; 132:6

**Thanks** 49:19

**Theological** 11:7

**therapy** 21:22; 159:16

**thereabouts** 17:15

**thereby** 79:7, 8

**therefore** 67:10; 68:21; 143:7

**Thereupon** 4:3

**thinking** 19:14

**third** 45:18; 131:22; 144:1; 157:11; 166:12

**though** 7:8; 46:10; 67:15; 95:17; 146:6

**thought** 75:16; 81:9; 92:21; 96:5; 119:6; 156:3; 163:22

**three** 18:19; 54:4, 8; 70:11; 76:17, 22; 156:2, 3, 12; 177:21

**threw** 179:2

**thrift** 175:9, 10

**times** 67:20; 70:5; 76:17, 22; 82:2

**title** 18:9; 22:12, 13; 30:20; 48:19; 58:7; 73:6; 127:7, 9, 11, 14, 18; 129:3; 130:25

**titles** 18:17

**today** 9:8; 130:6; 139:4; 175:4; 176:9, 12

**together** 34:22; 35:5; 64:18; 77:12; 152:10, 19; 160:19; 173:18; 178:4

**told** 15:13; 17:5; 21:1; 35:14; 36:17; 38:4; 39:3; 40:14; 41:20; 42:5; 47:25; 48:7; 50:17; 53:5; 54:22; 55:8, 10, 17; 56:4; 58:14; 64:6; 67:25; 80:15; 87:25; 91:18; 96:1; 98:17; 105:14; 112:13; 118:1;

119:6; 10; 124:16, 18; 125:5; 130:13; 131:19, 25, 25; 133:18, 23; 134:4; 138:7; 155:8; 175:4

**tolerate** 57:1

**took** 20:13; 39:18; 40:7; 60:3; 62:11, 12; 73:9; 81:8; 92:11; 93:23; 105:16; 160:7

**top** 114:6; 118:16; 135:10; 156:14

**Tortorello** 176:25

**total** 64:23; 105:3, 9; 119:10; 171:14, 17, 20; 172:1, 2, 4, 16

**touch** 126:2

**touched** 37:2

**tough** 57:11, 13

**tour** 147:6

**toured** 146:25

**touring** 117:9

**tournament** 33:25

**toward** 133:13

**towards** 57:20

**townhouse** 4:15

**track** 68:8, 10

**train** 168:2, 2

**training** 32:2, 6

**transcript** 110:8

**transfer** 36:7, 15; 37:7; 39:13

**transferred** 29:19; 35:15; 36:4; 37:4; 39:17; 43:3; 45:2; 72:1, 6; 75:4; 80:10; 174:14

**transition** 32:16

**translating** 167:14

**transpired** 95:19; 141:15

**treat** 58:1

**treated** 58:13, 14, 18

**tried** 155:9; 177:9

**trip** 72:14; 78:2; 81:8, 12

**trips** 168:4

**trouble** 100:25

**true** 33:2; 85:21; 135:6; 171:4

**try** 7:10; 108:5; 155:7; 161:18

**trying** 15:12; 55:3, 23; 67:24; 128:17; 153:23; 158:18, 22; 162:7; 175:19, 20

**turn** 45:16; 145:18; 147:16

**turned** 92:21; 109:23; 176:18

**twenties** 87:12

**two** 6:2; 12:2; 13:13; 37:15; 40:16; 43:12; 46:7, 11; 50:1; 54:4, 8; 62:21; 63:2; 64:14; 67:7; 68:14, 25; 70:19; 94:2, 11; 98:20; 107:14, 15, 18, 22, 24; 131:6, 12; 133:23; 138:4, 11, 14; 141:10; 154:9, 9;

156:18; 157:7, 19; 159:6; 173:12

**two-page** 61:13; 152:4

**two-thirds** 147:21

**type** 12:25; 13:19; 64:10; 109:2; 158:16

**typed** 7:17; 144:8

**types** 6:14; 30:11; 31:25; 70:10; 109:14

**typewritten** 145:21; 147:18

## U

**unable** 38:15

**unbelievable** 167:19, 21, 22, 23

**unbelievably** 167:20, 20, 23

**uncertain** 35:18

**under** 91:21, 22; 92:2; 110:23; 138:16

**undersigned** 4:5

**understood** 75:16

**unemployed** 39:10, 12

**unemployment** 108:8, 9; 110:1, 13

**unfair** 41:14; 61:25

**unflattering** 57:2

**unit** 34:21, 25; 35:5, 6; 44:4; 62:10, 11, 12; 63:8, 11, 13, 15, 18; 165:13; 166:3; 168:14, 15, 16

**University** 20:2; 23:12; 42:14

**unless** 67:1, 3

**unnecessarily** 177:4

**unofficially** 36:19

**unpaid** 108:3

**unstable** 178:15

**unused** 113:23; 116:8

**up** 7:12, 17; 32:2; 33:24; 34:14; 38:25; 39:10, 11; 41:2; 48:4; 69:8; 93:5; 95:9; 97:24; 102:15; 121:20; 122:6; 124:17; 131:21; 138:25; 151:11; 155:9; 160:19; 163:7; 166:9, 18; 168:10; 176:3; 177:9; 178:5, 13

**update** 117:12; 147:4

**updating** 146:23

**upon** 37:2; 63:14; 68:9, 18; 114:3; 115:5; 120:21; 125:1, 16; 126:2; 131:17; 134:1; 163:23

**usage** 68:8

**use** 13:23; 160:9; 165:18; 166:1

**used** 27:23; 30:20; 70:6; 127:18; 135:15; 176:12

**using** 12:10; 154:3; 160:10

## V

**vacant** 86:16

**vacation** 67:2; 95:13, 14; 113:8, 12, 18, 23, 25; 114:11, 14, 22, 24; 115:11; 116:8; 153:13; 175:9

**Valerie** 74:20, 21, 23; 76:1; 78:21, 24; 79:2

**value** 96:5, 10, 11

**verbally** 60:1, 1

**version** 157:13, 18; 158:17, 24; 159:5, 7

**versus** 126:8; 128:13

**vicinity** 43:2; 67:16

**Vicky** 107:4

**Viera** 102:23; 105:20; 118:15

**view** 59:19, 20

**vigilant** 136:14

**Virginia** 20:3

**virtue** 144:19

**visiting** 44:4; 109:20

**vitamins** 13:22

**vocational** 108:20

**volunteer** 70:14, 22; 71:3, 7

**vomit** 92:22

## W

**W** 10:14

**W-2** 170:6

**wage** 39:20; 110:8

**wages** 173:22, 23; 175:5

**wait** 98:10

**waiting** 98:7

**walking** 146:22

**warned** 11:20

**watching** 155:22

**Water** 8:8, 12, 15; 9:10; 10:3, 16; 15:10; 159:11; 161:10; 162:10

**way** 7:18; 39:8; 45:19; 47:17; 55:24; 60:11; 91:24; 135:20; 142:8; 147:21; 155:21, 23; 161:15; 165:10; 167:8

**wear** 130:1; 167:5

**weary** 83:14

**weather** 25:8

**week** 11:23, 25; 63:1; 76:17, 23; 110:11

**weekly** 64:9; 66:22; 76:16

**weeks** 94:12; 110:14

**weren't** 63:5; 79:23; 95:10, 13, 14; 148:5

**West** 8:9; 10:16, 17; 20:3

**What's** 51:5; 117:3; 175:16

**wheel** 95:16

**whenever** 114:17

**whole** 57:9; 79:3
**Wholeheartedly** 161:24, 25
**wholesale** 168:19
**wife** 103:10, 15; 104:20, 25
**willful** 130:5, 10, 11
**Williams** 88:21; 118:14
**win** 165:14, 16, 17, 25; 166:1; 167:9
**wish** 19:15
**Wishful** 19:14
**withdraw** 164:6
**within** 38:20, 22; 63:2; 74:8; 76:11
**without** 158:3, 9
**WITNESS** 11:21; 16:17; 17:25; 22:23; 24:23; 45:10; 50:8, 11; 69:5; 74:16; 78:15, 18; 79:21; 83:10, 13; 90:7; 104:6; 106:6; 123:5; 126:18, 23; 131:11; 132:4; 141:24; 156:14, 18; 157:24; 160:7; 161:14, 25; 162:24; 165:7; 170:20; 171:7; 179:10
**woman** 48:6, 9
**women** 57:8; 59:23; 119:3; 131:20; 167:3
**women's** 59:19
**won** 18:11, 14; 166:17
**wonder** 164:5, 15
**words** 147:7
**wore** 167:1
**work** 8:7; 9:5; 10:2; 12:25; 13:12, 24; 14:19; 15:9, 13, 24; 17:6, 10; 24:6, 19, 20; 25:1, 19, 19; 26:11; 33:16; 35:12; 38:14, 16; 57:12; 88:16; 89:5, 10; 91:18, 20; 98:8, 11, 13; 102:17; 105:16; 106:12; 109:18, 20; 112:13; 119:8, 14; 138:24; 159:18; 161:6; 162:9; 176:23
**worked** 9:7; 12:19; 19:5; 23:14, 16; 24:14, 15; 25:3, 16; 31:6; 35:6; 43:11; 46:11; 48:7; 52:7; 68:14; 69:1; 70:20; 71:10; 77:12, 21; 81:19, 23; 89:23; 105:4, 5; 143:1; 162:25; 163:13; 164:14; 174:3; 178:6
**worker** 24:4; 27:23; 32:1; 159:17, 20
**Workers** 22:10
**working** 8:5, 14; 12:8; 14:2; 15:16; 16:2, 5; 17:9; 18:5; 19:3; 23:18, 21; 24:3, 7; 27:9; 36:19, 21, 23; 50:25; 58:24; 59:2, 5, 12; 60:19; 72:5; 78:7, 24; 81:13; 105:2, 8; 106:7, 9, 11; 120:10; 149:23; 153:12; 155:13, 23;

159:10, 21; 161:20; 162:24; 163:2, 24; 169:8, 9; 176:18
**works** 106:10
**worth** 168:15, 18
**wow** 117:10
**write** 98:6; 100:18; 101:3
**writing** 45:5, 11; 64:17; 158:4
**written** 49:19; 100:16; 135:5; 153:16; 158:2
**wrong** 175:16, 17, 17
**wrote** 144:23; 165:12

# Y

**year** 5:22, 25; 6:9; 13:13; 19:10; 24:24; 36:12; 62:21; 70:5, 20; 84:13; 104:24; 106:1; 141:17, 19; 148:11; 158:12; 168:18, 24; 171:18, 20; 174:25; 175:1, 6
**years** 4:14; 6:2; 12:2; 28:3; 33:7; 34:1, 6; 43:12; 50:1; 64:14; 68:14; 69:1; 74:9; 82:5; 93:12; 101:17; 105:5; 106:15; 116:15; 118:25; 119:18; 135:11; 153:23; 154:9; 172:21; 174:1, 3; 175:18, 25
**York** 19:23; 24:9, 11; 25:13
**young** 57:6, 7, 8; 97:16; 121:17; 124:16
**younger** 60:11; 97:15; 105:18; 106:15; 117:18, 19, 19; 118:3; 122:5, 14; 130:16; 131:20; 146:17; 147:7, 13
**youngish** 87:2

```
 1            P R O C E E D I N G S

 2                        -  -  -

 3   Thereupon,

 4                   JACQUELINE IAIA,

 5   being by the undersigned Notary Public first duly

 6   sworn, was examined and testified as follows:

 7                   DIRECT EXAMINATION

 8   BY MR. DEL RUSSO:

 9       Q      Ma'am, can you begin, please, by telling

10   me your full name and the address where you live?

11       A      Jacqueline Iaia.  I live at 1113 Southwest

12   17th Street in Boca Raton, Florida 33486.

13       Q      How long have you lived at that address?

14       A      Six years.

15       Q      Is that a home, a townhouse, a

16   condominium?

17       A      It is a home, it is my sister's home.

18       Q      Do you rent it?

19       A      No.  She owns.

20       Q      Does anyone live in that house with you?

21       A      Her son and my sister.

22       Q      Prior to that time, ma'am, what was your

23   residential address?

24       A      I can't remember the street number.  I was

25   living in Davie with my boyfriend.
```

```
 1     Q     What was that gentleman's name?

 2     A     James Strait, S T R A I T.

 3     Q     I take it you are a Florida resident?

 4     A     Yes.

 5     Q     How long have you been a Florida resident?

 6     A     I moved here in 1974.

 7     Q     What is your date of birth, ma'am?

 8     A     6/28/48.

 9     Q     And your Social Security number?

10     A     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.

11     Q     I take it you are not married now?

12     A     Right, that's correct.

13     Q     Have you ever been married?

14     A     Yes.

15     Q     More than once?

16     A     Yes.

17     Q     Tell me the name of your first husband,

18  please.

19     A     Adrian Borrego.

20     Q     Can you spell that, please?

21     A     B O R R E G O, A D R I A N.

22     Q     And what year did you marry Mr. Borrego?

23     A     In 19, I believe it was '75 or '76, I am

24  sorry.

25     Q     Okay.  And do you remember the year that
```

```
 1   your marriage with Mr. Borrego was dissolved?

 2       A      We were only married two years.

 3       Q      '77 or '78?

 4       A      Right.

 5       Q      And what was the name then of your next or

 6   your second husband, please?

 7       A      It was Anthony Fisichella,

 8   F I S I C H E L L A.

 9       Q      And do you remember the year in which you

10   married Mr. Fisichella?

11       A      Yes, we married in 1982.

12       Q      And when was that marriage dissolved?

13       A      I think around 1991 or '92.  I am sorry.

14       Q      Those aren't the types of things you

15   commit to memory.

16              Were you married on any other occasions?

17       A      No.

18       Q      Do you have any children?

19       A      No, I don't.

20       Q      I take it your attorney has explained to

21   you why we are here, ma'am?

22       A      Yes.

23       Q      Concerning your lawsuit against the

24   hospital that I represent or the company that I

25   represent.
```

1          I am going to ask you some questions.

2   This gentleman to your right is our court reporter.

3   He is going to take down everything that everyone

4   says.  And consequently I have a few suggestions

5   that might make it a little bit easier for both of

6   us.

7          Let me finish my question, please, before

8   you answer, even though you might know what I am

9   getting at.  Sometimes I talk slow, sometimes I talk

10  fast.  And conversely, I will try to let you finish

11  your answer before I start my next question.  If we

12  end up talking over each other it becomes difficult

13  for this gentleman to take down what we say.

14         Also, you have to answer audibly with a

15  yes or a no, if your answer is yes or no, because

16  (indicating) and (indicating), again I might know

17  what you are referring to, they don't get typed up

18  necessarily the way you intended, so I may remind

19  you of that if you answer with a (indicating) or

20  (indicating).

21         If you don't understand any of my

22  questions, please feel free to ask me and I will do

23  my best to repeat it or rephrase it to where you

24  feel comfortable in answering.  Fair enough?

25     A      Yes.  I have a question.  Can I take notes

```
 1   at all?

 2              MR. JANKOWSKI:  Sure.

 3   BY MR. DEL RUSSO:

 4       Q     Ma'am, in terms of employment, are you

 5   currently working?

 6       A     Yes, I am.

 7       Q     Where do you work?

 8       A     Living Water Counseling at First Church

 9   West.

10       Q     What is the nature of that organization or

11   that business?

12       A     Living Water Counseling is a counseling

13   ministry, pastoral counseling.

14       Q     When did you begin working for Living

15   Water Counseling?

16       A     In June of 1998.

17       Q     What is your position, what do you do

18   there?

19       A     I am a marriage and family counselor.  I

20   am also community relations specialist.

21       Q     What does that mean?

22       A     I assist in marketing.

23       Q     What is it that you market?

24       A     Our counseling office.

25       Q     To people who may be in need of those
```

```
 1   services?

 2        A      (Indicating.)

 3        Q      That's a yes?

 4        A      Yes.

 5        Q      Do you work there on a full-time basis?

 6        A      Yes.

 7        Q      Have you worked there continuously from

 8   June of 1998 until today?

 9        A      Yes.

10        Q      What is your salary at Living Water

11   Counseling?

12        A      $10.30 an hour.

13        Q      Was that the salary when you began in June

14   of 1998?

15        A      No, it was $10 an hour.

16        Q      Do you receive any benefits in terms of

17   your employment other than the salary you get paid

18   such as insurance or anything like that?

19        A      Health insurance which just became

20   available in November.

21        Q      Why was that, did the company just start

22   the health insurance plan?

23        A      No, no.  I was just not brought on until

24   that time.  I am not exactly sure why.  Other

25   employees had health.  I was the new person and so I
```

INTERIM COURT REPORTING
(561) 478-0401

1    did not have health until I was there a while.

2         Q    Are there other counselors who work for

3    Living Water Counseling?

4         A    Yes.

5         Q    Is there a particular person who is your

6    supervisor or whom you report to?

7         A    (Indicating.)

8         Q    That's a yes?

9         A    Yes.

10        Q    Who would that person be?

11        A    My immediate supervisor is the director of

12   counseling.

13        Q    What is that individual's name, please?

14        A    Jeff Bercaw, B E R C A W.

15        Q    Do you know or can you tell me the address

16   of Living Water Counseling at First Church West?

17        A    12700 West Broward Boulevard, Plantation,

18   Florida 33325.

19        Q    Prior to June of 1998 what did you do in

20   terms of employment?

21        A    I was in school.

22        Q    What was the time period in which you were

23   in school?

24        A    From 1996 to 1998.

25        Q    Was there a particular month you can

INTERIM COURT REPORTING
(561) 478-0401

1    recall when you began your school?

2        A    August of '96 and I graduated in June of

3    '98.

4        Q    What was the name of the school or

5    facility that you went to?

6        A    South Florida Bible College and

7    Theological Seminary.

8        Q    What was the nature of your studies at

9    South Florida Bible College?

10       A    I was getting a master's degree in

11   marriage and family counseling.

12       Q    Did you attend that course of studies on a

13   full-time basis?

14       A    Yes.

15       Q    Was that a program where you had to attend

16   classes --

17       A    Yes.

18       Q    -- five -- you don't know what I am going

19   to say so let me finish my question.

20            MR. JANKOWSKI:  He warned you.

21            THE WITNESS:  He did.

22   BY MR. DEL RUSSO:

23       Q    Five days a week?

24       A    No, I was not in the classroom five days a

25   week.

```
 1      Q      Did you have any source of income or

 2  employment during the approximate two years that you

 3  attended the South Florida Bible College?

 4      A      Yes, sir.

 5      Q      Would you tell me about that, please?

 6      A      Okay.  Beachside Gardens I was employed,

 7  my friend, by a friend, who owned the motel, and I

 8  was working there for a very short time on an hourly

 9  basis.

10      Q      Can you put a time frame on that, using

11  the August 1996 until June 1998 period in which you

12  were taking these studies?

13      A      I am sorry, I didn't understand your

14  question.

15      Q      Yes.  This was a source of income that you

16  had while you were attending the South Florida Bible

17  College, correct?

18      A      Yes, sir.

19      Q      When was it that you worked on an hourly

20  basis at Beachside Gardens?

21      A      Okay.

22             (Pause.)

23      A      It would have been approximately May, June

24  and July of 1998.

25      Q      What type of work did you do at Beachside
```

INTERIM COURT REPORTING
(561) 478-0401

1    Gardens?

2       A      I was helping the owner to market his

3    motel to churches and religious organizations to

4    bring their groups to Beachside Gardens for

5    educational seminars.

6       Q      All right.  And what were you being paid

7    for those services?

8       A      I think it was either 8 or $9 an hour.

9       Q      Going back to the period that you attended

10   your studies at the South Florida Bible College,

11   August of '96 until June of '98, other than this

12   work that you did at Beachside Gardens, did you

13   during that approximate two year period, did you

14   have any other source of employment or income?

15      A      Yes, sir.

16      Q      What was that?

17      A      I was a, with Melaleuca, Melaleuca,

18   Incorporated.

19      Q      What type of business organization is

20   that?

21      A      It is a company that sells household items

22   and vitamins and products, healthy products for

23   personal use.

24      Q      What is the time period that you did work

25   for Melaleuca, Incorporated?

```
 1      A      From around 1996 to, to that time.

 2      Q      To the time you began working at Beachside

 3  Gardens?

 4      A      Yes.  I am still with Melaleuca but I

 5  don't sell the product.

 6      Q      What was the nature of your compensation

 7  that you got from Melaleuca?  Was it a salary, was

 8  it a commission, bonus?

 9      A      It was a commission.  If you -- you

10  would -- I would earn money on how many people I had

11  enrolled.

12      Q      Is it fair to say, ma'am, that from 1996

13  when you began with them until --

14          MR. JANKOWSKI:  Them being the school or

15      Melaleuca?

16          MR. DEL RUSSO:  I am sorry, Melaleuca.

17  BY MR. DEL RUSSO:

18      Q      From 1996 when you began with Melaleuca

19  until May of '98 when you began doing this work for

20  Beachside Gardens, that Melaleuca was your sole

21  source of income or employment?

22      A      Yes, sir.

23      Q      Let me go back then to your South Florida

24  Bible College.  I take it that in June of 1998 you

25  completed your course of studies?
```

```
 1     A      Yes, sir.

 2     Q      Did you graduate?

 3     A      Yes.

 4     Q      Did you receive a degree or diploma?

 5     A      Yes, sir.

 6     Q      What in?

 7     A      A master's of arts in Christian marriage

 8  and family counseling.

 9     Q      It was after that point you went to work

10  at Living Water Counseling, is that correct?

11     A      Yes, sir.

12     Q      I am trying to do this in reverse

13  chronological order.  You told me about your work at

14  Melaleuca from 1996 until May of 1998.  Prior to

15  that time, prior to the point this time in 1996 when

16  you began working at Melaleuca what was your source

17  of employment?

18          MR. JANKOWSKI:  I object to the form.  The

19       testimony wasn't that she stopped in 1998, that

20       she is still doing it.

21          MR. DEL RUSSO:  All right.

22  BY MR. DEL RUSSO:

23     Q      Subject to that caveat what were you doing

24  prior to your work at Melaleuca in terms of your

25  employment?
```

```
 1    A      I was with Mary Kay Cosmetics.

 2    Q      When did you begin working with Mary Kay

 3 Cosmetics?

 4    A      July 1991, I believe.

 5    Q      It was while you were still working at the

 6 hospital?

 7    A      Yes.

 8    Q      After your employment was terminated at

 9 the hospital did you at that point devote your

10 efforts, employment related efforts, exclusively to

11 Mary Kay Cosmetics?

12         MR. JANKOWSKI:  I object to the form.

13 BY MR. DEL RUSSO:

14    Q      You can still answer the question if you

15 understand it.

16         MR. JANKOWSKI:  You can answer.

17         THE WITNESS:  I am sorry, could you say it

18    again, please?

19 BY MR. DEL RUSSO:

20    Q      After your employment was eliminated at

21 the hospital did you from that point forward devote

22 your exclusive efforts in terms of employment to

23 Mary Kay Cosmetics?

24    A      I had looked for other job opportunities

25 outside of Mary Kay but I was -- Mary Kay was my
```

1    only source of income.

