1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2          FT. LAUDERDALE DIVISION

3                          CASE NO. 00-6227-CIV-MORENO
                           Magistrate Judge:  Dube'
4

5     -  -  -  -  -  -  -  -  -  -
                                        :     LIGHT BOX
6     JACQUELINE IAIA,                  :       FILED

7                    Plaintiff,         :     NOV - 3 2000

8       -vs-                            :     CLARENCE MADDOX
                                              CLERK, USDC / SDFL / MIA
9     COLUMBIA HEALTHCARE CORPORATION   :
      d/b/a PEMBROKE PINES HOSPITAL,    :
10    a foreign corporation,            :
                                        :
11                    Defendant.        :
                                        :
12    -  -  -  -  -  -  -  -  -  -

13

14         Videotaped deposition of JERRY SUTPHIN

15         Taken on behalf of the Defendant

16         Date:   July 24, 2000

17         Place:  Norfolk, Virginia

18

19         APPEARANCES:

20         BECKER & POLIAKOFF, P. A.
           By:  RODERICK V. HANNAH, ESQUIRE
21              Counsel for the Plaintiff

22         LEVY, KNEEN, MARIANI, CURTIN,
           KORNFELD & DEL RUSSO, P. A.
23         By:  CHRISTOPHER C. COPELAND, ESQUIRE
                  and
24         By:  SUE WILLIS-GREEN, ESQUIRE
                Counsel for the Defendant
25
           Reported by:  Penny Commander Wile, RMR

ORIGINAL

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1             Videotaped deposition upon oral

2   examination of JERRY SUTPHIN, taken by and before

3   Penny Commander Wile, RMR, a Notary Public for the

4   State of Virginia at Large, pursuant to Notice to

5   Take Depositions, commencing on July 24, 2000, at

6   the offices of Associated Court Reporters, Inc.,

7   125 St. Paul's Boulevard, Suite 309, Norfolk,

8   Virginia, to be used in evidence in the

9   above-styled cause.

10

11             *   *   *

12

13                         <u>PAGE</u>

14   Direct examination by Mr. Copeland      5

15   Cross-examination by Mr. Hannah      72

16   Redirect examination by Mr. Copeland   140

17   Recross-examination by Mr. Hannah    148

18

19

20

21

22

23

24

25

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
                        E X H I B I T S

NO.   DESCRIPTION                              PAGE

ON BEHALF OF THE DEFENDANT:

1     Employee evaluation, Iaia               53

2     Letter dated November 11, 1993          61

3     Letter dated November 16, 1993          66

4     Memo dated December 11, 1991            69

5     Employee evaluation, Monteiro           70




ON BEHALF OF THE PLAINTIFF:

1     Letter dated May 5, 1994                81

2     Letter dated March 6, 1998              89

3     Newsletter, Iaia                        99

4     Newletter, Monteiro                     100

5     Newspaper article                       101

6     Employee appraisal, Monteiro            107

7     Application for employment              117

8     Resume                                  119

9     Job description                         133

10    Incentive compensation plan             148
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1              THE VIDEOGRAPHER:  This is the

 2  videotaped deposition of Jerry Sutphin taken on

 3  July 24th, 2000, at 11:22 a.m., at the address of

 4  125 St. Paul's Boulevard, Suite 309, in the matter

 5  of Jacqueline Iaia versus Columbia Healthcare

 6  Corporation d/b/a Pembroke Pines Hospital, a

 7  foreign corporation, case number

 8  00-6227-CIV-MORENO, to be heard in the United

 9  States District Court, Southern District of

10  Florida, Fort Lauderdale Division.

11              My name is Shawn Burr, with the firm

12  of Video Litigation, Limited, located at 125 St.

13  Paul's Boulevard, Norfolk, Virginia, and I will be

14  videotaping this deposition.

15              Would counsel for the plaintiffs

16  please identify themselves for the record?

17              MR. HANNAH:  Yes.  Rod Hannah.

18  Becker & Poliakoff, P. A. on behalf of the

19  plaintiff.

20              THE VIDEOGRAPHER:  Would counsel for

21  the defense please identify himself for the

22  record?

23              MR. COPELAND:  Chris Copeland of

24  Levy, Kneen, et al.

25              MS. WILLIS-GREEN:  Sue Willis-Green,
```

1  also on behalf of the defendants.

2            THE VIDEOGRAPHER:  Would the court

3  reporter please identify herself and swear in the

4  witness?

5            THE REPORTER:  I'm Penny Wile with

6  Associated Court Reporters.

7

8            JERRY SUTPHIN, called as a witness,

9  being first duly sworn, was examined and testified

10 as follows:

11

12            THE REPORTER:  Thank you.

13

14            DIRECT EXAMINATION

15 BY MR. COPELAND:

16      Q.    Could you state your name for the

17 record, please?

18      A.    Jerry Sutphin.

19      Q.    And how do you spell your name,

20 please?

21      A.    S-u-t-p-h-i-n.

22      Q.    Mr. Sutphin, where do you currently

23 reside?

24      A.    Virginia Beach, Virginia.

25      Q.    And is this your permanent place of

1    residence?

2         A.    Yes, it is.

3         Q.    Do you maintain any residence within

4    the State of Florida?

5         A.    No, I do not.

6         Q.    Do you plan on being in the State of

7    Florida anytime during the month of October?

8         A.    No, sir.

9         Q.    Are you currently employed?

10        A.    Self-employed.

11        Q.    Okay.  And what is your current

12   position of employment?

13        A.    I've just opened an insurance agency.

14        Q.    Okay.  How long ago did you open that

15   agency?

16        A.    It's been open now about 30 days or

17   ʳ .

18        Q.    All right.  And prior to opening the

19   insurance agency, what was the last position of

20   employment that you had?

21        A.    I had a small consulting company, and

22   prior to that was the chief executive officer at

23   or the -- I'm sorry.  The executive director of

24   Humana Group Health Plan in Washington, D. C.

25        Q.    Mr. Sutphin, can you tell me what

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1    your date of birth is?

 2         A.    April 30th, 1944.

 3         Q.    And what is your current age?

 4         A.    Fifty-six.

 5         Q.    All right.  Are you married?

 6         A.    Yes.

 7         Q.    And do you have children?

 8         A.    Yes.

 9         Q.    How many children do you have?

10         A.    One.

11         Q.    All right.  All over the age of 18?

12         A.    Yes.

13         Q.    Do you reside with your wife and your

14    children?

15         A.    No.  My daughter does not reside with

16    us.  I reside with my wife.

17         Q.    Okay.  Mr. Sutphin, I'd like to get,

18    just if I could, just a little bit of background

19    on your education.

20         A.    Okay.

21         Q.    We won't go back too far, just

22    starting with college.  Could you summarize for me

23    any colleges that you attended and what degrees

24    you obtained?

25         A.    I attended West Virginia State
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    College.  Graduated in 1974 with a Bachelor of

2    Science in Accounting.  Subsequent to that went to

3    work for Humana in Louisville, Kentucky, and have

4    held several positions with them throughout the

5    last few years.

6         Q.    Okay.  And you graduated in '74,

7    1974; is that correct?

8         A.    Yes, sir.

9         Q.    Have you undergone any continuing

10   education other than formal education at West

11   Virginia?

12        A.    Attending many seminars and various

13   and sundry things over the years.

14        Q.    Was that in the course and scope of

15   your employment?

16        A.    In my employment, yes, sir.

17        Q.    I believe you said that after

18   graduating from Columbia you went to work for

19   Humana?

20        A.    Yes.

21        Q.    Can you summarize for me your

22   employment history in the medical field with

23   Humana?

24        A.    I started out with Humana in

25   Louisville, Kentucky sometime in 1975.  Spent

1   about three years there.  Went from there into a

2   finance position at a hospital in Virginia Beach.

3   Subsequently left there and went back to

4   Louisville, Kentucky in a finance position in

5   hospital with Humana.  Again left there.  Became

6   the executive director of a hospital in West

7   Virginia, which was a Humana Greenbrier Valley.

8   From there went to Virginia Beach again as the

9   executive director.  From there to North Miami

10  Beach, Florida at what is now Aventura Medical

11  Center, as executive director, and to Pembroke

12  Pines Hospital from there as executive director

13  and CEO.

14        Q.     Okay.  Now, when you refer to

15  executive director, is that commonly known as also

16  as the CEO?

17        A.     I think it would be equated to the

18  CEO position, yes.

19        Q.     Can you explain to me starting with,

20  I guess, Aventura -- I believe you stated that you

21  had started at Aventura as the executive director

22  or CEO?

23        A.     Yes.

24        Q.     Do you recall when that date was,

25  approximately?

1      A.      That would have been -- I'm trying to

2   think back.  1989 possible.

3      Q.      Okay.  And I think prior to that one

4   were you employed at was it Bayside Hospital?

5      A.      Yes.  In Virginia Beach.

6      Q.      That's in Virginia Beach?

7      A.      Yes.

8      Q.      Were you the CEO there as well?

9      A.      Yes.

10     Q.      And when did you start there?

11     A.      About 1984.

12     Q.      And prior to that were you at

13   Greenbrier Valley Medical Center?

14     A.      Yes.

15     Q.      And when did you --

16     A.      From about 1979 or so, '80 maybe.

17     Q.      Okay.  And at each of those hospitals

18   were you the executive director?

19     A.      Yes, sir.

20     Q.      Okay.  Can you explain to the jury,

21   please, what is the function of an executive

22   director or the CEO of a hospital?

23     A.      Basically for the overall -- has the

24   overall responsibility for the functioning of the

25   facility, maintaining its various accreditations,

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

11

1    and assuring quality care within the facility.

2         Q.    Is the CEO, are you the top

3    administrator that is on the hospital campus?

4         A.    That's correct.

5         Q.    Now, you were affiliated -- each one

6    of these hospitals, was it owned by a Humana

7    Corporation?

8         A.    Humana owned all of them up until

9    about early 1993.

10        Q.    Okay.  It's your understanding were

11   those hospitals directly owned by Humana or do you

12   have any understanding of how the relationship

13   was, how they were owned?

14        A.    They were all subsidiaries of the

15   Humana Corporation, as far as I know.

16        Q.    Did Humana -- is this the same

17   corporation which also provides insurance?

18        A.    Yes, sir.

19        Q.    Now, Mr. Sutphin, in your position

20   are you familiar with the term RIF?

21        A.    Yes, sir.

22        Q.    Can you explain or define what a RIF

23   is?

24        A.    Reduction in work force.

25        Q.    All right.  And have you had

1    experience as the CEO to undergo any RIFs at the

2    various hospitals that you've worked at?

3         A.    Yes, sir.

4         Q.    Could you explain to the members of

5    the jury, I mean, what is a RIF or what leads up

6    to a RIF commonly?

7         A.    Generally a RIF is used, and possibly

8    not in all cases, but in most cases a RIF is used

9    to reduce the operating expenses of a facility, to

10   provide a better operating picture.  And

11   particularly in a case of decline in membership in

12   the number of patients or decline in outpatient

13   procedure, whatever may have caused that,

14   generally RIF is used to adjust your staffing work

15   force to a level which is commensurate with what

16   your volume is.

17        Q.    Okay.  And in your past experience as

18   CEO could you quantify the numbers of RIFs that

19   you've had to supervise or undergo under your

20   tutelage?

21        A.    I'm not sure I can give an exact

22   number, but I think it would be fair to say that

23   it's been several.  I would guess between, and

24   it's pure speculation, between five and 10.

25        Q.    Okay.  What are the typical reasons

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1   for a reduction in force having to be implemented?

2           A.      Generally it's to adjust your

3   operating expenses to compensate for a -- the

4   volume that your facility is currently generating.

5           Q.      Okay.  And is there a -- through the

6   number of RIFs that you've undergone have you

7   undergone a common course of practice in making

8   the decisions on who would be subject to a RIF; in

9   other words, who's going to lose their jobs and

10  who's going to retain their jobs?

11          MR. HANNAH:  Object to the form.

12

13  BY MR. COPELAND:

14          Q.      Okay.  What is the decision process

15  that's normally employed in determining who

16  remains and who is terminated?

17          A.      Generally it's a process of, first of

18  all, determining your objective in terms of what

19  you felt may be needed in terms of payroll

20  reduction cost.  From that point you go to your

21  various department heads suggesting a possible

22  number in terms of dollar amount where we can best

23  handle a reduction in force without affecting the

24  quality of care, and then depend on your various

25  department heads to make recommendations back to

1   you of what they think they can do in terms of a

2   reduction in force.

3        Q.    Okay.  Is it a fair statement to say

4   that each of the directors of the various

5   departments within a hospital would propose

6   individuals from their department to be included

7   on the RIF?

8        A.    Yes.

9             MR. HANNAH:  Objection.  Leading.

10

11  BY MR. COPELAND:

12       Q.    What about -- did you have as a CEO

13  direct supervisory control of any individuals in

14  the hospital, that were employed in the hospital?

15       A.    Yes.

16       Q.    All right.  Who would make the

17  decision in regards to whether or not those

18  individuals would be included in any reduction in

19  force?

20       A.    I would.

21       Q.    Now, is the reduction in force

22  process, is it blind to age or is age a

23  consideration?

24       A.    I can say that I don't ever remember

25  considering age in these.

1          Q.     All right.  Is the individual's

2  performance or seniority a factor which would be

3  taken into consideration whether or not they would

4  be included in a reduction of force?

5                 MR. HANNAH:  Objection.  Compound

6  question.

7

8  BY MR. COPELAND:

9          Q.     You can answer, if you understand.

10         A.     Would you repeat the question?

11         Q.     Sure.  Let me break it down.

12                Is an individual's seniority a factor

13  which is taken into consideration in any reduction

14  in force?

15         A.     In some cases but not necessarily in

16  all.

17         Q.     Okay.  Is an individual's performance

18  in their position a factor which is taken into

19  consideration in reduction --

20         A.     In many cases but not necessarily.

21         Q.     What are the primary factors which

22  you look to in regards to which positions will

23  actually be -- let me strike that.

24                Do you look towards eliminating

25  individuals or do you look to eliminating

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    positions?

2         A.      Positions.

3         Q.      I want to go back and talk a little

4    bit about Pembroke Pines and your history with

5    them.

6         A.      Fine.

7         Q.      Do you recall when you started as the

8    CEO at Pembroke Pines Hospital?

9         A.      Approximately January of '92, if I

10   recall.

11        Q.      And at the time you started as CEO do

12   you know which -- was the hospital still owned by

13   Humana?

14        A.      Yes.

15        Q.      Okay.  What were your duties and

16   responsibilities as the CEO at Pembroke Pines?

17        A.      Basically the same function that I

18   would have as CEO of any other facility; however,

19   in this particular case when I agreed to accept

20   the position because of the relationship with

21   Humana between its hospitals, if you will, and its

22   insurance operations it presented a little

23   different operating challenge, if you will, in

24   that we needed to try to accommodate as many

25   Humana patients as we could from that particular

1    area, around South Broward County and North Dade.

2         Q.    Okay.  What was the area or the

3    service area for Pembroke Pines Hospital?

4         A.    It was basically the South Broward

5    County area.

6         Q.    All right.  And were there -- at the

7    time that you started at the hospital was there

8    any competition from other hospitals?

9         A.    Yes.

10        Q.    What was the competition for Pembroke

11   Pines?

12        A.    Memorial Hospital or the South

13   Broward Hospital district, it was the most

14   imminent competitor, if you will.

15        Q.    All right.

16        A.    And the subsequent opening of its

17   Memorial West Hospital.

18        Q.    Okay.  Was Memorial West opened at

19   the time that you started as CEO or was that

20   subsequent to starting?

21        A.    I can't recall the exact dates, but

22   it was relatively in that period of time.  I can't

23   remember whether it was before or after.  I

24   believe it was after I took over as CEO.

25        Q.    Okay.  Can you explain a little bit

1    to the members of the jury what type of a facility

2    Pembroke Pines Hospital was?

3         A.        Pembroke Pines was, if I recall, a

4    300, 301 bed acute care hospital.  When I say

5    acute care, basically medical services which

6    encompasses everything from intensive care units,

7    general medical/surgical unit, medical units, and

8    the surgical section of the hospital.

9         Q.        Okay.  Do they have an emergency room

10   as well?

11        A.        Yes, they had an emergency room.

12        Q.        Did they have a pediatrics

13   department?

14        A.        Yes, sir.

15        Q.        And an OB department?

16        A.        And an OB department at the time I

17   took over.

18        Q.        Now, were there any positions as the

19   CEO of Pembroke Pines that you had direct

20   supervisory authority over?

21        A.        Yes, sir.

22        Q.        Do you recall what those positions

23   were?

24        A.        Not all of them in total, but

25   basically the head of the nursing divisions, the

```
 1   finance director, the number two person or the

 2   chief operating officer reported to me, and the

 3   director of marketing, and the director of the

 4   Seniors Program.

 5        Q.     Okay.  Do you recall when you came

 6   out to Pembroke Pines as CEO who filled the

 7   position of director of marketing?

 8        A.     Jackie Iaia.

 9        Q.     Is she the plaintiff in this action?

10        A.     Yes, sir.

11        Q.     And do you recall who filled the

12   position of Senior Friends at the time you came on

13   at Pembroke Pines?

14        A.     Monique Monteiro.

15        Q.     Do you know what the duties of the

16   director of marketing were?

17        A.     Yes, sir.

18        Q.     Can you explain to the jury what was

19   the director?

20        A.     Basically it's marketing the facility

21   in terms of media marketing, newspaper

22   advertising, various and sundry community events

23   which she may attend, basically the promotion of

24   the hospital.

25        Q.     Okay.  And what about the director of
```

1    Senior Friends?  What was the functions of that

2    position?

3            A.      Her responsibilities was to act as

4    the director of what we call the Senior Friends

5    Program, which was to create and alliance between

6    the seniors community and the facility.

7            Q.      Was there any cross between the

8    director of marketing and the director of Senior

9    Friends and what functions they performed on

10   behalf of the hospital?

11              MR. HANNAH:  Object to the form.

12              THE WITNESS:  The only thing that I

13   may recall that may be, going back that far, may

14   be the relationship that may exist when the Senior

15   Friends may do their own newspaper advertising,

16   something of that nature, which was very similar

17   to what the director of marketing did, only I

18   think they placed their own ads, but I'm pulling

19   that from memory and can't say that for sure.

20

21   BY MR. COPELAND:

22           Q.      What was the purpose of having a

23   Senior Friends Program?

24           A.      The Seniors Program was a program

25   that was developed to -- several years ago through

1    Humana under which it was an association for those

2    individuals -- I can't remember the age at the

3    time, I want to say over age 55 -- to belong to

4    the association, which we would provide various

5    and sundry educational programs, that we would

6    help with things such as maybe possibly their

7    billing problems that may exist or that they may

8    have with Medicare, and to try and create an

9    alliance between the seniors community and the

10   facilities.

11        Q.    And why was it beneficial for the

12   hospital to create that alliance?

13        A.    Well, certainly the growing senior

14   population was believed to be the -- needless to

15   say, is going to be something that grows immensely

16   in the future, and we felt that by tying into

17   seniors to our facilities and providing a service

18   to them hopefully that that would pay off in terms

19   of services they may use at the facilities, in

20   addition to providing a community service to them.

21        Q.    Was this, in essence, a marketing

22   attempt directed to seniors in particular?

23        A.    No question.

24             MR. HANNAH:  Objection.  Leading.

25             THE WITNESS:  Yes.

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    BY MR. COPELAND:

2         Q.    Now, did you have any experience with

3    the Senior Friends Program at any other Humana

4    hospital prior to coming to Pembroke Pines?

5         A.    Yes, sir.  Both Aventura and Bayside.

6         Q.    Were you involved in any way in

7    implementing any of those programs?

8         A.    The one at Bayside was -- I

9    implemented it back in the mid '80s.  I don't

10   recall exactly what its -- how many had been

11   formed prior to that in other hospitals, but I

12   think we were fairly low on the list in terms of

13   the numbers that had been placed in other

14   hospitals.

15        Q.    Turning back a little bit to when you

16   came on to Pembroke Pines, who did you understand

17   was your employer at the time you started at

18   Pembroke Pines Hospital?

19        A.    When I started at Pembroke?

20        Q.    Yes.

21        A.    Humana.

22        Q.    Did that at some point in time, to

23   your understanding, change?

24        A.    Yes.

25        Q.    And what are the circumstances of

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    when that -- how that changed?

2        A.    In early '93 or late '92, I can't

3    recall the exact time on it, Humana apparently

4    made a corporate decision or obviously made a

5    corporate decision to split their insurance

6    products or division and the hospital division

7    into two separate companies.  The successor

8    corporation on the hospital side was a company

9    called Galen, who then took over the operation of

10   I want to say all, but I'm not quite sure that

11   that was entirely true, but most of the old Humana

12   hospitals.

13       Q.    And was Galen, as far as you know, a

14   wholly-owned corporation of Humana?

15       A.    No, sir.  It was a separate Stock

16   Exchange, New York Stock Exchange, corporation, as

17   far as I know.

18       Q.    Then is it your understanding, I

19   guess, you became an employee of Galen?

20       A.    Yes, sir.

21       Q.    Was there any other change subsequent

22   to becoming an employee of Galen, as far as you

23   know?

24       A.    In I'm going to say mid '93 we were

25   informed at the hospital that Columbia was

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    possibly interested in acquiring Pembroke Pines,

2    and at that time went through a period of time in

3    which several representatives were in the hospital

4    looking at it, so forth and so on.  And then in --

5    later in '93, I can't remember the exact date,

6    Columbia actually bought the entire or acquired

7    Galen as a corporation, which included Pembroke

8    Pines Hospital.

9         Q.    Okay.  Were you involved in the

10   transaction itself as to how the purchase was

11   effected?

12        A.    Not in the actual purchase of the

13   facility.  I was involved in a lot of the what is

14   called the due diligence process of going through.

15        Q.    Do you know if Columbia, as you refer

16   to them, was the actual entity that became the

17   owner of the hospital or another entity?

18        A.    To my knowledge, it was Columbia.

19        Q.    Now, when you started at Pembroke

20   Pines, did you undertake an evaluation of the

21   status of the hospital, determine what its

22   weaknesses and what its strengths were?

23        A.    Yes, sir.

24        Q.    Tell me, if you could, what were the

25   weaknesses that you found when you started?

1        A.      Without going through each and every

2    detail, basically the overall weaknesses at

3    Pembroke was it had a relatively low patient

4    volume in relation to its bed size.  The facility

5    needed a lot of renovation in terms of the

6    cosmetics of the facility.  It needed to be

7    basically just totally updated and restructured.

8        Q.      Okay.  Are you familiar with the term

9    census in regards to hospitals?

10       A.      Yes, sir.

11       Q.      Can you explain to the jury, what

12   does that refer to?

13       A.      Basically equates to the number of

14   patients you see through your facility on an

15   outpatient or inpatient basis.

16       Q.      Is a census done on a daily basis?

17       A.      The inpatient census is done on a

18   daily basis, that's correct.

19       Q.      For example, if you had 30 people in

20   or 30 people staying in beds overnight, would the

21   census for the hospital then be 30?

22       A.      Thirty at midnight, yes.

23       Q.      How was the census of the hospital?

24   Let me strike that.

25               Is that a form of measuring how good

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    the hospital is performing, its census?

2         A.     In terms of number of patients, yes.

3         Q.     Is it an objective of the hospital to

4    at least try to get the census as high as

5    possible?

6              MR. HANNAH:  Objection.  Leading.

7              THE WITNESS:  It is an objective to,

8    first of all, provide quality care in a hospital

9    but, secondly, to try to maintain a reasonable

10   census which will support the financial goals of

11   the facility.

12

13   BY MR. COPELAND:

14        Q.     Okay.  Was there any problems that

15   you saw when you came on to Pembroke Pines in

16   regards to its census in particular?

17        A.     Pembroke Pines was a facility that,

18   to the best of my understanding or what I've been

19   told, was acquired as a result of Humana closing

20   the old South Broward Hospital, which was in Dade

21   County, and was, I guess you could say, a support

22   hospital for the Health Plan at that time or it

23   was acquired as a support hospital for the Humana

24   Health Plan.

25              I think a lot of what happened at

```
 1    Pembroke in terms of why it had a low volume had a

 2    lot to do with its location in terms of not where

 3    it was physically located, how it was built.  The

 4    access to the emergency room, basically you had to

 5    go between two office buildings to get to it.  In

 6    fact, the hospital is located behind an office

 7    building.  Humana also at the time was trying to

 8    develop a Medicare or had developed a Medicare

 9    insurance product down there, and we were trying

10    to build that up so that we could get a reasonable

11    census in the hospital at least from the Humana

12    side of it.

13         Q.     Did the hospital when you came on as

14    CEO, did it primarily rely upon participants in

15    the Humana insurance program in order to fill its

16    beds?

17         A.     I would say --

18              MR. HANNAH:  Objection.  Leading.

19              THE WITNESS:  I would say, and I

20    cannot remember the exact numbers, but a large

21    number of the patients in that facility at the

22    time I went there was Humana patients.

23

24    BY MR. COPELAND:

25         Q.     Okay.  Was there a fiscal year for
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    the hospital?

2          A.    If I recall, it was August 31.

3          Q.    Okay.

4          A.    Ending.

5          Q.    All right.  So at the end of August

6    31, when would that be, through September of the

7    next year?

8          A.    No.  It would be September through

9    August 31.

10          Q.    Okay.  Now, I believe you stated you

11    started on was it January of '92?

12          A.    Yes.

13          Q.    So you came in during the fiscal year

14    that would have been September '91 through August

15     '92; is that correct?

16          A.    Yes.  That's correct.

17          Q.    Do you have any recollection in

18    regards to that fiscal year, the September '91

19    through August '92 fiscal year, how the hospital

20    performed?

21          A.    The exact numbers, I cannot recall.

22    To give you an answer in terms of dollars or

23    census would be pure speculation on my part.  I

24    can't recall the exact numbers.

25          Q.    Okay.  Do you know if it was making

```
 1    money or losing money at that time?

 2         A.     No, I don't.

 3         Q.     Okay.  Do you recall if South Broward

 4    Hospital -- strike that.

 5              Was South Broward Hospital an

 6    affiliated Humana hospital?

 7         A.     Yes, it was.

 8         Q.     Do you recall at some point in time

 9    if South Broward Hospital closed its doors?

10         A.     Yes.

11         Q.     All right.  Were you at Pembroke

12    Pines when that --

13         A.     No.

14         Q.     Did you come on shortly after?

15         A.     It would have been fairly shortly

16    after that.  I don't recall the exact timing on

17    it.

18         Q.     Do you know if the -- when South

19    Broward Hospital closed its doors what happened to

20    its patients it was seeing?

21         A.     If I recall, they were moved -- a lot

22    of them were moved over to Pembroke Pines.  I

23    suspect others went other places.  I know I was at

24    Aventura at the time, and we may have gotten a few

25    of them also.
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1          Q.      Okay.  Now, I believe that you stated

2     that when you started on at Pembroke Pines Miss

3     Iaia was already employed; is that correct?

4          A.      Yes, sir.

5          Q.      Do you know if she or how she came to

6     be employed at Pembroke Pines?

7          A.      As best I can recall, she was at

8     South Broward.

9          Q.      Okay.  You understand that she was

10     transferred?

11         A.      That's my understanding.

12         Q.      Okay.  Now, at the time that you came

13     on to Pembroke Pines, what was the relationship

14     between the hospital and Humana directly?  Was it

15     wholly-owned or --

16         A.      Yes.

17         Q.      Okay.  Did this -- at some point in

18     time while you were there as the CEO did that

19     relationship change in how Humana came to its

20     relationship with the hospital directly?

21         A.      Yes.  That's when -- as I said

22     before, that's when Galen, they split off the two

23     companies and Galen became the --

24         Q.      Did this have a financial impact upon

25     the hospital when Humana split off its hospitals

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    to Galen?

2         A.    Ultimately it did.

3         Q.    How did this financially impact the

4    hospital?

5         A.    I think the biggest thing was that

6    the relationship that existed between Galen --

7    well, between Humana and its hospitals prior to

8    the split, while that relationship still existed

9    after Galen took over, it was a lot on the

10   corporate level and not necessarily on an

11   individual hospital level.  Even though there was

12   still a good working relationship between the

13   facilities on an individual basis there was some

14   declines in the relationship.

15        Q.    Was there a change in the way the

16   hospital was reimbursed for patients under the

17   Humana program?

18        A.    If I recall, somewhere in that year,

19   and I can't quote the exact numbers, but there

20   were some changes in the reimbursement that we

21   received from Humana.

22        Q.    Do you know if the hospital was

23   receiving the same amount for patient services

24   when they were directly owned by Humana as to

25   after the split?

1      A.      On an individual basis I can't

2  recall, other than the fact I know there were --

3  there was some changing of the rates because you

4  were paid various rates for various services.

5      Q.      Now, would you recall when the split

6  between Humana and Galen took place?

7      A.      Early part of 1993, but I can't

8  recall the exact time.

9      Q.      Okay.  Then let's talk a little bit

10  about the fiscal year of September '92 through

11  August '93.

12      A.      Okay.

13      Q.      Was there any changes in how the

14  hospital performed in that year as opposed to the

15  prior year?

16      A.      It's safe to say that, yes, there

17  was.

18      Q.      Okay.

19      A.      While I can't recall the exact

20  numbers, we were fighting a decline in patient

21  volumes throughout the entire facility in terms of

22  both the emergency room, inpatient, and so forth,

23  due not only to the Humana relationship but the

24  fact that Memorial Hospital West also opened

25  during that period of time or shortly before that

1    period of time -- I'm not sure of the date of

2    that -- which greatly affected the emergency room

3    at the hospital.

4           Q.      Okay.  Did you -- and did you

5    consider Memorial West to be direct competition to

6    Pembroke Pines?

7           A.      Oh, yes, sir.

8           Q.      And, I mean, financially how did them

9    opening up affect the hospital?

10          A.      Basically a lot of the patients -- at

11   the time Pembroke Pines was the furthest hospital,

12   I guess you might say, west in South Broward

13   County.  Memorial West opened, and basically we

14   were caught between their main hospital and the

15   South Broward Hospital Memorial division and

16   Memorial West.

17          Q.      Did the hospital see an increase or

18   decline in its census in the fiscal year September

19    '92 to '93?

20          A.      It would have had to be a decline

21   because it was continuing to decrease.

22          Q.      Okay.  Do you recall -- going back to

23   this September '91 to August '92 census, do you

24   recall what the census was around that time?

25          A.      No, sir.  Not off the top of my head.

1          Q.       Do you recall what the census was in

2    proximate September '91 to '92 subsequent?

3          A.       No, but it's -- I can say there was a

4    significant percentage decline, but to quote the

5    exact numbers, I cannot do that.

6          Q.       To you, what would be significant?

7          A.       Thirty to 40 percent decrease would

8    be my best guess.

9          Q.       Now, as a result of Memorial West

10   opening and the split between Humana and Galen,

11   were there any other factors which impacted upon

12   the hospital, to your recollection, during the

13   September '92 to August '93 fiscal year?

14              MR. HANNAH:  Objection to form.

15              THE WITNESS:  The only thing that

16   comes to mind is, if I recall, during that period

17   of time Memorial Hospital, I believe, either

18   increased or started a trauma unit, which also

19   impacted our emergency room.

20

21   BY MR. COPELAND:

22         Q.       Okay.  And how did it impact your

23   emergency room?

24         A.       Because in cases that may have gone

25   to our facility were now going over to the

1   Memorial trauma unit.

2        Q.     All right.

3        A.     Even though we did not have a trauma

4   unit, we could handle some severe medical cases.

5        Q.     Now, as the CEO what actions, if any,

6   did you take in response to these changes or these

7   conditions that you were presented with?

8        A.     Well, it's -- in working with the

9   managers of the department, my manager of finance,

10  and various and sundry things, we started looking

11  at different ways we could approach problems.

12             We increased an awareness of a unit

13  that we had called the ventilator unit, which was

14  basically the respiratory therapy department.

15  That was a big tool which was used by the Humana

16  insurance.  And we started looking at how we could

17  start cutting back on some costs, if necessary, to

18  compensate for this.

19       Q.     Okay.  And what areas -- in regards

20  to reduction of costs, what type of actions did

21  you either consider or actually take?

22       A.     Well, I can't remember the specifics

23  of what each and every thing we looked at.  As a

24  general rule in hospitals when you start looking

25  at reducing costs you look at overall costs, but,

1    as a result of that, labor costs are a large

2    percentage of the facility's operating expense,

3    and consequently it's -- you end up having to

4    adjust your staffing levels to accommodate.

5         Q.    Did you take in or did you consider a

6    reduction in force?

7         A.    Later in the year, yes.

8         Q.    Was this at a time when the hospital

9    was still under the Galen Corporation?

10        A.    I don't recall the timing of whether

11   we looked at a reduction in force prior to

12   Columbia or not.

13        Q.    All right.  Did you eliminate or shut

14   down any departments within the hospital?

15        A.    During the period that I was there

16   the one that comes to mind is we did close our

17   obstetrical department.

18        Q.    Okay.  And what were the reasons why

19   you closed that department?

20        A.    Basically low volume.

21        Q.    All right.  Well, what about the

22   volume was so low?  I mean, was there anything you

23   recognized in how low the volume was which led you

24   to believe that was a prudent decision?

25             MR. HANNAH:  Object to relevance.

1              THE WITNESS:  Average -- I can't

2     recall a number of them.  I remember walking in

3     there one day and we had one patient.

4

5     BY MR. COPELAND:

6          Q.     And how many beds were in that

7     department?

8          A.     I don't recall off the top of my

9     head, but more than one.

10          Q.     Was there any competition from other

11     hospitals?

12          A.     Memorial West had also opened at that

13     time with their new obstetrical unit.

14          Q.     Now, at this time, I guess during the

15     September '92 to August '93 fiscal period, was the

16     hospital losing money?

17          A.     Uh-huh.

18          Q.     Did you have reports or did you give

19     reports to any of the directors at any regular

20     basis on how the hospital was performing

21     financially?

22          A.     We tried to keep as much informed as

23     we could, yes.

24          Q.     Okay.  Do you have any recollection

25     of how much money or let me ask you -- strike

1    that.

2            How regularly would you give these

3    reports?  Would that be monthly?

4        A.    We have monthly department head

5    meetings.

6        Q.    Okay.  During this period of time,

7    September '92 to August '93 period of time, do you

8    recall generally how much money the hospital was

9    losing?

10        A.    In terms of numbers, no, sir.  It's

11    been too many years ago.

12        Q.    Okay.  Do you have an approximate?  I

13    mean, do you know if it was more or less than a

14    million a month or any recollection to that

15    regard?

16            MR. HANNAH:  Objection.  Calls for

17    speculation.

18            THE WITNESS:  It would be speculation

19    on my part.  We were losing money, but to call the

20    exact number, I cannot do that.

21

22    BY MR. COPELAND:

23        Q.    Okay.  Now, I believe you stated that

24    at some point in time Galen was sold to or there

25    was discussions between Galen and Columbia?

1          A.       Uh-huh.

2          Q.       Is that correct?

3                   And you testified that, I guess, some

4     individuals from Columbia would come down.  Were

5     you involved in the due diligence; is that

6     correct?

7                   MR. HANNAH:  Objection as to the

8     characterization of testimony.

9

10    BY MR. COPELAND:

11         Q.       Okay.  What was your involvement, if

12    any, with any individuals from Columbia in regards

13    to the sale of Galen Hospital?

14         A.       It was only as the person to

15    coordinate the various people coming in and out,

16    and try to be as cooperative as possible in the

17    process, making sure that they had everything that

18    they need.

19         Q.       Were you involved in the negotiations

20    over the purchase?

21         A.       No, sir.

22         Q.       Do you recall any of the individuals

23    from Columbia which presented themselves at the

24    hospital?

25         A.       Two or three that come to mind is Dan

```
 1    Bowen, who happened to be the regional director or
 2    president.  I'm not sure exactly what his title
 3    was at that time with Columbia.  There was another
 4    lady by the name of Jamie Hopping who was involved
 5    with the Columbia regional office.  And a
 6    gentleman who was in there on behalf of Columbia
 7    to perform a lot of the due diligence work.  And
 8    the chairman of Columbia was there at least one
 9    time that I can recall, but that's all I can
10    recall.
11         Q.    All right.  Did you have any
12    discussions with them about the financial
13    condition of the hospital?
14         A.    They were very aware of the financial
15    conditions of the hospital, yes.
16         Q.    Now, did they or did any of the
17    individuals from Columbia that were present ever
18    comment to you on what actions they thought needed
19    to be taken in regards to getting the hospital
20    back into shape?
21         A.    Specifics, I cannot recall other than
22    we had to reduce costs.
23         Q.    All right.  Anything -- other
24    generalities you can recall what actions that
25    they --
```

1        A.        No, sir.  I don't recall.

2                  MR. HANNAH:  Objection.  Hearsay.

3

4    BY MR. COPELAND:

5        Q.        Was there any statements made in your

6    presence from any individuals from Columbia in

7    regards to eliminating positions or firing

8    employees?

9                  MR. HANNAH:  Objection.  Leading.

10   Hearsay.

11                 THE WITNESS:  I can't recall specific

12   discussions that I had with them regarding that,

13   no, sir.

14

15   BY MR. COPELAND:

16       Q.        All right.  Do you recall any

17   individuals from Columbia ever making a statement

18   to the effect that the hospital needed a

19   "facelift"?

20       A.        I can't recall.

21                 MR. HANNAH:  Objection.  Leading.

22                 THE WITNESS:  I can't recall.

23

24   BY MR. COPELAND:

25       Q.        Do you recall any statements from

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1    individuals from Columbia to the effect that it
 2    was time to get out with the old and in with the
 3    new or any age-related remarks?
 4          A.    Not that I recall, no, sir.
 5          Q.    Do you have any recollection of any
 6    suggestion on their part that you should be
 7    looking to eliminate individuals based upon their
 8    age?
 9          A.    No, sir.
10          Q.    At some point in time did you
11    consider a reduction in force into Pembroke Pines?
12          A.    Yes.
13          Q.    Okay.  If you can, tell me what --
14    how was it decided that reduction in force was
15    needed at Pembroke Pines?
16          A.    Again, I can't remember the specifics
17    of this particular case.  I can only speak again
18    in generalities of the way I normally did this,
19    and that was through our department heads and
20    through consultation with various people to come
21    up with the number of people that we would RIF.
22          Q.    Okay.  Do you have any recollection
23    of what your involvement was in the reduction in
24    force that -- at Pembroke Pines?
25          A.    Basically a review process of what
```

```
 1    was going on.
 2         Q.    All right.
 3         A.    And, of course, you know, we had to
 4    make a final decision on whether or not to do it
 5    and how many to do.
 6         Q.    Did you provide any of your directors
 7    with instructions on what to do in regards to a
 8    RIF?
 9         A.    I can't recall specific instructions
10    to them.
11         Q.    Okay.  In the course of your
12    practice -- let me ask you this:  Is there
13    anything about the way that the RIF was enacted at
14    Pembroke Pines which, in your recollection, was
15    different than what you've gone through in other
16    hospitals?
17         A.    Not any particular thing sticks out,
18    no.
19         Q.    Okay.  Do you recall if you received
20    any directives on how to pursue the reduction in
21    force from Columbia or anyone associated with
22    Columbia?
23         A.    I cannot recall.
24         Q.    Do you know how it was that
25    individuals at Pembroke Pines were identified as
```

 1    being candidates for reduction in force?

 2          A.      Individuals?

 3          Q.      Yes.

 4          A.      No, other than the consultation that

 5    we may have had with the individual department

 6    heads and their recommendations as I said before.

 7          Q.      Okay.  Your understanding that as in

 8    your normal course was that the directors would

 9    present you with a list of individuals?

10          A.      Yes.

11          Q.      All right.  And what was your

12    involvement in regards to those individuals that

13    you had direct supervision?

14          A.      Generally went through my director of

15    human resources, who in turn would do all the

16    necessary review work, and I would sit down with

17    the director of human resources and go through it

18    and try to make sure it was a fair and equitable

19    reduction.

20          Q.      Okay.  Was there -- did you provide

21    any directives to any of your directors to take

22    into consideration the age of any of the

23    employees?

24          A.      No, sir.  Never had.

25          Q.      Did you direct any of your directors

 1   in regards to Pembroke Pines to take into

 2   consideration the length of service of any

 3   employees?

 4        A.    I would not have -- I don't recall,

 5   but I would not generally have generally provided

 6   that direction.

 7        Q.    I believe you said there were a

 8   couple positions you had direct supervisory

 9   authority over?

10        A.    Yes, sir.

11        Q.    Who was it that made the decision

12   that those individuals you had direct --

13        A.    It would have been me if they

14   reported directly to me.

15        Q.    Did you make a decision to include or

16   exclude any individuals that you had direct

17   supervisory authority in the reduction in force?

18        A.    Obviously I did.  I mean, Ms. Iaia

19   was one of those that was reduced.

20        Q.    Okay.  Were there any particular

21   goals which you were trying to achieve in regards

22   to the reduction in force at Pembroke Pines?

23        A.    The specific goals and the numbers on

24   it, no, sir, I can't recall off the top of my

25   head, but, if it's like any other that we've done,

```
 1    it was in order to compensate for the volume

 2    decrease that was in the facility.

 3         Q.    Okay.  Would you have been the

 4    individual responsible for deciding on whether or

 5    not the director of marketing would be --

 6         A.    Yes, sir.

 7         Q.    -- included?

 8               And would you have been the

 9    individual responsible for deciding whether or not

10    the director of Senior Friends would be included?

11         A.    Yes, sir.

12         Q.    Do you recall -- do you recall that

13    Miss Iaia was the director of marketing, correct?

14         A.    Yes, sir.

15         Q.    And was it your decision to include

16    her in the reduction in force?

17         A.    It would have had to have been.  She

18    reported directly to me.

19         Q.    Okay.  Do you have any recollection

20    what factors you took into consideration in

21    including Ms. Iaia in the reduction of force?

22         A.    Ms. Iaia's specific case, nothing

23    specifically comes to mind other than the position

24    itself.

25         Q.    Okay.  What was it about the position
```

1    itself that you felt made it appropriate to

2    include in the reduction in force?

3         A.     Well, under the circumstances that we

4    were under, and I think it was fairly well known

5    that I am not a big supporter of various and

6    sundry marketing programs within hospitals.  Under

7    the circumstances of the reduction in census at

8    Pembroke Pines, I suspect that I looked at that

9    position as a position which the funds could be

10   used better to support other areas because I had,

11   as far as I can recall, no marketing program set

12   forth in the future.

13        Q.     In regards to Miss Iaia's performance

14   as the director of marketing, as the CEO did you

15   see whether or not her performance was having a

16   positive effect on the financial condition of the

17   hospital?

18             MR. HANNAH:  Object to form.

19             THE WITNESS:  That's very hard to

20   measure, but I'm not sure I can -- yes, I would

21   have looked at it, but it's a very hard thing to

22   measure.

23

24   BY MR. COPELAND:

25        Q.     Okay.  During your experience -- I

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    mean, during your term there did the census

2    increase or decrease?

3         A.    Decreased.

4         Q.    Now, you alluded to the fact that you

5    have a, I guess, a predisposition towards the

6    marketing position in hospitals?

7         A.    Yes, sir.

8         Q.    Can you explain that for me a little

9    bit, you know, what it is -- your beliefs in

10   regards to marketing positions in hospitals?

11        A.    I guess it's not necessarily

12   marketing positions as it's so much as marketing

13   programs.  Over my years of experience to do what

14   I call media advertising, that being newspapers,

15   TV, whatever, unless it is related to a very

16   specific program, I have not found it to be

17   beneficial to hospitals.  That's just been my

18   experience.  It's something that I could never

19   measure as a program which developed anything on

20   behalf of the hospital to grow its patient

21   volumes.

22        Q.    Okay.  Now, do you have any

23   individual recollection of Miss Iaia as you sit

24   here today?

25        A.    Other than recalling her, no.

1          Q.      Okay.  Do you even know what her age

2    is?

3          A.      No, sir.

4          Q.      At the time when you made the

5    decision to include her position in the reduction

6    in force, did you have any understanding of what

7    her age is?

8          A.      Not that I recall.

9          Q.      Did you have any understanding of

10   whether or not she was 40 years or older or under?

11         A.      I don't even recall.

12         Q.      Do you recall what she looked like?

13         A.      Yes.

14         Q.      Did she look to you, in your

15   recollection, as an individual who was 40 or over

16   or 40 or under?

17         A.      I don't know that I ever thought

18   about it.

19         Q.      Okay.  Did you take Mrs. Iaia's age

20   into consideration in any way in your decision to

21   include her in the reduction in force?

22         A.      No, sir.

23         Q.      Did you take into consideration any

24   of your personal likes or dislikes of Miss Iaia in

25   your decision to include her in the --

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1            A.      Not that I recall.

 2            Q.      Did you take into consideration her

 3    length of employment with Humana and Pembroke

 4    Pines in your decision to include her in the

 5    reduction in force?

 6            A.      The only thing I can recall in that

 7    effect might be the years of service that she had

 8    to develop a package to present to the employees

 9    once they left in terms of a monetary package.

10            Q.      Okay.  What was it about the fact or

11    what was it about a length of service which would

12    affect the severance pay?

13            A.      Generally the severance package would

14    have been depending on your length of service.  My

15    experience has been we always provide a higher

16    severance package for individuals with longer

17    years of service.

18            Q.      Were there any factors, other than

19    the positions itself, that -- or were there any

20    outside factors which led you to include the

21    director of marketing in your decision?

22            A.      I'm not sure I understand the

23    question.

24            Q.      Okay.  What were -- were there any

25    goals you had in mind for the future of the
```

1    marketing program or marketing of the hospital

2    which contributed to your decision to --

3          A.     Not that I recall.

4          Q.     Okay.  Now, did you make the decision

5    to include the director of marketing position in

6    consultation with any other individuals?

7          A.     I don't recall the specifics of who

8    all was -- things were discussed with during this

9    process, no.  I can't --

10         Q.     Okay.  Now, I want to talk a little

11   bit about, you know, Monique Monteiro.

12         A.     Yes, sir.

13         Q.     What position did she hold at the

14   hospital?

15         A.     Director of the Seniors Program.

16         Q.     Do you have any recollection as to

17   how she was -- how she did in her position as

18   director of Senior Friends?

19         A.     Did an extremely good job, as best I

20   can recall.

21         Q.     Okay.  What was it -- is there

22   anything you recall specifically about her

23   successes or her lack of success as director of

24   Senior Friends?

25         A.     Other than the programs that I

1    attended that she put on, it seemed to be, if my

2    memory serves me correctly, that their membership

3    was growing in terms of the number of members they

4    had in the association.  I don't recall the exact

5    numbers right now, but there was a growth there.

6         Q.    Okay.  And was her -- did you review

7    her position and her performance in her position

8    in deciding whether or not to include Ms. Monteiro

9    in the reduction in force?

10        A.    I don't recall whether we looked at

11   that position or not.

12        Q.    Do you know if in fact she was

13   included or excluded?

14        A.    Not as far as I know.

15        Q.    Do you know why she wasn't included

16   in the reduction in force?

17        A.    Because we had a lot of efforts put

18   forth into the Seniors Programs on all fronts in

19   all our facilities, but we felt like that the

20   Seniors Program, if maintained in the proper

21   fashion, was a good tool for the facility to use

22   as an access to the senior members of the

23   community to get our story out to the seniors of

24   what we were trying to do, and we felt like that

25   the Seniors Program was something that needed to

1    be nurtured and continue to grow.

2         Q.    Okay.  Do you recall how old Miss

3    Monteiro was at the time?

4         A.    Not off the top of my head, no, sir.

5         Q.    Did her age in any way impact upon

6    your decision to retain her as Senior Friends

7    director?

8         A.    No, sir.

9         Q.    Now, as a direct supervisor of Miss

10   Iaia, did you perform evaluations of her during

11   the time that you were CEO?

12        A.    Same as I would with anybody else

13   that reported directly to me, yes.

14        Q.    Okay.  Let me show you what I'll have

15   marked as Defendant's Exhibit Number 1.  Show it

16   to opposing counsel first.

17             MR. HANNAH:  It's incomplete.  Let

18   the record reflect that's an incomplete document.

19             MR. COPELAND:  Okay.  I'll have this

20   marked as Defendant's Exhibit Number 1.

21                  (Defendant's Exhibit 1 was

22                  marked for identification.)

23

24   BY MR. COPELAND:

25        Q.    Do you recognize the document I've

1    handed to you?

2         A.      Yes, sir.  It's an evaluation form.

3         Q.      Okay.  And do you have an

4    understanding of who this was an evaluation of?

5         A.      There is no signature on it.  It says

6    Jackie.

7         Q.      Okay.  Is this your handwriting on

8    the evaluation form?

9         A.      Yes, it is.

10        Q.      Okay.  And the scores which are

11   indicated on the first page, are those -- is that

12   your handwriting as well?

13        A.      Yes, sir.

14        Q.      Did you perform this evaluation?

15        A.      I'm sure I did if I wrote the

16   numbers.

17        Q.      Okay.  Now, how was it that the

18   hospital Pembroke Pines, at that time would

19   evaluate?  Was there a scale in place in grading

20   somebody?

21        A.      If I recall, it was the same in all

22   of the Humana hospitals at that time, and that was

23   basically a one to five scale.

24        Q.      Okay.  With one being the lowest and

25   five being the highest?

1          A.      One being the lowest and five being

2    the highest.

3          Q.      Okay.  In review of this evaluation

4    did you consider this to be a positive or good

5    evaluation?

6          A.      In my opinion, it was a positive

7    evaluation.

8          Q.      Now, did you have an opportunity to

9    work with Miss Iaia directly while you were the

10   CEO at the hospital?

11         A.      I'm sure I did.  She reported

12   directly to me.

13         Q.      Okay.  Where was her offices located

14   in relation to your office?

15         A.      As best I can recall, it was -- there

16   was a conference room next to mine, and, if I

17   recall, her office was just beyond that.

18         Q.      Okay.  Now, did you ever directly

19   actually make any comments to Miss Iaia which were

20   derogatory in nature?

21         A.      Not that I recall.

22         Q.      Mr. Sutphin, do you have any

23   preference for younger women as opposed to older

24   women?

25         A.      Not necessarily.

1          Q.      In a professional sense, in regards

2    to who you employ, do you prefer younger women as

3    opposed to older women?

4          A.      I prefer the person best qualified

5    for the job.

6          Q.      All right.  Mr. Sutphin, have you

7    ever flirted with any of the female staff at

8    Pembroke Pines while you were employed there?

9          A.      Not intentionally.

10          Q.      To your knowledge, did you ever flirt

11    with Monique Monteiro?

12          A.      Not that I'm aware of.

13          Q.      All right.  To your knowledge, did

14    you ever chat more with Monique Monteiro as

15    opposed to any of the other female directors?

16          A.      I'm not even sure I can comment on

17    that because that calls me to make a judgment on

18    the number of times, and I haven't got the

19    slightest idea.

20          Q.      Did you treat Monique differently

21    than you would have treated any other female

22    director?

23          A.      Not any different.  I probably spent

24    a lot of time with her trying to develop the

25    Seniors Program, but, you know, not necessarily

```
 1    more so than anybody else.

 2         Q.      Did you have any relationship with

 3    Miss Monique Monteiro, other than a professional

 4    relationship?

 5         A.      No, sir.

 6         Q.      Did you have any relationship with

 7    any of the female directors and staff, other than

 8    a professional relationship?

 9         A.      No, sir.

10         Q.      To your knowledge, Mr. Sutphin, have

11    you ever made any comments while at Pembroke Pines

12    that were age-related comments to the effect that

13    you disfavored older people as opposed to younger

14    people?

15         A.      No, sir.

16         Q.      Have you ever made any comment to the

17    effect that it's time to go out with the old and

18    in with the new?

19         A.      I don't recall making that comment.

20         Q.      Okay.  Is it possible that comment of

21    that nature was made by you and you just don't

22    recall or --

23              MR. HANNAH:  Object to the form.

24              THE WITNESS:  I just don't know if I

25    made it or not.
```

1    BY MR. COPELAND:

2         Q.    Okay.  Do you recall ever making any

3    comments to any of the directors or at any

4    meetings at Pembroke Pines to the effect if you're

5    not able to cut the mustard heads will roll?

6         A.    I don't recall making that specific

7    comment, no, sir.

8         Q.    Okay.  Would it be unlike you to make

9    that type of comment?

10             MR. HANNAH:  Object to the form.

11             THE WITNESS:  In a moment of

12   frustration, maybe not those words but the tone of

13   it, I could possibly have made that, yes.

14

15   BY MR. COPELAND:

16        Q.    Okay.  Do you know or recall if you

17   ever made a comment to other directors or

18   employees at Pembroke Pines that if your attitude

19   is old and/or complacent you are not going to make

20   it?

21        A.    No, sir, I don't remember making that

22   comment.

23        Q.    Okay.  Have you ever made any

24   comments to that effect dealing with an old

25   attitude?

```
 1          A.      Possibly, but I don't recall a
 2  specific case.
 3          Q.      Okay.  And what was it you would be
 4  referring to if you were referring to old
 5  attitude?
 6                  MR. HANNAH:  Objection.  Calls for
 7  speculation.  Doesn't recall actually making those
 8  statements.
 9                  THE WITNESS:  It would be -- I could
10  only guess that it would be something to do with
11  new ways of doing things.
12
13  BY MR. COPELAND:
14          Q.      Okay.  Would that --
15                  MR. HANNAH:  Move to strike, by the
16  way.  Nonresponsive.  Speculation.  Guessing.
17
18  BY MR. COPELAND:
19          Q.      Would you ever have made a comment or
20  do you recall ever making a comment to the effect
21  if the attitude is old referring to the age of the
22  person?
23          A.      No, sir.
24          Q.      Now, Mr. Sutphin, was your decision
25  in keeping the Senior Friends director position in
```

```
 1    any way tied to your decision to eliminate the

 2    director of marketing position?

 3         A.     Not that I recall.

 4         Q.     Did you subsequent to making the

 5    decision to eliminate the director of marketing

 6    position make any subsequent decisions to combine

 7    any of those functions in conjunction with the

 8    Senior Friends?

 9         A.     Sir, I cannot remember doing that.

10         Q.     Okay.  Now, I want to get into the

11    specifics.

12              Who was the individual at the

13    hospital which would advise Mrs. Iaia that she was

14    being included in the reduction in force?

15         A.     That she was being included or in

16    fact she had been?

17         Q.     Had been included.

18         A.     Probably would have been me.

19         Q.     Okay.  Do you recall having a meeting

20    with her in order -- in what time you advised her

21    she was being included in --

22         A.     I don't recall the specifics of it,

23    but I'm sure I did meet with her.

24         Q.     Okay.  What is it that leads you to

25    believe that you did in fact meet with her?
```

 1         A.     Well, it would have been my

 2    responsibility to talk to her, to -- as a --

 3    because her job was being eliminated.

 4         Q.     I'll show you what I'll have marked

 5    Defendant's Exhibit 2.  It's previously

 6    Defendant's Exhibit Number 8 to Miss Iaia's

 7    deposition.

 8               (Defendant's Exhibit 2 was

 9               marked for identification.)

10

11    BY MR. COPELAND:

12         Q.     I'm going to ask you, Mr. Sutphin, if

13    you recall ever seeing this memo I've handed to

14    you dated November 11th, 1993?

15         A.     This specific one, no.  I think it

16    was a letter or a memo that was put out kind of of

17    a general nature in terms that everyone that was

18    in the RIF got a memo of this nature to explain

19    the benefits and what happened.

20         Q.     On the third page or fourth page -- I

21    apologize -- there is an acknowledgment page

22    with -- is that your signature under witness?

23         A.     Yes, sir.

24         Q.     And it's dated 11-11-93.  Does this

25    refresh your recollection as to whether or not

1    this document was --

2         A.    I obviously signed it, but --

3         Q.    Do you recall having Miss Iaia sign

4    this document in your presence?

5         A.    I don't recall the specific incident,

6    but she has signed it.

7         Q.    Okay.  If you can, if you would,

8    please, review the first page or the first

9    paragraph of the first page of that and I'll ask

10   you if that refreshes your recollection as to any

11   factor which went into your decision to include

12   Mrs. Iaia's position.

13        A.    It does not bring back specifics to

14   me, but, again, it would have been a decision as

15   it relates to the position would have chosen not

16   to do that.

17        Q.    There is a reference in here that

18   says due to the recent reorganization.  What was

19   that referring to, reorganization on the first

20   paragraph?

21             MR. HANNAH:  Object to the form.

22   He's not the author.

23             THE WITNESS:  I don't recall exactly

24   what that was referring to other than the

25   possibility of the acquisition by Columbia.

```
 1    BY MR. COPELAND:

 2         Q.      Okay.  Do you have any understanding

 3    as to whether or not it was referring to the

 4    Humana Galen reorganization or the Columbia

 5    purchasing of the --

 6              MR. HANNAH:  Objection.  Calls for

 7    speculation.

 8              THE WITNESS:  It would have, in my

 9    opinion, had to have related to the Columbia since

10    this was back -- this is November, and Galen was

11    no part of this at that time.

12

13    BY MR. COPELAND:

14         Q.      Now, in here it indicates this memo

15    was from Paula Adamson.  To your understanding,

16    would she have been the individual who prepared

17    this document?

18         A.      If she signed it she would have

19    prepared it, yes.

20         Q.      Do you have any recollection if you

21    participated in the preparation of this document?

22         A.      I don't recall.

23         Q.      Now, do you recall if Miss Iaia was

24    provided with any severance at the time of her

25    termination?
```

1          A.      The amount, no, I don't know off the

2    top of my head.

3          Q.      Okay.  Generally there is a severance

4    package, but I can't recall how much or what it

5    was.

6          Q.      Okay.  Do you recall if she was in

7    fact -- she was presented with some severance

8    package but you just can't recall the specifics?

9          A.      Yes, sir.  I think all the employees

10   pretty much were on this.

11         Q.      Do you recall if Miss Iaia at any

12   time ever objected to her being included in the

13   reduction in force based upon what she felt was

14   her age?

15         A.      Specific conversations, no, sir.

16         Q.      Okay.  Now, in performing reductions

17   in forces and in fact giving the bad news, so to

18   speak, to the employees, have there been occasions

19   when the employees would become upset emotionally?

20         A.      It is not unusual.

21         Q.      Okay.  And what would be your

22   response in those type of a circumstance?

23         A.      Well, my response is I hate to see

24   anyone lose their job.  It's --

25         Q.      Would you take any efforts to comfort

1    them?

2         A.    Probably.

3         Q.    If a female was being laid off or

4    part of the reduction in force and became

5    emotional during this period, would it be unusual

6    for you to attempt to hug her or to comfort her?

7              MR. HANNAH:  Objection.  Calls for

8    speculation.  Not specifically relevant.

9              THE WITNESS:  It's possible.

10

11   BY MR. COPELAND:

12        Q.    Do you recall if that in fact

13   occurred at all with Miss Iaia?

14        A.    I don't recall.

15        Q.    Now, do you offer to write letters of

16   recommendation on behalf of employees that have

17   been included in reduction in forces as a matter

18   of course?

19        A.    Not as a matter of course.  If I feel

20   like they're a good employee I will do that.

21        Q.    Do you recall if in fact you offered

22   to Miss Iaia to write a letter of recommendation

23   on her behalf?

24        A.    I don't recall making the offer,

25   but --

1          Q.      Let me show you what I'll have marked

2    Defendant's Exhibit Number 3.

3                          (Defendant's Exhibit 3 was

4                          marked for identification.)

5

6    BY MR. COPELAND:

7          Q.      It's a document -- can you identify

8    this document?

9          A.      It's a -- basically a overall letter

10   of recommendation since it's addressed to whom it

11   may concern relating to Jackie Iaia from me as a

12   recommendation for the work performed as director

13   of marketing/public relations.

14         Q.      Okay.  Do you recall any specifics as

15   to whether or not you wrote this of your own

16   volition or whether or not it was requested of you

17   by Miss Iaia?

18         A.      I don't recall.  I can't recall the

19   specific circumstances, no.

20         Q.      Under what conditions would you write

21   a letter of recommendation as you did for Miss

22   Iaia?

23         A.      Generally if someone requested that

24   and I felt like they deserved a letter of

25   recommendation I would write one.

1     Q.     Do you recall if Miss Iaia had any

2   contact with you after she was advised she was

3   included in the reduction in force?

4     A.     Not that I recall.

5     Q.     Do you recall any request by Miss

6   Iaia to be reimbursed for medical or dental

7   insurance?

8     A.     I do not recall that.

9     Q.     Who was your successor or -- let me

10  strike that.

11          At some point in time did you leave

12  the employment at Pembroke Pines as CEO?

13    A.     Yes, sir.  November of '93.

14    Q.     Would that have been shortly after

15  the reduction in force was implemented?

16    A.     I can't remember the exact date, but

17  it was right around the end of November.

18    Q.     Okay.  And under what circumstances

19  did you leave your employment with Pembroke?

20    A.     I had been offered a position with

21  Humana in Washington, D. C.

22    Q.     All right.  And what position was

23  that?

24    A.     As the executive director of Humana

25  Group Health Plan, which was under the process of

1   being acquired at the time by Humana.

2        Q.     Okay.  Was this a transfer of a

3   position or did you have to -- I mean, how did you

4   end your relationship with Pembroke Pines?

5        A.     I basically handed a letter of

6   resignation in to them.

7        Q.     Now I want to talk a little bit about

8   Miss Monteiro some more.

9              My understanding is that she was in

10  the position of director of Senior Friends at the

11  time you came on as CEO at --

12       A.     She was there at the time I took over

13  the position, yes, sir.

14       Q.     Did you have any understanding of how

15  she performed at that position at that time or

16  were you apprised?

17       A.     No.

18              MR. HANNAH:  Objection.  Asked and

19  answered.

20              THE WITNESS:  No.  I don't recall.

21

22  BY MR. COPELAND:

23       Q.     Let me show you a memo dated December

24  11, 1991 I'll have marked Defendant's Exhibit

25  Number 4, am I at?

```
 1                    (Defendant's Exhibit 4 was

 2                    marked for identification.)

 3

 4    BY MR. COPELAND:

 5         Q.    Let me ask you first, in reviewing

 6    that memo do you recall ever reviewing this memo?

 7         A.    No, sir.

 8         Q.    Was your understanding of how Miss

 9    Monteiro was performing in her position of

10    director of Senior Friends, did it comport with

11    what this memo sets forth?

12              MR. HANNAH:  Objection to leading.

13              THE WITNESS:  I don't ever remember

14    having a discussion in that relationship.

15

16    BY MR. COPELAND:

17         Q.    Okay.  Do you agree with the

18    assessment as set forth within this memo dated

19    December 11th, 1991?

20              MR. HANNAH:  Objection.  This is the

21    year before he started.

22              THE WITNESS:  I wasn't even here at

23    the time.

24

25
```

```
 1    BY MR. COPELAND:

 2         Q.      I'll show you what I'll have marked

 3    as Defendant's Exhibit Number 5.

 4                      (Defendant's Exhibit 5 was

 5                      marked for identification.)

 6

 7    BY MR. COPELAND:

 8         Q.      I'm going to ask you, sir, if you can

 9    review that and if you can identify that document

10    for me?

11         A.      Yes.   It's an evaluation of Monique

12    Monteiro.

13         Q.      And who performed this evaluation?

14         A.      I did.

15         Q.      Is your signature indicated on this

16    document?

17         A.      Yes, sir.

18         Q.      And would that be on which page,

19    fourth page?

20         A.      Fifth page of my copy.

21         Q.      And is the handwriting on the third

22    and fourth page, is that your handwriting?

23         A.      Yes.

24         Q.      Now, again, how would you have -- how

25    would you characterize this evaluation of Miss
```

 1   Monteiro?

 2        A.      Very good.

 3        Q.      To your knowledge, did you perform

 4   any additional evaluations of Miss Monteiro?

 5        A.      I just don't recall.

 6        Q.      Okay.  Do you recall ever receiving

 7   any feedback from other employees of Humana or

 8   individuals outside Humana in regards to how Mrs.

 9   Monteiro was performing in her functions of Senior

10   Friends?

11        A.      I don't recall specific details, no.

12        Q.      Okay.  Do you recall -- do you recall

13   that you did receive them, you just don't know

14   what the details are?

15        A.      I don't even recall any discussions I

16   had.  Could have very well have, but I just don't

17   recall.

18        Q.      Do you recall if you ever received

19   any negative comments that were directed to Mrs.

20   Monteiro's performances or functions --

21        A.      Same answer.  I just don't recall.

22        Q.      Okay.  Mr. Sutphin, you've appeared

23   here today for your deposition.  Did you appear

24   here as a result of being served with a subpoena?

25        A.      Yes, sir.

```
1          Q.    Have you been offered any money or

2    any remuneration for purposes of providing your

3    testimony here today?

4          A.    No, sir.  I received a check for $10.

5          Q.    All right.  Now, have you had any

6    conversations with me prior to --

7          A.    Yes, sir.

8          Q.    And have any of those conversations

9    in any way impacted upon your answers you

10   provided?

11         A.    No, sir.

12         Q.    One minute.

13               THE VIDEOGRAPHER:  We will now go off

14   the record at the time and date indicated on the

15   screen.

16               (Recess)

17               THE VIDEOGRAPHER:  We are now back on

18   the record as time and date indicated on the

19   screen.

20               MR. COPELAND:  Mr. Sutphin, that's

21   all the questions I have for you right now.

22

23                    CROSS-EXAMINATION

24   BY MR. HANNAH:

25         Q.    Mr. Sutphin, my name is Rod Hannah.
```

```
 1    I'm one of the attorneys for Jacqueline Iaia in

 2    this case against Columbia Healthcare d/b/a

 3    Pembroke Pines Hospital.

 4              What's your exact home address?

 5        A.    1348 Marshall Lane, Virginia Beach,

 6    23455.

 7        Q.    Do you have a separate work address?

 8        A.    No, sir.

 9        Q.    You work out of your home?

10        A.    Yes.

11        Q.    Why did you leave Humana?

12        A.    We sold the Health Plan in

13    Washington.

14        Q.    Did you find yourself out of a job at

15    that time?

16        A.    Uh-huh.

17        Q.    Is that yes?

18        A.    Yes.

19        Q.    Mr. Copeland asked you if you had a

20    discussion with him prior to today.  How long was

21    that discussion?

22        A.    We spoke for probably an hour Friday

23    on the telephone.

24        Q.    How about today?

25        A.    And this morning for breakfast, yes.
```

```
 1          Q.      How long was that discussion?

 2          A.      An hour or so.

 3          Q.      When you spoke last Friday, about how

 4   long was your discussion?

 5          A.      About an hour.

 6          Q.      What did you discuss?

 7          A.      We just went through some of the

 8   questions that we were -- I may be asked.

 9          Q.      Okay.  So you knew the questions that

10   he was going to ask you before you came in here

11   today?

12          A.      Yes, sir.

13          Q.      And you told him what your answers

14   would be to those questions?

15          A.      Not in all cases.  He asked me to

16   think about them.

17          Q.      You did also tell him what some of

18   your answers were going to be?

19          A.      Yes.

20          Q.      Okay.  And you also met with Ms.

21   Willis-Green as well, the other attorney for --

22          A.      Yes.

23          Q.      -- the defendant in this case?

24          A.      Yes.

25          Q.      That was this morning as well?
```

1          A.     This morning, yes.

2          Q.     Have you ever met with Mr. Edwards?

3    Do you know who Mark Edwards is?

4          A.     No.

5          Q.     Have you ever met with any attorney

6    for Columbia Healthcare or Pembroke Pines Hospital

7    with regard to Miss Iaia's claims prior to today?

8          A.     Not up until this time, no.

9          Q.     Were you ever contacted by any

10   attorney or anyone from Pembroke Pines Hospital,

11   Columbia Healthcare, or Galen Hospital for that

12   matter, regarding any of Miss Iaia's charges of

13   discrimination --

14         A.     No, sir.

15         Q.     -- prior to today?

16         A.     No, sir, other than --

17         Q.     Other than to speak to counsel?

18         A.     As it relates to this.

19         Q.     Okay.  Have you ever been accused of

20   discrimination of any kind?

21         A.     No, sir.

22         Q.     Okay.  Have you ever been accused of

23   harassment of any kind?

24         A.     No, sir.

25         Q.     There were other people let go by

1    Pembroke Pines Hospital in the reduction in force

2    at the same time as Miss Iaia?

3          A.    As best I can recall, yes.

4          Q.    There were other directors who were

5    also let go?

6          A.    I don't recall the specifics of all

7    of the people that were let go.

8          Q.    Was the director of nursing let go at

9    the time?

10         A.    Quite frankly, not that I recall.

11         Q.    Do you know who Carol Naples was?

12         A.    Yes.  She was the director of

13   nursing.

14         Q.    Do you know if she was let go in this

15   so-called reduction in force?

16         A.    I cannot recall whether she was let

17   go in the reduction if force or whether she was

18   let go as a result of Columbia wanting to make

19   certain management changes at the facility.

20         Q.    There were other people let go for

21   other reasons?

22         A.    Yes.

23         Q.    How about Claudia Jack?  You remember

24   her?

25         A.    She would have been human resource

1   director, and she was replaced not as part of the

2   RIF but the fact Columbia would like to have

3   people who were familiar with their programs in.

4        Q.      Did you -- were you responsible for

5   terminating her?

6        A.      I don't recall her specific

7   instances, but she reported to me, yes.

8        Q.      You don't recall if you were the one

9   that terminated her?

10       A.      Probably.  I don't recall, again, the

11  specific instances.

12       Q.      Do you know who replaced her?

13       A.      Paula Adamson maybe.

14       Q.      Do you know if Paula Adamson is

15  younger than Claudia Jack?

16       A.      I have no idea.

17       Q.      All right.  Do you know who replaced

18  Carol Naples as director of nursing?

19       A.      No, sir.  I don't even recall.

20       Q.      Were you the one that actually

21  terminated Carol Naples?

22       A.      I don't even recall the incident.

23       Q.      Do you remember a person by the name

24  of Ron Hoffman?

25       A.      Yes, sir.

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    Q.    All right.  Did he report to you?

2    A.    I can't recall that.

3    Q.    He was director of engineering?

4    A.    That doesn't necessarily mean he

5    reported to me.  It could have been to my

6    assistant.

7    Q.    Do you know if he was let go in the

8    reduction of force?

9    A.    Not that I recall.

10    Q.    Do you know if he was let go at all,

11    terminated at all?

12    A.    Yes, sir.

13    Q.    Do you know who communicated the

14    termination decision?

15    A.    No, sir.

16    Q.    You weren't involved in that

17    termination decision?

18    A.    I don't recall.

19    Q.    Let me finish my question.  You're

20    very quick to answer.

21    A.    I'm sorry.

22    Q.    Let me just finish my question.  Then

23    you can answer, okay?

24    A.    Okay.

25    Q.    How about Connie Viara?

1          A.      I do not recall.

2          Q.      Don't know who that person was?

3          A.      The name rings a bell, but I can't

4    remember specifics.

5          Q.      Do you know the director of medical

6    records by the name of Cheryl?

7          A.      No.

8          Q.      Do you know if the director of

9    medical records was let go during the reduction in

10   force?

11         A.      I do not recall.

12         Q.      Now, Mr. Copeland showed you a

13   document before, I believe it was Exhibit Number

14   2, termination memoranda.

15         A.      Uh-huh.

16         Q.      Pull that out, please.

17         A.      (Witness complied.)

18                 This?

19         Q.      Yes.  What's the date on that?

20         A.      November the 11th, 1993.

21         Q.      Okay.  And in that termination

22   memorandum Miss Iaia was not actually terminated

23   from the hospital, was she?

24         A.      I would have to look at it and see.

25         Q.      Why don't you take a look at it?

1              MR. COPELAND:  Objection.  The

2    document speaks for itself.

3              THE WITNESS:  It says she will be

4    placed in an involuntary leave of absence.

5

6    BY MR. HANNAH:

7         Q.      So she was placed on a six-month

8    leave of absence at that time?

9         A.      That's the way the memo reads, yes.

10        Q.      Do you recall that actually

11   occurring, her being placed on a six-month leave

12   of absence?

13        A.      The specifics of what's in the memo,

14   no.

15        Q.      What was the purpose of putting her

16   on a leave of absence, if you recall?

17        A.      I don't recall.  It would be pure

18   speculation if I could sit here and guess.

19        Q.      You don't know if it was to try to

20   locate her another position at the hospital?

21        A.      I would guess that that would be the

22   case, but I don't know it for a fact.

23        Q.      Okay.  I would have this marked

24   Defendant's Exhibit Number 1.

25              THE REPORTER:  It would be

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    Plaintiff's.

2                MR. HANNAH:  I'm sorry.  Plaintiff's

3    Exhibit Number 1.  I'm the one used to taking the

4    deposition.

5                    (Plaintiff's Exhibit 1 was

6                    marked for identification.)

7

8    BY MR. HANNAH:

9        Q.    I show you Plaintiff's Exhibit Number

10   1.  You may or may not recall that document.  I'm

11   going to ask you if you've actually seen that

12   document before?

13       A.    No, sir.

14       Q.    Okay.  Do you know if that is the

15   type of document that's given to employees that

16   have been placed on a six-week involuntary leave

17   of absence as a reduction in force when they're

18   actually terminated?

19       A.    It may have been a policy that they

20   put in subsequent to me leaving, but I don't know.

21       Q.    Okay.  You had no involvement

22   whatsoever in any kind of decision as to whether

23   or not to place Miss Iaia on a six-month leave of

24   absence as opposed to just terminating her

25   outright in a reduction of force?

```
1            A.      Sir, I think there was a general --

2     probably a general consensus of how the whole

3     package would be put together, but as it related

4     specifically to Miss Iaia I cannot answer.

5            Q.      Let's talk about the specific package

6     in the reduction in force.  How many people do you

7     recall being terminated?

8            A.      It was several, but --

9            Q.      Let me finish my question.

10           A.      I thought you already asked.

11           Q.      How many people were terminated by

12    Pembroke Pines Hospital as a result of the

13    reduction in force back in late 1993?

14           A.      I don't recall the exact number.

15           Q.      Can you tell me, was it more than 10

16    people?

17           A.      I would guess that it was, in

18    relation, probably even more than that, yes.

19           Q.      And those people who were terminated,

20    what was the -- strike that.

21                   With regard to those people that were

22    terminated, were they all permitted to go on a

23    six-month involuntary leave of absence prior to

24    actual outright termination?

25           A.      I don't recall that.
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1          Q.      You don't know if that was the

2     general policy that was in place?

3          A.      I just don't recall.

4          Q.      Do you know who at Pembroke Pines

5     Hospital would have that kind of knowledge, who

6     would have had that kind of knowledge?

7          A.      Six years ago I probably would have

8     had it, but in this period of time I can't

9     remember the details of this.  Paula Adamson would

10    have been the personnel director.

11         Q.      Okay.  Do you know if she's still

12    with Humana?

13         A.      I have no idea.

14         Q.      In the reductions in forces you've

15    handled for Humana -- you've done more than one,

16    right?

17         A.      Yes.

18         Q.      Were the employees placed on a

19    six-month involuntary leave of absence, the

20    employees that were selected?

21         A.      Are we speaking of Humana or

22    Columbia?

23         Q.      Let's talk about Humana.

24         A.      I have seen it done multiple ways.

25         Q.      All right.  Sometimes they're put on

1    a leave of absence period, right?

2         A.    Yes.  I have seen that.

3         Q.    For the purposes of trying to put

4    them in another position?

5         A.    Find them another facility, something

6    of that nature.

7         Q.    And that was the case with regard to

8    Miss Iaia, correct?

9         A.    That's what the memo says, yes, sir.

10        Q.    You were copied on that memo?

11        A.    I'm -- my name is not on there to be

12   copied, no.

13        Q.    Didn't you actually sign that memo as

14   a witness?

15        A.    Yes.

16        Q.    Okay.  So you were aware of that

17   memo?

18        A.    Yes.

19        Q.    So you would have been aware of the

20   reason why Miss Iaia was being placed on a

21   six-month leave of absence, correct?

22        A.    At the time I probably was.

23        Q.    All right.  Today you don't remember

24   what the reason was?

25        A.    I don't recall.

1        Q.      It appears to you the reason she was

2   put on that was Columbia or Pembroke Pines

3   Hospital was going to try to locate her in another

4   position?

5              MR. COPELAND:  Objection.

6   Argumentative.

7              THE WITNESS:  I don't know.

8

9   BY MR. HANNAH:

10       Q.      Let's talk about the actual

11   termination of Miss Iaia.

12              Were you aware that Miss Iaia was

13   older than Monique Monteiro?

14       A.      No, sir.

15       Q.      You had no idea?

16       A.      No, sir.

17       Q.      Okay.  Sitting here today do you have

18   any idea how old Miss Monteiro is?

19       A.      No, sir.

20       Q.      As we sit here today do you have any

21   idea how old Miss Iaia was?

22       A.      No.

23       Q.      How often in your job as CEO and

24   executive director did you have contact with Miss

25   Iaia?

1          A.      It was sporadic.  It might be on a

2     daily basis.  It might be on a weekly basis

3     depending on the schedule and appointments and so

4     forth.

5          Q.      How often would you have contact with

6     Miss Monteiro during that period of time?

7          A.      No more so --

8          Q.      Daily basis?

9          A.      Daily, weekly, whatever.

10         Q.      Did you see them every day?

11         A.      It depends.  The Seniors Program was

12    located in a building completely across the

13    driveway from the hospital.

14         Q.      With regard to the actual reduction

15    in force, isn't it true that Miss Iaia's position

16    was not actually eliminated?

17         A.      I don't recall that being anything

18    but that.

19         Q.      Well, she was director of

20    marketing/public relations, correct?

21         A.      Uh-huh.

22         Q.      Isn't it true that that position was

23    combined with the director of Senior Friends

24    position?

25         A.      I do not recall that happening, sir.

1          Q.      You have no idea if that happened or

2     not?

3          A.      No, sir.  I don't recall it

4     happening.

5          Q.      Okay.  Isn't it true Miss Monteiro

6     after this so-called reduction in force became the

7     director of marketing/public relations and Senior

8     Friends?

9          A.      I have no idea.

10         Q.      You have no idea if that happened?

11         A.      No, sir.  I did not -- I left there

12    probably within a week and-a-half to two weeks of

13    this.

14         Q.      All right.  When this reduction in

15    force decision came down, okay, do you know if

16    Miss Monteiro was going to continue her employment

17    at Pembroke Pines Hospital in any kind of

18    position?

19         A.      Mrs. Monteiro?

20         Q.      Ms. Monteiro.

21         A.      As far as I knew, yes.

22         Q.      Okay.  What was your understanding

23    what position she was going to continue in?

24         A.      She reported to me.  She was the

25    director of the Senior Program.

1    Q.    So you had no idea what that
2    position -- whether or not that position was going
3    to stay the same or change after this reduction in
4    force?
5    A.    I just don't recall the circumstances
6    involving the director of public relations aspect
7    of it.
8    Q.    So you don't know if Ms. Monteiro
9    assumed the duties and responsibilities of the
10   director of marketing and public relations after
11   Miss Iaia was taken out of that position?
12   A.    I cannot recall the circumstances
13   behind that, no.
14   Q.    Was that your responsibility to
15   select the position of the person who was going to
16   continue on in the position of director of
17   marketing/public relations or Senior Friends?
18   A.    Yes.
19   Q.    Did you consider Miss Iaia for
20   continued employment in that position?
21   A.    As the Seniors Program?
22   Q.    No.  As director of marketing and
23   public relations and Senior Friends?
24   A.    Possibly eliminate the position.
25   Q.    It's your understanding the entire

1    position was eliminated?

2         A.    Yes, sir.

3         Q.    Okay.  And when did you leave

4    Pembroke Pines Hospital?

5         A.    November of '93.

6         Q.    So it was your understanding that

7    Pembroke Pines Hospital was no longer going to

8    have anyone doing any kind of marketing or public

9    relations for the hospital?

10        A.    I do not recall, while I was there, a

11   conversation assigning responsibilities for that

12   position after Ms. Iaia left.

13             MR. HANNAH:  Let's have this marked.

14             (Plaintiff's Exhibit 2 was

15             marked for identification.)

16

17   BY MR. HANNAH:

18        Q.    Why don't you take a look at what's

19   been marked Plaintiff's Exhibit Number 2?  Why

20   don't you read that document?

21        A.    (Witness complied.)

22        Q.    All I'm asking is for you to read

23   that document.

24        A.    Okay.

25        Q.    Now that you've read it, is that an

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1    accurate statement of the facts as to what

2    happened with the director of marketing/public

3    relations position?

4          A.    This says that the position was

5    eliminated and it was combined with Mrs.

6    Monteiro's position.

7          Q.    Is that accurate?

8          A.    The position was eliminated.  I

9    cannot remember the specific circumstances where

10   Mrs. Monteiro may have taken over that position.

11         Q.    So you have no idea if she actually

12   took over any of those job duties --

13         A.    No.

14         Q.    Let me finish my question, please.

15               You have no recollection as we sit

16   here today whether or not Ms. Monteiro assumed job

17   duties and responsibilities that were formerly

18   performed by Ms. Iaia?

19         A.    No, sir.

20         Q.    Okay.  The reason why you don't know

21   that is because you left the hospital too quickly?

22         A.    Not only that, but it's been seven

23   years since the incident occurred.  I can't

24   remember the specifics of it.

25         Q.    So that could be correct?  That

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1   information could be correct?

 2        A.     I don't know.  I can't give you an

 3   answer on something I can't remember.

 4        Q.     All right.  And you can't remember

 5   why Ms. Iaia was not considered for the combined

 6   position of director of public relations and

 7   Senior Friends?

 8              MR. COPELAND:  Objection.

 9   Argumentative.

10              THE WITNESS:  I don't know that that

11   was ever a consideration in that the Seniors

12   Program was a very intense, very well run program,

13   and, to the best of my knowledge, Ms. Iaia had no

14   experience in that.

15

16   BY MR. HANNAH:

17        Q.     To your knowledge, Ms. Iaia had no

18   experience in Senior Friends?

19        A.     Yes.

20        Q.     In running the Senior Friends

21   Program?

22        A.     That's right.

23        Q.     Were you actually aware she did

24   actually have that responsibility?

25        A.     No.
```

1        Q.    You have no idea?

2        A.    No.

3        Q.    Did you actually review her

4 qualifications at all to determine whether or not

5 she was the better person for the position after a

6 reduction in force than Monique Monteiro?

7        A.    I do not recall the specific

8 circumstances back then.

9        Q.    Okay.  Do you take any medication

10 that affects your memory?

11       A.    No, sir.

12       Q.    Do you take any kind of medication at

13 all?

14       A.    No, sir.

15       Q.    Do you drink alcoholic beverages?

16       A.    Occasionally.

17       Q.    What was the date you left?

18       A.    I believe it was November of '93.

19       Q.    Okay.  Who took over your position?

20       A.    O'Connell maybe.  I don't recall.

21       Q.    That's the last name, O'Connell?

22       A.    Yes.  I believe that was the case.

23       Q.    Was that a man or a woman?

24       A.    Don't recall.  Never met him.

25       Q.    Or her?

```
 1        A.      Or her.

 2        Q.      Did you review the qualifications on

 3   Monique Monteiro in deciding whether to keep her

 4   on as an employee of Pembroke Pines Hospital?

 5        A.      I would have to answer the same way,

 6   I don't recall looking at them seven years ago.

 7        Q.      Did you review the performance

 8   records of Jackie Iaia to determine whether or not

 9   she should stay on as any kind of public relations

10   director or Senior Friends director?

11        A.      I don't recall.

12        Q.      So Miss Iaia's performance had no --

13   was not involved at all in any way in your

14   consideration whether or not to let her go?

15              MR. COPELAND:  Objection.

16   Argumentative.

17              THE WITNESS:  I can't recall that.

18   We eliminated the position.  That's the best I

19   recall.

20

21   BY MR. HANNAH:

22        Q.      Eliminated the position but combined

23   it with another position?

24              MR. COPELAND:  Objection.

25   Argumentative.
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1                  THE WITNESS:  I don't know.  I cannot

 2    recall whether that was combined in there at the

 3    time or not.

 4

 5    BY MR. HANNAH:

 6         Q.      Tell me all the other people that

 7    were involved in that decision-making process as

 8    to reduction in force and combining positions,

 9    eliminating positions.

10         A.      Would have been my department head,

11    department of human resources.

12         Q.      Who is that?

13         A.      Various department heads would have

14    been involved in employee reductions by supplying

15    names within their departments that could be

16    eliminated.

17         Q.      Claudia Jack, was she involved?

18         A.      I can't even recall whether she was

19    there at the time or not.

20         Q.      Well, certainly the human resources

21    director at the time would have been involved,

22    right?

23         A.      Yes.

24         Q.      What other department heads were

25    involved in the decision-making process?
```

```
 1         A.     I cannot recall specifics.  It would

 2  have been probably any department head that would

 3  have been -- that their employees were affected.

 4         Q.     Okay.

 5                THE VIDEOGRAPHER:  This is the end of

 6  tape one.  Thank you.

 7                This is the beginning of tape two of

 8  the videotaped deposition of Jerry Sutphin.

 9

10  BY MR. HANNAH:

11         Q.     Mr. Sutphin, with regard to deciding

12  who would be let go in the reduction of force by

13  Pembroke Pines Hospital, were there meetings held

14  to decide or to make that decision?

15         A.     Specific meetings, I cannot recall,

16  but it would not be unusual for that to happen.

17         Q.     Who would be at those meetings?

18         A.     Those people affected from the

19  department head standpoint.

20         Q.     Okay.  Certainly with regard to

21  marketing/public relations, that would have been

22  Miss Iaia, right?

23         A.     That's correct.

24         Q.     Okay.  But she wasn't involved in

25  meetings with you as to deciding who to get rid
```

1    of, correct?

2         A.    I suspect not, no.

3         Q.    Okay.  Director of human resources

4    would have been involved in those meetings,

5    correct?

6         A.    Yes, sir.

7         Q.    You don't remember who that was,

8    though?

9         A.    I believe at the time Paula Adamson

10   had taken over that position.

11        Q.    Do you recall actually being in

12   meetings where Paula Adamson was present and

13   discussions were had about eliminating jobs?

14        A.    No, sir.

15        Q.    Who made the decision as to what jobs

16   should be eliminated?

17        A.    It was in conjunction with

18   recommendations from the department heads and from

19   human resources reviewing -- I would have had the

20   ultimate say of yes, that's fine, that's good.

21        Q.    Who would have had the

22   responsibilities for deciding if any positions

23   should be combined as opposed to just totally

24   eliminating it?

25        A.    Ultimately I would have.

```
 1           Q.      Was it your understanding that the

 2     Pembroke Pines Hospital would continue to have

 3     some kind of marketing function --

 4           A.      Sir --

 5           Q.      -- after Ms. Iaia was let go?

 6           A.      I cannot answer that question because

 7     I do not remember having that discussion with

 8     anyone.

 9           Q.      Was her job an important job?

10           A.      To a certain extent, yes.

11           Q.      Okay.  And marketing and public

12     relations for a hospital is an important part of

13     the hospital, correct?

14           A.      Not necessarily.

15           Q.      Part of Pembroke Pines Hospital which

16     was losing beds, so to speak, or customers, wasn't

17     marketing and public relations of the hospital an

18     important function?

19           A.      Public relations aspects are a very

20     important aspect of hospitals, but marketing, such

21     as advertising, is not necessarily in that

22     situation.

23           Q.      Let's talk about public relations.

24     That's an important aspect of the hospital,

25     correct?
```

1    A.    Uh-huh.

2    Q.    Yes?

3    A.    Yes.

4    Q.    Okay.  And someone would need to

5    continue performing that position after Ms. Iaia

6    left, correct?

7    A.    Possibly.

8    Q.    You have no idea if that happened?

9    A.    I have no idea what public relations

10   functions were performed after that.

11   Q.    Okay.  And you were not involved at

12   all in giving to Ms. Monteiro, after Ms. Iaia was

13   notified of her selection for reduction in force,

14   any marketing or public relations

15   responsibilities?

16   A.    Sir, I cannot remember having that

17   conversation with Mrs. Monteiro.

18   Q.    I didn't ask you if you had a

19   conversation about that.

20   A.    I don't remember signing any

21   paperwork relating to that.

22   Q.    You don't know if she continued to

23   perform those job duties and responsibilities?

24   A.    I do not recall after that, no.

25   Q.    Was there somebody else involved in

```
 1   that process after you left?
 2        A.     I have no idea.  I wasn't there.
 3        Q.     Was one of Ms. Iaia's job duties and
 4   responsibilities as director of marketing and
 5   public relations to prepare a newsletter for the
 6   hospital?
 7        A.     Uh-huh.
 8        Q.     Yes?
 9        A.     If I recall, it was.
10        Q.     Okay.  Let me show you --
11               MR. HANNAH:  Let's have this marked
12   Plaintiff's Exhibit Number 3, I believe, right?
13                    (Plaintiff's Exhibit 3 was
14                     marked for identification.)
15
16   BY MR. HANNAH:
17        Q.     Take a look at Plaintiff's Exhibit
18   Number 3.  Tell me if you recognize that.
19        A.     It's a newsletter put out by Pembroke
20   Pines Hospital.
21        Q.     Okay.  That was something that was
22   performed by Ms. Iaia when she was director of
23   public relations and marketing, correct?
24        A.     As best I can recall, yes.
25        Q.     In fact, it shows her name there as
```

1    the editor?

2        A.    Yes.

3        Q.    What's the date of that?

4        A.    March of '93.

5        Q.    Okay.  So one of the job duties and

6    responsibilities of the director of public

7    relations was to prepare this newsletter, correct?

8        A.    Yes, sir.

9        Q.    Let me show you this document,

10   Plaintiff's Exhibit Number 4.

11                (Plaintiff's Exhibit 4 was

12                marked for identification.)

13

14   BY MR. HANNAH:

15       Q.    If you'll look at Plaintiff's Exhibit

16   Number 4.  Does this appear to be the same

17   newsletter?

18       A.    Appears to be.

19       Q.    Who's the editor of that?

20       A.    Monique Monteiro.

21       Q.    What's the date of that newsletter?

22       A.    December of 93.

23       Q.    You had already left by that time?

24       A.    If I recall, that's correct.

25       Q.    Okay.  And that indicates Ms.

```
 1    Monteiro was in December of 1993 performing one of

 2    the job duties and responsibilities of the

 3    director of marketing and relations -- marketing

 4    and public relations that had previously been

 5    performed by Jackie Iaia, correct?

 6              MR. COPELAND:  Objection.

 7    Argumentative.

 8              THE WITNESS:  Appears that way.

 9

10    BY MR. HANNAH:

11         Q.    Any reason to believe that Ms.

12    Monteiro also did not assume all of the other job

13    duties and responsibilities of Ms. Iaia commencing

14    in December of 1993?

15              MR. COPELAND:  Objection.  Calls for

16    speculation.

17              THE WITNESS:  I don't recall.

18

19    BY MR. HANNAH:

20         Q.    You wouldn't have any idea?

21         A.    Seven years ago, no.

22              MR. HANNAH:  Let's have this marked

23    Plaintiff's Exhibit Number 5.

24                   (Plaintiff's Exhibit 5 was

25                   marked for identification.)
```

1   BY MR. HANNAH:

2        Q.      Look at Plaintiff's Exhibit Number

3   5.   You may or may not have seen that article.

4   The date of the article was January 2nd, 1994,

5   correct?

6        A.      Yes.

7        Q.      From the Miami Herald, correct?

8        A.      Yes.

9        Q.      Okay.  Look at the underlined

10  portions of that article, actually the second set

11  of underlines.

12       A.      Uh-huh.

13       Q.      Where it says Monique Monteiro, the

14  hospital's public relations director.  You see

15  that?

16       A.      Yes.

17       Q.      Have any reason to believe that's an

18  inaccurate statement?

19       A.      I would not know.

20              MR. COPELAND:  Objection.  Calls for

21  speculation.

22

23  BY MR. HANNAH:

24       Q.      Do you have any reason to believe as

25  of January 2nd, 1994 Monique Monteiro was not the

1    hospital's public relations director?

2          A.      Sir, I have no idea.  I wasn't there

3    in January of '94.

4          Q.      So after you left the hospital you

5    actually had no dealings with --

6          A.      I have not been back to South Florida

7    since then.

8          Q.      To your knowledge, sir, was there

9    documentation generated by Pembroke Pines Hospital

10   or by Galen Hospital or by Columbia with regard to

11   this reduction in force?

12         A.      Was there -- I'm sorry.  Ask the

13   question again.  What paper?

14         Q.      Documentation generated by the

15   corporation that owned the hospital back in

16   November of 1993 as to what was entailed in the

17   reduction in force?

18               MR. COPELAND:  Objection to the form.

19               THE WITNESS:  Yes.

20

21   BY MR. HANNAH:

22         Q.      There was?

23         A.      I'm sure there was, yes.

24         Q.      Do you recall authoring any of that

25   documentation?

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1          A.     Not off the top of my head, no.

2          Q.     Do you know if that documentation

3    came from you or from the corporation itself?

4          A.     I don't recall.

5          Q.     Okay.  And do you recall if there was

6    any documentation indicating what jobs would be

7    eliminated and what jobs would be kept?

8          A.     There was some documentation on a

9    list I saw this morning, but that's the only

10   list.  That's the first I recall.

11         Q.     You saw some documentation on a list

12   this morning?

13         A.     Yes, sir.

14         Q.     But I'm -- other than that, you don't

15   recall any other documentation?

16         A.     Not other than what we've seen right

17   here.

18         Q.     Okay.  Who was responsible for the

19   personnel records for the hospital?

20         A.     Director of human resources.

21         Q.     Okay.  That would have been Paula

22   Adamson?

23         A.     Yes.

24         Q.     Okay.  And you have any idea how long

25   she was the director of human resources at the

1    hospital?

2         A.    She came shortly before my leaving,

3    and I have no idea whether she's still there or

4    not.

5         Q.    All right.  Let's see if we can get

6    some things straight.

7              At the time of the reduction in force

8    who was the owner of the hospital?  What company?

9         A.    As far as I know --

10              MR. COPELAND:  Objection to form.

11              THE WITNESS:  It was Columbia.

12

13   BY MR. HANNAH:

14        Q.    Columbia Healthcare?

15        A.    Yes.

16        Q.    It was no longer Galen Hospital at

17   that time?

18        A.    No.  It was not currently owned by

19   Galen Corporation.

20        Q.    Excuse me?

21        A.    It was no longer owned by the

22   corporation of Galen.

23        Q.    Right.  Galen ceased to exist as a

24   corporation at some point in time?

25        A.    I do not know the specifics behind

1    dissolving the corporation or what happened to it

2    after I --

3          Q.     Do you know if Columbia Healthcare

4    purchased Galen?

5          A.     It's my understanding that's the

6    case, yes.

7          Q.     Okay.  So as of November 1993 you

8    were employed by Columbia Healthcare?

9          A.     I was employed by Pembroke Pines

10   Hospital, which was a subsidiary of Columbia, as

11   far as I know.

12         Q.     Subsidiary or doing business as?

13         A.     Doing business as.

14         Q.     Okay.  So --

15         A.     I don't recall the d/b/a name, but --

16         Q.     All right.  But you worked for

17   Pembroke Pines Hospital, which was owned by

18   Columbia Healthcare?

19         A.     Yes, sir.

20         Q.     And all of the decisions with regard

21   to the reduction in force that you performed back

22   in November of 1993 you did as an employee of

23   Columbia Healthcare doing business as Pembroke

24   Pines Hospital, correct?

25               MR. COPELAND:  Object to the form.

```
 1    Argumentative.

 2

 3    BY MR. HANNAH:

 4         Q.    Correct?  As far as you know?

 5         A.    As far as I know, yes.

 6         Q.    I'd like to refer you to Defendant's

 7    Exhibit Number 5, which was a performance

 8    evaluation you prepared on behalf of Monique

 9    Monteiro.

10         A.    Uh-huh.

11         Q.    It indicates her job was manager,

12    Humana Seniors Association?

13         A.    Yes, sir.

14         Q.    Is that different than director?

15         A.    I would say they would be used

16    synonymously with each other.

17         Q.    She wasn't called director, right?

18         A.    I do not recall exactly what her

19    title was.  It says Manager of Seniors, Humana

20    Seniors Association, sir.

21         Q.    Okay.

22               MR. HANNAH:  Let's have this marked.

23                    (Plaintiff's Exhibit 6 was

24                    marked for identification.)

25
```

1    BY MR. HANNAH:

2         Q.    Take a look at Plaintiff's Exhibit

3    Number 6.  Of course, I'm going to ask you if you

4    recognize that document, if you've seen it before

5    today?

6         A.    I recognize the similarity of the

7    form, yes, sir.

8         Q.    That's a performance appraisal form?

9         A.    Yes.

10        Q.    That was used by the hospital?

11        A.    Yes.

12        Q.    By Pembroke Pines Hospital?

13        A.    Doesn't have Pembroke's name on it

14   because it was generic when we used it throughout

15   the company.

16        Q.    It was similar to the one you used

17   when you prepared performance evaluation for

18   Monique Monteiro, correct?

19        A.    Yes, sir.

20        Q.    That appears to be, also, a

21   performance evaluation for Monique Monteiro,

22   correct?

23        A.    Uh-huh.

24        Q.    Yes?

25        A.    Yes.

1          Q.      That was for the period December 1st,

2    '93 through December 1st, '94?

3          A.      Correct.

4          Q.      Okay.  For the period right after you

5    left the hospital, right?

6          A.      Uh-huh.

7          Q.      Yes?

8          A.      Yes.

9          Q.      You see the job title that she has on

10   there?

11         A.      Yes, I do.

12         Q.      What is it?

13         A.      Director of public relations and

14   Seniors Association.

15         Q.      Do you have any reason to believe

16   that Ms. Monteiro did not become the director of

17   public relations and Senior Friends right after

18   the reduction in force?

19              MR. COPELAND:  Objection.  Asked and

20   answered.

21              THE WITNESS:  I think I've already --

22   I do not recall the situation of giving her that

23   position.

24

25

1    BY MR. HANNAH:

2         Q.      And you don't recall considering Ms.

3    Iaia for that position?

4              MR. COPELAND:  Objection.  Asked and

5    answered.

6              THE WITNESS:  No, sir.

7

8    BY MR. HANNAH:

9         Q.      In fact, you didn't interview either

10   one of those two women with regard to the position

11   of director of public relations and Senior

12   Friends?

13        A.      No, sir.  Not that I recall.

14        Q.      All right.  In fact, you didn't even

15   review any of their performance records in making

16   a decision to keep Monique Monteiro as opposed to

17   Jackie Iaia, correct?

18             MR. COPELAND:  Objection.  Asked and

19   answered.

20             THE WITNESS:  I don't recall.

21

22   BY MR. HANNAH:

23        Q.      Is that something you would normally

24   do?

25        A.      In the process of changing positions,

1    yes.

2         Q.    Okay.  And would it also be something

3    you would normally do is to look at the experience

4    of each individual candidate for a particular

5    position?

6         A.    I'll look at -- when I'm getting

7    ready to do a position, yes, I will look at the

8    person's experience.

9         Q.    November of 1993 do you know how much

10   marketing experience Monique Monteiro had?

11        A.    No, sir.  I don't recall.

12        Q.    As you sit here today have you any

13   idea how much marketing experience she had?

14        A.    No, sir.

15        Q.    Back in 1993 when you made the

16   decision to keep Monique Monteiro and let Jackie

17   Iaia go, did you have any knowledge as to how much

18   public relations experience Ms. Monteiro had?

19             MR. COPELAND:  Objection.

20   Argumentative.

21             THE WITNESS:  No, sir.  I don't

22   recall.

23

24   BY MR. HANNAH:

25        Q.    Do you know how long Jackie Iaia had

```
 1    been doing public relations/marketing job duties

 2    and responsibilities as of November of 1993?

 3         A.     Number of years?  No, sir, I do not

 4    recall.

 5         Q.     So you have no idea even what her

 6    experience was, right?

 7         A.     No.

 8         Q.     Other than she had some experience,

 9    right?

10         A.     Other than she was there when I came.

11         Q.     Do you know who had more experience

12    in the area of director of -- excuse me.  Do you

13    know who had more experience in the area of

14    marketing and public relations, Jackie Iaia or

15    Monique Monteiro, back in November of 1993?

16         A.     Sir, I do not recall.

17         Q.     Okay.  Is that something you would

18    have looked at to determine who to keep on?

19         A.     No.  I looked at the position.  I

20    would have looked at positions at that time, and

21    director of Seniors Programs was not a program

22    that we were going to do away with.  We were going

23    to keep the Seniors Program.

24         Q.     All right.  You were also going to

25    keep the public relations department as well,
```

113

1    correct?

2         A.    Not if we let Ms. Iaia go.

3         Q.    Well, you gave it to Ms. Monteiro?

4         A.    I don't recall giving it to Mrs.

5    Monteiro.  I told you I don't recall that

6    circumstance.

7         Q.    Okay.  And you know if there is any

8    documentation that would indicate whether or

9    not -- strike that.

10             Do you know if any documentation

11   would exist to indicate there would be a combining

12   of job positions?

13        A.    I don't recall, no.  I do not know.

14        Q.    It did happen, though, right?

15             MR. COPELAND:  Objection.

16   Argumentative.

17             THE WITNESS:  By what you've given

18   me, the title is there, yes.

19

20   BY MR. HANNAH:

21        Q.    Going back to Mr. Edwards' position

22   statement, which I think was Plaintiff's Exhibit

23   Number 2, looking at it again can you tell me is

24   there anything in there that strikes you as an

25   inaccurate statement of fact?

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1          A.      May I have a moment to review it

 2     again?

 3          Q.      Sure.  Read it word by word, line by

 4     line.

 5          A.      What's your question again?

 6          Q.      Just go to the second page.  I'll get

 7     a little easier for you.  Page two, first

 8     paragraph.  I'll read the sentence.  "During this

 9     period of time --"

10               MR. COPELAND:  Objection.  Let me put

11     an objection into publishing a hearsay statement.

12

13     BY MR. HANNAH:

14          Q.      Okay.  "During this period of time

15     the hospital reviewed Ms. Iaia's position in the

16     marketing department along with various other

17     management level positions and determined that the

18     function of the marketing department director

19     could be combined with the position of the

20     director of public relations and Senior Friends."

21               See that statement?

22          A.      Yes.

23          Q.      I read that accurately?

24          A.      You read the statement accurately.

25          Q.      Is that a correct statement or
```

```
 1   incorrect statement?

 2        A.    Sir, I have told you, I do not recall

 3   assigning those responsibilities to Mrs. Monteiro.

 4        Q.    So you don't even know if it's

 5   correct or not?

 6        A.    I do not know.

 7        Q.    All right.  You didn't speak to Mr.

 8   Edwards about this position statement?

 9        A.    No, sir.

10        Q.    Al right.  The second paragraph,

11   first sentence, "This decision was made because

12   the employee performing the function of the

13   director of public relations and Senior Friends

14   was capable of performing the duties and

15   responsibilities of both areas."

16             I read that accurately?

17        A.    You are accurate, yes.

18        Q.    Do you have any idea whether that's

19   incorrect or correct statement?

20        A.    I have no idea.

21        Q.    Okay.  And the next sentence, "Ms.

22   Iaia was not experienced in the area of Senior

23   Friends, could not perform that function when the

24   positions were combined.  Consequently, her

25   position was eliminated."
```

1          Are those two sentences accurate?

2          A.      To the best of my knowledge, they

3     are.

4          Q.      So her position -- one of the reasons

5     her position was eliminated was because it was

6     determined by you and the hospital that she did

7     not have experience in the area of Senior Friends,

8     could not perform that function?

9          A.      I do not recall the specifics behind

10    that.  I will go back to what I said earlier.  We

11    eliminated the position of director of public

12    relations and marketing.  The details of that at

13    best are vague at this late date.  I do not recall

14    today whether Ms. Iaia had any experience in

15    Senior Friends.  To the best of my knowledge

16    today, I don't recall that.

17         Q.      Did you take that into consideration

18    when you made a decision to let her go?

19         A.      Sir, I don't recall.

20         Q.      You don't recall just because of all

21    the time that's passed by?

22         A.      Just the time element.  I've been

23    through many of these since then.

24         Q.      Going to the next to last paragraph,

25    "Following the elimination of her position her

```
 1    job responsibilities were absorbed by another

 2    employee."

 3               Is that an accurate statement?

 4        A.    I'm sorry.  Where are you?

 5        Q.    Next to last paragraph, second

 6    sentence.

 7        A.    I don't know.

 8        Q.    You don't know if that's accurate or

 9    not?

10        A.    Yes.

11        Q.    You don't know where Mr. Edwards got

12    his information from?

13        A.    No, sir.

14               MR. HANNAH:  Have that marked.

15                   (Plaintiff's Exhibit 7 was

16                   marked for identification.)

17

18    BY MR. HANNAH:

19        Q.    Take a look at Plaintiff's Exhibit

20    Number 7.  Have you seen that document before, the

21    front and back?

22        A.    Not that I recall.

23        Q.    Okay.  That's not something you would

24    have reviewed in determining whether or not to

25    keep Ms. Monteiro over Ms. Iaia?
```

 1                    MR. COPELAND:  Objection to the form.

 2                    THE WITNESS:  I just don't ever

 3       remember seeing the form.

 4

 5       BY MR. HANNAH:

 6             Q.     Do you know what that is?

 7             A.     It looks like an employment

 8       application.

 9             Q.     For who?

10             A.     Monique Willenbrock.

11             Q.     Do you know who Monique Willenbrock

12       is?

13             A.     I have never heard the name

14       Willenbrock.

15             Q.     You don't know if that was the maiden

16       name of Mrs. Monteiro?

17             A.     I have no idea.

18                    MR. HANNAH:  Let's have the next one

19       marked.

20                         (Plaintiff's Exhibit 8 was

21                          marked for identification.)

22

23       BY MR. HANNAH:

24             Q.     Just ask if you recognize that

25       document, Plaintiff's Exhibit Number 8?

```
 1          A.      No, sir.

 2          Q.      In determining who to keep and who to

 3   let go in the reduction of force, do you review

 4   their personnel records before you make that

 5   decision?

 6          A.      I cannot recall in this circumstance

 7   whether that was done or not.

 8          Q.      Do you normally do that?

 9          A.      I'm trying to remember.  I don't --

10   I'm sure I have at some time or another, but I

11   don't recall the specific instances.

12          Q.      Okay.  Do you review the performance

13   records of employees to determine who stays, who

14   goes, in reduction of force?

15          A.      I do not personally unless it reports

16   directly to me.

17          Q.      With regard to those people who

18   report directly to you, do you review their

19   performance records?

20          A.      It depends on the position.

21          Q.      Do you generally review the

22   performance records?

23          A.      The reason I'm saying it depends on

24   the position, where I have a one person department

25   that's already been decided to be eliminated then
```

1    there would be no reason to do that.

2         Q.    Who is Julie Odesky?  Does that name

3    ring a bell with you?

4         A.    No, sir.

5         Q.    Quality -- you don't remember if she

6    was the quality assurance manager at Pembroke

7    Pines Hospital?

8         A.    Now that you mention that, I do

9    recall that, yes.

10        Q.    Okay.  Did you ever flirt with her?

11        A.    Not that I'm aware of.

12        Q.    Do you know who Pat Pierce is?

13        A.    I want to say something to do with

14   the medical staff.

15        Q.    You don't recall she was the director

16   of risk management for the hospital back in 1994?

17        A.    I remember the name, but I can't

18   remember the position.

19        Q.    So is it a correct statement to make,

20   sir, that the reason you were brought to Pembroke

21   Pines Hospital was to reduce costs, including

22   doing a -- performing a reduction in force?

23        A.    I would not think that would be a

24   fair statement.

25        Q.    Okay.  Is that one of your job duties

```
 1   and responsibilities to reduce costs through

 2   reduction in force when you came there?

 3        A.    One of my responsibilities was try to

 4   put the hospital on an even keel.

 5        Q.    What was the reason that you left the

 6   hospital in November of 1993?

 7        A.    Take employment with Humana again in

 8   Washington, D. C.

 9        Q.    It just happened directly right after

10   the reduction in force was put into place,

11   correct?

12        A.    I can't remember specific dates, but

13   I would say it was very close to that, yes.

14        Q.    Can you tell me any other hospitals

15   where you performed reduction in force?

16        A.    Greenbrier Valley.  Humana Hospital

17   Greenbrier Valley.

18        Q.    Where is that?

19        A.    In West Virginia.

20        Q.    Okay.  You remember when that was?

21        A.    It would have been in 19 -- early

22   '80s.

23        Q.    Okay.  That was a reduction in force

24   to reduce costs?

25        A.    Yes, sir.
```

122

```
 1          Q.      Excuse me?

 2          A.      Yes, sir.

 3          Q.      Okay.  And how long after reduction

 4   in force was implemented did you leave that

 5   hospital?

 6          A.      I don't recall.  That was 1984, '83.

 7          Q.      You don't recall if it was a short

 8   time after, long time after?

 9          A.      I was at the hospital I think five

10   years.

11          Q.      What other hospitals did you perform

12   reduction in force?

13          A.      Probably at all of them I've been at.

14          Q.      Every hospital you've been at you've

15   done a reduction in force?

16          A.      Usually there is a time when you get

17   to a point of staffing needs to be adjusted in

18   facilities.

19          Q.      Do you know how long Jackie Iaia has

20   been doing that public relations work in November

21   of 1993 for the hospitals?

22          A.      No, sir.

23          Q.      Do you know how long Monique Monteiro

24   had been doing the Senior Friends function at the

25   hospital back in November of 1993?
```

```
 1              A.      No, sir.

 2              Q.      Do you know who would have been at

 3    the hospital longer?

 4              A.      I don't recall because I think -- if

 5    my memory serves me correctly, Monique was already

 6    there and Jackie transferred over from South

 7    Broward, but that's --

 8              Q.      Did you review Jackie Iaia's records

 9    from South Broward to determine whether or not she

10    was more qualified than Monique Monteiro to

11    continue on at the hospital?

12              A.      Not that I recall.

13              Q.      Okay.  You don't recall very much.

14    Is that because of the passage of time?

15              A.      Yes, sir.

16              Q.      Excuse me?

17              A.      Yes, sir.

18              Q.      And none of the documents you've

19    looked at brings any of these memories back to you

20    whatsoever?

21              A.      Not really, no.

22              Q.      Okay.  How would you describe your

23    working relationship with Jackie Iaia at the

24    hospital, Pembroke Pines Hospital?

25              A.      The best I can remember, it was a
```

```
 1    good working relationship.

 2         Q.    How do you describe your working

 3    relationship with Monique Monteiro?

 4         A.    Good.

 5         Q.    Who was making more money back in

 6    November of 1993?

 7         A.    I do not recall.

 8              MR. COPELAND:  Object to the form.

 9

10    BY MR. HANNAH:

11         Q.    You don't recall if Monique Monteiro

12    was getting paid less than Jackie Monteiro?

13         A.    No, sir.

14         Q.    Would that have been a consideration

15    you would have taken into account in deciding who

16    to let go and who to keep?

17         A.    I do not recall.

18              MR. COPELAND:  Objection.

19    Argumentative.

20

21    BY MR. HANNAH:

22         Q.    You do not recall?

23         A.    I do not recall.

24         Q.    With regard to the reduction in

25    force, was that a consideration of yours at all
```

125

1    keeping people who made less money as opposed to

2    more money and letting go the people who made more

3    money?

4            A.      Not necessarily.

5            Q.      Was that a consideration you took

6    into account?

7            A.      I do not recall the considerations

8    that went into that.

9            Q.      Is that because of the passage of

10   time?

11           A.      Yes, sir.

12           Q.      Is there anything you would need to

13   look at to refresh your recollection with regard

14   to any of these events?

15           A.      Not that I can recall, no.  Not that

16   I can think of anyway.

17           Q.      Do you recall meeting with Jackie

18   Iaia to tell her her job was over?

19                   MR. COPELAND:  Objection.  Asked and

20   answered.

21                   THE WITNESS:  Pardon?

22                   MR. COPELAND:  I was putting an

23   objection.

24

25

```
 1    BY MR. HANNAH:

 2         Q.     Do you recall a meeting with Jackie

 3    Iaia to let her know her job had been eliminated?

 4         A.     I don't remember the specific

 5    meeting, but I would say I did, yes.

 6         Q.     Do you remember what you said to her?

 7         A.     No, sir.

 8         Q.     Do you remember giving her a hug?

 9         A.     No, sir.

10         Q.     Do you remember her reaction to you

11    telling her what had happened?

12         A.     No.

13         Q.     Did you care about what kind of

14    reaction she had?

15         A.     I care about every employee that I

16    lay off.  It's not an enjoyable thing to do.

17         Q.     Or to experience?

18         A.     Pardon?

19         Q.     Or to experience?

20         A.     That's correct.

21         Q.     Do you know who Patty David is?

22         A.     Not off the top of my head, no.

23         Q.     You don't know if she was the person

24    that replaced Carol Naples?

25         A.     I don't recall.
```

```
 1           Q.      Who was the CFO at the time, November

 2    of --

 3           A.      Mike Scialdone.

 4           Q.      How old is he?  How old was he back

 5    in November of 1993?

 6           A.      It would be a pure guess on my part

 7    because I remember him and his wife were just

 8    ready to have a child when I left there, so fairly

 9    young I would think.

10           Q.      Young guy?

11           A.      Yes.

12           Q.      Okay.  Did you get rid of him in the

13    reduction of force?

14           A.      No, sir.  He was still there when I

15    left.

16           Q.      How about Paula Adamson?  Do you know

17    how old she was?

18           A.      No, sir.

19           Q.      Do you know she's in her 20s, 30s,

20    40s, 50s?

21           A.      I don't recall.

22           Q.      You don't know who she was?

23           A.      I know who she is.  I don't recall.

24    She was probably there for two or three weeks

25    before I left probably.
```

```
 1              Q.     Was she working at the hospital prior

 2    to the reduction in force?

 3              A.     No.

 4              Q.     Was she somebody hired right

 5    afterwards?

 6              A.     No.  It was somebody that worked for

 7    Columbia prior to the acquisition.

 8              Q.     And she replaced Claudia Jack?

 9              A.     Uh-huh.

10              Q.     Yes?

11              A.     Yes.

12              Q.     Okay.  Do you know how old Claudia

13    Jack was?

14              A.     I don't recall.

15              Q.     Don't know if she was in her 20s,

16    30s, 40s?

17              A.     (Witness shook head.)

18              Q.     No?

19              A.     I just don't know.

20              Q.     Did you offer to continue Jackie

21    Iaia's health insurance after she was notified of

22    her termination?

23              A.     I don't recall the specific incident,

24    no.

25              Q.     You don't recall recommending she get
```

129

```
 1    an additional three months of medical coverage
 2    after she was notified of her termination?
 3         A.    No, sir.
 4         Q.    Would that be something that would be
 5    your responsibility to do or within your
 6    discretion?
 7         A.    I'm sure it would have had to come
 8    through me, yes.
 9         Q.    Do you know who Valerie Lockwood
10    Moran is?
11         A.    By name, yes.
12         Q.    You don't know what she did with the
13    hospital?
14         A.    I cannot recall.  She was there -- I
15    don't believe she was there when I got there.  I'm
16    not sure.
17         Q.    Julie Odesky, was she young?
18         A.    Best I can recall.
19         Q.    Was she attractive?
20         A.    Best I can recall, yes.
21         Q.    How about Monique Monteiro, was she
22    young?
23         A.    I don't recall her age, but
24    relatively so, yes.
25         Q.    Was she attractive?
```

130

```
 1              A.      Yes.

 2              Q.      Jackie Iaia, do you -- would you call

 3    her young?

 4              A.      I don't recall her age.

 5              Q.      You don't recall one way or another,

 6    young, old, middle-aged?

 7              A.      I would consider, best I can recall,

 8    Jackie, she was -- I wouldn't even want to guess

 9    what her age was.  I don't know.

10              Q.      I'm not asking you to guess her age.

11    I'm asking was she a young person, was she a

12    middle-aged person, was she an elderly person?

13              A.      Somewhere between young and

14    middle-aged I would say.

15              Q.      In her 40s?

16              A.      I don't know.

17              Q.      Did you like Pat Pierce?

18              A.      I don't recall Pat Pierce.

19              Q.      You don't recall her?

20              A.      (Witness shook head.)

21              Q.      Let's go to -- let me find it --

22    Defendant's Exhibit Number 3, which was your

23    letter of recommendation for Jackie Iaia.  See

24    that?

25              A.      Yes.
```

```
 1          Q.       Okay.  Did she ask you for that
 2   letter of recommendation or did you offer it to
 3   her?
 4          A.       I do not recall.
 5          Q.       Okay.  All the information in there,
 6   do you believe it?
 7          A.       She was obviously a very capable
 8   person.  I wrote her a letter of recommendation.
 9   I generally won't do that unless I support the
10   individual.
11          Q.       Did you believe she had a thorough
12   working knowledge of the marketing and public
13   relations field?
14          A.       Yes.
15          Q.       Okay.  Do you know in November of
16   1993 if Monique Monteiro had a thorough working
17   knowledge of the marketing/public relations field?
18          A.       I don't recall.
19          MR. COPELAND:  Objection.  Asked and
20   answered.
21
22   BY MR. HANNAH:
23          Q.       Do you believe Jackie Iaia was a
24   supportive, hard worker?
25          A.       To the best of my knowledge, she was
```

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

 1    supportive.

 2         Q.      Did you consider her an excellent

 3    employee?

 4         A.      Based on the evaluation that I looked

 5    at, I considered her a very good employee, yes.

 6         Q.      Do you know what benefits were being

 7    offered employees of Pembroke Pines Hospital back

 8    in November of 1993?

 9         A.      Specifically?  Not off the top of my

10    head, but --

11         Q.      Did they have healthcare coverage?

12         A.      They had health insurance.

13         Q.      Did they have a retirement plan?

14         A.      Vacation, sick pay, so forth.

15         Q.      Did they have a retirement and

16    savings plan?

17         A.      They had a -- you could qualify for a

18    401-K plan, yes.

19         Q.      Okay.  Did they have something

20    besides a 401-K or was it just a 401-K?

21         A.      Best I can recall, it was just a

22    401-K.

23         Q.      Okay.  The company, do you know if it

24    contributed to that 401-K plan?

25         A.      Yes.

1    Q.    Do you know what the percentage was

2  back in November of '93?

3    A.    No, I don't off the top of my head.

4    Q.    Do you know if it varied from year to

5  year or was it consistent all the way throughout,

6  at least for the time that you worked at Pembroke

7  Pines Hospital?

8    A.    As far as I know, it was consistent.

9  If it was the same plan I had, which I think it

10  was, it would depend on your contribution

11  percentage.

12    Q.    Okay.  Do you know how much the

13  company would match?

14    A.    If I recall, it was up to 50 percent.

15    Q.    Did they have life insurance policies

16  for the employees?

17    A.    I don't recall.

18    Q.    Did they have disability insurance

19  for the employees?

20    A.    I don't recall whether the disability

21  was part of the employee package or not.

22         MR. HANNAH:  Let's have this marked.

23              (Plaintiff's Exhibit 9 was

24              marked for identification.)

25

```
 1   BY MR. HANNAH:

 2        Q.     Take a look at Plaintiff's Exhibit

 3   9.  Tell me if you recognize that document.

 4        A.     Not this specific document, no.

 5        Q.     I want you to take a look at what

 6   appears to be a job description for the director

 7   of public relations and marketing, and tell me if

 8   you find it to be an accurate description of the

 9   job duties and responsibilities that Ms. Iaia

10   performed for Pembroke Pines Hospital.

11        A.     It seems fair, yes.

12        Q.     So it's pretty accurate?

13        A.     I would think.

14        Q.     Okay.  Was it your intention when you

15   eliminated that position to eliminate all those

16   responsibilities?

17        A.     Sir, I was eliminating the position.

18   I don't know that I --

19        Q.     Let's talk about the job duties and

20   responsibilities that were being performed by that

21   position.  Was it your intention when you

22   eliminated the position to eliminate all those job

23   duties and responsibilities?

24        A.     Yes.

25        Q.     Okay.  So it was your intention that
```

 1    no one would be performing any of those duties and

 2    responsibilities after Ms. Iaia left the hospital?

 3         A.    We eliminated the position.  My

 4    thought process at that time, I don't recall.

 5         Q.    Were these important job duties and

 6    responsibilities for the hospital?

 7         A.    Up until the time of the elimination

 8    of the position, yes.

 9         Q.    Why did they become at the time of

10    the elimination of the position no longer

11    important job duties and responsibilities?

12         A.    Because at the time I made that

13    decision it was based on the fact we were not

14    going to put a lot of emphasis in the area of

15    marketing in the future.

16         Q.    What about public relations?

17         A.    Public relations I was planning on --

18    I had no plans for that at that point in time that

19    I can recall.

20         Q.    You had no plans?

21         A.    No.

22         Q.    Was just going to --

23         A.    I just don't remember the details of

24    it.

25         Q.    Okay.  That's because all the years

1    that's passed by, the seven years?

2        A.    Yes, sir.

3        Q.    Did the hospital have an incentive

4    compensation plan?

5        A.    Yes.

6        Q.    What was that?

7        A.    Available to department heads based

8    on certain goals and objectives.

9        Q.    Okay.  And what exactly did the

10   compensation plan provide, to your recollection?

11       A.    It was a percentage of your salary

12   that you could get up to.  I don't recall the

13   exact percentage now.

14       Q.    Like a bonus?

15       A.    Sort of like a bonus, yes.

16       Q.    That was available to Ms. Iaia?

17       A.    Should have been, yes.

18       Q.    If she had stayed on as a department

19   head?

20       A.    Yes.

21       Q.    Certainly was available to Ms.

22   Monteiro, right?

23       A.    It was available to everyone at the

24   time I was there.  Whether that incentive program

25   stayed in subsequent to my leaving or not, I have

1    no idea.

2        Q.    Okay.  It was in place, though, at

3    the time you were there, right?

4        A.    Yes.

5        Q.    Okay.  And that applied to all

6    department managers and directors?

7        A.    Yes.  Well, whether or not they had

8    been there long enough to qualify or not.

9        Q.    It was available for them?

10       A.    Yes.

11       Q.    That was income over and above what

12   they would get in terms of salary, correct?

13       A.    Yes, sir.

14       Q.    Are you aware of any other perks that

15   were available to department managers or

16   department directors back in the latter part of

17   1993 besides 401-K plan, healthcare plan, and the

18   incentive compensation plan?

19       A.    Not that I recall any specific ones.

20       Q.    What do you do currently now?  You

21   work for an insurance agency or you have your own

22   insurance agency?

23       A.    I have just formed an insurance

24   agency.  We're in the process of forming that

25   right now.

1         Q.      Selling what kind of insurance?

2         A.      Basically healthcare and long-term

3    healthcare.

4         Q.      Was there a period of time you've

5    been out of work?

6         A.      I've been doing some consulting and

7    so forth ever since 199 -- late 1997.

8         Q.      '97 is when you left Humana?

9         A.      Uh-huh.

10        Q.      Is that yes?

11        A.      Yes.  I'm sorry.

12        Q.      Were you terminated?

13        A.      We sold the plan, and the position

14   was eliminated.

15        Q.      You were subject to a reduction in

16   force?

17        A.      Kind of like that.

18        Q.      How did you feel when that happened?

19             MR. COPELAND:  Objection.  Relevance.

20             THE WITNESS:  I certainly was not

21   happy about not having a job.

22

23   BY MR. HANNAH:

24        Q.      Did you find it hard to find another

25   job?

```
 1          A.      Yes.

 2          Q.      In fact, you found it so hard you

 3   started your own agency, right?

 4          A.      That's right.

 5          Q.      You certainly made that attempt first

 6   to find another job after you left, right?

 7                  MR. COPELAND:  Objection.  Relevance.

 8

 9   BY MR. HANNAH:

10          Q.      Yes?

11          A.      I took some personal time off in the

12   process.

13          Q.      Remember your last day at Pembroke

14   Pines Hospital, what day in November it was?

15          A.      No, sir, I don't.

16          Q.      Was this the latter part of November

17   or earlier part?

18          A.      I don't recall.  It was --

19          Q.      Who was the chief operating officer

20   at Pembroke Pines Hospital when you were there?

21          A.      I don't recall.  She had just come

22   there.

23          Q.      Who was the finance director?

24          A.      Mike Scialdone.

25          Q.      Mike?
```

1      A.     S-c-i-a-l-d-o-n-e, if I recall.

2      Q.     He was the CFO?

3      A.     Yes.

4      Q.     I don't have any further questions.

5             MR. COPELAND:  Let's just take a

6    couple minute break.

7             THE VIDEOGRAPHER:  We will now go off

8    the record at the time and date indicated on the

9    screen.

10            (Recess)

11            THE VIDEOGRAPHER:  We are now back on

12   the record as time and date indicated on the

13   screen.

14

15             REDIRECT EXAMINATION

16   BY MR. COPELAND:

17      Q.     Mr. Sutphin, you were asked some

18   questions about whether or not Mrs. Monteiro had

19   any -- if you had any knowledge if she had any

20   experience in marketing and/or public relations?

21      A.     Uh-huh.

22      Q.     My question, sir, is do you have any

23   understanding whether or not as Senior Friends

24   director her position would include duties which

25   would parallel the duties of a marketing --

1  director of marketing or director of public

2  relations?

3           MR. HANNAH:  Object to the form.

4           THE WITNESS:  I don't recall whether

5  they would parallel that or not.  Best I can

6  remember, her position along with others that I

7  had would do -- they had a newsletter that they

8  put out that they had to give input to or it was,

9  you know, if they had announcements in the paper,

10 they would put those in there, that type of thing,

11 if you want to call that parallel.

12

13 BY MR. COPELAND:

14      Q.    Okay.  What do you understand the

15 objectives of a director of marketing?  What is

16 the objectives of marketing the hospital?

17      A.    Well, it takes on various aspects.

18 It can vary anything from attending meetings and

19 so forth to placement of TV and media advertising.

20      Q.    All right.  Is one of the objectives

21 of a director of marketing an attempt to increase

22 the census of the hospital or --

23      A.    Well, it's the intent of it is to

24 promote the hospital, yes.

25      Q.    Okay.  Is one of the intents of the

142

1   director of Senior Friends to hopefully increase

2   the census of the hospital?

3         A.    Yes, sir.

4         Q.    Would you consider that a parallel

5   responsibility between the director of marketing

6   and director of Senior Friends?

7               MR. HANNAH:  Object to form.

8               THE WITNESS:  Not necessarily because

9   the seniors is dedicated to a seniors atmosphere

10  in terms of trying to in their own right draw

11  relationship with the senior community.

12

13  BY MR. COPELAND:

14        Q.    Out of the population of South

15  Florida, was there a specific population which was

16  more likely than not to utilize the services of

17  the hospital by age group?

18              MR. HANNAH:  Object to the form.

19  Calls for speculation.

20              THE WITNESS:  Its seniors are known

21  to use the hospital services more so than younger

22  people.

23

24  BY MR. COPELAND:

25        Q.    Did you have any -- as the CEO did

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

1   you place any importance on who it was more

2   important to market the hospital towards; i.e.,

3   seniors as opposed to the general public?

4       A.    I would have placed more emphasis on

5   the senior program than I would have the younger

6   population only by the fact I had closed the

7   obstetrical department.

8       Q.    Okay. Out of Mrs. Iaia or Mrs.

9   Monteiro, who would have been responsible for

10  marketing the hospital targeted toward seniors?

11      A.    Could very well have been both of

12  them. There could be some overlap in there.

13      Q.    Did you have any understanding as to

14  who was more successful?

15          MR. HANNAH:  Object to the form.

16  They did different jobs.

17          THE WITNESS:  I don't recall off the

18  top of my head.

19

20  BY MR. COPELAND:

21      Q.    You recall if the senior program

22  initiated by Mrs. Monteiro was successful?

23          MR. HANNAH:  Objection. Asked and

24  answered.

25          THE WITNESS:  It was successful.  I

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1    can't remember -- recall the numbers right now.

 2

 3    BY MR. COPELAND:

 4         Q.    Do you recall how many people

 5    participated in the Senior Friends Program?

 6         A.    No, I don't.

 7         Q.    Do you know if it was in excess of

 8    1,000?

 9              MR. HANNAH:  Objection to form.  She

10    says he doesn't know.

11              THE WITNESS:  I don't recall that

12    number.

13

14    BY MR. COPELAND:

15         Q.    Do you know how the Senior Friends

16    Program compared to other Senior Friends programs

17    within the South Florida area?

18         A.    I just don't recall the numbers.  No.

19         Q.    Now, when you made the decision to

20    eliminate Mrs. Iaia's position as you testified,

21    was your decision to eliminate that position in

22    any way tied to your decision to retain the

23    position of Senior Friends?

24         A.    Not that I recall.

25         Q.    I mean, in simpler terms, were you --
```

```
 1   did you couple Mrs. Iaia and Mrs. Monteiro's

 2   employment -- future employment status together?

 3   Were those decisions remotely tied at all?

 4               MR. HANNAH:  Objection.  He just says

 5   he doesn't recall.

 6               THE WITNESS:  Not that I recall.

 7

 8   BY MR. COPELAND:

 9       Q.    You talked a little bit about

10   benefits that you received while you were at

11   Pembroke Pines Hospital?

12       A.    Uh-huh.

13       Q.    Were those benefits which were paid

14   to you when the hospital was owned by Humana?

15       A.    Paid to me or available to the

16   employees?

17       Q.    Available to the employees.

18       A.    Yes.  There were benefits available

19   to the employees under Humana and Galen.

20       Q.    Okay.  Now, when Galen was sold to

21   either Columbia or an affiliated entity, do you

22   understand as to whether there was any change in

23   what benefits were offered?

24       A.    I don't recall whether they retained

25   the benefits or not.
```

```
 1          Q.      Okay.  Do you have any understanding

 2   as to what benefits were offered to employees

 3   subsequent to you leaving Pembroke Pines?

 4          A.      No, sir.

 5          Q.      Now, there was some discussion as to

 6   the process of making the decision on who was

 7   going to be included, and you talked about

 8   department of heads providing you with

 9   individuals.  And some questions were asked about

10   whether or not Mrs. Iaia was in fact participating

11   in the RIF as a department or the head of the

12   director of marketing.

13          A.      Yes.

14          Q.      Are there any specific reasons why

15   she did not participate in the --

16          A.      Well, first of all, it's kind of an

17   assumption on my part that she did not participate

18   only from the standpoint of her position and she

19   was the only one in the department being

20   eliminated.

21          Q.      Okay.  Do you understand if she had

22   any employees that reported to her or that she

23   supervised?

24          A.      Not that I recall.

25          Q.      Would an individual who didn't have
```

1    employees or director who did not have any

2    supervisory or employees they supervised

3    participate in the RIF discussions?

4         A.    Not necessarily.

5         Q.    And, Mr. Sutphin, can you state with

6    any certainty whether or not Mrs. Iaia's age had

7    anything to do with your decision to include her

8    in the reduction in force?

9              MR. HANNAH:  Objection.  Asked and

10   answered.

11             THE WITNESS:  I don't recall even

12   considering age.

13

14   BY MR. COPELAND:

15        Q.    Have you ever in any of the

16   reductions of forces which you've done or through

17   your various hospitals ever considered age?

18        A.    No, sir.

19             MR. HANNAH:  Objection.  Asked and

20   answered.

21             MR. COPELAND:  Just one second.

22             No further questions.

23             MR. HANNAH:  I have a couple.  Let's

24   have this marked.

25

```
 1                    (Plaintiff's Exhibit 10 was

 2                    marked for identification.)

 3

 4                    RECROSS-EXAMINATION

 5    BY MR. HANNAH:

 6         Q.    Mr. Sutphin, we talked about the

 7    various benefits that were available to the

 8    employees back in November of 1993, correct?

 9         A.    Uh-huh.

10         Q.    Right?

11         A.    Yes, sir.

12         Q.    Okay.  One of those benefits was

13    this -- at least to department managers and

14    department heads hospital incentive compensation

15    plan?

16         A.    It was under Galen and Humana.  I

17    can't recall what Columbia instituted.

18         Q.    Let's take a look at Plaintiff's

19    Exhibit Number 10.  Tell me if you recognize that

20    document.

21         A.    Okay.

22         Q.    All right.  Does that refresh your

23    recollection as to --

24         A.    It's very similar.

25         Q.    Who was offering the incentive plan?
```

1          A.      It's very similar to the one that was

2    under or looks to be very similar to the one that

3    was under Humana and Galen.

4          Q.      What was the period of effectiveness

5    of this Columbia Healthcare Corporation incentive

6    compensation plan?

7          A.      Four-month period ending December 31,

8    1993.

9          Q.      The period you were still at the

10   hospital?

11         A.      Yes.

12         Q.      And Jackie Iaia?

13         A.      Up until the RIF, yes.

14         Q.      So at that point in time the

15   incentive compensation plan was being administered

16   by Columbia Healthcare Corporation, being offered

17   by Columbia Healthcare Corporation to its

18   employees?

19              MR. COPELAND:  Objection.

20              THE WITNESS:  According to this.

21

22   BY MR. HANNAH:

23         Q.      You were covered by that Health

24   Plan -- excuse me -- by that hospital incentive

25   compensation plan?

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

```
 1          A.      I don't recall whether it was

 2    implemented at the time or not to me.  It says

 3    during that four-month period, so, yes, I would

 4    have been except I left the position.

 5          Q.      Do you have any reason to believe

 6    that hospital incentive compensation plan of

 7    Columbia Healthcare Corporation did not apply to

 8    the department managers at Pembroke Pines Hospital

 9    back in November of 1993?

10          A.      I have no reason to believe it, but I

11    just don't recall.

12          Q.      No further questions.

13               THE VIDEOGRAPHER:  That's the end of

14    this deposition as time and date indicated on the

15    screen.  Thank you.

16               MR. COPELAND:  You have the right,

17    Mr. Sutphin, to read your deposition once it's

18    transcribed in order to ensure that everything

19    she's taken down here is accurately taken down and

20    transcribed or you can waive that right.  You just

21    need to let the court reporter know so she can

22    make arrangements to get it to you once it is

23    transcribed.

24               THE WITNESS:  I would like to have a

25    copy of it.
```

1          MR. COPELAND:  They won't actually

2   provide you a copy.  They will probably tell you

3   to come to their office and read it.

4          THE WITNESS:  That will be fine.

5          MR. HANNAH:  So he wants to read.

6

7          (Whereupon, the deposition was

8       concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>C E R T I F I C A T E</u>

     I, the undersigned, JERRY SUTPHIN, do hereby certify that I have read the foregoing deposition taken in the case of Jacqueline Iaia vs Columbia Healthcare Corporation d/b/a Pembroke Pines Hospital on July 24, 2000, that, to the best of my knowledge, said deposition is true and correct (with the exception of the following corrections listed below.)

<u>Page</u>  <u>Line</u>   <u>Correction</u>

Date:

                     ------------------------------
                               Signature

```
                    C E R T I F I C A T E
```

STATE OF VIRGINIA

CITY OF NORFOLK, to-wit:


    I, Penny Commander Wile, RMR, a Notary Public

for the State of Virginia at Large, certify that

the foregoing deposition of JERRY SUTPHIN was duly

taken and sworn to before me at the time and place

and for the purpose in the caption mentioned, and

that the transcript is a true record of the

testimony given by the witness.

    I further certify that I am neither attorney

nor counsel for nor related to or employed by any

of the parties to the action in which this

deposition is taken, and further that I am not a

relative or employee of any attorney or counsel

employed by the parties hereto nor financially

interested in the action.

    Given under my hand this 29th day of July,

2000.


_____
                Notary Public


My commission expires:  January 31, 2001

WORD INDEX

**'10** [1] 4:6 | 49:8 36:1 9 [3] 36:10 35:23
**'74** [1] 8:6 | **1994** [4] 3:12 102:4 | 134:3
**'80** [1] 10:16 | 102:25 120:16 | **93** [1] 100:22
**'80s** [2] 22:9 121:22 | **1997** [1] 138:7 | **99** [1] 3:14
**'83** [1] 122:6 | **1998** [1] 3:13 | **a.m** [1] 4:3
**'9 i** [4] 28:14 28:18 | **1st** [2] 109:1 109:2 | **able** [1] 58:5
33:23 34:2 | **2** [8] 3:5 3:13 | **above** [1] 137:11
**'92** [12] 16:9 23:2 | 61:5 61:8 79:14 | **above-styled** [1]
28:11 28:15 28:19 | 89:14 89:19 113:23 | 2:9
32:10 33:19 33:23 | **2000** [5] 1:16 2:5 | **absence** [10] 80:4
34:2 34:13 37:15 | 4:3 152:7 153:21 | 80:8 80:12 80:16
38:7 | **2001** [1] 153:25 | 81:17 81:24 82:23
**'93** [14] 23:2 23:24 | **20s** [2] 127:19 128:15 | 83:19 84:1 84:21
24:5 32:11 33:19 | **22** [1] 4:3 | **absorbed** [1] 117:1
34:13 37:15 38:7 | **23455** [1] 73:6 | **accept** [1] 16:19
67:13 89:5 92:18 | **24** [3] 1:16 2:5 | **access** [2] 27:4
100:4 109:2 133:2 | 152:7 | 52:22
**'94** [2] 103:3 109:2 | **24th** [1] 4:3 | **accommodate** [2]
**'97** [1] 138:8 | **29th** [1] 153:20 | 16:24 16:4
**-vs** [1] 1:8 | **2nd** [2] 102:4 102:25 | **According** [1] 149:20
**00-6227-CIV-MORENO** | **3** [8] 3:6 3:14 | **account** [2] 124:15
[2] 1:3 4:8 | 66:2 66:3 99:12 | 125:6
**1** [9] 3:4 3:12 | 99:13 99:18 130:22 | **Accounting** [1] 8:2
53:15 53:20 53:21 | **30** [4] 6:16 25:19 | **accreditations** [1]
80:24 81:3 81:5 | 25:20 25:21 | 10:25
81:10 | **300** [1] 18:4 | **accurate** [8] 90:1
**1,000** [1] 144:8 | **301** [1] 18:4 | 90:7 115:17 116:1
**10** [5] 3:21 12:24 | **309** [2] 2:7 4:4 | 117:3 117:8 134:8
82:15 148:1 148:19 | **30s** [2] 127:19 128:16 | 134:12
**100** [1] 3:15 | **30th** [1] 7:2 | **accurately** [4] 114:23
**101** [1] 3:16 | **31** [3] 28:2 28:6 | 114:24 115:16 150:19
**107** [1] 3:17 | 28:9 149:7 153:25 | **accused** [2] 75:19
**11** [4] 3:5 3:7 | **4** [7] 3:7 3:15 | 75:22
4:3 68:24 | 68:25 69:1 100:10 | **achieve** [1] 45:21
**11-11-93** [1] 61:24 | 100:11 100:16 | **acknowledgment** [1]
**117** [1] 3:18 | **40** [4] 34:7 49:10 | 61:21
**119** [1] 3:19 | 49:15 49:16 | **acquired** [4] 24:6
**125** [3] 2:7 4:4 | **401-K** [6] 132:18 | 26:19 26:23 68:1
4:12 | 132:20 132:20 132:22 | **acquiring** [1] 24:1
**133** [1] 3:20 | 132:24 137:17 | **acquisition** [2] 62:25
**1348** [1] 73:5 | **40s** [3] 127:20 128:16 | 128:7
**140** [1] 2:16 | 130:15 | **act** [1] 20:3
**148** [2] 2:17 3:21 | **5** [10] 2:14 3:8 | **action** [3] 19:9
**16** [1] 3:6 | 3:12 3:16 70:3 | 153:15 153:19
**18** [1] 7:11 | 70:4 101:23 101:24 | **actions** [4] 35:5
**19** [1] 121:21 | 102:3 107:7 | 35:20 40:18 40:24
**1944** [1] 7:2 | **50** [1] 133:14 | **actual** [5] 24:12
**1974** [2] 8:1 8:7 | **50s** [1] 127:20 | 24:16 82:24 85:10
**1975** [1] 8:25 | **53** [1] 3:4 | 86:14
**1979** [1] 10:16 | 55 [1] 21:3 | **acute** [2] 18:4 18:5
**1984** [1] 10:11 122:6 | **6** [4] 3:13 3:17 | **Adamson** [8] 63:15
**1989** [1] 10:2 | 107:23 108:3 | 77:13 77:14 83:9
**199** [1] 138:7 | **61** [1] 3:5 | 96:9 96:12 104:22
**1991** [3] 3:7 68:24 | **66** [1] 3:6 | 127:16
69:19 | **69** [1] 3:7 | **addition** [1] 21:20
**1993** [27] 3:5 | **7** [3] 3:18 117:15 | **additional** [2] 71:4
3:6 11:9 32:7 | 117:20 | 129:1
61:14 79:20 82:13 | **70** [1] 3:8 | **address** [2] 4:3
101:1 101:14 103:16 | **72** [1] 2:15 | 73:4 73:7
106:7 106:22 111:9 | **8** [4] 3:19 61:6 | **addressed** [1] 66:10
111:15 112:2 112:15 | 118:20 118:25 | **adjust** [2] 12:14
121:6 121:21 124:6 | **81** [1] 3:12 | 13:2 36:4
124:6 127:5 131:16 | **89** [1] 3:13 | **adjusted** [1] 122:17
132:8 137:17 148:8 | | **administered** [1]
| | 149:15

**administrator** [1]
11:3
**ads** [1] 20:18
**advertising** [5] 19:22
20:15 48:14 97:21
141:19
**advise** [1] 60:13
**advised** [2] 60:20
67:2
**affect** [2] 33:9
50:12
**affected** [3] 33:2
95:3 95:18
**affecting** [1] 13:23
**affects** [1] 92:10
**affiliated** [1] 11:5
29:6 145:21
**afterwards** [1] 128:5
**again** [2] 9:5
9:8 42:16 42:17
62:14 70:24 77:10
103:13 113:23 114:2
114:5 121:7
**against** [1] 73:2
**age** [23] 7:3 7:11
14:22 14:22 14:25
21:2 21:3 42:8
44:22 49:1 49:7
49:19 53:5 59:21
64:14 129:23 130:4
130:9 130:10 142:17
147:6 147:12 147:17
**age-related** [2] 42:3
57:12
**agency** [7] 6:13
6:15 6:19 137:21
13:22 137:24 139:3
**ago** [6] 6:14 20:25
38:11 83:7 93:6
101:21
**agree** [1] 69:17
**agreed** [1] 16:19
**al** [2] 4:24 115:10
**alcoholic** [1] 92:15
**alliance** [3] 20:5
21:9 21:12
**alluded** [1] 48:4
**along** [1] 114:16
141:6
**always** [1] 50:15
**amount** [1] 13:22
31:23 64:1
**and-a-half** [1] 87:12
**announcements** [1]
141:9
**answer** [9] 15:9
28:22 71:21 78:20
78:23 82:4 91:3
93:5 97:6
**answered** [9] 68:19
109:20 110:5 110:19
125:20 131:20 143:24
147:10 147:20
**answers** [3] 72:9
74:13 74:18
**anytime** [1] 6:7

**anyway** [1] 194:2 195:2,245
**apologize** [1] 61:21
**appear** [2] 71:23
100:16
**APPEARANCES** [1]
1:19
**appeared** [1] 71:22
**application** [2] 3:18
118:8
**applied** [1] 137:5
**apply** [1] 150:7
**appointments** [1]
86:3
**appraisal** [2] 3:17
108:8
**apprised** [1] 68:16
**approach** [1] 35:11
**appropriate** [1] 47:1
**approximate** [1]
38:12
**April** [1] 7:2
**area** [10] 17:1 17:2
17:3 17:5 112:12
112:13 115:22 116:7
135:14 144:17
**areas** [3] 35:19 47:10
115:15
**Argumentative** [9]
85:6 91:9 93:16
93:25 101:7 107:1
111:20 113:16 124:19
**arrangements** [1]
150:22
**article** [4] 3:16
102:3 102:4 102:10
**aspect** [3] 88:6
97:20 97:24
**aspects** [2] 97:19
141:17
**assessment** [1] 69:18
**assigning** [1] 89:11
115:3
**assistant** [1] 78:6
**associated** [2] 2:6
5:6 43:21
**association** [6] 21:1
21:4 52:4 107:12
107:20 109:14
**assume** [1] 101:12
**assumed** [2] 88:9
90:16
**assumption** [1] 146:17
**assurance** [1] 120:6
**assuring** [1] 11:1
**atmosphere** [1] 142:9
**attempt** [4] 21:22
65:6 139:5 141:21
**attend** [1] 19:23
**attended** [3] 7:23
7:25 52:1
**attending** [2] 8:12
141:18
**attitude** [4] 58:18
58:25 59:5 59:21

Case 0:00-cv-06227-FAM   Document 56   Entered on FLSD Docket 11/06/2000   Page 155 of 245

Case 0:04-cv-06227-FAM Document 66 Entered on FLSD Docket 12/19/2006 Page 156 of 245

**attorney** [1]   75:5   75:10   153:13   153:17

**attorneys** [1]   73:1

**attractive** [2]   129:19   129:25

**August** [10]   28:2
28:5   28:9   28:14
28:19   32:11   33:23
34:13   37:15   38:7

**author** [1]   62:22

**authoring** [1]   103:24

**authority** [1]   18:20
45:9   45:17

**available** [10]   136:7
136:16   136:21   136:23
137:9   137:15   145:15
145:17   145:18   148:7

**Aventura** [5]   9:10
9:20   9:21   22:5
29:24

**Average** [1]   37:1

**aware** [8]   40:14
56:12   84:16   84:19
85:12   91:23   120:11
137:14

**awareness** [1]   35:12

**away** [1]   112:22

**B** [1]   3:1

**Bachelor** [1]   8:1

**background** [1]   7:18

**bad** [1]   64:17

**based** [5]   42:7
64:13   132:4   135:13
136:7

**basis** [9]   25:15   25:16
25:18   31:13   32:1
37:20   86:2   86:2
86:8

**Bayside** [1]   10:4
22:5   22:8

**Beach** [7]   5:24
9:2   9:8   9:10
10:5   10:6   73:5

**became** [6]   9:5
23:19   24:16   30:23
65:4   87:6

**Becker** [2]   1:20
4:18

**become** [3]   64:19
109:16   135:9

**becoming** [1]   23:22

**bed** [2]   18:4   25:4

**beds** [4]   25:20   27:16
37:6   97:16

**beginning** [1]   95:7

**behalf** [11]   1:15
3:3   3:11   4:18
5:1   20:10   40:6
48:20   65:16   65:23
107:8

**behind** [4]   27:6
88:13   105:25   116:9

**beliefs** [1]   48:9

**bell** [2]   79:3   120:3

**belong** [1]   21:3

**below** [1]   51:6

**beneficial** [2]   21:11
48:17

**benefits** [10]   61:19
132:6   145:10   145:13
145:18   145:23   145:25
146:2   148:7   148:12

**best** [22]   13:22   26:18
30:7   34:8   51:19
55:15   56:4   76:3
91:13   93:18   99:24
116:2   116:13   116:15
123:25   129:18   129:20
130:7   131:25   132:21
141:5   152:7

**better** [3]   12:10
47:10   92:5

**between** [17]   12:23
12:24   16:21   20:5
20:7   21:9   27:5
30:14   31:6   31:7
31:12   32:6   33:14
34:10   38:25   130:13
142:5

**beverages** [1]   92:15

**beyond** [1]   55:17

**big** [2]   35:15   47:5

**biggest** [1]   31:5

**billing** [1]   21:7

**birth** [1]   7:1

**bit** [9]   7:18   16:4
17:25   22:15   32:9
48:9   51:11   68:7
145:9

**blind** [1]   14:22

**bonus** [2]   136:14
136:15

**bought** [1]   24:6

**Boulevard** [2]   2:7
4:4   4:13

**Bowen** [1]   40:1

**break** [1]   15:11
140:6

**breakfast** [1]   73:25

**bring** [1]   62:13

**brings** [1]   123:19

**brought** [1]   120:20

**Broward** [13]   17:1
17:4   17:13   26:20
29:3   29:5   29:9
29:19   30:8   33:12
33:15   123:7   123:9

**build** [1]   27:10

**building** [2]   27:7
86:12

**buildings** [1]   27:5

**built** [1]   27:3

**Burr** [1]   4:11

**business** [3]   106:12
106:13   106:23

**C** [8]   1:23   6:24
67:21   121:8   152:1
152:1   153:1   153:1

**calls** [8]   38:16   56:17
59:6   63:6   65:7
101:15   102:20   142:19

**campus** [1]   51:6

**candidate** [1]   111:4

**candidates** [1]   44:1

**cannot** [18]   27:20
28:21   34:5   38:20
40:21   43:23   60:9
76:16   82:4   88:12
90:9   94:1   95:1
95:15   97:6   98:16
119:6   129:14

**capable** [2]   115:14
131:7

**caption** [1]   153:10

**care** [8]   11:1   13:24
18:4   18:5   18:6
26:8   126:13   126:15

**Carol** [4]   76:11
77:18   77:21   126:24

**case** [14]   1:3   4:7
12:11   16:19   42:17
46:22   59:2   73:2
74:23   80:22   84:7
92:22   106:6   152:5

**cases** [7]   12:8   12:8
15:15   15:20   34:24
35:4   74:15

**caught** [1]   33:14

**caused** [1]   12:13

**ceased** [1]   105:23

**census** [19]   25:9
25:16   25:17   25:21
25:23   26:1   26:4
26:10   26:16   27:11
28:23   33:18   33:23
33:24   34:1   47:7
48:1   141:22   142:2

**Center** [2]   9:11
10:13

**CEO** [28]   9:13
9:16   9:18   9:22
10:8   10:22   11:2
12:1   12:18   14:12
16:8   16:11   16:16
16:18   17:19   17:24
18:19   19:6   27:14
30:18   35:5   47:14
53:11   55:10   67:12
68:11   85:23   142:25

**certain** [3]   76:19
97:10   136:8

**certainly** [6]   21:13
94:20   95:20   136:21
138:20   139:5

**certainty** [1]   147:6

**certify** [1]   152:4
153:7   153:13

**CFO** [2]   127:1   140:2

**chairman** [1]   40:8

**challenge** [1]   16:23

**change** [6]   22:7
23:21   30:19   31:15
88:3   145:22

**changed** [1]   23:1

**changes** [4]   31:20
32:13   35:6   76:19

**changing** [1]   32:3
110:25

**characterization** [1]   39:8

**characterize** [1]   70:25

**charges** [1]   75:12

**chat** [1]   56:14

**check** [1]   72:4

**Cheryl** [1]   79:6

**chief** [3]   6:22   19:2
139:19

**child** [1]   127:8

**children** [3]   7:7
7:9   7:14

**chosen** [1]   62:15

**Chris** [1]   4:23

**CHRISTOPHER** [1]
1:23

**circumstance** [3]
64:22   113:6   119:6

**circumstances** [9]
22:25   47:3   47:7
66:19   67:18   88:5
88:12   90:9   92:8

**CITY** [1]   153:4

**claims** [1]   75:7

**Claudia** [5]   76:23
77:15   94:17   128:8
128:12

**close** [2]   36:16   121:13

**closed** [1]   29:9
29:19   36:19   143:6

**closing** [1]   26:19

**college** [2]   7:22
8:1

**colleges** [1]   7:23

**Columbia** [48]   1:9
4:5   8:18   23:25
24:6   24:15   24:18
36:12   38:25   39:4
39:12   39:23   40:3
40:5   40:6   40:8
40:17   41:6   41:17
42:1   43:21   43:22
62:25   63:4   63:9
73:2   75:6   75:11
76:18   77:2   83:22
85:2   103:10   105:11
105:14   106:3   106:8
106:10   106:18   106:23
128:7   145:21   148:17
149:5   149:16   149:17
150:7   152:6

**combine** [1]   60:6

**combined** [8]   86:23
90:5   91:5   93:22
94:2   96:23   114:19
115:24

**combining** [2]   94:8
113:11

**comfort** [2]   64:25
65:6

**coming** [2]   22:4
39:15

**Commander** [2]   2:3
153:6

**commencing** [2]
2:5   101:13

**corporate** [2]   12:15

**comment** [11]   40:18
56:16   57:16   57:19
57:20   58:7   58:9
58:17   58:22   59:19
59:20

**comments** [6]   55:19
57:11   57:12   58:3
58:24   71:19

**commission** [1]   153:25

**common** [1]   13:7

**commonly** [2]   9:15
12:6

**communicated** [1]
78:13

**community** [6]   19:22
20:6   21:9   21:20
52:23   142:11

**companies** [2]   23:7
30:23

**company** [6]   6:21
23:8   105:8   108:15
132:23   133:13

**compared** [2]   144:16

**compensate** [3]   13:3
35:18   46:1

**compensation** [9]
3:21   136:4   136:10
137:18   148:14   149:6
149:15   149:25   150:6

**competition** [4]   17:8
17:10   33:5   37:10

**competitor** [1]   17:14

**complacent** [1]   58:19

**completely** [1]   86:12

**complied** [2]   79:17
89:21

**comport** [1]   69:10

**Compound** [1]   15:5

**concern** [1]   66:11

**concluded** [1]   151:8

**condition** [2]   40:13
47:16

**conditions** [3]   35:7
40:15   66:20

**conference** [1]   55:16

**conjunction** [2]   60:7
96:17

**Connie** [1]   78:25

**consensus** [1]   82:2

**consequently** [2]
36:3   115:24

**consider** [7]   33:5
35:21   36:5   42:11
55:4   88:19   130:7
132:2   142:4

**consideration** [16]
14:23   15:3   15:13
15:19   44:22   45:2
46:20   49:20   49:23
50:2   91:11   93:14
116:17   124:14   124:25
125:5

**considerations** [1]
125:7

**considered** [3] 14:25
132:5   147:17

**considering** [3] 14:25
110:2   147:12

**consistent** [2] 133:5
133:8

**consultation** [3]
42:20   44:4   51:6

**consulting** [2] 6:21
138:6

**contact** [1] 67:2
85:24   86:5

**contacted** [1] 75:9

**continue** [8] 53:1
87:16   87:23   88:16
97:2   98:5   123:11
128:20

**continued** [2] 88:20
98:22

**continuing** [2] 8:9
33:21

**contributed** [2] 51:2
132:24

**contribution** [1]
133:10

**control** [1] 14:13

**conversation** [3]
89:11   98:17   98:19

**conversations** [3]
64:15   72:6   72:8

**cooperative** [1] 39:16

**coordinate** [1] 39:15

**Copeland** [79] 1:23
2:14   2:16   4:23
4:23   5:15   13:13
14:11   15:8   20:21
22:1   26:13   27:24
34:21   37:5   38:22
39:10   41:4   41:15
41:24   47:24   53:19
53:24   58:1   58:15
59:13   59:18   61:11
63:1   63:13   65:11
66:6   68:22   69:4
69:16   70:1   70:7
72:20   73:19   79:12
80:1   85:5   91:8
93:15   93:24   101:6
101:15   102:20   103:18
105:10   106:25   109:19
110:4   110:18   111:19
113:15   114:10   118:1
124:8   124:18   125:19
125:22   131:19   138:19
139:7   140:5   140:16
141:13   142:13   142:24
143:20   144:3   144:14
145:8   147:14   147:21
147:19   150:16   151:1

**copied** [2] 84:10
84:12

**copy** [3] 70:20   150:25
151:2

**corporate** [3] 23:4
23:5   31:10

**corporation** [23]
1:9   1:10   4:6
4:7   11:7   11:15
11:17   23:13   23:14

29:16   30:1
103:15   104:3   105:19
105:22   105:24   106:1
149:5   149:16   149:17
150:7   152:6

**correct** [42] 8:7
11:4   25:18   28:15
28:16   30:3   39:2
39:6   46:13   84:8
84:21   86:20   90:25
91:1   95:23   96:1
96:5   97:13   97:25
98:6   99:23   100:7
100:24   101:5   102:5
102:7   106:24   107:4
108:18   108:22   109:3
110:17   113:1   114:25
115:5   115:19   120:19
121:11   126:20   137:12
148:8   152:9

**Correction** [1] 152:12

**corrections** [1] 152:10

**correctly** [2] 52:2
123:5

**cosmetics** [1] 25:6

**cost** [1] 13:20

**costs** [9] 35:17   35:20
35:25   35:25   36:1
40:22   120:21   121:1
121:24

**counsel** [8] 1:21
1:24   4:15   4:20
53:16   75:17   153:14
153:17

**County** [4] 17:1
17:5   26:21   33:13

**couple** [4] 45:8
140:6   145:1   147:23

**course** [8] 8:14
13:7   43:3   43:11
44:8   65:18   65:19
108:3

**court** [6] 1:1   2:6
4:9   5:2   5:6
150:21

**coverage** [2] 129:1
132:11

**covered** [1] 149:23

**create** [3] 20:5
21:8   21:12

**cross** [1] 20:7

**Cross-examination** [2]
2:15   72:23

**current** [2] 6:11
7:3

**CURTIN** [1] 1:22

**customers** [1] 97:16

**cut** [1] 58:5

**cutting** [1] 35:17

**D** [3] 6:24   67:21
121:8

**d/b/a** [5] 1:9   4:6
73:2   106:15   152:6

**Dade** [2] 17:1   26:20

**daily** [3] 25:16   25:18
86:2   86:8   86:9

**Dan** [1] 39:25

**date** [6] 3:1
9:24   24:5   33:1
67:16   72:14   72:18
79:19   92:17   100:3
100:21   102:4   116:13
140:8   140:12   150:14
152:22

**dated** [9]
3:6   3:7   3:12
3:13   61:14   61:24
68:23   69:18

**dates** [2] 17:21   121:12

**daughter** [1]
7:15

**David** [1]
126:21

**days** [1] 6:16

**dealing** [1]
58:24

**dealings** [1]
103:5

**December** [9] 3:7
68:23   69:19   100:22
101:1   101:14   109:1
109:2   149:7

**decide** [1] 95:14

**decided** [2] 42:14
119:25

**deciding** [8] 46:4
46:9   52:8   93:3
95:11   95:25   96:22
124:15

**decision** [39] 13:14
14:17   23:4   23:5
36:24   43:4   45:11
45:15   46:15   49:5
49:20   49:25   50:4
50:21   51:2   51:4
53:6   59:24   60:1
60:5   62:11   62:14
78:14   78:17   81:22
87:15   95:14   96:15
110:16   111:16   115:11
116:18   119:5   135:13
144:19   144:21   144:22
146:6   147:7

**decision-making** [2]
94:7   94:25

**decisions** [3] 13:8
60:6   106:20   145:3

**decline** [6] 12:11
12:12   32:20   33:18
33:20   34:4

**declines** [1] 31:14

**decrease** [4] 33:21
34:7   46:2   48:2

**Decreased** [1] 48:3

**dedicated** [1] 142:9

**defendant** [5] 1:11
1:15   1:24   3:3
74:23

**Defendant's** [15]
53:15   53:20   53:21
61:5   61:6   61:8
66:2   66:3   68:24
69:1   70:3   70:4
80:24   107:6   130:22

**defendants** [1] 5:1

**defense** [1] 4:21

**define** [1] 11:22

**degrees** [1] 7:23

**DELL** [1] 1:22
   67:6

**dental** [1]
   67:6

**department** [37] 13:21
13:25   14:6   18:13
18:15   18:16   35:9
35:14   36:17   36:19
37:7   38:4   42:19
44:5   94:10   94:11
94:13   94:24   95:2
95:19   96:18   112:25
114:16   114:18   119:24
136:7   136:18   137:6
137:15   137:16   143:7
146:8   146:11   146:19
148:13   148:14   150:8

**departments** [3]
14:5   36:14   94:15

**depend** [1] 13:24
133:10

**depending** [2] 50:14
86:3

**deposition** [15] 1:14
2:1   4:2   4:14
61:7   71:23   81:4
95:8   150:14   150:19
151:7   152:5   152:8
153:8   153:16

**Depositions** [1] 2:5

**derogatory** [1] 150:24

**describe** [2] 123:22
124:2

**description** [4] 3:2
3:20   134:6   134:8

**deserved** [1] 66:24

**detail** [1] 25:2

**details** [5] 71:11
71:14   83:9   116:12
135:23

**determine** [6] 24:21
92:4   93:8   112:18
119:13   123:9

**determined** [2] 114:17
116:6

**determining** [4] 13:15
13:18   117:24   119:2

**develop** [2] 27:8
50:8   56:24

**developed** [2] 20:25
27:8   48:19

**different** [6] 16:23
35:11   43:15   56:23
107:14   143:16

**differently** [1] 56:20

**diligence** [3] 24:14
39:5   40:7

**direct** [11] 2:14
5:14   14:13   18:19
33:5   44:13   44:25
45:8   45:12   45:16
53:9

**directed** [2] 21:22
71:19

**direction** [1] 45:6

**directives** [2] 43:20
44:21

**directly** [13] 11:11
30:14   30:20   31:24

45:1   45:2   53:25
55:9   55:12   55:18
119:16   119:18   121:9

**director** [96] 6:23
9:6   9:9   9:11
9:12   9:15   9:21
10:18   10:22   19:1
19:3   19:3   19:7
19:16   19:19   19:25
20:4   20:8   20:8
20:17   40:1   44:14
44:17   46:5   46:10
46:13   47:14   50:21
51:5   51:15   51:18
51:23   53:7   56:22
59:25   60:2   60:5
66:12   67:24   68:10
69:10   76:8   76:12
77:1   77:18   78:3
79:5   79:8   83:10
85:24   86:19   86:23
87:7   87:25   88:6
88:10   88:16   88:22
90:2   91:6   93:10
93:10   94:21   96:3
99:4   99:22   100:6
101:3   102:14   103:1
104:20   104:25   107:14
107:17   109:13   109:16
110:11   112:12   112:21
114:18   114:20   115:13
116:11   120:15   134:6
139:23   140:24   141:1
141:1   141:15   141:21
142:1   142:5   142:6
146:12   147:1

**directors** [13] 14:4
37:19   43:6   44:8
44:21   44:25   56:15
57:5   58:3   58:17
76:4   137:6   137:16

**disability** [2] 133:18
133:20

**discretion** [1] 129:6

**discrimination** [2]
75:13   75:20

**discuss** [1] 74:6

**discussed** [1] 51:8

**discussion** [7] 69:14
73:20   73:21   74:1
74:4   97:7   146:5

**discussions** [6] 38:25
40:12   41:12   71:15
96:13   147:3

**disfavored** [1] 57:13

**dislikes** [1] 49:24

**dissolving** [1] 106:1

**district** [5] 1:1
1:1   4:9   4:9
17:13

**division** [5] 1:2
4:10   23:6   23:6
33:15

**divisions** [1] 18:25

**document** [24] 53:18
53:25   62:1   62:4
63:17   63:21   66:7
66:8   70:9   70:16
79:13   80:2   81:10
81:12   81:15   89:20

89:23    100:9    108:4
117:20   118:25   134:3
134:4    148:20

**documentation** [10]
103:9    103:14   103:25
104:2    104:6    104:8
104:11   104:15   113:8
113:10

**documents** [1]    123:18
**doesn't** [5]    59:7
78:4    108:13   144:10
145:5
**dollar** [1]    13:22
**dollars** [1]    28:22
**done** [8]    25:16    25:17
45:25    83:15    83:24
119:7    122:15   147:16
**doors** [2]    29:9
29:19
**down** [8]    15:11
27:9    36:14    39:4
44:16    87:15    150:19
150:19
**draw** [1]    142:10
**drink** [1]    92:15
**driveway** [1]    86:13
**Dube'** [1]    1:3
**due** [5]    24:14    32:23
39:5    40:7    62:18
**duly** [2]    5:9    153:8
**during** [18]    6:7
28:13    32:25    34:12
34:16    36:15    37:14
38:6    47:25    48:1
51:8    53:10    65:5
79:9    86:6    114:8
114:14   150:3
**duties** [21]    16:15
19:15    88:9    90:12
90:17    98:23    99:3
100:5    101:2    101:13
112:1    115:14   120:25
134:9    134:19   134:23
135:1    135:5    135:11
140:24   140:25

**E** [5]    3:1    152:1
152:1    153:1    153:1
**early** [4]    11:9    23:2
32:7    121:21
**easier** [1]    114:7
**editor** [2]    100:1
100:19
**education** [3]    7:19
8:10    8:10
**educational** [1]    21:5
**Edwards** [4]    75:2
75:3    113:18   117:11
**Edwards'** [1]    113:21
**effect** [9]    41:18
42:1    47:16    50:7
57:12    57:17    58:4
58:24    59:20
**effected** [1]    24:11
**effectiveness** [1]
149:4
**efforts** [2]    52:17
64:25

**either** [4]    34:17
35:21    110:9    145:21
**elderly** [1]    130:12
**element** [1]    116:22
**eliminate** [9]    36:13
42:7    60:1    60:5
88:24    134:15   134:22
144:20   144:21
**eliminated** [20]    61:3
86:16    89:1    90:5
90:8    93:18    93:22
94:16    96:16    104:7
115:25   116:5    116:11
119:25   126:3    134:15
134:22   135:3    138:14
146:20
**eliminating** [7]    15:24
15:25    41:7    94:9
96:13    96:24    134:17
**elimination** [3]    116:25
135:7    135:10
**emergency** [7]    18:9
18:11    27:4    32:22
33:2    34:19    34:23
**emotional** [1]    65:5
**emotionally** [1]    64:19
**emphasis** [2]    135:14
143:4
**employ** [1]    56:2
**employed** [11]    6:9
10:4    13:15    14:14
30:3    30:6    56:8
106:8    106:9    153:14
153:18
**employee** [16]    3:4
3:8    3:17    23:19
23:22    65:20    93:4
94:14    106:22   115:12
117:2    126:15   132:3
132:5    133:21   153:17
**employees** [27]    41:8
44:23    45:3    50:8
58:18    64:9    64:18
64:19    65:16    71:7
81:15    83:18    83:20
95:3    119:13   132:7
133:16   133:19   145:16
145:17   145:19   146:2
146:22   147:1    147:2
148:8    149:18
**employer** [1]    22:17
**employment** [15]
3:18    6:12    6:20
8:15    8:16    8:22
50:3    67:12    67:19
87:16    88:20   118:7
121:7    145:2    145:2
**enacted** [1]    43:13
**encompasses** [1]
18:6
**end** [6]    28:5    36:3
67:17    68:4    95:5
150:13
**ending** [2]    28:4
149:7
**engineering** [1]    78:3
**enjoyable** [1]    126:16
**ensure** [1]    150:18

**entailed** [1]    103:16
**entire** [3]    24:6
32:21    88:25
**entirely** [1]    23:11
**entity** [3]    24:16
24:17    145:21
**equated** [1]    9:17
**equates** [1]    25:13
**equitable** [1]    44:18
**ESQUIRE** [3]    1:20
1:23    1:24
**essence** [1]    21:21
**et** [1]    4:24
**evaluate** [1]    54:19
**evaluation** [17]    3:4
3:8    4:20    54:2
54:4    54:8    54:14
55:3    55:5    55:7
70:11    70:13   70:25
107:8    108:17   108:21
132:4
**evaluations** [2]    53:10
71:4
**events** [1]    19:22
125:14
**evidence** [1]    2:8
**exact** [18]    12:21
17:21    23:3    24:5
27:20    28:21   28:24
29:16    31:19   32:8
32:19    34:5    38:20
52:4    67:16   73:4
82:14    136:13
**exactly** [5]    22:10
40:2    62:23   107:18
136:9
**examination** [5]
2:2    2:14    2:16
5:14    140:15
**examined** [1]    5:9
**example** [1]    25:19
**excellent** [1]    132:2
**except** [1]    150:4
**exception** [1]    152:9
**excess** [1]    144:7
**Exchange** [2]    23:16
23:16
**exclude** [1]    45:16
**excluded** [1]    52:13
**excuse** [5]    105:20
112:12   122:1    123:16
149:24
**executive** [12]    6:22
6:23    9:6    9:9
9:11    9:12    9:15
9:21    10:18   10:21
67:24    85:24
**Exhibit** [41]    53:15
53:20    53:21   61:5
61:6    61:8    66:2
66:3    68:24   69:1
70:3    70:4    79:13
80:24    81:3    81:5
81:9    89:14   89:19
99:12    99:13   99:17
100:10   100:11   100:15
101:23   101:24   102:2

**107:7    107:23   108:2**
113:22   117:15   117:19
118:20   118:25   130:22
133:23   134:2    148:1
148:19
**exist** [4]    20:14    21:7
105:23   113:11
**existed** [2]    31:6
31:8
**expense** [1]    36:2
**expenses** [2]    12:9
13:3
**experience** [23]    12:1
12:17    22:2    47:25
48:13    48:18   50:15
91:14    91:18   91:3
111:8    111:10   111:13
111:18   112:6   112:8
112:11   112:13   116:7
116:14   126:17   126:19
140:20
**experienced** [1]    115:22
**expires** [1]    153:25
**explain** [9]    9:19
10:20    11:22   12:4
17:25    19:18   25:11
48:8    61:18
**extent** [1]    97:10
**extremely** [1]    51:19
**F** [2]    152:1    153:1
**facelift** [1]    41:19
**facilities** [6]    21:10
21:17    21:19   31:13
52:19    122:18
**facility** [21]    10:25
11:1    12:9    13:4
16:18    18:1    19:20
20:6    24:13   25:4
25:6    25:14   26:11
26:17    27:21   32:21
34:25    46:2    52:21
76:19    84:5
**facility's** [1]    36:2
**fact** [21]    27:6    32:2
32:24    48:4    50:10
52:12    60:16   60:25
64:7    64:17   65:12
65:21    77:2    80:22
99:25    110:9   110:14
113:25   135:13   139:2
143:6    146:10
**factor** [4]    15:2
15:12    15:18   62:11
**factors** [5]    15:21
34:11    46:20   50:18
50:20
**facts** [1]    90:1
**fair** [5]    12:21   14:3
44:18    120:24   134:11
**fairly** [2]    22:12
29:15    47:4    127:8
**familiar** [3]    11:20
25:8    77:3
**far** [14]    7:21    11:15
20:13    23:13   23:17
23:22    47:11   52:14
87:21    105:9   106:11
107:4    107:5   133:8

**fashion** [1]    52:21
**feedback** [1]    71:7
**felt** [7]    13:19    21:16
47:1    52:19   52:24
64:13    66:24
**female** [5]    56:7
56:15    56:21   57:7
65:3
**few** [2]    29:24
**field** [3]    8:22    131:13
131:17
**Fifth** [1]    70:20
**Fifty-six** [1]    7:4
**fighting** [1]    32:20
**fill** [1]    27:15
**filled** [1]    19:6
19:11
**final** [1]    43:4
**finance** [5]    9:2
9:4    19:1    35:3
139:23
**financial** [5]    26:10
30:24    40:12   40:14
47:16
**financially** [4]    31:3
33:8    37:21   153:18
**fine** [3]    16:6    96:20
151:4
**finish** [1]    78:19
78:22    82:9    90:14
**firing** [1]    41:7
**firm** [1]    4:11
**first** [15]    5:9    13:17
26:8    53:16   54:11
62:8    62:8    62:9
62:19    69:5   104:10
114:7    115:11   139:5
146:16
**fiscal** [5]    27:25
28:13    28:18   28:19
32:10    33:18   34:13
37:15
**five** [5]    12:24   54:23
54:25    55:1   122:9
**flirt** [2]    56:10   120:10
**flirted** [1]    56:7
**Florida** [8]    1:1
4:10    6:4    6:7
9:10    103:6   142:15
144:17
**following** [2]    116:25
152:9
**follows** [1]    5:10
**force** [68]    11:24
12:15    13:1    13:23
14:2    14:19   14:21
15:4    15:14   36:6
36:11    42:1    42:14
42:24    43:21   44:1
45:17    45:22   46:16
46:21    47:2    49:6
49:21    50:5    52:9
52:16    60:14   64:13
65:4    67:3    67:15
76:1    76:15   76:17
78:8    79:10   81:17
81:25    82:6    82:13

86:15    87:15
88:4    92:6    94:8
95:12    98:13    103:11
103:17    105:7    106:21
109:18    119:3    119:14
120:22    121:2    121:10
121:15    121:23    122:4
122:12    122:15    124:25
127:13    128:2    138:16
147:8

**forces** [4]    64:17
65:17    83:14    147:16

**foregoing** [2]    152:4
153:8

**foreign** [2]    1:10
4:7

**form** [23]    13:11
20:11    25:25    34:14
47:18    54:2    54:8
57:23    58:10    62:21
103:18    105:10    106:25
108:7    108:8    118:1
118:3    124:8    141:3
142:7    142:18    143:15
144:9

**formal** [1]    8:10

**formed** [2]    22:11
137:23

**formerly** [1]    90:17

**forming** [1]    137:24

**Fort** [1]    4:10

**forth** [10]    24:4
32:22    47:12    52:18
69:11    69:18    86:4
132:14    138:7    141:19

**found** [3]    24:25
48:16    139:2

**four-month** [2]    149:7
150:3

**fourth** [3]    61:20
70:19    70:22

**frankly** [1]    76:10

**Friday** [2]    73:22
74:3

**Friends** [39]    19:12
20:1    20:4    20:9
20:15    20:23    22:3
46:10    51:18    51:24
53:6    59:25    60:8
68:10    69:10    71:10
86:23    87:8    88:17
88:23    91:7    91:18
91:20    93:10    109:17
110:12    114:20    115:13
115:23    116:7    116:15
122:24    140:23    142:1
142:6    144:5    144:15
144:16    144:23

**front** [1] 117:21

**fronts** [1]    52:18

**frustration** [1]    58:12

**FT** [1]    1:2

**function** [9]    10:21
16:17    97:3    97:18
114:18    115:12    115:23
116:8    122:24

**functioning** [1] 10:24

**functions** [6]    20:1

20:9    60:7    71:9
71:20    98:10

**funds** [1]    47:9

**furthest** [1]    33:11

**future** [5]    21:16
47:12    50:25    135:15
145:2

**Galen** [29]    23:9
23:13    23:19    23:22
24:7    30:22    30:23
31:1    31:6    31:9
32:6    34:10    36:9
38:24    38:25    39:13
63:4    63:10    75:11
103:10    105:16    105:19
105:22    105:23    106:4
145:19    145:20    148:16
149:3

**general** [7]    18:7
35:24    61:17    82:1
82:2    83:2    143:3

**generalities** [2] 40:24
42:18

**generally** [13]    12:7
12:14    13:2    13:17
38:8    44:14    45:5
45:5    50:13    64:3
66:23    119:21    131:9

**generated** [2]    103:9
103:14

**generating** [1]    13:4

**generic** [1]    108:14

**gentleman** [1]    40:6

**given** [4]    81:15
113:17    153:12    153:20

**giving** [5]    64:17
98:12    109:22    113:4
126:8

**goals** [5] 26:10    45:21
45:23    50:25    136:8

**goes** [1]    119:14

**gone** [2]    34:24    43:15

**good** [11]    25:25
31:12    51:19    52:21
55:4    65:20    71:2
96:20    124:1    124:4
132:5

**grading** [1]    54:19

**graduated** [2]    8:1
8:6

**graduating** [1]    8:18

**greatly** [1]    8:18

**Greenbrier** [4]    9:7
10:13    121:16    121:17

**group** [3]    6:24
67:25    142:17

**grow** [2] 48:20    53:1

**growing** [2]    21:13
52:3

**grows** [1]    21:15

**growth** [1]    52:5

**guess** [17]    9:20
12:23    23:19    26:21
33:12    34:8    37:14
39:3    48:5    48:11
59:10    80:18    80:21
82:17    127:6    130:8

**Guessing** [1]    59:16

**guy** [1]    127:10

**H** [1]    3:1

**hand** [1] 153:20

**handed** [3]    54:1
61:13    68:5

**handle** [2]    13:23
35:4

**handled** [1]    83:15

**handwriting** [4] 54:7
54:12    70:21    70:22

**Hannah** [88]    1:20
2:15    2:17    4:17
4:17    13:11    14:9
15:5    20:11    21:24
26:6    27:18    34:14
36:25    38:16    39:7
41:2    41:9    41:21
47:18    53:17    57:23
58:10    59:6    59:15
62:21    63:6    65:7
68:18    69:12    69:20
72:24    72:25    80:6
81:2    81:8    85:9
89:13    89:17    91:16
93:21    94:5    95:10
99:11    99:16    100:14
101:10    101:19    101:22
102:1    102:23    103:21
105:13    107:3    107:22
108:1    110:1    110:8
110:22    111:24    113:20
114:13    117:14    117:18
118:5    118:18    118:23
124:10    124:21    126:1
131:22    133:22    134:1
138:23    139:9    141:3
142:7    142:18    143:15
143:23    144:9    145:4
147:9    147:19    147:23
148:5    149:22    151:5

**happening** [2]    86:25
87:4

**happy** [1]    138:21

**harassment** [1]    75:23

**hard** [5]    47:19    47:21
131:24    138:24    139:2

**hate** [1]    64:23

**head** [19]    18:25
33:25    37:9    38:4
45:25    53:4    64:2
94:10    95:2    95:19
104:1    126:22    128:17
130:20    132:10    133:3
136:19    143:18    146:11

**heads** [11]    13:21
13:25    42:19    44:6
58:5    94:13    94:24
96:18    136:7    146:8

**health** [8]    6:24
26:22    26:24    67:25
73:12    128:21    132:12
149:23

**healthcare** [19]    1:9
4:5    73:2    75:6
75:11    105:14    106:3
106:8    106:18    106:23

130:10

**132:13    137:17    138:2
138:3    149:5    149:16
149:17    150:7    152:6

**beard** [2]    4:8
118:13

**hearsay** [3]    41:2
41:10    114:11

**held** [2] 8:4    95:13

**help** [1]    21:6

**Herald** [1]    102:7

**hereby** [1]    152:4

**hereto** [1]    153:18

**herself** [1]    5:3

**high** [1]    26:4

**higher** [1]    50:15

**highest** [2]    54:25
55:2

**himself** [1]    4:21

**hired** [1] 128:4

**history** [2]    8:22
16:4

**Hoffman** [1]    77:24

**hold** [1] 51:13

**home** [2]    73:4
73:9

**hopefully** [2]    21:18
142:1

**Hopping** [1]    40:4

**hospital** [169]    1:9
4:6    9:2    9:5
9:6    9:12    10:4
10:22    11:3    14:5
14:14    14:14    16:8
16:12    17:3    17:7
17:12    17:13    17:17
18:2    18:4    18:8
19:24    20:10    21:12
22:4    22:18    23:6
23:8    23:25    24:3
24:8    24:17    24:21
25:21    25:23    26:1
26:3    26:8    26:20
26:22    26:23    27:6
27:11    27:13    28:1
28:19    29:4    29:5
29:6    29:9    29:19
30:14    30:20    30:25
31:4    31:11    31:16
31:22    32:14    32:24
33:3    33:9    33:11
33:14    33:15    33:17
34:12    34:17    36:8
36:14    37:16    37:20
38:8    39:13    39:24
40:13    40:15    40:19
41:18    47:17    48:20
51:1    51:14    54:18
55:10    60:13    73:13
75:6    75:10    75:11
76:1    79:23    80:20
82:12    83:5    85:3
86:13    87:17    89:4
89:7    89:9    90:21
93:4    95:13    97:2
97:12    97:17    98:10
97:17    97:24    99:6
99:20    103:4    103:9
103:10    103:15    104:19
105:1    105:8    105:16

106:10    106:17    106:24
108:10    108:12    109:5
114:15    116:6    120:7
120:16    120:21    121:4
121:6    121:16    122:5
122:9    122:14    122:25
123:3    123:11    123:24
123:24    128:1    129:13
132:7    133:7    134:10
135:2    135:6    136:3
139:14    139:20    141:16
141:22    141:24    142:2
142:17    142:21    143:2
143:10    145:11    145:14
148:14    149:10    149:24
150:6    150:8    152:7

**hospital's** [2]    102:14
103:1

**hospitals** [25]    10:17
11:6    11:11    12:2
16:21    17:8    22:11
22:14    23:12    25:9
30:25    31:7    35:24
37:11    43:16    47:6
48:6    48:10    48:17
54:22    97:20    121:14
122:11    122:21    147:17

**hour** [2] 73:22    74:2
74:5

**hug** [2] 65:6    126:8

**human** [9]    44:15
44:17    76:25    94:11
94:20    96:3    96:19
104:20    104:25

**Humana** [61]    6:24
8:3    8:19    8:23
8:24    9:5    9:7
11:6    11:8    11:11
11:15    11:16    16:13
16:21    16:25    21:1
22:3    22:21    23:3
23:11    23:14    26:19
26:23    27:7    27:11
27:15    27:22    29:6
30:14    30:19    30:25
31:7    31:17    31:21
31:24    32:6    32:23
34:10    35:15    50:3
54:22    63:4    67:21
67:24    68:1    71:7
71:8    73:11    83:12
83:15    83:21    83:23
107:12    107:19    121:7
121:16    138:8    145:9
145:19    148:16    149:3

**i.e** [1]    143:2

**Iaia** [75]    1:6    3:4
3:14    4:5    19:8
30:3    45:18    46:13
46:21    48:23    49:24
53:10    55:9    55:19
60:13    62:3    63:23
64:11    65:13    65:22
66:11    66:17    66:22
67:1    67:6    73:1
76:2    79:22    81:23
82:4    84:8    84:20
85:11    85:12    85:21
85:25    88:11    88:19
89:12    90:18    91:5
91:13    91:17    93:8
95:22    97:5    98:5

Case 0:00-cv-06222-FAM Document 56 Entered on FLSD Docket 11/06/2000 Page 160 of 245

101:13 110:3 110:17
111:17 111:25 112:14
113:2 115:22 116:14
117:25 122:19 123:23
125:18 126:3 130:2
130:23 131:23 134:9
135:2 136:16 143:8
145:1 146:10 149:12
152:5

**laia's** [15]    46:22
47:13 49:19 61:6
62:12 75:7 75:12
86:15 93:12 99:3
114:15 123:8 128:21
144:20 147:6

**idea** [25] 56:19   77:16
83:13 85:15 85:18
85:21 87:1 87:9
87:10 88:1 90:11
92:1 98:8 98:9
99:2 101:20 103:2
104:24 105:3 111:13
112:5 115:18 115:20
118:17 137:1

**identification** [15]
53:22 61:9 66:4
69:2 70:5 81:6
89:15 99:14 100:12
101:25 107:24 117:16
118:21 133:24 148:2

**identified** [1] 43:25

**identify** [5]   4:16
4:21 5:3 66:7
70:9

**immensely** [1] 21:15

**imminent** [1] 17:14

**impact** [4]    30:24
31:3 34:22 53:5

**impacted** [3]   34:11
34:19 72:9

**implemented** [5]
13:1 22:9 67:15
122:4 150:2

**implementing** [1]
22:7

**importance** [1] 143:1

**important** [8]   97:9
97:12 97:18 97:20
97:24 135:5 135:11
143:2

**inaccurate** [1] 102:18
113:25

**Inc** [1]   2:6

**incentive** [10]   3:21
136:3 136:24 137:18
148:14 148:25 149:5
149:15 149:24 150:6

**incident** [4]   62:5
77:22 90:23 128:23

**include** [13]   45:15
46:15 47:2 49:5
49:21 49:25 50:4
50:20 51:5 52:8
62:11 140:24 147:7

**included** [16]   14:6
14:18 15:4 24:7
46:7 46:10 52:13
52:15 60:14 60:15

65:17 67:3 146:7

**including** [2]   46:21
120:21

**income** [1] 137:11

**incomplete** [1] 53:17
53:18

**incorrect** [2]   115:1
115:19

**increase** [4]   33:17
48:2 141:21 142:1

**increased** [2]   34:18
35:12

**indicate** [2]   113:8
113:11

**indicated** [7]   54:11
70:15 72:14 72:18
140:8 140:12 150:14

**indicates** [3]   63:14
100:25 107:11

**indicating** [1] 104:6

**individual** [13] 31:11
31:13 32:1 44:5
46:4 46:9 48:23
49:15 60:12 63:16
111:4 131:10 146:25

**individual's** [3]
15:1 15:12 15:17

**individuals** [23]
14:6 14:13 14:18
15:25 21:2 39:4
39:12 39:22 40:17
41:6 41:17 42:1
42:7 43:25 44:2
44:9 44:12 45:12
45:16 50:16 51:6
71:8 146:9

**information** [3] 91:1
117:12 131:5

**informed** [2]   23:25
37:22

**initiated** [1] 143:22

**inpatient** [3]   25:15
25:17 32:22

**input** [1] 141:8

**instances** [1]   77:7
77:11 119:11

**instituted** [1] 148:17

**instructions** [2] 43:7
43:9

**insurance** [17]   6:13
6:19 11:6 16:22
23:5 27:9 27:15
35:16 67:7 128:21
132:12 133:15 133:18
137:21 137:22 137:23
138:1

**intense** [1]   91:12

**intensive** [1] 18:6

**intent** [1] 141:23

**intention** [1]   134:14
134:21 134:25

**intentionally** [1]
56:9

**intents** [1]   141:25

**interested** [2]   24:1
153:19

interview [1] 80:4

**involuntary** [1] 80:4
81:16 82:23 83:19

**involved** [17]   22:6
24:9 24:13 39:5
39:19 40:4 78:16
93:13 94:7 94:14
94:17 94:21 94:25
95:24 96:4 98:11
98:25

**involvement** [4]
39:11 42:23 44:12
81:21

**involving** [1] 88:6

**itself** [6] 24:10 46:24
47:1 50:19 80:2
104:3

**Jack** [5] 76:23   77:15
94:17 128:8 128:13

**Jackie** [22]   19:8
54:6 66:11 93:8
101:5 110:17 111:16
111:25 112:14 122:19
123:6 123:8 123:23
124:12 125:17 126:2
128:20 130:2 130:8
130:23 131:23 149:12

**Jacqueline** [4]   1:6
4:5 73:1 152:5

**Jamie** [1]   40:4

**January** [6]   16:9
28:11 102:4 102:25
103:3 153:25

**Jerry** [1] 1:14   2:2
4:2 5:8 5:18
95:8 152:3 153:8

**job** [33] 3:20 51:19
56:5 61:3 64:24
73:14 85:23 90:12
90:16 97:9 97:9
98:23 99:3 100:5
101:2 101:12 107:11
109:9 112:1 113:12
117:1 120:25 125:18
126:3 134:6 134:9
134:19 134:22 135:5
135:11 138:21 138:25
139:6

**jobs** [7] 13:9 13:10
96:13 96:15 104:6
104:7 143:16

**Judge** [1]   1:3

**judgment** [1]   56:17

**Julie** [2] 120:2 129:17

**July** [5] 1:16   2:5
4:3 152:7 153:20

**jury** [5] 10:20 12:5
18:1 19:18 25:11

**keel** [1] 121:4

**keep** [10]   37:22
93:3 110:16 111:16
112:18 112:23 112:25
117:25 119:2 124:16

**keeping** [2]   59:25
125:1

**Kentucky** [1]   8:3
8:25 9:4

**kept** [1] 104:7

**kind** [9] 80:13
75:23 81:22 83:5
83:6 87:17 89:8
92:12 93:9 97:3
126:13 138:1 138:17
146:16

**Kneen** [2]   1:22
4:24

**knew** [2]     74:9
87:21

**knowledge** [18] 24:18
56:10 56:13 57:10
71:3 83:5 83:6
91:13 91:17 103:8
111:17 116:2 116:15
131:12 131:17 131:25
140:19 152:8

**known** [3]    9:15
47:4 142:20

**KORNFELD** [1]
1:22

**labor** [1] 36:1

**lack** [1] 51:23

**lady** [1] 40:4

**laid** [1] 65:3

**Lane** [1] 73:5

**large** [4] 2:4   27:20
36:1 153:7

**last** [7] 6:19   8:5
74:3 92:21 116:24
117:5 139:13

**late** [4] 23:2 82:13
116:13 138:7

**latter** [2] 137:16 139:16

**Lauderdale** [2]   1:2
4:10

**lay** [1] 126:16

**leading** [1]    14:9
21:24 26:6 27:18
41:9 41:21 69:12

**leads** [2] 12:5 60:24

**least** [5] 26:4   27:11
40:8 133:6 148:13

**leave** [15]     67:11
67:19 73:11 80:4
80:8 80:11 80:16
81:16 81:23 82:23
83:19 84:1 84:21
89:3 122:4

**leaving** [4]   81:20
105:2 136:25 146:3

**led** [2] 36:23 50:20

**left** [20] 9:3   9:5
50:9 87:11 89:12
90:21 92:17 98:6
99:1 100:23 103:4
109:5 121:5 127:8
127:15 127:25 128:5
138:8 139:6 150:4

**length** [4]    45:2
50:3 50:11 50:14

**less** [3] 38:13 124:12
125:1

**letter** [13]     3:5
3:6 3:12 3:13
61:16 65:22 66:9
66:21 66:24 68:5

**letters** [1]    65:15

**letting** [1]   125:2

**level** [2] 12:15   31:10
31:11 114:17

**levels** [1]    36:4

**Levy** [2] 1:22   4:24

**life** [1] 133:15

**likely** [1]    142:16

**likes** [1] 49:24

**Limited** [1]   4:12

**line** [3] 114:3   114:4
152:12

**list** [5] 22:12 44:9
104:9 104:10 104:11

**listed** [1]    152:10

**Litigation** [1]   4:12

**llth** [3] 61:14 69:19
79:20

**locate** [2]    80:20
85:3

**located** [5]   4:12
27:3 27:6 55:13
86:12

**location** [1]   27:2

**Lockwood** [1] 129:9

**long-term** [1] 138:2

**longer** [5]    50:16
89:7 105:16 105:21
123:3 135:10

**look** [21] 15:22   15:24
15:25 35:25 49:14
79:24 79:25 89:18
99:17 100:15 102:2
102:9 102:22 111:3
111:6 111:7 117:19
125:13 134:2 134:5
148:18

**looked** [11]   35:23
36:11 47:8 47:21
49:12 52:10 112:18
112:19 112:20 123:19
132:4

**looking** [7]   24:4
35:10 35:16 35:24
42:7 93:6 113:23

**looks** [1]   118:7
149:2

**lose** [2] 13:9 64:24

**losing** [1]   29:1
37:16 38:9 38:19
97:16

**Louisville** [3]   8:3
8:25 9:4

**low** [6] 22:12 25:3
27:1 36:20 36:22
36:23

**lowest** [1]    54:24
55:1

**Magistrate** [1]   1:3

**maiden** [1]   118:15

**main** [1] 33:14

**maintain** [1]   6:3
26:9

**maintained** [1] 52:20

**maintaining** [1] 10:25

**man** [1] 92:23

**management** [3]
76:19   114:17   120:16

**manager** [4]      35:9
107:11   107:19   120:6

**managers** [5]      35:9
137:6   137:15   148:13
150:8

**March** [2]      3:13
100:4

**MARIANI** [1]      1:22

**Mark** [1]      75:3

**marked** [31]      53:15
53:20   53:22   61:4
61:9   66:1   66:4
68:24   69:2   70:2
70:5   80:23   81:6
89:13   89:15   89:19
99:11   99:14   100:12
101:22   101:25   107:22
107:24   117:14   117:16
118:19   118:21   133:22
133:24   147:24   148:2

**market** [1]      143:2

**marketing** [53]      19:3
19:7   19:16   19:20
19:21   20:8   20:17
21:21   46:5   46:13
47:6   47:11   47:14
48:6   48:10   48:12
48:12   50:21   51:1
51:1   51:5   60:2
60:5   88:10   88:22
89:8   97:3   97:11
97:17   97:20   98:14
99:4   99:23   101:3
101:3   111:10   111:13
112:14   114:16   114:18
116:12   131:12   134:7
135:15   140:20   140:25
141:1   141:15   141:16
141:21   142:5   146:10
146:12

**marketing/public** [7]
66:13   86:20   87:7
88:17   90:2   95:21
131:17

**married** [1]      7:5

**Marshall** [1]      73:5

**match** [1]      133:13

**matter** [4]      4:4
65:17   65:19   75:12

**may** [24] 3:12      12:13
13:19   19:23   20:13
20:13   20:13   20:14
20:15   21:7   21:7
21:19   29:24   34:24
44:5   66:11   74:8
81:10   81:10   81:19
90:10   102:3   102:3
114:1

**mean** [9] 12:5      33:8
36:22   38:13   45:18
48:1   68:3   78:4
144:25

**measure** [3]      47:20
47:22   48:19

**measuring** [1]   25:25

**media** [3]      19:21
48:14   141:19

**medical** [11]      8:22
9:10   10:13   18:5
18:7   35:4   67:6
79:5   79:9   120:14
129:1

**medical/surgical** [1]
18:7

**Medicare** [3]      21:8
27:8   27:8

**medication** [2] 92:9
92:12

**meet** [2] 60:23   60:25

**meeting** [4]      60:19
125:17   126:2   126:5

**meetings** [9]      38:5
58:4   95:13   95:15
95:17   95:25   96:4
96:12   141:18

**members** [4]      12:4
18:1   52:3   52:22

**membership** [2]
12:11   52:2

**memo** [16]      3:7
61:13   61:16   61:18
63:14   68:23   69:6
69:6   69:11   69:18
80:9   80:13   84:9
84:10   84:13   84:17

**memoranda** [1] 79:14

**memorandum** [1]
79:22

**Memorial** [12]      17:12
17:17   17:18   32:24
33:5   33:13   33:15
33:16   34:9   34:17
35:1   37:12

**memories** [1]   123:19

**memory** [4]      20:19
52:2   92:10   123:5

**mention** [1]      120:8

**mentioned** [1]   153:10

**met** [4]   74:20   75:2
75:5   92:24

**Miami** [1]      9:9
102:7

**mid** [2]   22:9   23:24

**middle-aged** [3]
130:6   130:12   130:14

**midnight** [1]   25:22

**might** [4]      33:12
50:7   86:1   86:2

**Mike** [3] 127:3   139:24
139:25

**million** [1]      38:14

**mind** [5] 34:16   36:16
39:25   46:23   50:25

**mine** [1] 55:16

**minute** [2]      72:12
140:6

**Miss** [45]
46:13   47:13   48:23
49:24   53:2   53:9
55:9   55:19   57:3
61:6   62:3   63:23
64:11   65:13   65:22

**miss** [continued]
66:17   67:1
67:5   68:8   69:8
70:25   71:4   75:7
75:12   76:2   79:22
81:23   82:4   84:8
84:20   85:11   85:12
85:18   85:21   85:24
86:6   86:15   87:5
87:16   88:11   88:19
93:12   95:22

**moment** [1]      58:11
114:1

**monetary** [1]      50:9

**money** [11]      29:1
29:1   37:16   37:25
38:8   38:19   72:1
124:5   125:1   125:2
125:3

**Monique** [29]   19:14
51:11   56:11   56:14
56:20   57:3   70:11
85:13   92:6   93:3
100:20   102:13   102:25
107:8   108:18   108:21
110:16   111:10   111:16
112:15   118:10   118:11
122:23   123:5   123:10
124:3   124:11   129:21
131:16

**Monteiro** [60]      3:8
3:15   3:17   19:14
51:11   52:8   53:3
56:11   56:14   57:3
68:8   69:9   70:12
71:1   71:4   71:9
85:13   85:18   86:6
87:5   87:16   87:19
87:20   88:8   90:10
90:16   92:6   93:3
98:12   98:17   100:20
101:1   101:12   102:13
102:25   107:9   108:18
108:21   109:16   110:16
111:10   111:16   111:18
112:15   113:3   113:5
115:3   117:25   118:16
122:23   123:10   124:3
124:11   124:12   129:21
131:16   136:22   140:18
143:9   143:22

**Monteiro's** [1]   71:20
90:6   145:1

**month** [2]      6:7
38:14

**monthly** [2]      38:3
38:4

**months** [1]      129:1

**Moran** [1]      129:10

**morning** [5]      73:25
74:25   75:1   104:9
104:12

**most** [3] 12:8      17:13
23:11

**Move** [1]      59:15

**moved** [1]      29:21
29:22

**Mrs** [21] 49:19   60:13
62:12   71:8   71:19
87:19   90:5   90:10
98:17   113:4   115:3

**Ms** [37]   4:25   45:18
46:21   46:22   52:8
74:20   87:20   88:8
89:12   90:16   90:18
91:5   91:13   91:17
97:5   98:5   98:12
98:12   99:3   99:22
100:25   101:11   101:13
109:16   110:2   111:18
113:2   113:3   114:15
115:21   116:14   117:25
117:25   134:9   135:2
136:16   136:21

**multiple** [1]      83:24

**mustard** [1]      58:5

**name** [18]      4:11
5:16   5:19   40:4
72:25   77:23   79:3
79:6   84:11   92:21
99:25   106:15   108:13
118:13   118:16   120:2
129:17   129:11

**names** [1]      94:15

**Naples** [4]      76:11
77:18   77:21   126:24

**nature** [1]      20:16
55:20   57:21   61:17
61:18   84:6

**necessarily** [12] 15:15
15:20   31:10   48:11
55:25   56:25   78:4
97:14   97:21   125:4
142:8   147:4

**necessary** [2]      35:17
44:16

**need** [4] 39:18   98:4
125:12   150:21

**needed** [8]      13:19
16:24   25:5   25:6
40:18   41:18   42:15
52:25

**needless** [1]      21:14

**needs** [1]      122:17

**negative** [1]      71:19

**negotiations** [1]
39:19

**neither** [1]      153:13

**never** [4]      44:24
48:18   92:24   118:13

**new** [5]   23:16   37:13
42:3   57:18   59:11

**Newletter** [1]      3:15

**news** [1] 64:17

**newsletter** [7]      3:14
99:5   99:19   100:7
100:17   100:21   141:7
148:19

**newspaper** [3]      3:16
19:21   20:15

**newspapers** [1]   48:14

**next** [6]   28:7   55:16
115:21   116:24   117:5
118:18

**none** [1] 123:18

**maintaining** [continued]
118:16   140:18   143:8
143:8   143:22   144:20
145:1   145:1   146:10
147:6

**Ms** [continued]

**Nonresident** [1]
59:16

**nor** [3]   153:14   153:14
153:18

**Norfolk** [4]      1:17
2:7   4:13   153:4

**normal** [1]      44:8

**normally** [5]      13:15
42:18   110:23   111:3
119:8

**North** [2]      9:9
17:1

**Notary** [3]      2:3
153:6   153:23

**nothing** [1]      46:22

**Notice** [1]      2:4

**notified** [3]      98:13
128:21   129:2

**November** [28] 3:5
3:6   61:14   63:10
67:13   67:17   79:20
89:5   92:18   103:16
106:7   106:22   111:9
112:2   112:15   121:6
122:20   122:25   124:6
127:1   127:5   131:15
132:8   132:3   139:14
139:16   148:8   150:9

**now** [52] 6:16      9:10
9:14   11:5   11:19
14:21   18:18   22:2
24:19   28:10   30:1
30:12   32:5   34:9
34:25   35:5   37:14
38:23   40:16   48:4
48:22   51:4   51:10
52:5   53:9   54:17
55:8   55:18   59:24
60:10   63:14   63:23
64:16   65:15   68:7
70:24   72:5   72:13
72:17   72:21   79:12
89:25   120:8   136:13
137:20   137:25   140:7
140:11   144:1   144:19
145:20   146:5

**number** [41]      4:7
12:12   12:22   13:6
13:22   19:1   25:13
26:2   27:21   37:2
38:20   42:21   52:3
53:15   53:20   56:18
61:6   66:2   68:25
70:3   79:13   80:24
81:3   81:9   82:14
89:19   99:12   99:18
100:10   100:16   101:23
102:2   107:7   108:3
112:3   113:23   117:20
118:25   130:22   144:12
148:19

**numbers** [14]      12:18
22:13   27:20   28:21
28:24   31:19   32:20
34:5   38:10   45:23
52:5   54:16   144:1
144:18

**nursing** [4]      18:25
76:8   76:13   77:18

**nurtured** [1]      53:1

**O'Connell** [2]  9:220
92:21

**OB** [2]  18:15  18:16

**Object** [13]  13:11
20:15  36:25  47:18
57:23  58:10  62:21
106:25  124:8  141:3
142:7  142:18  143:15

**objected** [1]  64:12

**objection** [47]  14:9
15:5  21:24  26:6
27:18  34:14  38:16
39:7  41:2  41:9
41:21  59:6  63:6
65:7  68:18  69:12
69:20  80:1  85:5
91:8  93:15  93:24
101:6  101:15  102:20
103:18  105:10  109:19
110:4  110:18  111:19
113:15  114:10  114:11
118:1  124:18  125:19
125:23  131:19  138:19
139:7  143:23  144:9
145:4  147:9  147:19
149:19

**objective** [3]  13:18
26:3  26:7

**objectives** [4]  136:8
141:15  141:16  141:20

**obstetrical** [3]  36:17
37:13  143:7

**obtained** [1]  7:24

**obviously** [2]  23:4
45:18  62:2  131:7

**Occasionally** [1]
92:16

**occasions** [1]  64:18

**occurred** [2]  65:13
90:23

**occurring** [1]  80:11

**October** [1]  6:7

**Odesky** [2]  120:2
129:17

**off** [18]  21:18  30:22
30:25  33:25  37:8
45:24  53:4  64:1
65:3  72:13  104:1
126:16  126:22  132:9
133:3  139:11  140:7
143:17

**offer** [4]  65:15  65:24
128:20  131:2

**offered** [7]  65:21
67:20  72:1  132:7
145:23  146:2  149:16

**offering** [1]  148:25

**office** [6]  27:5
27:6  40:5  55:14
55:17  151:3

**officer** [3]  6:22
19:2  139:19

**offices** [2]  2:6
55:13

**often** [2] 85:23  86:5

**old** [16]  23:11  26:20
42:2  53:2  57:17
58:19  58:24  59:4

**one** [41]  7:10  10:3
11:5  22:8  36:16
37:3  37:3  37:9
40:8  45:19  54:23
54:24  55:1  61:15
66:25  72:12  73:1
77:8  77:20  81:3
83:15  95:6  99:3
100:5  101:1  108:16
110:10  116:4  118:18
119:24  120:25  121:3
130:5  135:1  141:20
141:25  146:19  147:21
148:12  149:1  149:2

**ones** [1]  137:19

**open** [2]  6:14  6:16

**opened** [5]  6:13
17:18  32:24  33:13
37:12

**opening** [4]  6:18
17:16  33:9  34:10

**operating** [7]  12:9
12:10  13:3  16:23
19:2  36:2  139:19

**operation** [1]  23:9

**operations** [1]  16:22

**opinion** [2]  55:6
63:9

**opportunity** [1] 55:8

**opposed** [2]  32:14
55:23  56:3  56:15
57:13  81:24  96:23
110:16  125:1  143:3

**opposing** [1]  53:16

**oral** [1]  2:1

**order** [4] 27:15  46:1
60:20  150:18

**outpatient** [1]  12:12
25:15

**outright** [2]  81:25
82:24

**outside** [2]  50:20
71:8

**overall** [5]  10:23
10:24  25:2  35:25
66:9

**overlap** [1]  143:12

**overnight** [1]  25:20

**own** [6]  20:15  20:18
66:15  137:21  139:3
142:10

**owned** [11]  11:6
11:8  11:11  11:13
16:12  31:24  103:15
105:18  105:21  106:17
145:14

**owner** [2]  24:17
105:8

**P** [3]  1:20  1:22
4:18

**package** [9]  50:8
50:9  50:13  50:16
64:4  64:8  82:3
82:5  133:21

**page** [15]  2:13
3:2  54:11  61:20
61:20  61:21  62:8
62:9  70:18  70:19
70:20  70:22  114:6
114:7  152:12

**paid** [4]  32:4  124:12
145:13  145:15

**paper** [2]  103:13
141:9

**paperwork** [1]  98:21

**paragraph** [6]  62:9
62:20  114:8  115:10
116:24  117:5

**parallel** [4]  140:25
141:5  141:11  142:4

**Pardon** [1]  125:21
126:18

**part** [15]  28:23  32:7
38:19  42:6  63:11
65:4  77:1  97:12
97:15  127:6  133:21
137:16  139:16  139:17
146:17

**participants** [1] 27:14

**participate** [3]  146:15
146:17  147:3

**participated** [2] 63:21
144:5

**participating** [1]
146:10

**particular** [8]  16:19
16:25  21:22  26:16
42:17  43:17  45:20
111:4

**particularly** [1] 12:11

**parties** [2]  153:15
153:18

**passage** [2]  123:14
125:9

**passed** [2]  116:21
136:1

**past** [1]  12:17

**Pat** [3]  120:12  130:17
130:18

**patient** [5]  25:3
31:23  32:20  37:3
48:20

**patients** [9]  12:12
16:25  25:14  26:2
27:21  27:22  29:20
31:16  33:10

**Patty** [1] 126:21

**Paul's** [3]  2:7
4:4  4:13

**Paula** [8]  63:15
77:13  77:14  83:9
96:9  96:12  104:21
127:16

**pay** [3]  21:18  50:12
132:14

**payroll** [1]  13:19

**pediatrics** [1]  18:12

**Pembroke** [80]  15:3
4:6  9:11  16:4
16:8  16:16  17:3
17:10  18:2  18:3
18:19  19:6  19:13
22:4  22:16  22:18
22:19  24:1  24:7
24:19  25:3  26:15
26:17  27:1  29:11
29:22  30:2  30:6
30:13  33:6  33:11
42:11  42:15  42:24
43:14  43:25  45:1
45:22  47:8  50:3
54:18  56:8  57:11
58:4  58:18  67:12
67:19  68:4  73:3
75:6  75:10  76:1
82:12  83:4  85:2
87:17  89:4  89:7
93:4  95:13  97:2
97:15  99:19  103:9
106:9  106:17  106:23
108:12  120:6  120:20
123:24  132:7  133:6
134:10  139:13  139:20
145:11  146:3  150:8
152:6

**Pembroke's** [1] 108:13

**Penny** [3]  2:3
5:5  153:6

**people** [23]  25:19
25:20  39:15  42:20
42:21  57:13  57:14
75:25  76:7  76:20
77:3  82:6  82:11
82:16  82:19  82:21
94:6  95:18  119:17
125:1  125:2  142:22
144:4

**percent** [2]  34:7
133:14

**percentage** [6]  34:4
36:2  133:1  133:11
136:11  136:13

**perform** [8]  40:7
53:10  54:14  71:3
98:23  115:23  116:8
122:11

**performance** [15]
15:2  15:17  47:13
47:15  52:7  93:7
93:12  107:7  108:8
108:17  108:21  110:15
119:12  119:19  119:22

**performances** [1]
71:20

**performed** [14]  20:9
28:20  32:14  66:12
68:15  70:13  90:18
98:10  99:22  101:5
106:21  121:15  134:10
134:20

**performing** [11] 26:1
37:20  64:16  70:8
71:9  98:5  101:1
115:12  115:14  120:22
135:1

**period** [22]  17:22
24:2  32:25  33:1
34:16  36:15  37:15

**package** [9]  50:8

**Pembroke** [80]  15:3

**38:6**  98:7  65:3
83:8  84:1  86:6
109:1  109:4  114:9
114:14  138:4  149:4
149:7  149:9  150:3

**perks** [1]  137:14

**permanent** [1]  5:25

**permitted** [1]  82:22

**person** [14]  19:1
39:14  56:4  59:22
77:23  79:2  88:15
92:5  119:24  126:23
130:11  130:12  130:12
131:8

**person's** [1]  111:8

**personal** [2]  49:24
139:11

**personally** [1]  119:15

**personnel** [3]  83:10
104:19  119:4

**physically** [1]  27:3

**picture** [1]  12:10

**Pierce** [3]  120:12
130:17  130:18

**Pines** [76]  1:9
4:6  9:12  16:4
16:8  16:16  17:3
17:11  18:2  18:3
18:19  19:6  19:13
22:4  22:16  22:18
24:1  24:8  24:20
26:15  26:17  29:12
29:22  30:2  30:6
30:13  33:6  33:11
42:11  42:15  42:24
43:14  43:25  45:1
45:22  47:8  50:4
54:18  56:8  57:11
58:4  58:18  67:12
68:4  73:3  75:6
75:10  76:1  82:12
83:4  85:2  87:17
89:4  89:7  93:4
95:13  97:2  97:15
99:20  103:9  106:9
106:17  106:24  108:12
120:7  120:21  123:24
132:7  133:7  134:10
139:14  139:20  145:11
146:3  150:8  152:7

**place** [10]  1:17
5:25  32:6  54:19
81:23  83:2  121:10
137:2  143:1  153:9

**placed** [9]  20:18
22:13  80:4  80:7
80:11  81:16  83:18
84:20  143:4

**placement** [1]  141:19

**places** [1]  29:23

**plaintiff** [5]  1:7
1:21  3:11  4:19
19:9

**Plaintiff's** [26]  81:1
81:2  81:5  81:9
89:14  89:19  99:12
99:13  99:17  100:10
100:11  100:15  101:23
101:24  102:2  107:23

Case 9:00-cv-06247-FAM Document 56 Entered on FLSD Docket 11/06/2000 Page 163 of 245

117:19  118:20  118:25
133:23  134:2  148:1
148:18

**plaintiffs** [1]      4:15

**plan** [25] 3:21      6:6
6:24    26:22   26:24
67:25   73:12   132:13
132:16  132:18  132:24
133:9   136:4   136:10
137:17  137:17  137:18
138:13  148:15  148:25
149:6   149:15  149:24
149:25  150:6

**planning**          135:17

**plans** [2]          135:18
135:20

**point** [11]          13:20
22:22   29:8    30:17
38:24   42:10   67:11
105:24  122:17  135:18
149:14

**Poliakoff** [2]       1:20
4:18

**policies** [1]        133:15

**policy** [2]          81:19
83:2

**population** [4]      21:14
142:14  142:15  143:6

**portions** [1]        102:10

**position** [98]       6:12
6:19    9:2     9:4
9:18    11:19   15:18
16:20   19:7    19:12
20:2    46:23   46:25
47:9    47:9    48:6
49:5    51:5    51:13
51:17   52:7    52:7
52:11   59:25   60:2
60:6    62:12   62:15
67:20   67:22   68:3
68:10   68:13   68:15
69:9    80:20   84:4
85:4    86:15   86:22
86:24   87:18   87:23
88:2    88:2    88:11
88:15   88:16   88:20
88:24   89:1    89:12
90:3    90:4    90:6
90:8    90:10   91:6
92:5    92:19   93:18
93:22   93:23   96:10
98:5    109:23  110:3
110:10  111:5   111:7
112:19  113:21  114:15
114:19  115:8   115:25
116:4   116:5   116:11
116:25  119:20  119:24
120:18  134:15  134:17
134:21  134:22  135:3
135:8   135:10  138:13
140:24  141:6   144:20
144:21  144:23  146:18
150:4

**positions** [19]      8:4
15:22   16:1    16:2
18:18   18:22   41:7
45:8    48:10   48:12
50:19   94:8    94:9
96:22   110:25  112:20
113:12  114:17  115:24

**positive** [1]         55:6

**possibility** [1]     62:25

**possible** [6]         10:2
13:21   26:5    39:16
57:20   65:9

**possibly** [7]         12:7
21:6    24:1    58:13
59:1    88:24   98:7

**practice** [2]         13:7
43:12

**predisposition** [1]
48:5

**prefer** [2]           56:2
56:4

**preference** [1]     55:23

**preparation** [1]    63:21

**prepare** [2]          99:5
100:7

**prepared** [4]        63:16
63:19   107:8   108:17

**presence** [1]        41:6
62:4

**present** [4]         40:17
44:9    50:8    96:12

**presented** [4]       16:22
35:7    39:23   64:7

**president** [1]        40:2

**pretty** [1]          64:10
134:12

**previously** [1]      61:5
101:4

**primarily** [1]       27:14

**primary** [1]         15:21

**problems** [3]        21:7
26:14   35:11

**procedure** [1]      12:13

**process** [16]        13:14
13:17   14:22   24:14
39:17   42:25   51:9
67:25   94:7    94:25
99:1    110:25  135:4
137:24  139:12  146:6

**product** [1]         27:9

**products** [1]        23:6

**professional** [3]
56:1    57:3    57:8

**program** [29]        19:4
20:5    20:23   20:24
20:24   22:3    27:15
31:17   47:11   48:16
48:19   51:1    51:15
52:20   52:25   56:25
86:11   87:25   88:21
91:12   91:12   91:21
112:21  112:23  136:24
143:5   143:21  144:5
144:16

**programs** [9]        21:5
22:7    47:6    48:13
51:25   52:18   77:3
112:21  144:16

**promote** [1]        141:24

**promotion** [1]      19:23

**proper** [1]          52:20

**propose** [1]          14:5

**provided** [2]        21:4    26:8    43:6
44:20   50:15   136:10
151:2

**provided** [1]        44:5
63:24   72:10

**provides** [1]        11:17

**providing** [4]       21:17
21:20   72:2    146:8

**proximate** [1]       34:2

**prudent** [1]         36:24

**public** [39]          2:3
88:6    88:10   88:23
89:8    91:6    93:9
97:11   97:17   97:19
97:23   98:9    98:14
99:5    99:23   100:6
101:4   102:14  103:1
109:13  109:17  110:11
111:18  112:1   112:14
112:25  114:20  115:13
116:11  122:20  131:12
134:7   135:16  135:17
140:20  141:1   143:3
153:6   153:23

**publishing** [1]     114:11

**Pull** [1]            79:16

**pulling**             20:18

**purchase** [1]        24:10

**purchased** [1]      106:4

**purchasing** [1]     63:5

**pure** [4] 12:24      28:23
80:17   127:6

**purpose** [3]         20:22
80:15   153:10

**purposes** [2]        72:2
84:3

**pursuant** [1]         2:4

**pursue** [1]          43:20

**put** [15] 52:1       52:17
61:16   81:20   82:3
83:25   84:3    85:2
99:19   114:10  121:4
121:10  135:14  141:8
141:10

**putting**             80:15
125:22

**qualifications** [2]
92:4    93:2

**qualified** [2]       56:4
123:10

**qualify** [1]        132:17
137:8

**quality** [5]         11:1
13:24   26:8    120:5
120:6

**quantify** [1]        12:18

**questions** [9]       72:21
74:8    74:9    74:14
140:4   144:18  146:9
147:22  150:12

**quick** [1]           78:20

**quickly** [1]         90:21

**quite** [2] 23:10     76:10

**quote** [2]           31:19
34:4

**rates** [2] 32:3      32:4

**reaction** [2]       126:10
126:14

**read** [12] 89:20     89:22
89:25   114:3   114:8
114:23  114:24  115:16
150:17  151:3   151:5
152:4

**reads** [1] 80:9

**ready** [2]          111:7
127:8

**really** [1]         123:21

**reason** [14]         84:20
84:24   85:1    90:20
101:11  102:17  102:24
109:15  119:23  120:1
120:20  121:5   150:5
150:10

**reasonable** [2]      26:9
27:10

**reasons** [5]         12:25
36:18   76:21   116:4
146:14

**recalling** [1]      48:25

**receive** [1]        71:13

**received** [5]        31:21
43:19   71:18   72:4
145:10

**receiving** [1]      31:23
71:6

**recent** [1]         62:18

**Recess** [1]         72:16
140:10

**recognize** [7]      53:25
99:18   108:4   108:6
118:24  134:3   148:19

**recognized** [1]     36:23

**recollection** [18]
28:17   34:12   37:24
38:14   42:5    42:22
43:14   46:19   48:23
49:15   51:16   61:25
62:10   63:20   90:15
125:13  136:10  148:23

**recommendation** [9]
65:16   65:22   66:10
66:12   66:21   66:25
130:23  131:2   131:8

**recommendations** [3]
13:25   44:6    96:18

**recommending** [1]
128:25

**record** [9]          4:16
4:22    5:17    53:18
72:14   72:18   140:8
140:12  153:11

**records** [10]        79:6
79:9    93:8    104:19
110:15  119:4   119:13
119:19  119:22  123:8

**Recross-examination**
2:17    148:4

**Redirect** [2]        2:16
140:15

**reduce** [5]          12:9
40:22   120:21  121:1

**reduced** [1]         45:19

**reducing** [1]       35:25

**reduction** [73]
13:1    13:20   13:23
14:2    14:18   14:21
15:4    15:13   15:19
35:20   36:6    36:11
42:11   42:14   42:23
43:20   44:1    44:19
45:17   45:22   46:16
46:21   47:2    47:7
49:5    49:21   50:5
52:9    52:16   60:14
64:13   65:4    65:17
67:3    67:15   76:1
76:15   76:17   78:8
79:9    81:17   81:25
82:6    82:13   86:14
87:6    87:14   88:3
92:6    94:8    95:12
98:13   103:11  103:17
105:7   106:21  109:18
119:3   119:14  120:22
121:2   121:10  121:15
121:23  122:3   122:12
122:15  124:24  127:13
128:2   138:15  147:8

**reductions** [4]      64:16
83:14   94:14   147:16

**refer** [4] 9:14      24:15
25:12   107:6

**reference** [1]      62:17

**referring** [6]       59:4
59:4    59:21   62:19
62:24   63:3

**reflect** [1]         53:18

**refresh** [3]         61:25
125:13  148:22

**refreshes** [1]      62:10

**regard** [13]         38:15
75:7    82:21   84:7
86:14   95:11   95:20
103:10  106:20  110:10
119:17  124:24  125:13

**regarding** [2]      41:12
75:12

**regards** [17]        14:17
15:22   25:9    26:16
28:18   35:19   39:12
40:19   41:7    43:7
44:12   45:1    45:21
47:13   48:10   56:1
71:8

**regional** [2]        40:1
40:5

**regular** [1]         37:19

**regularly** [1]       38:2

**reimbursed** [2]     31:16
67:6

**reimbursement** [1]
31:20

**related** [4]         48:15
63:9    82:3    153:14

**relates** [2]         62:15
75:18

**relating** [2]        66:11
98:21

**relation** [1] 90:21
55:14 82:18

**relations** [42] 66:13
86:20 87:7 88:6
88:10 88:17 88:23
89:9 90:3 91:6
93:9 95:21 97:12
97:17 97:19 97:23
98:9 98:14 99:5
99:23 100:7 101:3
101:4 102:14 103:1
109:13 109:17 110:11
111:18 112:14 112:25
114:20 115:13 116:12
122:20 131:13 131:17
134:7 135:16 135:17
140:20 141:2

**relations/marketing**
[1] 112:1

**relationship** [21]
11:12 16:20 20:14
30:13 30:19 30:20
31:6 31:8 31:12
31:14 32:23 57:2
57:4 57:6 57:8
68:4 69:14 123:23
124:1 124:3 142:11

**relative** [1] 153:17

**relatively** [3] 17:22
25:3 129:24

**relevance** [3] 36:25
138:19 139:7

**relevant** [1] 65:8

**rely** [1] 27:14

**remains** [1] 13:16

**remarks** [1] 42:3

**remember** [42] 14:24
17:23 21:2 24:5
27:20 35:22 37:2
42:16 58:21 60:9
67:16 69:13 76:23
77:23 79:4 83:9
84:23 90:9 90:24
91:3 91:4 96:7
97:7 98:16 98:20
118:3 119:9 120:5
120:17 120:18 121:12
121:20 123:25 126:4
126:6 126:8 126:10
127:7 135:23 139:13
141:6 144:1

**remotely** [1] 145:3

**remuneration** [1]
72:2

**renovation** [1] 25:5

**reorganization** [3]
62:18 62:19 63:4

**repeat** [1] 15:10

**replaced** [5] 77:1
77:12 77:17 126:24
128:8

**report** [2] 78:1
119:18

**reported** [9] 19:2
45:14 46:18 53:13
55:11 77:7 78:5
87:24 146:22

**reporter** [5] 5:3
5:5 5:12 80:25

**Reporters** [2] 2:6
5:6

**reports** [4] 37:18
37:19 38:3 119:15

**representatives** [1]
24:3

**request** [1] 67:5

**requested** [2] 66:16
66:23

**reside** [4] 5:23
7:13 7:15 7:16

**residence** [2] 6:1
6:3

**resignation** [1] 68:6

**resource** [1] 76:25

**resources** [8] 44:15
44:17 94:11 94:20
96:3 96:19 104:20
104:25

**respiratory** [1] 35:14

**response** [3] 35:6
64:22 64:23

**responsibilities** [25]
16:16 20:3 88:9
89:11 90:17 96:22
98:15 98:23 99:4
100:6 101:2 101:13
112:2 115:3 115:15
117:1 121:1 121:3
134:9 134:16 134:20
134:23 135:2 135:6
135:11

**responsibility** [6]
10:24 61:2 88:14
91:24 129:5 142:5

**responsible** [5] 46:4
46:9 77:4 104:18
143:9

**restructured** [1] 25:7

**result** [6] 26:19
34:9 36:1 71:24
76:18 82:12

**Resume** [1] 3:19

**retain** [3] 13:10
53:6 144:22

**retained** [1] 145:24

**retirement** [2] 132:13
132:15

**review** [16] 42:25
44:16 52:6 55:3
62:8 70:9 92:3
93:2 93:7 110:15
114:1 119:3 119:12
119:18 119:21 123:8

**reviewed** [1] 114:15
117:24

**reviewing** [1] 69:5
69:6 96:19

**rid** [2] 95:25 127:12

**RIF** [17] 11:19 11:22
12:5 12:6 12:7
12:8 12:14 13:8
14:7 42:21 43:8
43:13 61:18 77:2
146:11 147:3 149:13

**RIFs** [3] 12:1 12:18

**right** [67] 6:18
7:5 7:11 11:25
14:16 15:1 17:6
17:15 28:5 29:11
35:2 36:13 36:21
40:11 40:23 41:16
43:2 44:11 52:5
56:6 56:13 67:17
67:22 72:5 72:21
77:17 78:1 83:16
83:25 84:1 84:23
87:14 91:4 91:22
94:22 95:22 99:12
104:16 105:5 105:23
106:16 107:17 109:4
109:5 109:17 110:14
112:6 112:9 112:24
113:14 115:7 115:10
121:9 128:4 136:22
137:3 137:25 139:3
139:4 139:6 141:20
142:10 144:1 148:10
148:22 150:16 150:20

**ring** [1] 120:3

**rings** [1] 79:3

**risk** [1] 120:16

**RMR** [2] 2:3
153:6

**Rod** [2] 4:17 72:25

**RODERICK** [1]
1:20

**roll** [1] 58:5

**Ron** [1] 77:24

**room** [8] 18:9 18:11
27:4 32:22 33:2
34:19 34:23 55:16

**rule** [1] 35:24

**run** [1] 91:12

**running** [1] 91:20

**RUSSO** [1] 1:22

**S** [1] 3:1

**S-c-i-a-l-d-o-n-e** [1]
140:1

**S-u-t-p-h-i-n** [1]
5:21

**safe** [1] 32:16

**salary** [2] 136:11
137:12

**sale** [1] 39:13

**savings** [1] 132:16

**saw** [3] 26:15 104:9
104:11

**says** [10] 54:5 62:18
80:3 84:9 90:4
102:13 107:19 144:10
145:4 150:2

**scale** [2] 54:19 54:23

**schedule** [1] 86:3

**Scialdone** [2]
139:24

**Science** [1] 8:2

**scope** [1] 8:14

**scores** [1] 54:10

**screen** [5] 72:15
72:19 140:9 140:13

**second** [5] 102:10
114:6 115:10 117:5
147:21

**secondly** [1] 26:9

**section** [1] 18:8

**see** [11] 25:14 33:17
47:15 64:23 79:24
86:10 102:14 105:5
109:9 114:21 130:23

**seeing** [2] 29:20
61:13 118:3

**select** [1] 88:15

**selected** [1] 83:20

**selection** [1] 98:13

**Self-employed** [1]
6:10

**Selling** [1] 138:1

**seminars** [1] 8:12

**senior** [45] 19:12
20:1 20:4 20:8
20:14 20:23 21:13
22:3 46:10 51:18
51:24 52:22 53:6
59:25 60:8 68:10
69:10 71:9 86:23
87:7 87:25 88:17
88:23 91:7 91:18
91:20 93:10 109:17
110:11 114:20 115:13
115:22 116:7 116:15
122:24 140:23 142:1
142:6 142:11 143:5
143:21 144:5 144:15
144:16 144:23

**seniority** [2] 15:2
15:12

**seniors** [26] 19:4
20:6 20:24 21:9
21:17 21:22 51:15
52:18 52:20 52:23
52:25 56:25 86:11
88:21 91:11 107:12
107:19 107:20 109:14
112:21 112:23 142:9
142:9 142:20 143:3
143:10

**sense** [1] 56:1

**sentence** [4] 114:8
115:11 115:21 117:6

**sentences** [1] 116:1

**separate** [3] 23:7
23:15 73:7

**September** [11] 28:6
28:8 28:14 28:18
32:10 33:18 33:23
34:2 34:13 37:15
38:7

**served** [1] 71:24

**serves** [2] 52:2
123:5

**service** [3] 17:3
21:17 21:20 45:2
50:7 50:11 50:14
50:17

**services** [6] 18:5
21:19 31:23 32:4
142:16 142:21

**set** [3] 69:15 243
102:10

**sets** [1] 69:11

**seven** [4] 90:22
93:6 101:21 136:1

**several** [5] 8:4
12:23 20:25 24:3
82:8

**severance** [6] 50:12
50:13 50:16 63:24
64:3 64:7

**severe** [1] 35:4

**shape** [1] 40:20

**Shawn** [1] 4:11

**shook** [2] 128:17
130:20

**short** [1] 122:7

**shortly** [5] 29:14
29:15 32:25 67:14
105:2

**show** [9] 53:14 53:15
61:4 66:1 68:23
70:2 81:9 99:10
100:9

**showed** [1] 79:12

**shows** [1] 99:25

**shut** [1] 36:13

**sick** [1] 132:14

**side** [2] 23:8 27:12

**sign** [2] 62:3 84:13

**signature** [4] 54:5
61:22 70:15 152:25

**signed** [2] 62:2
62:6 63:18

**significant** [2] 34:4
34:6

**signing** [1] 98:20

**similar** [5] 20:16
108:16 148:24 149:1
149:2

**similarity** [1] 108:6

**simpler** [1] 144:25

**sit** [6] 44:16 48:23
80:18 85:20 90:15
111:12

**Sitting** [1] 85:17

**situation** [1] 97:22
109:22

**Six** [1] 83:7

**six-month** [6] 80:7
80:11 81:23 82:23
83:19 84:21

**six-week** [1] 81:16

**size** [1] 25:4

**slightest** [1] 56:19

**small** [1] 6:21

**so-called** [2] 76:15
87:6

**sold** [4] 38:24 73:12
138:13 145:20

**someone** [2] 66:23
98:4

**sometime** [1] 8:25

**Sometimes** [1] 83:25

Case 3:06-cv-06227-FAM    Document 56    Filed on FLSD Docket 11/06/2000    Page 165 of 245

somewhere [3] 49:3
130:13

sorry [6] 6:23    78:21
81:2    103:12    117:4
138:11

Sort [1] 136:15

South [16]    17:1
17:4    17:12    26:20
29:3    29:5    29:9
29:18    30:8    33:12
33:15    103:6    123:6
123:9    142:14    144:17

Southern [2]    1:1
4:9

speak [5]    42:17
64:18    75:17    97:16
115:7

speaking [1]    83:21

speaks [1]    80:2

specific [26]    41:11
43:9    45:23    46:22
48:16    58:6    59:2
61:15    62:5    64:15
66:19    71:11    77:6
77:11    82:5    90:9
92:7    95:15    119:11
121:12    126:4    128:23
134:4    137:19    142:15
146:14

specifically [5] 46:23
51:22    65:8    82:4
132:9

specifics [15]    35:22
40:21    42:16    51:7
60:11    60:22    62:13
64:8    66:14    76:6
79:4    80:13    90:24
95:1    105:25    116:9

speculation [12]
12:24    28:23    38:17
38:18    59:7    59:16
63:7    65:8    80:18
101:16    102:21    142:19

spell [1] 5:19

spent [2]    8:25
56:23

split [7] 23:5    30:22
30:25    31:8    31:25
32:5    34:10

spoke [2]    73:22
74:3

sporadic [1]    86:1

St [3]    2:7    4:4
4:12

staff [3] 56:7    57:7
120:14

staffing [3]    12:14
36:4    122:17

standpoint [2] 95:19
146:18

start [3] 10:10    35:17
35:24

started [17]    8:24
9:21    16:7    16:11
17:7    17:19    22:17
22:19    24:19    24:25
28:11    30:2    34:18
35:10    35:16    69:21

starting [3]    7:22
9:19    17:20

state [8] 2:4    5:16
6:4    6:6    7:25
147:5    153:3    153:7

statement [16]    14:3
41:17    90:1    102:18
113:22    113:25    114:11
114:21    114:24    114:25
115:1    115:8    115:19
117:3    120:19    120:24

statements [3] 41:5
41:25    59:8

States [2]    1:1
4:9

status [1]    24:21
145:2

stay [2] 88:3    93:9

stayed [2]    136:18
136:25

staying [1]    25:20

stays [1] 119:13

sticks [1]    43:17

still [8]    16:12    31:8
31:12    36:9    83:11
105:3    127:14    149:9

Stock [2]    23:15
23:16

story [1] 52:23

straight [1]    105:6

strengths [1]    24:22

strike [8]    15:23
25:24    29:4    37:25
59:15    67:10    82:20
113:9

strikes [1]    113:24

subject [2]    13:8
138:15

subpoena [1]    71:24

subsequent [10] 8:2
17:16    17:20    23:21
34:2    60:4    60:6
81:20    136:25    146:3

Subsequently [1]
9:3

subsidiaries [1] 11:14

subsidiary [2] 106:10
106:12

success [1] 51:23

successes [1] 51:23

successful [3] 143:14
143:22    143:25

successor [2]    23:7
67:9

such [2] 21:6    97:20

Sue [2]    1:24    4:25

suggesting [1]    13:21

suggestion [1] 42:6

Suite [2] 2:7    4:4

summarize [2]    7:22
8:21

sundry [5]    8:13
19:22    21:5    35:10
47:6

supervised [2] 146:23
147:2

supervision [1] 44:13

supervisor [1] 53:9

supervisory [5] 14:13
18:20    45:8    45:17
147:2

supplying [1]    94:14

support [5]    26:10
26:21    26:23    47:10
131:9

supporter [1]    47:5

supportive [1] 131:24
132:1

surgical [1]    18:8

suspect [3]    29:23
47:8    96:2

Sutphin [25]    1:14
2:2    4:2    5:8
5:18    5:22    6:25
7:17    11:19    55:22
56:6    57:10    59:24
61:12    71:22    72:20
72:25    95:8    95:11
140:17    147:5    148:6
150:17    152:3    153:8

swear [1]    5:3

sworn [2]    5:9
153:9

synonymously [1]
107:16

T [5]    3:1    152:1
152:1    153:1    153:1

takes [1] 141:17

taking [1]    81:3

tape [2] 95:6    95:7

targeted [1]    143:10

telephone [1]    73:23

telling [1]    126:11

term [3] 11:20    25:8
48:1

terminated [1] 13:16
77:9    77:21    78:11
79:22    81:18    82:7
82:11    82:19    82:22
138:12

terminating [1] 77:5
81:24

termination [9] 63:25
78:14    78:17    79:14
79:21    82:24    85:11
128:22    129:2

terms [20]    13:18
13:19    13:22    14:1
19:21    21:18    22:12
25:5    26:2    27:1
27:2    28:22    32:21
38:10    50:9    52:3
61:17    137:12    142:10
144:25

testified [3]    5:9
39:3    144:24

testimony [3]    39:8
72:3    153:12

Thank [3]    5:12
95:6    150:15

therapy [1]    35:14

third [2] 61:20    70:21

Thirty [2]    25:22
34:7

thorough [2]    131:11
131:16

thought [4]    40:18
49:17    82:10    135:4

three [4] 9:2    39:25
127:24    129:1

through [22]    13:5
20:25    24:2    24:14
25:1    25:14    28:6
28:8    28:14    28:19
32:10    42:19    42:20
43:15    44:14    44:17
74:7    109:2    116:23
121:1    129:8    147:16

throughout [4]    8:4
32:21    108:14    133:5

tied [3]    60:1    144:22
145:3

times [1]    56:18

timing [2]    29:16
36:10

title [4]    40:2    107:19
109:9    113:18

to-wit [1]    153:4

today [16]    48:24
71:23    72:3    73:20
73:24    74:11    75:7
75:15    84:23    85:17
85:20    90:16    108:5
111:12    116:14    116:16

together [2]    82:3
145:2

tone [1]    58:12

too [3]    7:21    38:11
90:21

took [11] 17:24    18:17
23:9    31:9    32:6
46:20    68:12    90:12
92:19    125:5    139:11

tool [2]    35:15    52:21

top [1]    11:2    33:25
37:8    45:24    53:4
64:2    104:1    126:22
132:9    133:3    143:18

total [1]    18:24

totally [2]    25:7
96:23

toward [1]    143:10

towards [3]    15:24
48:5    143:2

transaction [1]    24:10

transcribed [3] 150:18
150:20    150:23

transcript [1]    153:11

transfer [1]    68:2

transferred [2]    30:10
123:6

trauma [3]    34:18
35:1    35:3

treat [1]    56:20

tried [1]    37:22

true [6]    23:11    86:15
86:22    87:5    152:8
153:11

try [9]    16:24    21:8
26:4    26:9    39:16
44:18    80:19    85:3
121:3

trying [9]    10:1
27:7    27:9    45:21
52:24    56:24    84:3
119:9    142:10

turn [1]    44:15

Turning [1]    22:15

tutelage [1]    12:20

TV [2]    48:15    141:19

two [11]    19:1    23:7
27:5    30:22    39:25
87:12    95:7    110:10
114:7    116:1    127:24

tying [1] 21:16

type [6]    18:1    35:20
58:9    64:22    81:15
141:10

typical [1]    12:25

ultimate [1]    96:20

Ultimately [2]    31:2
96:25

under [18]    12:19
21:1    31:16    36:9
47:3    47:4    47:6
49:10    49:16    61:12
66:20    67:18    67:25
145:19    148:16    149:2
149:3    153:20

undergone [1]    12:1
12:19

undergone [3]    8:9
13:6    13:7

underlined [1]    102:9

underlines [1]    102:11

undersigned [1]
152:3

understand [7]    15:9
22:16    30:9    50:22
141:14    145:22    146:21

undertake [1]    14:20

unit [7]    18:7    34:18
35:1    35:4    35:12
35:13    37:13

United [1]    1:1
4:8

units [2] 18:6    18:7

unless [3]    48:15
119:15    131:9

unlike [1]    58:8

unusual [3]    64:20
65:5    95:16

up [11]    11:8    12:5
27:10    33:9    36:3
42:21    75:8    133:14
135:7    136:12    149:13

updated [1]    25:7

upset [1]    64:19

used [11]    2:8

Case 0:00-cv-06227-FAM   Document 56   Entered on FLSD Docket 11/06/2000   Page 166 of 245

35:15 47:10 81:3
107:15 108:10 108:14
108:16
**Usually** [1]    122:16
**utilize** [1]    142:16
**V** [1]    1:20
**Vacation** [1]    132:14
**vague** [1]    116:13
**Valerie** [1]    129:9
**Valley** [4]    9:7
10:13   121:16   121:17
**varied** [1]    133:4
**various** [19]    8:12
10:25   12:2   13:21
13:24   14:4   19:22
21:4   32:4   32:4
35:10   39:15   42:20
47:5   94:13   114:16
141:17   147:17   148:7
**vary** [1]   141:18
**ventilator** [1]    35:13
**versus** [1]    4:5
**Viara** [1]    78:25
**Video** [1]    4:12
**VIDEOGRAPHER**
[9]   4:1   4:20
5:2   72:13   72:17
95:5   140:7   140:11
150:13
**videotaped** [4]   1:14
2:1   4:2   95:8
**videotaping** [1] 4:14
**Virginia** [17]    1:17
2:4   2:8   4:13
5:24   5:24   7:25
8:11   9:2   9:7
9:8   10:5   10:6
73:5   121:19   153:3
153:7
**volition** [1]    66:16
**volume** [8]    12:16
13:4   25:4   27:1
36:20   36:22   36:23
46:1
**volumes** [2]    32:21
48:21
**vs** [1]    152:5
**waive** [1]    150:20
**walking** [1]    37:2
**wanting** [1]    76:18
**wants** [1]    151:5
**Washington** [4] 6:24
67:21   73:13   121:8
**ways** [3] 35:11   59:11
83:24
**weaknesses** [3] 24:22
24:25   25:2
**week** [1] 87:12
**weekly** [2]    86:2
86:9
**weeks** [2]    87:12
127:24
**west** [13]    7:25
8:10   9:6   17:17
17:18   32:24   33:5

33:12   33:13   33:16
34:9   37:12   121:19
**whatsoever** [2] 81:22
123:20
**whole** [1]    82:2
**wholly-owned** [2]
23:14   30:15
**wife** [3] 7:13    7:16
127:7
**Wile** [3] 2:3    5:5
153:6
**Willenbrock** [3]
118:10   118:11   118:14
**Willis-Green** [4]
1:24   4:25   4:25
74:21
**within** [10]    6:3
11:1   14:5   36:14
47:6   69:18   87:12
94:15   129:5   144:17
**without** [2]    13:23
25:1
**witness** [56]    5:4
5:8   20:12   21:25
26:7   27:19   34:15
37:1   38:18   41:11
41:22   47:19   57:24
58:11   59:9   61:22
62:23   63:8   65:9
68:20   69:13   69:22
79:7   80:3   84:14
85:7   89:21   91:10
93:17   94:1   101:8
101:17   103:19   105:11
109:21   110:6   110:20
111:21   113:17   118:2
125:21   128:17   130:20
138:20   141:4   142:8
142:20   143:17   143:25
144:11   145:6   147:11
149:20   150:24   151:4
153:12
**woman** [1]    92:23
**women** [5]    55:23
55:24   56:2   56:3
110:10
**word** [2] 114:3   114:3
**words** [2]    13:9
58:12
**worked** [4]    12:2
106:16   128:6   133:6
**worker** [1]    131:24
**write** [4] 65:15   65:22
66:20   66:25
**wrote** [3]    54:15
66:15   131:8
**X** [1]    3:1
**year** [15] 27:25    28:7
28:13   28:18   28:19
31:18   32:10   32:14
32:15   33:18   34:13
36:7   69:21   133:4
133:5
**years** [17]    8:5
8:13   9:1   20:25
38:11   48:13   49:10
50:7   50:17   83:7
90:23   93:6   101:21
112:3   122:10   135:25

136:1
**York** [1] 23:16
**young** [8]    127:9
127:10   129:17   129:22
130:3   130:6   130:11
130:13
**younger** [6]    55:23
56:2   57:13   77:15
142:21   143:5
**yourself** [1]    73:14

CONDENSED TRANSCRIPT

**Page 1**

```
          UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
          FT. LAUDERDALE DIVISION

                 CASE NO. 00-6227-CIV-MORENO
                 Magistrate Judge: Dube'



  JACQUELINE IAIA,

               Plaintiff,

        vs-

  COLUMBIA HEALTHCARE CORPORATION
  d/b/a PEMBROKE PINES HOSPITAL,
  a foreign corporation,

               Defendant



          Videotaped deposition of JERRY SUTPHIN

          Taken on behalf of the Defendant

          Date:  July 24, 2000

          Place:  Norfolk, Virginia


  APPEARANCES:

  BECKER & POLIAKOFF, P. A.
  By:  RODERICK V. HANNAH, ESQUIRE
          Counsel for the Plaintiff

  LEVY, KNEEN, MARIANI, CURTIN,
  KORNFELD & DEL RUSSO, P. A
  By    CHRISTOPHER C. COPELAND, ESQUIRE
                    and
  By:  SUE WILLIS-GREEN, ESQUIRE
          Counsel for the Defendant
```

**Page 3**

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| ON BEHALF OF THE DEFENDANT: | | |
| 1 | Employee evaluation, Iaia | 53 |
| 2 | Letter dated November 11, 1993 | 61 |
| 3 | Letter dated November 16, 1993 | 66 |
| 4 | Memo dated December 11, 1991 | 69 |
| 5 | Employee evaluation, Monteiro | 70 |
| ON BEHALF OF THE PLAINTIFF: | | |
| 1 | Letter dated May 5, 1994 | 81 |
| 2 | Letter dated March 6, 1998 | 89 |
| 3 | Newsletter, Iaia | 99 |
| 4 | Newletter, Monteiro | 100 |
| 5 | Newspaper article | 101 |
| 6 | Employee appraisal, Monteiro | 107 |
| 7 | Application for employment | 117 |
| 8 | Resume | 119 |
| 9 | Job description | 133 |
| 10 | Incentive compensation plan | 148 |

**Page 2**

1      Videotaped deposition upon oral
2 examination of JERRY SUTPHIN, taken by and before
3 Penny Commander Wile, RMR, a Notary Public for the
4 State of Virginia at Large, pursuant to Notice to
5 Take Depositions, commencing on July 24, 2000, at
6 the offices of Associated Court Reporters, Inc.,
7 125 St. Paul's Boulevard, Suite 309, Norfolk,
8 Virginia, to be used in evidence in the
9 above-styled cause.

11      * * *

13            PAGE
14 Direct examination by Mr. Copeland      5
15 Cross-examination by Mr. Hannah      72
16 Redirect examination by Mr. Copeland    140
17 Recross-examination by Mr. Hannah    148

**Page 4**

1      THE VIDEOGRAPHER: This is the
2 videotaped deposition of Jerry Sutphin taken on
3 July 24th, 2000, at 11:22 a.m., at the address of
4 125 St. Paul's Boulevard, Suite 309, in the matter
5 of Jacqueline Iaia versus Columbia Healthcare
6 Corporation d/b/a Pembroke Pines Hospital, a
7 foreign corporation, case number
8 00-6227-CIV-MORENO, to be heard in the United
9 States District Court, Southern District of
10 Florida, Fort Lauderdale Division.
11      My name is Shawn Burr, with the firm
12 of Video Litigation, Limited, located at 125 St.
13 Paul's Boulevard, Norfolk, Virginia, and I will be
14 videotaping this deposition.
15      Would counsel for the plaintiffs
16 please identify themselves for the record?
17      MR. HANNAH: Yes. Rod Hannah.
18 Becker & Poliakoff, P. A. on behalf of the
19 plaintiff.
20      THE VIDEOGRAPHER: Would counsel for
21 the defense please identify himself for the
22 record?
23      MR. COPELAND: Chris Copeland of
24 Levy, Kneen, et al.
25      MS. WILLIS-GREEN: Sue Willis-Green,

Page 5

1 also on behalf of the defendants.
2        THE VIDEOGRAPHER: Would the court
3 reporter please identify herself and swear in the
4 witness?
5        THE REPORTER: I'm Penny Wile with
6 Associated Court Reporters.
7
8        JERRY SUTPHIN, called as a witness,
9 being first duly sworn, was examined and testified
10 as follows:
11
12        THE REPORTER: Thank you.
13
14        DIRECT EXAMINATION
15 BY MR. COPELAND:
16     Q.   Could you state your name for the
17 record, please?
18     A.   Jerry Sutphin.
19     Q.   And how do you spell your name,
20 please?
21     A.   S-u-t-p-h-i-n.
22     Q.   Mr. Sutphin, where do you currently
23 reside?
24     A.   Virginia Beach, Virginia.
25     Q.   And is this your permanent place of

Page 6

1 residence?
2     A.   Yes, it is.
3     Q.   Do you maintain any residence within
4 the State of Florida?
5     A.   No, I do not.
6     Q.   Do you plan on being in the State of
7 Florida anytime during the month of October?
8     A.   No, sir.
9     Q.   Are you currently employed?
10     A.   Self-employed.
11     Q.   Okay. And what is your current
12 position of employment?
13     A.   I've just opened an insurance agency.
14     Q.   Okay. How long ago did you open that
15 agency?
16     A.   It's been open now about 30 days or
17 so.
18     Q.   All right. And prior to opening the
19 insurance agency, what was the last position of
20 employment that you had?
21     A.   I had a small consulting company, and
22 prior to that was the chief executive officer at
23 or the -- I'm sorry. The executive director of
24 Humana Group Health Plan in Washington, D. C.
25     Q.   Mr. Sutphin, can you tell me what

Page 7

1 your date of birth is?
2     A.   April 30th, 1944.
3     Q.   And what is your current age?
4     A.   Fifty-six.
5     Q.   All right. Are you married?
6     A.   Yes.
7     Q.   And do you have children?
8     A.   Yes.
9     Q.   How many children do you have?
10     A.   One.
11     Q.   All right. All over the age of 18?
12     A.   Yes.
13     Q.   Do you reside with your wife and your
14 children?
15     A.   No. My daughter does not reside with
16 us. I reside with my wife.
17     Q.   Okay. Mr. Sutphin, I'd like to get,
18 just if I could, just a little bit of background
19 on your education.
20     A.   Okay.
21     Q.   We won't go back too far, just
22 starting with college. Could you summarize for me
23 any colleges that you attended and what degrees
24 you obtained?
25     A.   I attended West Virginia State

Page 8

1 College. Graduated in 1974 with a Bachelor of
2 Science in Accounting. Subsequent to that went to
3 work for Humana in Louisville, Kentucky, and have
4 held several positions with them throughout the
5 last few years.
6     Q.   Okay. And you graduated in '74,
7 1974; is that correct?
8     A.   Yes, sir.
9     Q.   Have you undergone any continuing
10 education other than formal education at West
11 Virginia?
12     A.   Attending many seminars and various
13 and sundry things over the years.
14     Q.   Was that in the course and scope of
15 your employment?
16     A.   In my employment, yes, sir.
17     Q.   I believe you said that after
18 graduating from Columbia you went to work for
19 Humana?
20     A.   Yes.
21     Q.   Can you summarize for me your
22 employment history in the medical field with
23 Humana?
24     A.   I started out with Humana in
25 Louisville, Kentucky sometime in 1975. Spent

Page 9

1  about three years there. Went from there into a
2  finance position at a hospital in Virginia Beach.
3  Subsequently left there and went back to
4  Louisville, Kentucky in a finance position in
5  hospital with Humana. Again left there. Became
6  the executive director of a hospital in West
7  Virginia, which was a Humana Greenbrier Valley.
8  From there went to Virginia Beach again as the
9  executive director. From there to North Miami
10 Beach, Florida at what is now Aventura Medical
11 Center, as executive director, and to Pembroke
12 Pines Hospital from there as executive director
13 and CEO.
14     Q.  Okay. Now, when you refer to
15 executive director, is that commonly known as also
16 as the CEO?
17     A.  I think it would be equated to the
18 CEO position, yes.
19     Q.  Can you explain to me starting with,
20 I guess, Aventura -- I believe you stated that you
21 had started at Aventura as the executive director
22 or CEO?
23     A.  Yes.
24     Q.  Do you recall when that date was,
25 approximately?

Page 11

1  and assuring quality care within the facility.
2      Q.  Is the CEO, are you the top
3  administrator that is on the hospital campus?
4      A.  That's correct.
5      Q.  Now, you were affiliated -- each one
6  of these hospitals, was it owned by a Humana
7  Corporation?
8      A.  Humana owned all of them up until
9  about early 1993.
10     Q.  Okay. It's your understanding were
11 those hospitals directly owned by Humana or do you
12 have any understanding of how the relationship
13 was, how they were owned?
14     A.  They were all subsidiaries of the
15 Humana Corporation, as far as I know.
16     Q.  Did Humana -- is this the same
17 corporation which also provides insurance?
18     A.  Yes, sir.
19     Q.  Now, Mr. Sutphin, in your position
20 are you familiar with the term RIF?
21     A.  Yes, sir.
22     Q.  Can you explain or define what a RIF
23 is?
24     A.  Reduction in work force.
25     Q.  All right. And have you had

Page 10

1      A.  That would have been -- I'm trying to
2  think back. 1989 possible.
3      Q.  Okay. And I think prior to that one
4  were you employed at was it Bayside Hospital?
5      A.  Yes. In Virginia Beach.
6      Q.  That's in Virginia Beach?
7      A.  Yes.
8      Q.  Were you the CEO there as well?
9      A.  Yes.
10     Q.  And when did you start there?
11     A.  About 1984.
12     Q.  And prior to that were you at
13 Greenbrier Valley Medical Center?
14     A.  Yes.
15     Q.  And when did you --
16     A.  From about 1979 or so, '80 maybe.
17     Q.  Okay. And at each of those hospitals
18 were you the executive director?
19     A.  Yes, sir.
20     Q.  Okay. Can you explain to the jury,
21 please, what is the function of an executive
22 director or the CEO of a hospital?
23     A.  Basically for the overall -- has the
24 overall responsibility for the functioning of the
25 facility, maintaining its various accreditations,

Page 12

1  experience as the CEO to undergo any RIFs at the
2  various hospitals that you've worked at?
3      A.  Yes, sir.
4      Q.  Could you explain to the members of
5  the jury, I mean, what is a RIF or what leads up
6  to a RIF commonly?
7      A.  Generally a RIF is used, and possibly
8  not in all cases, but in most cases a RIF is used
9  to reduce the operating expenses of a facility, to
10 provide a better operating picture. And
11 particularly in a case of decline in membership in
12 the number of patients or decline in outpatient
13 procedure, whatever may have caused that,
14 generally RIF is used to adjust your staffing work
15 force to a level which is commensurate with what
16 your volume is.
17     Q.  Okay. And in your past experience as
18 CEO could you quantify the numbers of RIFs that
19 you've had to supervise or undergo under your
20 tutelage?
21     A.  I'm not sure I can give an exact
22 number, but I think it would be fair to say that
23 it's been several. I would guess between, and
24 it's pure speculation, between five and 10.
25     Q.  Okay. What are the typical reasons

Page 13

1   for a reduction in force having to be implemented?
2       A.   Generally it's to adjust your
3   operating expenses to compensate for a -- the
4   volume that your facility is currently generating.
5       Q.   Okay.  And is there a -- through the
6   number of RIFs that you've undergone have you
7   undergone a common course of practice in making
8   the decisions on who would be subject to a RIF; in
9   other words, who's going to lose their jobs and
10  who's going to retain their jobs?
11      MR. HANNAH:  Object to the form.
12
13  BY MR. COPELAND:
14      Q.   Okay.  What is the decision process
15  that's normally employed in determining who
16  remains and who is terminated?
17      A.   Generally it's a process of, first of
18  all, determining your objective in terms of what
19  you felt may be needed in terms of payroll
20  reduction cost.  From that point you go to your
21  various department heads suggesting a possible
22  number in terms of dollar amount where we can best
23  handle a reduction in force without affecting the
24  quality of care, and then depend on your various
25  department heads to make recommendations back to

Page 14

1   you of what they think they can do in terms of a
2   reduction in force.
3       Q.   Okay.  Is it a fair statement to say
4   that each of the directors of the various
5   departments within a hospital would propose
6   individuals from their department to be included
7   on the RIF?
8       A.   Yes.
9       MR. HANNAH:  Objection.  Leading.
10
11  BY MR. COPELAND:
12      Q.   What about -- did you have as a CEO
13  direct supervisory control of any individuals in
14  the hospital, that were employed in the hospital?
15      A.   Yes.
16      Q.   All right.  Who would make the
17  decision in regards to whether or not those
18  individuals would be included in any reduction in
19  force?
20      A.   I would.
21      Q.   Now, is the reduction in force
22  process, is it blind to age or is age a
23  consideration?
24      A.   I can say that I don't ever remember
25  considering age in these.

Page 15

1       Q.   All right.  Is the individual's
2   performance or seniority a factor which would be
3   taken into consideration whether or not they would
4   be included in a reduction of force?
5       MR. HANNAH:  Objection.  Compound
6   question.
7
8   BY MR. COPELAND:
9       Q.   You can answer, if you understand.
10      A.   Would you repeat the question?
11      Q.   Sure.  Let me break it down.
12           Is an individual's seniority a factor
13  which is taken into consideration in any reduction
14  in force?
15      A.   In some cases but not necessarily in
16  all.
17      Q.   Okay.  Is an individual's performance
18  in their position a factor which is taken into
19  consideration in reduction --
20      A.   In many cases but not necessarily.
21      Q.   What are the primary factors which
22  you look to in regards to which positions will
23  actually be -- let me strike that.
24           Do you look towards eliminating
25  individuals or do you look to eliminating

Page 16

1   positions?
2       A.   Positions.
3       Q.   I want to go back and talk a little
4   bit about Pembroke Pines and your history with
5   them.
6       A.   Fine.
7       Q.   Do you recall when you started as the
8   CEO at Pembroke Pines Hospital?
9       A.   Approximately January of '92, if I
10  recall.
11      Q.   And at the time you started as CEO do
12  you know which -- was the hospital still owned by
13  Humana?
14      A.   Yes.
15      Q.   Okay.  What were your duties and
16  responsibilities as the CEO at Pembroke Pines?
17      A.   Basically the same function that I
18  would have as CEO of any other facility; however,
19  in this particular case when I agreed to accept
20  the position because of the relationship with
21  Humana between its hospitals, if you will, and its
22  insurance operations it presented a little
23  different operating challenge, if you will, in
24  that we needed to try to accommodate as many
25  Humana patients as we could from that particular

Page 17

1 area, around South Broward County and North Dade.
2    Q.  Okay.  What was the area or the
3 service area for Pembroke Pines Hospital?
4    A.  It was basically the South Broward
5 County area.
6    Q.  All right.  And were there -- at the
7 time that you started at the hospital was there
8 any competition from other hospitals?
9    A.  Yes.
10    Q.  What was the competition for Pembroke
11 Pines?
12    A.  Memorial Hospital or the South
13 Broward Hospital district, it was the most
14 imminent competitor, if you will.
15    Q.  All right.
16    A.  And the subsequent opening of its
17 Memorial West Hospital.
18    Q.  Okay.  Was Memorial West opened at
19 the time that you started as CEO or was that
20 subsequent to starting?
21    A.  I can't recall the exact dates, but
22 it was relatively in that period of time.  I can't
23 remember whether it was before or after.  I
24 believe it was after I took over as CEO.
25    Q.  Okay.  Can you explain a little bit

Page 18

1 to the members of the jury what type of a facility
2 Pembroke Pines Hospital was?
3    A.  Pembroke Pines was, if I recall, a
4 300, 301 bed acute care hospital.  When I say
5 acute care, basically medical services which
6 encompasses everything from intensive care units,
7 general medical/surgical unit, medical units, and
8 the surgical section of the hospital.
9    Q.  Okay.  Do they have an emergency room
10 as well?
11    A.  Yes, they had an emergency room.
12    Q.  Did they have a pediatrics
13 department?
14    A.  Yes, sir.
15    Q.  And an OB department?
16    A.  And an OB department at the time I
17 took over.
18    Q.  Now, were there any positions as the
19 CEO of Pembroke Pines that you had direct
20 supervisory authority over?
21    A.  Yes, sir.
22    Q.  Do you recall what those positions
23 were?
24    A.  Not all of them in total, but
25 basically the head of the nursing divisions, the

Page 19

1 finance director, the number two person or the
2 chief operating officer reported to me, and the
3 director of marketing, and the director of the
4 Seniors Program.
5    Q.  Okay.  Do you recall when you came
6 out to Pembroke Pines as CEO who filled the
7 position of director of marketing?
8    A.  Jackie Iaia.
9    Q.  Is she the plaintiff in this action?
10    A.  Yes, sir.
11    Q.  And do you recall who filled the
12 position of Senior Friends at the time you came on
13 at Pembroke Pines?
14    A.  Monique Monteiro.
15    Q.  Do you know what the duties of the
16 director of marketing were?
17    A.  Yes, sir.
18    Q.  Can you explain to the jury what was
19 the director?
20    A.  Basically it's marketing the facility
21 in terms of media marketing, newspaper
22 advertising, various and sundry community events
23 which she may attend, basically the promotion of
24 the hospital.
25    Q.  Okay.  And what about the director of

Page 20

1 Senior Friends?  What was the functions of that
2 position?
3    A.  Her responsibilities was to act as
4 the director of what we call the Senior Friends
5 Program, which was to create and alliance between
6 the seniors community and the facility.
7    Q.  Was there any cross between the
8 director of marketing and the director of Senior
9 Friends and what functions they performed on
10 behalf of the hospital?
11        MR. HANNAH:  Object to the form.
12        THE WITNESS:  The only thing that I
13 may recall that may be, going back that far, may
14 be the relationship that may exist when the Senior
15 Friends may do their own newspaper advertising,
16 something of that nature, which was very similar
17 to what the director of marketing did, only I
18 think they placed their own ads, but I'm pulling
19 that from memory and can't say that for sure.
20
21 BY MR. COPELAND:
22    Q.  What was the purpose of having a
23 Senior Friends Program?
24    A.  The Seniors Program was a program
25 that was developed to -- several years ago through

1  Humana under which it was an association for those
2  individuals -- I can't remember the age at the
3  time, I want to say over age 55 -- to belong to
4  the association, which we would provide various
5  and sundry educational programs, that we would
6  help with things such as maybe possibly their
7  billing problems that may exist or that they may
8  have with Medicare, and to try and create an
9  alliance between the seniors community and the
10  facilities.
11     Q.  And why was it beneficial for the
12  hospital to create that alliance?
13     A.  Well, certainly the growing senior
14  population was believed to be the -- needless to
15  say, is going to be something that grows immensely
16  in the future, and we felt that by tying into
17  seniors to our facilities and providing a service
18  to them hopefully that that would pay off in terms
19  of services they may use at the facilities, in
20  addition to providing a community service to them.
21     Q.  Was this, in essence, a marketing
22  attempt directed to seniors in particular?
23     A.  No question.
24        MR. HANNAH:  Objection.  Leading.
25        THE WITNESS:  Yes.

1  BY MR. COPELAND:
2     Q.  Now, did you have any experience with
3  the Senior Friends Program at any other Humana
4  hospital prior to coming to Pembroke Pines?
5     A.  Yes, sir.  Both Aventura and Bayside.
6     Q.  Were you involved in any way in
7  implementing any of those programs?
8     A.  The one at Bayside was -- I
9  implemented it back in the mid '80s.  I don't
10  recall exactly what its -- how many had been
11  formed prior to that in other hospitals, but I
12  think we were fairly low on the list in terms of
13  the numbers that had been placed in other
14  hospitals.
15     Q.  Turning back a little bit to when you
16  came on to Pembroke Pines, who did you understand
17  was your employer at the time you started at
18  Pembroke Pines Hospital?
19     A.  When I started at Pembroke?
20     Q.  Yes.
21     A.  Humana.
22     Q.  Did that at some point in time, to
23  your understanding, change?
24     A.  Yes.
25     Q.  And what are the circumstances of

1  when that -- how that changed?
2     A.  In early '93 or late '92, I can't
3  recall the exact time on it, Humana apparently
4  made a corporate decision or obviously made a
5  corporate decision to split their insurance
6  products or division and the hospital division
7  into two separate companies.  The successor
8  corporation on the hospital side was a company
9  called Galen, who then took over the operation of
10  I want to say all, but I'm not quite sure that
11  that was entirely true, but most of the old Humana
12  hospitals.
13     Q.  And was Galen, as far as you know, a
14  wholly-owned corporation of Humana?
15     A.  No, sir.  It was a separate Stock
16  Exchange, New York Stock Exchange, corporation, as
17  far as I know.
18     Q.  Then is it your understanding, I
19  guess, you became an employee of Galen?
20     A.  Yes, sir.
21     Q.  Was there any other change subsequent
22  to becoming an employee of Galen, as far as you
23  know?
24     A.  In I'm going to say mid '93 we were
25  informed at the hospital that Columbia was

1  possibly interested in acquiring Pembroke Pines,
2  and at that time went through a period of time in
3  which several representatives were in the hospital
4  looking at it, so forth and so on.  And then in --
5  later in '93, I can't remember the exact date,
6  Columbia actually bought the entire or acquired
7  Galen as a corporation, which included Pembroke
8  Pines Hospital.
9     Q.  Okay.  Were you involved in the
10  transaction itself as to how the purchase was
11  effected?
12     A.  Not in the actual purchase of the
13  facility.  I was involved in a lot of the what is
14  called the due diligence process of going through.
15     Q.  Do you know if Columbia, as you refer
16  to them, was the actual entity that became the
17  owner of the hospital or another entity?
18     A.  To my knowledge, it was Columbia.
19     Q.  Now, when you started at Pembroke
20  Pines, did you undertake an evaluation of the
21  status of the hospital, determine what its
22  weaknesses and what its strengths were?
23     A.  Yes, sir.
24     Q.  Tell me, if you could, what were the
25  weaknesses that you found when you started?

Page 25

1  A. Without going through each and every
2 detail, basically the overall weaknesses at
3 Pembroke was it had a relatively low patient
4 volume in relation to its bed size. The facility
5 needed a lot of renovation in terms of the
6 cosmetics of the facility. It needed to be
7 basically just totally updated and restructured.
8  Q. Okay. Are you familiar with the term
9 census in regards to hospitals?
10  A. Yes, sir.
11  Q. Can you explain to the jury, what
12 does that refer to?
13  A. Basically equates to the number of
14 patients you see through your facility on an
15 outpatient or inpatient basis.
16  Q. Is a census done on a daily basis?
17  A. The inpatient census is done on a
18 daily basis, that's correct.
19  Q. For example, if you had 30 people in
20 or 30 people staying in beds overnight, would the
21 census for the hospital then be 30?
22  A. Thirty at midnight, yes.
23  Q. How was the census of the hospital?
24 Let me strike that.
25  Is that a form of measuring how good

Page 26

1 the hospital is performing, its census?
2  A. In terms of number of patients, yes.
3  Q. Is it an objective of the hospital to
4 at least try to get the census as high as
5 possible?
6  MR. HANNAH: Objection. Leading.
7  THE WITNESS: It is an objective to,
8 first of all, provide quality care in a hospital
9 but, secondly, to try to maintain a reasonable
10 census which will support the financial goals of
11 the facility.
12
13 BY MR. COPELAND:
14  Q. Okay. Was there any problems that
15 you saw when you came on to Pembroke Pines in
16 regards to its census in particular?
17  A. Pembroke Pines was a facility that,
18 to the best of my understanding or what I've been
19 told, was acquired as a result of Humana closing
20 the old South Broward Hospital, which was in Dade
21 County, and was, I guess you could say, a support
22 hospital for the Health Plan at that time or it
23 was acquired as a support hospital for the Humana
24 Health Plan.
25  I think a lot of what happened at

Page 27

1 Pembroke in terms of why it had a low volume had a
2 lot to do with its location in terms of not where
3 it was physically located, how it was built. The
4 access to the emergency room, basically you had to
5 go between two office buildings to get to it. In
6 fact, the hospital is located behind an office
7 building. Humana also at the time was trying to
8 develop a Medicare or had developed a Medicare
9 insurance product down there, and we were trying
10 to build that up so that we could get a reasonable
11 census in the hospital at least from the Humana
12 side of it.
13  Q. Did the hospital when you came on as
14 CEO, did it primarily rely upon participants in
15 the Humana insurance program in order to fill its
16 beds?
17  A. I would say --
18  MR. HANNAH: Objection. Leading.
19  THE WITNESS: I would say, and I
20 cannot remember the exact numbers, but a large
21 number of the patients in that facility at the
22 time I went there was Humana patients.
23
24 BY MR. COPELAND:
25  Q. Okay. Was there a fiscal year for

Page 28

1 the hospital?
2  A. If I recall, it was August 31.
3  Q. Okay.
4  A. Ending.
5  Q. All right. So at the end of August
6 31, when would that be, through September of the
7 next year?
8  A. No. It would be September through
9 August 31.
10  Q. Okay. Now, I believe you stated you
11 started on was it January of '92?
12  A. Yes.
13  Q. So you came in during the fiscal year
14 that would have been September '91 through August
15 '92; is that correct?
16  A. Yes. That's correct.
17  Q. Do you have any recollection in
18 regards to that fiscal year, the September '91
19 through August '92 fiscal year, how the hospital
20 performed?
21  A. The exact numbers, I cannot recall.
22 To give you an answer in terms of dollars or
23 census would be pure speculation on my part. I
24 can't recall the exact numbers.
25  Q. Okay. Do you know if it was making

**ASSOCIATED COURT REPORTERS, INC.**

Page 29

1  money or losing money at that time?
2      A.  No, I don't.
3      Q.  Okay.  Do you recall if South Broward
4  Hospital -- strike that.
5          Was South Broward Hospital an
6  affiliated Humana hospital?
7      A.  Yes, it was.
8      Q.  Do you recall at some point in time
9  if South Broward Hospital closed its doors?
10     A.  Yes.
11     Q.  All right.  Were you at Pembroke
12 Pines when that --
13     A.  No.
14     Q.  Did you come on shortly after?
15     A.  It would have been fairly shortly
16 after that.  I don't recall the exact timing on
17 it.
18     Q.  Do you know if the -- when South
19 Broward Hospital closed its doors what happened to
20 its patients it was seeing?
21     A.  If I recall, they were moved -- a lot
22 of them were moved over to Pembroke Pines.  I
23 suspect others went other places.  I know I was at
24 Aventura at the time, and we may have gotten a few
25 of them also.

Page 30

1      Q.  Okay.  Now, I believe that you stated
2  that when you started on at Pembroke Pines Miss
3  Iaia was already employed; is that correct?
4      A.  Yes, sir.
5      Q.  Do you know if she or how she came to
6  be employed at Pembroke Pines?
7      A.  As best I can recall, she was at
8  South Broward.
9      Q.  Okay.  You understand that she was
10 transferred?
11     A.  That's my understanding.
12     Q.  Okay.  Now, at the time that you came
13 on to Pembroke Pines, what was the relationship
14 between the hospital and Humana directly?  Was it
15 wholly-owned or --
16     A.  Yes.
17     Q.  Okay.  Did this -- at some point in
18 time while you were there as the CEO did that
19 relationship change in how Humana came to its
20 relationship with the hospital directly?
21     A.  Yes.  That's when -- as I said
22 before, that's when Galen, they split off the two
23 companies and Galen became the --
24     Q.  Did this have a financial impact upon
25 the hospital when Humana split off its hospitals

Page 31

1  to Galen?
2      A.  Ultimately it did.
3      Q.  How did this financially impact the
4  hospital?
5      A.  I think the biggest thing was that
6  the relationship that existed between Galen --
7  well, between Humana and its hospitals prior to
8  the split, while that relationship still existed
9  after Galen took over, it was a lot on the
10 corporate level and not necessarily on an
11 individual hospital level.  Even though there was
12 still a good working relationship between the
13 facilities on an individual basis there was some
14 declines in the relationship.
15     Q.  Was there a change in the way the
16 hospital was reimbursed for patients under the
17 Humana program?
18     A.  If I recall, somewhere in that year,
19 and I can't quote the exact numbers, but there
20 were some changes in the reimbursement that we
21 received from Humana.
22     Q.  Do you know if the hospital was
23 receiving the same amount for patient services
24 when they were directly owned by Humana as to
25 after the split?

Page 32

1      A.  On an individual basis I can't
2  recall, other than the fact I know there were --
3  there was some changing of the rates because you
4  were paid various rates for various services.
5      Q.  Now, would you recall when the split
6  between Humana and Galen took place?
7      A.  Early part of 1993, but I can't
8  recall the exact time.
9      Q.  Okay.  Then let's talk a little bit
10 about the fiscal year of September '92 through
11 August '93.
12     A.  Okay.
13     Q.  Was there any changes in how the
14 hospital performed in that year as opposed to the
15 prior year?
16     A.  It's safe to say that, yes, there
17 was.
18     Q.  Okay.
19     A.  While I can't recall the exact
20 numbers, we were fighting a decline in patient
21 volumes throughout the entire facility in terms of
22 both the emergency room, inpatient, and so forth,
23 due not only to the Humana relationship but the
24 fact that Memorial Hospital West also opened
25 during that period of time or shortly before that

Page 33

1  period of time -- I'm not sure of the date of
2  that -- which greatly affected the emergency room
3  at the hospital.
4     Q.  Okay.  Did you -- and did you
5  consider Memorial West to be direct competition to
6  Pembroke Pines?
7     A.  Oh, yes, sir.
8     Q.  And, I mean, financially how did them
9  opening up affect the hospital?
10    A.  Basically a lot of the patients -- at
11 the time Pembroke Pines was the furthest hospital,
12 I guess you might say, west in South Broward
13 County.  Memorial West opened, and basically we
14 were caught between their main hospital and the
15 South Broward Hospital Memorial division and
16 Memorial West.
17    Q.  Did the hospital see an increase or
18 decline in its census in the fiscal year September
19 '92 to '93?
20    A.  It would have had to be a decline
21 because it was continuing to decrease.
22    Q.  Okay.  Do you recall -- going back to
23 this September '91 to August '92 census, do you
24 recall what the census was around that time?
25    A.  No, sir.  Not off the top of my head.

Page 34

1     Q.  Do you recall what the census was in
2  proximate September '91 to '92 subsequent?
3     A.  No, but it's -- I can say there was a
4  significant percentage decline, but to quote the
5  exact numbers, I cannot do that.
6     Q.  To you, what would be significant?
7     A.  Thirty to 40 percent decrease would
8  be my best guess.
9     Q.  Now, as a result of Memorial West
10 opening and the split between Humana and Galen,
11 were there any other factors which impacted upon
12 the hospital, to your recollection, during the
13 September '92 to August '93 fiscal year?
14       MR. HANNAH:  Objection to form.
15       THE WITNESS:  The only thing that
16 comes to mind is, if I recall, during that period
17 of time Memorial Hospital, I believe, either
18 increased or started a trauma unit, which also
19 impacted our emergency room.
20
21 BY MR. COPELAND:
22    Q.  Okay.  And how did it impact your
23 emergency room?
24    A.  Because in cases that may have gone
25 to our facility were now going over to the

Page 35

1  Memorial trauma unit.
2     Q.  All right.
3     A.  Even though we did not have a trauma
4  unit, we could handle some severe medical cases.
5     Q.  Now, as the CEO what actions, if any,
6  did you take in response to these changes or these
7  conditions that you were presented with?
8     A.  Well, it's -- in working with the
9  managers of the department, my manager of finance,
10 and various and sundry things, we started looking
11 at different ways we could approach problems.
12       We increased an awareness of a unit
13 that we had called the ventilator unit, which was
14 basically the respiratory therapy department.
15 That was a big tool which was used by the Humana
16 insurance.  And we started looking at how we could
17 start cutting back on some costs, if necessary, to
18 compensate for this.
19    Q.  Okay.  And what areas -- in regards
20 to reduction of costs, what type of actions did
21 you either consider or actually take?
22    A.  Well, I can't remember the specifics
23 of what each and every thing we looked at.  As a
24 general rule in hospitals when you start looking
25 at reducing costs you look at overall costs, but,

Page 36

1  as a result of that, labor costs are a large
2  percentage of the facility's operating expense,
3  and consequently it's -- you end up having to
4  adjust your staffing levels to accommodate.
5     Q.  Did you take in or did you consider a
6  reduction in force?
7     A.  Later in the year, yes.
8     Q.  Was this at a time when the hospital
9  was still under the Galen Corporation?
10    A.  I don't recall the timing of whether
11 we looked at a reduction in force prior to
12 Columbia or not.
13    Q.  All right.  Did you eliminate or shut
14 down any departments within the hospital?
15    A.  During the period that I was there
16 the one that comes to mind is we did close our
17 obstetrical department.
18    Q.  Okay.  And what were the reasons why
19 you closed that department?
20    A.  Basically low volume.
21    Q.  All right.  Well, what about the
22 volume was so low?  I mean, was there anything you
23 recognized in how low the volume was which led you
24 to believe that was a prudent decision?
25       MR. HANNAH:  Object to relevance.

THE WITNESS: Average -- I can't
recall a number of them. I remember walking in
there one day and we had one patient.

BY MR. COPELAND:
Q. And how many beds were in that
department?
A. I don't recall off the top of my
head, but more than one.
Q. Was there any competition from other
hospitals?
A. Memorial West had also opened at that
time with their new obstetrical unit.
Q. Now, at this time, I guess during the
September '92 to August '93 fiscal period, was the
hospital losing money?
A. Uh-huh.
Q. Did you have reports or did you give
reports to any of the directors at any regular
basis on how the hospital was performing
financially?
A. We tried to keep as much informed as
we could, yes.
Q. Okay. Do you have any recollection
of how much money or let me ask you -- strike

**Page 38**

that.
How regularly would you give these
reports? Would that be monthly?
A. We have monthly department head
meetings.
Q. Okay. During this period of time,
September '92 to August '93 period of time, do you
recall generally how much money the hospital was
losing?
A. In terms of numbers, no, sir. It's
been too many years ago.
Q. Okay. Do you have an approximate? I
mean, do you know if it was more or less than a
million a month or any recollection to that
regard?
MR. HANNAH: Objection. Calls for
speculation.
THE WITNESS: It would be speculation
on my part. We were losing money, but to call the
exact number, I cannot do that.

BY MR. COPELAND:
Q. Okay. Now, I believe you stated that
at some point in time Galen was sold to or there
was discussions between Galen and Columbia?

**Page 39**

A. Uh-huh.
Q. Is that correct?
And you testified that, I guess, some
individuals from Columbia would come down. Were
you involved in the due diligence; is that
correct?
MR. HANNAH: Objection as to the
characterization of testimony.

BY MR. COPELAND:
Q. Okay. What was your involvement, if
any, with any individuals from Columbia in regards
to the sale of Galen Hospital?
A. It was only as the person to
coordinate the various people coming in and out,
and try to be as cooperative as possible in the
process, making sure that they had everything that
they need.
Q. Were you involved in the negotiations
over the purchase?
A. No, sir.
Q. Do you recall any of the individuals
from Columbia which presented themselves at the
hospital?
A. Two or three that come to mind is Dan

**Page 40**

Bowen, who happened to be the regional director or
president. I'm not sure exactly what his title
was at that time with Columbia. There was another
lady by the name of Jamie Hopping who was involved
with the Columbia regional office. And a
gentleman who was in there on behalf of Columbia
to perform a lot of the due diligence work. And
the chairman of Columbia was there at least one
time that I can recall, but that's all I can
recall.
Q. All right. Did you have any
discussions with them about the financial
condition of the hospital?
A. They were very aware of the financial
conditions of the hospital, yes.
Q. Now, did they or did any of the
individuals from Columbia that were present ever
comment to you on what actions they thought needed
to be taken in regards to getting the hospital
back into shape?
A. Specifics, I cannot recall other than
we had to reduce costs.
Q. All right. Anything -- other
generalities you can recall what actions that
they --

1    A.  No, sir.  I don't recall.
2        MR. HANNAH: Objection. Hearsay.
3
4  BY MR. COPELAND:
5    Q.  Was there any statements made in your
6  presence from any individuals from Columbia in
7  regards to eliminating positions or firing
8  employees?
9        MR. HANNAH: Objection. Leading.
10  Hearsay.
11        THE WITNESS: I can't recall specific
12  discussions that I had with them regarding that,
13  no, sir.
14
15  BY MR. COPELAND:
16    Q.  All right.  Do you recall any
17  individuals from Columbia ever making a statement
18  to the effect that the hospital needed a
19  "facelift"?
20    A.  I can't recall.
21        MR. HANNAH: Objection. Leading.
22        THE WITNESS: I can't recall.
23
24  BY MR. COPELAND:
25    Q.  Do you recall any statements from

1  individuals from Columbia to the effect that it
2  was time to get out with the old and in with the
3  new or any age-related remarks?
4    A.  Not that I recall, no, sir.
5    Q.  Do you have any recollection of any
6  suggestion on their part that you should be
7  looking to eliminate individuals based upon their
8  age?
9    A.  No, sir.
10    Q.  At some point in time did you
11  consider a reduction in force into Pembroke Pines?
12    A.  Yes.
13    Q.  Okay.  If you can, tell me what --
14  how was it decided that reduction in force was
15  needed at Pembroke Pines?
16    A.  Again, I can't remember the specifics
17  of this particular case.  I can only speak again
18  in generalities of the way I normally did this,
19  and that was through our department heads and
20  through consultation with various people to come
21  up with the number of people that we would RIF.
22    Q.  Okay.  Do you have any recollection
23  of what your involvement was in the reduction in
24  force that -- at Pembroke Pines?
25    A.  Basically a review process of what

1  was going on.
2    Q.  All right.
3    A.  And, of course, you know, we had to
4  make a final decision on whether or not to do it
5  and how many to do.
6    Q.  Did you provide any of your directors
7  with instructions on what to do in regards to a
8  RIF?
9    A.  I can't recall specific instructions
10  to them.
11    Q.  Okay.  In the course of your
12  practice -- let me ask you this:  Is there
13  anything about the way that the RIF was enacted at
14  Pembroke Pines which, in your recollection, was
15  different than what you've gone through in other
16  hospitals?
17    A.  Not any particular thing sticks out,
18  no.
19    Q.  Okay.  Do you recall if you received
20  any directives on how to pursue the reduction in
21  force from Columbia or anyone associated with
22  Columbia?
23    A.  I cannot recall.
24    Q.  Do you know how it was that
25  individuals at Pembroke Pines were identified as

1  being candidates for reduction in force?
2    A.  Individuals?
3    Q.  Yes.
4    A.  No, other than the consultation that
5  we may have had with the individual department
6  heads and their recommendations as I said before.
7    Q.  Okay.  Your understanding that as in
8  your normal course was that the directors would
9  present you with a list of individuals?
10    A.  Yes.
11    Q.  All right.  And what was your
12  involvement in regards to those individuals that
13  you had direct supervision?
14    A.  Generally went through my director of
15  human resources, who in turn would do all the
16  necessary review work, and I would sit down with
17  the director of human resources and go through it
18  and try to make sure it was a fair and equitable
19  reduction.
20    Q.  Okay.  Was there -- did you provide
21  any directives to any of your directors to take
22  into consideration the age of any of the
23  employees?
24    A.  No, sir.  Never had.
25    Q.  Did you direct any of your directors

Page 45

1   in regards to Pembroke Pines to take into
2   consideration the length of service of any
3   employees?
4       A.  I would not have -- I don't recall,
5   but I would not generally have generally provided
6   that direction.
7       Q.  I believe you said there were a
8   couple positions you had direct supervisory
9   authority over?
10      A.  Yes, sir.
11      Q.  Who was it that made the decision
12  that those individuals you had direct --
13      A.  It would have been me if they
14  reported directly to me.
15      Q.  Did you make a decision to include or
16  exclude any individuals that you had direct
17  supervisory authority in the reduction in force?
18      A.  Obviously I did.  I mean, Ms. Iaia
19  was one of those that was reduced.
20      Q.  Okay.  Were there any particular
21  goals which you were trying to achieve in regards
22  to the reduction in force at Pembroke Pines?
23      A.  The specific goals and the numbers on
24  it, no, sir, I can't recall off the top of my
25  head, but, if it's like any other that we've done,

Page 46

1   it was in order to compensate for the volume
2   decrease that was in the facility.
3       Q.  Okay.  Would you have been the
4   individual responsible for deciding on whether or
5   not the director of marketing would be --
6       A.  Yes, sir.
7       Q.  -- included?
8           And would you have been the
9   individual responsible for deciding whether or not
10  the director of Senior Friends would be included?
11      A.  Yes, sir.
12      Q.  Do you recall -- do you recall that
13  Miss Iaia was the director of marketing, correct?
14      A.  Yes, sir.
15      Q.  And was it your decision to include
16  her in the reduction in force?
17      A.  It would have had to have been.  She
18  reported directly to me.
19      Q.  Okay.  Do you have any recollection
20  what factors you took into consideration in
21  including Ms. Iaia in the reduction of force?
22      A.  Ms. Iaia's specific case, nothing
23  specifically comes to mind other than the position
24  itself.
25      Q.  Okay.  What was it about the position

Page 47

1   itself that you felt made it appropriate to
2   include in the reduction in force?
3       A.  Well, under the circumstances that we
4   were under, and I think it was fairly well known
5   that I am not a big supporter of various and
6   sundry marketing programs within hospitals.  Under
7   the circumstances of the reduction in census at
8   Pembroke Pines, I suspect that I looked at that
9   position as a position which the funds could be
10  used better to support other areas because I had,
11  as far as I can recall, no marketing program set
12  forth in the future.
13      Q.  In regards to Miss Iaia's performance
14  as the director of marketing, as the CEO did you
15  see whether or not her performance was having a
16  positive effect on the financial condition of the
17  hospital?
18          MR. HANNAH:  Object to form.
19          THE WITNESS:  That's very hard to
20  measure, but I'm not sure I can -- yes, I would
21  have looked at it, but it's a very hard thing to
22  measure.
23
24  BY MR. COPELAND:
25      Q.  Okay.  During your experience -- I

Page 48

1   mean, during your term there did the census
2   increase or decrease?
3       A.  Decreased.
4       Q.  Now, you alluded to the fact that you
5   have a, I guess, a predisposition towards the
6   marketing position in hospitals?
7       A.  Yes, sir.
8       Q.  Can you explain that for me a little
9   bit, you know, what it is -- your beliefs in
10  regards to marketing positions in hospitals?
11      A.  I guess it's not necessarily
12  marketing positions as it's so much as marketing
13  programs.  Over my years of experience to do what
14  I call media advertising, that being newspapers,
15  TV, whatever, unless it is related to a very
16  specific program, I have not found it to be
17  beneficial to hospitals.  That's just been my
18  experience.  It's something that I could never
19  measure as a program which developed anything on
20  behalf of the hospital to grow its patient
21  volumes.
22      Q.  Okay.  Now, do you have any
23  individual recollection of Miss Iaia as you sit
24  here today?
25      A.  Other than recalling her, no.

Page 49

1    Q.  Okay.  Do you even know what her age
2  is?
3    A.  No, sir.
4    Q.  At the time when you made the
5  decision to include her position in the reduction
6  in force, did you have any understanding of what
7  her age is?
8    A.  Not that I recall.
9    Q.  Did you have any understanding of
10  whether or not she was 40 years or older or under?
11    A.  I don't even recall.
12    Q.  Do you recall what she looked like?
13    A.  Yes.
14    Q.  Did she look to you, in your
15  recollection, as an individual who was 40 or over
16  or 40 or under?
17    A.  I don't know that I ever thought
18  about it.
19    Q.  Okay.  Did you take Mrs. Iaia's age
20  into consideration in any way in your decision to
21  include her in the reduction in force?
22    A.  No, sir.
23    Q.  Did you take into consideration any
24  of your personal likes or dislikes of Miss Iaia in
25  your decision to include her in the --

Page 50

1    A.  Not that I recall.
2    Q.  Did you take into consideration her
3  length of employment with Humana and Pembroke
4  Pines in your decision to include her in the
5  reduction in force?
6    A.  The only thing I can recall in that
7  effect might be the years of service that she had
8  to develop a package to present to the employees
9  once they left in terms of a monetary package.
10    Q.  Okay.  What was it about the fact or
11  what was it about a length of service which would
12  affect the severance pay?
13    A.  Generally the severance package would
14  have been depending on your length of service.  My
15  experience has been we always provide a higher
16  severance package for individuals with longer
17  years of service.
18    Q.  Were there any factors, other than
19  the positions itself, that -- or were there any
20  outside factors which led you to include the
21  director of marketing in your decision?
22    A.  I'm not sure I understand the
23  question.
24    Q.  Okay.  What were -- were there any
25  goals you had in mind for the future of the

Page 51

1  marketing program or marketing of the hospital
2  which contributed to your decision to to --
3    A.  Not that I recall.
4    Q.  Okay.  Now, did you make the decision
5  to include the director of marketing position in
6  consultation with any other individuals?
7    A.  I don't recall the specifics of who
8  all was -- things were discussed with during this
9  process, no.  I can't --
10    Q.  Okay.  Now, I want to talk a little
11  bit about, you know, Monique Monteiro.
12    A.  Yes, sir.
13    Q.  What position did she hold at the
14  hospital?
15    A.  Director of the Seniors Program.
16    Q.  Do you have any recollection as to
17  how she was -- how she did in her position as
18  director of Senior Friends?
19    A.  Did an extremely good job, as best I
20  can recall.
21    Q.  Okay.  What was it -- is there
22  anything you recall specifically about her
23  successes or her lack of success as director of
24  Senior Friends?
25    A.  Other than the programs that I

Page 52

1  attended that she put on, it seemed to be, if my
2  memory serves me correctly, that their membership
3  was growing in terms of the number of members they
4  had in the association.  I don't recall the exact
5  numbers right now, but there was a growth there.
6    Q.  Okay.  And was her -- did you review
7  her position and her performance in her position
8  in deciding whether or not to include Ms. Monteiro
9  in the reduction in force?
10    A.  I don't recall whether we looked at
11  that position or not.
12    Q.  Do you know if in fact she was
13  included or excluded?
14    A.  Not as far as I know.
15    Q.  Do you know why she wasn't included
16  in the reduction in force?
17    A.  Because we had a lot of efforts put
18  forth into the Seniors Programs on all fronts in
19  all our facilities, but we felt like that the
20  Seniors Program, if maintained in the proper
21  fashion, was a good tool for the facility to use
22  as an access to the senior members of the
23  community to get our story out to the seniors of
24  what we were trying to do, and we felt like that
25  the Seniors Program was something that needed to

Page 53

1  be nurtured and continue to grow.
2      Q.  Okay.  Do you recall how old Miss
3  Monteiro was at the time?
4      A.  Not off the top of my head, no, sir.
5      Q.  Did her age in any way impact upon
6  your decision to retain her as Senior Friends
7  director?
8      A.  No, sir.
9      Q.  Now, as a direct supervisor of Miss
10 Iaia, did you perform evaluations of her during
11 the time that you were CEO?
12     A.  Same as I would with anybody else
13 that reported directly to me, yes.
14     Q.  Okay.  Let me show you what I'll have
15 marked as Defendant's Exhibit Number 1.  Show it
16 to opposing counsel first.
17     MR. HANNAH:  It's incomplete.  Let
18 the record reflect that's an incomplete document.
19     MR. COPELAND:  Okay.  I'll have this
20 marked as Defendant's Exhibit Number 1.
21     (Defendant's Exhibit 1 was
22     marked for identification.)
23
24 BY MR. COPELAND:
25     Q.  Do you recognize the document I've

Page 55

1      A.  One being the lowest and five being
2  the highest.
3      Q.  Okay.  In review of this evaluation
4  did you consider this to be a positive or good
5  evaluation?
6      A.  In my opinion, it was a positive
7  evaluation.
8      Q.  Now, did you have an opportunity to
9  work with Miss Iaia directly while you were the
10 CEO at the hospital?
11     A.  I'm sure I did.  She reported
12 directly to me.
13     Q.  Where was her offices located
14 in relation to your office?
15     A.  As best I can recall, it was -- there
16 was a conference room next to mine, and, if I
17 recall, her office was just beyond that.
18     Q.  Okay.  Now, did you ever directly
19 actually make any comments to Miss Iaia which were
20 derogatory in nature?
21     A.  Not that I recall.
22     Q.  Mr. Sutphin, do you have any
23 preference for younger women as opposed to older
24 women?
25     A.  Not necessarily.

Page 54

1  handed to you?
2      A.  Yes, sir.  It's an evaluation form.
3      Q.  Okay.  And do you have an
4  understanding of who this was an evaluation of?
5      A.  There is no signature on it.  It says
6  Jackie.
7      Q.  Okay.  Is this your handwriting on
8  the evaluation form?
9      A.  Yes, it is.
10     Q.  Okay.  And the scores which are
11 indicated on the first page, are those -- is that
12 your handwriting as well?
13     A.  Yes, sir.
14     Q.  Did you perform this evaluation?
15     A.  I'm sure I did if I wrote the
16 numbers.
17     Q.  Okay.  Now, how was it that the
18 hospital Pembroke Pines, at that time would
19 evaluate?  Was there a scale in place in grading
20 somebody?
21     A.  If I recall, it was the same in all
22 of the Humana hospitals at that time, and that was
23 basically a one to five scale.
24     Q.  Okay.  With one being the lowest and
25 five being the highest?

Page 56

1      Q.  In a professional sense, in regards
2  to who you employ, do you prefer younger women as
3  opposed to older women?
4      A.  I prefer the person best qualified
5  for the job.
6      Q.  All right.  Mr. Sutphin, have you
7  ever flirted with any of the female staff at
8  Pembroke Pines while you were employed there?
9      A.  Not intentionally.
10     Q.  To your knowledge, did you ever flirt
11 with Monique Monteiro?
12     A.  Not that I'm aware of.
13     Q.  All right.  To your knowledge, did
14 you ever chat more with Monique Monteiro as
15 opposed to any of the other female directors?
16     A.  I'm not even sure I can comment on
17 that because that calls me to make a judgment on
18 the number of times, and I haven't got the
19 slightest idea.
20     Q.  Did you treat Monique differently
21 than you would have treated any other female
22 director?
23     A.  Not any different.  I probably spent
24 a lot of time with her trying to develop the
25 Seniors Program, but, you know, not necessarily

**ASSOCIATED COURT REPORTERS, INC.**

Page 53 - Page 56

Page 57

1 more so than anybody else.
2    Q. Did you have any relationship with
3 Miss Monique Monteiro, other than a professional
4 relationship?
5    A. No, sir.
6    Q. Did you have any relationship with
7 any of the female directors and staff, other than
8 a professional relationship?
9    A. No, sir.
10    Q. To your knowledge, Mr. Sutphin, have
11 you ever made any comments while at Pembroke Pines
12 that were age-related comments to the effect that
13 you disfavored older people as opposed to younger
14 people?
15    A. No, sir.
16    Q. Have you ever made any comment to the
17 effect that it's time to go out with the old and
18 in with the new?
19    A. I don't recall making that comment.
20    Q. Okay. Is it possible that comment of
21 that nature was made by you and you just don't
22 recall or --
23    MR. HANNAH: Object to the form.
24    THE WITNESS: I just don't know if I
25 made it or not.

Page 58

1 BY MR. COPELAND:
2    Q. Okay. Do you recall ever making any
3 comments to any of the directors or at any
4 meetings at Pembroke Pines to the effect if you're
5 not able to cut the mustard heads will roll?
6    A. I don't recall making that specific
7 comment, no, sir.
8    Q. Okay. Would it be unlike you to make
9 that type of comment?
10    MR. HANNAH: Object to the form.
11    THE WITNESS: In a moment of
12 frustration, maybe not those words but the tone of
13 it, I could possibly have made that, yes.
14
15 BY MR. COPELAND:
16    Q. Okay. Do you know or recall if you
17 ever made a comment to other directors or
18 employees at Pembroke Pines that if your attitude
19 is old and/or complacent you are not going to make
20 it?
21    A. No, sir, I don't remember making that
22 comment.
23    Q. Okay. Have you ever made any
24 comments to that effect dealing with an old
25 attitude?

Page 59

1    A. Possibly, but I don't recall a
2 specific case.
3    Q. Okay. And what is it you would be
4 referring to if you were referring to old
5 attitude?
6    MR. HANNAH: Objection. Calls for
7 speculation. Doesn't recall actually making those
8 statements.
9    THE WITNESS: It would be -- I could
10 only guess that it would be something to do with
11 new ways of doing things.
12
13 BY MR. COPELAND:
14    Q. Okay. Would that --
15    MR. HANNAH: Move to strike, by the
16 way. Nonresponsive. Speculation. Guessing.
17
18 BY MR. COPELAND:
19    Q. Would you ever have made a comment or
20 do you recall ever making a comment to the effect
21 if the attitude is old referring to the age of the
22 person?
23    A. No, sir.
24    Q. Now, Mr. Sutphin, was your decision
25 in keeping the Senior Friends director position in

Page 60

1 any way tied to your decision to eliminate the
2 director of marketing position?
3    A. Not that I recall.
4    Q. Did you subsequent to making the
5 decision to eliminate the director of marketing
6 position make any subsequent decisions to combine
7 any of those functions in conjunction with the
8 Senior Friends?
9    A. Sir, I cannot remember doing that.
10    Q. Okay. Now, I want to get into the
11 specifics.
12    Who was the individual at the
13 hospital which would advise Mrs. Iaia that she was
14 being included in the reduction in force?
15    A. That she was being included or in
16 fact she had been?
17    Q. Had been included.
18    A. Probably would have been me.
19    Q. Okay. Do you recall having a meeting
20 with her in order -- in what time you advised her
21 she was being included in --
22    A. I don't recall the specifics of it,
23 but I'm sure I did meet with her.
24    Q. Okay. What is it that leads you to
25 believe that you did in fact meet with her?

1    A.  Well, it would have been my
2  responsibility to talk to her, to -- as a --
3  because her job was being eliminated.
4    Q.  I'll show you what I'll have marked
5  Defendant's Exhibit 2.  It's previously
6  Defendant's Exhibit Number 8 to Miss Iaia's
7  deposition.
8           (Defendant's Exhibit 2 was
9           marked for identification.)
10
11  BY MR. COPELAND:
12    Q.  I'm going to ask you, Mr. Sutphin, if
13  you recall ever seeing this memo I've handed to
14  you dated November 11th, 1993?
15    A.  This specific one, no.  I think it
16  was a letter or a memo that was put out kind of of
17  a general nature in terms that everyone that was
18  in the RIF got a memo of this nature to explain
19  the benefits and what happened.
20    Q.  On the third page or fourth page -- I
21  apologize -- there is an acknowledgment page
22  with -- is that your signature under witness?
23    A.  Yes, sir.
24    Q.  And it's dated 11-11-93.  Does this
25  refresh your recollection as to whether or not

1  BY MR. COPELAND:
2    Q.  Okay.  Do you have any understanding
3  as to whether or not it was referring to the
4  Humana Galen reorganization or the Columbia
5  purchasing of the --
6           MR. HANNAH: Objection.  Calls for
7  speculation.
8           THE WITNESS:  It would have, in my
9  opinion, had to have related to the Columbia since
10  this was back -- this is November, and Galen was
11  no part of this at that time.
12
13  BY MR. COPELAND:
14    Q.  Now, in here it indicates this memo
15  was from Paula Adamson.  To your understanding,
16  would she have been the individual who prepared
17  this document?
18    A.  If she signed it she would have
19  prepared it, yes.
20    Q.  Do you have any recollection if you
21  participated in the preparation of this document?
22    A.  I don't recall.
23    Q.  Now, do you recall if Miss Iaia was
24  provided with any severance at the time of her
25  termination?

1  this document was --
2    A.  I obviously signed it, but --
3    Q.  Do you recall having Miss Iaia sign
4  this document in your presence?
5    A.  I don't recall the specific incident,
6  but she has signed it.
7    Q.  Okay.  If you can, if you would,
8  please, review the first page or the first
9  paragraph of the first page of that and I'll ask
10  you if that refreshes your recollection as to any
11  factor which went into your decision to include
12  Mrs. Iaia's position.
13    A.  It does not bring back specifics to
14  me, but, again, it would have been a decision as
15  it relates to the position would have chosen not
16  to do that.
17    Q.  There is a reference in here that
18  says due to the recent reorganization.  What was
19  that referring to, reorganization on the first
20  paragraph?
21           MR. HANNAH: Object to the form.
22  He's not the author.
23           THE WITNESS:  I don't recall exactly
24  what that was referring to other than the
25  possibility of the acquisition by Columbia.

1    A.  The amount, no, I don't know off the
2  top of my head.
3    Q.  Okay.  Generally there is a severance
4  package, but I can't recall how much or what it
5  was.
6    Q.  Okay.  Do you recall if she was in
7  fact -- she was presented with some severance
8  package but you just can't recall the specifics?
9    A.  Yes, sir.  I think all the employees
10  pretty much were on this.
11    Q.  Do you recall if Miss Iaia at any
12  time ever objected to her being included in the
13  reduction in force based upon what she felt was
14  her age?
15    A.  Specific conversations, no, sir.
16    Q.  Okay.  Now, in performing reductions
17  in forces and in fact giving the bad news, so to
18  speak, to the employees, have there been occasions
19  when the employees would become upset emotionally?
20    A.  It is not unusual.
21    Q.  Okay.  And what would be your
22  response in those type of a circumstance?
23    A.  Well, my response is I hate to see
24  anyone lose their job.  It's --
25    Q.  Would you take any efforts to comfort

Page 65

1  them?
2      A.  Probably.
3      Q.  If a female was being laid off or
4  part of the reduction in force and became
5  emotional during this period, would it be unusual
6  for you to attempt to hug her or to comfort her?
7          MR. HANNAH:  Objection.  Calls for
8  speculation.  Not specifically relevant.
9          THE WITNESS:  It's possible.
10
11  BY MR. COPELAND:
12      Q.  Do you recall if that in fact
13  occurred at all with Miss Iaia?
14      A.  I don't recall.
15      Q.  Now, do you offer to write letters of
16  recommendation on behalf of employees that have
17  been included in reduction in forces as a matter
18  of course?
19      A.  Not as a matter of course.  If I feel
20  like they're a good employee I will do that.
21      Q.  Do you recall if in fact you offered
22  to Miss Iaia to write a letter of recommendation
23  on her behalf?
24      A.  I don't recall making the offer,
25  but --

Page 66

1      Q.  Let me show you what I'll have marked
2  Defendant's Exhibit Number 3.
3          (Defendant's Exhibit 3 was
4          marked for identification.)
5
6  BY MR. COPELAND:
7      Q.  It's a document -- can you identify
8  this document?
9      A.  It's a -- basically a overall letter
10  of recommendation since it's addressed to whom it
11  may concern relating to Jackie Iaia from me as a
12  recommendation for the work performed as director
13  of marketing/public relations.
14      Q.  Okay.  Do you recall any specifics as
15  to whether or not you wrote this of your own
16  volition or whether or not it was requested of you
17  by Miss Iaia?
18      A.  I don't recall.  I can't recall the
19  specific circumstances, no.
20      Q.  Under what conditions would you write
21  a letter of recommendation as you did for Miss
22  Iaia?
23      A.  Generally if someone requested that
24  and I felt like they deserved a letter of
25  recommendation I would write one.

Page 67

1      Q.  Do you recall if Miss Iaia had any
2  contact with you after she was advised she was
3  included in the reduction in force?
4      A.  Not that I recall.
5      Q.  Do you recall any request by Miss
6  Iaia to be reimbursed for medical or dental
7  insurance?
8      A.  I do not recall that.
9      Q.  Who was your successor or -- let me
10  strike that.
11          At some point in time did you leave
12  the employment at Pembroke Pines as CEO?
13      A.  Yes, sir.  November of '93.
14      Q.  Would that have been shortly after
15  the reduction in force was implemented?
16      A.  I can't remember the exact date, but
17  it was right around the end of November.
18      Q.  Okay.  And under what circumstances
19  did you leave your employment with Pembroke?
20      A.  I had been offered a position with
21  Humana in Washington, D. C.
22      Q.  All right.  And what position was
23  that?
24      A.  As the executive director of Humana
25  Group Health Plan, which was under the process of

Page 68

1  being acquired at the time by Humana.
2      Q.  Okay.  Was this a transfer of a
3  position or did you have to -- I mean, how did you
4  end your relationship with Pembroke Pines?
5      A.  I basically handed a letter of
6  resignation in to them.
7      Q.  Now I want to talk a little bit about
8  Miss Monteiro some more.
9          My understanding is that she was in
10  the position of director of Senior Friends at the
11  time you came on as CEO at --
12      A.  She was there at the time I took over
13  the position, yes, sir.
14      Q.  Did you have any understanding of how
15  she performed at that position at that time or
16  were you apprised?
17      A.  No.
18          MR. HANNAH:  Objection.  Asked and
19  answered.
20          THE WITNESS:  No.  I don't recall.
21
22  BY MR. COPELAND:
23      Q.  Let me show you a memo dated December
24  11, 1991 I'll have marked Defendant's Exhibit
25  Number 4, am I at?

Page 69

```
 1          (Defendant's Exhibit 4 was
 2       marked for identification.)
 3
 4  BY MR. COPELAND:
 5       Q.  Let me ask you first, in reviewing
 6  that memo do you recall ever reviewing this memo?
 7       A.  No, sir.
 8       Q.  Was your understanding of how Miss
 9  Monteiro was performing in her position of
10  director of Senior Friends, did it comport with
11  what this memo sets forth?
12          MR. HANNAH:  Objection to leading.
13          THE WITNESS:  I don't ever remember
14  having a discussion in that relationship.
15
16  BY MR. COPELAND:
17       Q.  Okay.  Do you agree with the
18  assessment as set forth within this memo dated
19  December 11th, 1991?
20          MR. HANNAH:  Objection.  This is the
21  year before he started.
22          THE WITNESS:  I wasn't even here at
23  the time.
24
25
```

Page 70

```
 1  BY MR. COPELAND:
 2       Q.  I'll show you what I'll have marked
 3  as Defendant's Exhibit Number 5.
 4          (Defendant's Exhibit 5 was
 5       marked for identification.)
 6
 7  BY MR. COPELAND:
 8       Q.  I'm going to ask you, sir, if you can
 9  review that and if you can identify that document
10  for me?
11       A.  Yes.  It's an evaluation of Monique
12  Monteiro.
13       Q.  And who performed this evaluation?
14       A.  I did.
15       Q.  Is your signature indicated on this
16  document?
17       A.  Yes, sir.
18       Q.  And would that be on which page,
19  fourth page?
20       A.  Fifth page of my copy.
21       Q.  And is the handwriting on the third
22  and fourth page, is that your handwriting?
23       A.  Yes.
24       Q.  Now, again, how would you have -- how
25  would you characterize this evaluation of Miss
```

Page 71

```
 1  Monteiro?
 2       A.  Very good.
 3       Q.  To your knowledge, did you perform
 4  any additional evaluations of Miss Monteiro?
 5       A.  I just don't recall.
 6       Q.  Okay.  Do you recall ever receiving
 7  any feedback from other employees of Humana or
 8  individuals outside Humana in regards to how Mrs.
 9  Monteiro was performing in her functions of Senior
10  Friends?
11       A.  I don't recall specific details, no.
12       Q.  Okay.  Do you recall -- do you recall
13  that you did receive them, you just don't know
14  what the details are?
15       A.  I don't even recall any discussions I
16  had.  Could have very well have, but I just don't
17  recall.
18       Q.  Do you recall if you ever received
19  any negative comments that were directed to Mrs.
20  Monteiro's performances or functions --
21       A.  Same answer.  I just don't recall.
22       Q.  Okay.  Mr. Sutphin, you've appeared
23  here today for your deposition.  Did you appear
24  here as a result of being served with a subpoena?
25       A.  Yes, sir.
```

Page 72

```
 1       Q.  Have you been offered any money or
 2  any remuneration for purposes of providing your
 3  testimony here today?
 4       A.  No, sir.  I received a check for $10.
 5       Q.  All right.  Now, have you had any
 6  conversations with me prior to --
 7       A.  Yes, sir.
 8       Q.  And have any of those conversations
 9  in any way impacted upon your answers you
10  provided?
11       A.  No, sir.
12       Q.  One minute.
13          THE VIDEOGRAPHER:  We will now go off
14  the record at the time and date indicated on the
15  screen.
16          (Recess)
17          THE VIDEOGRAPHER:  We are now back on
18  the record as time and date indicated on the
19  screen.
20          MR. COPELAND:  Mr. Sutphin, that's
21  all the questions I have for you right now.
22
23          CROSS-EXAMINATION
24  BY MR. HANNAH:
25       Q.  Mr. Sutphin, my name is Rod Hannah.
```

Page 73

1   I'm one of the attorneys for Jacqueline Iaia in
2   this case against Columbia Healthcare d/b/a
3   Pembroke Pines Hospital.
4           What's your exact home address?
5   A.   1348 Marshall Lane, Virginia Beach,
6   23455.
7   Q.   Do you have a separate work address?
8   A.   No, sir.
9   Q.   You work out of your home?
10  A.   Yes.
11  Q.   Why did you leave Humana?
12  A.   We sold the Health Plan in
13  Washington.
14  Q.   Did you find yourself out of a job at
15  that time?
16  A.   Uh-huh.
17  Q.   Is that yes?
18  A.   Yes.
19  Q.   Mr. Copeland asked you if you had a
20  discussion with him prior to today. How long was
21  that discussion?
22  A.   We spoke for probably an hour Friday
23  on the telephone.
24  Q.   How about today?
25  A.   And this morning for breakfast, yes.

Page 74

1   Q.   How long was that discussion?
2   A.   An hour or so.
3   Q.   When you spoke last Friday, about how
4   long was your discussion?
5   A.   About an hour.
6   Q.   What did you discuss?
7   A.   We just went through some of the
8   questions that we were -- I may be asked.
9   Q.   Okay. So you knew the questions that
10  he was going to ask you before you came in here
11  today?
12  A.   Yes, sir.
13  Q.   And you told him what your answers
14  would be to those questions?
15  A.   Not in all cases. He asked me to
16  think about them.
17  Q.   You did also tell him what some of
18  your answers were going to be?
19  A.   Yes.
20  Q.   Okay. And you also met with Ms.
21  Willis-Green as well, the other attorney for --
22  A.   Yes.
23  Q.   -- the defendant in this case?
24  A.   Yes.
25  Q.   That was this morning as well?

Page 75

1   A.   This morning, yes.
2   Q.   Have you ever met with Mr. Edwards?
3   Do you know who Mark Edwards is?
4   A.   No.
5   Q.   Have you ever met with any attorney
6   for Columbia Healthcare or Pembroke Pines Hospital
7   with regard to Miss Iaia's claims prior to today?
8   A.   Not up until this time, no.
9   Q.   Were you ever contacted by any
10  attorney or anyone from Pembroke Pines Hospital,
11  Columbia Healthcare, or Galen Hospital for that
12  matter, regarding any of Miss Iaia's charges of
13  discrimination --
14  A.   No, sir.
15  Q.   -- prior to today?
16  A.   No, sir, other than --
17  Q.   Other than to speak to counsel?
18  A.   As it relates to this.
19  Q.   Okay. Have you ever been accused of
20  discrimination of any kind?
21  A.   No, sir.
22  Q.   Okay. Have you ever been accused of
23  harassment of any kind?
24  A.   No, sir.
25  Q.   There were other people let go by

Page 76

1   Pembroke Pines Hospital in the reduction in force
2   at the same time as Miss Iaia?
3   A.   As best I can recall, yes.
4   Q.   There were other directors who were
5   also let go?
6   A.   I don't recall the specifics of all
7   of the people that were let go.
8   Q.   Was the director of nursing let go at
9   the time?
10  A.   Quite frankly, not that I recall.
11  Q.   Do you know who Carol Naples was?
12  A.   Yes. She was the director of
13  nursing.
14  Q.   Do you know if she was let go in this
15  so-called reduction in force?
16  A.   I cannot recall whether she was let
17  go in the reduction if force or whether she was
18  let go as a result of Columbia wanting to make
19  certain management changes at the facility.
20  Q.   There were other people let go for
21  other reasons?
22  A.   Yes.
23  Q.   How about Claudia Jack? You remember
24  her?
25  A.   She would have been human resource

Page 77

1  director, and she was replaced not as part of the
2  RIF but the fact Columbia would like to have
3  people who were familiar with their programs in.
4     Q.  Did you -- were you responsible for
5  terminating her?
6     A.  I don't recall her specific
7  instances, but she reported to me, yes.
8     Q.  You don't recall if you were the one
9  that terminated her?
10    A.  Probably.  I don't recall, again, the
11 specific instances.
12    Q.  Do you know who replaced her?
13    A.  Paula Adamson maybe.
14    Q.  Do you know if Paula Adamson is
15 younger than Claudia Jack?
16    A.  I have no idea.
17    Q.  All right.  Do you know who replaced
18 Carol Naples as director of nursing?
19    A.  No, sir.  I don't even recall.
20    Q.  Were you the one that actually
21 terminated Carol Naples?
22    A.  I don't even recall the incident.
23    Q.  Do you remember a person by the name
24 of Ron Hoffman?
25    A.  Yes, sir.

Page 79

1     A.  I do not recall.
2     Q.  Don't know who that person was?
3     A.  The name rings a bell, but I can't
4  remember specifics.
5     Q.  Do you know the director of medical
6  records by the name of Cheryl?
7     A.  No.
8     Q.  Do you know if the director of
9  medical records was let go during the reduction in
10 force?
11    A.  I do not recall.
12    Q.  Now, Mr. Copeland showed you a
13 document before, I believe it was Exhibit Number
14 2, termination memoranda.
15    A.  Uh-huh.
16    Q.  Pull that out, please.
17    A.  (Witness complied.)
18        This?
19    Q.  Yes.  What's the date on that?
20    A.  November the 11th, 1993.
21    Q.  Okay.  And in that termination
22 memorandum Miss Iaia was not actually terminated
23 from the hospital, was she?
24    A.  I would have to look at it and see.
25    Q.  Why don't you take a look at it?

Page 78

1     Q.  All right.  Did he report to you?
2     A.  I can't recall that.
3     Q.  He was director of engineering?
4     A.  That doesn't necessarily mean he
5  reported to me.  It could have been to my
6  assistant.
7     Q.  Do you know if he was let go in the
8  reduction of force?
9     A.  Not that I recall.
10    Q.  Do you know if he was let go at all,
11 terminated at all?
12    A.  Yes, sir.
13    Q.  Do you know who communicated the
14 termination decision?
15    A.  No, sir.
16    Q.  You weren't involved in that
17 termination decision?
18    A.  I don't recall.
19    Q.  Let me finish my question.  You're
20 very quick to answer.
21    A.  I'm sorry.
22    Q.  Let me just finish my question.  Then
23 you can answer, okay?
24    A.  Okay.
25    Q.  How about Connie Viara?

Page 80

1        MR. COPELAND:  Objection.  The
2  document speaks for itself.
3        THE WITNESS:  It says she will be
4  placed in an involuntary leave of absence.
5
6  BY MR. HANNAH:
7     Q.  So she was placed on a six-month
8  leave of absence at that time?
9     A.  That's the way the memo reads, yes.
10    Q.  Do you recall that actually
11 occurring, her being placed on a six-month leave
12 of absence?
13    A.  The specifics of what's in the memo,
14 no.
15    Q.  What was the purpose of putting her
16 on a leave of absence, if you recall?
17    A.  I don't recall.  It would be pure
18 speculation if I could sit here and guess.
19    Q.  You don't know if it was to try to
20 locate her another position at the hospital?
21    A.  I would guess that that would be the
22 case, but I don't know it for a fact.
23    Q.  Okay.  I would have this marked
24 Defendant's Exhibit Number 1.
25        THE REPORTER:  It would be

Page 81

1 Plaintiff's.
2      MR. HANNAH: I'm sorry. Plaintiff's
3 Exhibit Number 1. I'm the one used to taking the
4 deposition.
5           (Plaintiff's Exhibit 1 was
6           marked for identification.)
7
8 BY MR. HANNAH:
9      Q.   I show you Plaintiff's Exhibit Number
10 1. You may or may not recall that document. I'm
11 going to ask you if you've actually seen that
12 document before?
13     A.   No, sir.
14     Q.   Okay. Do you know if that is the
15 type of document that's given to employees that
16 have been placed on a six-week involuntary leave
17 of absence as a reduction in force when they're
18 actually terminated?
19     A.   It may have been a policy that they
20 put in subsequent to me leaving, but I don't know.
21     Q.   Okay. You had no involvement
22 whatsoever in any kind of decision as to whether
23 or not to place Miss Iaia on a six-month leave of
24 absence as opposed to just terminating her
25 outright in a reduction of force?

Page 82

1      A.   Sir, I think there was a general --
2 probably a general consensus of how the whole
3 package would be put together, but as it related
4 specifically to Miss Iaia I cannot answer.
5      Q.   Let's talk about the specific package
6 in the reduction in force. How many people do you
7 recall being terminated?
8      A.   It was several, but --
9      Q.   Let me finish my question.
10     A.   I thought you already asked.
11     Q.   How many people were terminated by
12 Pembroke Pines Hospital as a result of the
13 reduction in force back in late 1993?
14     A.   I don't recall the exact number.
15     Q.   Can you tell me, was it more than 10
16 people?
17     A.   I would guess that it was, in
18 relation, probably even more than that, yes.
19     Q.   And those people who were terminated,
20 what was the -- strike that.
21           With regard to those people that were
22 terminated, were they all permitted to go on a
23 six-month involuntary leave of absence prior to
24 actual outright termination?
25     A.   I don't recall that.

Page 83

1      Q.   You don't know if that was the
2 general policy that was in place?
3      A.   I just don't recall.
4      Q.   Do you know who at Pembroke Pines
5 Hospital would have had that kind of knowledge, who
6 would have had that kind of knowledge?
7      A.   Six years ago I probably would have
8 had it, but in this period of time I can't
9 remember the details of this. Paula Adamson would
10 have been the personnel director.
11     Q.   Okay. Do you know if she's still
12 with Humana?
13     A.   I have no idea.
14     Q.   In the reductions in forces you've
15 handled for Humana -- you've done more than one,
16 right?
17     A.   Yes.
18     Q.   Were the employees placed on a
19 six-month involuntary leave of absence, the
20 employees that were selected?
21     A.   Are we speaking of Humana or
22 Columbia?
23     Q.   Let's talk about Humana.
24     A.   I have seen it done multiple ways.
25     Q.   All right. Sometimes they're put on

Page 84

1 a leave of absence period, right?
2      A.   Yes. I have seen that.
3      Q.   For the purposes of trying to put
4 them in another position?
5      A.   Find them another facility, something
6 of that nature.
7      Q.   And that was the case with regard to
8 Miss Iaia, correct?
9      A.   That's what the memo says, yes, sir.
10     Q.   You were copied on that memo?
11     A.   I'm -- my name is not on there to be
12 copied, no.
13     Q.   Didn't you actually sign that memo as
14 a witness?
15     A.   Yes.
16     Q.   Okay. So you were aware of that
17 memo?
18     A.   Yes.
19     Q.   So you would have been aware of the
20 reason why Miss Iaia was being placed on a
21 six-month leave of absence, correct?
22     A.   At the time I probably was.
23     Q.   All right. Today you don't remember
24 what the reason was?
25     A.   I don't recall.

**ASSOCIATED COURT REPORTERS, INC.**

Page 85

1      Q.  It appears to you the reason she was
2  put on that was Columbia or Pembroke Pines
3  Hospital was going to try to locate her in another
4  position?
5          MR. COPELAND:  Objection.
6  Argumentative.
7          THE WITNESS:  I don't know.
8
9  BY MR. HANNAH:
10     Q.  Let's talk about the actual
11 termination of Miss Iaia.
12         Were you aware that Miss Iaia was
13 older than Monique Monteiro?
14     A.  No, sir.
15     Q.  You had no idea?
16     A.  No, sir.
17     Q.  Okay.  Sitting here today do you have
18 any idea how old Miss Monteiro is?
19     A.  No, sir.
20     Q.  As we sit here today do you have any
21 idea how old Miss Iaia was?
22     A.  No.
23     Q.  How often in your job as CEO and
24 executive director did you have contact with Miss
25 Iaia?

Page 87

1      Q.  You have no idea if that happened or
2  not?
3      A.  No, sir.  I don't recall it
4  happening.
5      Q.  Okay.  Isn't it true Miss Monteiro
6  after this so-called reduction in force became the
7  director of marketing/public relations and Senior
8  Friends?
9      A.  I have no idea.
10     Q.  You have no idea if that happened?
11     A.  No, sir.  I did not -- I left there
12 probably within a week and-a-half to two weeks of
13 this.
14     Q.  All right.  When this reduction in
15 force decision came down, okay, do you know if
16 Miss Monteiro was going to continue her employment
17 at Pembroke Pines Hospital in any kind of
18 position?
19     A.  Mrs. Monteiro?
20     Q.  Ms. Monteiro.
21     A.  As far as I knew, yes.
22     Q.  Okay.  What was your understanding
23 what position she was going to continue in?
24     A.  She reported to me.  She was the
25 director of the Senior Program.

Page 86

1      A.  It was sporadic.  It might be on a
2  daily basis.  It might be on a weekly basis
3  depending on the schedule and appointments and so
4  forth.
5      Q.  How often would you have contact with
6  Miss Monteiro during that period of time?
7      A.  No more so --
8      Q.  Daily basis?
9      A.  Daily, weekly, whatever.
10     Q.  Did you see them every day?
11     A.  It depends.  The Seniors Program was
12 located in a building completely across the
13 driveway from the hospital.
14     Q.  With regard to the actual reduction
15 in force, isn't it true that Miss Iaia's position
16 was not actually eliminated?
17     A.  I don't recall that being anything
18 but that.
19     Q.  Well, she was director of
20 marketing/public relations, correct?
21     A.  Uh-huh.
22     Q.  Isn't it true that that position was
23 combined with the director of Senior Friends
24 position?
25     A.  I do not recall that happening, sir.

Page 88

1      Q.  So you had no idea what that
2  position -- whether or not that position was going
3  to stay the same or change after this reduction in
4  force?
5      A.  I just don't recall the circumstances
6  involving the director of public relations aspect
7  of it.
8      Q.  So you don't know if Ms. Monteiro
9  assumed the duties and responsibilities of the
10 director of marketing and public relations after
11 Miss Iaia was taken out of that position?
12     A.  I cannot recall the circumstances
13 behind that, no.
14     Q.  Was that your responsibility to
15 select the position of the person who was going to
16 continue on in the position of director of
17 marketing/public relations or Senior Friends?
18     A.  Yes.
19     Q.  Did you consider Miss Iaia for
20 continued employment in that position?
21     A.  As the Seniors Program?
22     Q.  No.  As director of marketing and
23 public relations and Senior Friends?
24     A.  Possibly eliminate the position.
25     Q.  It's your understanding the entire

Page 89

1  position was eliminated?
2      A.  Yes, sir.
3      Q.  Okay.  And when did you leave
4  Pembroke Pines Hospital?
5      A.  November of '93.
6      Q.  So it was your understanding that
7  Pembroke Pines Hospital was no longer going to
8  have anyone doing any kind of marketing or public
9  relations for the hospital?
10     A.  I do not recall, while I was there, a
11 conversation assigning responsibilities for that
12 position after Ms. Iaia left.
13         MR. HANNAH:  Let's have this marked.
14         (Plaintiff's Exhibit 2 was
15           marked for identification.)
16
17 BY MR. HANNAH:
18     Q.  Why don't you take a look at what's
19 been marked Plaintiff's Exhibit Number 2?  Why
20 don't you read that document?
21     A.  (Witness complied.)
22     Q.  All I'm asking is for you to read
23 that document.
24     A.  Okay.
25     Q.  Now that you've read it, is that an

Page 90

1  accurate statement of the facts as to what
2  happened with the director of marketing/public
3  relations position?
4      A.  This says that the position was
5  eliminated and it was combined with Mrs.
6  Monteiro's position.
7      Q.  Is that accurate?
8      A.  The position was eliminated.  I
9  cannot remember the specific circumstances where
10 Mrs. Monteiro may have taken over that position.
11     Q.  So you have no idea if she actually
12 took over any of those job duties --
13     A.  No.
14     Q.  Let me finish my question, please.
15         You have no recollection as we sit
16 here today whether or not Ms. Monteiro assumed job
17 duties and responsibilities that were formerly
18 performed by Ms. Iaia?
19     A.  No, sir.
20     Q.  Okay.  The reason why you don't know
21 that is because you left the hospital too quickly?
22     A.  Not only that, but it's been seven
23 years since the incident occurred.  I can't
24 remember the specifics of it.
25     Q.  So that could be correct?  That

Page 91

1  information could be correct?
2      A.  I don't know.  I can't give you an
3  answer on something I can't remember.
4      Q.  All right.  And you can't remember
5  why Ms. Iaia was not considered for the combined
6  position of director of public relations and
7  Senior Friends?
8          MR. COPELAND:  Objection.
9  Argumentative.
10         THE WITNESS:  I don't know that that
11 was ever a consideration in that the Seniors
12 Program was a very intense, very well run program,
13 and, to the best of my knowledge, Ms. Iaia had no
14 experience in that.
15
16 BY MR. HANNAH:
17     Q.  To your knowledge, Ms. Iaia had no
18 experience in Senior Friends?
19     A.  Yes.
20     Q.  In running the Senior Friends
21 Program?
22     A.  That's right.
23     Q.  Were you actually aware she did
24 actually have that responsibility?
25     A.  No.

Page 92

1      Q.  You have no idea?
2      A.  No.
3      Q.  Did you actually review her
4  qualifications at all to determine whether or not
5  she was the better person for the position after a
6  reduction in force than Monique Monteiro?
7      A.  I do not recall the specific
8  circumstances back then.
9      Q.  Okay.  Do you take any medication
10 that affects your memory?
11     A.  No, sir.
12     Q.  Do you take any kind of medication at
13 all?
14     A.  No, sir.
15     Q.  Do you drink alcoholic beverages?
16     A.  Occasionally.
17     Q.  What was the date you left?
18     A.  I believe it was November of '93.
19     Q.  Okay.  Who took over your position?
20     A.  O'Connell maybe.  I don't recall.
21     Q.  That's the last name, O'Connell?
22     A.  Yes.  I believe that was the case.
23     Q.  Was that a man or a woman?
24     A.  Don't recall.  Never met him.
25     Q.  Or her?

Page 93

```
 1      A.  Or her.
 2      Q.  Did you review the qualifications on
 3  Monique Monteiro in deciding whether to keep her
 4  on as an employee of Pembroke Pines Hospital?
 5      A.  I would have to answer the same way,
 6  I don't recall looking at them seven years ago.
 7      Q.  Did you review the performance
 8  records of Jackie Iaia to determine whether or not
 9  she should stay on as any kind of public relations
10  director or Senior Friends director?
11      A.  I don't recall.
12      Q.  So Miss Iaia's performance had no --
13  was not involved at all in any way in your
14  consideration whether or not to let her go?
15      MR. COPELAND: Objection.
16  Argumentative.
17      THE WITNESS: I can't recall that.
18  We eliminated the position. That's the best I
19  recall.
20
21  BY MR. HANNAH:
22      Q.  Eliminated the position but combined
23  it with another position?
24      MR. COPELAND: Objection.
25  Argumentative.
```

Page 94

```
 1      THE WITNESS: I don't know. I cannot
 2  recall whether that was combined in there at the
 3  time or not.
 4
 5  BY MR. HANNAH:
 6      Q.  Tell me all the other people that
 7  were involved in that decision-making process as
 8  to reduction in force and combining positions,
 9  eliminating positions.
10      A.  Would have been my department head,
11  department of human resources.
12      Q.  Who is that?
13      A.  Various department heads would have
14  been involved in employee reductions by supplying
15  names within their departments that could be
16  eliminated.
17      Q.  Claudia Jack, was she involved?
18      A.  I can't even recall whether she was
19  there at the time or not.
20      Q.  Well, certainly the human resources
21  director at the time would have been involved,
22  right?
23      A.  Yes.
24      Q.  What other department heads were
25  involved in the decision-making process?
```

Page 95

```
 1      A.  I cannot recall specifics. It would
 2  have been probably any department head that would
 3  have been -- that their employees were affected.
 4      Q.  Okay.
 5      THE VIDEOGRAPHER: This is the end of
 6  tape one. Thank you.
 7      This is the beginning of tape two of
 8  the videotaped deposition of Jerry Sutphin.
 9
10  BY MR. HANNAH:
11      Q.  Mr. Sutphin, with regard to deciding
12  who would be let go in the reduction of force by
13  Pembroke Pines Hospital, were there meetings held
14  to decide or to make that decision?
15      A.  Specific meetings, I cannot recall,
16  but it would not be unusual for that to happen.
17      Q.  Who would be at those meetings?
18      A.  Those people affected from the
19  department head standpoint.
20      Q.  Okay. Certainly with regard to
21  marketing/public relations, that would have been
22  Miss Iaia, right?
23      A.  That's correct.
24      Q.  Okay. But she wasn't involved in
25  meetings with you as to deciding who to get rid
```

Page 96

```
 1  of, correct?
 2      A.  I suspect not, no.
 3      Q.  Okay. Director of human resources
 4  would have been involved in those meetings,
 5  correct?
 6      A.  Yes, sir.
 7      Q.  You don't remember who that was,
 8  though?
 9      A.  I believe at the time Paula Adamson
10  had taken over that position.
11      Q.  Do you recall actually being in
12  meetings where Paula Adamson was present and
13  discussions were had about eliminating jobs?
14      A.  No, sir.
15      Q.  Who made the decision as to what jobs
16  should be eliminated?
17      A.  It was in conjunction with
18  recommendations from the department heads and from
19  human resources reviewing -- I would have had the
20  ultimate say of yes, that's fine, that's good.
21      Q.  Who would have had the
22  responsibilities for deciding if any positions
23  should be combined as opposed to just totally
24  eliminating it?
25      A.  Ultimately I would have.
```

---

**Page 97**

1   Q. Was it your understanding that the
2 Pembroke Pines Hospital would continue to have
3 some kind of marketing function --
4   A. Sir --
5   Q. -- after Ms. Iaia was let go?
6   A. I cannot answer that question because
7 I do not remember having that discussion with
8 anyone.
9   Q. Was her job an important job?
10   A. To a certain extent, yes.
11   Q. Okay. And marketing and public
12 relations for a hospital is an important part of
13 the hospital, correct?
14   A. Not necessarily.
15   Q. Part of Pembroke Pines Hospital which
16 was losing beds, so to speak, or customers, wasn't
17 marketing and public relations of the hospital an
18 important function?
19   A. Public relations aspects are a very
20 important aspect of hospitals, but marketing, such
21 as advertising, is not necessarily in that
22 situation.
23   Q. Let's talk about public relations.
24 That's an important aspect of the hospital,
25 correct?

---

**Page 98**

1   A. Uh-huh.
2   Q. Yes?
3   A. Yes.
4   Q. Okay. And someone would need to
5 continue performing that position after Ms. Iaia
6 left, correct?
7   A. Possibly.
8   Q. You have no idea if that happened?
9   A. I have no idea what public relations
10 functions were performed after that.
11   Q. Okay. And you were not involved at
12 all in giving to Ms. Monteiro, after Ms. Iaia was
13 notified of her selection for reduction in force,
14 any marketing or public relations
15 responsibilities?
16   A. Sir, I cannot remember having that
17 conversation with Mrs. Monteiro.
18   Q. I didn't ask you if you had a
19 conversation about that.
20   A. I don't remember signing any
21 paperwork relating to that.
22   Q. You don't know if she continued to
23 perform those job duties and responsibilities?
24   A. I do not recall after that, no.
25   Q. Was there somebody else involved in

---

**Page 99**

1 that process after you left?
2   A. I have no idea. I wasn't there.
3   Q. Was one of Ms. Iaia's job duties and
4 responsibilities as director of marketing and
5 public relations to prepare a newsletter for the
6 hospital?
7   A. Uh-huh.
8   Q. Yes?
9   A. If I recall, it was.
10   Q. Okay. Let me show you --
11      MR. HANNAH: Let's have this marked
12 Plaintiff's Exhibit Number 3, I believe, right?
13        (Plaintiff's Exhibit 3 was
14        marked for identification.)
15
16 BY MR. HANNAH:
17   Q. Take a look at Plaintiff's Exhibit
18 Number 3. Tell me if you recognize that.
19   A. It's a newsletter put out by Pembroke
20 Pines Hospital.
21   Q. Okay. That was something that was
22 performed by Ms. Iaia when she was director of
23 public relations and marketing, correct?
24   A. As best I can recall, yes.
25   Q. In fact, it shows her name there as

---

**Page 100**

1 the editor?
2   A. Yes.
3   Q. What's the date of that?
4   A. March of '93.
5   Q. Okay. So one of the job duties and
6 responsibilities of the director of public
7 relations was to prepare this newsletter, correct?
8   A. Yes, sir.
9   Q. Let me show you this document,
10 Plaintiff's Exhibit Number 4.
11        (Plaintiff's Exhibit 4 was
12        marked for identification.)
13
14 BY MR. HANNAH:
15   Q. If you'll look at Plaintiff's Exhibit
16 Number 4. Does this appear to be the same
17 newsletter?
18   A. Appears to be.
19   Q. Who's the editor of that?
20   A. Monique Monteiro.
21   Q. What's the date of that newsletter?
22   A. December of 93.
23   Q. You had already left by that time?
24   A. If I recall, that's correct.
25   Q. Okay. And that indicates Ms.

---

Page 101

1 Monteiro was in December of 1993 performing one of
2 the job duties and responsibilities of the
3 director of marketing and relations -- marketing
4 and public relations that had previously been
5 performed by Jackie Iaia, correct?
6 　　　　MR. COPELAND: Objection.
7 Argumentative.
8 　　　　THE WITNESS: Appears that way.
9
10 BY MR. HANNAH:
11 　　Q. Any reason to believe that Ms.
12 Monteiro also did not assume all of the other job
13 duties and responsibilities of Ms. Iaia commencing
14 in December of 1993?
15 　　　　MR. COPELAND: Objection. Calls for
16 speculation.
17 　　　　THE WITNESS: I don't recall.
18
19 BY MR. HANNAH:
20 　　Q. You wouldn't have any idea?
21 　　A. Seven years ago, no.
22 　　　　MR. HANNAH: Let's have this marked
23 Plaintiff's Exhibit Number 5.
24 　　　　　(Plaintiff's Exhibit 5 was
25 　　　　　marked for identification.)

Page 102

1 BY MR. HANNAH:
2 　　Q. Look at Plaintiff's Exhibit Number
3 5. You may or may not have seen that article.
4 The date of the article was January 2nd, 1994,
5 correct?
6 　　A. Yes.
7 　　Q. From the Miami Herald, correct?
8 　　A. Yes.
9 　　Q. Okay. Look at the underlined
10 portions of that article, actually the second set
11 of underlines.
12 　　A. Uh-huh.
13 　　Q. Where it says Monique Monteiro, the
14 hospital's public relations director. You see
15 that?
16 　　A. Yes.
17 　　Q. Have any reason to believe that's an
18 inaccurate statement?
19 　　A. I would not know.
20 　　　　MR. COPELAND: Objection. Calls for
21 speculation.
22
23 BY MR. HANNAH:
24 　　Q. Do you have any reason to believe as
25 of January 2nd, 1994 Monique Monteiro was not the

Page 103

1 hospital's public relations director?
2 　　A. Sir, I have no idea. I wasn't there
3 in January of '94.
4 　　Q. So after you left the hospital you
5 actually had no dealings with --
6 　　A. I have not been back to South Florida
7 since then.
8 　　Q. To your knowledge, sir, was there
9 documentation generated by Pembroke Pines Hospital
10 or by Galen Hospital or by Columbia with regard to
11 this reduction in force?
12 　　A. Was there -- I'm sorry. Ask the
13 question again. What paper?
14 　　Q. Documentation generated by the
15 corporation that owned the hospital back in
16 November of 1993 as to what was entailed in the
17 reduction in force?
18 　　　　MR. COPELAND: Objection to the form.
19 　　　　THE WITNESS: Yes.
20
21 BY MR. HANNAH:
22 　　Q. There was?
23 　　A. I'm sure there was, yes.
24 　　Q. Do you recall authoring any of that
25 documentation?

Page 104

1 　　A. Not off the top of my head, no.
2 　　Q. Do you know if that documentation
3 came from you or from the corporation itself?
4 　　A. I don't recall.
5 　　Q. Okay. And do you recall if there was
6 any documentation indicating what jobs would be
7 eliminated and what jobs would be kept?
8 　　A. There was some documentation on a
9 list I saw this morning, but that's the only
10 list. That's the first I recall.
11 　　Q. You saw some documentation on a list
12 this morning?
13 　　A. Yes, sir.
14 　　Q. But I'm -- other than that, you don't
15 recall any other documentation?
16 　　A. Not other than what we've seen right
17 here.
18 　　Q. Okay. Who was responsible for the
19 personnel records for the hospital?
20 　　A. Director of human resources.
21 　　Q. Okay. That would have been Paula
22 Adamson?
23 　　A. Yes.
24 　　Q. Okay. And you have any idea how long
25 she was the director of human resources at the

Case 0:00-cv-06227-FAM    Document 56    Entered on FLSD Docket 11/06/2000    Page 194 of 245

---

1  hospital?
2      A.  She came shortly before my leaving,
3  and I have no idea whether she's still there or
4  not.
5      Q.  All right.  Let's see if we can get
6  some things straight.
7          At the time of the reduction in force
8  who was the owner of the hospital?  What company?
9      A.  As far as I know --
10         MR. COPELAND:  Objection to form.
11         THE WITNESS:  It was Columbia.
12
13 BY MR. HANNAH:
14     Q.  Columbia Healthcare?
15     A.  Yes.
16     Q.  It was no longer Galen Hospital at
17 that time?
18     A.  No.  It was not currently owned by
19 Galen Corporation.
20     Q.  Excuse me?
21     A.  It was no longer owned by the
22 corporation of Galen.
23     Q.  Right.  Galen ceased to exist as a
24 corporation at some point in time?
25     A.  I do not know the specifics behind

---

1  dissolving the corporation or what happened to it
2  after I --
3      Q.  Do you know if Columbia Healthcare
4  purchased Galen?
5      A.  It's my understanding that's the
6  case, yes.
7      Q.  Okay.  So as of November 1993 you
8  were employed by Columbia Healthcare?
9      A.  I was employed by Pembroke Pines
10 Hospital, which was a subsidiary of Columbia, as
11 far as I know.
12     Q.  Subsidiary or doing business as?
13     A.  Doing business as.
14     Q.  Okay.  So --
15     A.  I don't recall the d/b/a name, but --
16     Q.  All right.  But you worked for
17 Pembroke Pines Hospital, which was owned by
18 Columbia Healthcare?
19     A.  Yes, sir.
20     Q.  And all of the decisions with regard
21 to the reduction in force that you performed back
22 in November of 1993 you did as an employee of
23 Columbia Healthcare doing business as Pembroke
24 Pines Hospital, correct?
25         MR. COPELAND:  Object to the form.

---

1  Argumentative.
2
3  BY MR. HANNAH:
4      Q.  Correct?  As far as you know?
5      A.  As far as I know, yes.
6      Q.  I'd like to refer you to Defendant's
7  Exhibit Number 5, which was a performance
8  evaluation you prepared on behalf of Monique
9  Monteiro.
10     A.  Uh-huh.
11     Q.  It indicates her job was manager,
12 Humana Seniors Association?
13     A.  Yes, sir.
14     Q.  Is that different than director?
15     A.  I would say they would be used
16 synonymously with each other.
17     Q.  She wasn't called director, right?
18     A.  I do not recall exactly what her
19 title was.  It says Manager of Seniors, Humana
20 Seniors Association, sir.
21     Q.  Okay.
22         MR. HANNAH:  Let's have this marked.
23         (Plaintiff's Exhibit 6 was
24         marked for identification.)
25

---

1  BY MR. HANNAH:
2      Q.  Take a look at Plaintiff's Exhibit
3  Number 6.  Of course, I'm going to ask you if you
4  recognize that document, if you've seen it before
5  today?
6      A.  I recognize the similarity of the
7  form, yes, sir.
8      Q.  That's a performance appraisal form?
9      A.  Yes.
10     Q.  That was used by the hospital?
11     A.  Yes.
12     Q.  By Pembroke Pines Hospital?
13     A.  Doesn't have Pembroke's name on it
14 because it was generic when we used it throughout
15 the company.
16     Q.  It was similar to the one you used
17 when you prepared performance evaluation for
18 Monique Monteiro, correct?
19     A.  Yes, sir.
20     Q.  That appears to be, also, a
21 performance evaluation for Monique Monteiro,
22 correct?
23     A.  Uh-huh.
24     Q.  Yes?
25     A.  Yes.

---

1    Q.  That was for the period December 1st,
2   '93 through December 1st, '94?
3    A.  Correct.
4    Q.  Okay.  For the period right after you
5   left the hospital, right?
6    A.  Uh-huh.
7    Q.  Yes?
8    A.  Yes.
9    Q.  You see the job title that she has on
10   there?
11    A.  Yes, I do.
12    Q.  What is it?
13    A.  Director of public relations and
14   Seniors Association.
15    Q.  Do you have any reason to believe
16   that Ms. Monteiro did not become the director of
17   public relations and Senior Friends right after
18   the reduction in force?
19        MR. COPELAND:  Objection.  Asked and
20   answered.
21        THE WITNESS:  I think I've already --
22   I do not recall the situation of giving her that
23   position.
24
25

1   BY MR. HANNAH:
2    Q.  And you don't recall considering Ms.
3   Iaia for that position?
4        MR. COPELAND:  Objection.  Asked and
5   answered.
6        THE WITNESS:  No, sir.
7
8   BY MR. HANNAH:
9    Q.  In fact, you didn't interview either
10   one of those two women with regard to the position
11   of director of public relations and Senior
12   Friends?
13    A.  No, sir.  Not that I recall.
14    Q.  All right.  In fact, you didn't even
15   review any of their performance records in making
16   a decision to keep Monique Monteiro as opposed to
17   Jackie Iaia, correct?
18        MR. COPELAND:  Objection.  Asked and
19   answered.
20        THE WITNESS:  I don't recall.
21
22   BY MR. HANNAH:
23    Q.  Is that something you would normally
24   do?
25    A.  In the process of changing positions,

1   yes.
2    Q.  Okay.  And would it also be something
3   you would normally do is to look at the experience
4   of each individual candidate for a particular
5   position?
6    A.  I'll look at -- when I'm getting
7   ready to do a position, yes, I will look at the
8   person's experience.
9    Q.  November of 1993 do you know how much
10   marketing experience Monique Monteiro had?
11    A.  No, sir.  I don't recall.
12    Q.  As you sit here today have you any
13   idea how much marketing experience she had?
14    A.  No, sir.
15    Q.  Back in 1993 when you made the
16   decision to keep Monique Monteiro and let Jackie
17   Iaia go, did you have any knowledge as to how much
18   public relations experience Ms. Monteiro had?
19        MR. COPELAND:  Objection.
20   Argumentative.
21        THE WITNESS:  No, sir.  I don't
22   recall.
23
24   BY MR. HANNAH:
25    Q.  Do you know how long Jackie Iaia had

1   been doing public relations/marketing job duties
2   and responsibilities as of November of 1993?
3    A.  Number of years?  No, sir, I do not
4   recall.
5    Q.  So you have no idea even what her
6   experience was, right?
7    A.  No.
8    Q.  Other than she had some experience,
9   right?
10    A.  Other than she was there when I came.
11    Q.  Do you know who had more experience
12   in the area of director of -- excuse me.  Do you
13   know who had more experience in the area of
14   marketing and public relations, Jackie Iaia or
15   Monique Monteiro, back in November of 1993?
16    A.  Sir, I do not recall.
17    Q.  Okay.  Is that something you would
18   have looked at to determine who to keep on?
19    A.  No.  I looked at the position.  I
20   would have looked at positions at that time, and
21   director of Seniors Programs was not a program
22   that we were going to do away with.  We were going
23   to keep the Seniors Program.
24    Q.  All right.  You were also going to
25   keep the public relations department as well,

Page 113

1  correct?
2      A.  Not if we let Ms. Iaia go.
3      Q.  Well, you gave it to Ms. Monteiro?
4      A.  I don't recall giving it to Mrs.
5  Monteiro. I told you I don't recall that
6  circumstance.
7      Q.  Okay. And you know if there is any
8  documentation that would indicate whether or
9  not -- strike that.
10         Do you know if any documentation
11 would exist to indicate there would be a combining
12 of job positions?
13     A.  I don't recall, no. I do not know.
14     Q.  It did happen, though, right?
15         MR. COPELAND: Objection.
16 Argumentative.
17         THE WITNESS: By what you've given
18 me, the title is there, yes.
19
20 BY MR. HANNAH:
21     Q.  Going back to Mr. Edwards' position
22 statement, which I think was Plaintiff's Exhibit
23 Number 2, looking at it again can you tell me is
24 there anything in there that strikes you as an
25 inaccurate statement of fact?

Page 114

1      A.  May I have a moment to review it
2  again?
3      Q.  Sure. Read it word by word, line by
4  line.
5      A.  What's your question again?
6      Q.  Just go to the second page. I'll get
7  a little easier for you. Page two, first
8  paragraph. I'll read the sentence. "During this
9  period of time --"
10         MR. COPELAND: Objection. Let me put
11 an objection into publishing a hearsay statement.
12
13 BY MR. HANNAH:
14     Q.  Okay. "During this period of time
15 the hospital reviewed Ms. Iaia's position in the
16 marketing department along with various other
17 management level positions and determined that the
18 function of the marketing department director
19 could be combined with the position of the
20 director of public relations and Senior Friends."
21         See that statement?
22     A.  Yes.
23     Q.  I read that accurately?
24     A.  You read the statement accurately.
25     Q.  Is that a correct statement or

Page 115

1  incorrect statement?
2      A.  Sir, I have told you, I do not recall
3  assigning those responsibilities to Mrs. Monteiro.
4      Q.  So you don't even know if it's
5  correct or not?
6      A.  I do not know.
7      Q.  All right. You didn't speak to Mr.
8  Edwards about this position statement?
9      A.  No, sir.
10     Q.  Al right. The second paragraph,
11 first sentence, "This decision was made because
12 the employee performing the function of the
13 director of public relations and Senior Friends
14 was capable of performing the duties and
15 responsibilities of both areas."
16         I read that accurately?
17     A.  You are accurate, yes.
18     Q.  Do you have any idea whether that's
19 incorrect or correct statement?
20     A.  I have no idea.
21     Q.  Okay. And the next sentence, "Ms.
22 Iaia was not experienced in the area of Senior
23 Friends, could not perform that function when the
24 positions were combined. Consequently, her
25 position was eliminated."

Page 116

1          Are those two sentences accurate?
2      A.  To the best of my knowledge, they
3  are.
4      Q.  So her position -- one of the reasons
5  her position was eliminated was because it was
6  determined by you and the hospital that she did
7  not have experience in the area of Senior Friends,
8  could not perform that function?
9      A.  I do not recall the specifics behind
10 that. I will go back to what I said earlier. We
11 eliminated the position of director of public
12 relations and marketing. The details of that at
13 best are vague at this late date. I do not recall
14 today whether Ms. Iaia had any experience in
15 Senior Friends. To the best of my knowledge
16 today, I don't recall that.
17     Q.  Did you take that into consideration
18 when you made a decision to let her go?
19     A.  Sir, I don't recall.
20     Q.  You don't recall just because of all
21 the time that's passed by?
22     A.  Just the time element. I've been
23 through many of these since then.
24     Q.  Going to the next to last paragraph,
25 "Following the elimination of her position her

Page 117

1 job responsibilities were absorbed by another
2 employee."
3      Is that an accurate statement?
4   A. I'm sorry. Where are you?
5   Q. Next to last paragraph, second
6 sentence.
7   A. I don't know.
8   Q. You don't know if that's accurate or
9 not?
10   A. Yes.
11   Q. You don't know where Mr. Edwards got
12 his information from?
13   A. No, sir.
14    MR. HANNAH: Have that marked.
15     (Plaintiff's Exhibit 7 was
16     marked for identification.)
17
18 BY MR. HANNAH:
19   Q. Take a look at Plaintiff's Exhibit
20 Number 7. Have you seen that document before, the
21 front and back?
22   A. Not that I recall.
23   Q. Okay. That's not something you would
24 have reviewed in determining whether or not to
25 keep Ms. Monteiro over Ms. Iaia?

Page 118

1    MR. COPELAND: Objection to the form.
2    THE WITNESS: I just don't ever
3 remember seeing the form.
4
5 BY MR. HANNAH:
6   Q. Do you know what that is?
7   A. It looks like an employment
8 application.
9   Q. For who?
10   A. Monique Willenbrock.
11   Q. Do you know who Monique Willenbrock
12 is?
13   A. I have never heard the name
14 Willenbrock.
15   Q. You don't know if that was the maiden
16 name of Mrs. Monteiro?
17   A. I have no idea.
18    MR. HANNAH: Let's have the next one
19 marked.
20     (Plaintiff's Exhibit 8 was
21     marked for identification.)
22
23 BY MR. HANNAH:
24   Q. Just ask if you recognize that
25 document, Plaintiff's Exhibit Number 8?

Page 119

1   A. No, sir.
2   Q. In determining who to keep and who to
3 let go in the reduction of force, do you review
4 their personnel records before you make that
5 decision?
6   A. I cannot recall in this circumstance
7 whether that was done or not.
8   Q. Do you normally do that?
9   A. I'm trying to remember. I don't --
10 I'm sure I have at some time or another, but I
11 don't recall the specific instances.
12   Q. Okay. Do you review the performance
13 records of employees to determine who stays, who
14 goes, in reduction of force?
15   A. I do not personally unless it reports
16 directly to me.
17   Q. With regard to those people who
18 report directly to you, do you review their
19 performance records?
20   A. It depends on the position.
21   Q. Do you generally review the
22 performance records?
23   A. The reason I'm saying it depends on
24 the position, where I have a one person department
25 that's already been decided to be eliminated then

Page 120

1 there would be no reason to do that.
2   Q. Who is Julie Odesky? Does that name
3 ring a bell with you?
4   A. No, sir.
5   Q. Quality -- you don't remember if she
6 was the quality assurance manager at Pembroke
7 Pines Hospital?
8   A. Now that you mention that, I do
9 recall that, yes.
10   Q. Okay. Did you ever flirt with her?
11   A. Not that I'm aware of.
12   Q. Do you know who Pat Pierce is?
13   A. I want to say something to do with
14 the medical staff.
15   Q. You don't recall she was the director
16 of risk management for the hospital back in 1994?
17   A. I remember the name, but I can't
18 remember the position.
19   Q. So is it a correct statement to make,
20 sir, that the reason you were brought to Pembroke
21 Pines Hospital was to reduce costs, including
22 doing a -- performing a reduction in force?
23   A. I would not think that would be a
24 fair statement.
25   Q. Okay. Is that one of your job duties

Page 121

1  and responsibilities to reduce costs through
2  reduction in force when you came there?
3      A.  One of my responsibilities was try to
4  put the hospital on an even keel.
5      Q.  What was the reason that you left the
6  hospital in November of 1993?
7      A.  Take employment with Humana again in
8  Washington, D. C.
9      Q.  It just happened directly right after
10  the reduction in force was put into place,
11  correct?
12      A.  I can't remember specific dates, but
13  I would say it was very close to that, yes.
14      Q.  Can you tell me any other hospitals
15  where you performed reduction in force?
16      A.  Greenbrier Valley. Humana Hospital
17  Greenbrier Valley.
18      Q.  Where is that?
19      A.  In West Virginia.
20      Q.  Okay. You remember when that was?
21      A.  It would have been in 19 -- early
22  '80s.
23      Q.  Okay. That was a reduction in force
24  to reduce costs?
25      A.  Yes, sir.

Page 122

1      Q.  Excuse me?
2      A.  Yes, sir.
3      Q.  Okay. And how long after reduction
4  in force was implemented did you leave that
5  hospital?
6      A.  I don't recall. That was 1984, '83.
7      Q.  You don't recall if it was a short
8  time after, long time after?
9      A.  I was at the hospital I think five
10  years.
11      Q.  What other hospitals did you perform
12  reduction in force?
13      A.  Probably at all of them I've been at.
14      Q.  Every hospital you've been at you've
15  done a reduction in force?
16      A.  Usually there is a time when you get
17  to a point of staffing needs to be adjusted in
18  facilities.
19      Q.  Do you know how long Jackie Iaia has
20  been doing that public relations work in November
21  of 1993 for the hospitals?
22      A.  No, sir.
23      Q.  Do you know how long Monique Monteiro
24  had been doing the Senior Friends function at the
25  hospital back in November of 1993?

Page 123

1      A.  No, sir.
2      Q.  Do you know who would have been at
3  the hospital longer?
4      A.  I don't recall because I think -- if
5  my memory serves me correctly, Monique was already
6  there and Jackie transferred over from South
7  Broward, but that's --
8      Q.  Did you review Jackie Iaia's records
9  from South Broward to determine whether or not she
10  was more qualified than Monique Monteiro to
11  continue on at the hospital?
12      A.  Not that I recall.
13      Q.  Okay. You don't recall very much.
14  Is that because of the passage of time?
15      A.  Yes, sir.
16      Q.  Excuse me?
17      A.  Yes, sir.
18      Q.  And none of the documents you've
19  looked at brings any of these memories back to you
20  whatsoever?
21      A.  Not really, no.
22      Q.  Okay. How would you describe your
23  working relationship with Jackie Iaia at the
24  hospital, Pembroke Pines Hospital?
25      A.  The best I can remember, it was a

Page 124

1  good working relationship.
2      Q.  How do you describe your working
3  relationship with Monique Monteiro?
4      A.  Good.
5      Q.  Who was making more money back in
6  November of 1993?
7      A.  I do not recall.
8          MR. COPELAND: Object to the form.
9
10  BY MR. HANNAH:
11      Q.  You don't recall if Monique Monteiro
12  was getting paid less than Jackie Monteiro?
13      A.  No, sir.
14      Q.  Would that have been a consideration
15  you would have taken into account in deciding who
16  to let go and who to keep?
17      A.  I do not recall.
18          MR. COPELAND: Objection.
19  Argumentative.
20
21  BY MR. HANNAH:
22      Q.  You do not recall?
23      A.  I do not recall.
24      Q.  With regard to the reduction in
25  force, was that a consideration of yours at all

**Page 125**

1 keeping people who made less money as opposed to
2 more money and letting go the people who made more
3 money?
4    A. Not necessarily.
5    Q. Was that a consideration you took
6 into account?
7    A. I do not recall the considerations
8 that went into that.
9    Q. Is that because of the passage of
10 time?
11    A. Yes, sir.
12    Q. Is there anything you would need to
13 look at to refresh your recollection with regard
14 to any of these events?
15    A. Not that I can recall, no. Not that
16 I can think of anyway.
17    Q. Do you recall meeting with Jackie
18 Iaia to tell her her job was over?
19      MR. COPELAND: Objection. Asked and
20 answered.
21      THE WITNESS: Pardon?
22      MR. COPELAND: I was putting an
23 objection.
24
25

**Page 126**

1 BY MR. HANNAH:
2    Q. Do you recall a meeting with Jackie
3 Iaia to let her know her job had been eliminated?
4    A. I don't remember the specific
5 meeting, but I would say I did, yes.
6    Q. Do you remember what you said to her?
7    A. No, sir.
8    Q. Do you remember giving her a hug?
9    A. No, sir.
10    Q. Do you remember her reaction to you
11 telling her what had happened?
12    A. No.
13    Q. Did you care about what kind of
14 reaction she had?
15    A. I care about every employee that I
16 lay off. It's not an enjoyable thing to do.
17    Q. Or to experience?
18    A. Pardon?
19    Q. Or to experience?
20    A. That's correct.
21    Q. Do you know who Patty David is?
22    A. Not off the top of my head, no.
23    Q. You don't know if she was the person
24 that replaced Carol Naples?
25    A. I don't recall.

**Page 127**

1    Q. Who was the CFO at the time, November
2 of --
3    A. Mike Scialdone.
4    Q. How old is he? How old was he back
5 in November of 1993?
6    A. It would be a pure guess on my part
7 because I remember him and his wife were just
8 ready to have a child when I left there, so fairly
9 young I would think.
10    Q. Young guy?
11    A. Yes.
12    Q. Okay. Did you get rid of him in the
13 reduction of force?
14    A. No, sir. He was still there when I
15 left.
16    Q. How about Paula Adamson? Do you know
17 how old she was?
18    A. No, sir.
19    Q. Do you know she's in her 20s, 30s,
20 40s, 50s?
21    A. I don't recall.
22    Q. You don't know who she was?
23    A. I know who she is. I don't recall.
24 She was probably there for two or three weeks
25 before I left probably.

**Page 128**

1    Q. Was she working at the hospital prior
2 to the reduction in force?
3    A. No.
4    Q. Was she somebody hired right
5 afterwards?
6    A. No. It was somebody that worked for
7 Columbia prior to the acquisition.
8    Q. And she replaced Claudia Jack?
9    A. Uh-huh.
10    Q. Yes?
11    A. Yes.
12    Q. Okay. Do you know how old Claudia
13 Jack was?
14    A. I don't recall.
15    Q. Don't know if she was in her 20s,
16 30s, 40s?
17    A. (Witness shook head.)
18    Q. No?
19    A. I just don't know.
20    Q. Did you offer to continue Jackie
21 Iaia's health insurance after she was notified of
22 her termination?
23    A. I don't recall the specific incident,
24 no.
25    Q. You don't recall recommending she get

Page 129

1  an additional three months of medical coverage
2  after she was notified of her termination?
3     A.  No, sir.
4     Q.  Would that be something that would be
5  your responsibility to do or within your
6  discretion?
7     A.  I'm sure it would have had to come
8  through me, yes.
9     Q.  Do you know who Valerie Lockwood
10 Moran is?
11    A.  By name, yes.
12    Q.  You don't know what she did with the
13 hospital?
14    A.  I cannot recall.  She was there -- I
15 don't believe she was there when I got there.  I'm
16 not sure.
17    Q.  Julie Odesky, was she young?
18    A.  Best I can recall.
19    Q.  Was she attractive?
20    A.  Best I can recall, yes.
21    Q.  How about Monique Monteiro, was she
22 young?
23    A.  I don't recall her age, but
24 relatively so, yes.
25    Q.  Was she attractive?

Page 130

1     A.  Yes.
2     Q.  Jackie Iaia, do you -- would you call
3  her young?
4     A.  I don't recall her age.
5     Q.  You don't recall one way or another,
6  young, old, middle-aged?
7     A.  I would consider, best I can recall,
8  Jackie, she was -- I wouldn't even want to guess
9  what her age was.  I don't know.
10    Q.  I'm not asking you to guess her age.
11 I'm asking was she a young person, was she a
12 middle-aged person, was she an elderly person?
13    A.  Somewhere between young and
14 middle-aged I would say.
15    Q.  In her 40s?
16    A.  I don't know.
17    Q.  Did you like Pat Pierce?
18    A.  I don't recall Pat Pierce.
19    Q.  You don't recall her?
20    A.  (Witness shook head.)
21    Q.  Let's go to -- let me find it --
22 Defendant's Exhibit Number 3, which was your
23 letter of recommendation for Jackie Iaia.  See
24 that?
25    A.  Yes.

Page 131

1     Q.  Okay.  Did she ask you for that
2  letter of recommendation or did you offer it to
3  her?
4     A.  I do not recall.
5     Q.  Okay.  All the information in there,
6  do you believe it?
7     A.  She was obviously a very capable
8  person.  I wrote her a letter of recommendation.
9  I generally won't do that unless I support the
10 individual.
11    Q.  Did you believe she had a thorough
12 working knowledge of the marketing and public
13 relations field?
14    A.  Yes.
15    Q.  Okay.  Do you know in November of
16 1993 if Monique Monteiro had a thorough working
17 knowledge of the marketing/public relations field?
18    A.  I don't recall.
19       MR. COPELAND:  Objection.  Asked and
20 answered.
21
22 BY MR. HANNAH:
23    Q.  Do you believe Jackie Iaia was a
24 supportive, hard worker?
25    A.  To the best of my knowledge, she was

Page 132

1  supportive.
2     Q.  Did you consider her an excellent
3  employee?
4     A.  Based on the evaluation that I looked
5  at, I considered her a very good employee, yes.
6     Q.  Do you know what benefits were being
7  offered employees of Pembroke Pines Hospital back
8  in November of 1993?
9     A.  Specifically?  Not off the top of my
10 head, but --
11    Q.  Did they have healthcare coverage?
12    A.  They had health insurance.
13    Q.  Did they have a retirement plan?
14    A.  Vacation, sick pay, so forth.
15    Q.  Did they have a retirement and
16 savings plan?
17    A.  They had a -- you could qualify for a
18 401-K plan, yes.
19    Q.  Okay.  Did they have something
20 besides a 401-K or was it just a 401-K?
21    A.  Best I can recall, it was just a
22 401-K.
23    Q.  Okay.  The company, do you know if it
24 contributed to that 401-K plan?
25    A.  Yes.

Page 133

1    Q.  Do you know what the percentage was
2  back in November of '93?
3    A.  No, I don't off the top of my head.
4    Q.  Do you know if it varied from year to
5  year or was it consistent all the way throughout,
6  at least for the time that you worked at Pembroke
7  Pines Hospital?
8    A.  As far as I know, it was consistent.
9  If it was the same plan I had, which I think it
10  was, it would depend on your contribution
11  percentage.
12    Q.  Okay.  Do you know how much the
13  company would match?
14    A.  If I recall, it was up to 50 percent.
15    Q.  Did they have life insurance policies
16  for the employees?
17    A.  I don't recall.
18    Q.  Did they have disability insurance
19  for the employees?
20    A.  I don't recall whether the disability
21  was part of the employee package or not.
22        MR. HANNAH:  Let's have this marked.
23        (Plaintiff's Exhibit 9 was
24        marked for identification.)
25

Page 134

1  BY MR. HANNAH:
2    Q.  Take a look at Plaintiff's Exhibit
3  9.  Tell me if you recognize that document.
4    A.  Not this specific document, no.
5    Q.  I want you to take a look at what
6  appears to be a job description for the director
7  of public relations and marketing, and tell me if
8  you find it to be an accurate description of the
9  job duties and responsibilities that Ms. Iaia
10  performed for Pembroke Pines Hospital.
11    A.  It seems fair, yes.
12    Q.  So it's pretty accurate?
13    A.  I would think.
14    Q.  Okay.  Was it your intention when you
15  eliminated that position to eliminate all those
16  responsibilities?
17    A.  Sir, I was eliminating the position.
18  I don't know that I --
19    Q.  Let's talk about the job duties and
20  responsibilities that were being performed by that
21  position.  Was it your intention when you
22  eliminated the position to eliminate all those job
23  duties and responsibilities?
24    A.  Yes.
25    Q.  Okay.  So it was your intention that

Page 135

1  no one would be performing any of those duties and
2  responsibilities after Ms. Iaia left the hospital?
3    A.  We eliminated the position.  My
4  thought process at that time, I don't recall.
5    Q.  Were these important job duties and
6  responsibilities for the hospital?
7    A.  Up until the time of the elimination
8  of the position, yes.
9    Q.  Why did they become at the time of
10  the elimination of the position no longer
11  important job duties and responsibilities?
12    A.  Because at the time I made that
13  decision it was based on the fact we were not
14  going to put a lot of emphasis in the area of
15  marketing in the future.
16    Q.  What about public relations?
17    A.  Public relations I was planning on --
18  I had no plans for that at that point in time that
19  I can recall.
20    Q.  You had no plans?
21    A.  No.
22    Q.  Was just going to --
23    A.  I just don't remember the details of
24  it.
25    Q.  Okay.  That's because all the years

Page 136

1  that's passed by, the seven years?
2    A.  Yes, sir.
3    Q.  Did the hospital have an incentive
4  compensation plan?
5    A.  Yes.
6    Q.  What was that?
7    A.  Available to department heads based
8  on certain goals and objectives.
9    Q.  Okay.  And what exactly did the
10  compensation plan provide, to your recollection?
11    A.  It was a percentage of your salary
12  that you could get up to.  I don't recall the
13  exact percentage now.
14    Q.  Like a bonus?
15    A.  Sort of like a bonus, yes.
16    Q.  That was available to Ms. Iaia?
17    A.  Should have been, yes.
18    Q.  If she had stayed on as a department
19  head?
20    A.  Yes.
21    Q.  Certainly was available to Ms.
22  Monteiro, right?
23    A.  It was available to everyone at the
24  time I was there.  Whether that incentive program
25  stayed in subsequent to my leaving or not, I have

Page 137

1   no idea.
2       Q.   Okay.  It was in place, though, at
3   the time you were there, right?
4       A.   Yes.
5       Q.   Okay.  And that applied to all
6   department managers and directors?
7       A.   Yes.  Well, whether or not they had
8   been there long enough to qualify or not.
9       Q.   It was available for them?
10      A.   Yes.
11      Q.   That was income over and above what
12  they would get in terms of salary, correct?
13      A.   Yes, sir.
14      Q.   Are you aware of any other perks that
15  were available to department managers or
16  department directors back in the latter part of
17  1993 besides 401-K plan, healthcare plan, and the
18  incentive compensation plan?
19      A.   Not that I recall any specific ones.
20      Q.   What do you do currently now?  You
21  work for an insurance agency or you have your own
22  insurance agency?
23      A.   I have just formed an insurance
24  agency.  We're in the process of forming that
25  right now.

Page 138

1       Q.   Selling what kind of insurance?
2       A.   Basically healthcare and long-term
3   healthcare.
4       Q.   Was there a period of time you've
5   been out of work?
6       A.   I've been doing some consulting and
7   so forth ever since 199 -- late 1997.
8       Q.   '97 is when you left Humana?
9       A.   Uh-huh.
10      Q.   Is that yes?
11      A.   Yes.  I'm sorry.
12      Q.   Were you terminated?
13      A.   We sold the plan, and the position
14  was eliminated.
15      Q.   You were subject to a reduction in
16  force?
17      A.   Kind of like that.
18      Q.   How did you feel when that happened?
19           MR. COPELAND:  Objection.  Relevance.
20           THE WITNESS:  I certainly was not
21  happy about not having a job.
22
23  BY MR. HANNAH:
24      Q.   Did you find it hard to find another
25  job?

Page 139

1       A.   Yes.
2       Q.   In fact, you found it so hard you
3   started your own agency, right?
4       A.   That's right.
5       Q.   You certainly made that attempt first
6   to find another job after you left, right?
7           MR. COPELAND:  Objection.  Relevance.
8
9   BY MR. HANNAH:
10      Q.   Yes?
11      A.   I took some personal time off in the
12  process.
13      Q.   Remember your last day at Pembroke
14  Pines Hospital, what day in November it was?
15      A.   No, sir, I don't.
16      Q.   Was this the latter part of November
17  or earlier part?
18      A.   I don't recall.  It was --
19      Q.   Who was the chief operating officer
20  at Pembroke Pines Hospital when you were there?
21      A.   I don't recall.  She had just come
22  there.
23      Q.   Who was the finance director?
24      A.   Mike Scialdone.
25      Q.   Mike?

Page 140

1       A.   S-c-i-a-l-d-o-n-e, if I recall.
2       Q.   He was the CFO?
3       A.   Yes.
4       Q.   I don't have any further questions.
5           MR. COPELAND:  Let's just take a
6   couple minute break.
7           THE VIDEOGRAPHER:  We will now go off
8   the record at the time and date indicated on the
9   screen.
10          (Recess)
11          THE VIDEOGRAPHER:  We are now back on
12  the record as time and date indicated on the
13  screen.
14
15          REDIRECT EXAMINATION
16  BY MR. COPELAND:
17      Q.   Mr. Sutphin, you were asked some
18  questions about whether or not Mrs. Monteiro had
19  any -- if you had any knowledge if she had any
20  experience in marketing and/or public relations?
21      A.   Uh-huh.
22      Q.   My question, sir, is do you have any
23  understanding whether or not as Senior Friends
24  director her position would include duties which
25  would parallel the duties of a marketing --

Page 141

1 director of marketing or director of public
2 relations?
3      MR. HANNAH: Object to the form.
4      THE WITNESS: I don't recall whether
5 they would parallel that or not. Best I can
6 remember, her position along with others that I
7 had would do -- they had a newsletter that they
8 put out that they had to give input to or it was,
9 you know, if they had announcements in the paper,
10 they would put those in there, that type of thing,
11 if you want to call that parallel.
12
13 BY MR. COPELAND:
14      Q. Okay. What do you understand the
15 objectives of a director of marketing? What is
16 the objectives of marketing the hospital?
17      A. Well, it takes on various aspects.
18 It can vary anything from attending meetings and
19 so forth to placement of TV and media advertising.
20      Q. All right. Is one of the objectives
21 of a director of marketing an attempt to increase
22 the census of the hospital or --
23      A. Well, it's the intent of it is to
24 promote the hospital, yes.
25      Q. Okay. Is one of the intents of the

Page 143

1 you place any importance on who it was more
2 important to market the hospital towards; i.e.,
3 seniors as opposed to the general public?
4      A. I would have placed more emphasis on
5 the senior program than I would have the younger
6 population only by the fact I had closed the
7 obstetrical department.
8      Q. Okay. Out of Mrs. Iaia or Mrs.
9 Monteiro, who would have been responsible for
10 marketing the hospital targeted toward seniors?
11      A. Could very well have been both of
12 them. There could be some overlap in there.
13      Q. Did you have any understanding as to
14 who was more successful?
15      MR. HANNAH: Object to the form.
16 They did different jobs.
17      THE WITNESS: I don't recall off the
18 top of my head.
19
20 BY MR. COPELAND:
21      Q. You recall if the senior program
22 initiated by Mrs. Monteiro was successful?
23      MR. HANNAH: Objection. Asked and
24 answered.
25      THE WITNESS: It was successful. I

Page 142

1 director of Senior Friends to hopefully increase
2 the census of the hospital?
3      A. Yes, sir.
4      Q. Would you consider that a parallel
5 responsibility between the director of marketing
6 and director of Senior Friends?
7      MR. HANNAH: Object to form.
8      THE WITNESS: Not necessarily because
9 the seniors is dedicated to a seniors atmosphere
10 in terms of trying to in their own right draw
11 relationship with the senior community.
12
13 BY MR. COPELAND:
14      Q. Out of the population of South
15 Florida, was there a specific population which was
16 more likely than not to utilize the services of
17 the hospital by age group?
18      MR. HANNAH: Object to the form.
19 Calls for speculation.
20      THE WITNESS: Its seniors are known
21 to use the hospital services more so than younger
22 people.
23
24 BY MR. COPELAND:
25      Q. Did you have any -- as the CEO did

Page 144

1 can't remember -- recall the numbers right now.
2
3 BY MR. COPELAND:
4      Q. Do you recall how many people
5 participated in the Senior Friends Program?
6      A. No, I don't.
7      Q. Do you know if it was in excess of
8 1,000?
9      MR. HANNAH: Objection to form. She
10 says he doesn't know.
11      THE WITNESS: I don't recall that
12 number.
13
14 BY MR. COPELAND:
15      Q. Do you know how the Senior Friends
16 Program compared to other Senior Friends programs
17 within the South Florida area?
18      A. I just don't recall the numbers. No.
19      Q. Now, when you made the decision to
20 eliminate Mrs. Iaia's position as you testified,
21 was your decision to eliminate that position in
22 any way tied to your decision to retain the
23 position of Senior Friends?
24      A. Not that I recall.
25      Q. I mean, in simpler terms, were you --

1  did you couple Mrs. Iaia and Mrs. Monteiro's
2  employment -- future employment status together?
3  Were those decisions remotely tied at all?
4      MR. HANNAH: Objection. He just says
5  he doesn't recall.
6      THE WITNESS: Not that I recall.
7
8  BY MR. COPELAND:
9      Q. You talked a little bit about
10  benefits that you received while you were at
11  Pembroke Pines Hospital?
12      A. Uh-huh.
13      Q. Were those benefits which were paid
14  to you when the hospital was owned by Humana?
15      A. Paid to me or available to the
16  employees?
17      Q. Available to the employees.
18      A. Yes. There were benefits available
19  to the employees under Humana and Galen.
20      Q. Okay. Now, when Galen was sold to
21  either Columbia or an affiliated entity, do you
22  understand as to whether there was any change in
23  what benefits were offered?
24      A. I don't recall whether they retained
25  the benefits or not.

1      Q. Okay. Do you have any understanding
2  as to what benefits were offered to employees
3  subsequent to you leaving Pembroke Pines?
4      A. No, sir.
5      Q. Now, there was some discussion as to
6  the process of making the decision on who was
7  going to be included, and you talked about
8  department of heads providing you with
9  individuals. And some questions were asked about
10  whether or not Mrs. Iaia was in fact participating
11  in the RIF as a department or the head of the
12  director of marketing.
13      A. Yes.
14      Q. Are there any specific reasons why
15  she did not participate in the --
16      A. Well, first of all, it's kind of an
17  assumption on my part that she did not participate
18  only from the standpoint of her position and she
19  was the only one in the department being
20  eliminated.
21      Q. Okay. Do you understand if she had
22  any employees that reported to her or that she
23  supervised?
24      A. Not that I recall.
25      Q. Would an individual who didn't have

1  employees or director who did not have any
2  supervisory or employees they supervised
3  participate in the RIF discussions?
4      A. Not necessarily.
5      Q. And, Mr. Sutphin, can you state with
6  any certainty whether or not Mrs. Iaia's age had
7  anything to do with your decision to include her
8  in the reduction in force?
9      MR. HANNAH: Objection. Asked and
10  answered.
11      THE WITNESS: I don't recall even
12  considering age.
13
14  BY MR. COPELAND:
15      Q. Have you ever in any of the
16  reductions of forces which you've done or through
17  your various hospitals ever considered age?
18      A. No, sir.
19      MR. HANNAH: Objection. Asked and
20  answered.
21      MR. COPELAND: Just one second.
22  No further questions.
23      MR. HANNAH: I have a couple. Let's
24  have this marked.
25

1      (Plaintiff's Exhibit 10 was
2      marked for identification.)
3
4      RECROSS-EXAMINATION
5  BY MR. HANNAH:
6      Q. Mr. Sutphin, we talked about the
7  various benefits that were available to the
8  employees back in November of 1993, correct?
9      A. Uh-huh.
10      Q. Right?
11      A. Yes, sir.
12      Q. Okay. One of those benefits was
13  this -- at least to department managers and
14  department heads hospital incentive compensation
15  plan?
16      A. It was under Galen and Humana. I
17  can't recall what Columbia instituted.
18      Q. Let's take a look at Plaintiff's
19  Exhibit Number 10. Tell me if you recognize that
20  document.
21      A. Okay.
22      Q. All right. Does that refresh your
23  recollection as to --
24      A. It's very similar.
25      Q. Who was offering the incentive plan?

## Page 149

1  A.  It's very similar to the one that was
2  under or looks to be very similar to the one that
3  was under Humana and Galen.
4  Q.  What was the period of effectiveness
5  of this Columbia Healthcare Corporation incentive
6  compensation plan?
7  A.  Four-month period ending December 31,
8  1993.
9  Q.  The period you were still at the
10  hospital?
11  A.  Yes.
12  Q.  And Jackie Iaia?
13  A.  Up until the RIF, yes.
14  Q.  So at that point in time the
15  incentive compensation plan was being administered
16  by Columbia Healthcare Corporation, being offered
17  by Columbia Healthcare Corporation to its
18  employees?
19  MR. COPELAND: Objection.
20  THE WITNESS: According to this.
21
22  BY MR. HANNAH:
23  Q.  You were covered by that Health
24  Plan -- excuse me -- by that hospital incentive
25  compensation plan?

## Page 150

1  A.  I don't recall whether it was
2  implemented at the time or not to me. It says
3  during that four-month period, so, yes, I would
4  have been except I left the position.
5  Q.  Do you have any reason to believe
6  that hospital incentive compensation plan of
7  Columbia Healthcare Corporation did not apply to
8  the department managers at Pembroke Pines Hospital
9  back in November of 1993?
10  A.  I have no reason to believe it, but I
11  just don't recall.
12  Q.  No further questions.
13  THE VIDEOGRAPHER: That's the end of
14  this deposition as time and date indicated on the
15  screen. Thank you.
16  MR. COPELAND: You have the right,
17  Mr. Sutphin, to read your deposition once it's
18  transcribed in order to ensure that everything
19  she's taken down here is accurately taken down and
20  transcribed or you can waive that right. You just
21  need to let the court reporter know so she can
22  make arrangements to get it to you once it is
23  transcribed.
24  THE WITNESS: I would like to have a
25  copy of it.

## Page 151

1  MR. COPELAND: They won't actually
2  provide you a copy. They will probably tell you
3  to come to their office and read it.
4  THE WITNESS: That will be fine.
5  MR. HANNAH: So he wants to read.
6
7  (Whereupon, the deposition was
8  concluded.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 152

1  C E R T I F I C A T E
2
3  I, the undersigned, JERRY SUTPHIN, do
4  hereby certify that I have read the foregoing
5  deposition taken in the case of Jacqueline Iaia vs
6  Columbia Healthcare Corporation d/b/a Pembroke
7  Pines Hospital on July 24, 2000, that, to the best
8  of my knowledge, said deposition is true and
9  correct (with the exception of the following
10  corrections listed below.)
11
12  Page  Line  Correction
13
14
15
16
17
18
19
20
21
22  Date:
23
24  _____
25        Signature

Page 153

```
 1          C E R T I F I C A T E

 2

 3   STATE OF VIRGINIA

 4   CITY OF NORFOLK, to-wit:

 5

 6       I, Penny Commander Wile, RMR, a Notary Public

 7   for the State of Virginia at Large, certify that

 8   the foregoing deposition of JERRY SUTPHIN was duly

 9   taken and sworn to before me at the time and place

10   and for the purpose in the caption mentioned, and

11   that the transcript is a true record of the

12   testimony given by the witness.

13       I further certify that I am neither attorney

14   nor counsel nor related to or employed by any

15   of the parties to the action in which this

16   deposition is taken, and further that I am not a

17   relative or employee of any attorney or counsel

18   employed by the parties hereto nor financially

19   interested in the action.

20       Given under my hand this 29th day of July,

21   2000.

22

23          _____
                 Notary Public

24

25   My commission expires:  January 31, 2001
```

EXHIBITS

## B. PERFORMANCE CHARACTERISTICS

| RATE THE FOLLOWING | CODE | COMMENTS |
|---|---|---|
| **PROFICIENCY IN FIELD/SPECIALTY** Degree of competence. Professional manner. | 3.5 | Has developed well in field. |
| 2 **ADMINISTRATIVE EFFECTIVENESS** Skill in planning, organizing and implementing work assignments or projects. | 3.5 | Good organizational skills. |
| 3 **LEADERSHIP** Skill in getting work done through formal or informal direction of others. | 3 | Very good at organizing events (Blood Drives) and employee activities. |
| 4 **JUDGEMENT/DECISION MAKING** Degree of analysis, objectivity and foresight used to make decisions. | 3 | Seeks input. Objective in making decisions |
| 5 **RELATIONSHIPS** Ability to work with subordinates, peers and superiors. | 4 | Works well with all concerned |
| 6 **INITIATIVE & RESOURCEFULNESS** Amount of drive and creativity. Ability to start and accomplish work. Degree of supervision needed. | 4 | Very persistent in accomplishing tasks assigned. |
| 7 **SUPERVISORY SKILL** Demonstrated ability to select, train, motivate and develop subordinates. Degree of sustained contribution from work group. | N/A | |
| 8 **COMMUNICATION** Expression of ideas verbally or written. Method and manner of speaking. Ability to observe and listen. | 4 | Has good written and verbal skills |
| 9 **PROFESSIONAL DEVELOPMENT** Commitment to professional growth through development of skills and knowledge. | 4 | Very active in professional organizations |
| 10 **ADAPTABILITY** Efficiency under stress. Receptiveness to change/new ideas. Poise and/or courtesy in tough situations. | 4 | Handles most situations very well. |
| 11 **ATTITUDE & COOPERATION** Degree to which employee is supportive of organization's objectives, decisions and policies. Accepts and profits from constructive criticism. | 4 | Very supportive of organizations goals. |
| **OVERALL RATING** | 3.7 | |

C0622

1998

## C. DEVELOPMENT SUMMARY

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENTAL NEEDS |
|---|---|
| A. *See Notes below* | A. |
| 1. B. | B. |
| C. | C. |

Action to be taken to correct performance deficiencies where appropriate

2. *Jackie does an excellent job in promoting the facility through the Chamber of Commerce and other local organizations. Needs to continue to develop relationships with media and other organizations to promote and enhance the hospital's image within the community.*

| No. of In-Service Programs attended. | DID EMPLOYEE ATTEND ▶ | Safety Program ☐ YES ☐ NO | CPR ☐ YES ☐ NO | Infection Control ☐ YES ☐ NO | No. of Cont. Ed. Prog. Attended | Contact Hrs. |
|---|---|---|---|---|---|---|

| 4 | The position description for this employee has been reviewed and is current. ☐ YES ☐ NO | A revised position description has been attached. ☐ YES ☐ NO |
|---|---|---|

## D. EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal?
☐ YES ☐ NO

1998

C0023

57

# Pembroke
# Pines Hospital

| | |
|---|---|
| Memo to: | Jacqueline Iaia |
| Copy to: | |
| From: | Paula Adamson, Director of Human Resources |
| Date: | November 11, 1993 |
| Subject: | Termination of Employment |

---

As was discussed with you, due to the recent reorganization and low census at Pembroke Pines Hospital, we are unable to place you in an appropriate position. As a result, regretfully, your employment as Director Marketing/Community Relations is terminated effective today.

You will be placed on an involuntary leave of absence (non-paid) for a period of six (6) months. If, at the end of the six (6) months, you are not recalled, your name will be removed from our employment records. At that time you will be eligible for reemployment at Pembroke Pines Hospital based upon your qualifications and positions available.

You have already received a check for 8 weeks of severance pay based on your years of service. Monies paid will be based on your normal scheduled work week.

Regular pay through pay period ending 11/13/93, any unused vacation time and/or float holiday if applicable, less appropriate deductions, and any balances owed to the Hospital for Uniform Sale, Employee loans, Garnishments, or Hospital bill will be mailed certified to your home on 11/18/93.

You are responsible for returning all Pembroke Pines Hospital property in your possession including Picture Identification, Keys, Beepers, Parking Permit, Backbelts, etc. to your Department Manager or Human Resources. Any items not returned (i.e. backbelts and beepers) will be deducted from your final paycheck.

CC216





Page 2

If you are a member of the Eastern Credit Union, it is your responsibility to contact the Credit Union (Telephone: 305-966-6500) to make the necessary arrangements.

**MEDICAL INSURANCE COVERAGE**

You may continue your medical coverage by paying the full premium for the six (6) months you are on LOA status.  If you continue your coverage for the six (6) months, you will be eligible to continue medical coverage for 18 months under the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA).  After the six (6) month LOA, during which you have continued making payments for medical, you may contact Human Resources for information to continue medical coverage under COBRA.  Failure to make the premium payment within ten (10) days of the due date, will cause your coverage to cease on the last day that payment was made.  If coverage is not in effect at the time you are placed on a LOA or terminated, you are not eligible to enroll and continue coverage.

**DENTAL INSURANCE COVERAGE**

You may convert your dental insurance by following the same instructions as under Medical Insurance Coverage.

**LIFE INSURANCE**

If you are a participant, Life Insurance plans will continue for the six (6) months you are on a LOA at no cost to you. After the six (6) months, you can elect to continue coverage in an amount up to but not exceeding the amount of coverage you had under the group life insurance plan.  The cost of this coverage will depend upon the type of individual policy selected and its rate for a person in your age group.  You may convert your Group Life Insurance to an individual policy by completing and mailing the Notice of Conversion Privilege Form to the insurance company within 31 days of your last day of employment.  This form may be obtained from the Human Resources Department.  The insurance company will then provide specific information concerning rates and types of policies available.

00217

Page 4

I acknowledge receipt of this letter explaining my
termination and benefits.

_____     __11_-_11_-_93__
Employee                             Date

_____     __11_-_11_-_93__
Witness                              Date

00210

Page 5


I acknowledge understanding that to receive a final
distribution from the Retirement and/or 401-K Savings Plan
now, my termination date will be effective immediately, I
will not be placed on an unpaid leave of absence, and I will
forfeit recall rights.



_____        _____
Employee                           Date


_____        _____
Witness                            Date


002280

Pembroke Pines, Florida 33024
Telephone 305, 962-2650



Pembroke
Pines Hospital

November 16, 1993

To Whom It May Concern:

I would like to take this opportunity to write this letter of recommendation in regard to Jackie Iaia.

Jackie worked for me as Director of Marketing/Public Relations at Pembroke Pines Hospital for approximately two years and I found her to be very knowledgeable, understanding, and a supportive hard worker.

Jackie has a thorough working knowledge of the marketing/public relations field and I would like to lend my recommendation on her behalf in her pursuit of future job opportunities.

Very truly yours,

Jerry R. Sutphin
President and Chief Executive Officer

/es

C0068



DEFENDANT'S
EXHIBIT
10



MEMO TO **Monique Monteiro**

COPY TO **Ed Maas, Joe Berding, Anita Greenwood, Personnel File**

FROM **Valerie L. Moran**

DATE **December 11, 1991**

SUBJECT **Six Month Review**

---

**Humana**
**Seniors Association**

Getting to know you, the other Advisors and the individual Chapter personalities over the past six months has been both professionally and personally rewarding.

Monique, having looked back at each chapter over the past six months I would like to commend you and your staff for your successful performance in the following areas which positively impact the financial health of your hospital, insurance sales and the market, as a whole:

1. **Exceeding the HSA only goal for FY '91 by 122%**

2. **Membership Retention**

3. **Membership Recruitment**

4. **Membership Participation**

5. **Participating Fully in Market Team Building**

6. **Volunteering at Market Events**

7. **Increasing the number of Programs offered**

8. **Setting up speaking engagement to promote HSA**

9. **Keeping up on Medical Alert installations and trouble shooting**

10. **Providing the Market Office with timely information for Press Releases**

Most important of all, I appreciate your support of the Market Effort and working towards the HSA philosophy of improving the quality of life for adults 55 and over.

I look forward to working with you to make next year another banner year for HSA in South Florida.

Thank you for an outstanding job!

**D. EMPLOYEE COMMENTS (Continued)**

What do you feel you've accomplished during this evaluation period?

Met & far exceeded Corporate goals
Developed many & various new & successful programs
Membership exceeded 2100 in 2 year period
Got excellent media coverage & developed many relationships
with media people to help promote program

Can you recommend any changes which would help you do your job?

I feel I do the best I can with what the
hospital has for me to utilize. I am very happy
with my staff, budget and office equipment.
(A laser printer would be nice though to improve look
of newsletter!!)

What are your future work plans with us? (Mention where appropriate, relocation, career plans and whether present job is in line with career plans)

I plan to stay with the Seniors Assn. for years to come.
I enjoy my job and feel that I am very good at what
I do in providing a variety of social & helpful services
to the Seniors of our area.

Do you possess skills and aptitudes which are not fully utilized in your present position? (Mention foreign languages when appropriate)

In this field you learn to use skills you never knew
you had! Especially creativity, patience and a lot
of understanding!

What training and development do you need to do a better job in your current or future position?

I intend to go back to school to get my masters
degree in business or public relations

```
EXHIBIT
Dft's 5
PCW  7-24-00
```

## E. EVALUATION SUMMARY

| FOR APPRAISAL PERIOD EMPLOYEES | FOR PERMANENT EMPLOYEES | SIGNATURES |
|---|---|---|
| ☐ SATISFACTORY COMPLETION OF APPRAISAL PERIOD | ☒ SATISFACTORY COMPLETION OF EMPLOYMENT YEAR | Employee  Monique Monteiro  Date 10-22-__ |
| ☐ DELAY COMPLETION OF APPRAISAL RE-EVALUATION DATE ➔ | ☐ DELAY CONTINUED REGULAR STATUS & RE-EVALUATE. RE-EVALUATION DATE ➔ | Manager  Date |
| ☐ LESS THAN SATISFACTORY COMPLETION OF APPRAISAL. RECOMMEND TERMINATION. EFFECTIVE DATE ➔ | ☐ CONTINUED UNSATISFACTORY PERFORMANCE. RECOMMEND TERMINATION. EFFECTIVE DATE ➔ | Reviewing Manager  Date |

The employee's signature means that the performance appraisal was reviewed with him/her. It does not necessarily indicate that he/she agrees with the appraisal.

Case 0:00-cv-06227-FAM   Document 59   Entered on FLSD Docket 11/06/2000   Page 217 of 245

# EMPLOYEE PERFORMANCE APPRAISAL

**Humana**

HU-431  7/83

*Management Employees Only*

| | |
|---|---|
| ee Name<br>MONIQUE MONTERIO | Position Title<br>MANAGER HUMANA SENIORS ASSOCIATION |
| partment<br>SENIORS ASSOCIATION | Social Security No<br>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 |
| od Covered<br>m 12/91    To 12/92 | Date Due | Appraisal Type<br>☐ 3 MONTH  ☐ PROMOTION/TRANSFER<br>☒ ANNUAL  ☐ _____ |

## INDICATORS OF PERFORMANCE LEVELS

| | | |
|---|---|---|
| 5 | OUTSTANDING | Performance far exceeds standards with minimal supervision |
| 4 | EXCELLENT | Performance consistently above standards with minimal supervision |
| 3 | SATISFACTORY PLUS | Performance above standards on a regular basis |
| 2 | SATISFACTORY | Performance fully meets minimum standards |
| 1 | SATISFACTORY MINUS | Performance falls below minimum standards |

## B. PERFORMANCE CHARACTERISTICS

| RATE THE FOLLOWING | CODE | COMMENTS |
|---|---|---|
| 1 **PROFICIENCY IN FIELD/SPECIALTY** <br> Degree of competence. Professional manner | 5 | *Outstanding HSA Director. Very professional.* |
| 2 **ADMINISTRATIVE EFFECTIVENESS** <br> Skill in planning, organizing and implementing work assignments or projects | 5 | *Excellent organization skills.* |
| 3 **LEADERSHIP** <br> Skill in getting work done through formal or informal direction of others | 5 | *Gets 100% from staff and HSA members.* |
| 4 **JUDGEMENT/DECISION MAKING** <br> Degree of analysis, objectivity and foresight used to make decisions. | 5 | *Excellent judgement.* |
| 5 **RELATIONSHIPS** <br> Ability to work with subordinates, peers and superiors. | 5 | *Works well with everyone.* |
| 6 **INITIATIVE & RESOURCEFULNESS** <br> Amount of drive and creativity. Ability to start and accomplish work. Degree of supervision needed. | 5 | *Hard worker - needs very little supervision. Top performer in % growth.* |
| 7 **SUPERVISORY SKILL** <br> Demonstrated ability to select, train, motivate and develop subordinates. Degree of sustained contribution from work group. | 5 | *Does excellent job with employee and volunteers.* |
| 8 **COMMUNICATION** <br> Expression of ideas verbally or written. Method and manner of speaking. Ability to observe and listen. | 4 | *Excellent verbal and written skills.* |
| 9 **PROFESSIONAL DEVELOPMENT** <br> Commitment to professional growth through development of skills and knowledge. | 4 | *Attends appropriate seminars. Would encourage continuance of formal education.* |
| 10 **ADAPTABILITY** <br> Efficiency under stress. Receptiveness to change/new ideas. Poise and/or courtesy in tough situations. | 5 | *Very poised and is receptive to change.* |
| 11 **ATTITUDE & COOPERATION** <br> Degree to which employee is supportive of organization's objectives, decisions and policies. Accepts and profits from constructive criticism. | 5 | *Very supportive of Hospital and Corporate Goals* |
| **OVERALL RATING** | 4.8 | |

See Instructions on Page 1 for appropriate appraisal code

## C. DEVELOPMENT SUMMARY

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENTAL NEEDS |
|---|---|
| A | A |
| *See Note below* | |
| B | B |
| | |
| C | C |
| | |

Action to be taken to correct performance deficiencies where appropriate

2

*Monique has done an outstanding job with the Seniors Assn. and has exceeded all goals set for her.*

| 3 | No. of In-Service Programs attended | DID EMPLOYEE ATTEND ▶ | Safety Program ☐ YES ☐ NO | CPR ☐ YES ☐ NO | Infection Control ☐ YES ☐ NO | No. of Cont. Ed. Prog. Attended | Contact Hrs |
|---|---|---|---|---|---|---|---|
| 4 | The position description for this employee has been reviewed and is current | | ☐ YES ☐ NO | A revised position description has been attached | | ☐ YES ☐ NO | |

## D. EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal?
☐ YES ☐ NO

**D. EMPLOYEE COMMENTS (Continued)**

What do you feel you've accomplished during this evaluation period?

Can you recommend any changes which would help you do your job?

What are your future work plans with us? (Mention where appropriate, relocation, career plans and whether present job is in line with career plans)

You possess skills and aptitudes which are not fully utilized in your present position? (Mention foreign languages when appropriate)

What training and development do you need to do a better job in your current or future position?

## E. EVALUATION SUMMARY

| FOR APPRAISAL PERIOD EMPLOYEES | FOR PERMANENT EMPLOYEES |
|---|---|
| ☐ SATISFACTORY COMPLETION OF APPRAISAL PERIOD | ☐ SATISFACTORY COMPLETION OF EMPLOYMENT YEAR |
| ☐ DELAY COMPLETION OF APPRAISAL RE-EVALUATION DATE ➡ | ☐ DELAY CONTINUED REGULAR STATUS & RE-EVALUATE. RE-EVALUATION DATE ➡ |
| ☐ LESS THAN SATISFACTORY COMPLETION OF APPRAISAL. RECOMMEND TERMINATION. EFFECTIVE DATE ➡ | ☐ CONTINUED UNSATISFACTORY PERFORMANCE. RECOMMEND TERMINATION. EFFECTIVE DATE ➡ |

SIGNATURES

Employee _Monique J Montero_ Date 11-25-92

Manager _____ Date

Reviewing Manager _____ Date

The employee's signature means that the performance appraisal was reviewed with him/her. It does not necessarily indicate that he/she agrees with the appraisal.

```
                                  C O N F I R M A T I O N   D O C U M E N T                    RPT NO PR106441    PAGE 0002
                                                                                                          PRINTED 12/15/92
                                                                                                              TIME 02:17:41
                                                                                                     P.E.DATE 12/12/92
35912 HUMANA HOSPITAL PEMBROKE                                                                   LAST MAINT. 12/15/92
                                                                                                            ACTIVE
SOC SEC 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
NAME    MONTEIRO, MONIQUE
        FIELD TITLE              ELIG HRS.           .00        DATA                               CHANGE TO
**** SALARY CHANGE HISTORY ****   DATE     AMOUNT    PER    REAS     POSITION
                                *11/29/92  32999.46  4.80    03    92H-MGR HUM S
          FEDERAL|    0       S  12/01/91  31488.08  6.50    03    92H-MGR HUM S
          STATE|    0       S  12/02/90  29566.00   1.60    03    92H-MGR HUM S
          CITY|    0          08/20/90  29100.00    .00    01    92H-MGR HUM S
          COUNTY|    0        METH MAR-ST NO-EX ONE-EX AMT-PER  SCC-CODE
*********** TAXES ***********
          FEDERAL|    0       S    000      .00
          STATE|    0       S    00        00
          CITY|    0            00        00     .00      .00    0000
          COUNTY|    0          00        00     .00      .00    000
          FICA|    A
          FUI|    Y
     WORK STATE|110 FLORIDA
   RESIDE STATE|110 FLORIDA
          SUI/A|    C
          SUI/E|    Y
          DIS|    A
          SP IND|    00
*********** DDE ***********   MC  PC  T  AMT/PER  LIMIT    START              STOP
 DENTAL INSRNCE-54|           11   A  P    6.24     .00      .00             00/00/00
 HMO IHS2       -57|          11   A  P   57.50     .00      .00             00/00/00
 THRIFT PLAN    -60|          14   A  P    3.00   99700.65   .00             00/00/00
 CHARITYDEDUCT  -63|          11   A  P    7.11     .00      .00             00/00/00
*********** BONDS ***********
          PRICE CODE|
          OWNER CODE|
  OWNER/CO-OWNER|
  OWNER/CO-OWNER SSN|
     CURRENT BALANCE|
*********** THRIFT ***********
  THRIFT ELIGIBILITY DATE|  09/01/91
  THRIFT ENROLLMENT DATE|   09/01/91
 UNABLE TO CONTACT REASON|
  THRIFT STATUS REGULAR|    01 ELIGIBLE-PARTICIPATING
  SUSPEND DATE REGULAR|     00/00/00
  RE-ENTRY DATE REGULAR|    00/00/00
  THRIFT STATUS VOLUNTARY|  00 NOT SUSPENDED
  SUSPEND DATE VOLUNTARY|   00/00/00
  RE-ENTRY DATE VOLUNTARY|  00/00/00
* DISTRIBUTION PERCENTAGES *
          FUNDA|  025
          FUNDB|  025
          FUNDC|  050
*********** RETIREMENT ***********
  QUALIFIED PLAN DATE|      08/20/90
  CURRENT RETIREMENT STATUS|IP PARTICIPANT
 RETIREMENT PARTICIPATION DATE| 08/23/92
  NEXT INVESTMENT - FIXED|  50%
  NEXT INVESTMENT - EQUITY| 50%
  NEXT INVESTMENT - HUMANA| 0%
  CURRENT INVESTMENT - FIXED| 100%
```

C O N F I R M A T I O N   D O C U M E N T

RPT NO PP1106441

PAGE 0001 B

LAST MAINT. 12/15/92

35912 HUMANA HOSPITAL PEMBROKE

SOC SEC 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
NAME  MONTEIRO, MONIQUE

| FIELD TITLE | DATA | CHANGE TO |
|---|---|---|

********* PERSONAL **********

ACTIVE

| | |
|---|---|
| NAME | MONTEIRO, MONIQUE |
| ADDRESS LINE 1 | 7720 NW 39 STREET |
| ADDRESS LINE 2 | |
| CITY STATE ZIP | DAVIE                FL 33024 |
| HOME PHONE | 305/435/2093 |
| MARITAL STATUS | 1 |
| SPOUSE NAME | |
| SEX | F |
| BIRTHDATE | 03/15/66 |
| EMPLOYMENT DATE | 00/20/90 |
| KEY EMPLOYEE INDICATOR | |
| DEPARTMENT NUMBER | 923 |
| LOCATION CODE | 000 |
| WORK LOCATION | |
| ADJUSTED SERVICE DATE | 00/00/00 |
| OFFICE PHONE | 305/962/9650 |
| EXTENSION | 0000 |
| SUPERVISOR | |
| PROFESSIONAL LICENSE | |
| EMP UNION CODE | |
| JOB PREFERENCE | |
| GEOGRAPHICAL PREFERENCE | |
| EMPLOYEE CLASS | 5 |
| POSITION CLASS | 00 |
| EMPLOYMENT CODE | 01 |
| EEOC GROUP | H |
| VETERAN STATUS | |
| HANDICAP INDICATOR | |
| TERMINATION REASON | |
| DATE OF TERMINATION | 00/00/00 |
| LOA REASON | |
| LOA START DATE | 00/00/00 |
| LOA RETURN DATE | 00/00/00 |

***** PERFORMANCE REVIEW *****

| | DATE | RATING | NEXT REVIEW |
|---|---|---|---|
| | 12/02/92 | 480 | 12/02/93 |

***** SALARY INFORMATION *****

| | |
|---|---|
| PAY CODE | 3 |
| FULL/PART TIME | 1 |
| HOURLY RATE | 15.6651 |
| NORMAL BI-WEEKLY HOURS | 80.0 |
| BI-WEEKLY SALARY | 1269.21 |
| WORK SCHEDULE | 1 |
| SALARY CHANGE DATE | 11/29/92 |
| SALARY CHANGE REASON | 03 MERIT |
| NEXT SALARY REVIEW | 12/02/93 |
| POSITION NUMBER | 92H MGR HUMANA SENIORS ASSOCIATION |
| GRADE | M -07 |
| DATE PRESENT JOB | 00/20/90 |
| SCHEDULED SHIFT | 1 |
| PAY FREQUENCY | 2 |
| VACATION PLAN | AC ELIG HRS.    60.00 |



# PEMBROKE PINES HOSPITAL

*A New Commitment To Healthcare....Together*

May 5, 1994

Ms. Jacqueline Iaia
8321 SW 44 Place
Davie, FL 33328

Dear Jackie:

On November 11, 1993, you were placed on a reduction in
workforce leave of absence for six months. This letter is to
advise you that your employment with Pembroke Pines Hospital
will be terminated on May 11, 1994. We are sorry that we
have been unable to place you in an alternate position during
this time. If, at some time in the future, a position does
open that you feel you are qualified for, please do not
hesitate to reapply at the Human Resources Office.

Attached is the necessary paperwork for you to complete in
regard to your Retirement Plan and your Thrift and/or 401-K
Savings Plan. Please complete the form and return as soon as
possible to Vicky Neal at the above address. Also attached
is the paperwork to continue your medical/dental insurance
under COBRA. If you wish to continue your coverage the COBRA
form and your payment is to be sent directly to the address
at the bottom of the form.

Should you have any questions, please do not hesitate to
contact Human Resources at 963-8450.

With Best Regards,

*Paula Adamson*

Paula Adamson
Vice President Human Resources

C0215

MAYTERM



MARK E. EDWARDS
ATTORNEY AT LAW

MARK E EDWARDS
JEANNE CASSTEVENS THOMAS
SARAH R. GALVARRO
KIP P ROTH
SUE WILLIS-GREEN
ROBERT W HORTON

WRITER'S DIRECT DIAL
(615) 344-2970

2501 PARK PLAZA
NASHVILLE, TENNESSEE 37203

(615) 344-2591
(615) 344-2200 FAX

March 6, 1998
Via Facsimile 850/488-5291

Ms. Linda Mathis, Investigator
Employment Investigation Unit
Florida Commission on Human Relations
325 John Knox Road, Suite 240, Building F
Tallahassee, Florida 32303-4149

Re:   Iaia v. Galen Hospital - Pembroke Pines, Inc.
      f/d/b/a Pembroke Pines Hospital
      EEOC 15D971107 and FCHR No. 95-0414

Dear Ms. Mathis:

This letter constitutes the Corporation's statement of position and response to the Commission's request for information. Ms. Iaia alleged that she was discriminated against because of her age (49). As discussed more fully below, this charge is without merit and should be dismissed.

Counsel has prepared this letter solely for your use in your investigation and evaluation of the above-captioned case. Because counsel prepared this letter based on limited information, this statement and the representations herein are not based upon first-hand knowledge. Accordingly, counsel does not authorize or intend this letter to be used for any purpose other than that described above. The Corporation will cooperate in the investigation of this matter through counsel, and the undersigned will respond to any relevant questions or requests for information you may have now or later in your investigation.

The Corporation divested the assets relating to the Hospital in 1995. Therefore, this Corporation does not have direct information relating to this matter.

The Corporation understands that Ms. Iaia is a long-tenured employee of the Hospital and served as the Hospital's Director of the Marketing Department. In that capacity she was responsible for managing, retaining, and directing the marketing function of the Hospital.

000411

Iaia v. Pembroke Pines Hospital
Charge No. 15D971107 and FCHR No. 95-0414
March 3, 1998
Page 2


From late 1993 through 1994, the Hospital initiated a necessary reduction in operating costs. As part of this reduction, Ms. Iaia's position was eliminated. During this period of time, the Hospital reviewed Ms. Iaia's position in the Marketing Department along with various other management level positions and determined that the function of the Marketing Department Director could be combined with the position of the Director of Public Relations and Senior Friends.

This decision was made because the employee performing the function of the Director of Public Relations and Senior Friends was capable of performing the duties and responsibilities of both areas. Ms. Iaia was not experienced in the area of Senior Friends and could not perform that function when the positions were combined. Consequently, her position was eliminated.

In order to function in the changing healthcare environment, the Hospital had to reduce its expenses, including employment expenses. The Hospital selected positions for elimination to allow for the continued provision of quality patient care when staff was reduced. These positions were eliminated based on the Hospital's goal of reducing expense through the efficient and effective restructuring of job responsibilities that also ensured quality healthcare.

Clearly Ms. Iaia was not discriminated against based on her age (46). Following the elimination of her position, her job responsibilities were absorbed by another employee. Ms. Iaia was simply terminated because the Hospital determined that it was necessary to reduce expenses.

The Hospital denies that it discriminated against Ms. Iaia and respectfully requests that this charge be dismissed.

Sincerely,

Mark E. Edwards

MEE/WT:ges

**000412**

**⊛ Pembroke Pines Hospital**

# Stat

*A Monthly Publication of Happenings at*

*2301 University Drive, Pembroke Pines, FL 33024*

**March 1993**

**Jackie Iaia, Editor**



# Soaring to New Heights

Our VIP reception was honored by more than 300 esteemed guests who included the Mayors and politicians from the four neighboring cities, business leaders, physicians, employees and volunteers. Larry and the Dietary staff prepared a splendidly beautiful, artful and delicious culinary delight. Our own in house DeeJay Ev Carrol kept the mood intense as Jerry Sutphin unveiled the new Pemborke Pines Hospital name and Vice Mayor, Alex Fekete declared February 23, 1993 as Pembroke Pines Hospital day and presented us with a proclamation (it is in the Staff Conference Room).

The employees were treated again the following day at a cookout with hamburgers, hot dogs and even fish tasted good on the barbecue. But the greatest enjoyment was being able to wear T-shirts and jeans. This casual day attire gained so much momentum that the last Friday of every month is designated "casual day". Pembroke Pines Hospital T-shirts ONLY may be worn with slacks or skirts (jeans and shorts are not permissible.)



The New Galen InfoExpress voice response system will be operative on March 1 (1-800-847-3412) and can be accessed by employees who have received their PIN. Employees for whom the Special Election Form was mailed to Mercer by February 15, 1993, should have received their PIN by March 5th. Employees who have not received their PIN by that date can use their Social Security number to access the voice response system and ask an operator about the status of their PIN.

EXHIBIT
PH 3 3

## Pembroke Pines Hospital

CONGRATULATES ITS MEDICAL STAFF FOR THEIR EXPERTISE AND COMPASSION IN DELIVERING HEALTHCARE TO OUR PATIENTS.

THROUGH OUR STAFF'S COMMITMENT, WE CONTINUE TO PROVIDE CARING AND QUALITY SERVICE TO THE COMMUNITY.

THANK YOU FOR YOUR DEDICATION AND LOYALTY THROUGHOUT THE YEARS.



## HAPPY DOCTOR'S DAY



## March 30

South Florida Edition • Medical Business 3



Pembroke Pines Hospital

*Stat*

*A Monthly Edition Happenings*

*7800 University Drive, Pembroke Pines, FL 33024*

December 1993

Monique Monteiro, Editor

01208

# Holiday Happenings!

*We want to wish all employees a very happy and healthy holiday season and invite you to help celebrate at the following functions:*



### CHILDREN'S HOLIDAY PARTY

Tuesday, December 14th at 6:00 pm - 8:00 pm In the Classrooms

The party will feature face painting, story telling, gifts, Santa and Mrs. Claus and lots of holiday fun for all the children. RSVP is necessary. If you have not turned in your reservation forms, call 8030 with the number and ages of children that will attend.

### TRADITIONAL HOLIDAY LUNCHEON FOR ALL EMPLOYEES

In celebration of the holidays we will be hosting a free traditional Holiday Luncheon in Larry's Cafe (otherwise known as the hospital cafeteria) on **Thursday, December 16th** for all employee's to enjoy. Lunch will be served from 11 am - 2 pm, dinner from 4:30 pm - 7:00 pm and late night service for our night owls from 2:00 am - 3:00 am.

### HOSPITAL VOLUNTEER HOLIDAY PARTY

To be held on **Wednesday, December 15th at 12:00 noon** in the classrooms. RSVP were due December the first.

### DEPARTMENT DECORATING CONTEST

Departments will be judged on **Friday, December 17th at 11:00 am.** There will be two cash prizes for the winning department to apply to their holiday party - $50.00 for the first prize and $25.00 for second prize. Departments will be judged on creativity and resourcefulness.

## A Message from Pam...

*I have had the honor of becoming part of the team at Pembroke Pines Hospital some four weeks ago. Slowly, I am beginning to connect your faces with your names and positions, and I look forward to meeting with all of you at the December 1, 1993 'Round the Clock Staff Meetings. You have all been gracious in welcoming me into your "home" and I can assure you that, along with the rest of your executive staff, we will light up the community with the Pembroke Pines name. Many plans are under way for the start of new services, construction, re-decorating, new equipment acquisitions etc., and I look forward to sharing these projects with you. Your continued commitment and hard work will make 1994 the beginning of our success.*

*To all of you and your families, my wishes for a wonderful Holiday Season and a new year filled with Health and Happiness.*

*Pam Corliss*
*Chief Operating Officer*

**Stat is an employee publication featuring events and people at Pembroke Pines Hospital. If you are interested in working on the editorial staff of this newsletter or have suggestions or comments regarding the content please call the editor, Monique Monteiro at 963 - 8030.**

EXHIBIT

# Cancer victim fights for life

## Transplant is only chance

**H**ollywood resident **Barbara Plasker** is halfway through the fight of her life, and her mom is looking for foot soldiers to help finish the battle.

Plasker, 41, suffered from a rare strain of inoperable lung cancer that couldn't be eradicated through chemotherapy. Her only chance of survival was to get an even-rarer double-lung transplant.



**JORDAN BRESSLER**

**FRIENDS AND NEIGHBORS**

Plasker received the transplant early Thursday morning at Kirkland Hospital in Birmingham, Ala. Plasker, who was staying with relatives in Atlanta, received the call that a donor pair of lungs was located at 5:30 p.m. Wednesday.



**Plasker**

By 7:30 p.m., she had been whisked by private jet to the hospital, by 10:30 she was in surgery, and by 6:30 a.m. Thursday, the donor lungs were in place.

Though the next few weeks will be critical for her survival, they will be critical for the Plaskers' finances as well. Surgery and aftercare costs are expected to skyrocket to more than 300,000, only half of which will be covered by insurance.

That's where Plasker's mom, **Pearl Speert**, comes in. Speert, a resident of Davie's Rolling Hills, has joined with some of Plasker's friends to put together a surgery trust fund, administered by the National Heart Assist & Transplant Fund, a nonprofit agency.

Speert has been helping to feed and care for Plasker's children, **Staci**, 14, **Jonathan**, 11, and **Andrew**, 3, while their mother has been waging her war for survival.

"It's been rough. We're hoping [this] miracle will save her life," Speert said.

If you'd like to make a donation, send it to NHATF: Friends of Barbara Plasker Transplant Fund, P.O. Box 163, Haverford, Pa. 19041. Make checks payable to NHATF, Friends of Barbara Plasker. For information on the fund, call (215) 527-5056.

### Kids in Crisis, Part I

Managers and staff members at Pembroke Pines Hospital took to the streets last month — holding out bedpans and water containers to passersby at Sheridan Street and University Drive — and collected $1,772 for Kids in Crisis, a charity that assists abused children.

"It was very successful," said **Monique Monteiro**, the hospital's public relations director, who participated in the event. "Any time you can get that much money in three hours, it's a success."

Participants included **Scott Colton** of Pembroke Pines, **Pearl Magnus** of Pembroke Pines, **Barbara Laxon** of Miramar, **Bob Dickman** of Fort Lauderdale, **Rob Carrel** of Davie, **Marjorie Samerson** of Pembroke Pines, **Jane Hernandez** of Davie, **Mike Scialdone** of Coconut Creek, **Sharon O'Keefe** of Plantation, **Sandy Barrowman** of Hollywood, **Rosemarie Martineau** of Davie, **Marybeth Thompson** of Pembroke Pines and **Kay Bornstein** of Davie.

### Kids in Crisis, Part II

The biggest contribution, by far, to WAXY's one-day fundraiser for Kids in Crisis was a $25,000 matching donation by Weston-based Pediatrix, a national firm that contracts out neonatal and pediatric care doctors and services to hospitals.

The donation, called in over the air to WAXY host and Davie resident **Rick Shaw**, came as a shock to those listening behind the scenes.

"We just all kind of gasped," said WAXY program director **Dave Denver**. "It was one of the most wonderfully incredible moments I've had as a broadcaster. We were all choked up."

Dr. **Roger Medel**, chief executive officer of Pediatrix, made the on-air presentation after the 160 employees of the company dug deep into their pockets.

"We all got together and decided to do something about this," said Dr. **Brian Udell**, chief medical officer of Pediatrix. "Abused children are one of our biggest problems, as far as follow-ups go. Medically we can have the answers, but we can't help the home situation. It's frustrating."

During the nine-hour radiothon, WAXY raised a little more than $80,000 — and, Shaw hopes, the consciousness of the public about the far-reaching effects of child abuse.

"The problem is not an ethnic problem, economic or social thing. It's all over," Shaw said. "It's your neighbors, the people right down the street. The horror is people don't know about it. This is our cause."



**NEIGHBORS**

# Hometown Herald
9341 NW 57th St., Tamarac, FL 33351

| | | |
|---|---|---|
| ■ Editor | Dorothy Klein | 985-4584 |
| ■ Assistant Editor | Sandra Jacobs | |
| ■ Reporters | Michelle Patterson | 724-1512 |
| | Doris Quan | 724-1518 |
| | Jordan Bressler | 724-1514 |
| ■ Advertising | Susan Kelly-Gilbert | 724-1519 |
| ■ Classified | | 985-4547 |
| ■ Subscription/Delivery Information | | 524-2535 |
| | | 462-3000 |

EXHIBIT

# EMPLOYEE PERFORMANCE APPRAISAL
CO-431 9/94

*Management Employees Only*

| Employee Name | Position Title |
|---|---|
| *Monique Monteiro* | *Director of Public Relations and Senior Adr.* |
| Department | Social Security No. *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* |

| Period Covered | Date Due | Appraisal Type |
|---|---|---|
| From: *12/1/93*  To: *12/1/94* | *12/1/94* | ☐ 3 MONTH   ☐ PROMOTION/TRANSFER<br>☐ ANNUAL   ☐ _____ |

## INDICATORS OF PERFORMANCE LEVELS

| 5 | OUTSTANDING | Performance far exceeds standards with minimal supervision |

4     EXCELLENT     Performance consistently above standards with minimal supervision

3     SATISFACTORY PLUS     Performance above standards on a regular basis

2     SATISFACTORY     Performance fully meets minimum standards

1     SATISFACTORY MINUS     Performance falls below minimum standards



EXHIBIT

000092

# A. MAJOR ACCOMPLISHMENTS DURING APPRAISAL PERIOD

NOTE: MBO Summary may be substituted for this section

BRIEFLY IDENTIFY INDIVIDUAL GOALS PROJECTS MBO'S OR OTHER ACCOMPLISHMENTS

BRIEFLY SUMMARIZE EMPLOYEE'S PERFORMANCE

Development of Vascular Lab Program

Physician Marketing

Red Beret events

Spring Parade

Senior Programs

Partner with media

Growth of Seniors Program?

Tagging of hospital needs vs. Seniors

Attunement of Seniors Advertising.

Christmas Party for Children

Halloween events.

Logo recovering by Seniors events

000093

| ODE | COMMENTS |
|---|---|

Comprehensive knowledge of community and senior needs. *[illegible handwriting]* recognized in area of public relations and marketing.

Extremely organized - sets achievable deadlines - works indicate are of *[illegible]* with enthusiasm to ensure successful completion of project.

Self motivated - *[illegible]* to key management - *[illegible]* disclose choices, presenting positive and negatives. *[illegible]* Analysis *[illegible]* time done - *[illegible]* to pay more attention to future involvement and *[illegible]* demographic for *[illegible]*

Works well with all *[illegible]* of the staff. Maintain calm demeanor though always *[illegible]* "upbeat".

Self starter - creative - no to no supervision required - *[illegible]* to develop a *[illegible]* of self *[illegible]* when her peers already have *[illegible]* Very motivated - *[illegible]* her dept *[illegible]* managers. *[illegible]* enthusiasm is infectious and *[illegible]* motivates to get volunteers *[illegible]* others have failed.

Communicate effectively - *[illegible]* *[illegible]* to the point direct. *[illegible]* articulates her needs and *[illegible]* Currently enrolled in Master Program. Seeks opportunities internally to further her knowledge. Eager and motivated.

Always polite. Treats well *[illegible]* patients and visitors, *[illegible]* *[illegible]* to hospital associates *[illegible]* patients and visitors. Always polite. Very enthusiastic and supportive *[illegible]* organizations objectives.

5                                                      0094

4.82  Performance consistently above standard

## C. DEVELOPMENT SUMMARY

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENTAL NEEDS |
|---|---|
| A. *Self Motivates* | *To become a more active participant in SCHHO Activities* |
| B. *Enthusiastic* | *Be assertive in Department Specific Marketing and* |
| C. *Creative* | *Business Development programs.* |

*Work with "Senior Building" next door to develop home health. Help plan respite etc. programs to assure loyalty. Stream. Prepare biannual financial reporting of seniors program as benefit to hospital.*

**Action to be taken to correct performance deficiencies where appropriate**

| No. of In-Service Programs attended | DID EMPLOYEE ATTEND ▶ | Safety Program | CPR | Infection Control | No. of Cont. Ed. Prog. Attended | Contact Hrs |
|---|---|---|---|---|---|---|
| | | ☐ YES ☐ NO | ☐ YES ☑ NO | ☑ YES ☐ NO | | |

| The position description for this employee has been reviewed and is current. | ☑ YES ☐ NO | A revised position description has been attached. | ☐ YES ☐ NO |
|---|---|---|---|

## D. EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal?   ☑ YES ☐ NO

*I appreciate the confidence & support I have received from Administration regarding my first year in a new position. I feel they have given me the direction & "growing space" I needed to help me accomplish my goals!*

000095

## D: EMPLOYEE COMMENTS (Continued)

What do you feel you've accomplished during this evaluation period?

*Taking PR/Marketing & making it something that helps the hospitals bottom line as well as recognition in the community for the facility*

Can you recommend any changes which would help you do your job?

*more hours in the day!*

What are your future work plans with us? (Mention where appropriate, relocation, career plans and whether present job is in line with career plans)

*Growth & advancement within Columbia*

Do you possess skills and aptitudes which are not fully utilized in your present position? (Mention foreign languages when appropriate)

What training and development do you need to do a better job in your current or future position?

*Still working towards Masters Degree*

## E. EVALUATION SUMMARY

| FOR APPRAISAL PERIOD EMPLOYEES | FOR PERMANENT EMPLOYEES |
|---|---|
| ☒ SATISFACTORY COMPLETION OF APPRAISAL PERIOD | ☐ SATISFACTORY COMPLETION OF EMPLOYMENT YEAR |
| ☐ DELAY COMPLETION OF APPRAISAL RE-EVALUATION DATE ➡ | ☐ DELAY CONTINUED REGULAR STATUS & RE-EVALUATE. RE-EVALUATION DATE ➡ |
| ☐ LESS THAN SATISFACTORY COMPLETION OF APPRAISAL. RECOMMEND TERMINATION. EFFECTIVE DATE ➡ | ☐ CONTINUED UNSATISFACTORY PERFORMANCE. RECOMMEND TERMINATION. EFFECTIVE DATE ➡ |

**SIGNATURES**

Employee _____  Date 1-17-9?

Manager _____  000096

Reviewing Manager _____  Date 1-10-95

The employee's signature means that the performance appraisal was reviewed with him/her. It does not necessarily indicate that he/she agrees with the appraisal.

# Humana®

## APPLICATION FOR EMPLOYMENT

HU 244 (1/89)

Humana Hospital - Pembroke
2301 University Drive
Pembroke Pines, FL 33024

Humana Inc. and its affiliated subsidiaries are equal opportunity employers. We do not discriminate on the basis of sex, race, color, religion, national origin, handicapped status or veteran's status.

### PERSONAL HISTORY

**Applicant Name (Please give complete name):** Monique Willenbrock

**Social Security Number:** 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

**Present Address (Include City, State, Zip):** 8494 Charles Club Circle #187, Atlantabl, Hb23-2 Park Meadows?

**Home Phone:** (813) 737-5807

**Position For Which You Are Applying:** Blumana Senior Assur[?] Mgr.

**Type Position:** ☐ FULL TIME ☐ PART TIME

**Relocate?** ☐ YES ☐ NO

**Shift:** ☐ DAY ☐ EVENING ☐ NIGHT ☐ ROTATING

**Work Holidays?** ☒ YES ☐ NO

**Work Weekends?** ☒ YES ☐ NO

**Date Available For Work:** Aug 13, 1990

**Salary Requirements:**

**Are You Willing to Travel?** ☒ YES ☐ NO

**Have you ever been convicted of a crime, excluding minor traffic violations?** ☐ YES ☒ NO
If YES, please explain.

**Have you ever involved in a Humana facility before?** ☐ YES ☒ NO
If YES, when and what position?

**Are there any reasons why you would be unable to perform the position safely and any of the duties of the position for which you are applying?** ☐ YES ☒ NO
If YES, please explain

**What are your career goals?** _a chance to test level of negotiation professionalism_

**Have you lost any time due to illness in the past 5 years?** ☐ YES ☒ NO
If YES, please explain.

List any friends or relatives employed by Humana: Valerie Lockwood

Referred by:

List any memberships in professional organizations, honors or activities which you feel would indicate your application, excluding those that would indicate race, color, national origin, religion, sex or handicap: Member Honda Parks & Recreation, Certified Professional Service Professional

### EDUCATIONAL HISTORY

| | LOCATION | GRADE | From (Year) | To (Year) | GRADE | DEGREE |
|---|---|---|---|---|---|---|
| HIGH SCHOOL | Notre Dame | 9 10 11 12 | | '84 | genee | 3.0 |
| COLLEGE | Flower Md FSW | 1 2 3 4 | | 90 | hemine sumes | 37 |
| COLLEGE | | 1 2 3 4 | | | | |
| GRADUATE SCHOOL | | 1 2 3 4 | From (Year) | To (Year) | | |
| OTHER | | | From (Year) | To (Year) | | |
| OTHER | | | From (Year) | To (Year) | | |

List any professional licenses you possess: indicate type of license, number and state

**Clerical Skills (if applicable)**
☐ Typing _____ wpm
☐ Operate Dictating Equipment
Other Office Skills _____
☐ Shorthand _____ wpm

EXHIBIT

000041

MONIQUE JEAN WILLENBROCK

4053-2 PARK MEADOWS
FORT MYERS, FL  33908
813-939-5807

---

## EDUCATION

B.S. Leisure Services and Studies, Florida State University, Tallahassee, FL. Major area of emphasis: Older Adults/Retirement. 3.78 GPA upon graduation.

## WORK EXPERIENCE

Currently employed with Lee County Recreation, Ft. Myers, FL. Senior Citizens Recreation Specialist at Bonita Springs Recreation Center. In charge of planning and implementing all recreation programs for the Seniors as well as controlling the donation budget.

Cinnamon Cove Adult Community, Ft. Myers, FL. January 1990 to April 1990. Worked full time under Lynda Bragg, Program Coordinator assisting with the planning and implementing of recreation programs, writing of monthly newsletter and controlling budget during internship.

Tallahassee Senior Citizens Center, Tallahassee FL. August 1989 to December 1989. Assisted in planning and implementing special events, learning about city funded operations and assisting with other program components as part of fieldwork.

Woodmont Retirement Community, Tallahassee, FL. January 1989 to April 1989. In charge of assisting in recreation programming as part of fieldwork.

000044



## OTHER WORK EHPERIENCE

Waitress, Steak and Ale Restaurant, Ft. Myers FL. January 1990 to present. Duties include waiting tables and related works.

Waitress, Bartender, Banquet Waitress, Hostess. The Spartan Restaurant and Caucus Rooms, Tallahassee FL. Duties included waiting tables, banquets and bartending 35-40 hours per week while attending college. August 1986 to December 1989.

## ORGANIZATIONS

Member Florida Recreation and Parks Association. Recipient of 1989 Scholarship award.

## SPECIAL TRAINING AND CERTIFICATION

Certified Leisure Professional through the Florida Parks and Recreation Association.

Extensive knowledge of microcomputer word processing computers including Macintosh, IBM and Apple II and IIe. Familiar with programs such as Word Star, Microsoft Word, Word Perfect, Mac-Write and MacDraw.

## LEISURE INTERESTS AND HOBBIES

Enjoy biking, waterskiing, fishing, tennis, gardening exercise and line dancing.

**000045**

page two

2301 University Drive
Pembroke Pines, Florida
33024
Telephone 305 962-9650

## Humana Hospital
## Pembroke

### JOB DESCRIPTION ADDENDUM

**Department Name:**     Marketing/Public Relations

**Position Title:**     Director of Marketing/Public Relations

**Essential Duties:**

This position requires extensive knowledge of internal and
external policies, hospital goals, objectives and services.
Marketing and public relation skills are essential.
Management and supervisory skills and ability to interact
with all levels of personnel, both internally and externally,
are required. Listening and interpretative skills and
ability to understand information are required. This
position requires the ability to retrieve, communicate or
otherwise present information in a written, auditory or
visual fashion. The occupant of this position will express
or exchange ideas by means of the written and spoken word.

**Physical Duties:**

This position is primarily sedentary in nature. The maximum
amount of lifting is 10 pounds. The ability to transport
papers or other materials is required. The ability to push
and otherwise maneuver a wheeled cart is required.
Occasional trips to the professional building located across
the parking lot are required as well as walking to and
returning from the various departments throughout the
hospital. Attendance at events throughout the local
community is required. The ability to express or exchange
ideas by means of the spoken word is necessary.

**Personal Protective Equipment/Universal Precautions:**

The potential for frequent exposure to blood and other
potentially infectious materials is minimal to none.
Therefore, there will be no need to utilize any personal
protective equipment.

**Working Conditions:**

The occupant of this position spends over 95% of his/her time
inside air conditioned office space.

000103

EXHIBIT
Pll's 9

Job Description Addendum
Director of Marketing/Public Relations
Page 2

**General Educational Development:**

This position requires reasoning, mathematical and language skills at a college level.

**Aptitudes:**

Low    1    2    3    4    5    High

Intelligence:  General Learning Ability.  4

Verbal:  Receives and presents information or ideas clearly.  5

Numerical:  Ability to perform arithmetic operations quickly and accurately.  3

Spatial:  Understands the relationships of forms in space.  3

Form Perception:  Is able to perceive discriminations between and among objects.  3

Clerical Perception.  Perceive details in verbal or tabular material.  4

Motor Coordination:  Hand, eye coordination making rapid and/or accurately precise movements.  2

Finger Dexterity:  Work with fingers placing and turning motions.  2

Manual Dexterity:  Work with hands placing and turning motions.  2

Eye-Hand-Foot Coordination:  Coordinated movements in response to visual stimuli.  1

Color Discrimination:  Ability to perceive and respond to similarities or differences in colors, shapes or other values of the same or different colors.  1

000104

**COLUMBIA HEALTHCARE CORPORATION**     Rev.     02–Sep
HOSPITAL INCENTIVE COMPENSATION PLAN – GROUP III
DEPARTMENT MANAGER
FOR THE FOUR MONTH PERIOD ENDING DECEMBER 31, 1993

**I.     Objectives**

   **A.**   The objectives of the Hospital Incentive Compensation Plans are:

      **1.**   To optimize the profitability of Columbia Healthcare Corporation and each of its facilities consistent with Columbia's mission of achieving unequaled, measurable quality and productivity and with other goals of the division, Corporation, its stockholders and its employees.

      **2.**   To promote teamwork among members of management as well as to encourage excellence in the performance of individual responsibilities.

      **3.**   To provide significant opportunity for those members of hospital management who have significant responsibility within the facility.

**II.    Eligibility and Award**

   **A.**   Membership in this plan will be upon nomination by the Hospital Executive Director and approval by the Division President.  A list of approved positions is presented on page 6 of this plan.

      **1.**   Incentive compensation is generated by the Hospital's performance measured against goals for the period established by the Chief Operating Officer and the Division President.  These goals are presented in Attachment I.

      **2.**   An incentive compensation pool for participants shall be created based upon 33.33% of their base salaries at November 30, exclusive of any bonus or fringe benefits and shall not exceed ten percent (10%) of these salaries.  No pool will be generated unless the hospital achieves at least 90% of its pretax profit goal.

| Executive Director's Bonus % (Excluding President's Fund) | X | 10% of Participants' Total Base Salaries |
| --- | --- | --- |
| Executive Director's Maximum Bonus % (65%) | | Times 33.33% |



EXHIBIT

00100

Columbia Healthcare Corporation
Hospital Group III Incentive Compensation
Four Month Plan

3.   The incentive compensation pool generated by performance against such goals will be distributed among participants on a discretionary basis. In no event may a participant receive a bonus greater than 3.333% of the participant's base salary. The amount distributed to each participant of this plan will be determined by the Hospital Executive Director and approved by the Division President and the Chief Operating Officer. Any amounts remaining in this fund after all payments are made shall be retained by the Corporation and the fund shall terminate.

4.   Incentive compensation is earned in addition to consideration for merit and promotional increases under the Corporation's wage and salary program. Incentive compensation will be paid to participants on or before March 15, following the close of the four month period ending December 31, 1993.

III.   Evaluation of Performance

A.   Evaluation of performance against goals will be the responsibility of the Chief Operating Officer, the Division President and the Hospital Executive Director.

IV.   Administration of the Plan

A.   The plan shall be administered by the Chief Operating Officer. He shall have full power and final authority to construe, interpret, amend and administer the plan.

V.   Eligibility during the Four Month Period

A.   An individual who becomes eligible to participate in this plan due to employment, transfer or promotion during the four month period, will be eligible to receive partial incentive compensation based upon the participant's base salary for the period of time eligible and the level of achievement in relation to targeted goals for the entire four month period. In no event, however, will partial payments be made for any period of time of less than two months.

0010

Columbia Healthcare Corporation
Hospital Group III Incentive Compensation
Four Month Plan

**VI.** **Ineligibility during the Four Month Period**

    A.  A participant who becomes ineligible during the four month period due to transfer
       or change of position shall cease to be eligible for further participation in this plan
       on the date of transfer to the ineligible position.  If the participant, prior to
       transfer, had been in an eligible position for a minimum of two calendar months
       of the four month period, the participant will be eligible to receive partial incentive
       compensation based upon the participant's salary for the period of time eligible
       and the level of achievement in relation to targeted goals for the entire four
       months ending December 31, 1993.

**VII.** **Termination**

    A.  Except as specifically provided herein to the contrary, in order to be eligible
       for incentive compensation, a participant must be an active employee at the time
       incentive compensation is paid.  Termination, voluntary or involuntary, prior to the
       date of payment will result in the forfeiture of any incentive compensation claims
       for the period.

**VIII.** **Retirement**

    A.  A participant who has been employed during the entire four month period for
       which incentive compensation is to be earned, but who is retired under a
       retirement plan of the Corporation at the end of that period, will be eligible for full
       incentive compensation as determined in accordance with this plan.  If a
       participant retires under a retirement plan of the Corporation prior to the end of
       the four month period, but after October 31, the participant will be eligible to
       receive partial incentive compensation based upon the level of achievement in
       relation to targeted goals for the entire four month period.

00102

Columbia Healthcare Corporation
Hospital Group III Incentive Compensation
Four Month Plan

**IX. Leave of Absence or Disability**

    A. A participant who becomes disabled or who is granted a leave of absence after October 31, may, at the discretion of the Chief Operating Officer, be eligible to receive partial incentive compensation based upon the participant's base salary for the period of time he was a participant at the level of achievement in relation to targeted goals for the entire four month period.

**X. Death**

    A. If a participant who has been employed during the entire four month period for which incentive compensation is to be earned dies prior to the date of payment, the participant's estate will be eligible for full incentive compensation. If a participant dies after October 31, and before the end of the four month period, the participant's estate will be eligible to receive partial incentive compensation based upon the participant's base salary for the period of time he was a participant at the level of achievement in relation to targeted goals for the entire four month period.

**XI. Limitation on Award**

    A. In no event shall incentive compensation for participants in this plan and all other Columbia plans exceed five percent (5%) of corporate pre-tax profit as determined by the Corporation's internal financial statements for the four month period ending December 31, 1993.

**XII. Quality of Earnings**

    A. The Board of Directors reserves the right to pass upon the quality of earnings and to adjust earnings prior to calculation of incentive compensation awards if such earnings are not in accordance with the assumptions included in the Corporation's business plan.

00103

Columbia Healthcare Corporation
Hospital Group III Incentive Compensation
Four Month Plan

**XIII.  Profit Objective**

    A.  Incentive compensation generated for all participants shall be accrued and deducted as an expense for the four month period in determining whether profit objectives have been achieved.

**XIV.  General Provisions**

    A.  Any deviation from accepted operating practices related to quality of patient care or accounting methods and reporting, whether or not initiated by the participant, may, at the discretion of the Chief Operating Officer, reduce or forfeit a participant's claim or award under this plan.

    B.  No individual employee or any other person has any claim or right to be included in this plan or to be granted incentive compensation under this plan until such individual has been declared a participant and received an official written notice thereof in accordance with the procedures as set forth in this plan. In addition, all of the requirements and applicable rules and regulations of this plan must have been met including, but not limited to, the availability of funds for incentive compensation awards, the determination of the extent to which goals have been met and the evaluations of individual performances.

    C.  The designation of an individual as a participant under this plan does not alter the nature of the participant's employment relationship.

**XV.  Corporation's Right to Modify or Terminate**

    A.  The Corporation shall have the right to change, modify or terminate this plan, with or without notice, in whole or in part, at any time.

C0106.

Columbia Healthcare Corporation
Hospital Group III Incentive Compensation
Four Month Plan

XVI.  Following is a list of approved Group III participant positions:

Accounting Manager
Admitting Manager
Assistant Executive Director
Assistant Executive Director–Finance
Business Office Manager
Cardiac Cath Lab Manager
Director of Cardiac Rehabilitation
Center of Excellence Director
Credit & Collection Manager
Data Processing Manager
Dietary Manager
Director of Education
Director of Volunteers
DRG Coordinator
EKG Manager
Director of Engineering
Director – Environment
Home Health Manager
Housekeeping Manager
Laboratory Manager
Materials Manager
Medical Records Manager
Nuclear Medicine Manager
Nurse Manager – Anesthesia
Nurse Manager – Asst. Dir. of Nursing
Nurse Manager – Critical Care Unit

Nurse Manager – Emergency
Nurse Manager – Inservice
Nurse Manager – Other Ancillary Unit
Nurse Manager – Other Inpatient Unit
Nurse Manager – Patient Care Coordinator
Nurse Manager – Recovery
Nurse Manager – Shift Supervisor
Nurse Manager – Surgery
Occupational Therapy Manager
Patient Accounting Manager
Personnel Manager
Pharmacy Manager
Physical Therapy Manager
Plant Operations Manager
Public Relations Manager
Quality Assurance Manager
Quality Management Director
Radiology Manager
Respiratory Therapy Manager
Seniors Association Manager
Social Services Manager
Spinal Unit Manager
Transitional Living Manager
Others Approved by the President
   of the Corporation

Equation
Facility Name

| P | Facility No | Social Security No | | THRIFT USE ONLY ▶ | | C | E | |
|---|---|---|---|---|---|---|---|---|
| 2 | 3        7 | 8            16 | | | | 17 | 18 | |

☐ **NAME CHANGE OR CORRECTION**
It is requested that the name at the top of this form be changed to: _____

☐ **CHANGE OF BENEFICIARIES**
I hereby revoke all previous ☐ primary, or ☐ contingent beneficiary designation(s) in this Plan. I request any benefits due me, as applicable, be paid to

| Primary - Name | Relationship | Social Security No |
|---|---|---|
| Address (City State Zip) | | |

| Contingent - Name | Relationship | Social Security No |
|---|---|---|
| Address (City State Zip) | | |

☐ **CHANGE IN DEDUCTION**
I hereby change any authorized deductions for the Humana Thrift Plan to the amount of $7$ % (all deductions MUST be expressed as a whole percent) from my regular bi-weekly pay beginning the next Plan quarter, which is _____ I understand that the percent specified cannot be greater than ten percent (10%) of my compensation each pay period with employer contributions being applied to only the first six percent (6%).

☐ **CHANGE IN FUTURE INVESTMENTS**
I wish to change my current investment option percentages to the new options indicated below, beginning with the first full pay period in September. I understand that this request must be submitted at least thirty (30) days prior to the beginning of the next Plan Year and that I can make such change only at the start of the Plan Year. Only increments of 25% are allowed.

| Fund A  37        41 HUMANA COMMON STOCK | Fund B  42        46 DIVERSIFIED COMMON STOCK | Fund C  47        51 FIXED INCOME |
|---|---|---|
| 0 0 | 0 0 | 0 0 |

☐ **CHANGE IN INVESTMENTS PAST ACCOUNTS**
I hereby request a change in my account balances by transferring _____ % from Fund _____ to Fund _____ and _____ % from Fund _____ to Fund _____ I understand that this request must be submitted at least thirty (30) days prior to the beginning of the next Plan Year and that I can make such change only at the start of the Plan Year which is September 1.

➤
| Signature of Participant or Beneficiary | Date | I understand that the committee may either approve or reject this request | Facility Review Signature | Date |
|---|---|---|---|---|

THRIFT USE ONLY

E.E. LIQUIDATION PERCENT
| Fund A | Fund B | Fund C |
|---|---|---|
| | | |

E.E. REINVESTMENT PERCENT
| Fund A | Fund B | Fund C |
|---|---|---|
| | | |

| Date Received | Processor | Checker | Date Completed |
|---|---|---|---|