UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION



NIGHT BOX
FILED

NOV - 3 2000

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

JACQUELINE IAIA,

      Plaintiff,

vs.              CASE NO. 00-6277-CIV-MORENO

COLUMBIA HEALTHCARE CORPORATION
d/b/a PEMBROKE PINES HOSPITAL,
a foreign corporation,

      Defendants.
_____/

VIDEO DEPOSITION OF:      JOSEPH A. CASH

TAKEN AT THE INSTANCE OF    Attorneys for Defendant

DATE:              August 14, 2000

TIME:              Commenced at 11:20 a.m.
                   Concluded at  1:15 p.m.

LOCATION:         100 Salem Court
                   Tallahassee, Florida

REPORTED BY:        Carolyn L. Rankine
                   Notary Public in and for
                   the State of Florida at
                   Large

**CERTIFIED COPY**



2

APPEARANCES:

       **REPRESENTING THE PLAINTIFF:**

       RODERICK V. HANNAH, ESQUIRE
       Becker & Poliakoff, P.A.
       3111 Stirling Road
       Fort Lauderdale, Florida 33312

       **REPRESENTING THE DEFENDANT:**

       ALEXANDER D. del RUSSO, ESQUIRE
       Levy Kneen Mariani Curtin
        Kornfeld & del Russo, P.A.
       1400 Centrepark Boulevard
       Suite 1000
       West Palm Beach, Florida 33401

ALSO PRESENT:

DOUG NARGIZ

              *   *   *

             I N D E X

WITNESS                             PAGE

**JOSEPH A. CASH**
    Direct Examination by Mr. del Russo     5
    Cross Examination by Mr. Hannah     54
    Redirect Examination by Mr. del Russo   67

**CERTIFICATE OF ADMINISTERING OATH**     76

**CERTIFICATE OF REPORTER**     77

3

**EXHIBITS:**

Number                                                          PAGE

    1    Log of complaint activity          8
    2    Letter dated January 2, 1998     11
    3    Letter dated June 27, 1995      16
    4    Case management and dvelopment log   19
    5    Individual complaint log - intake
counselor:  CC        22
    6    Amended charge of discrimation   26
    7    Letter dated March 20, 1996   27
    8    Letter dated September 26, 1997  30
    9    Log of complaint activity  33
  10    Letter dated 9/26/97  37
  11    Letter dated September 10, 1997  40
  12    File transmittal form  43
  13    Individual complaint log - intake
counselor:  NS  46
  14    Letter dated November 21, 1997  49
  15    Letter dated 6/17/98  53

  P-1    Notice of determination:  cause  63
  P-2    Determination:  cause  63
  P-3    Investigator's memorandum dated
October 23, 1998  63

**0**

00-6227 4:11

**1**

1 8:17, 23; 63:12, 13; 64:10
10 37:24; 61:25; 62:11
100 4:16
11 40:10, 15; 42:21, 24; 45:11
11/14/94 10:6; 35:23
11/21/98 49:14
11:20 4:17
11s 45:12
11th 66:23
12 43:1; 45:13; 61:7, 7, 16
12/1/98 49:14
13 46:2, 5
14 11:18; 49:16, 20
14th 4:18; 10:14
15 53:12, 18
17 53:13
18 48:23, 24; 49:6; 51:19
180 50:24; 51:6; 56:10; 57:7
1992 51:3
1994 8:5, 13; 11:18; 18:10; 28:22; 50:11; 55:25; 56:21; 58:10; 59:9; 60:18
1995 12:8; 16:19; 18:11; 24:21; 26:25; 52:2; 67:19; 72:25
1996 27:14, 18; 28:14, 22; 58:3, 3
1997 30:15; 32:2, 4; 37:21; 40:7; 44:21; 47:5; 48:20, 23; 49:6, 17; 50:11; 51:11; 56:1, 21; 58:10; 59:10; 61:25
1998 11:6; 51:19; 53:13; 66:3, 23; 68:5, 12; 70:20
1:15 75:25

**2**

2 11:4, 6, 10; 20:21; 50:22; 63:19; 64:21; 71:22
20 27:18; 28:13; 37:6
2000 4:18
20th 27:14
21 49:17
23 70:20
23rd 66:3
26 24:21; 30:15; 32:2, 4; 37:21; 40:7; 44:21; 61:24
26th 31:19; 47:5
27 16:19; 19:10
27th 20:6

28 26:25

**3**

3 16:18, 22; 50:19; 63:24; 64:21; 66:2, 6; 67:5; 70:16
3/18/98 51:21
3/20/96 46:17
325 5:8

**4**

4 19:20, 23
4/1/96 42:13
4/11/96 42:15; 43:12; 44:8, 14, 16, 20; 45:2, 4

**5**

5 21:24; 22:2; 34:21

**6**

6 26:1, 6; 71:19
6/17/98 53:6, 9
6/26/95 18:23; 19:7

**7**

7 27:17, 23
760.11 50:19

**8**

8 30:14, 22

**9**

9 8:13; 33:16, 25; 34:4, 25; 35:19; 48:17; 51:17
9/26/97 36:1
94 10:14; 18:16; 35:11, 14; 36:9; 39:20; 56:15; 58:2; 59:12
95 10:14; 19:10; 36:10, 13; 59:12, 12
95-0414 7:7
96 36:15, 15; 37:6; 45:7, 16, 17; 59:12, 12
97 39:19; 47:2; 48:24; 56:15; 59:12
98 69:6, 8; 73:3
9th 8:5; 60:18

**A**

able 24:11; 54:7
absolute 55:9
absolutely 39:7; 56:12

acceptable 21:4, 7, 29:14, 16, 21; 30:3; 33:3
according 10:1, 4, 6; 11:17; 14:18; 20:6; 21:5; 26:22
accounts 36:11
accuracy 67:22; 68:15; 69:21; 70:6; 71:15; 75:15
Accurate 4:15; 8:21; 9:10; 11:8; 17:2; 19:21; 22:1; 27:21; 30:20; 40:13, 17; 42:24; 46:4; 49:19; 53:16; 62:21; 68:24
accurately 75:12, 14
Act 50:18; 51:2; 59:24; 60:4; 62:2, 19
action 10:22; 18:5; 38:18, 19; 39:10; 40:2; 41:20; 62:17
actions 38:21; 39:11
activities 35:20, 22; 51:18
activity 8:18; 9:9, 21, 23; 10:9, 16, 20; 11:20; 28:16, 22; 33:19; 34:6; 35:25; 44:19; 48:18; 55:3
actual 47:15; 48:3
actually 11:16; 14:16; 35:9; 38:3; 46:22; 58:2; 61:19; 62:14; 66:20
Adamson 34:20; 35:4, 18
additional 9:23; 69:14; 70:14
address 5:7, 9; 23:21; 24:13; 34:20, 21, 23; 35:1, 16; 69:12; 70:3
addressed 73:9, 12
ADEA 38:19; 62:19
administrative 28:3
adverse 52:10, 13, 21; 53:2, 7, 10; 54:3; 66:13, 13, 17; 67:8; 69:9; 70:12, 13
advise 11:23; 29:11; 72:25
advised 51:12; 71:23; 72:17
affidavit 24:9; 31:1, 4; 35:5, 6, 12; 70:8, 9
affidavits 70:5
again 15:16; 23:17, 25; 30:8; 52:8; 54:16; 67:24; 70:15; 71:6
against 29:12; 31:25
age 38:13; 62:2, 18; 65:10; 71:2
agencies 15:12; 59:24
agency 9:12; 11:9; 13:11; 14:6; 15:22; 18:9; 23:12; 25:20, 21; 26:5; 28:25; 29:18; 30:6; 32:20; 34:8; 35:8; 41:15; 50:6; 55:21; 56:9, 14, 21; 57:17, 22, 22; 59:24; 60:2, 10, 12, 17; 61:23; 62:5; 65:4; 71:25; 74:10

agency's 17:3; 27:6, 21; 40:14; 42:25
agent 59:24; 60:4
ago 5:6; 10:5; 12:2, 15; 13:23; 19:18, 22; 20:21; 28:7; 41:10; 44:22; 67:6
agreement 14:25; 15:1, 5, 6, 21; 16:2; 21:6; 57:23; 58:8, 9, 16; 59:6, 8, 22; 60:23; 62:25
ahead 16:8; 39:18, 21; 42:20
alerted 41:11
Alex 5:5
allegations 50:23; 52:23; 70:3; 72:6
almost 32:12
aloud 50:21; 51:20; 67:11
always 29:23
amend 19:8
amended 17:6, 8, 14; 18:12; 26:2, 9, 23; 55:19; 71:20
amending 19:2; 20:22
and/or 17:17, 24
annual 59:11
apparently 13:15; 39:16; 44:15; 61:5
appear 31:9; 49:10; 50:1
appeared 46:13
appears 17:19; 18:19; 19:21; 21:14; 25:8; 26:12; 27:13; 34:8; 35:4; 40:18; 42:15, 24; 53:15; 65:17
applicable 4:6
approximate 36:3
approximately 4:17; 10:7
April 58:3
area 6:11; 14:2; 15:10; 32:18
around 33:4; 41:24
arrangement 14:22
assessment 45:24
assets 68:7
asset[t]s 52:1; 67:18
assigned 13:7; 20:16; 47:10, 14; 48:24; 49:2, 4, 6, 9, 11, 24; 50:2
assume 74:19
attach 75:12
attachment 40:12
attempt 68:1; 72:9; 73:22
attempted 23:13, 23
attempts 52:15; 71:25; 73:5, 21
attention 11:15; 24:19; 51:17, 18; 70:22; 71:21
attorney 54:10
attorneys 65:21
attributable 55:11; 57:11, 15, 19; 58:4
August 4:17
authenticate 31:1

authorized 34:19
available 54:12
average 57:2
aware 12:10, 22; 16:5

**B**

back 14:11; 20:19; 24:16; 30:1; 33:5; 35:19; 36:20, 22; 37:7, 8, 15, 19; 39:2, 17; 40:6; 42:8, 12; 43:8, 12; 44:5, 6, 10; 46:23, 24; 48:16; 50:11; 51:17; 55:25; 56:3, 16, 21; 58:24; 61:1, 8, 14; 62:9; 65:8; 67:4; 69:18; 71:19; 72:25
backlog 55:22; 56:20; 74:1
Bad 49:8; 54:16
based 10:20, 20; 19:14, 15; 21:17; 27:13; 37:3; 41:2; 49:25; 53:5; 61:15; 66:12, 13; 67:8
basic 9:17; 20:14
basis 59:11; 65:9
Beach 14:2, 6; 32:17
begin 5:7; 8:1; 16:6
beginning 57:3
behalf 38:3, 23; 39:24; 60:3, 5
best 41:7, 21
better 59:2, 3; 74:25; 75:1
bit 58:20, 25
blank 31:1, 2
Bob 24:5
Boca 57:14
both 29:16; 65:3
bottom 24:20, 25; 26:13; 42:12; 43:5; 46:13; 61:7
branch 23:6
break 33:22
breaking 58:13
Brief 33:24; 63:8
bring 7:4
brought 29:12
Broward 16:10
business 5:7; 7:24; 22:7; 64:17; 65:4

**C**

C 49:14
Calhoun 16:19; 17:13; 18:11, 17; 19:4; 20:6; 22:9, 14, 15; 25:8; 26:10; 47:21
Calhoun's 20:4
call 33:21; 36:25; 37:1, 1
called 4:24; 8:9; 37:4; 41:9; 51:23
Calls 23:14; 36:24; 39:4; 43:22
Calvin 16:19; 18:24; 22:15

came 29:7, 15, 19, 23:25;
39:17; 65:8
Can 5:7; 6:20; 8:1, 11;
9:14; 11:15; 13:24; 14:18;
15:4; 18:8; 21:15; 23:8, 19;
24:8; 25:3, 12; 27:13;
29:17; 31:22; 39:8; 41:7;
43:5; 48:22; 49:12; 53:21;
54:6; 56:6; 58:12, 13, 14,
18; 60:21; 66:10; 67:21;
70:22; 75:12, 15, 18
captioned 8:18; 21:23;
26:2; 34:5
capture 9:16
Care 30:17; 37:21
Carolyn 4:19
Case 4:11, 12; 5:6; 6:24;
7:1, 1, 2; 12:12; 13:24;
14:1, 4, 8, 9, 13, 14; 15:20;
16:4, 9, 13; 17:24; 18:6,
22; 19:18; 20:1, 11, 13, 17,
19; 22:25; 23:11; 24:21;
25:6, 9; 27:14; 32:23, 25;
36:20; 37:13, 14; 38:13;
39:2, 7, 13, 17, 19, 20;
40:5; 41:13, 16, 20; 44:24;
45:23; 46:23; 47:10; 48:7,
24; 49:24; 50:2; 52:1; 53:1;
55:1; 56:18; 57:4; 64:8, 24;
65:7, 18; 66:14; 71:4, 13;
74:9, 19
cases 6:18; 14:7; 15:17;
52:14; 55:22; 74:1; 75:2
CASH 4:2, 14, 23; 5:3;
7:4; 8:16; 9:8; 21:18;
23:19; 25:19; 26:2; 27:1;
33:15; 34:3, 22; 37:20;
39:1; 40:10; 43:24; 44:19;
47:17; 48:16; 50:1, 17;
53:14; 54:4, 20, 24; 67:4;
73:20
catch 8:12; 56:17
cause 51:1; 63:11, 18;
64:11; 65:8, 20, 25
caused 56:9
causes 57:19
CC 22:13
cease 16:12
certain 50:5, 13; 52:19;
53:4; 56:24
certainly 14:13; 57:16;
66:15
cetera 21:13
challenged 72:14
changes 75:13
charge 7:14; 11:18; 19:2;
20:22; 21:10; 25:12, 21;
26:2, 23; 27:2; 28:23;
29:11, 20; 32:8; 36:10;
38:19; 40:12; 51:14;
55:19; 57:10, 24; 58:1;
60:2, 11, 17; 61:1; 62:1;
68:11; 69:13; 71:20; 72:6;
73:7; 74:6
Charge/Waive 24:23;
25:7
charges 30:4; 59:25

charging 58:18; 60:1;
62:17
chief 23:8; 24:5; 28:3
cite 71:15
Civil 50:18; 51:2
claim 41:5
claims 20:9
Claudia 70:25
clear 45:10; 50:10
cleared 12:17
clearly 21:3
clerical 6:10
close 58:23
closer 57:18
closing 73:11
Columbia 4:12; 11:6;
30:16; 37:21; 61:24
comfortable 12:24;
59:14
coming 40:6
commenced 51:11
comment 43:5, 6, 7, 12
comments 43:10
Commission 5:9, 18;
6:4, 14, 21, 25; 7:5, 19, 24;
10:3, 25; 11:5; 15:8; 26:15;
27:19; 28:4; 29:2, 20, 23;
30:16; 37:15; 38:18;
50:23, 25; 55:21; 59:9;
60:4; 63:1; 64:17, 23; 65:7;
72:4; 75:16
commission's 8:22;
38:20; 64:8, 14
communication 37:2, 8;
61:23
company 52:2; 69:11, 12
complainant 7:6; 11:17;
12:15; 17:16; 21:12;
22:17; 23:4; 32:19, 24;
35:2, 5; 36:24; 37:4; 57:17;
68:16; 70:2; 73:10, 16, 17
complainant's 22:17;
52:23
complaining 35:17;
42:4; 69:22
complaint 8:2, 10, 18;
9:9, 21; 10:2, 11, 20; 11:1,
20; 12:2, 6, 14, 21; 13:7,
13; 15:14, 22; 16:12; 17:7,
8, 10, 14, 16, 19, 20;
18:10, 12; 20:14; 21:19,
23; 24:5, 9, 20; 25:4; 26:9;
27:10; 28:8, 17; 29:1, 9,
14; 30:18; 31:25; 32:8, 13;
33:18; 34:5, 9; 35:3, 20;
36:24; 44:20; 46:3, 9; 47:5,
7, 16; 48:13, 17, 18; 50:7,
8, 24, 24; 51:6, 18; 74:5,
11, 13
complaints 6:13, 22
completes 15:24; 39:10
complied 55:18
concept 25:20
concern 75:4
concerning 72:1

conclude 41:3; 44:12
concluded 75:25
conclusion 11:2; 19:13,
15; 25:24; 36:16; 40:8;
44:6; 52:20; 56:20; 62:4,
21
conclusions 56:16; 57:7;
71:17
concurred 65:22
conduct 48:6, 9; 74:1
conducted 51:5
conducting 33:13;
41:16; 47:13, 15; 68:13
conference 31:12
confusion 14:12; 32:16
conjunction 64:18
connection 6:22; 53:3
consider 70:10
considered 29:21; 63:1
constructed 44:23
contact 23:9; 49:15;
71:25; 72:4, 9; 73:5, 22, 22
contained 30:21; 40:14;
46:4; 64:21
contemplating 25:17
contents 7:16
context 39:9
continue 9:21; 16:8; 29:2
coordinator 48:6
copies 8:25
copy 8:21; 9:10; 11:8, 13;
13:18; 16:20; 17:1, 2;
19:21; 21:25; 22:1; 26:4;
27:21; 30:20; 31:6, 10, 14;
32:8; 37:23; 40:13, 17;
42:21, 23, 24; 46:4; 49:18,
19; 50:18; 53:11, 15, 16;
57:10, 23; 64:12, 13
corner 22:11
Corp 11:6; 30:17; 37:22;
61:24
Corporation 4:13; 67:17,
20; 68:6, 8
correlation 39:6
correspondence 62:7
counsel 65:21, 22
counselor 18:24; 20:7, 8;
21:14; 22:8, 12; 24:12;
46:21; 47:24; 48:2
counselor's 38:11
counselors 47:22
counterpart 57:18
counties 15:13, 14
County 16:10
course 7:23, 23; 13:17;
15:16; 18:4, 5; 22:7; 36:23;
42:18; 52:4; 64:17; 65:4;
70:11; 72:3
Court 4:10, 16, 18, 20;
58:17, 19, 22; 59:1, 3;
63:5, 7, 9; 75:15, 18
cover 15:18
Cp 49:15
CROSS 54:22

current 64:12
currently 5:25; 6:7; 48:3;
50:9
custodian 7:13, 20
customarily 13:10, 18
customer 5:21, 25; 45:5,
23

D

d/b/a 30:17; 37:22
date 8:11, 12, 13; 10:5;
11:18; 12:1; 26:14, 15, 22;
28:6, 13; 32:1; 35:6, 7, 8,
12, 13, 21; 39:3; 44:8, 10;
46:13; 48:22; 51:13;
60:19; 61:24
dated 11:6; 16:19; 18:23;
24:21; 27:18; 37:20;
42:15; 49:17; 53:9; 66:3;
70:20
dates 34:12
day 19:9
days 10:8; 32:10; 50:24;
51:6; 56:10; 57:7
deciding 38:10
decision 72:13, 13, 18,
20
decisions 72:1
deemed 60:12
Defendant 4:13; 5:6
Defendant's 61:7
Defense 61:25
definitely 14:20
del 5:2, 5; 8:13, 15; 9:2, 5,
7; 33:23; 34:2; 45:9, 17,
19; 54:20; 55:2, 12; 56:5;
58:8, 12; 59:7; 60:20;
62:22; 63:4, 13; 64:3; 65:5;
66:6; 67:3; 75:5, 9, 23
delay 36:3; 57:9, 10; 58:1,
4
delays 55:10
department 23:7; 70:24;
73:11
deposition 4:2, 14; 8:17,
23; 11:4, 10; 12:11, 22;
16:18, 22; 19:20, 23;
21:24; 22:2; 26:1, 6; 27:18,
23; 30:22; 33:16, 25; 34:4;
37:24; 40:10, 15; 43:1;
46:5; 49:20; 53:12, 18;
63:14, 20, 25; 71:20; 75:25
derived 22:21
designated 7:19
determination 50:7, 14;
51:5; 63:11, 18; 64:11;
65:13, 24, 24; 68:14;
69:19; 71:4
determine 20:12; 50:25
determined 72:7
development 18:22;
19:19; 20:2, 20
dialogue 37:3
difference 10:7; 47:23,

23; 48:1
different 10:5; 12:18;
24:3; 34:20; 43:10; 59:13,
19; 74:3
DIRECT 5:1; 6:15; 11:15;
24:19; 51:16, 18; 70:17,
22; 71:21
directed 37:5
directions 59:19
directly 16:5; 23:4; 32:23;
72:5, 9
director 28:2
discovery 4:4
discrimination 6:13, 23,
24; 8:3; 13:7, 13; 15:23;
17:7, 9; 20:9; 26:3; 28:24;
29:11; 30:5, 18; 32:9;
40:12; 41:5; 51:14; 60:18;
62:2, 19; 65:9; 66:12;
68:11; 71:21; 74:7
discriminatory 51:1
discussed 12:2; 44:21;
47:21
discusses 25:20
discussing 20:24; 41:8
Discussion 9:6; 41:23;
42:9
discussions 41:4; 42:10
District 4:10, 10; 62:7
divested 67:18; 68:7
Division 4:11
docket 46:17
Docketed 36:1; 46:23
docketing 11:19; 24:22;
25:6, 9; 38:12
document 8:6, 9, 16, 20,
20, 21; 9:8, 10, 11, 15, 15;
10:1, 4; 11:3, 12; 16:17;
18:15, 21; 19:17, 22, 25;
21:22, 25; 22:1, 4, 11, 16;
25:25; 26:3, 4, 8, 14;
27:16; 30:13, 20, 21, 24;
31:2, 2, 4, 9; 33:15, 17;
34:3, 5, 10, 12, 14; 35:1, 9;
40:9, 14; 42:14; 46:1, 3, 4;
48:16, 19; 49:22; 51:15,
23; 53:5, 20; 55:20; 62:9;
64:13, 16; 66:16
documentation 36:21;
40:13; 54:11
documented 42:2
documents 7:22; 8:5;
9:1; 10:18, 21; 16:24;
19:14, 16; 23:16; 24:1, 17;
26:19; 27:8; 28:19; 31:10,
16; 38:1; 40:17; 42:6; 46:7;
52:5; 53:4, 22, 24; 54:1, 9,
15; 62:12; 63:6; 64:6, 21,
25; 65:1, 3; 66:4, 8, 23;
67:19; 68:3; 70:5, 18; 73:8
done 13:16; 21:13; 34:13,
14, 15; 36:12; 47:4; 55:7,
16; 61:5; 64:2; 65:13, 15
Doug 4:19
down 32:18; 34:18;
42:12; 44:4; 58:18, 20

**draft** 17:6
**drafted** 26:10
**draw** 11:2; 25:24; 52:20; 62:3
**drawing** 19:13, 15
**drew** 40:8; 44:6
**due** 67:19
**duly** 4:24; 60:7
**during** 10:11, 22; 18:13; 36:4, 23; 45:16, 17; 50:2; 51:10; 52:3; 56:14; 59:9; 70:11; 71:1; 74:22
**duties** 6:17

# E

**earlier** 32:15; 73:25
**easier** 24:2
**Edwards** 51:24; 66:22
**EEO** 42:18
**EEOC** 14:5, 10, 11, 22; 15:10, 18; 16:3, 5, 6, 11, 14, 15; 17:18, 22, 24, 25; 18:3; 20:25; 21:3, 16, 19; 27:3, 10, 15; 28:8, 14, 18; 29:2, 7, 19; 32:20; 33:9; 36:4, 16, 20, 25; 37:1, 2, 15, 18, 21; 38:2, 3, 24; 39:2, 7, 9, 17, 24; 40:1; 41:13; 42:8, 9, 13, 15, 19; 43:12; 44:5, 5; 46:17, 24; 57:10, 14, 24; 58:2; 59:8, 20; 60:4, 5, 13, 19; 61:1, 8, 14, 19; 62:8; 63:2; 74:18, 19
**EEOC's** 44:5
**EEOC/Miami** 19:3; 20:23
**effect** 58:10; 59:8
**effected** 73:7
**effects** 58:10
**effort** 67:22
**either** 14:5; 23:3, 3, 6; 24:8; 32:23; 40:8
**eliminated** 71:24
**else** 25:16; 29:6; 31:13; 43:23; 49:10; 65:14, 15
**employed** 5:12, 17; 72:17, 19
**employee** 72:8
**employment** 5:20; 6:13, 22, 24; 8:3; 13:12; 15:22; 17:7, 9; 20:9; 28:23; 62:2, 19; 72:2
**Enclosed** 17:6
**end** 57:3
**entire** 6:3; 7:5; 64:22
**entitled** 30:17
**entries** 9:24; 12:14; 24:20; 34:11; 46:9; 48:19
**entry** 35:21, 24; 48:22; 49:13; 51:19, 21; 53:6
**errata** 75:13, 20
**essentially** 28:3; 52:17, 23