2        Q      What was the period of time that Mary Kay

3    provided you with your only source of income?

4        A      From November of '93 until January of '96.

5        Q      Ms. Iaia, you told me earlier that you

6    began work at Melaleuca in 1996?

7        A      Yes.

8        Q      Was there any gap in time between January

9    of '96 when you stopped working with Mary Kay

10   Cosmetics until the time that you began work with

11   Melaleuca?

12       A      No, sir.

13       Q      Does that mean you would have began with

14   Melaleuca in January or February of 1996,

15   thereabouts?

16       A      Yes.

17       Q      What was your position or your job, if you

18   will, with Mary Kay Cosmetics?

19       A      At what point in time, sir?

20       Q      I take it then that there were different

21   positions or different jobs?

22       A      (Indicating.)

23              MR. JANKOWSKI:  You have to answer yes or

24       no.

25              THE WITNESS:  Yes.

                    INTERIM COURT REPORTING
                         (561) 478-0401

```
 1   BY MR. DEL RUSSO:

 2       Q    Can you give me a brief summary of the

 3   different positions you held since the time you

 4   began in July of 1991 until the time you stopped

 5   working with them in January of 1996?

 6       A    Yes, sir.

 7       Q    Okay.

 8       A    I came aboard as a beauty consultant.

 9   That was my first title.

10       Q    Okay.

11       A    And then I won the car and became a team

12   manager.

13       Q    Okay.

14       A    After I won the car I became an

15   independent sales director.

16       Q    All right.

17       A    Those were my titles, yes, sir.

18       Q    Can you attach approximate time frames to

19   each of those three positions?

20       A    Yes, sir.  Well, I became a team manager

21   in July 1, 1994 so I was a beauty consultant then

22   from '91 to '94.

23            And then I became an independent sales

24   director in December, actually it would have been

25   January 1, '95.
```

INTERIM COURT REPORTING
(561) 478-0401

1    Q      Until January of '96?

2    A      Yes.

3    Q      Prior to working with Mary Kay Cosmetics

4  what was your source of employment?

5    A      I worked with Humana.

6    Q      That brings us back in terms of time to

7  when you were at Pembroke Pines Hospital?

8    A      Yes, sir.

9    Q      Can you give me, ma'am, a brief summary of

10 your educational background starting with the year

11 that you graduated high school?

12   A      I graduated high school in 1996 -- excuse

13 me, '66.

14         MR. JANKOWSKI:  Wishful thinking.  We all

15    wish that.

16 BY MR. DEL RUSSO:

17   Q      Where was that?

18   A      That was in Philadelphia, Convent of the

19 Sacred Heart.

20   Q      Were you originally from the State of

21 Pennsylvania?

22   A      Yes, sir; actually originally born in New

23 York but most of my life was spent in Philadelphia.

24   Q      What about in terms of college?

25   A      I graduated college in 1970.

INTERIM COURT REPORTING
(561) 478-0401

```
 1      Q      Which school?

 2      A      It was the University of Charleston in

 3   Charleston, West Virginia.

 4      Q      What was your degree in?

 5      A      I had a bachelor's in sociology.

 6      Q      What was your next formal education that

 7   you received, was it your master's degree at the

 8   South Florida Bible College?

 9      A      No.  After I was doing some postgraduate

10   courses at Broward Community College.  I was looking

11   to go into medical school and was going through some

12   science, taking sciences for a period of time there.

13      Q      What was the period of time that you took

14   postgraduate courses at Broward Community?

15      A      Around 1981, 1982, I believe, in that

16   area.

17      Q      Did those courses ever lead to a degree or

18   a diploma of any kind?

19      A      No, sir.

20      Q      What other formal education did you

21   receive?

22      A      Then graduate school.

23      Q      The master's degree from South Florida

24   Bible College?

25      A      Yes, sir.
```

INTERIM COURT REPORTING
(561) 478-0401

```
 1      Q      That was in '98, you told me, I believe.

 2             Do you hold any professional licenses?

 3      A      Not at this time, no.

 4      Q      Have you ever held any professional

 5  licenses?

 6      A      Yes, sir.

 7      Q      What professional licenses have you

 8  previously held?

 9      A      I had a, I was a licensed

10  psychotherapist.  That would have been in about 1982

11  or around that area -- no, excuse me, late

12  seventies, eighties.  I am sorry, sir, I can't be

13  exact there.

14      Q      Was that a license you received from the

15  State of Florida?

16      A      Yes.

17      Q      What did you do with that, what was your

18  intent to do with that license?

19      A      To do private counseling, psychotherapy

20  and counseling.

21      Q      Did you do any private counseling or

22  therapy?

23      A      No, sir.

24      Q      Did you just let that license lapse?

25      A      Yes.
```

```
 1      Q      Have you ever held any other licenses

 2  other than that of psychotherapist?

 3      A      No, sir.

 4      Q      Do you now belong or have you ever

 5  belonged in Florida to any professional

 6  organizations or affiliations?

 7      A      Yes, sir.

 8      Q      Tell me about those, please.

 9      A      I belong to the Association for Social

10  Workers, I belong to the Public Relations Society

11  for Hospital Marketers.  Actually I think the proper

12  title was called the Gold -- I don't know, sir, I

13  can't remember the exact title.  It is on my resume.

14      Q      Okay.  I've got a copy and I will show it

15  to you later so maybe it will help you refresh your

16  memory.

17      A      Okay.

18      Q      Any other organizations or affiliations

19  you can recall at this point?

20             MR. JANKOWSKI:  This is present or in the

21        past?

22             MR. DEL RUSSO:  Either.

23             THE WITNESS:  American Association of

24        Christian Counselors.

25             Are you looking for chamber of commerce?
```

1    BY MR. DEL RUSSO:

2        Q       Any affiliations with chambers of

3    commerce?

4        A       Yes, an alumni and, what is it called,

5    Leadership of Broward.

6        Q       Okay.  That's all that comes to mind?

7        A       Yes, sir.

8        Q       I would like to talk for a minute about

9    your employment history from when you completed your

10   education.

11              So once you received your college degree

12   from the University of Charleston, tell me what you

13   did in terms of your employment.

14       A       I worked in the social service department

15   at the James Guiffre Medical Center in Philadelphia.

16       Q       What was the time frame that you worked at

17   the James Guiffre Medical Center?

18       A       I was working there during summer breaks

19   in between college, I had started there.  So it

20   probably would have been around 1969.

21       Q       Did you begin working there on a full-time

22   basis after you completed your studies in college?

23       A       I believe so.

24       Q       What was your position, your job, at James

25   Guiffre Medical Center after you graduated from

1   college?

2       A       I was responsible for discharge planning

3   and working with patients that had drug addiction.

4       Q       Were you a social worker?

5       A       Yes, sir.

6       Q       For how long did you work at that James

7   Guiffre Medical Center?  When did you stop working

8   there?

9       A       I relocated to New York City and it would

10  have been around 1972 that I stopped there.

11      Q       When you moved to New York City did you

12  take on any job there on a full-time basis?

13      A       Yes, sir.

14      Q       Tell me where you worked.

15      A       I worked for Howard Schubert Printing

16  Company.

17      Q       What did you do at Howard Schubert

18  Printing Company?

19      A       Office and clerical work.

20      Q       For approximately how long did you work

21  there?

22              MR. JANKOWSKI:  If you recall.

23              THE WITNESS:  Approximately nine months, a

24      year.

25  BY MR. DEL RUSSO:

INTERIM COURT REPORTING
(561) 478-0401

```
 1      Q      And where did you then next go to work on
 2   a full-time basis?
 3      A      I moved to Florida and I worked for a
 4   doctor's office for a couple of months.  I can't
 5   remember the name of that office.  And then I was
 6   employed on February 5th of 1974 with Humana
 7   Hospital South Broward.
 8      Q      Other than the weather were there any
 9   other reasons that brought you down to Florida?
10      A      Yes, sir.
11      Q      What were the reasons that caused you to
12   relocate to Florida?
13      A      I was raped living in New York City.
14      Q      Did you have family here in Florida?
15      A      I had a grandmother.
16      Q      So you worked for a brief period of time
17   at a doctor's office?
18      A      Yes, sir.
19      Q      Office work, general office work?
20      A      Yes, sir.
21      Q      And you began in February of 1994 at
22   Humana South Broward?
23      A      Yes, sir.
24      Q      Have you ever been fired from a job?
25      A      Never, sir.
```

INTERIM COURT REPORTING
(561) 478-0401

```
 1     Q      Have you ever been asked to resign or

 2  leave a job in lieu of being fired?

 3     A      Well, I was terminated from Humana

 4  Hospital Pembroke.

 5     Q      Other than the incident that is the

 6  subject of this lawsuit.

 7     A      No, sir, never.

 8     Q      Have you ever lodged a claim or a

 9  complaint of discrimination, other than in

10  connection with this lawsuit, but in connection with

11  any other work that you have had?

12     A      No, sir.

13     Q      Have you ever been a party to a lawsuit

14  other than your divorces, previous divorces?

15     A      What do you mean by party to?

16     Q      Have you ever been a plaintiff where you

17  have sued someone or have you ever been sued by

18  anyone?

19     A      No, sir.

20     Q      Can you tell me about Humana Hospital

21  South Broward, where is that or was that located?

22     A      It no longer stands.  It was located in

23  Hallandale on Hallandale Beach Boulevard.

24     Q      Was it a general acute care hospital?

25     A      Yes, it was a general acute care facility,
```

1    a couple hundred beds.

2       Q    Do you remember how many beds, how many

3    employees?

4       A    I think we had about 200 beds and it had

5    probably 400 employees.

6       Q    It was a different physical facility than

7    the Humana Hospital at Pembroke Pines?

8       A    Yes, sir.

9       Q    When you began working at Humana Hospital

10   at South Broward what was your first job or first

11   position?

12      A    I was the director of social services.

13      Q    What was the time period in which you held

14   that job as director of social services?

15      A    Until 1987.

16      Q    That would have been from February of '94

17   until --

18      A    February of '74.

19      Q    I am sorry, February of 1974 until 1987?

20      A    Yes, sir.

21      Q    What was your job or what did your job

22   involve as director of social services?

23      A    I was a medical social worker.  I used to

24   review medical charts, make rounds with physicians,

25   discharge planning, psychosocial assessments on

INTERIM COURT REPORTING
(561) 478-0401

1    clients, patients, move them to nursing homes, meet

2    with their families.

3        Q      You did that for 13 years?

4        A      Yes, sir.

5        Q      Let me ask you this, was there anyone in

6    your department of social services other than you?

7        A      There were periods when I had a secretary.

8        Q      Other than a secretary was there anyone

9    that reported to you when you served as director of

10   social services at the South Broward Hospital?

11       A      No, sir.

12       Q      At some point in time your position

13   changed?

14       A      Yes.

15       Q      You became the director of public

16   relations and marketing, is that correct?

17       A      Yes, sir.

18       Q      Do you remember approximately when that

19   was?

20       A      In 1987.

21              (Defendant's Exhibit No. 1 was marked for

22   identification.)

23   BY MR. DEL RUSSO:

24       Q      During this deposition I am going to show

25   you some documents.  What I will do in terms of

```
 1   procedure, I will hand them to your attorney first

 2   to look at them and then show them to you.

 3          Let me show you a document that I have

 4   marked for identification as Exhibit 1 to your

 5   deposition.

 6          (Pause.)

 7          MR. JANKOWSKI:  I take it this was from

 8      our production, No. 1189?

 9          MR. DEL RUSSO:  I ask you, ma'am --

10          MR. JANKOWSKI:  That is a yes?

11          MR. DEL RUSSO:  That's a yes.

12          MR. JANKOWSKI:  Okay.

13   BY MR. DEL RUSSO:

14      Q   Look at this document, if you would, and

15   tell me if you recall seeing it before.

16      A   Yes, sir.

17      Q   By looking at this document does it help

18   refresh your memory as to when it was that you

19   changed or transferred from being director of social

20   services to being the director of public relations

21   and marketing?

22      A   Well, effective date 9/1/87.

23      Q   Is that reference in the document

24   consistent with your memory as to approximately when

25   it was that you became the director of public
```

```
 1   relations and marketing?

 2       A     Yes, sir.

 3       Q     I take it that was a promotion?

 4       A     Yes.

 5       Q     How did that come about?  Was there

 6   someone previously who held that position that had

 7   left?  Was it a new position?

 8       A     It was not a new position.  When I was

 9   director of social service I was handling blood

10   drives and certain events that were part of public

11   relations types of things and the previous PR

12   director had left, the position was available and my

13   boss offered me the position.

14       Q     What was the name of your boss?

15       A     Steve Sutherland.

16       Q     Was he the chief administrator, if you

17   will, at Humana South Broward?

18       A     Yes, sir, he was the executive director, I

19   believe he was called.

20       Q     That was the title they used for the

21   senior administrator there, CEO --

22       A     CEO.

23       Q     When you were the director of social

24   services did you report to him, Mr. Sutherland?

25       A     Yes, sir.
```

1      Q      When you became the director of marketing

2   and public relations did you continue to report to

3   him?

4      A      Yes, sir.

5      Q      What was the time frame in which you

6   worked as the director of marketing and public

7   relations at Humana South Broward Hospital?

8      A      The hospital closed in I believe it was

9   October of, I don't know, sir, it was either '90 or

10  '91, and so they had moved me from South Broward

11  Hospital over to Pembroke Pines Hospital.

12     Q      Was that in connection with this closing,

13  the fact that they were closing the hospital?

14     A      Yes.

15     Q      Was the switch from social services to

16  marketing and public relations from your

17  perspective, ma'am, a change in the nature of your

18  employment?

19     A      Oh, yes, sir.

20     Q      Prior to that time had you had any

21  experience in marketing or public relations?

22     A      I had had some, some marketing experience,

23  well, actually I think more public relations

24  experience.  Because of some of the employee

25  activity types of things that I did at South Broward

```
 1    Hospital while I was the social worker, Humana had

 2    sent me up to corporate, some corporate training.

 3        Q      In what areas?

 4        A      In public relations, the You Can Make It

 5    Happen Program.  But I was --

 6        Q      You had some corporate training in public

 7    relations while you were the social services

 8    director?

 9        A      Yes, sir.

10        Q      And you served first at Humana South

11    Broward and then at Humana Pembroke Pines as the

12    director of marketing and public relations, is that

13    correct?

14        A      Yes.  I was actually marketing both

15    hospitals at one period of time while they -- we

16    were doing the transition.  The PR director had left

17    Pembroke Pines Hospital and so I was marketing both

18    hospitals.

19        Q      You were in that position from September

20    of 1987 until November of 1983, is that correct?

21        A      '93, sir.

22        Q      Yes.

23        A      Okay, yes.  No.  September.

24        Q      September of 1987 until November of 1993.

25               MR. JANKOWSKI:  The question again?
```

INTERIM COURT REPORTING
(561) 478-0401

1  BY MR. DEL RUSSO:

2      Q     Is it not true that you served as director

3  of marketing and public relations from September of

4  1987 until November of 1993?

5      A     Yes, sir.

6      Q     That would have been a period for a little

7  more than six years?

8      A     Yes, sir.

9      Q     Do you feel you did a good job in that

10 position?

11     A     I did an excellent job, sir.

12     Q     What do you think, Ms. Iaia, were your

13 strengths in terms of marketing and public

14 relations?

15     A     I knew everybody.  Because I had physician

16 contacts, because of my social work background at

17 South Broward Hospital, I knew people from other --

18 discharge planners from the community.  When I got

19 involved in marketing and public relations I was

20 involved with the mayors and a lot of the

21 politicians.

22          I was very involved with the chamber of

23 commerce.

24          I would head up chamber of commerce

25 activities.  I did the golf tournament for many

```
 1   years.

 2              I knew a lot of people.

 3       Q     That was something that you feel would

 4   have been one of your strengths, were your contacts

 5   or connections?

 6       A     Contacts, yes, sir.  I had 20 years in the

 7   community.

 8       Q     Any other attributes that you feel

 9   provided you strength as the director of marketing

10   and public relations?

11       A     I did physician relations.  Part of the

12   marketing and PR job was physician relations.  And

13   we had been recruiting physicians, talking to them

14   from different places, if they were finishing up

15   their residency programs and looking for places to,

16   to relocate and start building their practices.

17              I had, was the media and spokesperson for

18   the hospital.  I handled the press.  I organized

19   marketing campaigns, would implement marketing

20   campaigns to market.

21              Our hospital was putting in an OB unit at

22   South Broward so I put a huge special event together

23   to market that hospital.

24              And then Pembroke Pines Hospital, they had

25   an OB unit and so when I went over to Pembroke Pines
```

1    Hospital some of their marketing materials were in

2    need of some help and so I was marketing that OB

3    department as well.

4          And they had a pediatric, we had a

5    pediatric unit there and so I was putting together

6    programs to market the pediatric unit and worked

7    with physicians in helping them market their

8    offices.

9    Q    Do you perceive yourself as an outgoing

10   person?

11   A    Yes, sir.

12   Q    Able to work well with others?

13   A    Yes, sir.

14   Q    At some point in time you told me that you

15   transferred over to the Pembroke Pines Hospital, is

16   that correct?

17   A    Yes, sir.

18   Q    And you were uncertain as to whether that

19   was in 1990 or 1991.

20   A    It would be in my resume, sir.

21        (Defendant's Exhibit No. 2 was marked for

22   identification.)

23   BY MR. DEL RUSSO:

24   Q    I will show you a document, ma'am, that I

25   have marked for identification as Exhibit 2 to your

INTERIM COURT REPORTING
(561) 478-0401

1    deposition and ask you if you would, to look at this

2    document and tell me if you recognize it and if it

3    helps refresh your memory as to when it was you

4    transferred from the South Broward Hospital to the

5    Pembroke Pines Hospital.

6              (Pause.)

7    A        That was, my official transfer date was

8    10/19.  However, prior to that, prior to that time

9    there were a couple of months that I was doing, I

10   was at Pembroke Pines Hospital and at South Broward

11   Hospital.

12   Q        10/19, the year would have been 1991?

13   A        Yes, sir.

14   Q        So does this help refresh your memory as

15   to whether your transfer was in 1990 or 1991?

16   A        It was 1991.

17   Q        And I understand from what you have told

18   me that several months prior to the October 1991

19   date you were there unofficially working at Pembroke

20   Pines Hospital?

21   A        I was there officially working there.  I

22   was getting paid.  They had increased my salary

23   compensation for working at both hospitals.  And the

24   compensation had begun prior to this date.

25             Now it occurs to me that I may have

```
 1   started going there around May or June.

 2       Q      I know you touched upon it a little bit

 3   earlier, but can you explain to me what your

 4   recollection is as to why you transferred over to

 5   Pembroke Pines in the first place?  Let me be more

 6   specific.

 7              Was your transfer made to Pembroke Pines

 8   because the South Broward Hospital was closing?

 9       A      Yes, sir.

10       Q      What was your understanding as to why the

11   hospital was closing?

12              (Pause.)

13       A      A period of time prior to 1991 Humana

14   Hospital acquired Pembroke Pines Hospital in a

15   purchase and now they had, Humana had two hospitals

16   that were not that far from each other.  And Humana

17   Hospital was suffering a low census and Pembroke

18   Pines Hospital census wasn't that much -- was low as

19   well.  So it was a corporate --

20       Q      Corporate decision?

21       A      -- decision to shut down South Broward

22   Hospital anticipating that the patients would move

23   to Pembroke Pines Hospital.

24       Q      So at one point in time both of the

25   hospitals were staffed and open and essentially
```

```
 1   competing with each other?

 2        A     Yes, sir.

 3        Q     And I understand, ma'am, from what you

 4   have told me that a decision was made at a corporate

 5   level to shut down the one hospital, South Broward

 6   Hospital, and with the hopes that the census would

 7   increase at the Pembroke Pines Hospital?

 8        A     Yes, sir.

 9        Q     Do you know if in connection with the

10   shutting down of the South Broward Hospital, whether

11   any of the employees at South Broward Hospital lost

12   their jobs?

13        A     Humana placed a majority of people and

14   assisted people in getting work.

15        Q     But do you know of anyone who was unable

16   to get work and as a result of shutting down the

17   South Broward Hospital lost their respective jobs?

18        A     No, sir.

19        Q     Is it your understanding that everyone

20   from the South Broward Hospital was placed within

21   the Humana system?

22        A     Not all were placed within the Humana

23   system but were placed.

24        Q     Is it fair to say that you don't know if

25   there were people who ended up losing their jobs
```

```
 1   because the Humana Hospital at South Broward closed?

 2       A      I am sorry, could you say that again?

 3       Q      Sure.  You told me earlier there were

 4   about 400 employees at the South Broward Hospital,

 5   is that correct?

 6       A      Yes, sir.

 7       Q      Is it fair to say, ma'am, you don't know

 8   either way whether when Humana shut down the South

 9   Broward Hospital some of those 400 people may have

10   ended up unemployed?

11       A      I don't know anyone who ended up

12   unemployed, sir.

13       Q      You were able to transfer over to the

14   Pembroke Pines Hospital, correct?

15       A      Yes, sir.

16       Q      Did you suffer a reduction in your salary

17   because you transferred over?

18       A      They took away -- I was offered a 10

19   percent increase and then the, when I started at

20   Pembroke full time they reduced the wage that was

21   given in the increase, but there was no loss of

22   benefit.

23       Q      Let me show you what I will mark as

24   Exhibit 3 to your deposition.

25              (Defendant's Exhibit No. 3 was marked for
```

```
 1   identification.)

 2            MR. DEL RUSSO:   That is an October 1991

 3       personnel action request.

 4            (Pause.)

 5   BY MR. DEL RUSSO:

 6       Q      Is that what you are referring to, ma'am,

 7   that they took away a 10 percent salary increase?

 8       A      Yes, sir.

 9       Q      Explain to me how you got the increase in

10   the first place and what your understanding was

11   later as to why it was taken away.

12       A      Okay.

13            The associate director at the hospital,

14   his name was Campbell Epes, had told me that they

15   were going to increase my salary by 10 percent to

16   handle the two hospitals.  He was the associate

17   director at Humana Hospital South Broward.

18            So for the period of time that I was the

19   PR and marketing director of both hospitals there

20   was that 10 percent increase in salary.

21            When I came on at Pembroke Pines Hospital,

22   I guess it would have been at this 10/21/91 date,

23   the South Broward Hospital was now officially

24   closed.  I was one of the last people to leave the

25   South Broward Hospital because there was so much
```

INTERIM COURT REPORTING
(561) 478-0401

1  that had to get done.  So my employment there was

2  really up to, you know, the gates actually being

3  locked.  Many of the employees had left prior to

4  that time.