**establish** 25:9
**et** 21:12
**even** 17:21
**eventually** 32:22
**evidence** 4:4; 55:9
**exactly** 59:17
**examination** 4:3; 5:1; 54:22; 67:2
**examined** 4:25
**Except** 50:22
**exception** 31:8
**exceptions** 14:3; 15:16
**Excuse** 58:17
**executive** 28:2
**Exhibit** 8:17, 23; 11:4, 10; 16:18, 22; 19:20, 23; 21:24; 22:2; 26:1, 6; 27:17, 23; 30:14, 22; 33:16, 25; 34:4, 21, 25; 35:19; 37:24; 40:10, 15; 42:21, 23; 43:1; 45:11, 12, 13; 46:2, 5; 48:17; 49:16, 20; 51:17; 53:12, 18; 61:6, 6, 7, 16, 25; 62:11; 63:12, 14, 19, 24, 25; 64:10, 21; 66:2; 67:5; 70:15; 71:19
**Exhibits** 63:20
**exists** 26:4
**experiencing** 56:21
**explain** 6:20; 13:24; 15:4; 25:3; 39:8; 69:11
**explanation** 32:11

# F

**face** 20:11, 12; 48:13
**facility** 67:18, 20
**fact** 12:10, 22; 43:8; 56:3; 58:10; 61:23; 62:25; 66:20; 67:19; 68:25
**fair** 57:5
**fairly** 59:14
**familiar** 7:15
**familiarity** 15:2
**far** 20:10
**FAX** 31:12; 36:22
**FAX'd** 9:2; 63:6
**FCHR** 15:13; 37:1; 40:2
**federal** 57:17; 62:2, 18
**feedback** 74:20
**feel** 59:14
**few** 54:24; 67:4; 74:22
**file** 7:5, 7, 7, 10, 13, 16, 20, 23; 8:2; 9:17, 19, 19; 10:9, 24; 11:20; 13:18; 14:19; 16:5, 20; 17:3; 18:8; 23:19; 26:19, 23; 27:5, 14; 28:12, 16, 21; 31:1, 3, 6, 11, 17; 32:3, 19, 21; 35:16; 37:13, 22; 40:5; 41:18; 42:1, 11, 17, 21; 43:17; 44:19; 45:3, 10; 47:3; 49:5; 51:4, 8, 10; 52:3; 53:2, 8; 54:7, 8; 55:3, 9, 15; 57:6,

14, 20; 60:3; 61:21; 64:7, 8, 14, 22, 22, 22; 66:19; 72:24; 73:4, 21
**filed** 6:14, 22, 24; 10:2, 12; 11:18; 12:4; 13:8; 14:8; 18:10; 31:25; 35:23; 39:20; 41:10, 12; 51:7; 55:17; 57:21; 60:2, 11, 12, 17, 19; 74:5
**files** 8:22; 9:11; 11:9; 13:11; 16:21; 22:1; 26:5; 27:21; 30:21; 34:8; 40:14; 42:25; 46:4; 49:19; 50:1; 53:17, 21; 56:10, 15; 67:21, 25; 71:25
**filing** 12:7; 16:6; 30:18; 46:13; 50:24; 57:7; 58:1; 59:25; 60:5, 7; 63:1, 1
**filled** 41:17
**find** 23:18; 24:8, 8, 9, 10, 11
**finding** 7:2; 65:8; 66:11; 67:7
**findings** 64:18; 66:11; 71:8
**first** 4:24; 8:3; 10:2; 11:16, 16; 13:1; 15:24; 17:5, 9; 19:7; 32:17; 33:17; 34:17, 18; 35:21, 22; 36:8; 40:18; 42:8; 47:18; 49:23; 50:2; 62:15; 63:10, 11, 17; 64:9, 10; 67:10; 68:6, 18; 74:12
**firsthand** 19:12
**five** 10:8; 32:10; 74:16
**Florida** 4:10, 17; 5:9, 18; 6:3; 7:19; 10:3, 25; 11:5; 15:7, 8, 19; 24:6; 26:15; 27:19; 29:19; 30:16; 32:18; 37:15; 38:20; 50:18; 51:2; 55:21; 59:8; 60:3; 63:1; 64:7, 14, 17, 23
**focused** 48:12
**follow** 36:17
**following** 4:2
**follows** 4:25
**forget** 61:6
**form** 13:21; 16:1; 21:1; 23:14, 25; 29:22; 35:3; 38:7; 39:4; 41:18, 18; 42:1, 11, 17, 21, 25; 43:22; 45:11, 16, 21; 53:9; 55:12; 56:5; 58:9; 59:15; 60:20; 61:18; 62:7, 22; 71:5, 10
**format** 17:17, 21, 22, 23; 18:3; 19:5; 21:10, 15; 29:14, 15, 17; 30:2; 33:3
**formulating** 71:3
**Fort** 4:10
**forth** 75:14
**forty** 71:1
**forward** 19:5; 25:10; 39:19
**forwarded** 26:10
**four** 56:14, 19; 74:16
**frame** 50:13, 16; 56:14

**frequently** 25:23
**front** 6:11; 66:5; 70:17, 21
**fully** 56:15; 57:6
**further** 34:18; 66:25; 75:7

# G

**gaps** 55:3
**Gardens** 24:6
**gave** 10:5
**general** 6:21; 7:15; 15:2, 4; 20:14; 23:1, 2; 57:3; 65:20, 22
**generally** 6:25; 7:17; 9:16; 15:6, 13; 22:24; 29:6; 48:11; 69:24; 70:1, 8; 71:11; 72:10, 11
**geographical** 14:8; 15:9
**geographically** 21:3
**gets** 16:4; 29:17; 75:3
**given** 30:20; 35:4; 53:15; 56:20
**giving** 73:25
**goes** 12:5; 22:16; 39:23; 47:9
**Good** 5:3, 4
**governing** 4:6
**guess** 30:14; 55:2

# H

**hand** 16:9
**handed** 9:10; 17:1; 21:25; 26:3; 27:20
**handle** 36:16
**handwriting** 43:14
**handwritten** 17:20, 20; 19:5; 29:21; 30:4; 40:11; 61:5
**HANNAH** 5:23; 8:11, 25; 9:4; 16:1; 21:1; 23:14, 25; 25:15; 33:20, 20; 39:4; 43:22; 44:2, 18; 54:23, 25; 58:21, 24; 59:2, 5; 63:5, 9, 16, 22; 64:2, 4; 66:9, 25; 67:6; 71:5, 10; 73:24; 75:7
**happen** 27:12
**happened** 19:12, 13; 27:6; 28:9; 32:25; 36:23; 39:12; 45:3; 47:1; 65:18; 72:22, 22; 74:15, 17, 22
**happening** 18:9, 13
**happens** 14:2, 4; 32:19, 21; 37:2; 59:11; 65:17
**hard** 56:7; 57:12
**Harry** 19:2; 20:3
**headed** 63:17
**heading** 63:11, 23
**heads** 70:24
**Health** 30:16; 37:21
**Healthcare** 4:13; 11:6; 61:24
**hear** 5:23; 58:13

**heard** 41:14
**held** 6:2
**help** 24:17; 42:7; 59:1
**Here's** 41:9; 42:3
**Hialeah** 24:6
**highlighted** 50:19
**Hoffman** 70:25
**Hold** 63:7; 70:18; 72:16
**Hospital** 30:17; 37:22; 51:12, 25; 68:7; 69:1, 11; 72:25
**hospital's** 68:10
**Human** 4:12; 11; 8; 15:8; 23:7; 27:19; 29:20; 30:16; 55:22; 59:9; 64:23

# I

**Iaia** 4:12; 7:6; 13:8; 16:19; 17:14; 18:12; 23:12, 23; 26:10; 27:19; 32:14; 35:17; 40:11, 19, 21; 41:5, 8; 42:10; 49:17; 54:8, 25; 55:11, 16; 58:4; 71:23
**Iaia's** 8:2; 10:2, 1, 25; 12:6; 28:17, 23; 44:20; 47:4; 57:11; 60:17; 64:8, 23; 65:9; 72:2; 73:7
**ICL** 24:4, 22; 25:6
**identification** 8:24; 11:11; 16:23; 19:24; 22:3; 26:7; 27:24; 30:23; 34:1; 37:25; 40:16; 43:2; 46:6; 49:21; 53:19; 63:15, 21; 64:1
**identified** 45:10; 47:19
**identify** 9:14; 31:22; 43:5
**impossible** 57:8
**incident** 72:22
**include** 6:12
**included** 15:12; 64:7
**independent** 40:20, 22
**independently** 23:13, 20, 24
**indicate** 10:22; 44:25
**indicates** 61:25
**indicating** 39:22; 61:19
**indication** 10:18; 28:10, 19; 45:2
**individual** 8:10; 21:23; 24:4; 25:4; 38:9; 46:2, 8, 9
**infer** 52:10
**inference** 52:10, 13; 53:2, 7, 10; 54:3; 66:13, 17; 67:8; 69:9
**information** 9:17; 22:21; 23:3, 4, 6, 11, 20; 34:23; 35:16; 52:24; 57:16; 68:8; 69:10, 14; 70:14; 71:2, 15; 72:12
**initial** 12:7; 32:13; 49:14; 53:7
**initially** 10:12; 12:3; 73:9
**initials** 18:25; 22:12;

46:20

**initiate** 50:14

**initiating** 10:10; 20:8, 10

**instance** 17:18; 32:18; 75:12

**insufficient** 23:5

**intake** 18:24; 20:7, 7; 22:8, 12; 34:14; 38:11; 41:19, 24; 42:3, 16; 43:17; 46:21; 47:11, 22, 22, 24; 48:2, 6

**intention** 18:2; 21:18

**interest** 52:21

**interim** 36:4

**into** 20:15; 38:14; 41:16, 24; 42:4; 47:6; 48:7, 10; 50:21; 67:13

**introduced** 5:5

**investigate** 7:1; 13:7; 15:20; 21:9; 39:19, 21; 46:17, 25; 50:6, 23; 55:23; 56:10, 15, 19; 75:2

**investigated** 9:20; 14:5; 30:5; 57:6

**investigates** 14:6

**investigating** 6:13; 10:11; 15:22, 24; 28:17, 23; 29:9; 37:9; 44:20; 45:1

**investigation** 6:15; 13:12; 14:15, 17; 15:25; 16:6, 8, 13; 18:3; 20:9, 10; 21:20; 27:7, 10, 22; 28:8, 14; 33:6, 13; 36:5, 20; 37:16; 39:15; 40:3, 6; 41:16; 47:3, 6, 8, 13, 15, 20; 48:4, 7, 9; 49:25; 50:3, 14; 51:5, 11; 52:4; 64:18; 65:19; 68:13; 69:21; 70:12; 73:7; 74:2

**investigative** 20:15; 48:11; 64:7, 8, 22; 66:2; 71:12

**investigator** 13:6, 14, 17; 20:16; 34:16; 45:8; 47:10, 15, 24; 48:5, 25; 49:5, 9, 11; 50:2; 65:19; 66:17; 67:7; 68:4, 15, 23; 69:20; 70:6; 71:3, 8, 11, 14; 72:4; 73:6, 16

**investigator's** 63:23; 65:23; 67:5; 69:3; 70:16, 19; 71:9

**investigators** 6:10, 19; 47:12; 67:23; 68:1; 73:21

**investigatory** 47:25

**invokes** 48:14

**involved** 6:12; 65:12, 16

**involves** 15:5

**issue** 14:16

**issues** 69:12

**item** 22:12; 35:22

### J

**Jack** 70:25

**Jackie** 60:17

**Jacqueline** 7:6; 40:11; 54:25

**Jacquelyn** 4:12; 26:10; 49:17

**January** 11:6

**Jerry** 71:22; 73:5

**job** 6:12

**John** 5:8

**JOSEPH** 4:2, 14, 23

**July** 12:7; 26:25; 36:10, 13

**June** 16:19; 18:11; 19:10; 20:6; 24:21; 53:13; 69:8

**jurisdiction** 14:7, 14; 15:10, 19; 20:13; 39:13; 48:14

### K

**keep** 31:5, 14

**kept** 64:16; 65:3

**kind** 36:21; 37:8

**knowledge** 19:12

**Knox** 5:8

### L

**labeled** 9:8; 19:18; 33:18; 46:2

**lack** 52:22

**laid** 70:25

**Lamb** 19:2; 20:3

**language** 11:21; 12:8; 24:23; 25:18, 19

**lapse** 74:4, 10

**Largely** 6:17

**last** 7:11; 46:15; 67:9, 13; 74:2

**lastly** 24:10

**Lauderdale** 4:11

**leafing** 7:10

**learn** 36:19

**learned** 37:14; 39:2; 40:5, 8; 42:8

**least** 10:19; 29:23; 69:14

**left** 22:11; 46:21

**length** 75:1

**letter** 11:5; 7, 8; 12:20; 13:3, 10, 14, 15, 16, 17, 21; 16:18, 21, 25; 17:2, 6; 18:17; 19:10; 20:6; 27:18, 20, 21; 28:7; 30:15; 31:20, 22, 23; 32:1; 36:14; 37:20, 23; 38:2, 7, 10, 15, 22; 39:3, 13, 22; 40:11, 18, 19, 20, 23; 47:18, 18; 49:15, 16, 19, 23; 52:10, 13, 14, 17, 18; 53:2, 7, 8, 9, 10, 11, 13, 16; 54:3; 61:18; 66:17, 21; 68:6; 69:9; 73:3

**letters** 44:21

**letting** 52:18

**liabilities** 52:1

**limit** 32:6

**limited** 48:12; 67:19; 74:16

**Linda** 11:5; 13:4; 47:19; 48:5; 49:1, 17; 50:1

**line** 22:12; 25:1; 35:22; 44:24; 46:15, 16; 51:19

**list** 15:13; 22:16

**listed** 34:12; 35:24; 48:5

**listing** 23:21

**little** 10:4; 12:17; 18:23; 34:18; 56:22; 58:20, 24; 74:3

**local** 32:19

**location** 14:8; 15:9

**log** 8:10, 18; 9:9, 18, 20; 10:20; 11:19; 18:22; 19:19; 20:2, 20; 21:23; 22:6; 24:5, 21; 25:4; 33:18; 34:5; 35:20, 22, 25; 46:3, 9; 48:17; 51:17; 53:5

**long** 5:17; 38:16

**longer** 51:25; 56:10, 22; 57:4; 67:20; 68:25; 72:8, 17, 19; 73:13, 18; 74:11

**look** 8:19; 20:11, 14; 34:6; 41:24; 42:4; 48:13, 18; 64:5; 66:15, 16; 67:9

**looked** 14:1; 24:12; 68:23; 69:5, 13

**looking** 8:7; 12:13; 16:20; 17:23; 22:11; 42:6, 11; 44:11; 53:6, 21

**looks** 14:9; 20:3; 25:10; 32:15, 25; 35:1, 10, 13; 36:14; 43:11; 54:9; 57:13; 68:3; 73:8

**lost** 10:25; 12:6, 17, 21, 25; 13:1; 17:10

**lot** 32:21; 36:17; 57:18; 59:18; 74:25

### M

**ma'am** 75:23

**Madam** 63:5

**maintain** 31:2

**maintained** 7:5, 22; 9:11; 11:8; 13:11; 17:2; 31:10; 53:16

**maker** 72:18, 20

**makers** 72:13

**making** 65:13; 68:14; 73:6

**management** 18:22; 19:18; 20:1, 19

**manager** 5:21, 25; 42:16; 43:17; 45:5, 23

**managers** 47:22

**Mann** 42:13, 18; 43:9, 13; 44:11, 14, 15

**manner** 24:3; 58:9

**March** 27:14, 18; 28:13, 22; 36:15, 15; 37:6; 51:19;

58:3; 66:23; 68:5, 12; 69:6; 73:1

**mark** 8:17; 11:4; 16:18; 21:23; 26:1; 27:17; 30:14; 33:16; 40:10; 42:20; 46:2; 49:16; 51:24; 53:12; 63:10; 66:22

**marked** 8:23; 11:10; 16:22; 19:23; 22:2; 26:6; 27:23; 30:22; 33:25; 34:4; 37:24; 40:15; 42:23; 43:1; 46:5; 48:17; 49:20; 53:18; 63:12, 14, 18, 20, 23, 25; 71:19

**marking** 19:20

**Mathis** 11:5; 13:4; 47:19; 48:5; 49:1, 6, 17; 50:1

**matter** 15:18; 20:24; 29:22; 36:4, 17; 37:18; 42:8; 50:9; 55:10, 11; 66:19; 68:9; 72:3

**may** 4:5; 10:14; 12:18; 16:6, 9; 19:4, 5; 23:13; 33:17; 41:15; 47:16; 72:8

**maybe** 41:16; 74:16

**McElrath** 28:1

**mean** 13:21; 20:23; 30:7; 33:10; 36:8, 11; 40:4; 46:20; 57:12; 73:16; 75:4

**means** 15:21; 21:11; 39:1, 9; 43:25; 44:5; 45:12

**meant** 13:25; 16:15; 52:10

**mediation** 31:12

**memorandum** 63:23; 66:3; 67:6; 69:3, 4; 70:19; 71:9, 12, 16

**memory** 42:7

**mentioned** 13:23; 19:18; 28:7

**merits** 47:6; 48:7, 8; 50:7; 51:6

**Miami** 14:5; 15:10; 19:9; 20:23; 21:3, 9; 27:15; 28:18; 32:20, 22; 33:1, 9; 57:14, 17; 62:7

**might** 23:8; 24:17; 32:20; 43:14; 59:1

**minute** 10:5

**minutes** 7:11

**misplaced** 17:10

**moment** 5:6; 8:19; 12:2; 13:23; 19:18, 22; 20:20; 28:7; 44:21; 53:14; 67:6

**more** 17:23; 25:5; 47:21; 48:12, 12, 14; 54:3; 67:4; 74:15

**morning** 5:3, 4

**most** 6:17; 57:4

**Move** 25:15; 39:18; 44:18

**much** 16:3; 20:15; 41:25; 48:14; 54:21; 56:8; 59:3, 15; 68:8; 75:6, 24

**myself** 5:5

### N

**name** 5:5; 23:21; 24:5, 13; 34:19; 35:3, 4, 15; 54:24

**Nargiz** 4:19

**narrow** 48:12

**nature** 5:20

**necessarily** 36:18; 47:13; 57:15

**need** 17:22; 19:8; 21:14; 33:20, 21; 36:25; 39:20, 21; 42:4; 46:17; 74:20

**needed** 12:16; 33:6; 41:17, 20

**needs** 19:2; 20:22; 21:11, 12

**neither** 41:15; 72:3

**new** 69:10

**Newman** 24:5

**next** 9:21; 10:11; 12:5; 19:9; 27:6, 8, 11; 30:15; 35:24; 46:1; 49:12; 53:6; 58:25; 63:16, 22

**Nina** 42:16; 43:16; 46:8; 61:6

**Nina's** 46:20

**none** 57:11; 58:3

**nor** 72:4

**normal** 7:23; 18:4; 22:7

**notarize** 30:1

**notarized** 35:13; 36:10; 70:10

**notary** 29:25

**notation** 61:15

**note** 18:23; 42:12; 43:21

**notes** 24:11; 25:1; 46:16; 61:5

**notice** 4:3; 29:10; 30:17; 31:24; 32:3, 5, 7, 12; 39:14; 51:13; 63:11; 64:10; 74:6, 12

**noticed** 12:13; 75:3

**November** 8:5, 13; 10:13; 11:18; 18:10, 16; 28:22; 35:11, 14; 36:9; 48:20, 22, 24; 49:6, 17; 51:11; 58:2; 60:18

**Number** 4:11; 7:7; 20:21; 61:7, 7, 16, 25; 62:11; 63:12, 19, 24; 66:2, 6

**numbered** 71:22

**Numbers** 64:21

### O

**Object** 16:1; 21:1; 23:14, 25; 43:22; 55:12; 56:5; 60:20; 62:22; 71:5, 10

**Objection** 39:4; 44:2; 63:4

**obligation** 57:22

**obviously** 15:19; 16:12

occurred 51:2; 57:9; 65:9

October 66:3; 70:20

off 9:5, 6; 71:1

offering 73:10

office 9:3; 11:19; 14:5, 21; 23:6, 13, 23; 26:19; 29:9, 10; 30:10; 32:7, 13, 20; 36:19; 37:14; 38:5, 23; 39:2, 10; 40:5; 50:13; 51:24; 52:5; 53:4, 22; 54:1, 2; 62:8; 69:20, 22; 74:5, 12

office's 18:1; 21:18; 30:21; 73:21

officer 23:8; 24:6; 28:4

offices 4:15; 5:15; 7:4; 8:4; 12:3; 17:10; 26:24; 28:17; 46:24, 24; 47:4; 51:4, 12

Official 32:5; 48:3; 65:24

once 18:2; 29:1, 4, 17; 33:4; 35:10; 74:15

one 10:6; 13:15; 15:21, 24; 23:3; 24:19, 21; 25:5; 26:25; 30:15; 34:24, 25; 35:2, 14; 38:16; 43:11; 46:10; 49:9; 59:12, 22; 64:9; 65:1, 2, 21; 70:18

ones 59:13

only 28:10; 30:24; 31:14, 18; 38:16; 60:3; 61:11, 13, 14

operate 14:21

operating 23:8; 24:5

opinion 71:16

opportunity 70:3, 13

oral 4:3

order 21:2, 9; 66:18; 75:10

ordinary 64:17; 65:4

original 17:15

originated 15:14

otherwise 38:17; 39:25

out 11:22; 13:14; 14:1; 17:17, 21, 24; 23:18; 28:10; 29:16; 30:3, 9; 31:3, 5, 13; 32:12; 36:14; 38:2, 4, 10, 23; 39:14, 23; 41:17; 52:14, 16; 65:24; 69:8

outlines 15:7

over 14:1, 7, 14; 18:25; 29:7; 71:1

overall 75:1

own 13:20; 40:24; 71:16

owned 69:1

owner 69:10

owns 51:25; 67:20

**P**

P-1 63:14

P-2 63:20

P-3 63:25

p.m 75:25

---

packet 31:3, 14, 18; 39:23

page 9:22; 24:25; 33:17; 34:17, 18; 43:5; 48:19; 51:19; 63:17; 67:10, 14; 70:22

pages 34:7, 8; 63:10, 17, 22

Palm 14:2, 6; 32:17

paragraph 38:15; 39:6; 62:15; 67:12; 70:23; 71:22

part 6:17; 20:15; 31:13; 36:6, 7; 38:12, 22; 39:13, 22; 60:7

particular 8:6; 10:21; 12:14, 16; 14:9; 15:7, 11, 17; 18:20; 22:6, 24, 20; 25:18; 26:25; 30:6; 35:12, 14; 41:20; 42:17; 44:23; 46:10; 47:10; 50:20; 57:4; 59:20; 65:7; 68:6; 69:15; 70:3; 72:21; 73:10, 17

particularly 34:7

parties 17:17, 24; 29:16; 70:6

party 35:17; 38:18; 40:1; 62:1; 69:22; 70:9, 13

party's 62:18; 69:23

past 6:6; 12:25

Paula 34:20; 35:4, 18

pause 57:20

Pembroke 30:17; 37:22; 57:13; 69:10

pending 38:19

Pensacola 16:4

people 41:24

per 42:13; 43:8, 12; 44:14

perfect 19:8; 25:12

perfected 27:2; 36:9

perfecting 19:3; 20:22

Perfection 24:22; 25:7

perhaps 24:16; 42:9; 54:16

period 10:12, 13, 23; 18:13; 36:11; 45:16, 17; 50:5, 12; 52:19; 55:25; 59:9; 75:2

permitted 4:5

person 7:18; 71:23; 72:21

personnel 54:8

persons 6:11; 47:11

pertinent 71:13

Perusing 8:5; 10:18; 16:24; 18:15; 19:25; 22:4; 23:16; 24:1; 26:8; 27:8; 28:19; 30:24; 34:10; 35:1, 9; 38:1; 40:17; 46:7; 49:22; 53:5, 20, 24; 54:9, 15; 55:20; 62:12; 64:25; 65:1; 66:4, 8, 16, 23; 68:3; 70:18; 73:8

phone 33:21; 58:23, 25

phrase 25:19

pick 33:2

---

Pines 30:17; 37:22; 57:13; 69:10

place 10:22; 18:18; 27:9; 45:25

placed 13:18; 45:23

places 24:13

Plaintiff 4:12; 54:25

Plaintiff's 63:12, 13, 19, 24; 64:10, 20; 66:2; 67:5; 70:15

plan 38:18

planning 39:15

please 4:20; 5:7, 24; 8:19; 48:18; 50:21; 52:12; 53:14; 67:11, 16

point 10:25; 12:6, 10; 23:9; 24:6, 15; 27:1; 29:10; 39:3, 12, 15; 40:6; 41:11; 42:23; 47:9, 10; 52:3; 72:7

policy 50:15

portion 15:7, 11; 31:9; 34:14; 73:17

position 6:2, 5, 6; 45:5, 15; 47:19; 48:3; 60:10; 62:24; 66:20

positions 6:9; 47:20

possible 16:3

possibly 70:13

practical 16:7

practice 26:18; 51:1

preference 30:10

prepared 17:7, 9; 20:1; 22:5, 6; 46:9

prepares 34:11

preparing 17:13

presented 66:21

presently 5:12

preserved 62:1, 20

pretty 25:23; 56:8, 8; 59:15

previously 6:18; 49:9

prior 12:10, 22; 28:13, 18; 39:3; 40:6; 41:23; 47:5; 49:5

private 62:18

probably 56:8, 22

problem 41:12

problems 12:12, 19; 13:2, 24; 14:13

proceed 9:19

PROCEEDINGS 4:1

process 9:20; 14:10; 25:22; 29:7; 32:22; 33:1; 38:12; 39:16; 47:8, 25; 48:11; 56:10, 15, 19; 60:8; 65:16; 69:20

processed 30:5; 57:6

processing 12:19; 13:2; 14:13; 16:11; 32:16; 55:10; 57:2

produce 52:5; 54:7

professional 17:23

proper 18:2

provide 35:2; 59:23;