5          And so when I was now at Pembroke Pines

6  Hospital the HR director, Claudia Jack, had informed

7  me that they were reducing my salary the 10

8  percent.  And I was shocked because no one, Mr. Epes

9  had never said that was what was going to happen.

10          I had signed some paperwork with him and

11  he had, I believe, changed the paperwork after I had

12  signed it that the salary was to be reduced.

13   Q     So did you feel that was something that

14  was unfair at the time?

15   A     Yes, sir.

16   Q     Did you complain to anyone about that?

17   A     Yes, I did.  I went to Claudia Jack, I

18  complained to her.  I went to Ed Maas, who was the

19  executive director at Humana Hospital Pembroke and I

20  told him.  And they just said, no, that was not the

21  arrangement to their understanding.

22          I said, well, this is not the arrangement

23  to my understanding, and produced, Claudia produced

24  some document that Epes had changed.

25   Q     Did you ever confront Mr. Epes with that?

INTERIM COURT REPORTING
(561) 478-0401

```
 1      A       He was no longer at South Broward

 2  Hospital, he was at some other facility.

 3      Q       So after you went and complained to

 4  Mr. Maas and Claudia Jack and they related to you as

 5  you have just told me that that was not their

 6  understanding, was that from your perspective, is

 7  that when the discussion died on your concern over

 8  the salary reduction?

 9      A       Yes, sir, I bit the bullet.

10      Q       Can you describe the Pembroke Pines

11  Hospital to me?  I know you mentioned it was on

12  Hallandale Beach --

13      A       No, Pembroke Pines Hospital was on

14  Sheridan and University.

15      Q       All right.  Was that facility bigger,

16  smaller or about the same as the Humana South

17  Broward Hospital?

18      A       It was a larger facility.

19      Q       Do you know approximately how many

20  facilities there were at the Pembroke Pines

21  Hospital?

22      A       I couldn't say, sir.

23      Q       Do you remember approximately how many

24  licensed beds there were?

25      A       300.
```

```
 1      Q      300?

 2      A      300, in that general vicinity.

 3      Q      When you transferred over officially in

 4  October of 1991 did you then have a new supervisor?

 5      A      Yes, sir.

 6      Q      Who was your new supervisor?

 7      A      Ed Maas.

 8      Q      Was he the CEO, if you will, at the

 9  Pembroke Pines Hospital?

10      A      Yes, sir.

11      Q      So you worked as an employee of the

12  Pembroke Pines Hospital for approximately two years,

13  is that correct?

14      A      Yes, sir.

15      Q      How long did Mr. Maas remain as your

16  immediate supervisor?

17      A      A very short time.

18      Q      How would you describe for me your

19  professional relationship with him?  Did you get

20  along with him as a supervisor?

21      A      Yes, sir.

22      Q      Do you feel he was fair?

23      A      I feel he was fair.  I know he enjoyed

24  having me there because of the new programs that I

25  was instituting that the previous PR person had not
```

1   been doing.

2       Q     Can you tell me about those new programs

3   you started to institute?

4       A     The promoting of the OB unit and visiting

5   physicians in their offices.  I started the employee

6   activity committee.

7       Q     Do you remember if Mr. Maas ever evaluated

8   you, performed an employee evaluation of you?

9       A     Yes, sir, he did.

10      Q     Let me show you what I will mark as

11  Exhibit 4 to your deposition and ask you if you

12  could take a moment, please, and review that

13  document and tell me if you recognize it.

14            (Defendant's Exhibit No. 4 was marked for

15  identification.)

16            (Pause.)

17  BY MR. DEL RUSSO:

18      Q     Do you recognize it?

19      A     Yes, I recognize this.

20      Q     Can you identify it for me?

21      A     Yes, this is my evaluation, employee

22  evaluation.

23      Q     As of December '91?

24      A     Yes, sir.

25      Q     Would that have been then the first

```
 1   evaluation that Mr. Maas did of you after you

 2   transferred to the Pembroke Pines Hospital?

 3        A    Yes, sir.

 4        Q    Do you know if that is his signature or

 5   his writing on the first page where his name

 6   appears?

 7             MR. JANKOWSKI:  Are you talking about the

 8        cover page?

 9             MR. DEL RUSSO:  Yes, sir.

10             THE WITNESS:  No, sir, I don't know if

11        that's his writing.

12   BY MR. DEL RUSSO:

13        Q    Do you know if he actually did this

14   evaluation?

15        A    Yes, sir, he did this evaluation.

16        Q    Can you turn to the fifth page in, it is

17   numbered or Bates stamped at the bottom 29.

18             Do you see the caption about a third of

19   the way down, Position Responsibilities?  It is cut

20   off a bit.

21        A    Yes, sir.

22        Q    Were those the descriptions of your job

23   responsibilities as far as you recall?

24             (Pause.)

25        A    Yes, those were my position
```

1    responsibilities.

2        Q     Do you feel Mr. Maas' evaluation of you

3    was fair?

4        A     Yes, sir.  We had a very short -- it says

5    an annual evaluation but I had only really come on

6    board full time October of '91 and this evaluation

7    was done two months later, so it was a short period

8    of time that I had known him.

9        Q     Subject to that, did you feel his

10   evaluation of you was fair, even though you only had

11   worked with him for two months on a full-time basis?

12       A     Yes, sir.

13       Q     Do you remember if you received a pay

14   raise in connection with that evaluation?

15       A     I would have, yes.

16       Q     Do you recall ever receiving an evaluation

17   at Pembroke Pines in which you did not receive a pay

18   raise?

19       A     No, sir.

20       Q     You mentioned that Mr. Maas was your

21   supervisor only for a shored period of time.  Do you

22   know what the circumstances were in which he would

23   have left the facility?

24       A     It is a corporation, sir, they move people

25   around and they moved him to some other hospital.

```
1      Q      Did you ever discuss with him --

2      A      No, sir.

3      Q      -- the reason that he might be moving?

4      A      No.

5      Q      Have you spoken with him since the time

6  you lost your job at Pembroke Pines Hospital?

7      A      Yes, sir.

8      Q      How long ago?

9      A      How long ago did I speak with him?

10     Q      Yes, ma'am.

11     A      Probably in 1994.

12     Q      Would that have been the only time that

13  you had an occasion to speak with Mr. Maas since you

14  lost your employment at Pembroke Pines Hospital?

15     A      Yes, sir.

16     Q      Was your discussion with Mr. Maas or did

17  your discussion with Mr. Maas concern in any way the

18  claim that you had brought for age discrimination or

19  this lawsuit or any of the issues raised in this

20  lawsuit?

21     A      Yes, sir.

22     Q      Tell me as best you can recall what you

23  discussed with Mr. Maas.

24     A      He was sorry to hear that I was let go.

25  He told me that I should retain counsel.  And that
```

1  was the extent of our conversation.  It was in a

2  social setting.

3      Q      Do you know where he is now?

4      A      Up in Cape Cod.

5      Q      How do you know that?

6      A      I still maintain a friendship with a woman

7  that I worked with and she told me that he bought a

8  bed and breakfast.

9      Q      What is the name of that woman who related

10  that information to you?

11      A      Pat Pierce.

12      Q      Was Ms. Pierce an employee at Pembroke

13  Pines Hospital?

14      A      Yes, sir.

15      Q      What position did she have at the hospital

16  that would have given her an occasion to know

17  Mr. Maas?

18      A      She was the administrative, I think I

19  believe her title was his administrative assistant.

20      Q      She was his secretary?

21      A      More than a secretary.

22      Q      After Mr. Maas left who did your

23  supervisor then become?

24      A      Jerry Sutphin.

25      Q      Did Mr. Sutphin remain or continue as your

```
 1   supervisor from that point of time until the time

 2   that your job was eliminated?

 3        A    Yes, sir.

 4        Q    Do you remember when it was that Mr. Maas

 5   left and Mr. Sutphin became your immediate

 6   supervisor?

 7        A    No, I can't recall that time.

 8             (Defendant's Exhibit No. 5 was marked for

 9   identification.)

10   BY MR. DEL RUSSO:

11        Q    I show you a document, ma'am, that I am

12   marking for identification as Exhibit 5.  I ask you

13   to take a moment and look at that, please.

14             (Pause.)

15        Q    Do you recognize this memo dated January

16   31, 1992?

17        A    Yes, sir.

18        Q    Is that your handwriting where it is

19   written, Thanks, Jackie?

20        A    Yes, sir.

21        Q    Looking at this does it help giving you a

22   time frame as to when Mr. Sutphin would have become

23   your supervisor in Pembroke Pines Hospital?

24        A    Certainly in January of 1992.

25        Q    And he remained your supervisor then for a
```

1    little less than two years?

2    A    Until --

3    Q    This was until November of --

4    A    Until November of '93.

5    Q    How would you describe the professional

6    relationship --

7    A    Excuse me, sir.

8    THE WITNESS:  I was looking at your time.

9    What time do you have?

10    MR. JANKOWSKI:  11:40.

11    THE WITNESS:  Okay.  My car --

12    MR. DEL RUSSO:  Off the record.

13    (Discussion off the record.)

14    (At 11:40 a.m. a 25 minute recess was

15    taken.)

16    BY MR. DEL RUSSO:

17    Q    Ma'am, before the break you had told me

18    that Mr. Sutphin became your new supervisor in

19    January of 1992, correct?

20    A    Yes, sir.

21    Q    Can you describe for me the professional

22    relationship that you had with Mr. Sutphin as your

23    supervisor?

24    A    He was my boss.  Could you elaborate, sir?

25    Q    Did you feel you had a good working

INTERIM COURT REPORTING
(561) 478-0401

1    relationship with him?

2        A    He did not -- he didn't like the marketing

3    and PR position and he was obvious in comments that

4    he had made to me.

5        Q    What's your basis for saying that he

6    didn't like the marketing and public relations

7    position?

8        A    Well, he said to me, "You know how I feel

9    about the marketing and PR director, you know how I

10   feel about the marketing and public relations

11   position."

12       Q    How did he feel?  What was he referring

13   to?

14       A    He was referring to, that -- well, he was

15   at another hospital, Aventura, before he came to our

16   hospital he was at Aventura Hospital and he spoke

17   ill of the PR marketing person over there.  He

18   didn't like her.

19            She was, she was old.  And he, he didn't,

20   he didn't like her.  She was old and he --

21       Q    How do you know she was old?

22       A    Well, because he liked -- because she was

23   about my age and I knew her.

24       Q    Did you ever speak to her about Jerry

25   Sutphin?

INTERIM COURT REPORTING
(561) 478-0401

```
 1      A      Only that I knew her because we had -- we

 2  were in a marketing and PR affiliation, and so I

 3  knew that he was her boss before he came to our

 4  hospital.

 5             But I never spoke with her personally

 6  about him, just that, you know, in an area of, you

 7  know, him being her employer and, and she worked for

 8  him.

 9      Q      What is her name?

10      A      Sue Baron.

11      Q      So you never spoke with Sue Baron about

12  her experiences in dealing with Jerry Sutphin, is

13  that correct?

14      A      Yes, sir.

15      Q      Did Mr. Sutphin ever say anything to you

16  negative about Sue Baron?

17      A      Yes.

18      Q      What did he say to you that was negative

19  about Sue Baron?

20      A      Indicating that she was, she was an

21  irritant, indicating that she was -- he didn't like

22  her, he didn't like her.

23      Q      Do you know at Pembroke Pines Hospital how

24  many other directors or managers reported to

25  Mr. Sutphin?
```

1    A    I couldn't tell you exactly how many.  I

2   don't know.

3    Q    Certainly more than you?

4    A    Yes.

5    Q    You told me earlier that he, being

6   Mr. Sutphin, didn't like the marketing/public

7   relations position you held and was obvious by

8   comments that he made to you, is that correct?

9    A    Yes.

10    Q    One comment you related was that he said

11   to you, quote, "You know how I feel about the

12   marketing and public relations position," that was

13   one comment he made to you?

14    A    Yes.

15    Q    What other comments did he make to you

16   that led you to believe that he did not like the

17   marketing/public relations position other than that

18   one?

19    A    He commented about the marketing and PR

20   position at Aventura Hospital.

21    Q    In connection with Sue Baron whom he

22   didn't like?

23    A    Yes.

24    Q    What other comments did he make to you

25   when he was your supervisor at Pembroke Pines

1    Hospital that led you to conclude that Mr. Sutphin

2    did not like the marketing and public relations

3    position?

4        A     He on two or three occasions, not just one

5    time, said, "And you know how I feel about the

6    marketing and public relations position."  So he

7    said that on more than one occasion.

8        Q     Okay.  So there are two or three occasions

9    where he made that comment?

10       A     Yes.

11       Q     There were the comments he made to you

12   about the person who held that position at the

13   Aventura Hospital whom he expressed that he didn't

14   like.  Any other comments that you recall that he

15   made to you that led you to conclude that he didn't

16   like the position you held?

17       A     No, I don't recall.

18       Q     Did he ever explain to you or express to

19   you what it was about the marketing/public relations

20   position that he didn't like?

21       A     No, he never did.  He was -- he also,

22   another employee had told me that he had also,

23   Mr. Sutphin had made a comment to him about me and

24   the marketing and public relations department.

25       Q     Do you know if Mr. Sutphin during the

1   period of time that he supervised you, do you know

2   if he had any guidelines or means by which he was

3   trying to assess the effectiveness of the marketing

4   at Pembroke Pines Hospital?

5        A     I don't know what means or guidelines he

6   had.

7        Q     Just so I am clear, ma'am, I understand

8   from what you have told me that he had expressed to

9   you and to others that he didn't like the position

10  you held.  And you have also told me that he never

11  explained to you what it was about your job that he

12  didn't like.

13             My question to you now is, did you ever

14  hear from others any explanation as to why

15  Mr. Sutphin may not have liked the position that you

16  held.

17       A     I had asked Ron Hoffman who told me that

18  one day Mr. Sutphin had said a comment to Ron about

19  me.  I was outside preparing I guess for some

20  special event at the hospital, and Sutphin said, you

21  know, look at her, and like, kind of a, this is -- I

22  don't know how you are going to put (indicating).

23       Q     Like in a, I am not trying mischaracterize

24  you, like in a dismissive way, less than

25  flattering --

```
 1      A      Less than flattering, derogatory.

 2      Q      Look at her?

 3      A      Yes.

 4      Q      Was that what Mr. Hoffman told you that

 5  Mr. Sutphin said to him about you?

 6      A      Yes, sir.

 7      Q      Did he say anything else that Mr. Sutphin

 8  said?

 9      A      No.

10      Q      I am not saying that is not enough, ma'am,

11  I just want to understand what was related to you.

12      A      Okay.

13      Q      So I was asking you earlier about your

14  professional relationship with Mr. Sutphin and you

15  began, ma'am, by telling me that you concluded that

16  he didn't like the job, the position that you held,

17  is that correct?

18      A      Yes, sir.

19      Q      Other than the fact that it was your

20  perception that he didn't like the marketing/public

21  relations position, how was your relationship with

22  him on a personal level?

23      A      I was respectful to him and when he came

24  aboard he announced in a managers meeting that he

25  required loyalty from the staff and certainly his
```

```
 1   managers and he would not tolerate any kind of

 2   disloyalty or gossip or unflattering communication

 3   about him.  So I was very respectful of him.  He was

 4   my boss.  I did what he asked me to do.

 5           He never really provided much direction.

 6   And I don't -- he liked the young girls.  He liked

 7   the young pretty girls and I was not, you know,

 8   young and pretty, like some of the other women.  And

 9   so the -- we didn't really have a whole lot of

10   communication.

11      Q    Did you find him to be a tough person to

12   work for?

13      A    No, not necessarily tough.

14      Q    Was he demanding?

15      A    No.  He was just, he was incompetent.  I

16   was -- there was -- he -- I believe that he made

17   some bad decisions that adversely affected our

18   hospital.

19      Q    Do you know if he acted differently to the

20   other directors he supervised than he acted towards

21   you?

22      A    Yes, he did.

23      Q    Tell me about that.

24      A    Well, he would chat -- there was a lot of

25   communication and chatting with Monique Montiero.
```

1    Q    How else did he treat other directors
2  differently than you?
3    A    She was a director.  And Julie Odessky, he
4  was very fond of Julie.
5    Q    What position did she hold?
6    A    She was, I don't know exactly her job
7  title but it had to do with joint commission,
8  quality assurance.
9    Q    Quality assurance manager or director,
10 something like that?
11   A    Yes.
12   Q    So my question is how did you perceive
13 that he treated other directors differently than he
14 treated you.  You told me there was a lot more
15 communication and chatting with Monique Montiero and
16 Julie Odessky.
17   A    Yes.
18   Q    How else did you perceive he treated other
19 directors differently than you?
20   A    I would have to say that I can't recall
21 other than him spending more time with them and
22 communicating more with them.
23   Q    Is it fair to say that you just didn't
24 have a very good working relationship with
25 Mr. Sutphin?

```
 1      A       Yes.  I have had other bosses that I have
 2   enjoyed better working relationship with.
 3      Q       And is it fair to say that based on what
 4   you observed other directors seemed to have a better
 5   working relationship with Mr. Sutphin than you did?
 6      A       Yes.
 7      Q       Those would include, based on your
 8   observations, Monique Montiero and Julie Odessky,
 9   fair statement?
10      A       Yes.
11      Q       Any other directors that you think may
12   have had a better working relationship with
13   Mr. Sutphin than you did?
14      A       Female directors or male directors?
15      Q       Anyone.
16      A       Anyone?
17      Q       Yes.
18      A       Well, he would, just from a, from the
19   women's point of view, from a female point of you
20   view, he would flirt with them so he had better
21   relations with the male, other men directors, male
22   directors, but he didn't flirt with them.  But he
23   was flirting with -- he would flirt with the women.
24      Q       Did he ever flirt with you?
25      A       No.  One time, however, I guess -- excuse
```

```
 1   me, never verbally, no, he never flirted verbally

 2   with me.  But there was a time that, you know, I

 3   took my jacket off and I had something short

 4   sleeveless on and, you know, he was looking at my

 5   breasts.

 6       Q     Did he say anything to you?

 7       A     No.

 8       Q     And you observed that he was observing

 9   your breasts?

10       A     Yes.

11       Q     By the way, is he an older or younger

12   gentleman than you?

13       A     Older.

14       Q     Do you know what his approximate age is?

15       A     I would say that at the time probably,

16   approximately -- I am guessing.  Maybe I should just

17   say no, I don't know.

18       Q     Did I understand you to say earlier that

19   you also felt he had a better working relationship

20   with some men directors than he did with you?

21       A     Yes.

22       Q     Did he ever do a job evaluation of you?

23       A     Yes.

24       Q     Let me show you, ma'am, what I will mark

25   as Exhibit 6 to your deposition.  It appears to be
```

1    an excerpt of an evaluation.

2            (Defendant's Exhibit No. 6 was marked for

3    identification.)

4    BY MR. DEL RUSSO:

5        Q    I ask you if you recognize that as part of

6    a 1992 job evaluation done of you.

7            (Pause.)

8        A    Yes, sir.

9        Q    Was this something that was done by

10   Mr. Sutphin?

11       A    Yes.

12       Q    Did you feel that the evaluation from

13   which this two-page document came was fair to you?

14       A    It was adequate.

15       Q    You didn't, for instance, complain about

16   this evaluation or file any sort of grievance with

17   human resources that you were not being evaluated

18   fairly, did you?

19       A    No.

20       Q    And you did receive a pay increase in

21   connection with this evaluation, didn't you?

22       A    Yes.

23       Q    Did Mr. Sutphin ever reprimand or

24   discipline you in any manner that you felt was

25   unfair or inappropriate?

1      A      No.

2      Q      You mentioned earlier to me, ma'am, that

3   in discussing Mr. Sutphin that you felt he was not a

4   competent CEO and that he made some bad decisions

5   for the hospital, is that correct?

6      A      Yes.

7      Q      Can you explain to me what you mean by

8   those statements?

9      A      When I had come into the hospital we were

10  promoting OB and the pediatric unit.  And he closed

11  the pediatric unit, I mean, just took out the peds,

12  took out the peds unit.  We were the only pediatric

13  hospital around in that area.

14     Q      How do you know that was his decision

15  instead of a corporate level decision?

16     A      Well, he was making decisions for the

17  hospital.  That was his job.  And it takes a while,

18  you know, it takes -- a good administrator starts

19  planning and putting things in action, and you don't

20  really see the fruit right away, you see it down the

21  road.  It takes maybe a year or two.  And so from --

22  you didn't see a lot of the, the bad decisionmaking

23  right away.  You didn't see the results of that

24  until somewhere down the road.

25             And so at the point that he left which was

INTERIM COURT REPORTING
(561) 478-0401

```
 1   in '94, the week after he -- that I was terminated,

 2   he left.  He left two days later, within a couple of

 3   days.  And so, you know, things were not -- the

 4   hospital -- things were not -- census was low.

 5   Things just weren't going well.

 6        Q    My specific question, to you, ma'am, was

 7   how did you know that the decision to close the

 8   pediatric unit was his decision.

 9        A    He ran the hospital.

10        Q    Did he ever tell you he made the decision

11   to close the pediatric unit?

12        A    He would announce in managers meetings

13   that he -- that we are closing the pediatric unit.

14        Q    Was it based upon that that you concluded

15   it was his decision to close the pediatric unit?

16        A    Yes.

17        Q    Did he ever express to you or others in

18   your presence the reasons why the pediatric unit was

19   being closed?

20        A    I can't remember.

21        Q    Any other instances of decisions which he

22   made that you feel were bad decisions for the

23   hospital?

24        A    I can't remember.

25        Q    Why else do you feel he was, as you put
```

1    it, an incompetent administrator at the hospital?

2        A     This is all I can really recall at this

3    time, but probably later I will remember other

4    things, but this is all I can really remember now.

5        Q     In connection with the job that you did at

6    the hospital, can you -- I know you have told me you

7    were the director of marketing and public

8    relations.  Can you be a little more specific to me

9    in explaining what you did on a daily or weekly

10   basis at the hospital?  What type of things would

11   you do in a general sense?