---

69:9; 70:14; 72:12

provided 8:20; 23:11, 22; 35:17; 50:22; 54:11, 14, 17, 19; 59:23

provides 23:5

purpose 9:15; 29:18; 31:23

purposes 4:4, 5; 7:18; 8:7; 10:10; 16:7; 27:2, 6; 29:19; 33:10, 11, 12; 47:25; 59:25; 71:16

pursuant 4:3

put 17:22; 18:2; 21:10; 41:19; 42:1; 69:3, 3; 71:11

---

**Q**

quick 53:14

quicker 28:9; 36:12; 55:7, 16

quite 25:22; 56:17

quote 20:20, 22

---

**R**

Rankine 4:19

Raton 57:14

re-notarized 12:7

reach 71:17

reached 57:7

read 11:17; 20:20; 35:21; 38:14; 43:6; 48:22; 49:12; 50:21; 51:20; 67:10, 15; 73:1; 75:19, 23

Reading 4:6; 68:10

reads 17:6; 20:22; 24:21; 26:14; 46:16; 49:23; 70:23

real 58:23

realized 16:11; 41:14

really 20:13, 14; 36:17; 41:25; 42:5; 46:18; 48:13; 57:2

reason 36:2; 47:17; 52:20; 61:4, 11, 13, 14

reasonable 25:23; 50:25; 73:15

rebut 70:14

rebuttal 52:24

recall 12:13; 40:23, 25; 41:4, 7; 44:25; 55:3; 61:2; 72:21; 74:15

receipt 38:20

receive 12:4

received 8:3; 9:4; 10:2; 12:3; 16:12; 26:14, 20, 23, 25; 29:15; 32:13; 35:8, 10, 10, 14; 41:3; 51:13; 53:22; 54:1; 60:11, 12; 74:5, 12

receiving 10:10; 40:20, 24, 25

recently 45:22; 47:22

reception 6:11

recess 33:24; 63:8

---

recognize 43:14

recollection 40:20, 22; 41:22

recommendation 38:12; 65:19, 23; 66:18; 67:7; 70:16

record 9:5, 6; 21:18; 38:15; 41:2; 50:21; 54:13, 17, 18

record's 45:10

recorded 9:23; 11:19

records 52:2; 61:7; 7:14; 11:17; 45:6

red 7:10

REDIRECT 67:2

redone 11:1

refer 12:1; 16:13; 18:3; 19:3, 8; 20:23; 21:15, 19; 70:15; 74:18

reference 43:20; 44:8; 66:1

Referencing 62:14

referral 36:14; 39:16

referred 14:10; 19:6, 22; 22:13; 27:15; 28:8, 13, 18; 29:1, 4; 33:3; 36:4, 13; 37:5, 7, 18; 45:1; 58:8; 59:7

Referring 9:8; 18:20; 20:24; 33:8; 36:20; 42:22; 43:4, 11; 62:10

refers 12:20; 25:4; 52:12; 71:22

reflect 10:9, 24; 28:13, 16, 21; 32:3; 37:13; 44:19; 47:3; 51:4, 8, 10; 52:3; 53:2; 71:25

reflecting 75:13

reflects 18:21; 35:16; 73:5, 21

refrain 15:23

refresh 42:7

regard 64:20; 66:10, 14, 19; 69:15; 74:25

regarding 38:19; 50:15

regards 7:6

relating 68:7, 8

Relations 5:10, 18; 15:8; 27:19; 29:20; 30:16; 45:5, 23; 55:22; 59:9; 64:23

relative 28:23

relied 66:17; 71:3

relies 68:15; 69:21

rely 70:1, 6; 72:11; 75:15

relying 71:14

remaining 31:9

remember 12:15; 41:9, 9, 11; 42:5

renumber 45:13

reorganization 71:1

rep 42:18, 19

repeat 5:24; 8:11; 58:12; 59:4

Repetitive 65:5

rephrase 52:9; 71:7

**Report** 63:5

**reporter** 4:20; 45:9; 58:17, 19, 22; 59:1, 3; 63:7, 10; 75:15, 18

**Reporters** 4:16

**represent** 5:6; 54:25

**representative** 22:17, 18, 23; 23:22; 34:19; 35:15

**request** 38:17; 39:25; 51:23; 55:18

**requested** 52:5; 53:22; 54:2, 10

**requests** 38:18; 53:3

**required** 29:25; 32:7; 50:6

**resources** 23:7

**respect** 6:16; 13:3, 12; 18:9; 20:8, 24; 22:22; 25:4; 27:22; 29:8; 31:19; 34:9; 37:12; 41:5; 47:4; 53:1; 68:25; 69:2, 19; 70:5; 72:1, 13

**respond** 52:16, 16, 19; 70:13

**responded** 52:15; 53:25; 54:10; 73:9

**respondent** 22:18, 22; 23:9; 29:11; 30:3; 31:3, 5, 24; 32:4, 8; 39:14, 23, 25; 51:12, 23, 24; 52:4, 13, 15, 25; 53:3, 7, 23; 54:6, 7; 62:8; 66:14, 21; 67:17; 68:5, 23; 70:2, 24; 72:5, 12, 17, 24; 73:9, 12; 74:6, 13; 75:3

**respondent's** 22:18, 23; 23:21; 54:10; 69:11

**responding** 52:21

**response** 5:14; 42:1; 52:22; 53:8; 68:4, 10, 12; 69:5

**responsibility** 6:25

**responsible** 15:9, 10, 15; 38:9

**results** 38:20; 39:10

**retained** 13:11

**return** 39:7

**returned** 19:7; 24:22; 25:6, 9, 11, 12; 45:2

**review** 6:18; 18:18, 21; 21:17; 27:5; 40:4; 49:25; 50:9; 53:14; 54:6; 67:21; 75:10

**reviewed** 19:6; 65:21

**reviewing** 8:2; 10:10; 67:25; 72:24

**right** 5:14, 17; 6:2, 7, 20; 7:3, 22; 8:1; 9:14; 10:24; 11:3, 14; 12:4, 20; 13:3, 22, 23; 14:18; 17:1, 5; 18:1, 7, 20; 19:11, 15, 17; 20:19; 21:8, 17; 22:5; 23:10; 24:6, 16; 25:25; 26:13, 13, 22; 27:5, 16; 28:12, 16, 21; 29:1, 8;

30:13; 31:7, 8, 16; 33:14, 23; 34:15; 36:2, 11; 37:12; 38:14, 22, 25; 39:8, 22; 40:4, 18; 42:6, 20; 43:4; 44:14, 17; 45:4, 9; 49:12; 50:10, 17; 52:12; 54:13, 20; 56:9; 58:25; 61:11; 64:5; 68:12; 70:4; 72:23; 73:2, 14, 19, 24; 75:9, 9, 16, 21

**Rights** 50:18; 51:2; 62:1, 18

**Road** 5:8

**Rod** 33:20; 54:25

**role** 20:11

**Ronald** 28:1; 70:25

**rules** 4:6

**runs** 67:13

**RUSSO** 5:2, 5; 8:13, 15; 9:2, 5, 7; 33:23; 34:2; 45:9, 17, 19; 54:20; 55:2, 12; 56:5; 58:8, 12; 59:7; 60:20; 62:22; 63:4, 13; 64:3; 65:5; 66:6; 67:3; 75:5, 9, 23

**r]responsible** 51:25

# S

**Salem** 4:16

**same** 11:12; 31:12; 44:2; 45:24; 48:4; 56:8, 8; 59:15, 18; 60:14; 63:4; 64:20; 70:4, 11; 72:16

**satisfied** 73:16

**saw** 12:20; 34:21

**saying** 10:13; 11:22; 12:18, 24; 21:2; 24:14; 25:5, 6; 40:3; 44:4; 59:14; 61:4, 12, 13, 14; 62:6, 6; 73:10

**script** 20:21

**second** 38:15; 47:18; 62:14; 64:25; 67:12, 14; 70:18, 22, 23

**section** 7:14; 20:24; 34:14; 41:19; 42:3; 47:12; 50:19

**seeing** 44:25

**seem** 57:16

**seemed** 18:16; 19:4; 41:21, 22

**seems** 25:23; 74:17, 24

**send** 16:13; 17:17, 23; 21:3; 30:1, 3, 8; 31:3, 5, 13; 38:2, 10; 39:23; 52:14, 16; 57:23; 62:7

**sending** 17:14; 18:12; 39:2; 42:8; 61:1; 62:5

**sends** 29:10; 38:23

**sense** 6:21; 7:15; 15:4; 23:1, 2; 57:3

**sent** 14:11; 17:16, 19; 19:5; 27:10; 32:12; 33:5; 37:14; 38:4; 39:14; 42:12, 17; 43:8, 12; 44:4, 6, 10; 46:24; 49:15; 51:23; 53:3,

6; 58:2; 61:8, 14; 65:20, 23; 69:8; 74:6, 13

**sentence** 11:16; 12:5; 17:5; 38:16; 39:9; 49:23; 50:20, 21; 62:15; 67:10, 13, 15, 16; 69:2, 4

**sentences** 11:16

**separate** 47:16

**September** 30:15; 31:19; 32:2, 4; 37:21; 40:7; 44:21; 47:1, 5; 61:24

**serve** 72:5

**served** 5:15; 7:3

**service** 5:22; 6:1

**set** 75:14

**shall** 50:23, 25

**share** 14:25; 15:1; 16:2; 21:5

**sharing** 14:22; 15:6; 57:23; 58:8, 9, 16; 59:6, 7, 22; 60:23; 62:25

**sheet** 31:13; 75:13, 20

**show** 8:16; 11:3; 16:17; 19:19; 21:22; 25:25; 27:16; 30:13; 33:15; 34:3, 21; 35:11; 37:20; 40:9; 46:1; 50:17

**showed** 37:17; 47:18

**showing** 11:7; 42:3; 49:18

**shown** 33:18

**sic** 42:21, 24; 67:17, 18

**side** 19:1

**sign** 17:14; 26:11; 30:1; 75:20, 23

**signed** 21:12; 29:24; 35:7, 12; 36:10; 70:9

**significance** 71:8

**signing** 4:6

**similar** 6:6; 45:24; 74:11

**Singleton** 42:16; 43:16; 44:13, 15; 46:8; 47:21; 61:6, 15

**Singleton's** 46:20

**situation** 12:16; 36:18; 41:15; 74:18

**six** 5:19; 6:3; 74:9

**six-month** 10:12, 24

**sold** 51:13; 52:1; 72:25

**somebody** 16:4; 25:16; 65:13, 15

**someone** 43:23

**sometime** 41:10; 47:12

**Sometimes** 37:1

**soon** 29:13, 13, 15, 17; 54:11

**sorry** 21:7; 24:24; 58:13; 62:13; 68:19, 21

**sort** 6:11; 18:18

**sounds** 58:22

**south** 32:18

**Southern** 4:10

**speaking** 21:4; 22:24; 70:1

**specialist** 47:20

**specialists** 48:4

**specific** 15:13; 30:19; 43:6; 50:16; 54:3; 73:19, 20

**specifically** 23:10; 37:13; 44:24; 50:18; 51:16; 53:1; 67:9; 69:9; 70:23; 73:12

**speculate** 43:24

**speculation** 23:15; 39:5; 43:23

**speculative** 25:16

**stamp** 26:14, 19, 23

**standard** 13:15; 26:18

**start** 9:18, 18; 32:22; 64:9

**started** 14:10; 16:10; 33:1; 69:18

**starts** 11:22

**state** 57:18

**stated** 67:17; 68:23; 70:24

**statement** 57:5; 66:20; 69:15

**statements** 68:15; 69:22; 70:7

**States** 4:9

**status** 36:25

**stenographer** 4:18

**Stenotype** 4:15

**step** 27:8, 11

**stick** 16:2

**Still** 44:2; 45:4; 51:25; 69:12

**strike** 25:15; 44:18

**stuff** 46:12

**subject** 54:2

**submissions** 68:16; 69:23

**submitted** 6:18; 25:10; 70:5

**subpoena** 5:15; 7:3

**subsection** 50:19, 22

**suggest** 75:17

**suit** 62:18

**supervise** 6:7, 9, 10, 10, 11

**supervisor** 19:1, 7; 20:4; 21:13

**supposed** 39:17

**Sure** 23:18; 24:15; 28:15; 46:22; 48:14; 52:9; 59:17; 67:25; 71:7

**Susie** 42:13, 18; 43:9, 13; 44:11, 14, 15

**Sutphin** 71:22, 25; 72:5, 7, 12; 73:5, 22

**swear** 4:20

**sworn** 4:24

# T

**talked** 32:15

**talking** 12:15; 22:24; 25:11; 47:14; 69:24

**talks** 61:8

**Tallahassee** 4:16; 57:18

**telling** 8:1; 19:11; 21:14; 39:24; 44:15

**terminated** 73:11

**terms** 12:2; 47:8; 75:1

**testified** 4:25

**testimony** 75:14

**therefore** 68:7

**therein** 64:18

**Thereupon** 4:22

**thinking** 33:1

**third** 43:11; 48:19; 51:19; 65:1; 70:5, 9

**though** 24:19

**thought** 9:2; 12:16; 66:7; 68:19; 71:13

**three** 6:6; 24:12; 32:12; 34:7; 43:10; 56:14, 19; 59:13; 63:17; 64:6; 74:1

**three-page** 33:17; 34:5; 35:20

**three-year** 36:3; 74:4

**till** 10:14

**timely** 55:17, 18

**times** 32:21; 74:16

**timing** 55:2

**title** 48:1, 2

**today** 5:14; 7:5, 8, 18; 12:11, 23; 72:24; 75:18

**together** 41:19; 42:1

**told** 72:19

**took** 12:16; 16:9; 57:4

**top** 22:11; 46:14, 21; 67:14

**touch** 72:20

**traditionally** 55:22

**transcript** 75:10, 19, 22

**transmittal** 41:18; 42:1, 11, 17, 21; 45:11, 15, 21; 61:18

**transmitted** 57:10

**true** 8:21; 9:10; 11:7; 17:2; 19:21; 20:12; 21:25; 26:4; 27:20; 30:20; 31:10; 40:13; 42:24; 46:3; 49:18; 52:23; 53:16; 55:25; 56:3; 68:2; 70:4; 72:16

**try** 16:2; 23:5; 29:16, 23; 30:8; 69:18; 72:20

**trying** 23:18; 24:7; 25:8; 69:13

**turn** 29:7; 58:18, 19

**turned** 33:4

**twice** 35:10; 74:15

**two** 7:11; 11:16; 23:3; 31:15, 18; 35:9; 45:12; 47:16; 56:25; 63:10, 22; 70:24

**two-minute** 33:21

**type** 17:22; 29:25

**typed** 21:12; 29:24; 30:8;

46:22; 75:11

**types** 6:9; 15:17

**typewritten** 25:1; 30:11; 34:13; 46:15, 16

**typical** 25:19

**typically** 14:2, 3, 4, 7; 32:18; 34:11, 13; 36:16, 19; 65:17; 71:7

# U

**unable** 52:4, 6, 7

**unacceptable** 29:22

**under** 14:21, 22; 20:21, 21; 22:17; 25:1; 34:19; 38:19; 46:16; 50:9; 57:23; 62:1, 18

**undertake** 14:17

**unfortunate** 74:24

**unit** 5:22; 6:1; 45:6, 24, 24

**United** 4:9

**unless** 29:15; 38:17, 17; 39:25, 25

**untimely** 33:5, 7, 9, 10; 42:13; 43:12, 20; 44:5, 6, 16; 61:2, 8, 15, 20

**untrue** 68:2

**unusual** 56:13, 18, 25; 57:6; 73:25; 74:3, 8

**up** 12:17; 17:22; 29:24, 25; 30:8; 33:2; 36:18; 46:20; 56:14, 19; 58:13, 24; 75:12

**upon** 19:14; 21:17; 49:25; 61:15; 66:13, 13; 67:8; 68:15; 69:21; 70:6; 71:2, 15; 72:11

**use** 4:4

**used** 25:18, 22; 56:17

**uses** 4:5

**usual** 7:23; 73:25

**Usually** 24:8; 36:21; 37:8, 11

# V

**v** 4:12

**vaguely** 12:14

**valid** 70:10

**varies** 30:25

**various** 9:24; 34:12

**verify** 23:13, 24; 67:22; 69:14

**version** 18:12

**via** 66:21

**VIDEOGRAPHER** 4:9, 19

**videotaped** 4:14

**violation** 51:2

**virtually** 57:8

**virtue** 62:17

# W

**wait** 40:2; 49:14; 58:14, 14, 14, 14, 15, 15

**waive** 17:21; 25:3, 13; 75:21

**waived** 4:7; 46:16

**waiving** 16:15; 25:20; 27:2

**way** 14:20; 37:2; 39:16; 44:2; 66:12

**ways** 23:3

**week's** 10:7

**West** 14:2, 6; 32:17

**what's** 8:9; 16:15; 17:12; 35:6; 36:7, 24

**whereby** 62:25

**whole** 8:12; 59:18; 60:7; 67:15

**whose** 43:14

**within** 7:23; 11:8; 32:6; 40:14; 50:6, 13, 24; 51:6; 52:19; 57:7; 68:16; 69:22; 71:16

**without** 35:13; 44:23

**witness** 4:21, 24; 8:14; 45:14, 18; 58:18; 66:7; 75:22

**wonder** 38:14; 57:20

**word** 25:3; 43:25; 56:17

**words** 13:16, 20; 25:7, 10

**work** 14:19, 20, 21, 22, 25; 15:1, 6; 16:2; 21:5; 39:16; 57:23; 58:7, 9, 16; 59:6, 7, 22; 60:23; 62:25; 72:10

**worked** 6:3; 74:10

**working** 47:11; 48:1, 2; 73:13, 18

**worse** 56:3

**write** 46:12

**writes** 13:14, 16, 17

**writing** 11:22; 37:11; 42:3; 49:24

**written** 13:20; 20:21; 40:19; 42:15

**wrote** 18:17; 19:9; 43:23; 44:4, 13; 45:15, 20; 46:13

# Y

**year** 59:19, 19

**years** 5:19; 6:3, 6; 12:15; 32:12; 56:14, 19; 71:2; 74:1, 9, 23

**yellow** 50:20

4

<u>PROCEEDINGS</u>

1

2      The following deposition of **JOSEPH A. CASH** was

3  taken on oral examination, pursuant to notice, for

4  purposes of discovery, and for use as evidence, and for

5  other uses and purposes as may be permitted by the

6  applicable and governing rules.  Reading and signing is

7  not waived.

8                    *    *    *

9      THE VIDEOGRAPHER:  In the United States

10     District Court, Southern District of Florida, Fort

11     Lauderdale Division in the Case Number 00-6227.  In

12     the case <u>Jacquelyn Iaia, Plaintiff, v. Columbia</u>

13     <u>Healthcare Corporation, Defendant</u>.  This is the

14     videotaped deposition of Joseph A. Cash.

15     We are at the offices of Accurate Stenotype

16     Reporters at 100 Salem Court in Tallahassee,

17     Florida.  It is approximately 11:20.  It is August

18     14th, 2000.  The court stenographer is

19     Carolyn Rankine and the videographer is Doug Nargiz.

20     Would the court reporter please swear in the

21     witness.

22  Thereupon,

23              **JOSEPH A. CASH**

24  was called as a witness, having been first duly sworn,

25  was examined and testified as follows:

5

```
 1              DIRECT EXAMINATION
 2   BY MR. del RUSSO:
 3       Q     Good morning, Mr. Cash.
 4       A     Good morning.
 5       Q     My name is Alex del Russo.  I introduced myself
 6   a moment ago.  I represent the defendant in this case.
 7   Can you begin please by telling me your business address.
 8       A     325 John Knox Road.
 9       Q     Is that the address of the Florida Commission
10   on Human Relations?
11       A     Yes, sir, it is.
12       Q     And you're presently employed there?
13       A     Yes, sir.
14       Q     All right.  Are you here today in response to a
15   subpoena that was served on your offices?
16       A     Yes, sir, that's correct.
17       Q     All right.  How long have you been employed by
18   the Florida Commission on Human Relations?
19       A     About six years.
20       Q     And what is the nature of your employment?
21       A     Well, now, I'm the manager of the customer
22   service and records unit.
23             MR. HANNAH:  I couldn't hear that.
24       Q     Could you repeat your answer, please.
25       A     I'm currently the manager of the customer
```

6

1    service and records unit.

2         Q    All right.  And have you held that position for

3    the entire six years that you worked for the Florida

4    commission?

5         A    No, sir.  I've been in that position and a

6    similar position for the past three years.

7         Q    All right.  Do you currently supervise anyone?

8         A    Yes, sir, I do.

9         Q    What types of positions do you supervise?

10         A    I supervise investigators, I supervise clerical

11    persons and I supervise the front sort of reception area.

12         Q    Does your job include getting involved in

13    investigating complaints of employment discrimination

14    that are filed with the commission?

15         A    Direct investigation?

16         Q    In any respect.

17         A    Largely my duties for the most part have been

18    to review cases that have previously been submitted by

19    investigators.

20         Q    All right.  Can you explain for us, sir, in

21    just a general sense, what the commission does in

22    connection with complaints that are filed of employment

23    discrimination?

24         A    If an employment discrimination case is filed

25    with the commission, generally our responsibility is to

7

1    take the case in, investigate the case, and make a

2    finding on that case.

3        Q    All right.  Now, the subpoena that was served

4    on your offices, Mr. Cash, asked you to bring with you

5    today the entire file maintained by the commission with

6    regards to the complainant Jacqueline Iaia which is your

7    file number 95-0414.  Do you have that file with you

8    today?

9        A    Yes, sir, I do.

10       Q    Is that the red file that you've been leafing

11   through for the last two minutes?

12       A    Yes, sir, it is.

13       Q    Okay.  And are you the custodian of that file?

14       A    I'm in charge of the records section.

15       Q    Are you familiar in a general sense with the

16   contents of that file?

17       A    Yes, sir, generally.

18       Q    Are you the person for our purposes today who

19   has been designated by the Florida commission as the

20   custodian of that file?

21       A    Yes, sir.

22       Q    All right.  And are the documents maintained in

23   that file within the normal course or the usual course of

24   business for the commission?

25       A    Yes, sir.

1  Q All right.  Now, can you begin by telling me

2 from reviewing the file when Ms. Iaia's complaint of the

3 employment discrimination was first received by your

4 offices?

5  A (Perusing documents.)  November the 9th, 1994.

6  Q Is there a particular document that you're

7 looking at for purposes of answering that question?

8  A Yes, sir.

9  Q And what's the document referred to or called?

10  A Individual complaint log.

11  MR. HANNAH:  Can you repeat the date?  I didn't

12  catch the whole date.

13  MR. del RUSSO:  The date was November 9, 1994.

14  THE WITNESS:  That's correct.

15 BY MR. del RUSSO:

16  Q Mr. Cash, I'm going to show you a document that

17 I'm going to mark as Exhibit 1 to your deposition.  It's

18 captioned log of complaint activity.  I'm going to ask

19 you if you would take a moment, please, look at that

20 document and tell me if the document I've provided you is

21 a true and accurate copy of the document in your

22 commission's files.

23  (Deposition Exhibit 1 marked for

24 identification.)

25  MR. HANNAH:  I don't have copies of these

1    documents.

2           MR. del RUSSO:  I thought they were FAX'd to

3    your office.

4           MR. HANNAH:  No; I haven't received them.

5           MR. del RUSSO:  Let's go off the record.

6           (Discussion off the record.)

7    BY MR. del RUSSO:

8      Q    Referring, Mr. Cash, to this document labeled

9    log of complaint activity.  Let me ask you, sir, if the

10   document that I handed you is a true and accurate copy of

11   the document that's maintained in the files of your

12   agency?

13     A    Yes, sir.

14     Q    All right.  Can you identify for me what this

15   document is, what the purpose of this document is?