12              MR. JANKOWSKI:  Which period of time?

13   BY MR. DEL RUSSO:

14       Q     I guess the two years that you were the

15   director of marketing and public relations at the

16   hospital from the end of '91 until the end of '93.

17       A     I was writing the newsletter.  I was

18   putting together a promotional audio-visual project

19   on the hospital and would show this at different

20   business places and areas to promote the hospital.

21       Q     How often were you physically outside the

22   hospital facility?

23       A     In a percentage of total job time?

24       Q     Yes.

25       A     I would say probably 30 percent at

```
 1   community events.

 2       Q       Did you have at the hospital an office?

 3       A       Yes.

 4       Q       Where was your office located when

 5   Mr. Sutphin was your supervisor?

 6       A       One of the rooms adjacent to his office.

 7       Q       So you were in the administration suite?

 8       A       Yes.

 9       Q       Did Mr. Sutphin ever say to you any

10   comments about your age, specifically about your

11   age?

12       A       To me personally, no.

13       Q       What about comments you have heard about

14   from others that Mr. Sutphin made about your age?

15       A       None specific to me to others about my

16   age.

17       Q       None you have heard about from others?

18       A       No.

19       Q       What about any age related remarks, I am

20   intentionally asking as broad a question as I can,

21   comments, any age related comments or remarks by

22   Mr. Sutphin?

23       A       He would say, like in the managers

24   meeting, when Columbia came in, he would say, "You

25   know, if you're complacent, you know, if your
```

1    attitude is old and complacent you are not going to,

2    you're not going to make it around here."

3    Q    And he said that at a managers meeting?

4    A    (Indicating.)

5    Q    That's a yes?

6    A    Yes.

7    Q    How many people attended the managers

8    meetings?

9    A    I would say approximately 30.

10    Q    Any other general age related comments

11    that you ever heard Mr. Sutphin say?

12    A    There was an attitude of, like, in with

13    the new and out with the old.

14    Q    What did he say?  That might have been

15    your perception of an attitude.  What do you recall

16    him saying in any of those situations that would

17    have been an age related comment or remark?

18    A    "If you are not able to cut the mustard

19    heads are going to be rolling."

20    Q    Any other comments that you recall?

21    A    No.

22    Q    How often would you see him on a weekly

23    basis or daily basis?

24    A    Every day that I was in the hospital and

25    that he was in the hospital we would, you know -- we

INTERIM COURT REPORTING
(561) 478-0401

1   didn't talk daily but he was there, unless someone

2   was on vacation.

3       Q      So you would see him, unless you were out

4   or he was out you would see him on a daily basis?

5       A      At a distance or around.

6       Q      Your office was in the same area as his?

7       A      Yes, but there were two entrances into my

8   office so I could avoid going in through the main

9   suite and come in through the other entryway and

10  therefore not see him.

11      Q      Did you have an opportunity to observe how

12  he interacted with other people?

13      A      Yes.

14      Q      Did you have an opportunity to hear him

15  even though you couldn't see him because his office

16  was in the vicinity of yours?

17      A      To see him interact?

18      Q      To hear him talking to other people, other

19  managers or employees or coworkers.

20      A      Yes, at times.

21      Q      Going back to your job, ma'am, the job you

22  were performing, I asked you earlier if you knew

23  whether Mr. Sutphin had any gauge or guidelines by

24  which he was trying to evaluate the success of

25  hospital marketing.  I think you told me you didn't

1  know how he did that if at all.

2          My question, ma'am, to you is did you have

3  any guidelines or means by which you evaluated how

4  successful your marketing efforts were.

5      A     I would have to say that, for instance, if

6  we did an emergency room campaign, if we sent out a

7  mailer to promote the emergency room, then we

8  could -- we would attempt to track the usage of the

9  emergency room based upon the campaign.  And so we

10  would track that according to census.

11      Q     Were you provided with information on

12  patient census at the hospital?

13      A     Yes.

14      Q     During the two years that you worked at

15  Pembroke Pines Hospital do you recall if the daily

16  patient census was increasing or decreasing or

17  staying about the same?

18      A     It would fluctuate based upon the

19  snowbirds being here, so it was changeable.

20      Q     Other than the fact that the population

21  increases during the season and therefore the census

22  would increase during the season, other than that

23  fact, do you recall whether, taking that into

24  account, the patient census was decreasing,

25  increasing or staying the same during those two

```
 1   years that you worked at the hospital?

 2             MR. JANKOWSKI:  Asked and answered.

 3             You can answer it.  I just noted my

 4        objection.

 5             THE WITNESS:  When South Broward Hospital

 6        closed they had, you know, a shift from,

 7        movement of clients, patients.  Sometimes the

 8        census was up and sometimes it was down.

 9   BY MR. DEL RUSSO:

10        Q     Let me show you a document I will mark as

11   Exhibit 7.  I want you to take a moment, please, and

12   look at that and tell me if you recognize that July

13   27, 1993 memo.

14             (Defendant's Exhibit No. 7 was marked for

15        identification.)

16             (Pause.)

17   BY MR. DEL RUSSO:

18        Q     Do you recognize that?

19        A     Yes.

20        Q     Is that something you prepared?

21        A     Yes.

22        Q     How often would you prepare these memos to

23   the community advisory board?

24        A     This was the board of directors at the

25   hospital.
```

INTERIM COURT REPORTING
(561) 478-0401

1    Q        That's who the community advisory board

2    was?

3    A        Yes.  And quarterly activities, I can't

4    exactly recall but, you know, my inclination would

5    be that they met four times a year so I would do a

6    quarterly report.  We used to have lunches and I

7    don't know if it was any more or less.

8    Q        Would this quarterly activity memo to the

9    community advisory board be a good snapshot of the

10   types of things that you were doing during this

11   three month period?

12   A        Yes.

13   Q        Did Pembroke Pines Hospital have a

14   volunteer program?

15   A        Yes.

16   Q        Was that something that was separate than

17   the Senior Friends Program?

18   A        Yes.

19   Q        Do you remember if at the time, the two

20   year period that you worked at that hospital whether

21   there was an individual who was in charge of that

22   volunteer program?

23   A        Yes.

24   Q        Who was that individual?

25   A        Claudia Jack, she was the human resource

1    director.

2        Q      It is your recollection that the HR

3    director also ran the volunteer program?

4        A      Yes.

5        Q      To what extent would you as the director

6    of marketing and public relations interact with

7    Claudia Jack with respect to the volunteer program?

8        A      We did not have a very large interaction,

9    I would say minimal.

10       Q      When you worked at Pembroke Pines Hospital

11   as the director of marketing and community relations

12   were there any employees that reported to you?

13       A      No.

14       Q      Were you essentially a one person

15   department?

16       A      I was a one person department.  The

17   structure of the marketing and PR department was

18   such that the Senior Friends was -- the

19   accountability of the director of Senior Friends was

20   to the marketing and PR director.  So the Senior

21   Friends Program was part, was the lesser position

22   because that, that position reported to the

23   marketing and PR director position.

24       Q      Did anyone else report to you?

25       A      No.

```
 1      Q      When you transferred over to Pembroke
 2   Pines was Monique Montiero the director of Senior
 3   Friends?
 4      A      Yes.
 5      Q      So was she working at Pembroke Pines
 6   Hospital before you transferred to that hospital?
 7      A      Yes.
 8      Q      Do you know what her hire date was at
 9   Pembroke Pines Hospital?
10      A      I had, when I was at South Broward
11   Hospital, the director of Senior Friends was out on
12   a head injury and I had managed that department for
13   a period of time.  And the first time that I met
14   Monique was on a trip that I was taking, the Senior
15   Friends from South Broward Hospital to Nashville and
16   we were on a, all of the five Humana hospitals were
17   taking Senior Friends to Nashville and Monique had
18   just come in at that time and that was the first
19   that I had met her.  And so I was at South Broward,
20   she was at Pembroke Pines Hospital, and I would -- I
21   am kind of sketchy on the time frame but maybe about
22   1990.
23      Q      So there was a period of time when you
24   were at South Broward that you oversaw or covered
25   the Senior Friends Program when its director was out
```

1    with a head injury?

2    A    Yes.

3    Q    How long was that period for?

4    A    I can't recall exactly, but six months, I

5    believe, more or less.

6    Q    Your job title never changed, did it,

7    during that period?

8    A    No.

9    Q    That was just an additional duty you took

10    on while you were the director of marketing and

11    public relations at that hospital?

12    A    Yes.  And there was staff, there was a

13    staff person and she did report to me.  There was a

14    secretary.

15    Q    What was the name of the director of

16    Senior Friends who was at South Broward but went out

17    with a head injury?

18    A    Cindy Gates.

19    Q    Did she come back after that approximate

20    six months period?

21    A    I don't remember.

22    Q    Do you remember if the hospital instead

23    hired a new director of Senior Friends?

24    A    They did not hire a new director.

25    Q    Did you receive any form of additional

INTERIM COURT REPORTING
(561) 478-0401

```
 1    compensation when you were at the South Broward

 2    Hospital during the period of time that you were the

 3    marketing and public relations director and you also

 4    covered as the director of the Senior Friends

 5    program?

 6        A      No, I did not.

 7        Q      So you had more seniority than Monique

 8    Montiero within the Humana system, fair statement?

 9        A      I had been there 20 years.

10        Q      Fair statement?

11        A      Yes.

12        Q      But she had more seniority than you with

13    respect to the Pembroke Pines Hospital employment,

14    fair statement?

15               MR. JANKOWSKI:  I object to the form.

16               THE WITNESS:  Well, yes, sure, date of

17        hire was 1990.  You have the...

18    BY MR. DEL RUSSO:

19        Q      Who did she report to at Pembroke Pines?

20        A      Valerie Moran  -- maybe she wasn't married

21    then -- Valerie Lockwood Moran, the director of

22    marketing and public relations.

23        Q      I am sorry, who was Valerie Lockwood

24    Moran?

25        A      She was the director of marketing and
```

1    public relations.

2        Q        Before you?

3        A        Yes, at Pembroke Pines Hospital.

4        Q        When you transferred over to Pembroke

5    Pines Hospital the fall of 1991 who did Monique

6    Montiero report to?

7        A        Ed Maas.

8        Q        Who was the chief executive officer?

9        A        Yes.

10       Q        And when Mr. Maas left do you know who

11   Monique Montiero then reported to?

12       A        Jerry Sutphin.

13       Q        She reported to the same administrator

14   that you reported to?

15       A        Yes.

16       Q        I thought I understood you to tell me

17   earlier, ma'am, that director of Senior Friends was

18   supposed to report to the director of marketing.

19            MR. JANKOWSKI:  I object.  That was not

20       her testimony.

21   BY MR. DEL RUSSO:

22       Q        Was it your testimony earlier, ma'am, that

23   the director of the Senior Friends Program at the

24   Pembroke Pines Hospital was supposed to be reporting

25   to the director of marketing?

```
 1      A       Yes, sir, she reported to Valerie Moran

 2   who was the director of marketing.

 3      Q       Okay.  But that changed after you became

 4   the director of marketing and she began to report to

 5   the CEO?

 6      A       Yes.

 7      Q       Do you know why that changed?

 8      A       No, I don't.

 9      Q       Do you know if it had anything to do with

10   the Senior Friends Program or the level of activity

11   within the Senior Friends Program?

12      A       I don't know why.

13      Q       So you never supervised her?

14      A       No, I did not.

15      Q       How often would you see her on a daily or

16   weekly basis?

17      A       Probably three times a week.

18      Q       Was her office located in that same

19   administrative suite where you and Mr. Sutphin were?

20      A       No, she was a separate building, a

21   freestanding building outside of the hospital.

22      Q       You would see her maybe three times a

23   week?

24      A       Yes --

25      Q       Approximately?
```

1     A      In the cafeteria.

2     Q      To what extent did you interact with her

3  or deal with her when you were the director of

4  marketing and public relations and she was the

5  director of Senior Friends?

6     A      We did projects, there were projects that

7  we had, had to discuss or confer about.

8     Q      Do you know if her job included any

9  marketing aspects to it?

10    A      She -- there were aspects of marketing

11 with her job.  She marketed the senior people.

12    Q      You worked with her together on some

13 projects?

14    A      Yes.

15    Q      Did you have an opportunity to assess her

16 job performance?

17    A      Was I involved in her, are you saying, was

18 I involved in her job evaluations?  Is that --

19    Q      No, I assume you were not.

20    A      No, I was not.

21    Q      But based on the fact that you worked with

22 her as one director to another on some projects, did

23 you have any assessments that you reached in your

24 own mind as to her job performance?

25    A      Yes.

```
 1     Q     What were your assessments of her?

 2     A     When we had taken that trip to Nashville I

 3  had seen a level of immaturity in dealing with the

 4  senior citizens.  So I had made an assessment at

 5  that time and --

 6     Q     That would have been before you were

 7  working at Pembroke Pines?

 8           MR. JANKOWSKI:  Excuse me, let her finish

 9      the answer before you ask the next question.

10  BY MR. DEL RUSSO:

11     Q     I am sorry, were you not finished with

12  your answer?

13     A     No, I wasn't.

14     Q     I am sorry, then, please.

15           THE WITNESS:  What did I just say there?

16           MR. DEL RUSSO:  Read it back.

17           (Record read.)

18           THE WITNESS:  And had conveyed that to her

19      supervisor.

20  BY MR. DEL RUSSO:

21     Q     Valerie Moran?

22     A     Yes.

23     Q     Do you know the circumstances in which

24  Valerie Moran ceased working at the hospital,

25  Pembroke Pines Hospital?
```

```
 1      A       The corporate office created a regional

 2   position for Senior Friends and Valerie was placed

 3   in that regional position to market -- the whole

 4   idea of Humana was to, was to glom the senior

 5   citizens to come into the hospital so they would be

 6   effective leads, that these people would bond with

 7   the hospital and thereby choose to have Humana

 8   insurance and thereby build the hospital census and

 9   revenue.

10      Q       It was a form of marketing the hospital

11   through the senior citizens, fair statement?

12      A       Yes, the insurance division.

13      Q       And the hospital itself?

14      A       And the hospital and to drive census.

15      Q       Patient census?

16      A       Yes.

17      Q       So it was a form of marketing the hospital

18   through the senior citizens of the community,

19   correct?

20              MR. JANKOWSKI:   I object to the form.

21              THE WITNESS:   Indirectly.

22   BY MR. DEL RUSSO:

23      Q       Weren't there benefits that members of the

24   Senior Friends Program received in terms of hospital

25   stay and hospital expenses if they had joined the
```

1    Senior Friends Program?

2      A      I can't recall benefits to their hospital

3    stay.

4      Q      You mentioned to me earlier that there was

5    an approximate six month period back when you were

6    at the South Broward Hospital when you had to cover

7    the job of director of Senior Friends, correct?

8      A      Yes.

9      Q      Did you ever tell that to Ed Maas when you

10   transferred over to Pembroke Pines?

11     A      Yes, he knew.

12     Q      How do you know he knew?

13     A      Through conversations that I had had with

14   him.

15     Q      So you told Mr. Maas that you had at one

16   point covered Senior Friends?

17     A      Yes.

18     Q      What about Jerry Sutphin, did you ever

19   tell him there was a period of time that you covered

20   the Senior Friends job at South Broward Hospital?

21     A      I don't remember telling him such.

22     Q      Do you have any firsthand knowledge as to

23   whether Jerry Sutphin knew that you had at one point

24   covered the Senior Friends job at South Broward

25   Hospital?

```
1      A      No, I don't.

2      Q      We were talking earlier, ma'am, about

3   Monique Montiero and I asked you if when you were

4   the director of marketing at Pembroke Pines and she

5   was the director of Senior Friends and you

6   interacted with her on these projects if you had an

7   opportunity to assess her job performance and you

8   related to me that when you took this trip to

9   Nashville you thought there was a certain level of

10  immaturity by her, is that correct?

11     A      Yes.

12     Q      That trip to Nashville was back when you

13  were still working at the South Broward Hospital,

14  was it not?

15     A      Yes.

16     Q      What I would like to do, ma'am, is ask you

17  that question again but ask you to please focus on

18  any assessments you had of her and her job

19  performance when the both of you worked as directors

20  at the Pembroke Pines Hospital.

21     A      And so that question was?

22     Q      What was your assessment of her job

23  performance when both of you worked at the Pembroke

24  Pines Hospital?

25     A      She followed through and I would say that
```

1    she was competent in performing her duties.

2    However, her attitude was still at times harsh

3    and...

4         Q    Did you feel she had the same level of

5    immaturity that you first saw several years earlier

6    when you were at the South Broward Hospital?

7         A    She had shown some improvement, not the

8    same level.

9         Q    Based on your observations of her at the

10   Pembroke Pines Hospital was she a -- was she well

11   liked by the Senior Friends or the members of the

12   Senior Friends Program or did you have any

13   observations along those lines?

14        A    I didn't really have any dealings with

15   those people at that time.  I had no observation.

16        Q    Do you know how successful the Senior

17   Friends Program was at the Pembroke Pines Hospital?

18        A    Well, I know that they had specific goals

19   that were required to be met and I also -- and I

20   know that those goals were met because a great deal

21   of, when they closed the South Broward Hospital, the

22   Senior Friends from the South Broward came, you

23   know, into the Pembroke Pines Hospital.  So it was,

24   it was a movement of one group of people to the

25   other because the other program closed down.

```
 1     Q      That was something that you observed?

 2     A      Yes.

 3     Q      Did Jerry Sutphin ever speak to you about

 4  Monique Montiero or about his assessment of her

 5  performance?

 6     A      He never spoke to me about her, no.

 7     Q      At some point in time Columbia came in and

 8  acquired the Pembroke Pines Hospital, is that

 9  correct?

10            THE WITNESS:  Can we take a break?

11            MR. DEL RUSSO:  You want to take a break

12      now?

13            THE WITNESS:  Yes, I am getting a little

14      weary.  I need some fuel.

15            MR. DEL RUSSO:  Do you want to take a

16      lunch break?  It is already 1:00.

17            MR. JANKOWSKI:  Probably a good idea.

18            MR. DEL RUSSO:  Off the record.

19            (At 1:05 p.m. a luncheon recess was

20      taken.)

21

22

23

24

25
```

```
 1                    AFTERNOON SESSION

 2                         2:10 p.m.

 3   BY MR. DEL RUSSO:

 4       Q      At some point Pembroke Pines Hospital was

 5   acquired or purchased by Columbia, do you recall

 6   that?

 7       A      Yes, I do.

 8       Q      Do you remember approximately when you

 9   first learned that Columbia was involved or was

10   acquiring that hospital?

11       A      I believe it would have been around

12   September of '94.

13       Q      Well, it would have been the same year

14   that you learned that you were losing --

15       A      1994, right?

16       Q      '93.

17       A      1993, right.

18       Q      How did you learn that Columbia was

19   acquiring that hospital?

20       A      At a managers meeting.

21       Q      What was your understanding of what was

22   happening?  Was Humana selling to Columbia?  What

23   was your understanding, a layperson's understanding

24   of what was going on?

25       A      Prior to this acquisition -- it was an
```

```
 1   acquisition.  Prior to this acquisition Humana had
 2   wanted to split the hospital division from the
 3   insurance division.  And so in February, the prior
 4   February, there was a split.  The Galen Hospital,
 5   the hospital division was called Galen and the
 6   insurance division maintained the name Humana.  And
 7   so Columbia came in and acquired the Galen
 8   hospitals.
 9        Q    So it was your understanding that in
10   September of '93 there was a new owner of Pembroke
11   Pines Hospital?
12        A    Yes.
13        Q    What happened from your observations to
14   the senior management at Pembroke Pines Hospital, if
15   anything when the hospital was sold by Humana or
16   Galen to Columbia?
17        A    The director of human resource who was
18   over the age of 40 was terminated.
19        Q    Was that Ms. Jack?
20        A    Yes.
21        Q    Isn't it true that every senior manager
22   was replaced at that hospital?
23        A    In time.
24        Q    The director of human resources was
25   replaced as you just mentioned?
```

```
 1    A      (Indicating.)

 2    Q      Yes?

 3    A      Yes.

 4    Q      What was the name of her replacement?

 5    A      Paula Adamson.

 6    Q      Was she over 40?

 7    A      I don't know.

 8    Q      Do you remember who the chief operating

 9  officer was at Pembroke Pines Hospital before

10  Columbia acquired the hospital?

11    A      Jerry Sutphin.

12    Q      Chief operating officer.

13    A      Oh, operations.

14           (Pause.)

15    A      No, I don't.  I am sorry, I can't

16  remember.  I don't know if the position was vacant

17  or -- we did have a -- I can't recall.

18    Q      Do you remember a lady by the name of Pam

19  Corliss?

20    A      Yes.

21    Q      Did she come in after Columbia acquired

22  the hospital as the chief operating officer?

23    A      Yes.

24    Q      Do you know how old she was?

25    A      No, I don't.  It was rumored that she
```

1    wouldn't tell her age because she wanted to remain

2    youngish.

3        Q    Do you remember who the chief financial

4    officer was at that hospital prior to the time that

5    Columbia acquired it?

6        A    I believe it was Michael Schialdone, I

7    believe he was there at that time.

8        Q    Do you know if he was replaced by someone

9    at the hospital?

10       A    I don't know.

11       Q    Do you know how old Mr. Schialdone was?

12       A    He was in his, probably late twenties.

13       Q    Do you remember who the director of

14   nursing was at the hospital prior to Columbia's

15   acquisition?

16       A    Carol Naples.  She was over 40.

17       Q    She was replaced after Columbia acquired

18   the hospital, wasn't she?

19       A    Yes, she was.

20       Q    Do you remember who replaced her?

21       A    No, I don't.  Well, there was a Patty

22   David, but I don't know if she was an interim.  She

23   was from Pembroke Pines.

24       Q    And the chief executive officer before

25   Columbia acquired the hospital you have already told

1    me was Mr. Sutphin.

2         A     Yes.

3         Q     He left shortly after you learned your

4    position was eliminated, did he not?

5         A     Yes.

6         Q     Do you remember the name of the gentleman

7    who replaced him?

8         A     Rick O'Connell.

9         Q     Do you know if Mr. O'Connell at that time

10   was over 40?

11        A     It is hard, I don't know.  I had only seen

12   him once.  I don't know, sir.

13        Q     After you learned that Columbia was

14   acquiring the hospital you subsequently learned that

15   the hospital was going to commence a reduction in

16   work force, isn't that correct?

17        A     Yes.

18        Q     How was it that you first came to learn

19   that?