16     A    It's the -- generally it's to capture some

17   basic information about the file when it comes in and

18   then to start a log so it would start there and then it

19   would proceed as the -- as the file -- as the file was

20   investigated and went through the process, then this log

21   of complaint activity would then continue on to the next

22   page or whatever.

23     Q    With additional activity being recorded by

24   various entries?

25     A    That's correct.

1    Q    Now, according to this document, when was

2  Ms. Iaia's complaint first filed or received by the

3  Florida commission?

4    A    According to this document -- it was a little

5  different than the date I gave a minute ago, but

6  according to this one, it says 11/14/94.

7    Q    A week's difference approximately.

8    A    About five days.

9    Q    Now, does your file reflect any activity for

10  purposes of receiving, initiating, or reviewing, or

11  investigating Ms. Iaia's complaint during the next

12  six-month period after it was initially filed?

13    A    So you're saying from the period of November

14  14th of '94 till, what, about May of '95 --

15    Q    Yes, sir.

16    A    -- was there any activity taken?

17    Q    Yes.

18    A    (Perusing documents.)  There's no indication

19  that there was.  At least I can't tell there was anything

20  based on the -- based on that log of complaint activity,

21  and I don't see any particular documents that would

22  indicate that any action took place during that six-month

23  period.

24    Q    All right.  Does the file reflect that at some

25  point in time the Florida commission lost Ms. Iaia's

1  complaint such that it had to be redone?

2      A    I can't draw that conclusion.

3      Q    All right, sir.  Let me show you a document

4  that I'm going to mark as Exhibit 2 to this deposition.

5  It's a letter from Linda Mathis of the Florida commission

6  to Columbia Healthcare Corp. dated January 2, 1998, and

7  ask you if the letter I'm showing you is a true and

8  accurate copy of a letter that's maintained within your

9  agency files.

10         (Deposition Exhibit 2 marked for

11  identification.)

12     A    That's the same document.

13     Q    You have a copy of that?

14     A    That's right.

15     Q    Can I ask you to direct your attention to the

16  first sentence -- actually, the first two sentences which

17  read, ". . . according to our records, the Complainant

18  filed her charge on November 14, 1994.  This is the date

19  which was recorded by the docketing office on the Log of

20  Complaint Activity in the file."  Do you see that

21  language?

22     A    It starts out by saying, "I am writing to

23  advise you . . ."

24     Q    Yes.

25     A    Okay.  Yes, sir.

12

1      Q    And does, sir, that refer to the date that we

2  discussed a moment ago in terms of when her complaint was

3  initially received by your offices?

4      A    Right, receive and filed.

5      Q    The next sentence goes on to say, "However,

6  Ms. Iaia's complaint was lost at some point after the

7  initial filing and had to be re-notarized in July of

8  1995." Do you see that language?

9      A    Yes, sir, I do.

10     Q    Were you aware of this fact at any point prior

11 to the time of this deposition today?

12     A    I think we had some problems with this case and

13 I do recall.  And looking at it, I noticed that I made

14 some entries in this particular complaint and I vaguely

15 remember talking to the complainant some years ago about

16 this particular situation and I thought that it needed to

17 be cleared up.  But to say it was lost is a little

18 different than saying that there may have been some

19 problems in our processing.

20     Q    All right.  Well, the letter we just saw refers

21 to the complaint as being lost.  My question is were you

22 aware of that fact prior to the time of your deposition

23 here today?

24     A    Well, the thing is I'm not comfortable saying

25 that it was lost and so I -- you know, to then go past

13

1   that.  But first I wouldn't say it was lost.  I think

2   there was some problems in our processing.

3       Q    All right.  Now, with respect to this letter,

4   do you know who Linda Mathis is?

5       A    Yes, sir, I do.

6       Q    Do you know if she was the investigator

7   assigned to investigate the complaint of discrimination

8   filed by Ms. Iaia?

9       A    She was.

10      Q    And is a letter such as this customarily

11  retained or maintained in the files of the agency with

12  respect to your investigation of an employment

13  discrimination complaint?

14      A    The investigator writes a letter out.  This is

15  not a standard letter.  This is one that apparently was

16  done in her words.  And so if she writes a letter or any

17  investigator writes a letter like this, then, of course,

18  a copy of that would customarily be placed in the file,

19  yes, sir.

20      Q    When you say it was written in her own words,

21  do you mean this was not a form letter?

22      A    That's right.

23      Q    All right.  Now, you mentioned a moment ago

24  there were some problems with this case.  Can you explain

25  to me, what you meant by that?

14

1      A    Well, when I looked over this case, this is out

2  of the West Palm Beach area and so typically what happens

3  is -- and I say typically.  There are some exceptions --

4  but typically what happens is this case would be

5  investigated by either the Miami EEOC office or there's a

6  West Palm Beach agency there that also investigates

7  cases.  So typically we would not take jurisdiction over

8  a case that was filed in that geographical location.

9           In this particular case, it looks like we

10  started the process, we then referred it to the EEOC, and

11  then the EEOC sent it back to us.  So there was -- there

12  was some -- I don't want to say confusion, but there was

13  certainly some processing problems with the case as to

14  who was going to take jurisdiction over that case and do

15  the investigation.

16      Q    There was some issue as to who was actually

17  going to undertake the investigation?

18      A    That's right.  According to what I can see in

19  the file and, you know, how it should work, this didn't

20  work the way it should have, definitely.

21      Q    Does your office work under a -- or operate

22  under a work sharing arrangement with the EEOC?

23      A    Yes, sir, we do.

24      Q    Do you have --

25      A    Work share agreement.

1    Q    Work share agreement.  Thank you.  Do you have

2  a general familiarity as to what that is?

3    A    Yes, sir, I do.

4    Q    Can you explain to me in a general sense what

5  that agreement involves?

6    A    Well, generally the work sharing agreement

7  outlines a particular portion of Florida and says that

8  the Florida Commission on Human Relations would be

9  responsible for this geographical location or

10  jurisdiction area and the Miami EEOC would be responsible

11  for this particular portion, and then there are some

12  other agencies that are also included in there.  But

13  generally for FCHR we have a specific list of counties

14  that if the complaint originated in those counties, we

15  would be responsible for.

16        And, of course, again, there are exceptions to

17  that.  If there are some particular types of cases that

18  EEOC doesn't cover and that we do, then no matter where

19  it is in Florida, we would obviously take jurisdiction

20  and investigate that case.

21    Q    Do you know if the agreement means that if one

22  agency is investigating a complaint of employment

23  discrimination that the other will refrain from

24  investigating until the first one completes its

25  investigation?

16

1          MR. HANNAH:  Object to the form.

2      A    We try to stick to the work share agreement as

3  much as possible, but there are occasions where if EEOC

4  gets a case -- and, say, somebody from Pensacola -- they

5  file directly with the EEOC, we're not made aware of that

6  filing, and EEOC may begin that investigation, we would

7  then -- for all practical purposes, we would -- they

8  would go ahead and continue that investigation.  On the

9  other hand, it may be that if we took a case in that was

10  in, say, Broward County or something, and we started

11  processing it and we realized that EEOC had already

12  received that complaint, then we would obviously cease

13  our investigation and send that case -- refer it to the

14  EEOC.

15      Q    Is that what's meant by waiving to the EEOC?

16      A    Yes, sir, it is.

17      Q    Let me show you another document that I'm going

18  to mark as Exhibit 3 to your deposition.  It's a letter

19  dated June 27, 1995, from Calvin Calhoun to Ms. Iaia, and

20  ask you if, by looking in your file, if you have a copy

21  of that letter in your files as well.

22          (Deposition Exhibit 3 marked for

23  identification.)

24      A    (Perusing documents.)  Okay.  I see this

25  letter.

17

1    Q    All right.  And is the copy that I handed you a

2  true and accurate copy of the letter that's maintained in

3  your agency's file?

4    A    Yes, sir.

5    Q    All right.  Now, the first sentence in that

6  letter reads, "Enclosed is a draft of your amended

7  complaint of employment discrimination which was prepared

8  by me."  Do you know if the amended complaint of

9  employment discrimination was prepared because the first

10  complaint had been lost or misplaced by your offices?

11    A    No, sir; I don't think so.

12    Q    Well, what's your understanding, if you have an

13  understanding, as to why Mr. Calhoun was preparing an

14  amended complaint and sending it to Ms. Iaia to sign?

15    A    My understanding would be that the original

16  complaint that was sent in by the complainant was not in

17  a format that we could send out to the parties and/or

18  EEOC.  And so what we would do is -- for instance, it

19  appears that she sent in a complaint that was

20  handwritten, and so that handwritten complaint in that

21  format would not go out.  We couldn't even waive it to

22  EEOC in that format.  We would need to type it up, put it

23  in a more professional looking format and then send it

24  out to the parties and/or EEOC.  In this case, it would

25  be EEOC.  Should have been.

1    Q    All right.  Do you know if it was your office's

2    intention at this time, then, once it was put in a proper

3    format, to refer it to EEOC for investigation?

4    A    That should have been the normal course -- you

5    know, course of action that should have been taken in

6    this case, yes, sir.

7    Q    All right.  Well, then, my question to you,

8    sir, is:  do you know or can you tell from the file of

9    your agency as to what was happening with respect to this

10   complaint between November 1994, the time it was filed,

11   and June of 1995, which is the time Mr. Calhoun was

12   sending an amended version of the complaint to Ms. Iaia?

13   A    What was happening during that period?

14   Q    Yes.

15   A    Is that your question?  (Perusing document.)

16   Well, it seemed to me between November of '94 and the

17   time that Mr. Calhoun wrote this letter that there would

18   have been some sort of review being taking place.  That's

19   what it appears to me.

20   Q    All right.  Are you referring to any particular

21   document that reflects that review?

22   A    The case management and the development log

23   that was dated 6/26/95 -- and there's a little note there

24   that says Calvin, who was the intake counselor at the

25   time, it says -- and it's -- there's some initials over

19

1   there to the side which is -- was his supervisor at the

2   time, Harry Lamb.  And it says charge needs amending,

3   perfecting, then refer to EEOC/Miami.

4            So it seemed to me that Mr. Calhoun may have

5   been -- may have sent the handwritten format forward to

6   be referred and then when it got reviewed by a

7   supervisor, he returned on 6/26/95 and said first you

8   need to amend this, perfect it, and then we'll refer it

9   to Miami.  And then you see the next day he wrote that

10  letter June 27, '95.

11      Q    All right.  Now, are you telling me that

12  because you have firsthand knowledge that's what happened

13  or are you drawing a conclusion that's what happened

14  based upon what these documents say?

15      A    That's right.  I'm drawing a conclusion based

16  on the documents.

17      Q    All right.  Now, the document that you

18  mentioned a moment ago labeled case management and

19  development log, sir, I would like to show you what I'm

20  marking as Exhibit 4 to your deposition and ask you if

21  that appears to be a true and accurate copy of the

22  document that you referred to a moment ago.

23            (Deposition Exhibit 4 marked for

24  identification.)

25      A    (Perusing document.)  Yes, sir.

20

1      Q   Do you know who prepared that case management

2 and development log?

3      A   Looks like Harry Lamb.

4      Q   Would that have been Mr. Calhoun's supervisor?

5      A   Yes, sir.

6      Q   Mr. Calhoun, according the June 27th letter,

7 was the intake counselor.  Do you know what the intake

8 counselor does with respect to initiating an

9 investigation of employment discrimination claims?

10     A   Well, as far as initiating an investigation,

11 their role is to look at the case on its face and

12 determine if it's true on its face, would we have

13 jurisdiction of that case.  So they really just take a

14 general basic look at that complaint.  They don't really

15 get too much into the investigative part of it.

16     Q   He wasn't the investigator, then, assigned to

17 the case?

18     A   That's correct.

19     Q   All right.  Going back to this case management

20 and development log.  You read a quote from it a moment

21 ago under -- written in script under number 2, which

22 reads, quote, charge needs amending, perfecting, then

23 refer to Miami -- EEOC/Miami.  What does that mean with

24 respect to the section discussing referring the matter to

25 the EEOC?

1          MR. HANNAH:  Object to the form.

2      A    Well, what that's saying is that in order for

3  us to send this to Miami EEOC, clearly, geographically

4  speaking, this should have been something that we

5  shouldn't have been doing, according to the work share

6  agreement at that time.

7      Q    I'm sorry.  You should not have been doing?

8      A    Right, we should not have been doing.  But in

9  order to get that to Miami for them to investigate it,

10 then we've got to put that charge in the format that's

11 acceptable to them.  Which means that it needs to be

12 typed, it needs to be signed by the complainant, et

13 cetera, and it hadn't been done yet.  So the supervisor

14 is telling the counselor, it appears to me, that we need

15 to get this in a format so we can then refer that to

16 EEOC.

17     Q    All right.  Now, based upon your review of

18 these record, Ms. Cash, was it your office's intention at

19 the time to refer this complaint to the EEOC for

20 investigation?

21     A    Yes, sir.

22     Q    Let me show you now a document which is

23 captioned individual complaint log.  I'm going to mark it

24 as Exhibit 5 to your deposition, and ask you if the

25 document that I've handed you is a true copy and an

22

1   accurate copy of the document in your files.

2             (Deposition Exhibit 5 marked for

3   identification.)

4       A    (Perusing document.)  Yes, sir, it is.

5       Q    All right.  Now, do you know who prepared or

6   would have prepared this particular log?

7       A    In the normal course of business it would have

8   been the intake counselor.

9       Q    Would that have been Mr. Calhoun?

10      A    That's correct.

11      Q    Looking at the top, left corner of the document

12  there's a line item for intake counselor and the initials

13  CC, do you know if that would have referred to

14  Mr. Calhoun?

15      A    Calvin Calhoun, yes, sir.

16      Q    Now, it then goes on in the document to list a

17  complainant and complainant's representative and under

18  that the respondent and the respondent's representative.

19  Do you see that, sir?

20      A    Yes, sir.

21      Q    Do you know where the information is derived

22  with respect to who the respondent is and who the

23  respondent's representative is?

24      A    Are you speaking generally or are you talking

25  about this case.

1      Q    In a general sense.

2      A    In a general sense we would get that

3  information either one or two ways.  Either we would get

4  it directly from the information that the complainant

5  provides to us or if insufficient, we would try to then

6  get that information from either a branch office asking

7  them who their human resources department is or who their

8  chief operating officer, whoever it might be that we can

9  then establish a point of contact for that respondent.

10     Q    All right.  Now, then, specifically as to this

11 case, do you know if that information was provided to

12 your agency by Ms. Iaia or was that something that your

13 office may have attempted to verify independently?

14         MR. HANNAH:  Object to the form.  Calls for

15     speculation.

16     A    (Perusing documents.)  Could you ask your

17 question again?

18     Q    Sure.  What I'm just trying to find out from

19 you, Mr. Cash, is whether you can tell in the file or

20 whether you know independently whether the information

21 listing the name and the address of the respondent's

22 representative was something that you were provided by

23 Ms. Iaia or was that something that your office attempted

24 to verify independently.

25         MR. HANNAH:  Object to the form, again.

24

1     A    (Perusing documents.)

2     Q    Would it be easier, sir, if I asked it in a

3  different manner?

4     A    I can't tell on this particular ICL, individual

5  complaint log, where the name Bob Newman, chief operating

6  officer, Hialeah Gardens, Florida -- at this point right

7  now I can't tell where that came from.  And I'm trying to

8  find that.  Usually, you can find that either on the

9  complaint itself or you would find it in the affidavit,

10  and then lastly, if you couldn't find it there, you would

11  be able to find it in the notes that were made by the

12  counselor.  Well, I've looked at all three of those

13  places and I don't see where that name and address came

14  from.  I'm not saying it's not in here, I just don't see

15  it at this point.  I'm not sure where that came from.

16     Q    All right.  I'll come back and perhaps by going

17  through some the other documents, it might help.

18     A    Okay.

19     Q    Let me direct your attention, though, to one of

20  the entries at the bottom of that particular complaint

21  log.  The one dated June 26, 1995.  It reads, "Case

22  returned from Docketing for ICL & Perfection of

23  Charge/Waive."  Do you see that language?

24     A    I'm sorry.  Where are you?

25     Q    It's at the bottom of the page, it's the

25

1    typewritten line under notes.

2         A    Okay.

3         Q    Can you explain to me what the word "waive"

4    refers to with respect to this individual complaint log?

5         A    Well, I think he's saying more than one thing.

6    He's saying case returned from docketing for ICL and

7    perfection of charge/waive.  So, in other words, it

8    appears to me what Mr. Calhoun was trying to say is that

9    he got the case returned for -- from docketing -- in

10   other words, he submitted it forward, looks like it got

11   returned, as we were talking about before, and it got

12   returned for him to perfect the charge so he can then

13   waive it.

14        Q    Okay.

15            MR. HANNAH:  Move to strike as being

16        speculative as to what somebody else was

17        contemplating there.

18        Q    Well, is the language used in that particular

19   phrase, Mr. Cash, language that is -- that is typical for

20   your agency when it discusses the concept of waiving a

21   charge to another agency?

22        A    I think that's a process that we used quite

23   frequently, and so it seems pretty reasonable to me to

24   draw that conclusion.

25        Q    All right.  Let me show you now a document that

1    I'm going to mark as Exhibit 6 to your deposition,

2    Mr. Cash, it's captioned an amended charge of

3    discrimination, and ask you if the document I've handed

4    you is a true copy of a document that exists in your

5    agency files.

6         (Deposition Exhibit 6 marked for

7    identification.)

8         A    (Perusing document.)  Yes, sir.

9         Q    Do you know if that is the amended complaint

10   that Mr. Calhoun drafted and forwarded to Jacquelyn Iaia

11   to sign?

12        A    It appears so, yes, sir.

13        Q    All right.  Now, in the bottom right of that

14   document there's a date stamp which reads received,

15   Florida commission, and then it has a date and a time.

16   Do you see that?

17        A    Yes, sir.

18        Q    Is that a practice that is standard in your

19   office and that is to file stamp documents when they are

20   received in?

21        A    Yes, sir, it is.

22        Q    All right.  Now, what is the date, according to

23   that file stamp, at which the amended charge was received

24   by your offices?

25        A    This particular one was received July 28, 1995.

27

1     Q    At that point in time, Mr. Cash, would the

2 charge have then been perfected for purposes of waiving

3 it to the EEOC?

4     A    Yes.   Yes, sir.

5     Q    All right.  Now, from your review in the file,

6 what happened next for purposes of your agency's

7 investigation?

8     A    (Perusing documents.)  The next step that

9 should have taken place should have been that we should

10 have sent this complaint to the EEOC for investigation.

11 That should have been the next step.

12     Q    And did that happen?

13     A    It appears that -- based on what I can tell

14 from the file -- that on March 20th of 1996 this case was

15 then referred to the EEOC in Miami.

16     Q    All right.  Let me show you, sir, a document --

17 which I'm going to mark as Exhibit 7 to your

18 deposition -- it's a letter dated March 20, 1996, from

19 the Florida Commission on Human Relations to Ms. Iaia.

20 Ask you if the letter I've handed you is a true and

21 accurate copy of a letter in your agency's files with

22 respect to this investigation?

23     (Deposition Exhibit 7 marked for

24 identification.)

25     A    Yes, sir.

28

1    Q    Who is Mr. Ronald McElrath?

2    A    He was executive director at that time.

3    Q    Is that essentially the chief administrative

4  officer for the commission?

5    A    Yes, sir.

6    Q    Was it at or about this time; that is, the date

7  of this letter, as you mentioned a moment ago, this

8  complaint was referred to the EEOC for investigation?

9    A    It should have happened quicker than that, but

10  that's the only indication that I have that it went out

11  at that time.

12    Q    All right.  Well, is there -- does your file

13  reflect that it was referred any date prior to March 20,

14  1996, to the EEOC for investigation?

15    A    I sure didn't see any.

16    Q    All right.  Does your file reflect any activity

17  by your offices in investigating Ms. Iaia's complaint

18  prior to the time it was referred to the EEOC in Miami?

19    A    (Perusing documents.)  There's no indication of

20  that.

21    Q    All right.  And does your file reflect any

22  activity, then, between November 1994 and March of 1996,

23  relative to investigating Ms. Iaia's charge of employment

24  discrimination?

25    A    By our agency, no, sir.

29

1    Q    All right.  Once a complaint is referred to the

2  EEOC, what, if anything, does your commission continue to

3  do?

4    A    Once it's been referred?

5    Q    Yes, sir.

6    A    Generally, we don't do anything else to it.  We

7  then turn that process over to the EEOC.

8    Q    All right.  Now, with respect to a -- to a

9  complaint that your office is investigating, is there a

10  point in time in which your office sends notice to the

11  respondent to advise them that a charge of discrimination

12  had been brought against them?

13    A    We would do that as soon as the -- as soon as

14  we got the complaint in a format that is acceptable -- as

15  soon as we got it -- unless we received it in a format

16  that was acceptable to go out to both parties, we try to

17  do that as soon as we can once it gets in that format.

18    Q    For purpose of your agency -- now, I'm not

19  asking about the EEOC, but for the purposes of Florida

20  Commission of Human Relations -- is a charge that is

21  handwritten considered to be an acceptable or

22  unacceptable form or does it matter?

23    A    For the commission, we try to always at least

24  have it typed up and signed, and at that time there was a

25  notary that was required.  So we would type it up, have

1    them sign it and notarize it and send it back to us.  And

2    that would be the format in which it would have been

3    acceptable to send out to the respondent.

4        Q    Do you know if handwritten charges of

5    discrimination cannot be investigated or processed by

6    your particular agency?

7        A    I wouldn't say they cannot but -- I mean,

8    again, we try to get them typed up before we send them

9    out.

10       Q    It's the preference of your office that they be

11   typewritten?

12       A    That's correct.

13       Q    All right.  Let me show you a document, sir,

14   that I'm going to mark as Exhibit 8, is, I guess, the

15   next one.  It's a September 26, 1997 letter from the

16   Florida Commission on Human Relations to Columbia Health

17   Care Corp. d/b/a Pembroke Pines Hospital entitled notice

18   of filing of complaint of discrimination.  And my

19   specific question to you is going to be whether the

20   document I've given you is a true and accurate copy of

21   the document contained in your office's files?

22            (Deposition Exhibit 8 marked for

23   identification.)

24       A    (Perusing document.)  The only thing that

25   varies from what you have here and what I have in the

31

1  file is the affidavit to authenticate, which is a blank

2  document and we don't maintain that blank document in our

3  file.  We send that out as a packet to the respondent.

4      Q    So that affidavit would be a document that you

5  would send out to the respondent but you wouldn't keep a

6  copy in your file?

7      A    That's right.

8      Q    All right.  Other than that exception is the

9  remaining portion of this document -- or do they appear

10  to be a true copy of documents that are maintained in

11  your file?

12      A    The same thing but the mediation conference FAX

13  sheet.  That's something else that we send out as part of

14  the packet, but we don't keep a copy.  Those are the only

15  two.

16      Q    All right.  Any other documents that would not

17  be in your file?

18      A    Not in this packet.  That's the only two.

19      Q    What about with respect to the September 26th

20  letter itself?

21      A    Yes, sir, that's in there.

22      Q    Can you identify for us what this letter is,

23  what the purpose of this letter is?

24      A    This is the notice to the respondent that a

25  complaint has been filed against them.

32

1    Q    And the date of this letter is what?

2    A    September 26, 1997.

3    Q    Does your file reflect any notice to the

4  respondent for September 26, 1997?

5    A    Official notice, no, sir.

6    Q    Do you know if there is a time limit within

7  which your office is required to give notice to a

8  respondent and copy them on a complaint or a charge of

9  discrimination?

10    A    Yes, sir, it's five days.

11    Q    Do you have an explanation as to why this

12  notice was not sent out for almost three years from the

13  time the initial complaint was received by your office

14  from Ms. Iaia?

15    A    Well, as we talked about earlier, it looks like

16  there was some confusion in the processing.  When we

17  first got it in, we -- if it's in the West Palm Beach

18  area, for instance, or down in south Florida, typically

19  what happens is a complainant will file with their local

20  agency, whoever that might be, or the Miami EEOC office,

21  and then also file with us.  A lot of times what happens

22  is we start the process, but we know eventually Miami is

23  going to get that case either from us or directly from

24  the complainant.

25        So it looks like what happened in this case is

33

1  that we started the process thinking that Miami was going

2  to pick it up, anyway.  They didn't.  So then we got it

3  in a format that's acceptable to them, we referred it to

4  them.  Once it got to them, they then turned around and

5  sent it back to us and said that it was untimely and --

6  so that we needed to do the investigation.

7      Q    When you say they said it was untimely, who is

8  the they that you're referring to?

9      A    The EEOC in Miami.  And when I say untimely, I

10 mean untimely for their purposes.  Not for our --

11     Q    For purposes of --

12     A    -- purposes.

13     Q    -- of conducting an investigation?

14     A    Right.

15     Q    Okay.  Mr. Cash, let me show you a document now

16 that I'm going to mark as Exhibit 9 to your deposition.

17 It's a three-page document.  The first page I may have

18 shown you already.  It's labeled log of complaint

19 activity.