20        A     Well, they started, Carol was let go and

21   Claudia was let go and Dorothy Williams was let go

22   and Ron Hoffman was let go and these were managers.

23        Q     Do you have any personal knowledge as to

24   why Ms. Jack was let go?

25        A     No, I don't.

```
 1     Q       Or Ms. Naples, any personal knowledge as

 2   to why?

 3     A       No, I don't.

 4     Q       Do you know how employees at that hospital

 5   were affected by the reduction in work force?

 6     A       No, I don't have those figures.

 7     Q       Do you know who at the hospital or at the

 8   corporate level made the decisions on which

 9   employees were being affected by the reduction in

10   work force?

11     A       Jerry Sutphin.

12     Q       How do you know that?

13     A       Well, he was the one who terminated me.

14     Q       Okay.

15     A       He terminated Claudia, he terminated

16   Carol.

17     Q       Do you know if Mr. Sutphin was ever a

18   Columbia employee?

19     A       I don't -- prior to the takeover?

20     Q       At any time.

21     A       Well, he was an employee for the month

22   there.

23     Q       Are you saying that because he worked for

24   a month after Columbia acquired the hospital?

25     A       That he was, yes, yes.
```

INTERIM COURT REPORTING
(561) 478-0401

1      Q      Do you have any firsthand knowledge as to

2  whether he had remained an employee of Humana or had

3  become a Columbia employee during that one month

4  period?

5              MR. JANKOWSKI:  I object to form.

6              You can answer, if you know.

7              THE WITNESS:  He went to, he went back to

8        Humana.  I think he feared that he was going

9        to, he would be let go.

10  BY MR. DEL RUSSO:

11     Q      My specific question to you, ma'am, is

12  whether you have any firsthand knowledge as to

13  whether during that month that he remained at

14  Pembroke Pines Hospital he remained a Humana

15  employee or if he ever became a Columbia employee.

16     A      I am sorry, sir, I am not understanding

17  you.

18     Q      He stayed at the hospital for about a

19  month after Columbia acquired it, correct?

20     A      Yes.

21     Q      During that month do you have any personal

22  knowledge other than the fact that you know he was

23  physically there, do you have any personal knowledge

24  as to whether he became a Columbia employee during

25  that month or whether he stayed a Humana employee?

```
 1     A     I have no personal knowledge.  He did not

 2  discuss this with me on a personal knowledge.

 3     Q     So when you mentioned a moment ago that

 4  you think he may have feared that he would have been

 5  let go, that would have been speculation on your

 6  part?

 7     A     Well, he knew, he could see Columbia's

 8  practices.

 9     Q     Did he ever tell you that's what he

10  feared?

11     A     He did not personally tell me.

12     Q     What do you mean by Columbia's practices?

13     A     That they were getting rid of the older

14  employees that had been with the, that were older

15  and had been with the hospital.

16     Q     Do you know, I asked you earlier if you

17  knew the number of employees that were affected by

18  the reduction in work force and you told me no.  My

19  question, ma'am, is do you know any of the employees

20  who were affected by the reduction in work force who

21  were under 40?

22     A     I believe Ron Hoffman was just under 40,

23  he was 39.  And, no, I don't.

24     Q     You don't know either way?

25     A     I don't know anyone aside from Ron.
```

1    Q    But it is not, you are not testifying that

2    there were none under 40 other than Mr. Hoffman?

3    A    I know people were let go but I didn't

4    personally talk to them or -- I know that there were

5    people that were let go.  I don't know how many were

6    let go.

7    Q    How did you first come to learn that the

8    reduction in force was going to affect you

9    personally?

10    A    On November 11.

11    Q    What took place on November 11?

12    A    Well, it was like this:  Jerry called,

13    Sutphin, called me into his office and he said, you

14    know, sit down and, you know, he had a very kind of

15    elaborate office, and he said, well, kiddo, this is

16    your last day.

17         And I looked at him, you know, I just, I

18    was in disbelief.

19         And he said, we are closing down your

20    department.

21         And my stomach just turned and I thought I

22    was going to vomit on the table.  And I just, you

23    know, I said, you are closing?

24         He  said, yes, we are closing down the

25    marketing and public relations department and we

1  don't need you any more.

2          And I said, you mean that's it, that's

3  just it?

4          And he said, yes, that's it.

5          And he said, you can pack your things up

6  and he said, what are you going to do?

7          I said, I don't know what I am going do.

8          And he said, come here, let me give you a

9  hug.

10          And I looked at this man in horror, that,

11  you know, I had given him loyalty and respect and

12  had given my life for 20 years to this company and

13  to him as my boss and he, he wanted a hug.

14          And so, you know, I went over and, you

15  know, he said, you'll be fine, he hugged me.

16          And I am crying all over.

17          And he said, you know, you'll be fine,

18  and, you know, anything you need, if you need a

19  letter, whatever.  And that was it.

20          I said, well, when do I leave?

21          He said, well, you can leave now, and pack

22  your things.

23      Q    This meeting took place in his office?

24      A    Yes.

25      Q    Was anyone else present other than you and

1  Mr. Sutphin?

2     A     Just the two of us.

3     Q     Do you recall anything else that he may

4  have said to you at that meeting?

5     A     I said, well, where is the, I said, is

6  there a compensation package?

7           And he said, oh, yes, you know, oh, and he

8  gave me an envelope and he said, you need to sign

9  this paperwork here.

10          And the compensation package was, it was

11 two months of pay.

12    Q     Eight weeks of severance?

13    A     Yes.

14          (Defendant's Exhibit No. 8 was marked for

15 identification.)

16 BY MR. DEL RUSSO:

17    Q     Let me show you, ma'am, what I have marked

18 as Exhibit No. 8.  It is a November 11, '93 memo

19 from Ms. Adamson to you.  My question after you had

20 a chance to review it is whether that is the

21 paperwork he asked you to sign.

22          (Pause.)

23    A     That's the paper.  My life has been a mess

24 ever since.

25    Q     Is that your signature, ma'am, on the

1    fourth page?

2        A    Yes, sir.

3        Q    Do you recall anything else that he said

4    to you at that meeting?

5        A    No.

6        Q    Did he offer you or offer to cover your

7    medical insurance for any period of time?

8        A    No, they didn't offer to do that.  I had

9    to call them up and ask them to cover my medical

10   insurance.  They weren't going to pay me.

11            I had been there almost -- February of '94

12   would have been, I guess, the anniversary date of

13   when you get your paid vacation, they weren't going

14   to pay me a paid vacation.  They weren't going to

15   cover anything, you know, until I called and became

16   a squeaky wheel.

17       Q    Going back to this meeting, though, my

18   question is going to be, ma'am, whether you recall

19   anything else that transpired at that meeting,

20   anything else that Mr. Sutphin may have said to you

21   or you may have said to Mr. Sutphin.

22       A    No.

23       Q    Did he offer you a reason or an

24   explanation as to why they were eliminating your

25   job?

INTERIM COURT REPORTING
(561) 478-0401

1    A    He told me he was closing down the

2 department, he was shutting down the marketing and

3 public relations department leading me to believe

4 that there was no more department because he didn't

5 value the department.  He thought marketing and

6 public relations was a lot of fluff.

7         He made comments to me earlier about the

8 department being a fluff department.  He commented

9 about Baron's position at the other hospital.  He

10 saw no value in the department.  And he didn't see

11 value in the people that were managing the

12 department.

13    Q    Did he at that meeting tell you that the

14 reason he was eliminating your employment was

15 because of your age?

16    A    No, he did not.

17    Q    Did he ever tell you anything, anything

18 like that?

19    A    Not directly, no.

20    Q    What do you mean by that?  Did he

21 indirectly ever say --

22    A    Well, at managers meetings he would say

23 things about, what I had said earlier in the

24 testimony.

25    Q    What you mentioned earlier at the managers

1    meetings, is that correct, ma'am?

2       A    Yes.

3       Q    Do you know if Mr. Sutphin was the

4    individual who made the decision to eliminate your

5    job?

6       A    I know that when the other employees were

7    being let go that they were meeting with the

8    managers.  And since he was my manager, then he made

9    the decision.

10      Q    Do you know if Pam Corliss had any

11   involvement in the decision to eliminate your

12   employment?

13      A    I had very little interaction with Pam

14   Corliss.  She was only there a short time before I

15   was.  She was younger, she was aggressive, she --

16   Monique was young.  So she may have been

17   instrumental in that decisionmaking process.

18      Q    So after the meeting ended what did you

19   do?  Did you go back to your office and gather your

20   effects and leave?

21      A    Yes.

22      Q    Have you spoken with Mr. Sutphin for any

23   reason after that meeting on November 11, 1993?

24      A    I called him up to ask him, since this

25   letter said that we were on an involuntary leave of

1   absence for six months, if that was the situation,

2   then why was I not entitled to benefits and why

3   could they not continue to pay my health insurance

4   benefits since I was on this leave.

5          And so I had a conversation with him about

6   that and also asked him if he would write a letter

7   of recommendation because, you know, I was waiting

8   to come back to work.  I was hoping that they would

9   rehire me.  But, you know, I just knew that I had to

10  do something other than just wait and went looking

11  for work and asked for a letter of recommendation.

12     Q    Ms. Iaia, in your lawsuit you state that

13  in connection with the reduction in work force the

14  defendant, which is the hospital, decided to combine

15  your position with the director of Senior Friends

16  position.

17         Is that something that Mr. Sutphin told

18  you at that meeting on November 11?

19     A    No, sir.

20     Q    When did you first learn that those two

21  positions were being combined?

22     A    At some point later when I had heard

23  through the rumor mill that it was announced in a

24  managers meeting that Monique Montiero was the new

25  director of marketing and public relations and that

INTERIM COURT REPORTING
(561) 478-0401

1    she was assuming those positions.

2        Q    It was through communications you heard

3    from other managers that Monique Montiero was now

4    acting in both positions, as director of

5    marketing --

6        A    That they had -- I am sorry.

7        Q    -- director of marketing and the director

8    of Senior Friends?

9        A    Yes, and that the positions had been

10   combined.

11            (Defendant's Exhibit No. 9 was marked for

12   identification.)

13   BY MR. DEL RUSSO:

14       Q    I am going to show you a document I marked

15   as Exhibit 9.  I ask you if you recognize that as a

16   copy of, I guess it is the remittance advice

17   reflecting severance pay that you received.

18            (Pause.)

19       A    Yes.

20            (Defendant's Exhibit No. 10 was marked for

21   identification.)

22   BY MR. DEL RUSSO:

23       Q    Let me show a letter that I have marked as

24   Exhibit 10, it is a letter from Mr. Sutphin dated

25   November 16, 1993, ask you if you recognize that

INTERIM COURT REPORTING
(561) 478-0401

```
 1   letter.

 2              (Pause.)

 3      A      Yes.

 4      Q      Mr. Ms. Iaia, this isn't an endurance

 5   contest.

 6      A      I am sorry.

 7      Q      If you like, we can take a break.

 8      A      Yes.  I am sorry.

 9              MR. DEL RUSSO:  It is all right.

10              (At 2:40 p.m. a five minute recess was

11       taken.)

12   BY MR. DEL RUSSO:

13      Q      We were speaking, ma'am, about what I

14   marked as Exhibit 10 which is the November 16 letter

15   from Mr. Sutphin.  Tell me the circumstances in

16   which this was written.

17      A      I had called him and asked him if he would

18   write -- he wanted -- he offered -- I don't know,

19   maybe I neglected to say this.  I don't know if I

20   said this in the interrogatory.

21              When I was in his office with him, what

22   would I do, you know, what do you think you are

23   going to do.

24              And I said, I didn't know.

25              He said, you won't have any trouble
```

1    getting a job.

2         And so he said, if you need, you know, if

3    you need a letter from me, I will write one for you.

4         So then I called to get that letter.  And

5    that was the purpose of the letter.

6    Q    In your lawsuit also, ma'am, you state in

7    paragraph 7 that the new position was not given to

8    you but to Monique Montiero.

9         Is it your testimony that you felt you

10   were qualified to handle this new consolidated

11   position of director of Senior Friends and the

12   director of marketing?

13   A    Yes, sir.

14   Q    Is it also your testimony that you felt

15   Ms. Montiero was not qualified for this new

16   position?

17   A    Yes, sir.  I had had six years of

18   marketing experience, public relations experience

19   and Senior Friends experience and so I was very

20   qualified.

21   Q    Since the meeting on November 11 have you

22   spoken with any of your former coworkers about the

23   fact that your job was eliminated?

24   A    Yes.

25   Q    Tell me as best you can recall who you

```
 1   have spoken to about the fact that that hospital

 2   eliminated your job.

 3        A     Well, I spoke with Pat Pierce.

 4        Q     She was the administrative assistant?

 5        A     Well, she handled the legal.  She was more

 6   than -- she was director of, like risk management

 7   and legal -- risk management.

 8        Q     Was she the risk manager?

 9        A     Yes.  And then she had another combined

10   thing of, I think OSHA and safety and hazardous

11   materials.

12        Q     Did she have an office in the

13   administrative suite?

14        A     At one time she did, and then they moved

15   her up on the second floor.

16        Q     Was she affected at all by this reduction

17   in work force?

18        A     No, she was retained.

19        Q     Who else have you spoken to in addition to

20   Pat Pierce?

21        A     After I was let go?

22        Q     Yes, ma'am.

23        A     Connie Viera.

24        Q     What was her position at the hospital?

25        A     She was physician referral, telephone
```

```
 1    network.

 2        Q      Do you know if she was affected by the

 3    reduction in force?

 4        A      She was let go.

 5        Q      Excuse me?

 6        A      She was let go.

 7        Q      Anyone else that you have spoken to since

 8    you were let go, since your employment was

 9    terminated?

10        A      Ron Hoffman, his wife Maria.

11        Q      Was Maria an employee at the hospital?

12        A      Yes, she was.

13        Q      Was Mr. Hoffman let go?

14        A      Yes, he was.

15        Q      What about his wife Maria?

16        A      She is -- she was not let go.

17        Q      Anyone else?

18        A      Specifically about the letting go, are you

19    wanting to know or just people that I would talk to

20    in general?

21        Q      Specifically about the fact that you were

22    let go and you believe it was the result of age

23    discrimination.

24        A      Claudia Jack.

25        Q      She was the HR director who was let go?
```

```
 1      A      Yes.

 2      Q      Anyone else?

 3      A      I can't think of her last name, Cheryl in

 4  medical records, director of medical records.

 5             MR. JANKOWSKI:  Cheryl?

 6             THE WITNESS:  Cheryl.

 7  BY MR. DEL RUSSO:

 8      Q      Cheryl, the director of medical records?

 9      A      I can't think of her last name.

10      Q      If it occurs to you later, let me know.

11             Anyone else?

12      A      There may have been but I can't remember

13  at this time.

14      Q      When did you last speak with Claudia Jack

15  about the fact that you were let go and that you

16  believe it was the result of discrimination?

17      A      In 1994.

18      Q      Do you know where she is now?

19      A      No, I don't.

20      Q      What about Ron Hoffman or his wife, when

21  was the last time you spoke with either of them

22  about those same issues?

23      A      I spoke with Ron several months ago of

24  this year, 2000.

25      Q      What about his wife Maria?
```

```
 1     A      At the same time.

 2     Q      Do you know where he is working now?

 3     A      Ron never recovered.  He's on total

 4  disability.  He has not worked since he was let go

 5  and worked for them for 15 years.

 6     Q      Was he a disabled employee?

 7     A      No.  He went out -- not while he was

 8  working he wasn't disabled.  After he was let go he

 9  became mentally impaired and is on total disability.

10     Q      What was his position at the hospital?

11     A      He was director of engineering.

12     Q      Have you asked him to testify for you?

13     A      No, we have not.

14     Q      I apologize if you told me this before,

15  ma'am, I don't recall, at the time that these

16  reductions in work force took place was Mr. Hoffman

17  40 or over?

18     A      He was not 40, he was younger than 40.

19     Q      When was the last time you spoke with

20  Connie Viera?

21     A      I think probably around 1995.

22     Q      What about Pat --

23     A      Around that time.

24     Q      What about Pat Pierce?

25     A      2000.
```

```
 1     Q      You spoke to her this year?

 2     A      Yes.

 3     Q      What was the nature of your discussion

 4  with Pat Pierce?

 5     A      We -- I called her to ask her to submit

 6  the affidavit and to be a witness for our case.

 7     Q      Is she working now?

 8     A      Yes.

 9     Q      Do you know where she is working?

10     A      No.  Excuse me, she works out of the

11  home.  She's, she's working out of her home

12  assisting her boyfriend's work.  She's not in health

13  care.

14     Q      Do you know what her age is?

15     A      Pat is 10 years younger than I am, she's

16  42.

17            (Defendant's Exhibit No. 11 was marked for

18  identification.)

19  BY MR. DEL RUSSO:

20     Q      Let me show you a document that I have

21  marked for identification as Exhibit 11 and ask you

22  to take a moment and look at that and tell me if you

23  recognize it.

24            (Pause.)

25     A      Yes.
```

1     Q     Do you recall receiving this?

2     A     Yes.

3     Q     Do you have any recollection of a

4  conversation with a Vicky Neal?

5     A     I am looking at this.  It indicates we did

6  converse, but I am not recalling in my mind the

7  actual phone conversation.

8     Q     All right.  Can you explain to me why you

9  are being or were being reimbursed for medical and

10  dental, what appears to be medical and dental

11  insurance coverage?

12     A     Yes.  When I had talked to Jerry, and I am

13  recalling now, I had said to him, well, you know, if

14  you gave me two months of severance then why would

15  you not give me two months of medical and dental,

16  you know.  So that was why.

17     Q     So did he then agree to cover your medical

18  and dental for the two month period?

19     A     Yes.

20     Q     So just so I understand, ma'am, when the

21  hospital eliminated your job in terms of your

22  severance benefits they paid you two months of

23  salary and they covered your medical and dental

24  insurance for two months, is that a fair statement?

25     A     Yes.

```
 1     Q       That earlier letter that I showed you that

 2   Mr. Sutphin handed you and asked you to sign

 3   indicated that you would be on unpaid leave for six

 4   months.  What did you do or what efforts did you

 5   make during those six months to try to find other

 6   employment?

 7     A       I sent out resumes, I went to

 8   unemployment, I had to maintain logs for

 9   unemployment of search record of places that I was

10   interviewing with.

11     Q       Where did you get the names that you sent

12   resumes out to, was it through the newspaper?

13     A       Some were from the newspaper, some people

14   that I knew, I knew people in the community, I was

15   calling them, asking them about job leads, through

16   the chamber of commerce, different businesses, you

17   know, going through files, some stuff that I had

18   had.

19     Q       Did you contact any professional

20   recruiters, vocational recruiters?

21     A       No, I did not contact anyone in that

22   nature because, quite frankly, I was, I was

23   embarrassed, I was ashamed.  I couldn't even explain

24   to people like why I was let go.  And so, you know,

25   to go to a, you know, a recruiter -- so I didn't go
```

1    to a recruiter, no, sir.

2        Q      What type of jobs were you looking for

3    that you sent out your resumes to?

4        A      There were jobs that were marketing

5    positions.

6        Q      What about sales reps?

7        A      Sales reps, because I had the physician

8    relation background.  I think you have it in my

9    file, in the files that we gave you.

10       Q      I can't ask questions of the papers, I

11   have to see what I can ask of you that you may

12   recall.

13              Is it fair to say you were looking for

14   marketing, sales reps types jobs, any public

15   relations?

16       A      Anything that was public relations,

17   anything that was hospital related in terms of even,

18   you know, social, of a social work nature.

19              I went on some interview with a home

20   health agency to do work for them, visiting with

21   patients.

22       Q      Did you receive any job offers that you

23   turned down?

24       A      No.

25       Q      You mentioned that you applied for

INTERIM COURT REPORTING
(561) 478-0401

```
 1   unemployment?

 2       A     Yes.

 3             (Defendant's Exhibit No. 12 was marked for

 4   identification.)

 5   BY MR. DEL RUSSO:

 6       Q     Let me show you a document, ma'am, what I

 7   have marked as Exhibit 12 and ask you if you

 8   recognize that as a wage transcript you received in

 9   connection with your employment.

10       A     Yes.

11       Q     Were you being paid $250 a week, if I read

12   this form correctly?

13       A     Yes, from unemployment.

14       Q     That ran for 13 weeks, or how long did

15   that run?

16       A     I think it expired around May.

17       Q     Six months?

18       A     Yes.  I think it expired around May.

19       Q     Do you see in the middle of that page on

20   the right side there is a column labeled employer

21   name?

22       A     Yes.

23       Q     Do you see under that it is printed in

24   bold face Galen Hospital Pembroke Pines?

25       A     (Indicating.)
```

1     Q     That is a yes?

2     A     Yes.

3     Q     Do you know who that is?

4     A     That was Pembroke Pines Hospital.

5     Q     Do you have any knowledge as to the

6     relationship or the corporate connection between

7     Galen Hospital Pembroke Pines and Columbia

8     Healthcare Corporation?

9     A     Columbia acquired all the Galen hospitals.

10    Q     Do you know if it was a separate company?

11    A     I don't know.

12    Q     Do you know if it had similar officers or

13    directors?

14    A     Columbia brought in their own officers.

15    Q     Do you know if Columbia owned Pembroke

16    Pines Hospital or Columbia owned the stock of

17    another company that owned Pembroke Pines Hospital?

18    A     I don't know.

19          (Defendant's Exhibit No. 13 was marked for

20    identification.)

21    BY MR. DEL RUSSO:

22    Q     Ms. Iaia, let me show you a document that

23    I have marked for identification as Exhibit 13 and

24    ask you if you recall receiving that letter.  It is

25    a letter dated May 5, 1994.

INTERIM COURT REPORTING
(561) 478-0401

```
 1              (Pause.)

 2      A      Yes.

 3      Q      Is it fair to say that it was through your

 4  receipt of this letter that you learned that your

 5  leave of absence was permanent, that is, that your

 6  employment was terminated?

 7      A      Yes.

 8      Q      What did you understand was your status

 9  between November 11, 1993 and the time that you

10  received this letter?

11      A      Well, there was some confusion because I

12  was placed on a leave of absence, I was placed on

13  a -- they were reducing the work force, Jerry told

14  me he was closing down the department.  The

15  department was functioning.  So it was a big lie and

16  a big confusion.

17              And I was hopeful and was inclined and

18  hopeful and anticipating that maybe I would get

19  called back.

20              So it was very ambiguous.  It was a mixed

21  message, what was going on.

22              (Defendant's Exhibit No. 14 was marked for

23  identification.)

24  BY MR. DEL RUSSO:

25      Q      I show you a letter dated November 4, 1994
```

 1   which I have marked as Exhibit 14 and ask you to

 2   take a moment and look at that and tell me if you

 3   recognize that as a letter that you sent to

 4   Mr. O'Connell.

 5            (Pause.)