20          MR. HANNAH:  This is Rod Hannah.  I need to

21      take a phone call.  I need to take a two-minute

22      break.

23          MR. del RUSSO:  All right.

24          (Brief recess.)

25          (Deposition Exhibit 9 marked for

34

1    identification.)

2    BY MR. del RUSSO:

3        Q    Mr. Cash, I'm going to show you a document that

4    I marked as Exhibit 9 to your deposition.   It's a

5    three-page document which is captioned log of complaint

6    activity.   I'm going to ask you to look at this, and

7    particularly all three pages, and tell me if each of

8    those pages appears in the -- the files of your agency

9    with respect to this complaint.

10       A    (Perusing document.)   Yes, sir.

11       Q    Who typically prepares the entries that are

12   listed for the various dates on this document?

13       A    That's typically done -- the typewritten

14   portion of it is done by the intake document section.

15       Q    All right.   And then so it would not be done by

16   the investigator?

17       A    Not that first page; no, sir.

18       Q    And a little further down in the first page,

19   under authorized representative, there is the name of

20   Paula Adamson and an address which is different than the

21   address that we saw in Exhibit 5, which I'm going to show

22   you now.   And my question to you, Mr. Cash, is do you

23   know where that address information came from?

24       A    Which one?

25       Q    The one on Exhibit 9.

1       A       (Perusing document.)   That address looks like

2  one that was provide by the complainant that's on the

3  complaint form itself.   The name, however, of

4  Paula Adamson appears to be the name given by the

5  complainant on her affidavit.

6       Q       And what's the date of that affidavit?   Well,

7  let me ask you:   what was the date it was signed; and

8  then what was the date it was received by your agency?

9       A       (Perusing document.)   There's actually two --

10  looks like we received it twice.   We received it once in

11  the November of '94, which is -- but it doesn't show the

12  date it was signed.   This particular affidavit was

13  notarized without a date on it, but it looks like we

14  received that particular one in November of '94.

15       Q       Okay.   But as to the name of the representative

16  and the address, your file reflects that was information

17  provided by the complaining party, Ms. Iaia?

18       A       The Paula Adamson, yes, sir.

19       Q       Okay.   Now, going back to Exhibit 9, which is

20  this three-page log of complaint activities, could you

21  read for us the date and entry for the first -- for the

22  first line item on the log of activities?

23       A       It says 11/14/94.   Filed.

24       Q       And what is the next entry that's listed on

25  this log of activity?

1      A    9/26/97.  Docketed.

2      Q    All right.  And do you know, sir, if the reason

3  for the approximate three-year delay was because this

4  matter had been referred during the interim to the EEOC

5  for investigation?

6      A    I would say that's part of it.

7      Q    What's the other part of it?

8      A    Well, I mean, if we got it in -- we first got

9  it in November of '94, and we didn't get a perfected,

10  signed, notarized charge until July of '95, then that

11  accounts for some period right there.  I mean, that

12  should have been done quicker.

13          Then after July of '95, when we referred it, it

14  looks like the letter for referral didn't go out until

15  March of '96.  And then after March of '96, our

16  conclusion typically would be that EEOC would then handle

17  that matter.  And so we don't really have a lot of follow

18  up necessarily in a situation like this.

19      Q    How does your office typically learn that the

20  EEOC is referring a case back to you for investigation?

21      A    Usually, we'll get some kind of documentation

22  back from them, whether it's a FAX, whether it's

23  something that happened during the course of the

24  complaint.  The complainant calls and says what's the

25  status.  And we say, well, you need to call EEOC.  They

1  call EEOC and they say you call FCHR.  Sometimes it

2  happens that way that we get in communication from EEOC

3  just based on our dialogue with them.

4          We'll say, well, the complainant called and we

5  directed them to you because we referred it to you on

6  March 20, '96.  And they say, well, we don't have it.  We

7  referred it back to you.  Oh, you did.  Whatever.  We'll

8  usually get some kind of communication back that we

9  should be investigating it --

10     Q     Now --

11     A     -- usually in writing.

12     Q     All right.  Now, what about with respect to

13  this case specifically?  Does the file reflect how it was

14  that your office learned that the case was being sent

15  back from the EEOC to the Florida commission for

16  investigation?

17     A     I didn't see anything like that, that showed

18  from the EEOC that said this matter is being referred

19  back to you.

20     Q     Let me show you, Mr. Cash, a letter dated

21  September 26, 1997, from the EEOC to Columbia Health Care

22  Corp. d/b/a Pembroke Pines Hospital, ask you if your file

23  has a copy of that letter in it as well.

24          (Deposition Exhibit 10 marked for

25  identification.)

38

1      A     (Perusing documents.)  Yes, sir, it does.

2   That's not a letter from the EEOC.  We send that out on

3   behalf of the EEOC, actually.

4      Q     Oh, this would have been sent out by your

5   office?

6      A     That's correct.

7      Q     Who would have -- is this a form letter?

8      A     Yes, it is.

9      Q     Who would have been the individual responsible

10  for deciding to send this letter out?

11     A     That would have been the intake counselor's

12  recommendation and part of the docketing process, if this

13  was an age case.

14     Q     All right.  I wonder if you would read into the

15  record for us the second paragraph of that letter.  It's

16  only one sentence long.

17     A     "Unless you request otherwise, or unless the

18  charging party requests action by the Commission, we plan

19  no action regarding this charge under the ADEA, pending

20  receipt of the results of the Florida Commission's

21  actions."

22     Q     All right.  And that's part of the letter which

23  I understand, sir, your office sends out on behalf of the

24  EEOC?

25     A     That's right.

39

1    Q    Do you know if that means, Mr. Cash, that your

2   office had learned the EEOC was sending this case back to

3   you at some point prior to the date of this letter?

4         MR. HANNAH:  Objection to the form.  Calls for

5      speculation.

6    A    There's no correlation between that paragraph

7   and the return of the case from the EEOC, absolutely not.

8    Q    All right.  Well, can you explain to me what

9   that sentence means in the context of the EEOC itself not

10  taking any action until your office completes the results

11  of its actions?

12   A    Well, what happened at this point is we are now

13  taking jurisdiction of this case and this letter is part

14  of the notice that we sent out to the respondent.  So at

15  this point we were planning an investigation.  The

16  referral process apparently didn't work the way it was

17  supposed to and so the case went to EEOC, it came back to

18  us, we said, okay, we're going to go ahead and move

19  forward and investigate this case.  This is '97, this

20  case was filed in '94, we need to do something with this.

21  Let's -- we need to go ahead and take and investigate it.

22         This letter right here (indicating) is part of

23  that packet that goes out to the respondent that we send

24  on behalf of the EEOC.  And all it's telling the

25  respondent is, unless you request otherwise or unless the

40

1  charging party does, then the EEOC is not going to take

2  any action.  They're going to wait for the FCHR to do

3  their investigation.  That's all that's saying.

4       Q    All right.  Does that mean, sir, by your review

5  of the file, that your office learned this case was

6  coming back to you for investigation at some point prior

7  to September 26, 1997?

8       A    Either we learned or we drew that conclusion.

9       Q    Let me show you now a document that I'm going

10 to mark as Exhibit 11 to your deposition, Mr. Cash.  It's

11 a handwritten letter from Jacqueline Iaia to you with an

12 attachment of a charge of discrimination.  Ask you if

13 this documentation is a true and accurate copy of a

14 document contained within your agency's files.

15           (Deposition Exhibit 11 marked for

16 identification.)

17      A    (Perusing documents.)  It's an accurate copy.

18      Q    All right.  The first letter is -- appears to

19 be a letter written by Ms. Iaia to you.  Do you have any

20 independent recollection of receiving this letter from

21 Ms. Iaia?

22      A    Independent recollection?

23      Q    Other than what the letter says do you recall

24 receiving it on your own?

25      A    Do I recall receiving it?

41

1       Q    Yes.

2       A    Yes, sir.  And based on the record, I would

3   conclude that I received it.

4       Q    And do you recall having any discussions with

5   Ms. Iaia with respect to her claim of discrimination?

6       A    Yes, sir, I do.

7       Q    Tell me as best you can what you recall

8   discussing with Ms. Iaia.

9       A    Here's what I remember:  I remember she called

10  me and said that she had filed with us sometime ago and

11  that I remember being alerted at that point that there

12  was a problem.  And she said that she filed with us.  I

13  said that, you know, the case went to the EEOC.  She said

14  she never heard from them.  And so I realized then that

15  this may have been a situation where neither agency was

16  conducting an investigation into this case and that maybe

17  we needed to do something about it.  And so I filled out

18  the file transmittal form, which is the form that the

19  intake section had put together, to let them know that

20  some action needed to be taken on a particular case.

21          It seemed like to me -- and this is the best of

22  my recollection -- but it seemed like to me I had some

23  discussion with her prior to this and that I was going to

24  look into it and I asked around to the intake people what

25  was going on with it and I didn't really get much of a

1  response.  So I put this file transmittal form together

2  so we could, you know, have something documented in

3  writing showing the intake section here's what she's

4  complaining about and we need to look into it.  And

5  that's really all I remember about that.

6      Q    All right.  But by looking at these documents

7  now, does it help refresh your memory as to whether you

8  first learned the EEOC was sending the matter back

9  through discussion with the EEOC or through perhaps

10  discussions with Ms. Iaia?

11      A    Well, looking at the file transmittal form

12  there is a note down at the bottom, and it says sent back

13  untimely by EEOC 4/1/96 per Susie Mann.  Which I don't

14  see where that -- where there's a document in there from

15  EEOC dated 4/11/96, but this appears to we written by

16  Nina Singleton, who was the intake manager at the time,

17  and who this particular file transmittal form I sent to.

18  And then, of course, Susie Mann is -- she was EEO rep --

19  EEOC rep.

20      Q    All right.  I'm going to go ahead and mark as

21  Exhibit 11 [sic] a copy of that file transmittal form

22  that you've been referring to, sir.  And let me just ask

23  you at this point if the copy that I've marked as Exhibit

24  11 [sic] appears to be a true and accurate copy of the

25  form that's in your agency's files?

43

```
 1              (Deposition Exhibit 12 marked for

 2    identification.)

 3         A    Yes, sir.

 4         Q    All right.  Now, you were referring to a

 5    comment at the bottom of the page.  Can you identify for

 6    me or read for me what that specific comment is?

 7         A    Which comment?  There's --

 8         Q    About the fact that it was sent back per

 9    Susie Mann.

10         A    Okay.  There are three different comments here,

11    but the one that you're referring to looks like the third

12    comment that says sent back untimely by EEOC 4/11/96 per

13    Susie Mann.

14         Q    Do you recognize whose handwriting that might

15    be?

16         A    Nina Singleton.

17         Q    She was the intake manager of the file at the

18    time?

19         A    Yes, sir.

20         Q    Do you know what the reference to untimely is

21    in her note?

22              MR. HANNAH:  Object to the form.  Calls for

23         speculation as to what someone else wrote.

24         Q    Well, don't speculate, Mr. Cash.  Tell me, if

25    you know, what the word means.  If you don't, tell me you
```

44

1    don't know.

2             MR. HANNAH:  Still same objection.  No way he

3        could know.

4        A    What this is saying -- when she wrote down sent

5    back untimely by EEOC, that means it's EEOC's -- EEOC

6    drew the conclusion that it was untimely and sent it back

7    to us.

8        Q    What about the reference to the date 4/11/96?

9    Do you know if that was -- do you know if that was the

10   date it was sent back?

11       A    Looking at this, that's what Susie Mann said.

12   That's what I would conclude.

13       Q    That's what Ms. Singleton wrote?

14       A    Right.  She said 4/11/96 per Susie Mann.  So

15   apparently Susie Mann was telling Ms. Singleton that this

16   was untimely as on 4/11/96.

17       Q    All right.

18            MR. HANNAH:  Move to strike.

19       Q    Does your file, Mr. Cash, reflect any activity

20   in investigating Ms. Iaia's complaint between 4/11/96 and

21   the September 26, 1997 letters that we discussed a moment

22   ago?

23       A    Without having constructed a particular time

24   line on this case, I couldn't answer that specifically.

25   But I don't recall seeing anything that would indicate

1  that we were investigating after we referred it, and if

2  it got returned on 4/11/96, there's no indication that

3  happened in the file.

4       Q    All right.  Now, in 4/11/96, were you still in

5  the position of manager of customer relations in the

6  records unit?

7       A    '96.  I believe at that time I was an

8  investigator.

9            MR. del RUSSO:  All right.  Ms. Reporter, just

10      so our record's clear I identified the file

11      transmittal form as Exhibit 11 and I think that

12      means we have two Exhibit 11s, so I'm going to

13      renumber it as Exhibit 12.

14            THE WITNESS:  So you're asking me what my

15      position was at the time I wrote the transmittal

16      form or during the '96 period?

17            MR. del RUSSO:  During the '96 period.

18            THE WITNESS:  Okay.

19  BY MR. del RUSSO:

20       Q    What about at the time you wrote the

21  transmittal form?

22       A    Now, I think at that time I had recently been

23  placed as the manager of the customer relations and case

24  assessment unit, which is similar to the same unit that's

25  in place now.

1    Q    Okay.  Next document I'm going to show you I'm

2  going to mark as Exhibit 13, it is labeled individual

3  complaint log, and ask you if this document is a true and

4  accurate copy of the document contained in your files.

5         (Deposition Exhibit 13 marked for

6  identification.)

7    A    (Perusing documents.)  Yes, sir, it is.

8    Q    Would Nina Singleton been the individual who

9  prepared the entries on this individual complaint log?

10   A    This particular one?

11   Q    Yes, sir.

12   A    She didn't write the stuff that's at the

13 bottom.  She appeared to have wrote the filing date at

14 the top.  That was it.

15   Q    What about the typewritten line, the last

16 typewritten line under notes which reads:  "Waived

17 3/20/96?  EEOC did not investigate.  Need to docket."?

18   A    I really don't know the answer to that.

19   Q    Okay.

20   A    I mean, it's got Nina's Singleton's initials up

21 there at the top, left where it says intake counselor,

22 but whether or not she actually typed that I'm not sure.

23   Q    Do you know if this case was docketed back in

24 your offices after the EEOC sent it back for your offices

25 to investigate?

1      A    I don't think that happened until September of

2    '97.

3      Q    Does your file reflect any investigation that

4    was done by your offices with respect to Ms. Iaia's

5    complaint prior to September 26th, 1997?

6      A    Not an investigation into the merits of the

7    complaint; no, sir.

8      Q    In terms of the process that an investigation

9    goes through at what point -- or do you know at what

10   point an investigator is assigned to a particular case?

11     A    The persons who are working in the intake

12   section are investigators, have been for sometime, but

13   they wouldn't necessarily be conducting an investigation.

14   I think, what you're talking about, assigned to an

15   investigator and conducting an actual investigation in a

16   complaint may be two separate things.

17     Q    The reason I asked you that, Mr. Cash, is that

18   the first letter or the second letter that I showed you

19   from Linda Mathis identified her position as an

20   investigation specialist, and the positions of

21   Mr. Calhoun and Ms. Singleton, who we've discussed more

22   recently, were intake counselors or intake managers.  Is

23   there a difference or do you know if there's a difference

24   between an intake counselor and an investigator for

25   purposes of this investigatory process?

48

1      A      There is a difference but the working title of

2    intake counselor is just that, a working title.  Their

3    actual official position could be and they -- currently

4    they are investigation specialists, the same as the

5    investigator that you have listed there, Linda Mathis.

6      Q      Does an intake coordinator conduct any

7    investigation into the merits of the case?

8      A      Not the merits; no, sir.

9      Q      Well, what do they conduct an investigation

10   into, if anything?

11     A      Well, generally, their investigative process

12   would be more limited and more narrow focused and they

13   would really look at the face of the complaint to make

14   sure that it invokes our jurisdiction and not much more

15   than that.

16     Q      I'm going to go back to the document, Mr. Cash,

17   that I marked as Exhibit 9, it's the complaint -- log of

18   complaint activity, and I would like you to please look

19   on the third page of that document which are the entries

20   in November of 1997.

21     A      Yes, sir.

22     Q      Can you read the entry for the date of November

23   18, 1997?

24     A      November 18, '97.  Case assigned to

25   investigator.

49

1    Q    Do you know if that was Linda Mathis to whom it

2  was assigned?

3    A    Yes, sir.

4    Q    Do you know if anyone was assigned to be an

5  investigator on this file prior to the time that it was

6  assigned on November 18, 1997, to Ms. Mathis?

7    A    No, sir.

8    Q    Bad question.  No; you don't know, or no; no

9  one was previously assigned as an investigator?

10    A    No; it doesn't appear that anybody else was

11  assigned as an investigator.

12    Q    All right.  And can you read to me the next

13  entry as well?

14    A    12/1/98.  C -- wait.  11/21/98.  Initial

15  contact letter sent to Cp.

16    Q    Let me mark as Exhibit 14 a letter from

17  Linda Mathis to Jacquelyn Iaia dated November 21, 1997;

18  ask you if the copy I'm showing you is a true and

19  accurate copy of a letter that's in your files.

20          (Deposition Exhibit 14 marked for

21  identification.)

22    A    (Perusing document.)  Yes, sir, it is.

23    Q    The first sentence in this letter reads:  "I am

24  writing to let you know that your case has been assigned

25  to me for investigation."  Based upon your review of the

1  files, Mr. Cash, does it appear that Linda Mathis was the

2  first investigator to whom this case was assigned for

3  investigation?

4      A    Yes, sir.

5      Q    Do you know if there was a certain time period

6  within which your agency is required to investigate a

7  complaint and then make a determination as to the merits

8  of a complaint?

9      A    That matter is currently under review.  There

10 is no -- right now it's not clear.

11     Q    Well, what about back between 1994 and 1997,

12 during that time period, do you know if there was a

13 certain time frame within which your office was to

14 initiate an investigation and make a determination?

15     A    There was no policy regarding that, that we had

16 a specific time frame; no, sir.

17     Q    All right.  I'm going to show you, Mr. Cash, a

18 copy of the Florida Civil Rights Act, specifically

19 section 760.11, subsection 3, and I have highlighted in

20 yellow a particular sentence and I'm going to ask you,

21 sir, to please read that sentence aloud into the record.

22     A    "Except as provided in subsection 2, the

23 commission shall investigate the allegations in the

24 complaint.  Within 180 days of filing of the complaint,

25 the commission shall determine if there is reasonable

1  cause to believe that discriminatory practice has

2  occurred in violation of the Florida Civil Rights Act of

3  1992."

4      Q    Does your file reflect that your offices

5  conducted an investigation and made a determination as to

6  the merits of the complaint within 180 days of the time

7  it was filed?

8      A    The file does not reflect that we did that; no,

9  sir.

10     Q    Does the file reflect that during the

11  investigation, which commenced in November of 1997, the

12  respondent advised your offices that the hospital had

13  been sold before the date it received notice of the

14  charge of discrimination?

15     A    Do you have a document for that or --

16     Q    Yes, sir.  Specifically -- let me direct your

17  attention back to Exhibit 9, which is the log of

18  complaint activities, and I would direct your attention

19  to the third page, the line entry for March 18, 1998.  If

20  you could just read that aloud for us?

21     A    The 3/18/98 entry?

22     Q    Yes.

23     A    "Sent document request to Respondent.  Called

24  Mark Edwards office and they said that Respondent no

25  longer owns the hospital but is still [r]responsible for

1  this case and the liabilities.  The asset[t]s were sold

2  to another company in 1995."

3       Q    Does your file reflect that at any point during

4  the course of the investigation the respondent was unable

5  to produce documents which your office requested?

6       A    Unable?

7       Q    Unable.

8       A    Could you ask that question again?

9       Q    Sure.  I'll rephrase it.  Does -- do you know

10 what is meant by an adverse inference letter?

11      A    Yes, sir.

12      Q    All right.  Tell us please what that refers to.

13      A    An adverse inference letter to the respondent

14 is a letter that we send out in those cases where the

15 respondent has not responded, and we made attempts to get

16 them to respond and they don't respond.  So we send out

17 this letter which says that -- essentially, what it says

18 is that this letter is letting you know that if you don't

19 respond within a certain time period, then we're going to

20 draw the conclusion that the reason why you're not

21 responding is because it's adverse to your interest and

22 so we're going to infer from that lack of response that

23 the complainant's allegations essentially are true

24 because there's no rebuttal information from the

25 respondent.

1    Q    Now, with respect to this case specifically,

2    does your file reflect that an adverse inference letter

3    was sent to the respondent in connection with requests

4    that your office made for certain documents?

5    A    (Perusing document.)  Based on the log that

6    we're looking at now, the next entry is:  "6/17/98  Sent

7    adverse inference letter to Respondent to get initial

8    response."  And then there is a letter in the file that's

9    also dated 6/17/98 which is a form letter that is an

10   adverse inference letter.

11   Q    I have a copy of that letter.  And what I would

12   like to do is mark that as Exhibit 15 to your deposition;

13   that is, the June 17, 1998 letter.  Ask you if you would

14   just take a quick moment, please, Mr. Cash, review the

15   copy I've given you and tell me if that appears to be a

16   true and accurate copy of the letter that's maintained in

17   your files.

18         (Deposition Exhibit 15 marked for

19   identification.)

20   A    (Perusing document.)  Yes, sir, it is.

21   Q    Can you tell by looking at your files if your

22   office ever received the documents that it had requested

23   from the respondent?

24   A    (Perusing documents.)  Now, your question was

25   whether or not you responded?

54

1      Q    Whether your office received the documents

2  requested by your office that were the subject of the

3  adverse inference letter.  I'll be more specific,

4  Mr. Cash.

5      A    Okay.  Thank you.

6      Q    Did the respondent -- can you tell from review

7  of the file if the respondent was ever able to produce

8  for you the personnel file of Ms. Iaia?

9      A    (Perusing documents.)  Looks like it was

10  requested and then the respondent's attorney responded to

11  it and said this documentation will be provided as soon

12  as it is available.

13      Q    All right.  Is there any record that it was

14  ever provided?

15      A    (Perusing documents.)  No, sir.

16      Q    Bad question again perhaps.  No, sir; there's

17  no record, or no, sir; it was never provided?

18      A    No, sir; there was no record that it had been

19  provided.

20          MR. del RUSSO:  All right, Mr. Cash.  Thank you

21      very much.  That's all the questions I have.

22                    CROSS EXAMINATION

23  BY MR. HANNAH:

24      Q    Mr. Cash, I have a few questions.  My name is

25  Rod Hannah.  I represent Jacqueline Iaia, the plaintiff

55

1    in this case.  There were some questions asked of you by

2    Mr. del Russo about timing and why there were, I guess,

3    gaps in activity on the file.  Do you recall those

4    questions?

5        A    Yes, sir.

6        Q    Okay.  And you said something about things

7    should have been done quicker.

8        A    Yes, sir.

9        Q    There is no absolute evidence in your file on

10   this matter that any of the delays in the processing of

11   this matter are attributable to Ms. Iaia, is there?

12            MR. del RUSSO:  Object to the form.

13       Q    Do you understand my question?

14       A    No, sir.

15       Q    Okay.  There's nothing in your file that

16   Ms. Iaia should have done things quicker, is there?

17       A    She filed timely.

18       Q    She also complied timely with your request for

19   amended charge, correct?

20       A    (Perusing document.)  Yes, sir.

21       Q    Now, your agency, the Florida Commission on

22   Human Relations, traditionally has had a backlog of cases

23   to investigate, isn't that correct?

24       A    Yes.

25       Q    And that was true back in the period of 1994

56

1    through 1997?

2        A    Yes, sir.

3        Q    In fact, isn't it true it was worse back then

4    than it is now?

5            MR. del RUSSO:  Object to the form.

6        Q    You can tell me.

7        A    Well, it's hard to say but I would say it's

8    probably pretty same -- pretty much the same.

9        Q    All right.  And that caused the agency to take

10   longer than 180 days to investigate and process files,

11   correct?

12       A    Absolutely.

13       Q    And is it unusual that it would take your

14   agency up to three to four years during that time frame,

15   '94 through '97, to fully investigate and process files

16   and come back with conclusions?

17       A    I didn't quite catch the word you used?

18       Q    When you say -- it's unusual for a case to take

19   up to three to four years to process and investigate and

20   to come to a conclusion, given the backlog that your

21   agency was experiencing back in 1994 and 1997?

22       A    I think that was probably a little longer --

23       Q    Okay.

24       A    -- but there's certain --

25       Q    But it's unusual for it to take like two years,

57

1    correct?

2        A    I don't really know the average processing time

3    from beginning to end, but I get the general sense that

4    this particular case took longer than most.

5        Q    Would it be a fair statement to say that it was

6    unusual for a file to be fully investigated, processed,

7    and reached conclusions within 180 days of the filing?

8        A    That was virtually impossible.

9        Q    Okay. The delay that occurred in having the --

10    a copy of the charge transmitted to the EEOC, that delay,

11    none of it was attributable to Ms. Iaia's doing, was it?