 6       A    Yes.

 7       Q    You were requesting that you be paid for

 8   your accrued vacation hours, correct?

 9       A    Yes.

10       Q    Was it your understanding that an employee

11   was not entitled to be compensated for their accrued

12   vacation hours until their anniversary date?

13            MR. JANKOWSKI:  Asked and answered.

14   BY MR. DEL RUSSO:

15       Q    I am sorry, their employment anniversary

16   date.

17       A    I am sorry, could you state that again?

18       Q    Yes.  You had accrued some vacation hours

19   during that period, had you not?

20       A    Yes.

21       Q    What was your understanding as to the

22   hospital policy regarding employees getting paid for

23   their accrued and unused vacation hours?

24       A    That they would be entitled to that

25   accrued vacation.

1    Q    Regardless of when their employment was

2  ended?

3    A    Well, if their -- based upon the date that

4  they were terminated.

5    Q    If you look on the second page, ma'am, the

6  top line, it reads, "As you can see I was placed on

7  the LOA just prior to my February 5, 1994

8  anniversary date."

9         What is the significance of that date

10  based on your understanding in terms of whether and

11  when you get paid for vacation hours?

12    A    The significance of that date would have

13  been, that was my anniversary date and that I should

14  have been eligible to receive my vacation hours.

15    Q    As of that date?

16    A    Full benefit as of that date, but an

17  accrual of benefit prior to that date or whenever

18  they determine your termination date is.

19    Q    That is your understanding?

20    A    Yes.

21    Q    Have you seen any hospital policies

22  regarding payment of accrued vacation hours that

23  reflect that understanding?

24    A    Well, I had the vacation hour policy in my

25  possession which -- so when I had this discussion

1    with Cathy Garnett on the phone, we were going back

2    and forth and she was interpreting it different than

3    I was interpreting it.

4              And I lost that benefit manual.  So I was

5    pleading my case based upon what I had read in that

6    manual.

7        Q    By the date of this letter I take it

8    Mr. Sutphin was gone and replaced by Mr. O'Connell?

9        A    Yes.

10       Q    Mr. O'Connell agreed to grant your request

11   to be paid for vacation time, didn't he?

12       A    Yes.

13            (Defendant's Exhibit No. 15 was marked for

14   identification.)

15   BY MR. DEL RUSSO:

16       Q    Let me show you what I have marked as

17   Exhibit 15 and ask you if you recognize that as a

18   letter that you received from Mr. O'Connell.

19            (Pause.)

20       Q    Do you recall receiving that letter?

21       A    Yes.

22       Q    The letter makes reference to a payment of

23   $2,186.78.

24            Was that what Mr. O'Connell was agreeing

25   to pay you less the reimbursed medical coverage?

INTERIM COURT REPORTING
(561) 478-0401

```
 1      A      Yes.

 2             (Defendant's Exhibit No. 16 was marked for

 3      identification.)

 4      BY MR. DEL RUSSO:

 5      Q      Let me show you what I have marked as

 6      Exhibit 16 and direct your attention to that

 7      remittance advice and ask you if that reflects the

 8      hospital's payment to you of the unused vacation

 9      time.

10      A      Yes.

11      Q      Ms. Iaia, you claim in this lawsuit the

12      reason why your position was eliminated was because

13      of your age, is that correct?

14      A      Yes, sir.

15      Q      You were 45 years old in November of 1993,

16      is that correct?

17      A      Yes, sir.

18      Q      Who were the supervisors at the hospital

19      that you believe discriminated against you because

20      of your age?

21      A      Jerry.

22      Q      Okay, Mr. Sutphin?

23      A      Mr. Sutphin.

24      Q      Anyone else?

25      A      Possibly Pam Corliss.
```

```
 1      Q      Anyone else?

 2      A      No.

 3      Q      What's your basis for believing that

 4  Ms. Corliss may have discriminated against you

 5  because of your age?

 6      A      When Columbia came in to take over the

 7  executives had come into the hospital and because I

 8  was the, you know, because I was the marketing

 9  director was touring with them through the hospital.

10          And they were making comments like, wow,

11  this place is sure going to get a face lift, and we

12  need to update things around here, and it was an

13  attitude of oldness.

14          Of course, later in time, you know, it

15  proved that they did get rid of those people who

16  were older and it was very evident that Columbia's

17  attitude was, you know, things are stale if you are

18  old and let's get the younger, let's have the

19  younger image, let's have the younger person.

20          And that was what was going on.

21      Q      My specific question, Ms. Iaia, was the

22  basis for your belief that Ms. Corliss discriminated

23  against you because of your age.  Do you have any

24  other reasons or facts that support your belief that

25  Pam Corliss discriminated against you because of
```

INTERIM COURT REPORTING
(561) 478-0401

1    your age other than what you have told me?

2        A    Well, she liked Monique and I -- and

3    Monique was younger and aggressive and I was old, in

4    Pam Corliss' sight.

5        Q    Any other reason you believe Pam Corliss

6    may have discriminated against you because of your

7    age?

8        A    No.

9        Q    You mentioned a moment ago that it was

10   proven that they, referring to the new

11   administration, wanted to get rid of those older

12   people.  How was it proven?

13       A    Well, because Claudia was terminated and

14   Carol was terminated and Dorothy Williams was

15   terminated and Connie Viera was terminated and these

16   were people that were in top management positions.

17       Q    You didn't supervise any of those people,

18   did you?

19       A    No.

20       Q    So you have no personal knowledge, do you,

21   as to whether they were doing a good or not doing a

22   good job?

23       A    Mr. Del Russo, these people had been at

24   the hospital, some of them for 15, some of them for

25   22 years.  If they had not been doing a good job

1    they would have been let go prior to this point.

2        Q    You have no personal knowledge, do you, as

3    to whether those four women you named were doing a

4    good job?

5        A    I did not evaluate them or assess them.

6        Q    I thought you had told me a moment ago

7    that you did not know the number of employees

8    affected by the reduction in work force, is that

9    correct?

10       A    I had told you I did not know the total

11   number but I knew that, certainly I knew these

12   ladies.

13       Q    You knew four specific individuals who

14   were let go in the reduction of work force, correct,

15   these four people that you named?

16       A    Yes.

17       Q    And you knew all four of these people were

18   over 40 years old, correct?

19       A    Yes.

20       Q    Is that the basis for your earlier

21   statement that it was proven that the new hospital

22   wanted to get rid of older people?

23       A    It was a pattern, yes.

24       Q    That was the basis?

25       A    Yes.

```
 1      Q      Did anyone with the new administration say

 2   to you, we are going to get rid of old people

 3   directly?

 4      A      Directly, no.

 5      Q      Do you know any people who did not like

 6   Monique Montiero?

 7      A      Not any that I can recall at this time.

 8      Q      Did you like Ms. Montiero?

 9      A      She was not, I was not a close friend of

10   hers but we had a respect for working relationship.

11      Q      Based on your observations of her was she

12   an outgoing person?

13      A      Yes, she was.

14      Q      Based on your observations of her was she

15   a likable person?

16      A      She had a, I mentioned earlier, a

17   harshness about her but people liked Monique.

18      Q      Did you feel she was a likable person?

19      A      Did I personally, no.

20      Q      Have I exhausted your memory, Ms. Iaia, as

21   to the different facts upon which you base your

22   belief that Ms. Corliss may have discriminated

23   against you because of your age?

24      A      Have you exhausted the facts?

25      Q      No, your memory of the facts.
```

```
 1     A      You have exhausted my mind.  Off the

 2  record.

 3            What was the question again, please?

 4     Q      Have I exhausted your memory, Ms. Iaia as

 5  to the different reasons why you believe Pam Corliss

 6  may have discriminated against you because of your

 7  age?

 8     A      At this time, yes, you have.

 9     Q      The other person you mentioned, the other

10  supervisor you mentioned who you believe

11  discriminated against you because of your age was

12  Mr. Sutphin.

13            My question to you is going to be the same

14  with respect to Ms. Corliss, that is, what is your

15  basis for believing that Mr. Sutphin discriminated

16  against you because of your age.

17     A      He liked young pretty girls.  When the

18  Miami Dolphin cheerleaders came in, I brought them

19  into the hospital, he was ogling and was, you know,

20  chatting always, chatting it up with Monique.

21     Q      He was someone that appeared to like

22  Monique?

23     A      Oh, yes, he liked Monique.

24     Q      Did he ever say to you the reason that we

25  are going to eliminate your job is because I think
```

1  you are too old?

2      A      No, he never directly said that, no.

3      Q      What are the other reasons you believe he

4  discriminated against you because of your age?  You

5  mentioned that he seemed to like younger pretty

6  girls and he would always chat it up with Monique.

7          Any other reasons for why you believe he

8  discriminated against you because of your age?

9      A      Well, I did a fine job in marketing, I had

10 Senior Friends experience and he didn't offer me the

11 job.

12          And it would be my inclination that in

13 lieu of, I am not qualified, that he gave it to her

14 because she was younger.

15     Q      Okay.

16     A      Can I take a little stretch here?

17     Q      You bet.

18          (At 3:15 p.m. a 15 minute recess was

19 taken.)

20 BY MR. DEL RUSSO:

21     Q      I will show you a document, ma'am, I am

22 not going to mark it at this point, and ask you,

23 this is a document that was in your file, and ask

24 you if you can identify what ChamberChips is or was?

25          MR. JANKOWSKI:  You are not marking it?

```
 1              MR. DEL RUSSO:  If she can identify it I
 2      may.
 3              MR. JANKOWSKI:  Okay.
 4              (Pause.)
 5              THE WITNESS:  ChamberChips is the
 6      newsletter that is put out by the chamber of
 7      commerce.
 8  BY MR. DEL RUSSO:
 9      Q     Of which you were a member?
10      A     Yes.
11      Q     I put a little green tab on that page a
12  couple of pages back.  Is that you?
13      A     Yes.
14      Q     And that was an article that ran on you?
15      A     Yes.
16      Q     What was the date of that particular issue
17  of ChamberChips?
18      A     Is it here?  May of '94?
19      Q     That would have been at or about the time
20  that you learned your employment was, for the second
21  time you learned your employment was terminated?
22      A     Yes.
23              MR. JANKOWSKI:  I object to the form.
24  BY MR. DEL RUSSO:
25      Q     That was at or about the time you received
```

 1    the letter that I previously marked from Ms. Adamson

 2    advising you that you were not being recalled and

 3    your employment was being terminated is that a fair

 4    statement?

 5        A    Yes.

 6             MR. DEL RUSSO:  I am going to go ahead and

 7        mark that copy of ChamberChips bulletin as

 8        Defendant's Exhibit No. 17 for our record.

 9             (Defendant's Exhibit No. 17 was marked for

10    identification.)

11    BY MR. DEL RUSSO:

12        Q    We were speaking, ma'am, about Mr. Sutphin

13    and I asked you what was the reason or the basis for

14    your belief that his actions against you

15    discriminated against you because of your age and

16    you told me it was because he liked young pretty

17    girls, that he was chatting it up frequently with

18    Ms. Montiero and you told me it was because you had

19    better experience in marketing and experience in

20    Senior Friends than Ms. Montiero did and of course

21    you had more seniority in the system but he chose

22    Ms. Montiero for the job, correct?

23        A    Yes.  I said that.  And may I add to that

24    this.

25        Q    That's what I wanted to ask you, what were

INTERIM COURT REPORTING
(561) 478-0401

```
 1    the other reasons or facts upon which you base your

 2    belief that Mr. Sutphin was discriminating against

 3    you because of your age.

 4         A    Well, he had, he had lied to me.  You

 5    know, it was a big lie.  Because first he told me

 6    that the department was being closed down, and when

 7    in fact I was discriminated because the department

 8    wasn't closed down.  They in fact had combined the

 9    departments and he never offered me the opportunity

10    to apply for that new position that they were now

11    create, that they were now creating a new position

12    and I was not allowed or informed of or given the

13    opportunity to apply for that position.

14         Q    Okay.

15         A    Okay.

16         Q    Any other reasons upon which you base your

17    belief that Mr. Sutphin discriminated against you

18    because of your age?

19         A    I can't recall anything else.

20         Q    Do you draw a distinction in your mind

21    between the marketing department being closed down

22    and the marketing department being consolidated with

23    Senior Friends?

24         A    Could you rephrase that, please?  I am not

25    understanding.
```

```
 1    Q      Sure.

 2           My question is intended to touch upon what

 3    you mentioned a moment ago, that is that you

 4    believed Mr. Sutphin lied to you when he said your

 5    department was being closed down.  So my specific

 6    question to you now, Ms. Iaia, is do you draw a

 7    distinction in your mind between the marketing

 8    department being closed down versus the marketing

 9    department being consolidated with the Senior

10    Friends department.

11    A      Yes, there is a distinction there.

12    Q      Would you agree with me that the marketing

13    department was indeed closed down as a separate

14    department?

15           MR. JANKOWSKI:  I object to the form of

16       that question.

17           You can answer it.

18           THE WITNESS:  What was the question,

19       please?  I am sorry.

20           MR. DEL RUSSO:  All right, fine.  Could

21       you read it back, please, Mr. Reporter?

22           (Record read.)

23           THE WITNESS:  The marketing department,

24       yes, was closed down as a separate department,

25       a separate department in which I was the
```

```
 1          director of that department, was closed down.
 2    BY MR. DEL RUSSO:
 3        Q       Would you also agree with me that after
 4    you were eliminated as an employee no one replaced
 5    you at that hospital that held the position as the,
 6    of the director of marketing/public relations?
 7        A       Monique was given my title as the director
 8    of marketing and public relations.
 9        Q       Wasn't she given the title of director of
10    Senior Friends and marketing?
11        A       I believe her title was director of
12    marketing, public relations and Senior Friends.
13        Q       Okay, with that in mind would you agree
14    with me then that no one was given your job title as
15    you had it before your employment was terminated?
16            MR. JANKOWSKI:  Objection, she answered
17        that question.  She said it was given to her.
18        "It used to be my title."  That was her
19        answer.
20    BY MR. DEL RUSSO:
21        Q       Did anyone, after your employment was
22    terminated did anyone succeed you as the director of
23    marketing and public relations who did not also
24    function as the director of Senior Friends at the
25    same time?
```

MR. JANKOWSKI: If you don't understand it you can't answer it.

I don't understand the question.

You are getting into semantics of how it is combined which is something different and that's not what she testified to earlier, what Mr. Sutphin said, we are closing down your department. That is very different from we are combining your department with another department.

So I am not going to allow you to pigeonhole her into the semantics of closing down versus combining, that is not being offered. That was very clear.

And I will object to this line of questioning because it is getting into semantics and confusing trying to justify blatant misrepresentations. So I object to the question.

She can answer -- you can restate it. I know where you are going with this and I can't let you go there because it is really going down a very crooked path and justifying a misrepresentation, which I can't allow to happen.

BY MR. DEL RUSSO:

2    Q    Let me ask you this.  Do you know what

3    Ms. Montiero's title was after your employment was

4    terminated?

5         MR. JANKOWSKI:  Asked and answered.

6    BY MR. DEL RUSSO:

7    Q    I will ask you again, ma'am --

8         MR. JANKOWSKI:  Can you read back her

9         answer?  Because she answered that question.

10        It was pretty far back.

11        She said she was director of marketing and

12        public relations and Senior Friends.

13   BY MR. DEL RUSSO:

14   Q    That is your testimony?

15   A    Yes, sir.

16   Q    So no one had the position you had that

17   did not combine duties and responsibilities from

18   Senior Friends, isn't that correct?

19   A    Yes, that's correct.

20        MR. JANKOWSKI:  At which time period?

21        Because she testified earlier she held both

22        positions at the old hospital.  So we have to

23        clarify which time period you are speaking of,

24        because she testified when the person got the

25        head injury she held both positions at the

INTERIM COURT REPORTING
(561) 478-0401

1          other hospital, so she did wear both hats.

2    BY MR. DEL RUSSO:

3         Q    Ms. Iaia, your complaint alleges that the

4    conduct by the hospital in terminating your

5    employment was willful and malicious.  Is that your

6    testimony today?

7         A    Yes.

8         Q    What is your basis in your testimony that

9    the decision to eliminate your employment was

10   willful and malicious?

11        A    They were willful and malicious because

12   they terminated me as the director of marketing and

13   public relations because they told me they were

14   closing down my department and then they got rid of

15   me and gave my department and functions to another

16   person who was younger than I and called her a

17   marketing and public relations director.

18        Q    In preparing for this deposition did you

19   review any documents?

20        A    Some documents, yes.

21        Q    Did you review Ms. Montiero's personnel

22   file?

23        A    Yes, I did.

24        Q    Is it your testimony after reviewing her

25   file that her title was the director of marketing

INTERIM COURT REPORTING
(561) 478-0401

1    attitude is old and complacent you are not going to,

2    you're not going to make it around here."

3        Q    And he said that at a managers meeting?

4        A    (Indicating.)

5        Q    That's a yes?

6        A    Yes.

7        Q    How many people attended the managers

8    meetings?

9        A    I would say approximately 30.

10       Q    Any other general age related comments

11   that you ever heard Mr. Sutphin say?

12       A    There was an attitude of, like, in with

13   the new and out with the old.

14       Q    What did he say?  That might have been

15   your perception of an attitude.  What do you recall

16   him saying in any of those situations that would

17   have been an age related comment or remark?

18       A    "If you are not able to cut the mustard

19   heads are going to be rolling."

20       Q    Any other comments that you recall?

21       A    No.

22       Q    How often would you see him on a weekly

23   basis or daily basis?

24       A    Every day that I was in the hospital and

25   that he was in the hospital we would, you know -- we

```
 1   and public relations?

 2       A       And I, I saw an evaluation that was done

 3   by her in, at the end of 1994 that, I don't know

 4   what it called -- called her director of marketing,

 5   public relations and Senior Friends.

 6       Q       Can we agree that those two positions were

 7   consolidated after your employment was eliminated?

 8               MR. JANKOWSKI:  I object to the form.

 9       Other than what documents she has, she wouldn't

10       know firsthand.

11               THE WITNESS:  A short time after I was

12       terminated these two departments were

13       combined.

14   BY MR. DEL RUSSO:

15       Q       I want to go back to Mr. Sutphin to make

16   sure that I have exhausted your memory as to the

17   different reasons or facts upon which you believe

18   his actions against you were age discrimination.

19               You told me that first in your assessment

20   he liked younger pretty women, girls actually;

21   second, that he was frequently chatting it up with

22   Ms. Montiero; third, that you had better experience

23   and seniority but he didn't offer you the job that

24   Ms. Montiero later received.  And then finally you

25   told me that he lied to you when he told you that
```

INTERIM COURT REPORTING
(561) 478-0401

1   your department was being closed down.  Correct?

2           MR. JANKOWSKI:  She further elaborated on

3       that last point.

4           THE WITNESS:  I further elaborated on the

5       last point.

6           MR. JANKOWSKI:  It was your testimony that

7       was a part of that last answer.

8   BY MR. DEL RUSSO:

9       Q    Are there any other bases that you have

10  for believing that Mr. Sutphin's actions were age

11  discrimination against you?

12      A    That, comments that were made in the

13  managers meeting.

14      Q    By those do you mean what you had

15  testified to earlier which was, quote, if you're

16  complacent, if your attitude is old and complacent

17  you are not going to make it here, close quote?

18      A    (Indicating.)

19      Q    That's a yes?

20      A    Yes.

21      Q    And quote, if you're not going to be able

22  to cut the mustard, heads will be rolling, close

23  quote, are those the comments that you are referring

24  to?

25      A    Yes, sir.

INTERIM COURT REPORTING
(561) 478-0401

1     Q      Were there any other comments that you

2   recall he made that lead you to believe his actions

3   against you were age discrimination?

4     A      Not that I can remember at this time,

5   which is I think how I answered you the last time

6   that you have asked this.

7     Q      You understand, ma'am, this is my only

8   chance to take your deposition and I want to make

9   sure that I exhaust your memory on these points?

10     A      I understand that.

11     Q      Any other actions or conduct or statements

12   by Mr. Sutphin which lead you to believe that his

13   decisions toward you were age discrimination?

14     A      Other than actions other than giving the

15   job --

16     Q      I mean, I could go over the list again?

17     A      Okay.

18     Q      But everything you have already told me.

19   Anything in addition to this?

20     A      No.

21     Q      Now we have spoken about Ms. Corliss and

22   we have spoken about Mr. Sutphin and those were the

23   two individuals you had told me you believed

24   discriminated against you because of your age.

25           Do you have any other facts or information

INTERIM COURT REPORTING
(561) 478-0401

```
 1   upon which you base your belief that this hospital

 2   discriminated against you because of your age in

 3   connection with the termination of your employment

 4   other than what you have already told me so far in

 5   your deposition?

 6               (Pause.)

 7   A       No, I can't.

 8   Q       When did you first come to believe that

 9   the hospital had discriminated against you?

10   A       When I had learned that Monique was taking

11   over my department.

12               (Defendant's Exhibit No. 18 was marked for

13   identification.)

14   BY MR. DEL RUSSO:

15   Q       Let me show, ma'am, a document that I am

16   marking as Defendant's Exhibit 18 and ask you if you

17   recognize that as a charge of discrimination that

18   you filed with the Florida Commission on Human

19   Relations.

20               (Pause.)

21   A       Yes.

22   Q       Is that your signature at the bottom?

23   A       Yes.

24   Q       Is that your handwriting?

25   A       Yes.
```

```
 1      Q      The document is notarized by a Ralph

 2  Ezzo.  Was he your counsel at that time?

 3      A      Yes.

 4      Q      If you take a moment and read this to

 5  yourself and tell me if everything that is written

 6  on here is true and accurate to the best of your

 7  knowledge.

 8             (Pause.)

 9      A      Yes, sir.

10      Q      On the top of the second page, Ms. Iaia,

11  it states that you had 20 years of service with

12  Columbia.  That isn't accurate, is it?

13      A      It was accurate in that every time our

14  hospital had gone through name changes and

15  difference of corporation, we used to be American

16  Medical, Inc. and then it was taken over by Humana

17  and so we always retained our, our benefits and our

18  seniority and so Columbia was now taken over,

19  Columbia had now taken over Humana.  And so in light

20  of the way that the name change had happened

21  previously, yes, that I would say that I had that

22  seniority with that organization.

23      Q      Do you know how this charge of

24  discrimination was forwarded to the Florida

25  Commission on Human Relations?
```

1      A      It was forwarded by Ralph Ezzo.

2      Q      Do you know if he sent it by regular first

3  class mail or by certified mail or do you have any

4  recollection?