12        A    Well, that's hard to say. I mean, she's in --

13    it looks like she was in Pembroke Pines and then she was

14    in Boca Raton, and she didn't file with the Miami EEOC.

15    I wouldn't necessarily say it's attributable to her, but

16    certainly it would seem to me that the information to the

17    complainant that she had a federal agency in Miami that's

18    a lot closer than the state counterpart in Tallahassee, I

19    wouldn't say that's attributable to her but it causes me

20    pause to wonder why she didn't file with them.

21        Q    Okay. But I'm asking you, sir, that she filed

22    with your agency, and then your agency had an obligation,

23    under the work sharing agreement, to send a copy of that

24    charge to the EEOC, correct?

25        A    Yes, sir.

58

```
 1        Q    And the delay between the filing of the charge

 2   in November of '94 and actually being sent to the EEOC in

 3   I believe it was 1996, April -- March of 1996 -- none of

 4   that delay is attributable to anything Ms. Iaia did,

 5   correct?

 6        A    That's correct.

 7        Q    Okay.  Now, let me ask you about this work

 8   sharing agreement that Mr. del Russo referred to.  The

 9   work sharing agreement in such form or manner it

10   effects -- was in fact in effect 1994 through 1997,

11   correct?

12             MR. del RUSSO:  Can you repeat that question?

13        I'm sorry.  You're breaking up.  Can you hear him?

14        Can you understand his -- wait, wait, wait, wait,

15        wait, wait.

16        Q    -- work sharing agreement between --

17             THE COURT REPORTER:  Excuse me.

18             THE WITNESS:  You can just turn it down --

19             THE COURT REPORTER:  Yeah.  We're going to turn

20        you down a little bit --

21             MR. HANNAH:  Okay.

22             THE COURT REPORTER:  -- because it sounds like

23        you're real close to the phone.

24             MR. HANNAH:  Do you want me to back up a little

25        bit?  I'm right next to the phone.
```

1                THE COURT REPORTER:  That might help.

2                MR. HANNAH:  Is that better?

3                THE COURT REPORTER:  Yes.  That's much better.

4        Thank you.  If you could repeat that question.

5    BY MR. HANNAH:

6        Q     Yeah.  The work sharing agreement that

7    Mr. del Russo referred to, there was a work sharing

8    agreement in effect between the EEOC and the Florida

9    Commission on Human Relations during the period 1994

10   through 1997, correct?

11       A     It happens on an annual basis so there would

12   have been one from '94 to '95, '95 to '96, and '96 to '97

13   so there would have been three different ones.  But I

14   would feel fairly comfortable in saying that those were

15   pretty much the same in form.

16       Q     Okay.

17       A     I don't know for sure that they were exactly

18   the same, but -- but we didn't get a whole lot of

19   different directions from year to year about what

20   particular things EEOC was going to do and which things

21   we were going to do.

22       Q     Now, one thing that the work sharing agreement

23   did provide for or had provided for is that each of the

24   agencies act as the agent for the other agency for

25   purposes of filing charges, correct?

60

1      A      That's correct.

2      Q      So that when a charge is filed with your agency

3  not only do you file it on behalf of the Florida

4  commission but you also act as the agent for the EEOC in

5  filing on behalf of the EEOC as well, correct?

6      A      That's correct.

7      Q      And that's part of the whole duly filing

8  process, correct?

9      A      Yes, sir.

10     Q      Okay.  And isn't it the position of your agency

11  that when the charge is received and filed by your

12  agency, that it's also deemed as received and filed by

13  the EEOC?

14     A      Is that the same question?

15     Q      Yes.

16     A      Yes, sir.

17     Q      So when your agency filed Jackie Iaia's charge

18  of discrimination on November 9th, 1994, that is also the

19  date it was filed with the EEOC, correct?

20            MR. del RUSSO:  Object to the form.

21     Q      You can answer it.

22     A      Yes, sir.

23     Q      -- work sharing agreement.

24     A      Yes, sir, that's correct.

25     Q      Now, there were some questions asked of about

61

1    the -- about the EEOC sending back the charge as being

2    untimely.  Do you recall that?

3        A    Yes, sir, I do.

4        Q    And the reason you're saying that is because

5    there are some handwritten notes done by -- apparently by

6    Nina Singleton on -- I forget the exhibit -- Exhibit

7    Number 12, Defendant's Exhibit Number 12 on the bottom

8    there where it talks about sent back untimely by EEOC,

9    correct?

10       A    Yes, sir.

11       Q    All right.  That's not the only reason you're

12   saying that, correct?

13       A    Only reason why I'm saying what?

14       Q    Only reason you're saying the EEOC sent it back

15   as untimely, based upon that notation by Ms. Singleton on

16   Exhibit Number 12.

17       A    Yes, sir, that's correct.

18       Q    You don't have any letter, transmittal form, or

19   anything from the EEOC indicating this thing actually

20   being untimely, correct?

21       A    I didn't see anything like that in the file;

22   no, sir.

23       Q    In fact, your agency by communication to

24   Columbia Healthcare Corp. by the date of September 26,

25   1997, which is Defense Exhibit Number 10, indicates that

1   the charge of party has preserved her rights under the

2   Federal Age Discrimination in Employment Act, correct?

3       A    Are you asking me if I would draw that

4   conclusion?

5       Q    Isn't what your agency is doing by sending that

6   to the -- saying -- isn't what they are saying when they

7   send this form, correspondence from the Miami District

8   Office of the EEOC to the respondent?

9       A    Could you go back to that -- which document are

10  you referring to?

11      Q    Exhibit Number 10.

12      A    (Perusing documents.)   Okay.   Now, ask your

13  question.   Sorry.

14      Q    Okay.   Referencing, actually, the second

15  sentence of the first paragraph.

16      A    Okay.

17      Q    Says:   "By virtue of this action, the charging

18  party's private suit rights under the Federal Age

19  Discrimination in Employment Act (ADEA) have been

20  preserved."   Okay.   Would you say that is a correct and

21  accurate conclusion?

22          MR. del RUSSO:   Object to the form.

23      A    Yes, sir.

24      Q    Okay.   And that position was taken because of

25  the fact that there's a work sharing agreement whereby a

1  filing with the Florida commission is considered a filing

2  with the EEOC?

3      A    That's correct.

4          MR. del RUSSO:  Same objection.

5          MR. HANNAH:  Now, Madam Court Report, I had

6      FAX'd some documents.  Do you have those?

7          THE COURT REPORTER:  Hold on.

8          (Brief recess.)

9          MR. HANNAH:  I would like to have the court

10     reporter mark the first two pages -- I think, the

11     first heading is notice of determination:  cause,

12     have that marked as Plaintiff's Exhibit Number 1.

13         MR. del RUSSO:  Plaintiff's 1?

14         (Deposition Exhibit P-1 marked for

15 identification.)

16         MR. HANNAH:  Yeah.  And then have the next

17     three pages which is -- the first page is headed

18     determination:  cause, have that marked as

19     Plaintiff's Exhibit Number 2.

20         (Deposition Exhibits P-2 marked for

21 identification.)

22         MR. HANNAH:  And then have the next two pages,

23     heading investigator's memorandum marked as

24     Plaintiff's Exhibit Number 3.

25         (Deposition Exhibit P-3 marked for

64

1    identification.)

2              MR. HANNAH:  And let me know when you get done.

3              MR. del RUSSO:  Okay.

4    BY MR. HANNAH:

5       Q    All right.  I would like you to take a look at

6    all three of those documents and tell me if those were

7    included in your investigative file of the -- Florida

8    commission's investigative file for Ms. Iaia's case?

9       A    Okay.  I'll start with the first one.

10      Q    First is Plaintiff's Exhibit 1 which is notice

11   of determination:  cause.

12      A    Is that the current copy?

13      Q    Is that -- do you have a copy of that document

14   in the Florida commission's file?

15      A    Yes, sir.

16      Q    Is that the document that's kept in the

17   ordinary course of business of the Florida commission in

18   conjunction with an investigation and findings therein?

19      A    Yes, sir.

20      Q    And same question with regard to Plaintiff's

21   Exhibit Numbers 2 and 3, are those documents contained in

22   the investigative file and the entire file for the

23   Florida Commission on Human Relations for Ms. Iaia's

24   case?

25      A    (Perusing documents.)  That's yes to the second

65

1    one.  (Perusing documents.)  And yes, sir, to the third

2    one.

3        Q    Okay.  And those both are documents kept in the

4    ordinary course of business of the agency?

5            MR. del RUSSO:  Repetitive.

6        A    Yes, sir.

7        Q    And in this particular case, the commission

8    came back with a finding of cause, I believe, that

9    discrimination had occurred on the basis of Ms. Iaia's

10   age, correct?

11       A    Yes, sir.

12       Q    And did you -- were you at all involved in

13   making that determination or was that done by somebody

14   else?

15       A    Done by somebody else.

16       Q    Who was involved in that process?

17       A    Typically, what happens -- and it appears it

18   happened in this case as well -- is that the -- the

19   investigator did an investigation, made a recommendation

20   of cause.  That was sent to the office of the general

21   counsel.  It was reviewed by the -- one of the attorneys

22   in the office of general counsel, and they concurred with

23   the investigator's recommendation, and then it was sent

24   out as determination -- an official determination of

25   cause.

1      Q    Okay.  Now, let me ask you in reference to

2  Plaintiff's Exhibit Number 3, which is the investigative

3  memorandum dated October 23rd, 1998.

4      A    (Perusing documents.)

5      Q    Do you have that in front of you?

6           MR. del RUSSO:  Number 3.

7           THE WITNESS:  Oh, I thought he said yours.

8      A    (Perusing documents.)  Okay.  I got it.

9  BY MR. HANNAH:

10     Q    Can you tell me if there is -- with regard to

11  the findings that were made, the finding that there was

12  discrimination, that they are, in any way at all, based

13  upon the adverse -- based upon any adverse inference

14  taken with regard to the respondent in the case?

15  Certainly take your time and look at it.

16     A    (Perusing document.)  Doesn't look like the

17  investigator relied on the adverse inference letter in

18  order to make a recommendation.

19     Q    And with regard to your file on the matter,

20  there actually was, in fact, a position statement

21  presented by respondent, correct?  Through -- via letter

22  from a Mark Edwards.

23     A    (Perusing documents.)  March 11th, 1998, yes,

24  sir.

25           MR. HANNAH:  Okay.  I don't have any further

1    questions.

2                    REDIRECT EXAMINATION

3    BY MR. del RUSSO:

4        Q    I have a few more, Mr. Cash.  Let's go back to

5    Plaintiff's Exhibit 3, which is the investigator's

6    memorandum.  Mr. Hannah asked you a moment ago if the

7    finding by -- or the recommendation by the investigator

8    was based upon any adverse inference.  What I would like

9    you to do, sir, is look specifically to the very last

10   sentence in that first page and if you could just read

11   that aloud for me, please.

12       A    Second paragraph?

13       Q    Yeah.  The very last sentence.  It runs into

14   the top of the second page.

15       A    You want me to read the whole sentence?

16       Q    Just that sentence, yes, please.

17       A    "Respondent stated that it's [sic] corporation

18   was divested of the facility and it's [sic] asset[t]s in

19   1995 and that documents are limited due to the fact that

20   the corporation no longer owns the facility."

21       Q    Can you tell by the review of your files

22   whether any effort was made to verify the accuracy of

23   that by your investigators?

24       A    Could you ask that again?

25       Q    Sure.  Do you know by reviewing the files

68

1   whether the investigators made any attempt to see if that

2   was true or untrue?

3       A    (Perusing documents.)  Looks like to me that

4   the investigator, when she got the response from the

5   respondent -- and that was March of 1998 -- and that

6   particular letter is where it first said the corporation

7   divested the assets relating to the hospital; therefore,

8   this corporation does not have much information relating

9   to this matter.

10      Q    You're reading from the hospital's response to

11  the charge of discrimination?

12      A    That's right.  The March 1998 response.

13      Q    Now, in doing or conducting its investigation

14  and making its determination, do you know if the

15  investigator relies upon the accuracy of the statements

16  made by the complainant within her submissions?

17      A    Well, I was going to answer your other question

18  first --

19      Q    I'm sorry.  I thought you had.

20      A    No; I wasn't -- no.

21      Q    I'm sorry.

22      A    Because you were asking me whether or not the

23  investigator looked to see if what the respondent stated

24  was accurate.

25      Q    Yes.  With respect to the fact it no longer

1  owned the hospital.

2       A     Well, with respect to that sentence that she

3  put in the investigator's memorandum.  Now, when she put

4  that sentence in that -- in that, her memorandum, it

5  looked like to me she was getting it from that response,

6  which was in March of '98.

7       Q     Okay.

8       A     But in June of '98, when she sent out the

9  adverse inference letter, she specifically asked provide

10 information as to the new owner of Pembroke Pines

11 Hospital and explain whether respondent's company is

12 still the company to whom we should address the issues in

13 this charge.  So it looked like to me that she was trying

14 to verify or at least get additional information with

15 regard to that particular statement.

16      Q     Okay.  Are you through with your answer, sir?

17      A     Yes, sir.

18      Q     Let me go back to the question I started to try

19 to ask you, and that is with respect to the determination

20 process itself.  Do you know if the investigator in his

21 or her investigation relies upon the accuracy of

22 statements made by the complaining party within that

23 party's submissions?

24      A     Are you talking generally?

25      Q     Yes.

1     A    Generally speaking, we would rely on what the

2  complainant says and then give the respondent an

3  opportunity to address those particular allegations.

4     Q    All right.  Would the same also be true with

5  respect to affidavits or documents submitted by third

6  parties, would the investigator rely upon the accuracy of

7  those statements as well?

8     A    Generally, if we get an affidavit -- an

9  affidavit from a third party, and it's signed and

10  notarized, we would consider that to be valid but at the

11  same time we would, during the course of the

12  investigation, give the party to who it's adverse to or

13  possibly adverse to an opportunity to respond to that, or

14  rebut it, or provide additional information.

15     Q    Let me refer you again to Plaintiff's Exhibit

16  3, which was investigator's recommendation.  I want to

17  direct -- do you have it in front of you, sir?

18     A    Hold on one second.  (Perusing documents.)

19  That was the investigator's memorandum?

20     Q    Yes.  Dated October 23, 1998.

21     A    Yes, sir, I have it in front --

22     Q    Can I direct your attention to the second page,

23  specifically the second paragraph which reads:

24  "Respondent stated that two other department heads,

25  Ms. Claudia Jack, and Mr. Ronald Hoffman, were also laid

71

1    off during the reorganization.  They were also over forty

2    years of age."  Would that have been information upon

3    which your investigator relied in formulating her

4    determination in this case?

5            MR. HANNAH:  Object to the form.

6    A    Could you ask your question again?

7    Q    Sure.  Let me rephrase it.  Typically, what is

8    the significance of findings made by an investigator in

9    the investigator's memorandum?

10           MR. HANNAH:  Object to the form.

11   A    Well, generally, the investigator would put in

12   the investigative memorandum those things that they

13   thought were pertinent to the case.

14   Q    And would the investigator, then, be relying

15   upon the accuracy of the information that they cite

16   within their own memorandum for purposes of the opinion

17   or conclusions that they reach?

18   A    I would think so, yes, sir.

19   Q    Let me go back to what I marked as Exhibit 6 to

20   your deposition.  It was the amended charge of

21   discrimination.  And I direct your attention to the

22   paragraph numbered 2, which refers to a Mr. Jerry Sutphin

23   as the person who advised Ms. Iaia that she was being

24   eliminated.  My question to you, sir, is whether your

25   agency files reflect any attempts to contact Mr. Sutphin

72

1  with respect to the decisions he made concerning

2  Ms. Iaia's employment?

3      A    We would not -- as a matter of course, neither

4  an investigator nor the commission, would contact

5  Mr. Sutphin directly.  We would serve the respondent with

6  the charge and then ask them to answer the allegations.

7  If at some point it was determined that Mr. Sutphin was

8  no longer an employee or something, then we may make an

9  attempt to contact him directly.  That's how it would

10  work, generally.

11      Q    So would you, generally, rely upon the

12  respondent to provide information from Mr. Sutphin or

13  from the decision makers with respect to the decision

14  that is being challenged?

15      A    We would.

16      Q    And would that same also hold true if the

17  respondent advised you that they no longer employed the

18  decision maker?

19      A    If they told us that they no longer employed

20  the decision maker, then we should try to get in touch

21  with that person to see if they recall that particular

22  incident, or how it happened, or what happened, or --

23      Q    All right.  And have we seen or have you seen,

24  from reviewing the file today, that the respondent did

25  advise you that it sold the hospital back in 1995?

73

1        A      Yeah.  We read that in the March --

2        Q      All right.

3        A      -- '98 letter.

4        Q      So my question, then, sir, is whether your file

5    then reflects any attempts to contact Mr. Jerry Sutphin

6    by the investigator or by anyone who was making or doing

7    the investigation which effected Ms. Iaia's charge?

8        A      (Perusing documents.)  It looks like the

9    respondent, when they responded initially, addressed that

10   particular offering by the complainant.  She's saying she

11   was terminated because they were closing my department.

12   Well, the respondent specifically addressed why she was

13   no longer working there.

14       Q      All right.

15       A      So it's reasonable that I think the

16   complainant -- I mean, the investigator was satisfied

17   with that particular portion of how the complainant was

18   no longer working there.

19       Q      All right.  But that's not my specific

20   question, Mr. Cash.  My specific question is whether your

21   file reflects any attempts by your office's investigators

22   to contact or attempt to contact Mr. Sutphin?

23       A      I didn't see that anywhere.

24       Q      All right.  Now, Mr. Hannah had asked you

25   earlier whether it was usual or not unusual, giving your

1    backlog of cases, to take three years in which to conduct

2    an investigation.  My question or my last question is a

3    little different, and that is whether it's unusual for

4    there to be a three-year lapse in time between the time a

5    complaint is filed or received by your office and the

6    time that notice is sent to the respondent of the charge

7    of discrimination?

8         A    That is unusual.

9         Q    Have you ever seen a case in the six years that

10   you worked in the agency where there has been a lapse of

11   time similar or longer between the time a complaint is

12   first received by your office and the time that notice of

13   the complaint is sent to the respondent?

14        A    I would say I've seen it before.  And I think

15   it's -- as I recall, it happened more than once or twice,

16   but it's very limited, maybe four or five times.  It

17   seems like every time that's happened it's because of a

18   situation like this where we refer it to the EEOC, and we

19   assume that EEOC is going to take that case, and we don't

20   get any feedback that no; we're not taking it, you need

21   to take it.

22            So it's happened on a few occasions during the

23   years that I've been there, but it's something that we --

24   and it's unfortunate.  But it seems that things are

25   getting better in that regard and we're doing a lot

75

1   better overall in terms of the length that it takes us to

2   investigate cases and the time period between when it

3   comes in and when the respondent gets noticed, which -- I

4   mean, that's of concern to us as well.

5           MR. del RUSSO:  Okay.  That's all I have, sir.

6   Thank you very much.

7           MR. HANNAH:  I don't have any further

8   questions.

9           MR. del RUSSO:  All right.  You have the right,

10          if we order the transcript, to review it, to see if

11          your questions -- answers to the questions are typed

12          up accurately.  And in that instance, you can attach

13          an errata sheet reflecting any changes that you

14          believe accurately set forth your testimony, or you

15          can rely on the accuracy of our court reporter.

16              It's a right that you -- or the commission has,

17          I should say.  And we can't suggest what to do, and

18          you can -- have to tell the court reporter today

19          whether you would like to read the transcript and

20          then sign it with an errata sheet or whether you

21          would like to waive that right.

22          THE WITNESS:  I would like to get a transcript.

23          MR. del RUSSO:  Read and sign, then, ma'am.

24   Okay.  Thank you very much.

25          (Deposition concluded at 1:15 p.m.)

```
1
2                 CERTIFICATE OF ADMINISTERING OATH
3
4   STATE OF FLORIDA:
5   COUNTY OF LEON:
6
7           I, CAROLYN L. RANKINE, Registered Professional
8   Reporter and Notary Public in and for the State of
9   Florida at Large:
10
11          DO HEREBY CERTIFY that on the date and place
12  indicated on the title page of this transcript, an oath
13  was duly administered by me to the designated witness
14  before testimony was taken.
15
16          DATED THIS ____30___ day of August, 2000.
17
18
19          _____
20          CAROLYN L. RANKINE
            Commission #:  CC 469816
21          100 Salem Court
            Tallahassee, Florida 32301
            850/878-2221
22
23  My commission expires:  July 23, 2003
24
25
```



Carolyn L. Rankine
Commission # CC 843731
Expires July 23, 2003
Bonded Thru
Atlantic Bonding Co., Inc.

77

**CERTIFICATE OF REPORTER**

STATE OF FLORIDA:

COUNTY   OF   LEON:


    I, CAROLYN L. RANKINE, do hereby certify that the foregoing proceedings were taken before me at the time and place therein designated; that my shorthand notes were thereafter translated under my supervision; and the foregoing pages numbered 1 through 75 are a true and correct record of the aforesaid proceedings.


    I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor relative or employee of such attorney or counsel, or financially interested in the foregoing action.


    DATED THIS ___30___ day of August, 2000.




CAROLYN L. RANKINE
100 Salem Court
Tallahassee, Florida 32301
850/878-2221

LAWYER'S NOTES

| Page | Line | |
|------|------|--|
| | | |

# ERRATA SHEET

I have read the transcript of my deposition, pages _____ through _____, and hereby subscribe to same, including any corrections and/or amendments listed below.

9-12-00
Date

Signature

| Page | Line | Correction or Amendment | Reason for Change |
|------|------|------------------------|-------------------|
| 34 | 14 | ... intake/docketing ... | not what I said |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

8-14-00
Date of Deposition

Carolyn Raaline
Reporter

LOG OF COMPLAINT ACTIVITY

DATE DUE: 04/13/95

FCHR No. 95-0414                    BASIS: age

EEOC No. 15D971107                  ISSUE: D2 ^ L1

COMPLAINANT(S)                      RESPONDENT(S)

Ms. Jacqueline Iaia                 Columbia Health Care Corp. d/b/a
                                    Pembroke Pines Hospital


ADDRESS                             ADDRESS
1113 S.W. 17th St.                  2301 University Drive

Boca Raton, FL 33486               Pembroke Pines, FL 33024

TELEPHONE                           TELEPHONE

561-750-0099                        305-962-9650

AUTHORIZED REPRESENTATIVE           AUTHORIZED REPRESENTATIVE

                                    Ms. Paula Adamson
                                    Personnel Director

ADDRESS                             ADDRESS

                                    2301 University Drive

                                    Pembroke Pines, FL 33024

TELEPHONE                           TELEPHONE

                                    305-962-9650

DATE        ACTION
11/14/94    FILED
09/26/97    DOCKETED
09/26/97    FCHR NOTICE OF RECEIPT MAILED TO COMPLAINANT
09/26/97    FCHR NOTICE OF FILING MAILED TO RESPONDENT
09/26/97    DUAL FILED WITH EEOC
09/26/97    EEOC NOTICE TO CP + RSP MAILED
09/26/97    EEOC FORM 212, 155 + COPIES OF NOTICES MAILED TO EEOC
09/26/97    DOCUMENT REQUEST LETTER MAILED TO COMPLAINANT
09/26/97    DOCUMENT REQUEST LETTER MAILED TO RESPONDENT
03/07/94    AMENDED



DEPOSITION
EXHIBIT

1

# Florida Commission on Human Relations

Lawton Chiles, Governor
Ronald M. McElrath, Executive Director

January 2, 1998

Columbia Health Care Corp. d/b/a Pembroke Pines Hospital
c/o Mark E. Edwards, Esq.
2501 Park Plaza
Nashville, Tn. 37203

Dear Mr. Edwards:

RE:  JACQUELINE IAIA v. PEMBROKE PINES HOSPITAL
FCHR NO. 95-0414

I am writing to advise you that according to our records,
the Complainant filed her charge on November 14, 1994.  This
is the date which was recorded by the docketing office on the
Log of Complaint Activity in the file.
However, Ms. Iaia's complaint was lost at some point after
the initial filing and had to be re-notarized in July of
1995.

Therefore, please provide a response to the charge and
supporting documentation as soon as possible.

If you have any questions please call me at 850-488-7082
ext. 1029.

Sincerely,

Linda Mathis

Linda Mathis

Investigation Specialist II

DEPOSITION
EXHIBIT
2

00357

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(904) 488-7082 • 1-800-342-8170 (Complaints Only, Voice or TDD)
An Equal Opportunity Employer • Affirmative Action Employer

4

# Florida Commission on Human Relations

Lawton Chiles, Governor
Ronald M. McElrath, Executive Director

June 17, 1998

Ms. Jacqueline Dais
8301 SW 44th Place
Pembroke Pines, FL 33104

FCHR No.: 98-1414

Dear Ms. Dais:

Enclosed is a draft of your amended complaint of employment discrimination which was prepared by me.