5      A      There is an envelope here and I don't

6  really know how it was sent.

7      Q      At some point in time, Ms. Iaia, did you

8  come to learn that the commission had lost your

9  first charge, this charge of discrimination?

10     A      Yes.

11     Q      How was it that you came to learn that

12  they had lost your charge?

13     A      Because I, I had -- I was calling them and

14  was being vigilant in staying with what, you know,

15  staying with the process and what was going on with

16  the process.

17            So I had contacted them and was informed

18  that they had lost my file.

19     Q      Were you asked to sign a new charge?

20     A      I am not exactly certain about that, but I

21  do know that they rewrote, they did in fact rewrite

22  the file.  So I don't know if that was meaning to

23  sign a new charge or what.

24            (Defendant's Exhibit No. 19 was marked for

25  identification.)

1    BY MR. DEL RUSSO:

2        Q    Let me show you Exhibit No. 19, a letter

3    dated June 27, 1995, and ask you if you recall

4    receiving this letter from the Florida Commission.

5             (Pause.)

6        A    Yes, I do.

7        Q    When you mentioned a moment ago that they

8    had rewritten the file and the charge for you, is

9    that what is referred to here as the enclosed draft

10   of your amended complaint?

11       A    Yes.

12       Q    Did they ever offer any more of an

13   explanation as to what happened to your file other

14   than the fact that it was lost or misplaced?

15       A    This Mr. Calhoun was in an auto accident

16   and he was out for a while and somebody else had

17   come in and taken over and so it was just, it seemed

18   to be some sort of staffing problem over at the

19   commission.

20            (Defendant's Exhibit No. 20 was marked for

21   identification.)

22   BY MR. DEL RUSSO:

23       Q    Let me show you now what I have marked as

24   Exhibit No. 20 and ask you if you recognize that as

25   the second or amended charge of discrimination that

1    you filed with the Florida Commission.

2            (Pause.)

3    A    Yes.

4    Q    Other than these two charges that I have

5    shown you, the one that I marked as Exhibit 18, the

6    1994 one and then this new one which I marked as

7    Exhibit No. 20 which you told me was done because

8    the first was misplaced, have you filed any other

9    charges of discrimination with either the Florida

10   Commission or the EEOC?

11   A    Other than these two have I filed with the

12   EEOC?

13   Q    With any agency, have you filed any other

14   charges other than these two that I have shown you?

15   A    No.

16   Q    On the second one under the first

17   paragraph do you see in the second line it reads,

18   prior to this time I was given different terms and

19   conditions of my employment?  Can you tell me what

20   that refers to?

21           (Pause.)

22   A    Well, that I wasn't terminated, I was

23   placed on an LOA, that there was, the reduction of,

24   you know, work force but -- you know, they, they

25   subsequently ended up combining the departments.

```
 1     Q      Does this charge reflect any actions or

 2   conduct by the hospital that you believe were

 3   discriminatory other than what we have already

 4   spoken about today?

 5     A      No.

 6            (Defendant's Exhibit No. 21 was marked for

 7   identification.)

 8   BY MR. DEL RUSSO:

 9     Q      I show you, ma'am, a document that I have

10   marked for identification as Defendant's Exhibit No.

11   21.  It is a letter dated March 20, 1996.  I ask you

12   if you would look at it and tell me if you recall

13   receiving it.

14            (Pause.)

15     A      Yes.

16     Q      Do you recall being advised by the

17   commission that it was, it intended to refrain from

18   any investigation while your complaint was being

19   investigated before the EEOC?

20     A      That's what it is stating here.

21     Q      Right, that's what the letter says.  By

22   reading it does it refresh your memory as to the

23   fact that was communicated to you back in 1996?

24     A      I am sorry, I can't remember the telephone

25   conversations.  There were so many of them.
```

1          (Defendant's Exhibit No. 22 was marked for

2   identification.)

3   BY MR. DEL RUSSO:

4      Q    I show you a document which I have marked

5   as Defendant's Exhibit 22.  It is a letter dated

6   September 26, 1997.  I ask you if you take a moment

7   and look at that and tell me if you have ever seen

8   it before.

9          (Pause.)

10     Q    Do you recall seeing a copy of that letter

11  before?

12     A    Yes, sir.

13     Q    Do you remember -- did you see a copy of

14  this letter at or about the date reflected on this

15  letter?

16     A    I don't remember when I received the

17  letter.

18     Q    Do you remember who you received the

19  letter from?

20     A    No, I don't.

21         (Defendant's Exhibit No. 23 was marked for

22  identification.)

23  BY MR. DEL RUSSO:

24     Q    Let me show you a letter which I have

25  marked as Defendant's Exhibit No. 23 and ask you if

INTERIM COURT REPORTING
(561) 478-0401

1   you could look at that and tell me if you recall

2   sending this letter to the Florida Commission.

3           (Pause.)

4       A     Yes, this is mine.

5       Q     Who was Mr. Cash?

6       A     He's with the commission.  He holds some

7   managerial supervisor or person that was handling my

8   case.

9       Q     If you could look back at Exhibit No. 21

10  which is two before that, it is the March 20, 1996

11  letter.  That's the letter that says the commission,

12  quote, commission will refrain from commencing an

13  investigation into your complaint while it is before

14  the EEOC.

15          What was it that transpired if you recall

16  that would have caused you to communicate with the

17  Florida Commission the following year when you sent

18  this letter on September 10, 1997?

19      A     I hadn't heard anything a year, I had been

20  calling and I had heard nothing about what was

21  happening with my case.

22          And I had gotten a supervisor's name and I

23  don't know who I called, actually.

24          THE WITNESS:  Do you remember?

25          Can I ask my attorney a question?

1          MR. JANKOWSKI:  I don't remember so don't

2      bother asking me.  If you don't remember say

3      you don't remember.

4  BY MR. DEL RUSSO:

5      Q     If you don't remember that is fine.

6      A     I have a file folder with this person's

7  name and that person and everybody we talked to

8  along the way and I haven't reviewed it.  It is

9  somewhere.

10      Q     In the 6,000 pages of documents --

11      A     Correct.

12      Q     -- you were kind enough to send me and I

13  want to thank you for that again.

14      A     So anyway, so I called McElrath and I

15  guess he put me on to Cash.  I can't remember all

16  the details.

17      Q     The letter in the second paragraph reads,

18  I am just going to read it out loud --

19          MR. JANKOWSKI:  Which exhibit?

20          MR. DEL RUSSO:  23.

21  BY MR. DEL RUSSO:

22      Q     In your September 10 letter you say, "I

23  spoke to Ralph Ezzo's (attorney's) office," then

24  there is a name I can't decipher.

25      A     Marcella Poirier.

INTERIM COURT REPORTING
(561) 478-0401

1    Q    That is an attorney that worked with

2    Mr. Ezzo?

3    A    Yes.

4    Q    "Marcella Poirier had remembered filing

5    this case.  She stated that on the original

6    affidavit it was marked and mailed 11/7/94.  It did

7    not go out by registered mail and therefore have no

8    receipt or any other documentation."

9         Why were you mentioning this to Mr. Cash?

10   A    I can't remember.

11   Q    Was there an issue at the time they

12   couldn't find documents, perhaps this affidavit that

13   is mentioned?

14   A    They had lost the file.

15   Q    Again, a second time?

16   A    I'm sorry, I need to refresh my notes.

17        (Defendant's Exhibit No. 24 was marked for

18   identification.)

19   BY MR. DEL RUSSO:

20   Q    Let me show you what I will mark as

21   Exhibit No. 24.  Maybe this will help.  It is an

22   affidavit by you.

23        (Pause.)

24   Q    Once you have had a chance to review that,

25   ma'am, can you tell me whether you recognize your

```
 1   signature on the third page.

 2        A      Yes, I do.

 3        Q      Was this an affidavit that you had

 4   submitted to the Florida Commission?

 5        A      My attorney had submitted this to the

 6   Florida Commission.

 7        Q      All right.

 8        A      He had typed it and submitted it.

 9        Q      You see your signature is notarized on

10   November 4, 1994?

11        A      Yes.

12        Q      And then on the first page of the

13   affidavit it shows it was received on September 12,

14   1997, do you see that?

15        A      Then it had been re-sent.

16        Q      Which was the same date of your letter to

17   Mr. Cash which was Exhibit 23?

18        A      Okay.

19        Q      By looking at that and by virtue of the

20   reference to the original affidavit in the letter to

21   Mr. Cash, does that help refresh your memory as to

22   whether you may have sent this affidavit to Mr. Cash

23   at the time you wrote him the letter?

24        A      Yes, and I had spoken to Ezzo's office and

25   she was going to get, I think she was re-faxing this
```

1    to him or re-mailing it.  It went here.  It was

2    re-mailed.

3        Q      Do you know if the reason it was re-mailed

4    was because the commission had lost this affidavit?

5        A      Yes, they were requesting papers.

6        Q      Do you know if that was an occasion when

7    they lost portions of your file for a second time?

8        A      No, Mr. Del Russo, I can't remember.  I am

9    sorry, that I didn't look at my own dates that I

10   have.  I don't remember if they lost my file a

11   second time.  I know that it was lost one time.  I

12   can't recall if it was lost a second time.

13          I don't know if this was just a re-sent of

14   papers that were, you know, it is somebody else's

15   office that he wanted for himself.  I can't

16   remember.

17       Q      Fair enough.

18          Can I ask you to turn to the second page

19   of the affidavit which has been marked as Exhibit

20   24.  What I would like you to do is read that

21   typewritten paragraph to yourself.

22       A      Page 3 here?

23       Q      Page 2.

24       A      Page 2, okay.

25          (Pause.)


INTERIM COURT REPORTING
(561) 478-0401

1     Q      Have you had a chance to read it?

2     A      Yes.

3     Q      I think we discussed already a number of

4  references made in this affidavit, I am not going to

5  be repetitive.

6            The first sentence reads, though the

7  company came in September 11, 1993, is that a

8  reference to when Columbia acquired the hospital

9  from Humana?

10    A      Yes, that was what the reference would

11 be.

12           MR. JANKOWSKI:   September what?

13           MR. DEL RUSSO:   '93, the first sentence.

14           MR. JANKOWSKI:   Okay.

15 BY MR. DEL RUSSO:

16    Q      And then the very last sentence reads,

17 quote, they wanted a younger image, do you see that?

18    A      Yes.

19    Q      Is it fair to say that no one said that to

20 you but that that was your perception of what was

21 going on around you?

22    A      That was said when we were walking through

23 the hospital about updating the image, face lift.

24    Q      Is that the reference to when the Columbia

25 execs came in and you toured with them and they

                    INTERIM COURT REPORTING
                       (561) 478-0401

```
 1   said, quote --

 2      A     Yes.

 3      Q     -- this place is sure going to get a face

 4   lift, close quote, we need to update things around

 5   here, close quote?  Did they say anything else

 6   during that tour?

 7      A     You mean specific words, younger image?

 8      Q     Yes.

 9      A     You are looking for quotes here.

10            What was the question?

11      Q     Anything else that was said in your

12   presence that led you to the conclusion that they

13   wanted a, quote, younger image.

14      A     Nothing that was, nothing more, you know,

15   that I can recall that was said.

16      Q     Can you turn to the next page of that

17   affidavit, page No. 3, take a moment and read that

18   typewritten paragraph to yourself.

19            (Pause.)

20      A     Yes.

21      Q     It reads about two-thirds of the way down,

22   they hired another marketing director, going against

23   the necessity to downsize, close quote.  Are you

24   referring there to Ms. Montiero?

25      A     Yes.
```

1    Q    Then the line below that it reads, quote,

2    the hospital was not losing money.

3         Do you see that?

4    A    Yes.

5    Q    How do you know they weren't losing money?

6    A    Because they were certainly spending a lot

7    of money.

8    Q    Any other basis for your belief that the

9    hospital was not losing money?

10   A    When the hospital makes budget we get

11   bonuses and we got bonuses that year.

12   Q    You were the director of, I should say as

13   the director of marketing and public relations you

14   were not on the hospital senior management team,

15   were you?

16   A    No.

17   Q    Did you ever have access to a review of

18   the hospital's profit and loss statement?

19   A    They shared it with us.

20   Q    At managers meetings?

21   A    At managers meetings.

22        (Defendant's Exhibit No. 25 was marked for

23   identification.)

24   BY MR. DEL RUSSO:

25   Q    I show you a document that I have marked

1    for identification as Exhibit No. 25 and ask you if

2    you have seen this letter before which is a letter

3    dated September 26, 1997 from the Florida

4    Commission.

5              (Pause.)

6         Q    Have you seen that document before?

7         A    Yes, sir.

8         Q    Do you know if that was the first notice

9    given to the hospital of your charge of

10   discrimination?

11        A    I don't know.

12             (Defendant's Exhibit No. 26 was marked for

13   identification.)

14   BY MR. DEL RUSSO:

15        Q    I show you what I have marked as Exhibit

16   26, a letter dated October 28, 1997 from Mark

17   Edwards to the commission and ask you if you have

18   ever seen that letter before.

19             (Pause.)

20        A    Yes, I have seen this letter.

21        Q    Do you remember who sent you that letter?

22        A    I had an investigator, Linda Mathis, that

23   I was working with.  I am not exactly sure if she

24   sent me this letter or if this wasn't at the end of

25   our proceedings with the commission I had asked them

1    to send me a full file.  And so I recognize this

2    letter from being in that file but I don't know

3    whether it was sent by my investigator or not.

4        Q    Do you know if Linda Mathis was your

5    investigator after Mr. Cash?

6        A    Yes.  Linda Mathis, yes.  I'm saying yes,

7    I don't know.  Linda Mathis was assigned to my case

8    and she would have been after Mr. Cash.

9             (Defendant's Exhibit No. 27 was marked for

10   identification.)

11   BY MR. DEL RUSSO:

12       Q    I show you a letter that I have marked as

13   Exhibit 27 and ask you if you have seen this letter

14   before.  For the record it is a letter dated January

15   2, 1998 from Linda Mathis to Mr. Edwards.

16            (Pause.)

17       A    Okay, yes, I have seen this.

18       Q    Do you remember the circumstances in which

19   you were provided with a copy of that letter?

20       A    That I would call Linda and want to know

21   the status of the case.  And so she would have sent

22   this to me to let me know that they were, confirming

23   that she was in communication with Columbia.

24            (Defendant's Exhibit No. 28 was marked for

25   identification.)

1    BY MR. DEL RUSSO:

2        Q    Let me show you a letter that I have

3    marked as Exhibit 28, a letter dated November 21,

4    1997 from Ms. Mathis to you.  I ask you if you

5    recall receiving that letter?

6        A    Yes, I do.

7        Q    Was this when you first learned that Linda

8    Mathis would be handling your case as an

9    investigator?

10       A    She had actually I think called me first

11   on the phone and then she had followed up.

12       Q    When you said you had made phone inquiries

13   from time to time were you calling the Florida

14   Commission?

15       A    Yes.

16       Q    Did you ever contact anyone at the EEOC

17   office?

18       A    I was calling both.  I had phone

19   conversations going with both agencies.

20            (Defendant's Exhibit No. 29 was marked for

21   identification.)

22   BY MR. DEL RUSSO:

23       Q    Let me show you now what I am marking for

24   identification as Defendant's Exhibit No. 29 and I

25   ask you if you can identify this document for me.


INTERIM COURT REPORTING
(561) 478-0401

```
 1              (Pause.)

 2      A       Yes, I recognize this document.

 3      Q       What was the purpose for which you sent

 4  this two-page letter to Linda Mathis?

 5      A       I was taking a mediation class in school

 6  and I was talking to my professor that I had this

 7  case pending and I had no attorney and I didn't

 8  really know how to proceed.

 9              And he said, let me see what you have.

10  And so he helped me to put together something.  And

11  I sent it to Ms. Mathis.

12      Q       Did she ask you to send her any sort of

13  statement about your claim or is this something you

14  wanted to do for another reason?

15      A       She had the affidavits, she had had that

16  information, but I just wanted to, when I was

17  talking to Mathis, she want to know, you know, what

18  are you looking for in terms of damages.

19              And so I just put something together very

20  brief, didn't really have any kind of legal counsel

21  other than my professor.  And so I sent this to her

22  showing her what I would want in terms of

23  remuneration.

24              (Defendant's Exhibit No. 30 was marked for

25  identification.)
```

153

1    BY MR. DEL RUSSO:

2       Q      Let me show you another letter that I have

3    marked as Exhibit 30, a letter dated March 17, 1998

4    from you to Ms. Mathis.  Tell me if you recognize

5    that as a letter that you sent to Ms. Mathis.

6              (Pause.)

7       A      Yes, I recognize this.

8       Q      What was the reason that you had sent this

9    subsequent letter to Ms. Mathis?

10      A      She was -- I believe that that was the

11   time -- that was the time -- it was a very slow

12   process working with these people and tedious.  And

13   they would, you know, go on vacation and then, you

14   know, there was always some sort of setback or

15   something.

16             And so this letter would have been written

17   to her just to, you know, --

18      Q      Kind of prod along, if you will?

19      A      Kind of prod her and if they lost papers,

20   enclosed are papers supporting my employment status,

21   so I don't know what papers were enclosed with that

22   but just, you know, I mean, a very tedious process

23   of five or six years, you know, trying to move this

24   case along by myself.

25      Q      When you first filed your charge was Ralph

1    Ezzo your attorney representing you?

2        A    Yes.

3        Q    And at some point did you cease using his

4    services?

5        A    He, he quit.

6        Q    Can you put a time frame on when he may

7    have quit?

8        A    He, well, I want to say somewhere around

9    two, probably two or a couple of years after I had

10   originally gone to him that he informed me that

11   labor law was not his strength and to go find an

12   employment law attorney.

13       Q    Did you make any efforts to do that?

14       A    Yes, I did.

15       Q    Were you at any point represented by

16   subsequent counsel other than the ones who are

17   currently representing you?

18       A    No, sir.

19            (Defendant's Exhibit No. 31 was marked for

20   identification.)

21   BY MR. DEL RUSSO:

22       Q    Let me show you what I have marked as

23   Exhibit 31, it is an EEOC determination dated

24   September 28, 1999.  I am going to ask you if you

25   recognize and recall receiving that document.

155

```
 1              (Pause.)

 2      A       Yes, I do recognize this.

 3      Q       I would like to talk for a little bit,

 4  Ms. Iaia, about the job search efforts you made

 5  after your employment was terminated at the

 6  hospital.  I know we spoke about it a little bit and

 7  I will try not to be repetitive.

 8              You told me that you sent out resumes, you

 9  tried to follow up leads.

10              The next job that you had was with Mary

11  Kay Cosmetics?

12      A       Yes.

13      Q       Were you working as a Mary Kay consultant

14  part time while you were still employed at the

15  hospital?

16      A       Yes.

17              (Defendant's Exhibit No. 32 was marked for

18  identification.)

19  BY MR. DEL RUSSO:

20      Q       Let me show you a document, ma'am, I am

21  coming to the end, by the way.

22              MR. JANKOWSKI:  I am watching.

23              MR. DEL RUSSO:  Working my way down.

24              MR. JANKOWSKI:  That stack has gone down.

25  BY MR. DEL RUSSO:
```

1      Q      I am marking this as Defendant's Composite

2  Exhibit 32 and it consists of three resumes, rather

3  than mark them as three separate documents I thought

4  I would mark them as one composite and then ask you

5  if you could first identify them for me as copies of

6  your resume and then perhaps give me a chronology in

7  terms of when each of these were prepared.

8           MR. DEL RUSSO:   I know that is a compound

9       question.

10          MR. JANKOWSKI:   How many are combined

11      here?

12          MR. DEL RUSSO:   It appears to be three.

13          (Pause.)

14          THE WITNESS:   The top one would have been

15      prepared, I was living in Davie, it would have

16      been prepared in 1993.

17          MR. JANKOWSKI:   How many pages?

18          THE WITNESS:   Two

19  BY MR. DEL RUSSO:

20      Q      So would this have been prepared after you

21  learned that your position was being eliminated in

22  November of '93?

23      A      Yes.

24      Q      But before you learned in May of '94 that

25  you were not being recalled?

1      A      Yes, sir.

2      Q      This would have been then the first resume

3   that you were circulating?

4      A      (Indicating.)

5      Q      That's a yes?

6      A      Yes, that's a yes.

7      Q      Is everything accurate on this two page

8   resume as far as you can tell?

9      A      Well, yes.

10     Q      The second resume which I believe consists

11  of a third page in this exhibit, it is Bates stamped

12  at the bottom No. 550, can you put a time frame on

13  this version of your resume for me?

14     A      I was in school so it would have been 19,

15  presently pursuing a degree, it would have been

16  1998, no, I went to school, I graduated in '98 so it

17  would have been between 1996 or 1997.

18     Q      Was there a version of your resume between

19  these two, that is between the first one which might

20  have been prepared at the end of '93 and the second

21  one that was prepared in 1997?

22     A      Well, this one here.

23            MR. JANKOWSKI:  Referring to page 50.

24            THE WITNESS:  Yes, I was an independent,

25        had already become an independent sales

INTERIM COURT REPORTING
(561) 478-0401

1    director and so I notice here that this was

2    written in with my handwriting about the going

3    to school.  So this present document without

4    the writing in of my handwriting there could

5    have been prepared after I became an

6    independent sales director but prior to going

7    to my master's program

8  BY MR. DEL RUSSO:

9    Q    So without the handwritten notation at the

10  bottom of this one which is page No. 550, you

11  believe this would have been a resume prepared in

12  1995 which is the year that you were an independent

13  sales director at Mary Kay?

14    A    Yes, and also when I moved to my sister's

15  home with that new address.

16    Q    Okay.  What type of job or jobs were you

17  pursuing with this version of your resume?

18    A    I went to Tenet Healthcare.  I was trying

19  to get a position with the dual diagnostic, dual

20  diagnosis clinic that tenet had some satellite

21  hospitals and so I was going there meeting with some

22  people there trying to get employment there.

23    Q    Were you pursuing any opportunities for a

24  marketing position with this version of your resume?