In order for the Commission to proceed further with this matter, you must:

1. Review the complaint;

2. Sign the complaint in the designated spaces in the presence of a notary public;

3. Return the signed complaint to this office in the enclosed self-addressed envelope.

I urge you to complete these three steps as soon as possible. If for any reason you decide that you no longer wish to pursue this matter, we would appreciate prompt notification of your intent.

Please do not hesitate to contact me if you have any questions regarding this matter.

Sincerely,

Calvin Calhoun
Intake Counselor

Enclosure



DEPOSITION
EXHIBIT
3

325 John Knox Road • Suite 240 • Building F • Tullahasse, Florida 32303-4149
(904) 488-7082 • 1-800-342-8170 (Complaints Only, Voice or TDD)
An Equal Opportunity Employer • Affirmative Action Employer





**Florida Commission on Human Relations**
325, John Knox Road
Suite 240, Building F
Tallahassee, Florida 32303-4149



Florida Commission on Human Relations
325 John Knox Road
Suite 240, Building F
Tallahassee, Flo... 32303-4149

32303-4149



# CASE MANAGEMENT AND DEVELOPMENT LOG

| CHARGE NUMBER | RESPONDENT | | CHARGING PARTY |
|---|---|---|---|
| 95 0414 | | | TAIA J. |

| DATE | ACTION | ENTERED BY |
|---|---|---|
| 6/26/95 | INTAKE PACKAGE-CHARGE REVIEWED | |
| | -AFFIDAVIT REVIEWED | |
| | ASSIGNED TO UNIT | |
| | RFI-RELEVANT TIME PERIOD | |
| | ① No on ICC | (ACC) |
| "N.V" | ② Charge needs amending perfecting — Then refer to EEOC / Miami! | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

DEPOSITION
EXHIBIT
4
PENGAD-Bayonne, N. J.

INDIVIDUAL COMPLAINT LOG

Intake Counselor: CC

Contact Type: 2

COMPLAINANT
Ms. Jacqueline Iaia
8321 SW 44th Place
Pembroke Pines, Fl 33024    Hm305-475-8496    Wk

CP REPRESENTATIVE
None

RESPONDENT
Columbia Health Care Corp. d/b/a
Pembroke Pines Hospital
2301 University Drive
Pembroke Pines Fl 33024    Ph# 305-962-9650

RSP REPRESENTATIVE
Mr. Bob Newman
Chief Operating Officer
Columbia Health Care Corp.
7975 NW 154th St.,Ste.400A
Hialeah Gardens, FL 33016    Ph# 305-364-1202

Date Rec'd 11 14 94

Date Assnd 11 14 94

Date Filed 11/9/94

FCHR No.: 950414
EEOC No.:

SS# 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

Basis: Age
2nd Basis:
Basis Code: OA

Issue: discharge

Issue Code: D2 ^ T2

DOB: 06/28/48

County: Broward
SMSA: 2680

Viol.Date: 05 11 94

SUSPENSE:  Due 07/26/95

DEPOSITION
EXHIBIT
5

Intake Exits:

To Docketing  7/13/95    Ref'l by Mail [EEOC/HUD_____

Inability to Contact_____    WD_____    FTR_____

No Juris._____    No HRA Viol._____    Tech.Assist._____

Intake Checklist:

____ # of Employees    ____Timeliness    ____S/A info.

____TVII    ____N-TVII    __X__ADEA    ____Housing

____CP was counseled    ____FCHR Process Discussed

Has this complaint been filed with another agency?    ____yes ____no

If so, Which agency?_____

NOTES:  Attempts/Contact with Complainant

6/26/95 Case returned from Docketing for ICL & Perfection of Charge/Waive.

* 7/10/95 Amended Charge returned undelivered/called phone # Lf mssg.
on machine to return call ASAP (7/13/95)

7/13/95 Gentleman at Home # CP gave sd that she don't live there anymore
but he relayed the mssg. to her. — Return call @ 1700 hrs.

18

FLORIDA COMMISSION ON HUMAN RELATIONS
325 John Knox Road, Suite 240, Building F
Tallahassee, Florida 32399-1570

AMENDED

| CHARGE OF DISCRIMINATION | FCHR No. |
|---|---|
| CC | 95-0414 |

| Name (Indicate Mr., Ms., or Mrs.) | Telephone No. (area code) |
|---|---|
| Ms. Jacqueline Iaia | |

| Street Address | Home |
|---|---|
| ~~8881 SW 18th Place~~  1115 SW 17 St | ~~305-475-3486~~  407-750-0099 |

| City, State, and Zip Code | Work (if possible to call you there) |
|---|---|
| ~~Pembroke Pines, Fl 33024~~  Boca Raton, Fl. 33486 | |

List the employer, labor organization, employment agency, apprenticeship committee, government agency, or other person who discriminated against you.

| Name | No. of Employees | Telephone No. (area code) |
|---|---|---|
| Columbia Health Care Corp. d/b/a Pembroke Pines Hospital | 15+ | 305-962-9650 |

| Street Address | City, State and Zip Code | County |
|---|---|---|
| 2301 University Drive | Pembroke Pines, Fl 33024 | Broward |

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box[es])
☐ RACE  ☐ COLOR  ☒ SEX  ☐ RELIGION  ☐ HANDICAP
☐ NATIONAL ORIGIN  ☒ AGE  ☐ MARITAL STATUS  ☐ RETALIATION

DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month, day, year)  05/11/94

THE PARTICULARS ARE (If additional space is needed, attach extra sheet[s].)

I.  PERSONAL HARM
On May 11, 1994, I was terminated from my position as a Director of Marketing/Public Relations. Prior to this time I was given different terms and conditions of my employment. I have been employed for 20 years.

II.  RESPONDENT'S REASON FOR ADVERSE ACTION
Mr. Jerry Sutphin, Executive Director, told me that I was being terminated because they were closing my department due to the necessity of the company to downsize.

III.  DISCRIMINATION STATEMENT
I believe I have been discriminated against because of my Age (46 years old) in violation of the Florida Civil Rights Act of 1992 and the Age Discrimination in Employment Act.

I REQUEST THE FULL RELIEF TO WHICH I AM ENTITLED, UNDER THE LAW(S).

1995 JUL 29  PM 3 52

DEPOSITION
EXHIBIT
6

I will advise the agency if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT  DATE 7/25/95

NOTARY — (Required for Filing)
SUBSCRIBED AND SWORN TO BEFORE ME

ANGELA V. MOORE
MY COMMISSION # CC396952 EXPIRES
August 5, 1998
BONDED THRU TROY FAIN INSURANCE, INC.

25  OF  July  19 9

# STATE OF FLORIDA
# Florida Commission on Human Relations

*Lawton Chiles, Governor*
*Ronald M. McElrath, Executive Director*

March 20, 1996

Ms. Jacqueline Iaia
1113 S.W. 17 Street
Boca Raton, Florida 33486

Dear Ms. Iaia:

Re: FCHR No. 95-0414

The Florida Commission on Human Relations is in receipt of your complaint of employment discrimination. Your complaint has been referred to the following agency:

Miami District Office
Equal Employment Opportunity Commission
One Biscayne Tower
2 South Biscayne Blvd., Suite 2700 (27th Floor)
Miami, Florida 33131

Your complaint of discrimination will be processed by the above-named agency pursuant to the Age Discrimination in Employment Act and/or the Americans with Disabilities Act. The Florida Commission on Human Relations will refrain from commencing an investigation into your complaint while it is before the EEOC. Within 35 days of notice of EEOC's Letter of Determination regarding the above-referenced complaint, you may request the Commission to review the final finding and orders of the EEOC and accord them substantial weight in determining whether or not reasonable cause exists to believe that the allegations made in your complaint are true.

You are therefore encouraged to cooperate fully with the EEOC. The EEOC's regulations require that you keep them informed of any change in address or telephone number and that you advise them of any prolonged absence from your current address. Your cooperation in this matter is essential.

Sincerely,



Ronald M. McElrath

RMM/nw
cc: Columbia Health Care Corp. d/b/a
     Pembroke Pines Hospital

DEPOSITION
EXHIBIT
7

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(904) 488-7082 • 1-800-342-8170 (Complaints Only, Voice or TDD)
*An Equal Opportunity Employer • Affirmative Action Employer*



EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

DATE  **3-20-96**

EEOC CHARGE NO. _____

706 AGENCY
CHARGE NO.  **95-0414**

To: Miami District Office
United States Equal Employment Opportunity Commission
One Biscayne Tower, Suite 2700
2 South Biscayne Boulevard
Miami, Florida 33131

SUBJECT: CHARGE TRANSMITTAL  *Jacqueline Iaia*          Re: *Columbia Health Care Corp.*
                                    *(Charging Party)*              *d/b/a Pembroke Pines Hospital*
                                                                        *(Respondent)*

Transmitted herewith is a charge of employment discrimination initially received by the:

[ ] EEOC   [x] Florida Commission on Human Relations.   *11-14-94*
                    *(Name of 706 Agency)*              *(Date of Receipt)*

[X] Pursuant to the work-sharing agreement, this charge is to be initially processed by the EEOC.

[ ] Pursuant to the work-sharing agreement, this charge is to be initially processed by the 706 Agency.

[ ] The work-sharing agreement does not determine which agency is to initially process the charge.

    [ ] EEOC requests a waiver      [x] 706 Agency waives

    [ ] No waiver requested        [ ] 706 Agency will process the charge initially

Please complete the bottom portion of this form to acknowledge receipt of the charge and, where appropriate, to indicate whether the 706 Agency will initially process the charge.

| NAME OF EEOC OR 706 AGENCY DIRECTOR | SIGNATURE |
|---|---|
| Ronald M. McElrath, Executive Director | *Ronald M. McElrath* |

_____   V.   _____
          *(Charging Party)*                          *(Respondent)*

To whom it may concern:

[ ] This will acknowledge receipt of the referenced charge and indicate this Agency's intention to initially process the charge.

[ ] This will acknowledge receipt of the referenced charge and indicate this Agency's intention not to initially process the charge.

[ ] This will acknowledge receipt of the referenced charge and indicate this Agency's intention to dismiss/close/not docket the charge for the following reason: _____

_____

| PRINTED NAME OF EEOC OR 706 AGENCY DIRECTOR | SIGNATURE |
|---|---|
| Federico Costales |  |

TO:

DATE _____

EEOC CHARGE NO. _____

706 AGENCY CHARGE NO. _____

STATE OF FLORIDA

# Florida Commission on Human Relations

*Lawton Chiles, Governor*
*Ronald M. McElrath, Executive Director*

NOTICE OF FILING OF
COMPLAINT OF DISCRIMINATION

September 26, 1997

Columbia Health Care Corp. d/b/a
  Pembroke Pines Hospital
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, FL 33024

Dear Sir or Madam:

                    Re:  Iaia v. Columbia Health Care Corp. d/b/a
                         Pembroke Pines Hospital
                         FCHR No. 95-0414

YOU ARE HEREBY NOTICED that the enclosed Charge of Employment Discrimination
has been filed against your company or organization.

The charge was filed under one or more of the following laws:  (a) The
Florida Civil Rights Act of 1992, as amended (Chapter 760, Florida Statutes);
(b) Title VII of the Civil Rights Act of 1964, as amended; (c) The Age
Discrimination in Employment Act (ADEA); and/or (d) The Americans with
Disabilities Act (ADA).

You are advised that the law prohibits retaliation against any person for
making a complaint, testifying, assisting or participating in an investigation,
proceeding, or hearing on an alleged unlawful employment practice.

In connection with the investigation of the above-referenced complaint of
discrimination, you are invited to attend and participate in a Mediation
Conference in an effort to expeditiously and amicably resolve this dispute.
The mediation process is offered as an alternative to investigation of this
complaint.  FCHR's mediation process is designed to allow the parties to
resolve this matter in a voluntary and informal process at the earliest stage
possible.  The mediation process is described in detail in the enclosed Fact
Sheet.  It is our experience that mediation results in reduced costs, avoids
protracted investigatory procedures, and leads to early resolutions in a
non-adversarial proceeding.

If you are agreeable to participating in a Mediation Conference, please call
the FCHR Mediation Coordinator, at 904/488-7082, no later than ten (10)
days of your receipt of this letter.  At the time of your call, please be
prepared to furnish a telephone number where you can be reached between
the hours of 8:00 a.m. and 5:00 p.m., Monday through Friday.

DEPOSITION
EXHIBIT
8

Notice of Filing, FCHR No. 95-0414
Page Two

In the event you decide not to participate in the mediation process, pursuant
to the provisions of Commission Rule 60Y-5.003, Florida Administrative Code,
please furnish in writing the information and documents requested on the
enclosed list.  Such information must be furnished within twenty-one (21) days
of the receipt of this letter.  In the event you have received this letter and
you are not the authorized representative for this company or organization,
please forward this correspondence to such person immediately.  Also, the
enclosed "Affidavit to Authenticate Documents" should be completed and
returned along with the information and documents requested.

The Document Request has been tailored to obtain relevant and necessary
information to evaluate the factual allegations made in the complaint of
discrimination.  You are advised that failure to provide the requested
information may result in either adverse findings or the Commission may
invoke its subpoena and enforcement powers.  You are therefore urged
to respond completely to each item of this Request for Information.
YOU ARE ADVISED THAT THIS IS AN INITIAL INVESTIGATIVE INQUIRY AND
ADDITIONAL INFORMATION MAY BE REQUIRED IN THE FUTURE.

When corresponding with this Commission concerning this matter, please
refer to FCHR No. 95-0414 and EEOC No. 15D971107.

                                    Sincerely,

                                    Otis B. Mallory
                                    Manager, Employment Investigation Unit

        OBM/nw

Enclosure

**Miami District Office**

1 Biscayne Tower, Suite 2700
2 South Biscayne Boulevard
Miami, FL 33131-1805
PH: (305) 536-4491
TDD: (305) 536-5721
FAX: (305) 536-4011

EEOC No. 15D971107
FCHR No. 95-0414
CHARGE FILING DATE: 11/14/94

Columbia Health Care Corp. d/b/a
Pembroke Pines Hospital
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, FL 33024

   Re: Iaia v. Columbia Health Care Corp. d/b/a
     Pembroke Pines Hospital

The EEOC has received and filed a copy of an age discrimination
charge filed with the Florida Commission on Human Relations. By
virtue of this action, the charging party's private suit rights
under the Federal Age Discrimination in Employment Act (ADEA) have
been preserved.

Unless you request otherwise, or unless the charging party
requests action by the Commission, we plan no action regarding
this charge under the ADEA, pending receipt of the results of
the Florida Commission's actions.

This Commission maintains a close working relationship with
state and local enforcement agencies with respect to the
settlement of charges of employment discrimination. Therefore,
we strongly encourage your cooperation with Florida state
officials on this matter.

Date: 09/26/97

SL-ADEA-N-2
6-82

## FLORIDA COMMISSION ON HUM

325 John Knox Road, Suite 240, Bldg.
Tallahassee, Florida 32399-157

*Please type in on the charge of discrimination.*
*Also my Social Security # 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 and Date of Birth 6/28/48*
*thanks!    Jacqueline Iaia*

FCHR 95-0414

| CC | CHARGE OF DISCRIMINATION |
|---|---|

**Name (Indicate Mr., Ms., or Mrs.)**
Ms. Jacqueline Iaia

**Street Address**
~~8321 SW 44th  Place~~    1113 SW 17 St.

**City, State, and Zip Code**
~~Pembroke Pines, Fl 33024~~    Boca Raton, Fl. 33486

List the employer, labor organization, employment agency, apprenticeship committee, governmental agency, or other person who discriminated against you.

| Name | No. of Employees | Telephone No. (area code) |
|---|---|---|
| Columbia Health Care Corp. d/b/a Pembroke Pines Hospital | 15+ | 305-962-9650 |

| Street Address | City, State and Zip Code | County |
|---|---|---|
| 2301 University Drive | Pembroke Pines, Fl 33024 | Broward |

**CAUSE OF DISCRIMINATION BASED ON (Check appropriate box[es])**
☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ HANDICAP
☐ NATIONAL ORIGIN   ☒ AGE   ☐ MARITAL STATUS   ☐ RETALIATION

**DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE**
(month,day,year)    05/11/94

THE PARTICULARS ARE (If additional space is needed, attach extra sheet[s])

**I.   PERSONAL HARM**
On May 11, 1994, I was terminated from my position as a Director of Marketing/Public Relations.  Prior to this time I was given different terms and conditions of my employment.  I have been employed for 20 years.

**II.   RESPONDENT'S REASON FOR ADVERSE ACTION**
Mr. Jerry Sutphin, Executive Director, told me that I was being terminated because they were closing my department due to the necessity of the company to downsize.

**III.   DISCRIMINATION STATEMENT**
I believe I have been discriminated against because of my Age (46 years old) in violation of the Florida Civil Rights Act of 1992 and the Age Discrimination in Employment Act.

I REQUEST THE FULL RELIEF TO WHICH I AM ENTITLED, UNDER THE LAW(S).

I will advise the agency if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

| SIGNATURE OF COMPLAINANT | DATE |
|---|---|
| Jacqueline Iaia | 7/25/95 |

**NOTARY –   (Required for Filing)**
SUBSCRIBED AND SWORN TO BEFORE ME

ANGELA V. MOORE
MY COMMISSION # CC396952 EXPIRES
August 5, 1998
BONDED THRU TROY FAIN INSURANCE, INC.

25  OF  July  19 95

AFFIDAVIT TO
AUTHENTICATE DOCUMENTS

1. **TRUE AND CORRECT COPIES**

I (We),_____
                    (Name(s) of custodian(s) of records)

_____, _____,
                            (Title(s) of such person(s))

after being duly sworn, hereby attest that the attached documents are true and

correct copies of the originals maintained by _____

_____
        (Name of Respondent or Entity Keeping Documents)

_____
        (Name of Section(s) or Division(s) Maintaining Records)

                        _____
                        Signature(s) of Custodian(s)

Sworn to and Subscribed before me this

_____ day of _____ 19_____.

_____
        Notary Public

My Commission Expires:_____

2. **ACCURACY OF ORIGINAL DOCUMENTS**

I (We) _____
        (Name of person(s) generating documents or person(s) familiar with

events reflected in documents) _____
                                (Title(s) of such person(s))

after being duly sworn, hereby attest that the originals of the attached docu-

ments accurately reflect the events recorded on them.

                        _____
                        Signature(s) of Originator(s)

Sworn to and Subscribed before me this

_____ day of _____ 19_____.

_____
        Notary Public

My Commission Expires:_____

Document/Information Request
FCHR No. 95-0414

1.  What  is  the corporate legal  name of your company or agency?

2.  Describe   your   business operations  or  agency  functions.

   (If  you  have  had less than 15 employees for each workday in each of
20 or more calendar weeks in the current or preceding calendar year, the
complaint may be dismissed for lack of jurisdiction.  If you claim less
than 15 employees, you must submit copies of your payroll records, a sworn
statement that you do not have interrelated operations with other entities,
and copies of your most recent IRS Form 940 or 941 and LES Form UCT-6 and
UCT-6W.  Do not proceed further if you have less than 15 employees.)

3.  Submit a statement that thoroughly addresses your position regarding
the events alleged by Complainant.  Provide a direct response to each
allegation as stated on the complaint. Include any additional information
and explanation you consider relevant to the complaint.

4.  Provide  sworn statements or  affidavits  from  the  officials who were
responsible for the actions taken which led to this complaint, explaining
why they deemed the actions necessary.  Send sworn statements from other
individuals who can verify the facts in support of your position.

5.  Provide copies of  documents  from official records in support of your
position.  Include copies of relevant personnel action forms and memoranda
from the personnel files of Complainant and any comparatives.

6.  Send copies of appropriate sections of written rules, policies and
procedures or portions of policy manuals or employee handbooks which relate
to the issues raised in  the  complaint.  Provide an explanation for any
unwritten policies  or  established  practices which apply to the issues.

7.  Give your  total number of  employees  at  the  facility  where
Complainant was employed, with a breakdown by race (white, black, Hispanic,
Asian, American Indian)  and  gender  (male and female).  Your latest EEO-1
report may be sent to meet this requirement.  If this complaint is based on
disability, send the total number  of employees with known disabilities and
omit race and gender.

8.  If the complaint was based on a disability, pregnancy, or religion,
indicate what  efforts  were  made  to  accommodate  the condition/basis.
If no accomodation was made, please explain why.

   NOTE:  "Current year" means the calendar year during which the most
recent personal harm occurred.

   NOTE:  You are invited to submit any proposal that might be considered
for  resolution  of this  complaint.  This may be  done now or at any time
during the  investigation  of this  complaint.

LEGAL EMPLOYMENT OPPORTUNITY COMMISSION

*JACQUELINE IATH*

THIS PERSON (CHECK ONE)
☐ CLAIMS TO BE AGGRIEVED
☐ IS FILING ON BEHALF OF ANOTHER

Columbia Health Care Corp.
d/b/a Pembroke Pines Hospital
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, Fl 33024

DATE OF ALLEGED VIOLATION
Earliest  /  /     Most Recent  /  /

PLACE OF ALLEGED VIOLATION

EEOC CHARGE NUMBER
15D971107

FEPA CHARGE NUMBER
95-0444

# NOTICE OF CHARGE OF DISCRIMINATION  IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS
*(See attached information sheet for additional information)*

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

☐ Title VII of the Civil Rights Act of 1964
☒ The Age Discrimination in Employment Act of 1967 (ADEA)
☐ The Americans with Disabilities Act

HAS BEEN RECEIVED BY

☐ The EEOC and sent for initial processing to _____
    Florida Commission on Human Relations                      *(FEP Agency)*
☒ The ___325 John Knox Road_____ and sent to the EEOC for dual filing purposes.
    Suite 240, Building *(agency)*
    Tallahassee, Florida 32303-4149

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

☐ As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency.. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

☐ An Equal Pay Act investigation (29 U.S.C. 206(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.
☒ Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NAT. ORIGIN  ☒ AGE  ☐ DISABILITY  ☐ RETALIATION  ☐ OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

Discharge/Layoff

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|---|---|---|
| 9-26-97 | Federico Costales Director | |

EEOC FORM 131-A (Rev. 06/92)

RESPONDENT'S COPY

The Florida Commission on Human Relations (FCHR) schedules mediation conferences for new complaints of employment discrimination pursuant to Sections 760.06(5) and 760.11(11) of the Florida Civil Rights Act of 1992. Mediation is a process in which an impartial person, the mediator, helps the parties to resolve their dispute. The mediator may suggest ways of resolving the dispute but does not make any judgement.

The purpose of the mediation conference is to provide for the exchange of concerns from both parties and to work toward a possible resolution of the dispute. This informal conference is an opportunity for the Complaining Party and the employer (Respondent) to resolve their dispute prior to the Commission's investigation.

The FCHR provides an impartial Commission representative to (1) conduct the mediation process, (2) conduct on-site mediation of complaints in accordance with appropriate procedures, and (3) issue and maintain all appropriate documents in accordance with all statutory and procedural requirements. In accordance with the Commission's rules, all communications at the conference are confidential.

## POSSIBLE OUTCOMES

1. The parties may enter into a Settlement Agreement prior to or during the conference. If the parties reach a settlement and execute a written agreement disposing of the dispute, the agreement is binding and enforceable in the same manner as any other written contract.

2. The mediator may declare that further efforts at mediation are no longer worthwhile. If the parties fail to resolve voluntarily the dispute, the case will be assigned to an investigator for a thorough investigation of the merits of the complaint. A finding will then be made based on an examination of the evidence.

3. The parties may complete the full mediation session, at which time a written declaration of either party will be made to the effect that the mediation proceedings are terminated.

## ~ COMPLAINANT ~

o It is suggested that you bring any information that you wish to present at the conference concerning the reason(s) you believe discrimination occurred. Limit your statements to the issues raised in your complaint.

o Be prepared to state what you are requesting from the Respondent. An itemized statement of losses would be helpful. Be prepared to consider various ways to resolve the complaint.

## ~ RESPONDENT ~

o It is suggested that you bring any information which would support your position. Respondent's representatives must have the authority to settle and all persons necessary to the decision to settle should be present. They should have direct knowledge of the events and circumstances cited in the complaint. The names and addresses of such persons shall be communicated in writing to the Mediation Specialist.

## OTHER IMPORTANT POINTS

o Mediation sessions are private and confidential. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

o There shall be no stenographic record of the mediation process and no person shall tape record any portion of the mediation session.

o No subpoenas, summons, complaints, citations, writs, or other process may be served upon any person at or near the site of any mediation session upon any person entering, attending or leaving the session.

o If mediation efforts are not successful within thirty (30) days of the complaint being referred to the Mediation Specialist, the case will be forwarded to appropriate Commission personnel for conducting an investigation.

o Pursuant to the Florida Civil Rights Act of 1992, it is unlawful employment practice to retaliate or discriminate against a person who has opposes a discriminatory practice or who has made or filed a complaint, testified, assisted or participated in any manner in an investigation, proceeding or hearing under this Act.