25    A    Yes, I would have been.

```
 1     Q      What about with respect to sales related

 2 positions?

 3     A      I am showing the strength in sales there

 4 which is also part of marketing.

 5     Q      The last version of this resume which

 6 consists of the last two pages, Nos. 577 and 578,

 7 can you put a time frame as to when this version was

 8 prepared by you?

 9     A      This was done in 1999 or 2000.

10     Q      While you were working as a counselor for

11 Living Water Counseling?

12     A      Yes.

13     Q      Would you agree, ma'am, that that

14 represented a change in your professional path from

15 sales, marketing, public relations to counseling or

16 family therapy?

17     A      My background has been a social worker and

18 when I was doing social work I was doing counseling

19 at that time.  And then having been with that social

20 worker background, occupational, psychotherapist

21 part of the jobs that I did while I was working in

22 health care with Humana, and so my current, with my

23 current career move, it really just, I needed the,

24 the graduate degree, gave me the credentials that I

25 needed to do counseling and the counseling office
```

```
 1   also provided a mix -- I am brain dead, now, excuse

 2   me.

 3           You didn't put that in there, did you?

 4           MR. JANKOWSKI:  It is applicable.

 5           MR. DEL RUSSO:  Read to the jury.

 6           I forgot the question.

 7           THE WITNESS:  The question was, I took a

 8       career move and so I, the graduate degree gave

 9       me the credentials to go back and use my

10       counseling skills, and yet I am still using my

11       marketing skills because now with my current

12       job I went to radio stations, I promoted our

13       counseling center.

14           We've gotten, because of my efforts we

15       have gotten a regular show on a radio station

16       called Ask the Counselor where I am frequently

17       on once a month and people call in and we are

18       doing counseling and marketing and I go out and

19       do exhibits.  I set up, I put together an

20       exhibit and a display board.

21           I have organized their brochures.  We have

22       rewritten brochures and so I have combined my

23       marketing with my counseling background.

24   BY MR. DEL RUSSO:

25       Q    So you don't perceive your current job as
```

1    a career change from what you had been doing in

2    marketing and public relations?

3        A    One aspect of it remained the same, the

4    marketing and PR aspect has remained the same.  But

5    I do counsel with individuals on one to one that are

6    hurting and pained, work with divorced people,

7    people who lose their jobs, all kinds of counseling

8    issues.

9        Q    To what extent is your current job as a

10   counselor with Living Water Counseling motivated by

11   it being a professional opportunity or by a calling

12   for religious or altruistic reasons?

13            MR. JANKOWSKI:  I object to the form.

14            THE WITNESS:  Would you restate that or

15        ask it in a different way, I am not really

16        understanding.

17   BY MR. DEL RUSSO:

18       Q    I will try.

19            You certainly make a lot less money now

20   than you did when you were working as the marketing

21   and PR director at the hospital.  We can agree on

22   that?

23       A    Yes, I would agree.

24            MR. JANKOWSKI:  Wholeheartedly.

25            THE WITNESS:  Wholeheartedly.

BY MR. DEL RUSSO:

Q    And during the ensuing period after your position was eliminated you studied at a seminary and got a master's degree in Christian counseling, would you agree with that?

A    Yes.

Q    I am trying to ask you, ma'am, perhaps I am not doing it very artfully, to what extent was your choice to work as a Christian family counselor at Living Water Counseling motivated by the fact it was a career opportunity in marketing and sales and public relations, or to what extent was it influenced by a religious or altruistic calling separate from a professional one?

MR. JANKOWSKI:  I am going to object to the form.  Are you asking her to compare her reasons?

MR. DEL RUSSO:  No.

BY MR. DEL RUSSO:

Q    Do you understand my question?

A    I understand the question.

MR. JANKOWSKI:  I still object to the form.

THE WITNESS:  I was working like a dog with Mary Kay.  I worked like a dog with

1       Humana.

2            I was working like a dog with Melaleuca.

3       And I was, I guess you could say that, you

4       know, I could see what was happening in the

5       hospitals, the hospitals were not hiring, they

6       were closing, as a matter of fact, they were

7       being gobbled up by different corporations and

8       there were not hospital jobs available out

9       there, nor was I going to risk putting myself

10      in a situation where I was going to get another

11      pink slip.

12           So I went to Mary Kay because they offered

13      pink cars.  And I worked with Mary Kay and it

14      looked glamorous and it looked great but there

15      was no paycheck.

16           And that's marketing.  Melaleuca was

17      marketing.

18           I was getting, I was burnt out, I was

19      burnt out on marketing, that I was out there

20      struggling and it wasn't paying off.  There

21      wasn't money there.

22           And so I thought, well, you know, based

23      upon my background and I enjoy people, I enjoy

24      working with people, I enjoy making connections

25      with people, which is all part of marketing,

INTERIM COURT REPORTING
(561) 478-0401

1          that I determined to go get a degree in

2          marriage and family counseling.

3    BY MR. DEL RUSSO:

4      Q      Why wasn't there a paycheck at Mary Kay?

5      A      You would wonder, wouldn't you.

6      Q      I mean, in fact, let me withdraw the

7    question and I will ask you in a moment, I will ask

8    you the same question if I remember in a moment.

9          (Defendant's Exhibit No. 33 was marked for

10   identification.)

11   BY MR. DEL RUSSO:

12     Q      Let me show you a collection of documents

13   I marked as Exhibit 33.  I tell you they all seem to

14   relate to the fact that you worked like a dog at

15   Mary Kay.  I wonder if you could run through them

16   and identify what each of those, what each of those

17   pages are.

18          MR. JANKOWSKI:  How many pages are there?

19          MR. DEL RUSSO:  Six pages.

20          MR. JANKOWSKI:  Can you just read the

21       Bates stamps into the record while she is

22       looking at it?

23          MR. DEL RUSSO:  987, 1107, 1151, 904,

24       90 -- it might be 905 and 906.

25          As a matter of fact, let me also show you

INTERIM COURT REPORTING
(561) 478-0401

1          what I am going to mark as Exhibit 34.  I meant

2          these all to be one document, Ms. Iaia, they

3          are more Mary Kay documents.  These are Bates

4          stamped 1161 and 1162.

5               (Defendant's Exhibit No. 34 was marked for

6     identification.)

7               THE WITNESS:  You want me to comment on

8          each document?

9     BY MR. DEL RUSSO:

10     Q     If you could just in a narrative way

11     explain or identify what these documents are.

12     A     Exhibit 33 was a letter that I wrote to my

13     recruits that we had become a Grand Am unit, is the

14     first car you win with Mary Kay.

15               You have to achieve certain levels of

16     qualifications and goals and eventually you win a

17     car.  But you don't really win a car.  You have the

18     use of a car.

19               So Mary Kay now, which I sold a Corvette

20     to downsize into a Pontiac Grand Am that Mary Kay

21     paid the monthly rental, whatever, the monthly car

22     payment and the insurance payment but if you would

23     reach a month where you didn't make certain quotas,

24     you had to pay for the car yourself.

25               So they tell you that you win a free car

1    but you don't win a free car, you get the use of the

2    car as long as you maintain quotas.

3           So that was page 1 telling my unit, let's

4    go, let's go because I am really saying to them,

5    okay, let's go here, and you know what, if I can do

6    this you can do it and I was now, now I was in a

7    qualification for directorship, so we had to keep

8    this thing going.

9    Q      Which is the next rung up the ladder?

10   A      Right.

11   Q      The second page is just a press release.

12          The third page is a second gold medal.

13   What is that referring to?

14   A      January 6, 1995 is the date on the

15   letter.  At this point I was a Mary Kay sales

16   director.  I am sorry, I am like, some, something

17   great that I did and I won a gold medal.  I can't

18   remember, sorry.  It was another great stride up the

19   ladder of success.

20   Q      Okay.

21   A      Okay.  The next page, I became a director

22   in January.

23   Q      What did that signify?

24   A      Being a director?

25   Q      Yes.

INTERIM COURT REPORTING
(561) 478-0401

```
 1     A     You wore the director suits, you were an

 2  independent sales director.  A very small minority

 3  of women ever achieve this status.

 4           And it is now you get to go to certain

 5  events, you wear certain clothing, you have achieved

 6  a very high level of achievement.

 7           You are not a national sales director, but

 8  you are on your way to continued success in Mary

 9  Kay.  Once you are a director and you win your

10  burgundy, the Grand Am is a burgundy car, now I am

11  eligible to go into the pink cars.

12     Q     At some point in time did you come to

13  realize that the gold medals and the directors and

14  the jackets notwithstanding it wasn't translating

15  into any paychecks?

16     A     Well, yes, I did.  But you first of all

17  you fake it until you make it, is what we are

18  taught.  And when people say to you how are things

19  going, you say, unbelievable and that could be

20  unbelievably good or unbelievably bad.

21     Q     But it was unbelievable?

22     A     But it was unbelievable so when you said

23  unbelievable you knew it was unbelievably bad but so

24  they would tell you, you know, they would tell you,

25  just hang in there, once you become a sales
```

1  director, you know, then you are on the gravy

2  train.  Well, the gravy train was maybe $2,000 a

3  month, maybe but the expenses in Mary Kay for the

4  career brunches and the recruiting and the trips and

5  going here and the, you know, all the, all the

6  expenses, they didn't give you any money for any

7  expenses in Mary Kay.

8         And now I was a director, I had my big

9  debut and people come in from all over and

10 consultants bring their guests and you are up there

11 and they see you and it is very exciting.  And so,

12 you know, other people now want to join Mary Kay.

13        So this is, this page here says, okay, now

14 you have to maintain a unit quota of $4,000 a

15 month.  And if your unit does not place $4,000 worth

16 of sales into the company, to maintain your unit, I

17 was putting these things on a credit card.  So now

18 at the end of a year I had $10,000 worth of

19 inventory in my garage wholesale which had a retail

20 price of $20,000.  I was in debt on credit cards.

21 And I had a shell of a company.  I was broke and had

22 nothing.

23        And I finally got to the point and I said,

24 you know, after a year, and the stress of getting

25 these orders in at the last month and getting

1    recruits and getting people to pay 3,000, 4,000, you

2    know so that I could keep my car and directorship

3    and finally I just couldn't.

4        Q      That is that what Exhibit 34, represents,

5    that is that the quotas were missed and they

6    terminated your directorship?

7        A      Yes.

8        Q      Was that the end of your working,

9    essentially your working with Mary Kay?

10       A      Yes.  I was able to send some of that

11   product back to the company and once you send

12   product back to the company and they don't give you

13   money on all of it but that terminates your

14   affiliation forever and ever with Mary Kay and

15   that's what I did.  And I still have credit card

16   debt I am paying on.

17              MR. JANKOWSKI:  Off the record a second.

18              (At 4:50 p.m. a five minute recess was

19       taken.)

20   BY MR. DEL RUSSO:

21       Q      Ms. Iaia, I am showing you now what I will

22   mark as Exhibit 36 to your deposition?

23       A      35 you have.

24       Q      35, I am sorry.

25              (Defendant's Exhibit No. 35 was marked for

INTERIM COURT REPORTING
(561) 478-0401

1    identification.)

2    BY MR. DEL RUSSO:

3        Q    I ask you if you had a chance to look at

4    these pages before.

5        A    Yes.

6        Q    Does the first page represent a W-2

7    statement from 1993 reflecting your income of

8    $42,044?

9        A    Yes.

10       Q    The second page is a front page of your

11   1994 tax return.  Do you have the entire return for

12   1994?

13       A    Entire?

14       Q    Well, the reason I ask, ma'am, I only was,

15   I only received the front page of your 1040

16   statement and I haven't received the entire return.

17            MR. JANKOWSKI:  We can double check.  I

18       believe you have everything we have, but we

19       will double check.

20            THE WITNESS:  What does the front page

21       look like?

22   BY MR. DEL RUSSO:

23       Q    This, the second page, that is the page I

24   have that was produced to me.  But I don't have page

25   2, Schedules A, B and any schedules that were filed

                    INTERIM COURT REPORTING
                        (561) 478-0401

1    with the tax return.

2              MR. JANKOWSKI:  I will double check.

3    BY MR. DEL RUSSO:

4        Q    Actually the same is true for all the tax

5    returns.

6              MR. JANKOWSKI:  I don't know.

7              THE WITNESS:  Okay.

8    BY MR. DEL RUSSO:

9        Q    We can talk about that later, but in any

10   event --

11             MR. JANKOWSKI:  If we have it I will give

12        copies.

13   BY MR. DEL RUSSO:

14       Q    This page reflects your total income in

15   1994 as $8,228, is that correct?

16       A    Yes, sir.

17       Q    And in 1995 your total income for that

18   year was negative $11,336, is that correct?

19       A    Yes.

20       Q    In 1996 your total income for that year

21   was negative $6,618, is that correct?

22       A    Yes.

23       Q    And in 1997, again, these are the only

24   pages I have.

25       A    So you are looking from here?

INTERIM COURT REPORTING
(561) 478-0401

1      Q      I am looking at the column total income

2   1997, your total income was $8,617, is that correct?

3      A      Yes.

4      Q      Then at the last page in 1998 your total

5   income was $9,719, is that correct?

6      A      Yes.

7             (Defendant's Exhibit No. 36 was marked for

8   identification.

9   BY MR. DEL RUSSO:

10     Q      Let me show you now what I have marked as

11  Exhibit No. 36, and it is a, your 1999 tax return

12  which was just produced to me this morning.  And I

13  would like you, if you could, to identify that for

14  me as your tax return for 1999.

15     A      Yes, it is.

16     Q      Does it reflect your total income in 1999

17  was $19,706?

18     A      Yes, it does.

19            MR. DEL RUSSO:  If you could just check,

20       John, the rest of the documents that comprise

21       her tax returns for those tax years.

22            MR. JANKOWSKI:  Sure.

23            MR. JANKOWSKI:  Off the record for a

24       second.

25            (Discussion off the record.)


INTERIM COURT REPORTING
(561) 478-0401

```
 1              (Defendant's Exhibit No. 37 was marked for

 2    identification.)

 3    BY MR. DEL RUSSO:

 4       Q      Good news, Ms. Iaia, this is the last

 5    document I have to show you, what I have marked as

 6    Exhibit No. 37.  And I am going to ask you if you

 7    recognize these as the answers you provided to some

 8    interrogatories that were served on you through your

 9    attorney earlier in this lawsuit.

10              (Pause.)

11       A      Yes, sir.

12       Q      The last two pages in this document

13    consist of a spreadsheet reflecting your claim for

14    damages.

15       A      Yes.

16       Q      Do you know who prepared this analysis?

17       A      I had very roughly given this to my

18    attorney and he put this grid together, but it was

19    rough.

20       Q      In terms of the damages that you are

21    claiming in this lawsuit, is it fair to say that you

22    are asking to be reimbursed for past wages and

23    future wages that you would have earned had you not

24    been terminated from your employment at the

25    hospital?
```

1      A      Yes, since I had 20 years previous

2  experience with them I would have stayed until I was

3  65 and worked another 20 years.

4      Q      Do you know what the current status is of

5  Pembroke Pines Hospital in terms of the ownership or

6  who is running it?

7      A      Yes.

8      Q      Tell me what you know about it.

9      A      The district, the Memorial, South Memorial

10  District owns the hospital.

11     Q      Do you know when that came about?

12     A      No, I don't.

13     Q      Is it your understanding that the client I

14  represent sold or somehow transferred the hospital

15  to the Memorial system, health care system?

16     A      Yes, that's my understanding.

17     Q      Do you know what happened to the employees

18  at the hospital in terms of their employment with my

19  client after the hospital came to be run by the

20  Memorial health care system?

21     A      I know Ms. Montiero continued in that job.

22     Q      For how long?

23     A      I don't know.  I understand she's not

24  there now but I understand that she continued there

25  for I think until either the year '99 or 2000 that

```
 1   she left, but I am not exactly sure what year.

 2        Q      How do you believe you have been damaged

 3   or injured as a result of the acts by managers at

 4   that hospital that you have told me about today?

 5        A      I have been damaged by lost wages and I

 6   lost a job that I was making about $42,000 a year

 7   at.

 8               I lost health insurance.  I lost dental

 9   insurance.  I lost vacation pay.  I lost thrift

10   plan.  I lost the matching fund of a thrift plan.  I

11   lost retirement pension.  I lost amortization on

12   that.

13               I lost a relationship with Jim Strait.  I

14   lost a home.  I lost stature in the community.

15               I lost having to live with, you know,

16   what's wrong with me, you know, couldn't figure out,

17   did I do anything wrong, didn't I do anything wrong.

18               I lost earning capacity over these years

19   trying to recoup and to reorganize.  And I lost

20   savings that I had trying to get this Mary Kay

21   business going.

22               I have become a pest to my family, that

23   they are supporting me.

24               I had to go back to my ex-husband and ask

25   him for money that we hadn't talked over years but I
```

1    was just desperate for income.

2              I don't know, Mr. Del Russo, there's

3    probably more but that's about all I can come up

4    with at this point.

5    Q    Have you gone to see any psychologists or

6    psychiatrists or mental health counselors for any

7    emotional damages that you claim you suffered as a

8    result of the acts that you have testified about

9    today?

10   A    I could not -- when I got let go I could

11   not feel sorry for myself.  I mean, I am feeling

12   sorry here today and I used to feel sorry for myself

13   in the loneliness of my room but I could not stay

14   down long and have a pity party so I just stuck

15   myself in Mary Kay and there was all kinds of

16   programs on self-esteem and self-worth and negative

17   self-talk and whatever program or conference was

18   there, I would go, working the business.  I turned

19   to god.  I got comfort in god.

20             And I went into the marriage and

21   counseling field so I can understand the process

22   myself.

23             I did go see some counselors.  I work with

24   counselors where I am, Jeff Bercaw.  I have gone to

25   Mary Kay Tortorello, she was another counselor.  So

```
 1   I did seek -- I saw Barry Brown briefly, he's a
 2   Ph.D.  I just, I just...
 3       Q     I am sorry if you feel I am prying
 4   unnecessarily into your life, that's not my
 5   intention.  But you mentioned, when I asked you
 6   about your damages you mentioned that you lost your
 7   relationship with Jim Strait.
 8              If that is something that isn't going to
 9   come up again if this case is tried, I am not going
10   to ask you about it, maybe that is something,
11   otherwise I am going to have to ask you about what
12   you are referring to, how the loss of the job had
13   any impact on your relationship with Mr. Stait.
14       A     So are you asking a question?
15       Q     I am really asking your counsel.
16             MR. DEL RUSSO:  Am I going to hear about
17         it again?  If so, I feel obligated to ask about
18         it.
19             MR. JANKOWSKI:  Can you give us a second?
20             MR. DEL RUSSO:  Yes.
21             (At 5:05 p.m. a three minute recess was
22         taken).
23             MR. DEL RUSSO:  On the record.
24   BY MR. DEL RUSSO:
25       Q     Ma'am, you mentioned when I asked you
```

INTERIM COURT REPORTING
(561) 478-0401

1   about your damage claim that you lost your

2   relationship with Mr. Stait.  What do you mean by

3   that?

4       A    We were living together.  He had just

5   bought a home and we were fixing it up and I had my

6   job at the hospital and he worked for BellSouth and

7   he was, he was very proud of what I did and very

8   proud of me.

9           And when the hospital was going through a

10  name change from Humana to Galen he had come to that

11  reception and he was just, you know, glowing with

12  pride and when I was let go he, he couldn't take the

13  emotional up and down.  He couldn't handle my, the

14  disruption that this had created and that how I was

15  just emotionally unstable.

16          He couldn't handle the Mary Kay business

17  being in the house.  He couldn't handle that I was

18  always out Friday nights, I was out on Saturday

19  nights and Saturday days.

20          It was just, it was -- he, he grew sick of

21  me because I was let go.  And, you know, and that

22  further affected my self-esteem because I felt very

23  much abandoned, abandoned by my job and now I was

24  abandoned by him and I couldn't live in that house

25  any more and I had to go find a place to live and I

1    had to go live with my sister.

2            And he just, he just threw me aside.

3            MR. DEL RUSSO:  All right, thank you.  I

4    have no further questions.

5            MR. JANKOWSKI:  Are you ordering?

6            MR. DEL RUSSO:  Yes.

7            MR. JANKOWSKI:  We will read.

8            I will take a copy and a disk.

9            MR. DEL RUSSO:  I will take the disk too.

10           (Witness excused.)

11           (At 5:15 p.m., the deposition was

12    concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

INTERIM COURT REPORTING
(561) 478-0401

```
1    STATE OF FLORIDA

2    COUNTY   OF   DADE

3

4

5           I, the undersigned Notary Public, in and

6    for the State of Florida, hereby certify that

7    JACQUELINE IAIA personally appeared before me and

8    was duly sworn.

9

10          WITNESS my hand and official seal this 2nd

11   day of July, 2000.

12

13

14          _____

15          RICHARD BURSKY, CM, RPR

16          Notary Public - State of Florida

17          My Commission No. CC 759731

18          Expires:  July 17, 2002

19

20

21

22

23

24

25
```

INTERIM COURT REPORTING
(561) 478-0401

```
 1              C E R T I F I C A T E

 2

 3
       STATE OF FLORIDA
 4
       COUNTY OF DADE
 5

 6           I, Richard Bursky, a Registered Merit
       Reporter, do hereby certify that I was authorized to
 7     and did stenographically report the deposition of
       JACQUELINE IAIA; and that the transcript is a true
 8     and correct transcription of the testimony given by
       the witness
 9
             I further certify that I am not a
10     relative, employee attorney or counsel of any of the
       parties, nor am I a relative or employee of any of
11     the parties' attorneys or counsel connected with the
       action, nor am I financially interested in the
12     action.

13

14           Dated this 2nd of July, 2000.

15

16

17

18     _____
       Richard Bursky
19     Registered Merit Reporter

20

21

22

23
             The foregoing certification of this
24     transcript does not apply to any reproduction of the
       same by any means unless under the direct control
25     and/or direction of the certifying reporter.
```

INTERIM COURT REPORTING
(561) 478-0401

1                              -   -   -

2                    C   E   R   T   I   F   I   C   A   T   E

3                              -   -   -

4    STATE OF FLORIDA
     COUNTY  OF  DADE

5

6            I, JACQUELINE IAIA, hereby certify that I
     have read the foregoing transcript of my deposition

7    and that the statements contained therein, together
     with any additions or corrections made on the

8    attached Errata Sheet, are true and correct.

9

             Dated this_____day of_____, 2000.

10

             _____

11    JACQUELINE IAIA

12

13

14            The foregoing certificate was subscribed to
     before me this_____day of_____, 2000, by the

15    witness who has produced a_____
     as identification and who did not take an additional

16    oath.

17

18                        _____

19

20

21

22

23

24

25

INTERIM COURT REPORTING
(561) 478-0401

# ADDITIONAL

# ATTACHMENTS

EXHIBITS.

Legal PAPERS

NOT

# SCANNED

## PLEASE REFER TO COURT FILE