LOG OF COMPLAINT ACTIVITY

DATE DUE: 04/13/95

FCHR No. 95-0414                        BASIS: age

EEOC No. 15D971107                      ISSUE: D2 ^ L1

COMPLAINANT(S)                          RESPONDENT(S)

Ms. Jacqueline Iaia                     Columbia Health Care Corp. d/b/a
                                        Pembroke Pines Hospital


ADDRESS                                 ADDRESS
1113 S.W. 17th St.                      2301 University Drive

Boca Raton, FL 33486                    Pembroke Pines, FL 33024

TELEPHONE                               TELEPHONE

561-750-0099                            305-962-9650

AUTHORIZED REPRESENTATIVE               AUTHORIZED REPRESENTATIVE

                                        Ms. Paula Adamson
                                        Personnel Director

ADDRESS                                 ADDRESS

                                        2301 University Drive

                                        Pembroke Pines, FL 33024

TELEPHONE                               TELEPHONE

                                        305-962-9650

DATE        ACTION
11/14/94    FILED
09/26/97    DOCKETED
09/26/97    FCHR NOTICE OF RECEIPT MAILED TO COMPLAINANT
09/26/97    FCHR NOTICE OF FILING MAILED TO RESPONDENT
09/26/97    DUAL FILED WITH EEOC
09/26/97    EEOC NOTICE TO CP + RSP MAILED
09/26/97    EEOC FORM 212, 155 + COPIES OF NOTICES MAILED TO EEOC
09/26/97    DOCUMENT REQUEST LETTER MAILED TO COMPLAINANT
09/26/97    DOCUMENT REQUEST LETTER MAILED TO RESPONDENT
~~03/07/94  AMENDED~~

---------------------------------------------------------------

*[handwritten, illegible]*

---------------------------------------------------------------

---------------------------------------------------------------

DEPOSITION
EXHIBIT
9

10/06/97 66 Assessed - ..ditional investigation neeⵣd

No response from Resp in file. Docketed: 9-26-97.
Did not go to mediation unit (ADEA case).
10/09/97 53 Documentation rcvd from Resp/Rep
10/09/97  DB
Rec'd notice of appearance.
10/15/97 50 Phone call recvd from Cp/Rep
10/15/97  JC
CP called this date and we discussed negotiations - CP stated that she notified Nina on
10-1-97 for negotiations.

CASE ACTIVITY LOG

FCHR NO. 95-0414

JACQUELINE IAIA

11/18/97 Case assigned to investigator.

11/21/98 Initial contact letter sent to Cp.

12/1/98 Cp called and we talked about her case.

3/18/98 Sent document request to Respondent.  Called Mark Edwards office and they said that Respondent no longer owns the hospital but is still rresponsible for this case and the liabilities.  The assetts were sold to another company in 1995.

6/17/98 Sent adverse inference letter to Respondent to get initial response.

6/23/98 Talked with Cp g gave status report.

7/27/98 Sent affidavit to Connie Viera, one of Cp's witnesses.

9/8/98 Received letter from Respondent, still have not received any personnel documentation on either Cp or Ms. MOntero.  Respondent's rep stated that they still can not get anything from the hospital.

10/13/98 Submitted Ip to Ron Snell for approval.

10/20/98 Ip approved.

10/23/98 Called cp and left message for her to call me.

10/23/98 Im submitted to Case Review Team.

Miami District Office

1 Biscayne Tower, Suite 2700
2 South Biscayne Boulevard,
Miami, FL 33131-1905
PH: (305) 536-4491
TDD: (305) 536-5721
FAX: (305) 536-4011

EEOC No. 15D971107
FCHR No. 95-0414
CHARGE FILING DATE: 11/14/94

Columbia Health Care Corp. d/b/a
Pembroke Pines Hospital
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, FL 33024

    Re:  Iaia v. Columbia Health Care Corp. d/b/a
         Pembroke Pines Hospital

The EEOC has received and filed a copy of an age discrimination
charge filed with the Florida Commission on Human Relations.  By
virtue of this action, the charging party's private suit rights
under the Federal Age Discrimination in Employment Act (ADEA) have
been preserved.

Unless you request otherwise, or unless the charging party
requests action by the Commission, we plan no action regarding
this charge under the ADEA, pending receipt of the results of
the Florida Commission's actions.

This Commission maintains a close working relationship with
state and local enforcement agencies with respect to the
settlement of charges of employment discrimination.  Therefore,
we strongly encourage your cooperation with Florida state
officials on this matter.

Date: 09/26/97

SL-ADEA-N-2
6-82

DEPOSITION
EXHIBIT
10

000375

(                    , 10, 1997)

CHL No. 95-0414

d as the

p) Office,

fling this

affidavt

not go

receipt

FLORIDA    COMMISSION    ON    HUMAN RELATIONS
325 John Knox Road, Suite 240, Building F
Tallahassee, Florida 32399-1570

*FILED*
FLORIDA COMMISSION ON
HUMAN RELATIONS

*media 11/7/94*

| CHARGE OF DISCRIMINATION | 1997 SEP 12 PM | FCHR No. 3-51 |
|---|---|---|

Name (Indicate Mr., Ms., or Mrs.)
**JACQUELINE IAIA**

Telephone No. (area code)
**305   425-8496**

Street Address
**8321 SW 44 PLACE**

Home
~~No~~ *As Above*

City, State, and Zip Code
**DAVIE, FL.   33328**

Work (if possible to call you there)
**NA**

list the employer, labor organization, employment agency, apprenticeship committee, government agency, or other person who discriminated against you.

Name
**Pembroke Pines Hospital**

No. of Employees
**350 ?**

Telephone No. (area code)
**(305) 962-9650**

Street Address
**8301 University Dr.**

City, State and Zip Code
**Pembroke Pines, FL. 33024**

County

CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es))

☐ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ HANDICAP
☐ NATIONAL ORIGIN   ☒ AGE   ☒ MARITAL STATUS   ☒ RETALIATION

DATE MOST RECENT OR CONTINUING
DISCRIMINATION TOOK PLACE
(month, day, year)
**5/11/94**

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s))

*I was employed by Pembroke Pines Hospital /
Columbia as Director of Public Relations / marketing.
with an annual salary of $42,044. Additionally
I had a lucrative retirement plan, pension
program, medical, dental & life insurance
and lengthy vacation benefits I was laid off &
subsequently terminated due to the downsizing of
the Public Relations / Marketing department. Two days
after my layoff an announcement was made that
a younger female coworker was promoted to
the Public Relations Director (in addition to her*

I will advise the agency if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

SIGNATURE OF COMPLAINANT
*Jacqueline Iaia*

DATE
**11/4/94**

NOTARY –    (Required for Filing)
SUBSCRIBED AND SWORN TO BEFORE ME

*7th  of November  94*

## FILE TRANSMITTAL FORM
### (Attach this form to all files being left for revision) –

TO:       NINA SINGLETON, INTAKE MANAGER

FROM:     _Joe Cash_

DATE:     _9-15-97_

FCHR#:    _950414_

NAME:     _Laia, Jacqueline_

---

**Attached is the above-referenced case which is being returned to you for the following action:**

_As discussed, info (complaint, etc) from ₵ is attached._
_System shows waived 3-20-96._

_561/750-0099 Call her w/status_
_Mail her duplicates back_
_Address: 1113 S.W. 17th St. Boca Raton FL 33486_

**After action is complete please:**

_____    Return to me

_____    Assign to Unit #_____

_____    File in Intake Closures

_____    Forward to the Clerk to file in closed files

_____    Other action: _____

          _____

          _____

          _____

          _____

DEPOSITION
EXHIBIT
12

INDIVIDUAL COMPLAINT LOG

Intake Counselor: NS

Contact Type: 2

Date Rec'd 11 14 94

Date Assnd 09 24 97

Date Filed 11-14-94

COMPLAINANT
Ms. Jacqueline Iaia
1113 S.W. 17th St.
Boca Raton, FL 33486    Hm561-750-0099    Wk

FCHR No.: 950414
EEOC No.: -15D971107

SS# 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

CP REPRESENTATIVE
None

Basis: Age
2nd Basis:
Basis Code: OA

RESPONDENT
Columbia Health Care Corp. d/b/a
Pembroke Pines Hospital
2301 University Drive
Pembroke Pines FL 33024    Ph# 305-962-9650

Issue: discharge

Issue Code: D2 ^ L1

DOB: 06/28/48

RSP REPRESENTATIVE
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, FL 33024    Ph# 305-962-9650

County: Broward
SMSA: 2680

Viol.Date: 05 11 94

SUSPENSE

Intake Exits:

To Docketing    09/24/97    Ref'l by Mail [EEOC/HUD] _____

Inability to Contact_____ WD_____ FTR_____

No Juris._____ No HRA Viol._____ Tech.Assist._____

Intake Checklist:

_____# of Employees    _____Timeliness    _____S/A info.

_____TVII    _____N-TVII    _____ADEA    _____Housing

_____CP was counseled    _____FCHR Process Discussed

Has this complaint been filed with another agency?    _____yes    _____no

If so, Which agency?_____

NOTES:    Attempts/Contact with Complainant

Waived 3/20/96?    EEOC did not investigate.    Need to docket.

*make copies CP wants her original paperwork back*

DEPOSITION
EXHIBIT
13
FISCAB-Bayonne, N.J.

11

# STATE OF FLORIDA
# Florida Commission on Human Relations

*Lawton Chiles, Governor*
*Ronald M. McElrath, Executive Director*

November 21, 1997

Ms. Jacqueline Iaia
1113 SW 17th St.
Boca Raton, fl. 33486

Dear Ms. Iaia

RE: IAIA v. COLUMBIA HEALTH CARE CORP. d/b/a PEMBROKE PINES
HOSPITAL
FCHR NO: 95-0414

I am writing to let you know that your case has been
assigned to me for investigation.  I will be reviewing your
case file to see what additional information is needed and
will contact you by phone or by mail at a later date should
further information be required.

If you have any questions about your case, please call me at
904-488-7082 ext. 1029 and I will be happy to answer any
questions you may have.

Sincerely,


Linda Mathis

Investigation Specialist II



DEPOSITION
EXHIBIT
14

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(904) 488-7082 • 1-800-342-8170 (Complaints Only, Voice or TDD)
An Equal Opportunity Employer • Affirmative Action Employer

8

STATE OF FLORIDA
# Florida Commission on Human Relations

*Lawton Chiles, Governor*
*Ronald M. McElrath, Executive Director*

6/17/98

Pembroke Pines Hospital
ESQ. Mark E. Edwards
2501 Park Plaza
Nashville , Tennessee 37203

Re:  Iaia  v.  Pembroke Pines Hospital
FCHR No. 950414
EEOC No. 15D971107#

Dear Sir or Madam:

A request for information relative to the above referenced complaint of employment discrimination was issued to your office when the complaint notice was sent to you, with a request that the information be furnished within 21 days.  To date, the requested information has not been received.

Please understand that the requested information is deemed critical to the resolution of this matter and must be submitted to enable the Commission to reach a determination that is based on a fair analysis of evidence submitted by both parties. It is also the desire of the Commission to complete the investigation in a timely manner.

Therefore, please be advised that the requested information must be provided no later than ten days from your receipt of this letter.  If the information is not received by that date, an inference will be drawn that the information sought is adverse to your interests, in accordance with Rule 60Y-5.003(4), Florida Administrative Code.

If you have received an extension for providing the information, please disregard this letter.

Respectfully,

Otis B. Mallory, Manager,
    Employment Investigations Unit



DEPOSITION
EXHIBIT
15

SUPPLEMENTAL DOCUMENT REQUEST

JACQUELINE IAIA
FCHR NO. 95-0414

Please provide the following information:

1.  Provide a copy of Ms. Iaia's personnel file and the personnel file of Monique Monteiro.

2.  Provide a list of all management employees (department heads) who were discharged at or near the same time as Complainant and provide their date of birth.

    3.  Please explain what duties Complainant was unable to perform of the Senior Friends position.

4.  Provide information as to the new owner of Pembroke Pines Hospital and explain whether Respondent's company is still the company to whom we should address the issues in this charge.



Document/Information Request
FCHR No. 95-0414 ·

1. What is the corporate legal name of your company or agency?

2. Describe your business operations or agency functions.

(If you have had less than 15 employees for each workday in each of 20 or more calendar weeks in the current or preceding calendar year, the complaint may be dismissed for lack of jurisdiction. If you claim less than 15 employees, you must submit copies of your payroll records, a sworn statement that you do not have interrelated operations with other entities, and copies of your most recent IRS Form 940 or 941 and LES Form UCT-6 and UCT-6W. Do not proceed further if you have less than 15 employees.)

3. Submit a statement that thoroughly addresses your position regarding the events alleged by Complainant. Provide a direct response to each allegation as stated on the complaint. Include any additional information and explanation you consider relevant to the complaint.

4. Provide sworn statements or affidavits from the officials who were responsible for the actions taken which led to this complaint, explaining why they deemed the actions necessary. Send sworn statements from other individuals who can verify the facts in support of your position.

5. Provide copies of documents from official records in support of your position. Include copies of relevant personnel action forms and memoranda from the personnel files of Complainant and any comparatives.

6. Send copies of appropriate sections of written rules, policies and procedures or portions of policy manuals or employee handbooks which relate to the issues raised in the complaint. Provide an explanation for any unwritten policies or established practices which apply to the issues.

7. Give your total number of employees at the facility where Complainant was employed, with a breakdown by race (white, black, Hispanic, Asian, American Indian) and gender (male and female). Your latest EEO-1 report may be sent to meet this requirement. If this complaint is based on disability, send the total number of employees with known disabilities and omit race and gender.

8. If the complaint was based on a disability, pregnancy, or religion, indicate what efforts were made to accommodate the condition/basis. If no accomodation was made, please explain why.

NOTE: "Current year" means the calendar year during which the most recent personal harm occurred.

NOTE: You are invited to submit any proposal that might be considered for resolution of this complaint. This may be done now or at any time during the investigation of this complaint.

3



STATE OF FLORIDA
# Florida Commission on Human Relations

*Jeb Bush, Governor*
*Ronald M. McElrath, Executive Director*

FCHR No. 95-0414
EEOC No. 15D971107

Ms. Jacqueline Iaia                  Complainant
1113 S.W. 17th Street
Boca Raton, FL 33486

Columbia Health Care Corp.           Respondent
d/b/a Pembroke Pines Hospital
Mark E. Edwards, Esquire
2501 Park Plaza
Nashville , Tennessee 37203

<u>NOTICE OF DETERMINATION: CAUSE</u>

PLEASE TAKE NOTICE that a determination has been made on the above-referenced complaint that there is reasonable cause to believe that an unlawful employment practice has occured. A copy of the Determination is attached.

During the following 30 days, you are invited to join the Commission in an effort to reach a just resolution of this matter through conciliation. The 30-day conciliation period does not, however, toll (affect) the 35-day limitation period for filing a PETITION FOR RELIEF.

COMPLAINANT may request an administrative hearing by filing a PETITION FOR RELIEF within 35 days of the date of this notice of DETERMINATION: CAUSE or COMPLAINANT may file a civil action within one year of the date of this NOTICE OF DETERMINATION: CAUSE.

A petition for relief form is enclosed with Complainant's notice. It may be beneficial for Complainant to seek assistance from legal counsel prior to actually filing a Petition for Relief.

If the Complainant fails to request an administrative hearing within 35 days of the date of this notice, the administrative claim under the Florida Civil Rights Act of 1992, Chapter 760, will be dismissed pursuant to section 760.11, Florida Statutes (1992).

A copy of the Florida Civil Rights Act of 1992 is enclosed for the parties' information.

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(850) 488-7082 • 1-800-342-8170 (Complaints Only: Voice or TDD) • Fax (850) 488-5291
An Equal Opportunity Employer • Affirmative Action Employer



DEPOSITION
EXHIBIT

FCHR No. 95-0414
Page Two

## CERTIFICATE OF SERVICE BY AGENCY CLERK

      I HEREBY CERTIFY that a copy of the foregoing NOTICE OF DETERMINATION: CAUSE was served upon the above-named addressees this _1st_ day of _February_, 19 _99_, by U.S. Mail.

BY: _Sharon Moultry ege_
         Clerk of the Commission

STATE OF FLORIDA
# Florida Commission on Human Relations

Jeb Bush, Governor
Ronald M. McElrath, Executive Director

FCHR No.: 95-0414
EEOC No.: 15D971107

MS. JACQUELINE IAIA                                    Complainant
1113 S.W. 17th Street
Boca Raton, Florida 33486

COLUMBIA HEALTH CARE CORPORATION,                      Respondent
   d/b/a PEMBROKE PINES HOSPITAL
c/o Mark E. Edwards, Esquire
2501 Park Plaza
Nashville, Tennessee 37203

## DETERMINATION: CAUSE

On November 14, 1994, MS. JACQUELINE IAIA, Complainant, filed a Complaint of Discrimination with the Florida Commission on Human Relations (hereafter Commission) alleging that COLUMBIA HEALTH CARE CORPORATION, d/b/a PEMBROKE PINES HOSPITAL, Respondent, discriminated against her on the basis of age in violation of the Florida Civil Rights Act of 1992, sections 760.01-760.11, 509.092, Florida Statutes (1997 & Supp. 1998). An investigation of this matter has been concluded by the Commission's Office of Employment Investigations and Enforcement. The Commission's Office of General Counsel has read the Investigator's Memorandum (IM) and completed its review of the content of the case file.

### FINDINGS

1.    Complainant claims in her sworn Complaint of Discrimination that she was employed by Respondent as its Director of Marketing/Public Relations. Respondent asserts in its position statement that Complainant was its Director of Marketing.

2.    On November 11, 1993, Respondent placed Complainant on a reduction in workforce leave of absence for a period of six months. Exactly six months later on May 11, 1994, Complainant was terminated. Respondent claims it was unable to find Complainant another position.

3.    Complainant was in her mid-forties at the time of her termination.

4.    Complainant asserts she was terminated because Respondent wanted a "younger image." Respondent states Complainant's charge is without merit. Respondent claims that Complainant's position was eliminated because of a necessary reduction in operating costs. According to counsel for Respondent, the position of Marketing Department Director was combined with the position of Director of Public Relations and Senior Friends. Ms. Monique Monteiro had been Respondent's Seniors Program Director. Ms. Monteiro, who was in her mid-twenties, was given the new position involving the combination of positions.

DEPOSITION
EXHIBIT

FCHR No.: 95-0414
Page Two

5.    According to Respondent, Complainant was not given the new position because she did not have experience in the area of Senior Friends.  Respondent felt Complainant would not be able to execute the job's duties and responsibilities.

6.    Ms. Pat Pierce, a former employee of Respondent contends in a sworn affidavit that Complainant had experience in managing a seniors program.  In addition, according to the Commission's Investigation Specialist, evidence failed to indicate that Ms. Monteiro was qualified to perform Complainant's job duties.  Ms. Pierce informed the Commission that Ms. Monteiro had no experience in marketing/public relations.  Complainant had approximately twenty years of experience.

## ANALYSIS

7.    Section 760.10(1)(a), Florida Statutes (1997 & Supp. 1998) provides:

It is an unlawful employment practice for an employer:

To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

8.    As the findings indicate, Complainant established a prima facie case of discrimination.

9.    In its position statement, Respondent states the following:

The Corporation understands that Ms. Iaia was a long standing employee of the Hospital and worked for the Hospital as the Director of the Marketing Department.  In that capacity, she was primarily responsible for planning, organizing and directing the marketing function of the Hospital.

From late 1993 through 1994, the Hospital initiated a necessary reduction in operating costs.  As part of this reduction, Ms. Iaia's position was eliminated.  During this period of time, the Hospital reviewed Ms. Iaia's position in the Marketing Department along with various other management level positions and determined that the function of the Marketing Department Director could be combined with the position of the Director of Public Relations and Senior Friends.

This decision was made because the employee performing the function of the Director of Public Relations and Senior Friends was capable of performing the duties and responsibilities of both areas.  Ms. Iaia was not experienced in the area of Senior Friends and could not perform that function when the positions were combined.  Consequently, her position was eliminated.

10.    The reason offered by Respondent for choosing Ms. Monteiro over Complainant appears to be a pretext for discrimination.  The evidence indicates that Complainant had experience in managing a seniors program.  In addition, evidence suggests that Ms. Monteiro lacked experience in marketing/public relations.  Complainant, on the other hand, had twenty years of experience.

FCHR No.: 95-0414
Page Three

## CONCLUSION

11. Complainant, an individual, is a "Person" within the meaning of FLA. STAT. §760.02(6) (1997 & Supp. 1998).

12. Complainant is an "Aggrieved person" within the meaning of FLA. STAT. §760.02(10) (1997 & Supp. 1998).

13. Complainant is an "individual" within the meaning of FLA. STAT. §760.10(1)(a) (1997 & Supp. 1998).

14. Respondent is a "Person" within the meaning of FLA. STAT. §760.02(6) (1997 & Supp. 1998).

15. Respondent is an "Employer" within the meaning of FLA. STAT. §760.02(7) (1997 & Supp. 1998).

16. The Complaint of Discrimination was filed in a timely manner pursuant to FLA. STAT. §760.11(1) (1997 & Supp. 1998).

17. The Investigator's Memorandum has been submitted by the Office of Employment Investigations and Enforcement. The Office of General Counsel has reviewed the memorandum and agrees with the recommendation of Cause made therein.

Pursuant to the authority delegated to me by Rules 60Y-2.004(2)(e) and 60Y-5.004, Florida Administrative Code, it is my determination that there is reasonable cause to believe that an unlawful employment practice has occurred.

DATED: _February 01_____, 1999    _Ronald McElrath_
                                        EXECUTIVE DIRECTOR
                                        Florida Commission on Human Relations

FILED: _February 01_____, 1999

BY: _Sharon Moultry_____
    Clerk of the Commission

INVESTIGATOR'S MEMORANDUM

DATE: October 23, 1998

To: Office Of General Counsel
From: Linda L. Mathis Employment Investigations

RE: JACQUELINE IAIA v. COLUMBIA HEALTH CARE CCORP. d.b.a
PEMBROKE PINES HOSPITAL

FCHR NO.: 95-0414
EEOC NO.: 15D971107

A.   RECOMMENDED DETERMINATION: Cause

   1.   DECLARATION OF JURISDICTION

Respondent is an employer within the meaning of the Florida
Civil Rights Act of 1992 and all other jurisdictional
requirements have been met.

   2.   FOCUS OF THE COMPLAINT

Complainant alleged that she was terminated on May 11, 1994,
from her position as Director of Marketing and Public
Relations, because of her age (46).  (Tab A, page 1, items I
and III).
I
3.   SUMMARY OF RESPONDENT'S POSITION

Respondent stated that Complainant was laid off during a
reorganization and that age was not a factor.  (Tab D-2,
page 7, pars. 2-4).

                     4.  ANALYSIS OF EVIDENCE AND CONCLUSION

Complainant alleged that she was laid off on November 3,
1993, and was later discharged on May 11, 1994, and that a
younger female, Ms. Monique Montero, (age 24) replaced her
as Marketing and Public Relations Director.  Complainant
further alleged that other key executives were also
terminated.  (Tab A, page 3).

Respondent stated that it initiated a necessary reduction in
operating costs in 1993.  Respondent stated that it's
corporation was divested of the facility and it's assetts in
1995, and that documents are limited due to the fact that



the corporation no longer owns the facility. Respondent
stated that Complainant was laid off as part of a
reorganization and that Complainant's position duties were
oobsorbed by another employee. Respondent stated that Ms.
Monique Montero was qualified to perform Complainantt's
duties as well as the duties of the Seniors Program.
Complainant stated that she had managed a senior friends
program. Complainant's witness, Ms. Pat Pierce, an employee
of Respondent, confirmed that Complainant had experience in
managing a Senior Friends program.
(Tab D-2, page 7, par. 1, page 2, item 4; Tab E, page 9).

Respondent stated that two other department heads, Ms.
Claudia Jack, and Mr. Ronald Hoffman, were also laid off
during the reorganization. They were also over forty years
of age. (Tab D-2, page 12, item 2).

The evidence produced during this investigation indicated
that Respondent was unable to refute Complainant's
allegations that she and other management personnel were
laid off. Respondent was also unable to demonstrate that
Ms. Montero was qualified to perform Complainant's job
duties. Complainant had established a prima facie case of
employment discrimination based on age.

Based on the foregoing discussion it is recommended that
there is reasonable cause to believe that Respondent
discriminated against Complainant because of her age.


D.  Other Violations:  None.

E.  INDEX OF INVESTIGATORY MATERIALS

    Tab A - Complaint and Intake Material
    Tab B - Investigative Notes
    Tab C-1 - General Correspondence To and From Complainant
    Tab C-2 - Substantive Material From Complainant
    Tab D-1 - General Correspondence To and From Respondent
    Tab D-2 - Respondent's Position Statement and Document
    Request Responses
    Tab E - Affidavits
    Tab F - Miscellaneous


/lm