UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

NON-COMPLIANCE OF S.D. fla. L.R. 5.1B

CASE NO.: 00-6227 CIV MORENO
Magistrate Judge Dube

JACQUELINE IAIA,

    Plaintiff,

v.

GALEN HOSPITAL-PEMBROKE
PINES, INC., d/b/a PEMBROKE
PINES HOSPITAL, a foreign corporation,

    Defendant.

_____/



FILED by _____ D.C.

DEC 1 1 2000

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

## APPENDIX IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

A.    Selected Excerpts from the Deposition of Plaintiff Jacqueline Iaia. (Tab 1)

B.    Selected Excerpts from the Deposition of Patricia Pierce. (Tab 2)

C.    Selected Excerpts from the Deposition of Monique Monteiro. (Tab 3)

D.    Selected Excerpts from the Deposition of Michael Scialdone. (Tab 4)

E.    Selected Excerpts from Defendant's Manager's Manual (Plaintiff's Exhibit 1 to Scialdone Deposition). (Tab 5)

F.    Selected Excerpts from the Deposition of Jerry Sutphin. (Tab 6)

G.    Selected Excerpts from the Deposition of Maria Lomaga. (Tab 7)

H.    Defendant's Position Statement to Florida Commission on Human Relations (Plaintiff's Exhibit 5 to Deposition of Maria Lomaga). (Tab 8)

I.    Selected Excerpts from the Deposition of Joseph Cash. (Tab 9)



J.    EEOC Determination of Reasonable Cause. (Tab 10)

K.    Plaintiff's First Request for Production. (Tab 11)

DEC 1 3 2000

Rec'd in MIA Dkt _____

Iaia v. Galen Hospital-Pembroke Pines, Inc.
Case No. 00-6227 CIV MORENO

Respectfully submitted,

JOHN F. JANKOWSKI, JR., ESQ., P.A.              BECKER & POLIAKOFF, P.A.
Co-Counsel for Plaintiff                        Counsel for Plaintiff
2 South University Dr.                           3111 Stirling Road
Suite 265                                        Ft. Lauderdale, FL 33312
Plantation, FL 33324                             Tel. (954) 985-4145
Tel. (954) 370-1026                              Fax (954) 985-4176
Fax. (954) 382-4322

By: _____              By: _____
John F. Jankowski, Jr., Esq.                    Roderick V. Hannah, Esq.
Fla. Bar No.: 833533                            Fla. Bar No. 435384

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by

mail to: Alexander D. del Russo, Esq., Levy, Kneen, Mariani, Curtin, Kornfeld & Del Russo,

P.A., Counsel for Defendant, 1400 Centrepark Boulevard, West Palm Beach, FL 33401, this

8th day of December, 2000.

BECKER & POLIAKOFF, P.A.
Attorneys for Plaintiff
3111 Stirling Road
Ft. Lauderdale, FL 33312
Tel. (954) 985-4145

By: _____
Roderick V. Hannah, Esq.

ATTACHMENT / EXHIBIT __1__

1

1                UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2                  FORT LAUDERDALE DIVISION

3                CASE NO. 00-6227-CIV-MORENO

4
    JACQUELINE IAIA,
5
                          Plaintiff,
6
    vs.
7
    COLUMBIA HEALTHCARE CORPORATION
8   d/b/a PEMBROKE PINES HOSPITAL,
    a foreign corporation,
9
                          Defendant.
10
    -------------------------------------/
11

12              DEPOSITION OF JACQUELINE IAIA

13

14          Taken before Richard Bursky, Registered

15   Merit Reporter and Notary Public in and for the

16   State of Florida at Large, pursuant to Notice of

17   Taking Deposition filed by the Defendant in the

18   above cause.

19                        - - -

20

21   Wednesday, June 28, 2000
     Suite 700
22   One East Broward Boulevard
     Fort Lauderdale, Florida
23   10:30 a.m. - 5:15 p.m.

24                        - - -

25

CERTIFIED COPY

PLAINTIFF'S
EXHIBIT
A

                INTERIM COURT REPORTING
                     (561) 478-0401

1      Q       Have you ever held any other licenses

2   other than that of psychotherapist?

3      A       No, sir.

4      Q       Do you now belong or have you ever

5   belonged in Florida to any professional

6   organizations or affiliations?

7      A       Yes, sir.

8      Q       Tell me about those, please.

9      A       I belong to the Association for Social

10  Workers, I belong to the Public Relations Society

11  for Hospital Marketers.  Actually I think the proper

12  title was called the Gold -- I don't know, sir, I

13  can't remember the exact title.  It is on my resume.

14     Q       Okay.  I've got a copy and I will show it

15  to you later so maybe it will help you refresh your

16  memory.

17     A       Okay.

18     Q       Any other organizations or affiliations

19  you can recall at this point?

20             MR. JANKOWSKI:  This is present or in the

21        past?

22             MR. DEL RUSSO:  Either.

23             THE WITNESS:  American Association of

24        Christian Counselors.

25             Are you looking for chamber of commerce?

```
 1    A     Less than flattering, derogatory.

 2    Q     Look at her?

 3    A     Yes.

 4    Q     Was that what Mr. Hoffman told you that

 5  Mr. Sutphin said to him about you?

 6    A     Yes, sir.

 7    Q     Did he say anything else that Mr. Sutphin

 8  said?

 9    A     No.

10    Q     I am not saying that is not enough, ma'am,

11  I just want to understand what was related to you.

12    A     Okay.

13    Q     So I was asking you earlier about your

14  professional relationship with Mr. Sutphin and you

15  began, ma'am, by telling me that you concluded that

16  he didn't like the job, the position that you held,

17  is that correct?

18    A     Yes, sir.

19    Q     Other than the fact that it was your

20  perception that he didn't like the marketing/public

21  relations position, how was your relationship with

22  him on a personal level?

23    A     I was respectful to him and when he came

24  aboard he announced in a managers meeting that he

25  required loyalty from the staff and certainly his
```

1    managers and he would not tolerate any kind of

2    disloyalty or gossip or unflattering communication

3    about him. So I was very respectful of him. He was

4    my boss. I did what he asked me to do.

5             He never really provided much direction.

6    And I don't -- he liked the young girls. He liked

7    the young pretty girls and I was not, you know,

8    young and pretty, like some of the other women. And

9    so the -- we didn't really have a whole lot of

10   communication.

11      Q    Did you find him to be a tough person to

12   work for?

13      A    No, not necessarily tough.

14      Q    Was he demanding?

15      A    No. He was just, he was incompetent. I

16   was -- there was -- he -- I believe that he made

17   some bad decisions that adversely affected our

18   hospital.

19      Q    Do you know if he acted differently to the

20   other directors he supervised than he acted towards

21   you?

22      A    Yes, he did.

23      Q    Tell me about that.

24      A    Well, he would chat -- there was a lot of

25   communication and chatting with Monique Montiero.

1   community events.

2       Q       Did you have at the hospital an office?

3       A       Yes.

4       Q       Where was your office located when

5   Mr. Sutphin was your supervisor?

6       A       One of the rooms adjacent to his office.

7       Q       So you were in the administration suite?

8       A       Yes.

9       Q       Did Mr. Sutphin ever say to you any

10  comments about your age, specifically about your

11  age?

12      A       To me personally, no.

13      Q       What about comments you have heard about

14  from others that Mr. Sutphin made about your age?

15      A       None specific to me to others about my

16  age.

17      Q       None you have heard about from others?

18      A       No.

19      Q       What about any age related remarks, I am

20  intentionally asking as broad a question as I can,

21  comments, any age related comments or remarks by

22  Mr. Sutphin?

23      A       He would say, like in the managers

24  meeting, when Columbia came in, he would say, "You

25  know, if you're complacent, you know, if your

1    attitude is old and complacent you are not going to,

2    you're not going to make it around here."

3        Q    And he said that at a managers meeting?

4        A    (Indicating.)

5        Q    That's a yes?

6        A    Yes.

7        Q    How many people attended the managers

8    meetings?

9        A    I would say approximately 30.

10       Q    Any other general age related comments

11   that you ever heard Mr. Sutphin say?

12       A    There was an attitude of, like, in with

13   the new and out with the old.

14       Q    What did he say?  That might have been

15   your perception of an attitude.  What do you recall

16   him saying in any of those situations that would

17   have been an age related comment or remark?

18       A    "If you are not able to cut the mustard

19   heads are going to be rolling."

20       Q    Any other comments that you recall?

21       A    No.

22       Q    How often would you see him on a weekly

23   basis or daily basis?

24       A    Every day that I was in the hospital and

25   that he was in the hospital we would, you know -- we

 1   clients, patients, move them to nursing homes, meet

 2   with their families.

 3       Q       You did that for 13 years?

 4       A       Yes, sir.

 5       Q       Let me ask you this, was there anyone in

 6   your department of social services other than you?

 7       A       There were periods when I had a secretary.

 8       Q       Other than a secretary was there anyone

 9   that reported to you when you served as director of

10   social services at the South Broward Hospital?

11       A       No, sir.

12       Q       At some point in time your position

13   changed?

14       A       Yes.

15       Q       You became the director of public

16   relations and marketing, is that correct?

17       A       Yes, sir.

18       Q       Do you remember approximately when that

19   was?

20       A       In 1987.

21               (Defendant's Exhibit No. 1 was marked for

22   identification.)

23   BY MR. DEL RUSSO:

24       Q       During this deposition I am going to show

25   you some documents.  What I will do in terms of

1  procedure, I will hand them to your attorney first

2  to look at them and then show them to you.

3           Let me show you a document that I have

4  marked for identification as Exhibit 1 to your

5  deposition.

6           (Pause.)

7           MR. JANKOWSKI:  I take it this was from

8      our production, No. 1189?

9           MR. DEL RUSSO:  I ask you, ma'am --

10          MR. JANKOWSKI:  That is a yes?

11          MR. DEL RUSSO:  That's a yes.

12          MR. JANKOWSKI:  Okay.

13  BY MR. DEL RUSSO:

14      Q    Look at this document, if you would, and

15  tell me if you recall seeing it before.

16      A    Yes, sir.

17      Q    By looking at this document does it help

18  refresh your memory as to when it was that you

19  changed or transferred from being director of social

20  services to being the director of public relations

21  and marketing?

22      A    Well, effective date 9/1/87.

23      Q    Is that reference in the document

24  consistent with your memory as to approximately when

25  it was that you became the director of public

1    relations and marketing?

2        A      Yes, sir.

3        Q      I take it that was a promotion?

4        A      Yes.

5        Q      How did that come about?  Was there

6    someone previously who held that position that had

7    left?  Was it a new position?

8        A      It was not a new position.  When I was

9    director of social service I was handling blood

10   drives and certain events that were part of public

11   relations types of things and the previous PR

12   director had left, the position was available and my

13   boss offered me the position.

14       Q      What was the name of your boss?

15       A      Steve Sutherland.

16       Q      Was he the chief administrator, if you

17   will, at Humana South Broward?

18       A      Yes, sir, he was the executive director, I

19   believe he was called.

20       Q      That was the title they used for the

21   senior administrator there, CEO --

22       A      CEO.

23       Q      When you were the director of social

24   services did you report to him, Mr. Sutherland?

25       A      Yes, sir.

1    Q    When you became the director of marketing

2  and public relations did you continue to report to

3  him?

4    A    Yes, sir.

5    Q    What was the time frame in which you

6  worked as the director of marketing and public

7  relations at Humana South Broward Hospital?

8    A    The hospital closed in I believe it was

9  October of, I don't know, sir, it was either '90 or

10  '91, and so they had moved me from South Broward

11  Hospital over to Pembroke Pines Hospital.

12    Q    Was that in connection with this closing,

13  the fact that they were closing the hospital?

14    A    Yes.

15    Q    Was the switch from social services to

16  marketing and public relations from your

17  perspective, ma'am, a change in the nature of your

18  employment?

19    A    Oh, yes, sir.

20    Q    Prior to that time had you had any

21  experience in marketing or public relations?

22    A    I had had some, some marketing experience,

23  well, actually I think more public relations

24  experience.  Because of some of the employee

25  activity types of things that I did at South Broward

1    Hospital while I was the social worker, Humana had

2    sent me up to corporate, some corporate training.

3        Q        In what areas?

4        A        In public relations, the You Can Make It

5    Happen Program.  But I was --

6        Q        You had some corporate training in public

7    relations while you were the social services

8    director?

9        A        Yes, sir.

10       Q        And you served first at Humana South

11   Broward and then at Humana Pembroke Pines as the

12   director of marketing and public relations, is that

13   correct?

14       A        Yes.  I was actually marketing both

15   hospitals at one period of time while they -- we

16   were doing the transition.  The PR director had left

17   Pembroke Pines Hospital and so I was marketing both

18   hospitals.

19       Q        You were in that position from September

20   of 1987 until November of 1983, is that correct?

21       A        '93, sir.

22       Q        Yes.

23       A        Okay, yes.  No.  September.

24       Q        September of 1987 until November of 1993.

25                MR. JANKOWSKI:  The question again?

INTERIM COURT REPORTING
(561) 478-0401

1    Q    When you transferred over to Pembroke

2  Pines was Monique Montiero the director of Senior

3  Friends?

4    A    Yes.

5    Q    So was she working at Pembroke Pines

6  Hospital before you transferred to that hospital?

7    A    Yes.

8    Q    Do you know what her hire date was at

9  Pembroke Pines Hospital?

10    A    I had, when I was at South Broward

11  Hospital, the director of Senior Friends was out on

12  a head injury and I had managed that department for

13  a period of time.  And the first time that I met

14  Monique was on a trip that I was taking, the Senior

15  Friends from South Broward Hospital to Nashville and

16  we were on a, all of the five Humana hospitals were

17  taking Senior Friends to Nashville and Monique had

18  just come in at that time and that was the first

19  that I had met her.  And so I was at South Broward,

20  she was at Pembroke Pines Hospital, and I would -- I

21  am kind of sketchy on the time frame but maybe about

22  1990.

23    Q    So there was a period of time when you

24  were at South Broward that you oversaw or covered

25  the Senior Friends Program when its director was out

1    with a head injury?

2        A       Yes.

3        Q       How long was that period for?

4        A       I can't recall exactly, but six months, I

5    believe, more or less.

6        Q       Your job title never changed, did it,

7    during that period?

8        A       No.

9        Q       That was just an additional duty you took

10   on while you were the director of marketing and

11   public relations at that hospital?

12       A       Yes.  And there was staff, there was a

13   staff person and she did report to me.  There was a

14   secretary.

15       Q       What was the name of the director of

16   Senior Friends who was at South Broward but went out

17   with a head injury?

18       A       Cindy Gates.

19       Q       Did she come back after that approximate

20   six months period?

21       A       I don't remember.

22       Q       Do you remember if the hospital instead

23   hired a new director of Senior Friends?

24       A       They did not hire a new director.

25       Q       Did you receive any form of additional

1     Q      But it is not, you are not testifying that

2  there were none under 40 other than Mr. Hoffman?

3     A      I know people were let go but I didn't

4  personally talk to them or -- I know that there were

5  people that were let go.  I don't know how many were

6  let go.

7     Q      How did you first come to learn that the

8  reduction in force was going to affect you

9  personally?

10    A      On November 11.

11    Q      What took place on November 11?

12    A      Well, it was like this:  Jerry called,

13 Sutphin, called me into his office and he said, you

14 know, sit down and, you know, he had a very kind of

15 elaborate office, and he said, well, kiddo, this is

16 your last day.

17           And I looked at him, you know, I just, I

18 was in disbelief.

19           And he said, we are closing down your

20 department.

21           And my stomach just turned and I thought I

22 was going to vomit on the table.  And I just, you

23 know, I said, you are closing?

24           He  said, yes, we are closing down the

25 marketing and public relations department and we

1    don't need you any more.

2                And I said, you mean that's it, that's

3    just it?

4                And he said, yes, that's it.

5                And he said, you can pack your things up

6    and he said, what are you going to do?

7                I said, I don't know what I am going do.

8                And he said, come here, let me give you a

9    hug.

10               And I looked at this man in horror, that,

11   you know, I had given him loyalty and respect and

12   had given my life for 20 years to this company and

13   to him as my boss and he, he wanted a hug.

14               And so, you know, I went over and, you

15   know, he said, you'll be fine, he hugged me.

16               And I am crying all over.

17               And he said, you know, you'll be fine,

18   and, you know, anything you need, if you need a

19   letter, whatever.  And that was it.

20               I said, well, when do I leave?

21               He said, well, you can leave now, and pack

22   your things.

23       Q    This meeting took place in his office?

24       A    Yes.

25       Q    Was anyone else present other than you and

1  Mr. Sutphin?

2      A      Just the two of us.

3      Q      Do you recall anything else that he may

4  have said to you at that meeting?

5      A      I said, well, where is the, I said, is

6  there a compensation package?

7             And he said, oh, yes, you know, oh, and he

8  gave me an envelope and he said, you need to sign

9  this paperwork here.

10            And the compensation package was, it was

11  two months of pay.

12     Q      Eight weeks of severance?

13     A      Yes.

14            (Defendant's Exhibit No. 8 was marked for

15  identification.)

16  BY MR. DEL RUSSO:

17     Q      Let me show you, ma'am, what I have marked

18  as Exhibit No. 8.  It is a November 11, '93 memo

19  from Ms. Adamson to you.  My question after you had

20  a chance to review it is whether that is the

21  paperwork he asked you to sign.

22            (Pause.)

23     A      That's the paper.  My life has been a mess

24  ever since.

25     Q      Is that your signature, ma'am, on the

1  fourth page?

2      A      Yes, sir.

3      Q      Do you recall anything else that he said

4  to you at that meeting?

5      A      No.

6      Q      Did he offer you or offer to cover your

7  medical insurance for any period of time?

8      A      No, they didn't offer to do that.  I had

9  to call them up and ask them to cover my medical

10 insurance.  They weren't going to pay me.

11             I had been there almost -- February of '94

12 would have been, I guess, the anniversary date of

13 when you get your paid vacation, they weren't going

14 to pay me a paid vacation.  They weren't going to

15 cover anything, you know, until I called and became

16 a squeaky wheel.

17     Q      Going back to this meeting, though, my

18 question is going to be, ma'am, whether you recall

19 anything else that transpired at that meeting,

20 anything else that Mr. Sutphin may have said to you

21 or you may have said to Mr. Sutphin.

22     A      No.

23     Q      Did he offer you a reason or an

24 explanation as to why they were eliminating your

25 job?

1      A      He told me he was closing down the

2    department, he was shutting down the marketing and

3    public relations department leading me to believe

4    that there was no more department because he didn't

5    value the department.  He thought marketing and

6    public relations was a lot of fluff.

7            He made comments to me earlier about the

8    department being a fluff department.  He commented

9    about Baron's position at the other hospital.  He

10   saw no value in the department.  And he didn't see

11   value in the people that were managing the

12   department.

13     Q      Did he at that meeting tell you that the

14   reason he was eliminating your employment was

15   because of your age?

16     A      No, he did not.

17     Q      Did he ever tell you anything, anything

18   like that?

19     A      Not directly, no.

20     Q      What do you mean by that?  Did he

21   indirectly ever say --

22     A      Well, at managers meetings he would say

23   things about, what I had said earlier in the

24   testimony.

25     Q      What you mentioned earlier at the managers

1   meetings, is that correct, ma'am?

2       A    Yes.

3       Q    Do you know if Mr. Sutphin was the

4   individual who made the decision to eliminate your

5   job?

6       A    I know that when the other employees were

7   being let go that they were meeting with the

8   managers.  And since he was my manager, then he made

9   the decision.

10      Q    Do you know if Pam Corliss had any

11  involvement in the decision to eliminate your

12  employment?

13      A    I had very little interaction with Pam

14  Corliss.  She was only there a short time before I

15  was.  She was younger, she was aggressive, she --

16  Monique was young.  So she may have been

17  instrumental in that decisionmaking process.

18      Q    So after the meeting ended what did you

19  do?  Did you go back to your office and gather your

20  effects and leave?

21      A    Yes.

22      Q    Have you spoken with Mr. Sutphin for any

23  reason after that meeting on November 11, 1993?

24      A    I called him up to ask him, since this

25  letter said that we were on an involuntary leave of

 1    absence for six months, if that was the situation,

 2    then why was I not entitled to benefits and why

 3    could they not continue to pay my health insurance

 4    benefits since I was on this leave.

 5            And so I had a conversation with him about

 6    that and also asked him if he would write a letter

 7    of recommendation because, you know, I was waiting

 8    to come back to work.  I was hoping that they would

 9    rehire me.  But, you know, I just knew that I had to

10    do something other than just wait and went looking

11    for work and asked for a letter of recommendation.

12    Q      Ms. Iaia, in your lawsuit you state that

13    in connection with the reduction in work force the

14    defendant, which is the hospital, decided to combine

15    your position with the director of Senior Friends

16    position.

17            Is that something that Mr. Sutphin told

18    you at that meeting on November 11?

19    A      No, sir.

20    Q      When did you first learn that those two

21    positions were being combined?

22    A      At some point later when I had heard

23    through the rumor mill that it was announced in a

24    managers meeting that Monique Montiero was the new

25    director of marketing and public relations and that

1    A    Yes.

2         (Defendant's Exhibit No. 16 was marked for

3    identification.)

4    BY MR. DEL RUSSO:

5    Q    Let me show you what I have marked as

6    Exhibit 16 and direct your attention to that

7    remittance advice and ask you if that reflects the

8    hospital's payment to you of the unused vacation

9    time.

10   A    Yes.

11   Q    Ms. Iaia, you claim in this lawsuit the

12   reason why your position was eliminated was because

13   of your age, is that correct?

14   A    Yes, sir.

15   Q    You were 45 years old in November of 1993,

16   is that correct?

17   A    Yes, sir.

18   Q    Who were the supervisors at the hospital

19   that you believe discriminated against you because

20   of your age?

21   A    Jerry.

22   Q    Okay, Mr. Sutphin?

23   A    Mr. Sutphin.

24   Q    Anyone else?

25   A    Possibly Pam Corliss.

1     A     You have exhausted my mind.  Off the

2     record.

3           What was the question again, please?

4     Q     Have I exhausted your memory, Ms. Iaia as

5     to the different reasons why you believe Pam Corliss

6     may have discriminated against you because of your

7     age?

8     A     At this time, yes, you have.

9     Q     The other person you mentioned, the other

10    supervisor you mentioned who you believe

11    discriminated against you because of your age was

12    Mr. Sutphin.

13          My question to you is going to be the same

14    with respect to Ms. Corliss, that is, what is your

15    basis for believing that Mr. Sutphin discriminated

16    against you because of your age.

17    A     He liked young pretty girls.  When the

18    Miami Dolphin cheerleaders came in, I brought them

19    into the hospital, he was ogling and was, you know,

20    chatting always, chatting it up with Monique.

21    Q     He was someone that appeared to like

22    Monique?

23    A     Oh, yes, he liked Monique.

24    Q     Did he ever say to you the reason that we

25    are going to eliminate your job is because I think

1   you are too old?

2        A      No, he never directly said that, no.

3        Q      What are the other reasons you believe he

4   discriminated against you because of your age?  You

5   mentioned that he seemed to like younger pretty

6   girls and he would always chat it up with Monique.

7               Any other reasons for why you believe he

8   discriminated against you because of your age?

9        A      Well, I did a fine job in marketing, I had

10  Senior Friends experience and he didn't offer me the

11  job.

12              And it would be my inclination that in

13  lieu of, I am not qualified, that he gave it to her

14  because she was younger.

15       Q      Okay.

16       A      Can I take a little stretch here?

17       Q      You bet.

18              (At 3:15 p.m. a 15 minute recess was

19  taken.)

20  BY MR. DEL RUSSO:

21       Q      I will show you a document, ma'am, I am

22  not going to mark it at this point, and ask you,

23  this is a document that was in your file, and ask

24  you if you can identify what ChamberChips is or was?

25              MR. JANKOWSKI:  You are not marking it?

1    A    It was forwarded by Ralph Ezzo.

2    Q    Do you know if he sent it by regular first

3    class mail or by certified mail or do you have any

4    recollection?

5    A    There is an envelope here and I don't

6    really know how it was sent.

7    Q    At some point in time, Ms. Iaia, did you

8    come to learn that the commission had lost your

9    first charge, this charge of discrimination?

10    A    Yes.

11    Q    How was it that you came to learn that

12    they had lost your charge?

13    A    Because I, I had -- I was calling them and

14    was being vigilant in staying with what, you know,

15    staying with the process and what was going on with

16    the process.

17    So I had contacted them and was informed

18    that they had lost my file.

19    Q    Were you asked to sign a new charge?

20    A    I am not exactly certain about that, but I

21    do know that they rewrote, they did in fact rewrite

22    the file.  So I don't know if that was meaning to

23    sign a new charge or what.

24    (Defendant's Exhibit No. 19 was marked for

25    identification.)

# PERSONNEL ACTION REQUEST

PIC 3580 HU288 3/85

Facility Name: Humana Hosp. So. Brwd.

Employee Name (Last, First, MI): ISICHELLA, Jacqueline M.

Social Security No.: 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

Street Address: 4977 N.W. 72 Terr.

City, State, Zip: Lauderhill, Fl. 33319

Home Phone: 742-6136

Work Phone:

01189

| | FROM | | TO |
|---|---|---|---|
| Dept. No. 768 | Dept. Name Soc. Svc. | Dept. No 920 | Dept. Name Public Rel; |
| Position No. 360 | Position Director | Position No 910 | Position Dir. Marketing/ |
| Empl Status F.T. | Hrs. (Daily) | Shift | Empl Status F.T. | Hrs. (Daily) | Shift |
| Hrs. (Weekly) | Grade M06 | STEP QTR LE | Salary 1105.89 | Hrs. (Weekly) | Grade M08 | STEP QTR LE | Salary 31,324.80 |
| Employment Date 2-5-74 | Salary Review Date | Employment Date 12-1-87 | Salary Review Date |
| Name Change | | Name Change 8-1-88 | |
| Other | | Other | |

**EMPLOYMENT ACTIVITY**
- ☐ New Hire
- ☐ Re-Hire
- ☐ Reinstatement
- ☐ Transfer
- ☐ Demotion
- ☒ Promotion

**PERSONAL**
- ☐ Address/Phone Change
- ☐ Update Pers. Info.

**UNPAID ABSENCE / REASONS**
- ☐ Authorized (0-14 days)
- ☐ Formal Leave (15 + days)
- ☐ Medical
- ☐ Educational
- ☐ Military
- ☐ Maternity
- ☐ Personal
- ☐ Other

**PAYROLL CHANGE**
- ☐ Re-Class
- ☐ Adjustment
- ☐ Demotion
- ☐ Mer. Incr.
- ☐ Gen. Incr.
- ☐ Other
- ☐ Promotion
- ☐ Compression
- ☐

**RESIGNATION**
- ☐ Transf. (01)
- ☐ Promoted (02)
- ☐ Adv. Oppor. (04)
- ☐ Benefits (05)
- ☐ Compensation (06)
- ☐ Job Security (07)
- ☐ Location (08)
- ☐ Training (09)
- ☐ Be Married (12)
- ☐ Became Self-Employed (13)
- ☐ Began Early Retirement (14)
- ☐ Continue Education (15)
- ☐ Improve Health (16)
- ☐ Join Military (17)
- ☐ Family Obligations (18)
- ☐ Maternity (19)
- ☐ Dislike Work (20)
- ☐ Dislike Supervisor (21)
- ☐ Dislike Company (22)
- ☐ Dislike Hours/Schedule (23)

**TERMINATION**
- ☐ Absenteeism (31)
- ☐ Critical Offense (32)
- ☐ Prog. Disip. Policy (33)
- ☐ Failed Apprs. Pd. (34)
- ☐ Unsat. Perform. (35)
- ☐ Poor Health/Injury (36)
- ☐ Posit. Elim. (37)
- ☐ Failure to Ret. from LOA (38)
- ☐ Perm. Work Force Reduction (40)
- ☐ Temp. Work Force Reduction (41)
- ☐ Failure to Rpt. Aft. Reinst. (42)
- ☐ Retirement (43)
- ☐ Death (45)

**VACATION REQUEST**
1st Request ☐ _____
2nd Request ☐ _____

**OTHER EXPLANATION**

Total 9% Merit & Promotion

| TERMINATIONS - IF YES - AMT. | HOURS | DOLLARS |
|---|---|---|
| Terminal Vacation ☐ Yes ☐ No | | |
| Severance Pay ☐ Yes ☐ No | | |
| Holiday/Other Pay ☐ Yes ☐ No | | |

## PLEASE APPRAISE AS OF TODAY

| FACTORS | EXPLANATION/QUALITY RATING | E | G | S | P | U |
|---|---|---|---|---|---|---|
| KNOWLEDGE | Consider extent of knowledge of present position | | | | | |
| QUANTITY | Consider the volume of work produced | | | | | |
| QUALITY | Consider accuracy and thoroughness | | | | | |
| COOPERATION | Consider attitude and ability to work well with others | | | | | |
| DEPENDABILITY | Consider extent of supervision required | | | | | |
| RATE THE FOLLOWING FACTORS ONLY IF REQUISITE OF POSITION / SUPERVISORY ABILITY | Leadership ability to organize and direct work of subordinates | | | | | |
| JUDGEMENT | Exercise discretion and make sound decisions | | | | | |
| PERSONALITY | Mannerisms, disposition, impression made on others | | | | | |
| OVER ALL RATING ➔ | | | | | | |

Rater's Signature

IS EMPLOYEE ELIGIBLE FOR REHIRE?  ☐ YES  ☐ NO

DEFENDANT'S EXHIBIT 1
6/28/nh

| Title of Notice | Effective Date 9-1-87 | Last Work Date |
|---|---|---|
| Exit Interview ☐ Yes ☐ No | | Date of Exit Interview |
| Employee Signature | | Date |

**APPROVAL SIGNATURES**
- Supervisor
- Dept. Head | Date
- Personnel V.R. Herman | Date 9-1-87
- Administration | Date 9-2-87

EMPLOYEE

| Employee Name (Last, First, MI) | Social Security No. | Street Addr |
|---|---|---|
| Taia, Jacqueline | 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 | |
| City, State, Zip | Home Phone | Work Phone |

**EMPLOYMENT ACTIVITY:** ☐ New Hire  ☐ Reinstatement  ☐ Demotion  ☐ Re-Hire  ☐ Transfer  ☐ Promotion

**PERSONAL:** ☐ Address/Phone Change  ☐ Update Pers. Info.

**UNPAID ABSENCE/ REASONS:**
Authorized ☐ (0-14 days)   Formal Leave ☐ (15 + days)
☐ Medical  ☐ Educational  ☐ Military
☐ Maternity  ☐ Personal  ☐ Other

**PAYROLL CHANGE:**
☐ Re-Class.  ☐ Adjustment  ☐ Demotion
☐ Mer. Incr.  ☐ Gen. Incr.  ☐ Other
☐ Promotion  ☐ Compression  ☐

**RESIGNATION:**
☐ Transf. (01)  ☐ Began Early Retirement (14)
☐ Promoted (02)  ☐ Continue Education (15)
☐ Adv. Oppor. (04)  ☐ Improve Health (16)
☐ Benefits (05)  ☐ Join Military (17)
☐ Compensation (06)  ☐ Family Obligations (18)
☐ Job Security (07)  ☐ Maternity (19)
☐ Location (08)  ☐ Dislike Work (20)
☐ Training (09)  ☐ Dislike Supervisor (21)
☐ Be Married (12)  ☐ Dislike Company (22)
☐ Became Self-Employed (13)  ☐ Dislike Hours/Schedule (23)

**TERMINATION:**
☐ Absenteeism (31)  ☐ Failure to Ret. from LOA (39)
☐ Critical Offense (32)  ☐ Perm. Work Force Reduction (40)
☐ Prog. Disp. Policy (33)  ☐ Temp. Work Force Reduction (41)
☐ Failed Apprs. Pd. (34)  ☐ Failure to Rpt. Aft. Reinst. (42)
☐ Unsat. Perform. (35)  ☐ Retirement (43)
☐ Poor Health/Injury (36)  ☐ Death (45)
☐ Post. Elim. (37)

**VACATION REQUEST:** 1st Request   2nd Request   vb-13
☐ Sick: Exempt ☐ Vac: 80.0

**OTHER EXPLANATION:** M/S: 1   EEO: W/F

rift: ✓   DOB: 6/28/48   Emp. Class: #5
$
-50%   Shift 2: None   Shift 3: None
-0
-50%   W-4: S-0   Emergency:

Retire: 0/75/25 Beneficiary: IFT James Schram/N

| Date of Notice | Effective Date 10/19/91 | Last Work Date |
|---|---|---|
| Exit Interview ☐ Yes ☐ No | | Date of Exit Interview |

Employee Signature
X _____ 10/19/91

---

| FROM | | TO | |
|---|---|---|---|
| Dept. No. **920** | Dept. Name **Public Relations** | Dept. No. | Dept. Name |
| Position No. **910** | Position **Director** | Position No. | Position 13.70 Fu. |
| Empl. Status **FT** | Hrs. (Daily) 8:8 September | Shift **1** | Empl. Status | Hrs. (Daily) | Shift |
| Hrs. (Weekly) **40** | Grade **M8** STEP | Salary **19.002** QTRLE. | Hrs. (Weekly) | Grade STEP | Salary QTRLE. |
| Employment Date **2/5/74** | Salary Review Date **12/2/91** | Employment Date | Salary Review Date |
| Name Change **Current DOH: 2/5/74** | | Name Change **OPED: 2/5/74** | |
| Other **Transfer Date: 10/19/91** | | Other **Bi-Weekly 1520.19** | |

| TERMINATIONS - IF YES - AMT | HOURS | DOLLARS |
|---|---|---|
| Terminal Vacation ☐ Yes ☐ No | | |
| Severance Pay ☐ Yes ☐ No | | |
| Holiday/Other Pay ☐ Yes ☐ No | | |

**PLEASE APPRAISE AS OF TODAY**

| FACTORS | EXPLANATION QUALITY RATING | E | G | S | P | U |
|---|---|---|---|---|---|---|
| KNOWLEDGE | Consider extent of knowledge of present position | | | | | |
| QUANTITY | Consider the volume of work produced | | | | | |
| QUALITY | Consider accuracy and thoroughness | | | | | |
| COOPERATION | Consider attitude and ability to work well with others | | | | | |
| DEPENDABILITY | Consider extent of supervision required | | | | | |
| SUPERVISORY ABILITY | Leadership ability to organize and direct work of subordinates | | | | | |
| JUDGEMENT | Exercise discretion and make sound decisions | | | | | |
| PERSONALITY | Mannerisms, deportment, impression made on others | | | | | |
| | **OVER ALL RATING** | | | | | |

*RATE THE FOLLOWING IF REQUISITE OF POSITION*

Rater's Signature _____

IS EMPLOYEE ELIGIBLE FOR REHIRE?  ☐ YES  ☐ NO

C0621

**DEFENDANT'S EXHIBIT 2**
6/20/03

**APPROVAL SIGNATURES**
Supervisor _____ Date _____
Dept. Head _____ Date _____
Personnel _____ Date 10/21/91
Administration _____ Date _____

EMPLOYEE

# umana

## PERSONNEL ACTION REQUEST
PICS 1003580 HU288 3/85

**Facility Name** Humana Hospital-Pembroke

**Employee Name (Last, First, MI)** AIA, JACQUELINE

**Social Security No.** 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

**Street Address**

**State, Zip**

**Home Phone**

**Work Phone**

**EMPLOYMENT ACTIVITY**
- ☐ New Hire
- ☐ Re-Hire
- ☐ Reinstatement
- ☐ Transfer
- ☐ Demotion
- ☐ Promotion

**PERSONAL**
- ☐ Address/Phone Change
- ☐ Update Pers. Info.

**LEAVE OF ABSENCE / REASONS**
- ☐ Authorized (0-14 days)
- ☐ Formal Leave (15 + days)
- ☐ Medical
- ☐ Educational
- ☐ Military
- ☐ Maternity
- ☐ Personal
- ☐ Other

**PAYROLL CHANGE**
- ☐ Re-Class
- ☐ Adjustment
- ☐ Demotion
- ☐ Mer. Incr
- ☐ Gen Incr
- ☑ Other - C 7
- ☐ Promotion
- ☐ Compression
- ☐

**RESIGNATION**
- ☐ Transf. (01)
- ☐ Promoted (02)
- ☐ Adv. Oppor. (04)
- ☐ Benefits (05)
- ☐ Compensation (06)
- ☐ Job Security (07)
- ☐ Location (08)
- ☐ Training (09)
- ☐ Be Married (12)
- ☐ Became Self-Employed (13)
- ☐ Began Early Retirement (14)
- ☐ Continue Education (15)
- ☐ Improve Health (16)
- ☐ Join Military (17)
- ☐ Family Obligations (18)
- ☐ Maternity (19)
- ☐ Dislike Work (20)
- ☐ Dislike Supervisor (21)
- ☐ Dislike Company (22)
- ☐ Dislike Hours/Schedule (23)

**TERMINATION**
- ☐ Absenteeism (31)
- ☐ Critical Offense (32)
- ☐ Prog. Disip. Policy (33)
- ☐ Failed Apprs. Pd. (34)
- ☐ Unsat. Perform. (35)
- ☐ Poor Health/Injury (36)
- ☐ Posn. Elim. (37)
- ☐ Failure to Ret. from LOA (38)
- ☐ Perm. Work Force Reduction (40)
- ☐ Temp. Work Force Reduction (41)
- ☐ Failure to Rpt. Aft. Reinst. (42)
- ☐ Retirement (43)
- ☐ Death (45)

**EDUCATION REQUEST**
1st Request ☐ _____
2nd Request ☐ _____

**OTHER EXPLANATION**
NO longer At
So. Broward -
Reduce Salary
10%.

### FROM / TO

| | FROM | | | TO | |
|---|---|---|---|---|---|
| **Dept. No.** 920 | **Dept. Name** Public Relations | | **Dept. No.** 920 | **Dept. Name** Public Relations | |
| **Position No.** 91Q | **Position** Director | | **Position No.** 91Q | **Position** Director | |
| **Empl. Status** FT | **Hrs. (Daily)** | **Shift** | **Empl. Status** FT | **Hrs. (Daily)** | **Shift** |
| **Hrs. (Weekly)** M8 | **Grade** **STEP** **OTRLE.** | **Salary** 1520.19 | **Hrs. (Weekly)** M8 | **Grade** **STEP** **OTRLE.** | **Salary** 1381.97 |
| **Employment Date** | **Salary Review Date** | | **Employment Date** | **Salary Review Date** | |
| **Name Change** | | | **Name Change** | | |
| **Other** | | | **Other** | | |

### TERMINATIONS - IF YES - AMT.

| TERMINATIONS - IF YES - AMT. | HOURS | DOLLARS |
|---|---|---|
| Terminal Vacation ☐ Yes ☐ No | | |
| Severance Pay ☐ Yes ☐ No | | |
| Holiday/Other Pay ☐ Yes ☐ No | | |

### PLEASE APPRAISE AS OF TODAY

| FACTORS | EXPLANATION/QUALITY RATING | E | G | S | P | U |
|---|---|---|---|---|---|---|
| KNOWLEDGE | Consider extent of knowledge of present position | | | | | |
| QUANTITY | Consider the volume of work produced | | | | | |
| QUALITY | Consider accuracy and thoroughness | | | | | |
| COOPERATION | Consider attitude and ability to work well with others | | | | | |
| DEPENDABILITY | Consider extent of supervision required | | | | | |
| SUPERVISORY ABILITY | Leadership ability to organize and direct work of subordinates | | | | | |
| JUDGEMENT | Exercise discretion and make sound decisions | | | | | |
| PERSONALITY | Mannerism, disposition, impression made on others | | | | | |

**OVER ALL RATING** ➡

**Rater's Signature**

**DEFENDANT'S EXHIBIT 3**
6/28/00 K

**IS EMPLOYEE ELIGIBLE FOR REHIRE?** ☐ YES ☐ NO

**Date of Notice** 0/28/91 **Effective Date** 10/19/91 **Last Work Date**
☐ Interview
☐ Yes ☐ No **Date of Exit Interview**
**Employee Signature** 10/29/91 **Date**

**APPROVAL SIGNATURES**
| Supervisor | Date |
| Dept. Head | Date |
| Personnel | 10/28/91 |
| Administration | 10-28-91 |

 mana

## EMPLO_E PERFORMANCE APPRAI_L

MI 4 1* 7 89
*Management Employees Only*

| yee Name | Position Title |
|---|---|
| Jackie Iaia | Director |
| nment | Social Security No. |
| Public Relations | 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 |

| d Covered | | Date Due | Appraisal Type |
|---|---|---|---|
| n  12/90   To   12/2/91 | | 12/2/91 | ☐ 3 MONTH  ☐ PROMOTION/TRANSFER<br>☒ ANNUAL  ☐ _____ |

### INDICATORS OF PERFORMANCE LEVELS   ξDMaay

| 5 | OUTSTANDING | Performance far exceeds standards with minimal supervision |
|---|---|---|
| 4 | EXCELLENT | Performance consistently above standards with minimal supervision |
| 3 | SATISFACTORY PLUS | Performance above standards on a regular basis |
| 2 | SATISFACTORY | Performance fully meets minimum standards |
| 1 | SATISFACTORY MINUS | Performance falls below minimum standards |

DEFENDANT'S
EXHIBIT
4
6/28/00

C0025

p. 100

## 1. PERFORMANCE CHARACTERISTICS

| RATE THE FOLLOWING | CODE | COMMENTS |
|---|---|---|
| **PROFICIENCY IN FIELD/SPECIALTY**<br>Degree of competence. Professional manner | 4 | JACKIE IS VERY EXPERIENCED AND TALENTED IN HER FIELD. |
| **2 ADMINISTRATIVE EFFECTIVENESS**<br>Skill in planning, organizing and implementing work assignments or projects | 3 | JACKIE IS ORGANIZED AND EFFECTIVE IN COORDINATING ACTIO |
| **3 LEADERSHIP**<br>Skill in getting work done through formal or informal direction of others. | 3 | JACKIE IS AN EXAMPLE TO OTHE IN HER POSITIVE BEHAVIOR. |
| **4 JUDGEMENT/DECISION MAKING**<br>Degree of analysis, objectivity and foresight used to make decisions. | 3 | JACKIE IS ADEPT IN DETERMIN EFFECTIVE PROGRAMS/PROJEC |
| **5 RELATIONSHIPS**<br>Ability to work with subordinates, peers and superiors. | 4 | JACKIE WORKS WELL WITH EVERYONE ALL THE TIM |
| **6 INITIATIVE & RESOURCEFULNESS**<br>Amount of drive and creativity. Ability to start and accomplish work. Degree of supervision needed. | 3 | JACKIE IS EXTREMELY RESOUR AND CREATIVE & WELL A ENTHUSIASTIC. |
| **7 SUPERVISORY SKILL**<br>Demonstrated ability to select, train, motivate and develop subordinates. Degree of sustained contribution from work group. | 3 | JACKIE HAS A GOOD RELATIONS WITH ALL STAFF IN OPE |
| **8 COMMUNICATION**<br>Expression of ideas verbally or written. Method and manner of speaking. Ability to observe and listen. | 3 | JACKIE IS EFFECTIVE IN HE WRITTEN AND VERBAL PRESEN |
| **9 PROFESSIONAL DEVELOPMENT**<br>Commitment to professional growth through development of skills and knowledge. | 3 | JACKIE IS CURRENT AND I INTERESTED IN NEW PROG |
| **10 ADAPTABILITY**<br>Efficiency under stress. Receptiveness to change/new ideas. Poise and/or courtesy in tough situations. | 3 | JACKIE IS EXTREMELY FLE AND ACCOMODATING. |
| **11 ATTITUDE & COOPERATION**<br>Degree to which employee is supportive ...tive decisions and | 4 | JACKIE IS ALWAYS POSIT WITH A VERY GOOD SENSE |

00352

.VELOPMENT SUMMARY

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENTAL NEEDS |
|---|---|
| JACKIE IS AN ENTHUSIASTIC <sup>A</sup> ASSET TO OUR HOSPITAL. | |
| JACKIE IS DEDICATED <sup>B</sup> AND LOYAL IN HER SUPPORT | |
| JACKIE INSPIRES OTHERS <sup>C</sup> WITH HER PROJECTS. | |

...ion to be taken to correct performance deficiencies where appropriate

| No. of In-Service Programs attended. | DID EMPLOYEE ATTEND ► | Safety Program ☐ YES ☐ NO | CPR ☐ YES ☐ NO | Infection Control ☐ YES ☐ NO | No. of Cont. Ed. Prog. Attended | Contact Hrs. |
|---|---|---|---|---|---|---|
| The position description for this employee has been reviewed and is current. | | ☐ YES ☐ NO | A revised position description has been attached. | | ☐ YES ☐ NO | |

## D. EMPLOYEE COMMENTS

...you have any comments concerning this appraisal?
☐ YES ☐ NO

C0027

NOTE MBO Summary may be substituted for this section

## MAJOR ACCOMPLISHMENTS DURING APPRAISAL PERIOD

| BRIEFLY IDENTIFY INDIVIDUAL GOALS/PROJECTS, MBO'S OR OTHER ACCOMPLISHMENTS | BRIEFLY SUMMARIZE EMPLOYEE'S PERFORMANCE | CODE |
|---|---|---|
| JACKIE IS ACTIVE IN COMMUNITY ACTIVITIES | JACKIE IS VERY INVOLVED AND RESPECTED AS A COMMUNITY LEADER. | |
| JACKIE HAS IMPLEMENTED AN EMPLOYEE ACTIVITY PROGRAM | JACKIE HAS ORGANIZED INTEREST IN EMPLOYEE ACTIVITIES AND HAS RECEIVED AN ENTHUSIASTIC RESPONSE. | |
| JACKIE HAS PLANNED APR/MARRIOTT PROGRAM FOR THE YEAR | JACKIE IS VERY KNOWLEDGEABLE AND THOROUGH IN HER PLANNING OR MARKETING PROGRAMS. SHE IS ALWAYS ON TARGET WITH DEADLINES | |
| JACKIE HAS ASSISTED IN PUBLIC IN RECRUITING | JACKIE IS ENTHUSIASTIC IN HER RESPONSIBILITIES OF MARKETING TO PHYSICIANS AND SUPPORTING PHYSICIAN RECRUITING. | |

C0523

103

Humana

POSITION DESCRIPTION

Employee Development/Public Relations

Director

**POSITION GOAL**

Plan, organize, direct, control and evalua
provided by the hospital for the general

**POSITION RESPONSI**

Establish strong working relationshipes
Perform liaison activities on behalf of
Organizational skills and good judgement
Knowledge of hospital services, organizational structure, policies and
    procedures and hospital service area.
Knowledge of external factors affecting hospital.
Written/verbal communication skills including public speaking apilities.
Decision making ability.
Membership and participation on appropriate external boards, committees
    and professional organiztions.
Leadership and motivational ability.
Ability to work under pressure.
Develop good working relationships with members of the media.

*Job Description*
*Public Relations*

**INTERACTION WITH OTHER DEPARTMENTS**

Works with all departments, community organiztions, community leaders
to promote hospital.

**POSITION REQUIREMENTS**

Experience
  In health care public relations or related field.

Education
  Bachelors degree

Special Qualifications
  Strong ability to motivate people and network.  Resourcefulness.

Outside Relationships
  Establish good working relationships with media — print, radio & televisi
  Community leaders, government officials, local clubs and organizations.

Budget
  N/A

Assets Controlled
  N/A

Employees Supervised
  Hospital staff as needed.

COO29

al Demands
  Walking, sitting, standing, bending, lifting & stooping.

Career Path
  N/A

Degree of Supervision Required
  Minimal

104

CRITERIA BASED PERFORMANCE APPRAISAL

*Jacqueline Tain*

Job Title: Director, Public Relations/Marketing
Department: Administration

**STANDARDS OF PERFORMANCE**

**EVALUATION CRITERIA**

I.    Proficiency in Field/Specialty

1. Strong ability to adapt to unexpected situations, deadlines and react accordingly.

2. Ability to complete all projects in an effective and timely manner.

3. Establish strong working relationships with local media: Newspapers, Radio and Television to enhance positive image of Hospital in community, including maintaining current media label list for mailing.

4. Act as Hospital spokesperson and information source when contacts are initiated by media including acting as escort within hospital and serving as liaison between media and department managers.

5. Work with administrators and other key individuals and departments to solve problems that interfere with customer satisfaction.

6. Initiate contact and act as liaison with local companies, organizations and government officials.

7. Plan and develop advertising schedule.

8. Knowledge of community including: hospital service area/demographics, community organizations, local and county government officials.

9. Strong creative writing ability

10. Strong ability to enhance and expand the image of hospital among its various publics through: planning, developing, coordinating and promoting new and exiting community outreach programs.

C0030

105

Proficiency in
Field/Specialty
(continued)

11. Maintain and update hospital
    scrapbook.
12. Oversees management of
    Volunteer Services.
13. Management of Seniors
    Association.
14. Excellent public speaking
    skills.
15. Adept to 35mm photography.
16. Develop brochures and
    promotional materials for
    hospital programs to include
    coordination of: design,
    typesetting, proofreading copy
    and production of promotional
    material.
17. Recommend outside services as
    needed ie: graphic artist,
    mailhouse.
18. Provides on-going com-
    munications with employees
    through bi-weekly internal
    publication.
19. Promote hospital regularly
    through press releases.
20. Perform all duties as required
    by the Executive Director.
21. Provides safe, clean and secure
    environment through available
    resources.
22. Responds to and provides
    direction in emergency
    procedures as necessary
    including fire drills, disaster
    drills, etc.

II.  Administrative
     Effectiveness

1. Performs managerial functions
   including evaluation of staff,
   disciplinary action and skills
   development.
2. Responsible for prioritization
   of duties including completion
   of special projects in a timely
   and effective manner.
3. Serve as a resource person for
   hospital personnel and
   community.
4. Responsible for completion of
   assignments in a timely and
   effective manner to include
   routine and special projects.
5. Be responsive to changes in
   priorities without compromising
   regular responsibilities and
   activities.

00031

106

III. Leadership

1. Take a leadership role in the community and hospital to enhance image, promote projects/programs.

2. Conducts all aspects of supervisory role in a fair, consistent and objective manner.

3. Strong ability to manage people and projects to insure success ie: chairing various community committees and volunteer programs.

4. Strong ability to function effectively and accurately under deadline pressure and/or media crisis while maintaining good interpersonal relations.

IV. Judgment/Decision

1. Initiates sharing of know-ledge and expertise to organizations/individuals requiring hospital services.

2. Foresees potential problem situations and intervenes to offset adverse impact.

3. Consults with or advises administrative officers of situations regarding follow-up or specific attention.

4. Provides rational explanation for decisions and actions to administrative officers, to patients and their families, or to other appropriate individuals as required.

5. Makes sound judgments after gathering factual, objective information or data base.

V. Relationships

1. Strong ability to interact with employees and physicians.

2. Strong ability to ingeract with all levels of individuals with-in local communities/government and media.

3. Strong ability to create a positive atmosphere in the workplace.

4. Ability to motivate and inspire positive attitudes.

C0032

107

VI.  Initiative/
     Resourcefulness

1. Participates effectively in hospital operations.
2. Responds quickly to the changing health care environment and promotes direction to meet these changes.
3. Performs all duties with relative efficiency and effectiveness.
4. Capable of performing all duties as assigned by the Executive Director.
5. Develops community programs and solicit funding
6. Promote community programs in areas of resistance.

VII. Supervisory Staff

1. Conducts all aspects of role in a fair, consistent and objective manner.
2. Provides leadership and educational opportunities to staff as well as disciplinary actions as necessary.
3. Monitors duties and responsibilities assigned to staff.

VIII. Communication

1. Maintains and promotes open communications with employees, medical staff and media.
2. Demonstrates ability to communicate both verbally and written.
3. Initiate positive media interest through press releases and telephone.
4. Is a positive role model.

IX.  Professional
     Development

1. Assumes a responsibility for ensuring both personal and professional growth.
2. Participates in Continuing Education programs as appropriate.
3. Graduate from an accredited college or university with internship in the Leisure Services Field.
4. Participates in professional organization.
5. Is self motivated to establish and promote new programs to benefit community/employees.

000308

X.   Adaptability

1. Demonstrates objectivity and maturity under stress.
2. Performs in other administrative capacities as needed.
3. Responds positively to changing situations in the work setting.
4. Strong ability to handle numerous projects while preforming other activities as directed.

XI.  Attitude and Cooperation

1. Is able to accept and profit from constructive criticism.
2. Presents a professional appearance.
3. Attendance and reliability through proper use of sick time, advance planning and corrective action to prevent recurring absences.
4. Demonstrates physical and emotional capability to perform position responsibilities.
5. Is supportive of hospital goals, decisions and policies as well as corporate goals.

JDVJL

C0034

109

01289

# Humana Hospital
## Pembroke

**MEMO**

**DATE:**   January 31, 1992

**TO:**     Jerry Sutphin, Executive Director

**FROM:**   Jackie Iaia, Director of Public Relations/Marketing

**RE:**     Vacation Extension

I have 24 hours of accrued vacation time to take by my anniversary date February 5, 1992.

I am requesting a 30 day extension period.  With my current schedule I can take February 7th and February 10th and another day prior to March 4th.

Please advise.

JI:tl

DEFENDANT'S
EXHIBIT
5

## B. PERFORMANCE CHARACTERISTICS

| RATE THE FOLLOWING | CODE | COMMENTS |
|---|---|---|
| **1 PROFICIENCY IN FIELD/SPECIALTY**<br>Degree of competence. Professional manner. | 3.5 | Has developed well in field. |
| **2 ADMINISTRATIVE EFFECTIVENESS**<br>Skill in planning, organizing and implementing work assignments or projects. | 3.5 | Good organizational skills. |
| **3 LEADERSHIP**<br>Skill in getting work done through formal or informal direction of others. | 3 | Very ~~good~~ good at organizing events (Blood Drives) and employee activities. |
| **4 JUDGEMENT/DECISION MAKING**<br>Degree of analysis, objectivity and foresight used to make decisions. | 3 | Seeks input.<br>Objective in making decisions |
| **5 RELATIONSHIPS**<br>Ability to work with subordinates, peers and superiors. | 4 | Works well with all concerned |
| **6 INITIATIVE & RESOURCEFULNESS**<br>Amount of drive and creativity. Ability to start and accomplish work. Degree of supervision needed. | 4 | Very persistent in accomplishing tasks assigned. |
| **7 SUPERVISORY SKILL**<br>Demonstrated ability to select, train, motivate and develop subordinates. Degree of sustained contribution from work group. | N/A | |
| **8 COMMUNICATION**<br>Expression of ideas verbally or written. Method and manner of speaking. Ability to observe and listen. | 4 | Has good written and verbal skills |
| **9 PROFESSIONAL DEVELOPMENT**<br>Commitment to professional growth through development of skills and knowledge. | 4 | Very active in professional organization |
| **10 ADAPTABILITY**<br>Efficiency under stress. Receptiveness to change/new ideas. Poise and/or courtesy in tough situations. | 4 | Handles most situations very well. |
| **11 ATTITUDE & COOPERATION**<br>Degree to which employee is supportive of organization's objectives, decisions and policies. Accepts and profits from constructive criticism. | 4 | Very supportive of organizations goals. |
| **OVERALL RATING** | 3.7 | |

DEFENDANT'S EXHIBIT 6

C0022

1993

## C. DEVELOPMENT SUMMARY

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENTAL NEEDS |
|---|---|
| A.  *See Notes below* | A. |
| 1  B. | B. |
|    C. | C. |

**Action to be taken to correct performance deficiencies where appropriate**

2   *Jackie does an excellent job in promoting the facility through the Chamber of Commerce and other local organizations. Needs to continue to develop relationships with media and other organizations to promote and enhance the hospital's image within the community.*

| 3 | No. of In-Service Programs attended. | DID EMPLOYEE ATTEND ▶ | Safety Program ☐ YES ☐ NO | CPR ☐ YES ☐ NO | Infection Control ☐ YES ☐ NO | No. of Cont. Ed. Prog. Attended | Contact Hrs |
|---|---|---|---|---|---|---|---|
| 4 | The position description for this employee has been reviewed and is current. | | ☐ YES ☐ NO | A revised position description has been attached. | | ☐ YES ☐ NO | |

## D. EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal?
☐ YES ☐ NO

1998

C0023

57

ATTACHMENT / EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FT. LAUDERDALE DIVISION

 3              CASE NO. 00-6227-CIV-MORENO
                   Magistrate Judge Dube
 4
     JACQUELINE IAIA,
 5
                     Plaintiff,
 6
     vs.
 7
     COLUMBIA HEALTHCARE
 8   CORPORATION d/b/a PEMBROKE
     PINES HOSPITAL, a foreign
 9   corporation,

10                   Defendant.

11   _____/

12

13

14         DEPOSITION OF PATRICIA ANN PIERCE

15         Taken before Richard Greenspan, Registered

16   Merit Reporter and Certified Realtime Reporter, Notary

17   Public in and for the State of Florida at Large,

18   pursuant to Notice of Taking Deposition filed by the

19   Defendant in the above cause.

20                      -   -   -

21

22

23
     Wednesday, July 26, 2000
24   One East Broward Boulevard, Suite 700
     Ft. Lauderdale, Florida
25   9:45 - 11:00 a.m.
```

KNIPES-COHEN/SPHERION COURT REPORTING
(561) 478-0401



1    Office for most of the time I was there, the

2    secretarial support staff and, of course, the CEO.

3         Q     I take it, Ms. Pierce, that when you worked

4    at the hospital, you did not at any time supervise Ms.

5    Iaia?

6         A     No, we were on the same level.

7         Q     You were directors on the same level?

8         A     Correct.

9         Q     What about Ms. Montiero, did you supervise

10   her at any time?

11        A     No.

12        Q     Was she also a director on the same level?

13        A     No.  Monique Montiero reported to the

14   Marketing/Public Relations person when she was

15   Director of Seniors.

16        Q     Do you recall when Ms. Iaia transferred over

17   to the Pembroke Pines Hospital?

18        A     Humana took over the hospital in 1990.

19   Valerie Lockwood was the Marketing/Public Relations

20   person at that time.  She transferred to Miramar and I

21   believe that was around '91.

22             At that time Jackie Iaia worked at South

23   Broward and she assumed responsibility for both

24   facilities.  She was doing Marketing/Public Relations

25   for Pembroke and for Humana South Broward.

1     Q     How long did she do that for, until they

2     closed South Broward, was that later that same year?

3     A     I think so.  Maybe early -- late '91, early

4     '92, somewhere around there.

5     Q     Was it approximately that time period she

6     transferred over and became an employee at South

7     Broward -- I'm sorry at Pembroke Pines?

8     A     Yes.

9     Q     Did you ever work at Humana Hospital South

10    Broward?

11    A     No.

12    Q     Did you know Jackie Iaia prior to the time

13    that she became an employee at the Pembroke Pines

14    Hospital?

15    A     No.

16    Q     So you first came to know her when she

17    transferred from the South Broward Hospital to the

18    Pembroke Pines Hospital?

19    A     Well, when she was doing both.

20    Q     For that transition period when she was doing

21    both and then later whether she came over on a

22    full-time basis?

23    A     That's right.

24    Q     Was her office located in any proximity to

25    where your office was when you were the Director of

1    A    No, I did not attend.

2    Q    Let me try that again and that's my fault, I

3    did not ask the question properly.

4         Ma'am, after June of 1993, did you continue

5    to attend the meetings of senior management?

6    A    No.

7    Q    Do you know who made the decision to

8    eliminate Jackie Iaia's position?

9    A    I believe it was Jerry Sutphin.

10   Q    Did you ever discuss that issue specifically

11   with Mr. Sutphin?

12   A    No.

13   Q    Did Mr. Sutphin ever say to you or to others

14   in your presence the reason or reasons why he may have

15   chosen to eliminate Jackie Iaia's job?

16   A    No.

17   Q    Did you ever hear Mr. Sutphin say that the

18   reason that he was laying Jackie Iaia off or

19   eliminating her job was because of her age?

20   A    No.

21   Q    Did you ever hear any senior management

22   personnel at the hospital say anything like that?

23   A    No.

24   Q    Do you know when Mr. Sutphin left the

25   hospital relative to when Ms. Iaia left the hospital?

1    A    It wasn't long after.

2    Q    Do you know the circumstances in which he

3    left?

4    A    He wanted to go back to Humana.  That was my

5    understanding.

6    Q    And who was he replaced by?

7    A    Rick O'Connell.

8    Q    Before you were telling me the names of the

9    senior management people before and after the Columbia

10    switch.  I will call it the Columbia switch.

11        One I didn't write down was Chief Financial

12    Officer.  You told me Michael Scialdone was the CFO

13    prior to Columbia's involvement.  Was he replaced by

14    someone after Columbia became involved?

15    A    I think he left, he transferred to another

16    facility and I think Rob Carroll became the CFO.  But

17    I'm not quite sure of the timeframe when that

18    happened.  Mike may have been there during the

19    transition and left, but he may have been gone before

20    then.  I'm not 100 percent sure.

21    Q    Do you know if there were any members of the

22    senior management team that were not replaced after

23    Columbia became involved in the hospital?

24    A    That were not replaced?

25    Q    Yes.

1 A I don't know:

2  (Pause)

3 Q Ms. Pierce, let me show you a document that I

4 am marking for identification as Exhibit 1 and ask you

5 if you would take a moment and look at that and tell

6 me if you recognize that affidavit.

7  (Defendant's Exhibit 1 was marked for

8 identification.)

9 A Yes, I do.

10 Q Is that something that you signed?

11 A Yes.

12 Q On or about November 19, 1997?

13 A That's right.

14 Q What were the circumstances, Ms. Pierce, in

15 which this document was prepared?

16 A Jackie Iaia asked me I could attest to some

17 of the sequence of events around that time.

18 Q Did she ask you in or about November of 1997,

19 that is using the date of this affidavit as a

20 timeframe?

21 A Yes.

22 Q Based upon her request, did you then prepare

23 this affidavit?

24 A Yes.

25 Q Did you discuss its contents at all with her

1    important for the seniors program and it was always

2    kind of like a big deal, so it stuck in my mind.

3    That's why I knew that.

4            MR. JANKOWSKI:  She was a Seminole.

5            THE WITNESS:  They go on and on and on.

6        A    Jackie, I knew she had a degree in social

7    services from what she had told me and I may have

8    asked her what, I knew she had gone to school

9    somewhere up in Virginia or the Carolinas or somewhere

10   and I may have clarified that point with her when I

11   did the affidavit, but that was it.

12       Q    Were was any of the content of this affidavit

13   based upon things that she told you?

14       A    No, it was based on what I observed.

15       Q    For instance, in the last paragraph, the

16   third line down it reads "Jackie ran the seniors

17   program at Humana South Broward for a period of time."

18   Was that something that Ms. Iaia would have told you

19   about?

20       A    Yes.  Yes, you are right there.

21       Q    The paragraph before that, in the last

22   sentence it reads, "It is my understanding that Jackie

23   Iaia was never offered the position prior to it being

24   offered to Monique Montiero."  Would that have also

25   been something that Ms. Iaia told you about?

1    Q    Fair enough.  Do you recall any facts or

2  anything you observed or anything you saw during your

3  employment at the hospital, other than what we have

4  already discussed, which would lead you to believe

5  that Ms. Iaia was laid off because of her age?

6    A    Well, again, these are my observations.  It

7  just seemed like there was an attitude in the Columbia

8  corporate philosophy, young and aggressive, young and

9  aggressive, and the people, like the Nursing Director

10  and Personnel Director and the housekeeping lady,

11  there were people that were not young and were not

12  aggressive and were let go.

13    Q    That would be something based upon your

14  perceptions?

15    A    Correct.

16    Q    Anything else that you observed or saw or

17  heard that would lead you to believe that Ms. Iaia may

18  have been laid off because of her age, other than what

19  we have already discussed?

20    A    I don't know what other reason there would be

21  to lay her off because she was a long-term good

22  employee that did her job.

23    Q    Any other reasons?  Anything else you saw or

24  observed?

25    A    I observed that they replaced her with a

1    25-year-old who didn't have the same experience as she

2    did.

3        Q    Anything else that you saw or observed?

4        A    Well, some other replacements that came in

5    for the other people I spoke about were significantly

6    younger than the people that were let go.

7        Q    You are referring to the Chief Nursing

8    Officer and the Director of Human Resources?

9        A    The Chief Nursing Officer.  The Director of

10   Human Resources, actually I think Paula was older.

11       Q    Who else would you be referring to then other

12   than the Chief Nursing Officer?

13       A    Well, the consolidation of Housekeeping and

14   Engineering, the person that overed that area, he was

15   a young man.

16       Q    Any other positions specifically that you are

17   referring to other than that position and the Chief

18   Nursing Officer?

19       A    There was something to do with the physicians

20   answering, was it the answering service or physician

21   referral service, and I think that was another

22   consolidation, but again, the person that was -- I

23   think that was her that was just outside in the hall.

24   She just jogged my memory.  She was also let go and

25   became a function I believe of the Medical Staff

1     A     Absolutely.

2     Q     Was there any kind of policy that you recall

3  in 1993 during this merger of whether seniority was

4  given consideration in job consolidations?

5     A     Yes, to the best of my recollection,

6  seniority was a consideration.

7     Q     Was that something that normally was taken

8  into consideration during a job hire or promotion?

9     A     No, it was a criteria for job elimination as

10  well.

11     Q     If I understand your testimony earlier with

12  Mr. Del Russo, in 1993, November, Columbia was the

13  entity at the time that was operating Pembroke Pines

14  Hospital?

15     A     Yes.

16     Q     They had merged and taken over for Galen

17  Hospital, correct?

18     A     Correct.  I believe that happened around

19  September of '93.

20     Q     And as far as you know, to your own personal

21  knowledge, the decision to eliminate Jackie Iaia's

22  position was Jerry Sutphin's decision or the CEO?

23     A     Yes.

24     Q     Do you know if anyone else was involved in

25  that decision to your personal knowledge?

 1     A     No.   Jerry didn't rule by committee and I

 2     know Jerry is the one that told her from what she told

 3     me.

 4     Q     Do you have any reason to doubt that?

 5     A     No.  None.

 6     Q     You say in your affidavit that Monique

 7     Montiero had no experience in marketing and public

 8     relations?

 9     A     Correct.

10     Q     What is that based on?

11     A     Personal knowledge.

12     Q     She was hired right out of college?

13     A     Yes.

14     Q     So her only experience was the experience she

15     had at the hospital?

16     A     Yes.

17     Q     And her only position at the hospital to your

18     knowledge was Senior Friends prior to November 1993?

19     A     Correct.

20     Q     Jackie had experience, Jackie Iaia had

21     experience in both Senior Friends and in

22     Marketing/Public Relations, correct?

23     A     Correct.  She was also a social worker as

24     well.

25     Q     And she had Senior Friends experience within

1    the hospitals where she worked that was part of that

2    Humana Columbia network, correct?

3       A    Correct. I know she had done Senior Friends

4    at South Broward for a period of time.

5       Q    What was the policy for Columbia on retaining

6    personnel files, was there any kind of policy of

7    destroying personnel files?

8       A    Not of destroying, no.

9       Q    What would happen to an employee who was

10   eliminated with their personnel file, was it kept on

11   location or was there a procedure to that effect?

12      A    Generally the files were kept for a period of

13   time on the premises and then as space needs deemed,

14   they were sent to off-site storage.

15      Q    Where, do you know, what off-site storage may

16   have been used?

17      A    No, I don't. I just call for records

18   occasionally and sometimes they were there, sometimes

19   they had to request them.

20      Q    As a Risk Manager, you had the occasion to go

21   into personnel files at various times?

22      A    Yes, many times.

23      Q    So you were familiar with the filing system

24   for personnel files?

25      A    Yes.

1    Q    Do you remember any occasion where the Miami

2    Dolphins cheerleaders came into the hospital?

3    A    Yes.

4    Q    Could you tell us about the reason why they

5    were there?

6    A    It was the holidays.  I think they came to

7    visit the kids.  They came with some of the football

8    players, the cheerleaders.

9    Q    That was part of the Public Relations, part

10   of the Seniors or what was the connection?

11   A    Public Relations.

12   Q    Was there anything from that occasion that

13   you recall that Mr. Sutphin was involved in?

14   A    Well, again, this is one of these, to mention

15   it, he was very happy to see the cheerleaders and they

16   were passing out like baseball cards with pictures of

17   themselves and he had taken one of the cards and

18   after, you know, the girls had left and gone upstairs

19   or whatever, he was like, like touching the card.

20   Q    It's probably uncomfortable for you, but can

21   you describe in a little more detail how he was

22   touching the card?

23   A    It was like he was touching them.  He was

24   like holding the card like in his hand and he was like

25   (indicating).

1        MR. JANKOWSKI:  For the record, indicating

2      the card is in the palm of his hand and stroking.

3        MR. DEL RUSSO:  I will object to your

4      characterization, but my objection is noted for

5      the record.

6        MR. JANKOWSKI:  I am just describing her

7      hand motion since we are not on a video depo.

8    Q    If you want to describe in more detail

9    rather than me put words in your mouth.

10    A    No, I don't really.  He did it.  I was

11    standing right there when he did it.

12    Q    Did you notice any flirting or preferences

13    that Mr. Sutphin may have had for younger women?

14    A    He -- his attitude.  He objectified women and

15    that's what came across.  If you were young and cute

16    he was nicer to you than if you weren't.

17    Q    Did you see any preference that he gave to

18    Monique Montiero over Jackie Iaia on how he treated

19    them?

20    A    I think he was nicer to Monique.  I think he

21    liked her better than Jackie.  Absolutely.

22        MR. JANKOWSKI:  I have no further questions.

23                REDIRECT EXAMINATION

24    BY MR. DEL RUSSO:

25    Q    Why do you say that, ma'am, what facts do you

**AFFIDAVIT**

1997 DEC 17 PM 12: 35

STATE OF FLORIDA
COUNTY OF BROWARD

Before me this day personally appeared Patricia Pierce who, being duly sworn, deposes and says the following:

I, Patricia Pierce, was employed at the hospital currently known as Memorial Hospital Pembroke and formerly known as Pembroke Pines Hospital, Humana Hospital Pembroke and Pembroke Pines General Hospital from August 1979 to November 1995.

In 1990, Humana acquired the hospital. Valerie Lockwood, the Director of Marketing/Public Relations at Pembroke, transferred to Humana's local corporate office in Miramar shortly after the change to Humana. Jackie Iaia, the Marketing/Public Relations Director at Humana Hospital South Broward assumed responsibility for both Humana Hospital South Broward and Humana Hospital Pembroke. In 1991, Humana elected to close down Humana Hospital South Broward and Jackie Iaia transferred permanently to Humana Hospital Pembroke.

In 1993, Humana decided to split up the HMO insurance part of the business from the hospital segment and created a new corporation, Galen Healthcare as the umbrella organization for the hospitals. The hospital was renamed Pembroke Pines Hospital at that time. Shortly thereafter, Columbia and Galen merged and Columbia took over operations at Pembroke Pines Hospital. All employees retained their seniority.

A management decision was made to consolidate the positions of the Marketing/Public Relations Director and the Director of the Seniors Program. Monique Monteiro was the Seniors Program Director at the time, a position that had reported to the Marketing/Public Relations Director in the past. Monique had been employed by the hospital for approximately three years at this point in time. Monique Monteiro was given the consolidated position and Jackie Iaia's employment after 20 years of service between South Broward and Pembroke was terminated. It is my understanding that Jackie Iaia was never offered the position prior to it being offered to Monique Monteiro.

Both women are college graduates. Monique Monteiro had a degree in leisure services from Florida State and Jackie Iaia had a degree in Social Services from the University of Charleston. Jackie Iaia had experience in both marketing/public relations and in running the seniors program. Jackie ran the seniors program at Humana South Broward for a period of time. Monique had no experience in marketing/public relations when the positions were consolidated. Jackie Iaia was in her mid-forties. Monique Monteiro was in her mid-twenties.

_Patricia Pierce_
Patricia Pierce


Sworn to and subscribed before me this ___19___ day of November, 1997.

_Doris Levine_
Signature of Notary Public

_DORIS LEVINE_
Printed Name

DORIS LEVINE
MY COMMISSION # CC 5699??
EXPIRES: November 8, 200?
Bonded Thru Notary Public Underwri...

**DEFENDANT'S EXHIBIT**
_1_
7/26/00

Personally Known ___✓___ or produced identification _____
Type of identification produced_____

Q A

ATTACHMENT / EXHIBIT 3

1

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2                FORT LAUDERDALE DIVISION

 3            CASE NO. 00-6227-CIV-MORENO

 4

    JACQUELINE IAIA,
 5
                  Plaintiff,
 6
    vs.
 7
    GALEN HOSPITAL-PEMBROKE PINES,
 8  INC., f/d/b/a PEMBROKE PINES
    HOSPITAL, a foreign corporation,
 9
                  Defendant.
10  _____/

11
                        3111 Stirling Road
12                      Fort Lauderdale, Florida
                        October 18, 2000
13                      2:25 p.m. - 5:25 p.m.

14  APPEARANCES:

15  JOHN F. JANKOWSKI, JR., P.A.
    BY:  JOHN F. JANKOWSKI, ESQ.
16  Attorney for the Plaintiff

17  BECKER & POLIAKOFF, P.A.
    BY:  RODERICK V. HANNAH, ESQ.
18  Attorneys for the Plaintiff

19  LEVY, KNEEN, MARIANI, CURTIN, KORNFELD & DEL
    RUSSO, P.A.
20  BY:  ALEXANDER D. DEL RUSSO, ESQ.
    Attorneys for the Defendant
21
    ALSO PRESENT:  JACQUELINE IAIA
22

23                    DEPOSITION

24                        OF

25                  MONIQUE MONTEIRO
```

ORIGINAL

CAPITAL REPORTING SERVICE, INC.
Fort Lauderdale, FL  (954) 522-6401



PLAINTIFF'S
EXHIBIT
1
C

70

1    on this line.

2           A.    Right.   That was the title change

3    from, to.

4           Q.    And with that promotion did you

5    receive an increase?

6           A.    Yes.

7           Q.    Do you recall what that increase was?

8           A.    Ten percent.

9           Q.    Now, is that the 10 percent that's

10   reflected back on this schedule back here, which

11   is Bates stamped 109?  This line up on top

12   12-26-93, that would be a 10 percent increase

13   there?

14          A.    I would guess so.

15          Q.    The year before that was 4.8

16   percent.  The year before that was 6.5 percent.

17   The year before that was 1.6 percent.  Was that

18   the interim report?

19          A.    Yes.

20          Q.    Those numbers are accurate, to the

21   best of your knowledge?

22          A.    They jive.

23                MR. JANKOWSKI:  We can mark this as

24   No. 17.

25                (Whereupon, a document was marked as

71

1          Plaintiff's Exhibit No. 17 for

2          identification by the reporter.)

3          Q.   (MR. JANKOWSKI)  I show you an

4    employee personnel -- I'm sorry.  Employee

5    Performance Appraisal, which seems to cover the

6    same period of time, 1993.  I ask you if you

7    recognize that.

8          A.   I don't think this first sheet is

9    right, is it?  '95, '94.  Yes, I guess.  Because

10   this is '95.  I think this was just late when I

11   got it.

12         Q.   The Bates stamp should be in order,

13   92, 93, 94, 95, 96.  I can't speak whether they

14   are correct.  That's why I'm asking you to look

15   at that.  If it's not correct, please let me

16   know.

17              MR. DEL RUSSO:  Object to the form.

18              THE WITNESS:  '93, '94.  I guess this

19   would be the one for that time frame.  It seems

20   like it should have been January to January

21   according to my last evaluation, which was

22   January.  It's close.  It's not exact.  It's my

23   evaluation.

24         Q.   (MR. JANKOWSKI)  For the time period

25   12-1-93 to 12-1-94?

72

1          A.   Well, that's the thing that -- I mean

2    this is for January.  My title change was

3    actually in January, so I guess they were just

4    always late.  I don't know when they did their

5    evals.

6          Q.   And this evaluation was done by whom?

7          A.   This one was done by Pam Corliss,

8    also.

9               MR. JANKOWSKI:  If you can mark that

10   then as No. 18.

11               (Whereupon, a document was marked as

12        Plaintiff's Exhibit No. 18 for

13        identification by the reporter.)

14          Q.   (MR. JANKOWSKI)  Next to your

15   signature is 1-17-95, correct?

16          A.   Right.

17          Q.   I'm going to show you an Employee

18   Performance Appraisal which has the dates on it

19   of 12-2-92 to 12-2-93 and ask you to look at

20   that as well.

21          A.   This one states '94, also.  '92, '93.

22          Q.   Now, there's no -- I'm not trying to

23   trick you here.  These are marked Bates

24   stamped.  That's how I received them.  So I need

25   to understand if something goes with something

1    else and the dates are wrong.  If we can clarify

2    that, if you know.

3         A.    No.  I guess it just throws me off.

4    It starts in '92 and then I sign in '94.  It's

5    just that they flow over to the next year,

6    because it's right on that deadline.  So this

7    would have been for the year '92 -- year of

8    '93.  And this is for the year of '94, right?

9    Yes.

10        Q.    I can't speak.  I don't know.  I know

11   what they say on the face of the document, but I

12   can't speak to the accuracy of it.

13        A.    Right.

14        Q.    I want to show you -- maybe this will

15   help if I can just grab this for a second.  On

16   the third page, which is Bates stamped 114, this

17   paragraph talks about a Rec. 5 percent merit

18   increase.

19        A.    Received 5 percent merit increase,

20   plus 10 percent adjustment for PR.  So this

21   was -- this is the one that went with this.

22   This one here goes with this one.

23        Q.    I'm sorry?

24        A.    This goes with this.

25             MR. DEL RUSSO:  You better indicate

1  the numbers, otherwise this is going to be

2  meaningless.

3          MR. JANKOWSKI:  Do you want to go off

4  the record to try and clarify?

5          MR. DEL RUSSO:  Off the record.

6          (Discussion off the record.)

7          MR. JANKOWSKI:  We are marking the

8  Bates stamps 112 through 115 as Exhibit 19.

9          (Whereupon, a document was marked as

10         Plaintiff's Exhibit No. 19 for

11         identification by the reporter.)

12     Q.    (MR. JANKOWSKI)  Miss Monteiro, if

13  you could clarify for the record what goes with

14  what.

15     A.    Personnel Action Request marked

16  Exhibit 17 goes with the Employee Performance

17  Appraisal marked Exhibit 19.

18     Q.    So these two coincide.

19     A.    Right.

20     Q.    And I showed you the paragraph --

21  here.  If you could explain these two increases

22  for me.  I'm pointing to a page Bates stamped

23  114.

24     A.    It looks like I was given a 5 percent

25  increase for my annual review of my senior

1    position for the year of 1993 and then a 10

2    percent adjustment for the title change to

3    public relations and senior services for

4    effective in January of '94.

5          Q.   Now, if you look at page -- the Bates

6    stamped number of 111, in the middle of the

7    page.  These are the increases of which you

8    spoke.  So we have the 10.05 percent increase,

9    which according to this printout was effective

10   12-26-1993.

11         A.   Yes.

12         Q.   And that was an increase that you

13   received when you became the public relations --

14         A.   Correct.

15         Q.   That was for the promotion.

16         A.   Right.

17         Q.   And then you received another 5

18   percent increase on January the 9th, 1994, and

19   that was your merit increase.

20         A.   I'm assuming that that's what that

21   is, yes.

22         Q.   So within that two-month span you

23   received an increase of 15 percent.

24         A.   Right.  Or two-week span, actually,

25   not two months.

80

1      Q.  How long after Jackie left did you

2  occupy the position of Director of Public

3  Relations?

4      A.  I was officially given that in my

5  evaluation in January.

6      Q.  But your raise of 10 percent was

7  effective in December.

8      MR. DEL RUSSO:  Object to the form.

9      THE WITNESS:  I don't know what to

10  say about that.  It could have been

11  retroactive.  I don't know how they did it.

12      Q.  (MR. JANKOWSKI)  But you agree with

13  me that the raise was effective in December,

14  December 26.

15      MR. DEL RUSSO:  Object to the form.

16      THE WITNESS:  Yes.

17      Q.  (MR. JANKOWSKI)  Let's go back to the

18  page.  I show you -- the line item I believe is

19  12-26-1993.

20      A.  Right.

21      Q.  That was the effective date of the

22  10.05 percent increase.

23      MR. DEL RUSSO:  Object to the form.

24  The document speaks for itself.

25      THE WITNESS:  Right.

81

1          Q.    (MR. JANKOWSKI)   I'm going to show

2    you a copy of the Stat newsletter dated March

3    1993.

4          A.    That's it.

5          Q.    So Jackie Iaia was the editor then.

6          A.    Yes.

7          Q.    And the editor was the person who's

8    the Director of Public Relations?

9          A.    Traditionally, I believe so.

10         Q.    When did you become the editor -- or

11   did you ever become the editor of the Stat?

12         A.    Yes, I did.

13         Q.    When did you become the editor of the

14   Stat?

15         A.    I think I started doing them shortly

16   after they let her go.

17         Q.    Do you recall how short of a period

18   that was?

19         A.    It could have been November or

20   December.  I mean the editions came out monthly,

21   so they wanted them out every month.

22              MR. JANKOWSKI:   Let's mark this as

23   20.

24              (Whereupon, a document was marked as

25         Plaintiff's Exhibit No. 20 for

82

1    identification by the reporter.)

2        Q.   (MR. JANKOWSKI)   I would like to show

3    you a copy from a Stat dated December 1993.

4        A.   That's me.

5        Q.   That's you.  So then you became the

6    editor, as far as you know by this document, in

7    December of 1993.

8        A.   Yes.

9        Q.   How much time prior to the actual

10   publication do you begin working on the

11   newsletter?

12       A.   Almost immediate.  After one goes

13   out, then you start keeping stuff for the next

14   one.

15       Q.   When are these typically published?

16   In what time period of the month?

17       A.   I always try to get them out the

18   first week in the month.  But I mean if that

19   happened or not, it just depended on the month,

20   I guess.  But I would say typically the first

21   week of the month, otherwise you're going to get

22   old news.

23       Q.   So they're published the first week

24   of the month and immediately you begin preparing

25   for the subsequent month.

83

1      A.   Yes.  I would keep a file, a

2  particular letter and just start shoving things

3  in there and put them together, you know, for

4  print deadline.

5           (Whereupon, a document was marked as

6        Plaintiff's Exhibit No. 21 for

7        identification by the reporter.)

8      Q.   (MR. JANKOWSKI)  Was there any

9  position posted for the Director of Public

10  Relations after Jackie Iaia left that you're

11  aware of?

12      A.   Not that I was aware of.

13      Q.   Did you interview for the position?

14      A.   No.

15      Q.   How did you receive the position?

16      A.   The first time that I found out about

17  it officially was at my evaluation, that she

18  basically asked me - I think that's why my

19  evaluation was done in two parts - if that was

20  something that I would be interested in taking

21  over.

22      Q.   Who asked you this?

23      A.   Pam Corliss.

24      Q.   Did you have any discussion with

25  Jerry Sutphin regarding this?

1    A.    Yes.

2    Q.    What did Mr. Sutphin tell you?

3    A.    After Jackie was let go and he came

4  to my office to tell me that it had happened,

5  they had laid several people off at the

6  hospital, he asked if there was anything in the

7  interim that would be considered emergency or,

8  you know, that needed to be done in the realm of

9  her duties, if I would consider helping them out

10  with that.

11    Q.    What was your response?

12    A.    My response was yes.

13    Q.    How soon after that request was made

14  of you did you actually jump in and help out?

15    A.    Specifically I couldn't really tell

16  you.  I mean I don't know, you know, how.  It

17  was a very volatile time at the hospital.  I

18  mean there was a lot going on and a lot of staff

19  changes, and the specifics all kind of run

20  together.  There are no specifics in my mind.

21    Q.    Was there any other person at the

22  hospital that took on any of Miss Iaia's

23  responsibilities?

24    A.    I don't know for sure.  I don't know

25  what other people were asked to do.

85

1        Q.   Was there any person that you worked

2    with other than your assistant --

3        A.   Miriam.

4        Q.   -- Miriam Muniz that helped you in

5    preparing the newsletter?

6        A.   The newsletter was always a -- when I

7    did it -- I couldn't speak for when Jackie did

8    it, but when I did it, it was always an effort

9    of departments submitting things to me to put in

10   the newsletter.  So it's possible that there

11   were other people that submitted things to it,

12   yes.

13       Q.   So even though the title may not have

14   included marketing, the title of Director of

15   Public Relations would include marketing

16   functions.

17            MR. DEL RUSSO:  Object to the form.

18            THE WITNESS:  Theoretically, yes.

19       Q.   (MR. JANKOWSKI)  I'm going to show

20   you a copy of an article from "The Miami Herald"

21   dated January 2nd, 1994, and ask if you by any

22   chance had seen that before.

23       A.   Probably.

24       Q.   I call your attention -- you happen

25   to be named in the middle paragraph there.  It's

1   underlined.  Would that be something that you

2   had given to "The Miami Herald" as public

3   relations manager or director?

4        A.   This drive was something that we did

5   for many, many years and usually they came out

6   the day of.  It was a very well-known event.

7   Usually they came out the day of the event, and

8   they interviewed us while we were standing on

9   the street corner and did photos.

10       Q.   When did this event take place?

11       A.   It took place sometime during the

12   month of December.  It doesn't seem to be dated

13   when it actually happened.

14       Q.   They have you -- a statement in

15   quotations in that second paragraph.  Kids in

16   Crisis was very successful.  Would that be an

17   accurate statement?

18       A.   Yes.

19       Q.   So you were interviewed by the

20   paper.

21       A.   It seems to be.

22       Q.   And it says at the end, the

23   hospital's public relations director.  Where

24   would they have gotten that information?

25       A.   I don't know.  It could have been

87

1    from me.

2             MR. JANKOWSKI:   Mark that section

3    Exhibit 22.

4             (Whereupon, a document was marked as

5          Plaintiff's Exhibit No. 22 for

6          identification by the reporter.)

7        Q.   (MR. JANKOWSKI)   At the time you took

8    over the position of public relations director,

9    was there any kind of job description given to

10   you?

11       A.   I don't recall specifically.

12       Q.   Was there any training they gave you

13   at that time?

14       A.   No.

15       Q.   Was there any seminars or anything

16   you attended?

17       A.   Not that I can recall.

18       Q.   I'm going to show you a document,

19   Pembroke Pines Hospital, Position Description,

20   and ask you to take a look at that.

21       A.   What did you call it?

22       Q.   I just read the top of the document.

23       A.   It looks like my evaluation for

24   1994.  This has a job description attached.

25       Q.   So that would be your evaluation and

92

1        Q.    Could you read the job description

2   that's set down there as far as essential

3   duties.  Take a look at that, please.  Read it,

4   please, to yourself.  You don't have to read it

5   out loud.

6              Did you have a chance to read it?

7        A.    Um-hum.

8        Q.    That's yes?

9        A.    Yes.

10       Q.    Do you agree that those were the job

11  duties and essential functions for the job of

12  Director of Marketing for the hospital, Pembroke

13  Pines Hospital back when you worked for it?

14       A.    I guess, yes.

15       Q.    You would agree that that would be an

16  accurate description, right?

17             MR. DEL RUSSO:  Object to the form.

18             THE WITNESS:  Sure.

19       Q.    (MR. HANNAH)  One of the items on

20  here, it says that marketing and public

21  relations skills are essential.  Do you see

22  that?  That's the second sentence.

23       A.    Yes.

24       Q.    Would you agree that marketing and

25  public relations skills are essential for the

93

1    job of marketing and public relations?

2        A.    Yes.

3        Q.    That's a position that you assumed in

4    you said the beginning of 1994, correct?

5        A.    Correct.

6        Q.    In addition to your duties as Senior

7    Friends, correct?

8        A.    Correct.

9        Q.    At the time that you applied for a

10   position with Pembroke Pines Hospital back in

11   1990, you had virtually no marketing or public

12   relations experience, did you?

13           MR. DEL RUSSO:   Object to the form.

14       Q.    (MR. HANNAH)   You can answer the

15   question.

16       A.    I feel I did.

17       Q.    Tell me what marketing experiences

18   you had back in August of 1990.

19       A.    Well, the job functions that I had

20   prior to that working through my internship in

21   the city and some retirement communities in

22   Tallahassee prior to my graduation, working in

23   that senior arena was a function of marketing.

24   It was building a program from nothing.  So you

25   had to go out and market what you were working

94

1    on.

2         Q.    You would agree with me that --

3         A.    I mean I guess it's a fine line, but

4    that was marketing to me.

5         Q.    You would agree with me that as of

6    the time that you applied for a job with

7    Pembroke Pines Hospital, that you had absolutely

8    no marketing or public relations experience in

9    the area of hospitals or healthcare providers.

10              MR. DEL RUSSO:  Object to the form.

11              THE WITNESS:  Correct.

12        Q.    (MR. HANNAH)  You would also agree

13   with me that at the time that you applied for a

14   position with Pembroke Pines Hospital, you had

15   absolutely no marketing experience whatsoever

16   other than in the area of seniors programs,

17   correct?

18              MR. DEL RUSSO:  Object to the form.

19        Q.    (MR. HANNAH)  Correct?

20        A.    Correct.

21        Q.    And with regard to actual marketing

22   and public relations experience as of the date

23   that you applied for a position with Pembroke

24   Pines Hospital, you would have to agree with me

25   that your experience was very limited.

95

1          MR. DEL RUSSO:  Object to the form.

2      Q.   (MR. HANNAH)  Correct?

3      A.   Yes.

4      Q.   And you would also agree with me that

5  your training in those areas, marketing and

6  public relations, as of the time that you

7  applied for a position with Pembroke Pines

8  Hospital was very limited, correct?

9          MR. DEL RUSSO:  Object to form.

10         THE WITNESS:  Yes.

11     Q.   (MR. HANNAH)  In fact, you had not

12  received any training or education in the area

13  of marketing and public relations for healthcare

14  providers or hospitals, correct?

15         MR. DEL RUSSO:  Object to form.

16     Q.   (MR. HANNAH)  This is as of the time

17  that you applied for a position with Pembroke

18  Pines Hospital.

19     A.   Correct.

20     Q.   I'm going now to the period of time

21  let's say November of 1993, December of 1993,

22  that period of time.  I would like you to focus

23  on that right now.  As of November of 1993, you

24  would agree with me that the only marketing or

25  public relations experience that you had was

1    limited to the seniors program.

2            MR. DEL RUSSO:  Object to the form.

3            THE WITNESS:  No.

4        Q.   (MR. HANNAH)  Did you have other

5    marketing and public relations experience beyond

6    the seniors program for the hospital?

7        A.    Absolutely.

8        Q.    Can you tell me what that was.

9        A.    From the time that I arrived there, I

10   worked with Valerie and other people in the

11   hospital on many hospital marketing functions

12   ranging from blood drives, Christmas parties,

13   Halloween parties.  I was on the Board of

14   Directors for the Chamber of Commerce.  I mean I

15   was like hospital cheerleader from the time I

16   got there.  I was involved in many, many

17   functions with the employees, and human

18   resources, the volunteers, and the community on

19   behalf of the hospital.

20       Q.   Are you telling me now that you had

21   extensive marketing and public relations

22   experience in the area of healthcare providers

23   and hospitals as of November 1993?

24           MR. DEL RUSSO:  Object to the form.

25           THE WITNESS:  I don't know that I

1    would use the word extensive, but I was very

2    entrenched in the hospital at that time.

3          Q.    (MR. HANNAH)   I'm focusing now beyond

4    your role as Senior Friends department.

5          A.    Right.

6          Q.    The hospital had a Director of

7    Marketing, correct?

8          A.    Yes.

9          Q.    And the --

10         A.    On and off for those three years,

11   yes.

12         Q.    And the responsibility of the

13   Director of Marketing and Public Relations was

14   to handle the marketing and public relations for

15   the hospital, correct?

16               MR. DEL RUSSO:  Object to the form.

17               THE WITNESS:  Yes.

18         Q.    (MR. HANNAH)   That was not your

19   responsibility, was it?

20               MR. DEL RUSSO:  Object to the form.

21               THE WITNESS:  In writing, no.

22         Q.    (MR. HANNAH)   In fact, it's not

23   indicated anywhere on your performance

24   evaluations that you performed any of those

25   functions, correct?

1  before that, but I don't know what she did

2  before that.

3        Q.   (MR. HANNAH)  Do you know if she had

4  more seniority than you?

5        A.   At that hospital, no.

6        Q.   With regard to the company, did you

7  know she had more seniority?

8             MR. DEL RUSSO:  Object to the form.

9             THE WITNESS:  Yes.  She was with

10  another hospital that closed before that.

11        Q.   (MR. HANNAH)  You're aware, though,

12  that she had more experience in the position of

13  Director of Marketing for a hospital than you

14  did as of November of 1993.

15        A.   Yes.

16        Q.   In fact, you had absolutely no

17  experience as a director or head of a marketing

18  or public relations program with the hospital as

19  of November 1993, correct?

20             MR. DEL RUSSO:  Object to the form.

21             THE WITNESS:  No, I don't agree with

22  that.

23        Q.   (MR. HANNAH)  Tell me which hospitals

24  you worked with as head of marketing and public

25  relations.

1    A.    The senior program that I ran at that

2   hospital for three years, three-and-a-half years

3   at that point, was a direct function of

4   marketing, period.  Just because it was called a

5   seniors program does not mean it was not a

6   function of marketing.  It was a hard core

7   marketing program that Humana developed to

8   cultivate a clientele, to bring them into the

9   hospital.

10    Q.    Isn't it true, ma'am, though, that

11   when you got your review for 1993, that you

12   recognized that you were deficient in the area

13   of marketing and public relations?

14          MR. DEL RUSSO:  Object to the form.

15          THE WITNESS:  I don't know.  I have

16   to read it.

17    Q.    (MR. HANNAH)  Let's take a look at

18   that.  Plaintiff's Exhibit No. 19, which was

19   your performance review for 1993.  Let's go to

20   the last page of that document.  You would agree

21   with me those are your comments on that page?

22   That's your handwriting?

23    A.    Yes, it is.

24    Q.    Could you go look at that last

25   comment there.  And I think the -- I'm sorry to

110

1    take it away from you, but the category says,

2    what training and development do you need to do

3    a better job in your current or future

4    position?  Could you read that into the record.

5        A.   Marketing skills - that will come in

6    time by doing and asking questions.  Looking

7    into taking marketing classes.

8        Q.   Isn't it true, ma'am, that you

9    recognized that you needed further development

10   in that area of marketing in order to do the job

11   of being head of the director of -- excuse me --

12   being Director of Marketing and Public Relations

13   for the hospital?

14            MR. DEL RUSSO:  Object to the form.

15       Q.   (MR. HANNAH)  You can answer the

16   question.

17       A.   I think that I always was looking to

18   develop my skills.

19       Q.   Isn't it true that as of that date

20   when you signed this performance evaluation,

21   that you recognized that you needed further

22   training and development in the area of

23   marketing and the marketing skills that you had

24   in order to properly perform as Director of

25   Marketing and Public Relations?

111

1           MR. DEL RUSSO:  Object to the form.

2           THE WITNESS:  I would guess so, yes.

3       Q.   (MR. HANNAH)  Isn't it true that you

4   also recognized that you were going to be the

5   head of public relations and marketing for the

6   hospital as of the date that you signed this

7   document?

8       A.   Yes.

9       Q.   Isn't it true that you already were

10  performing some of those functions?

11      A.   Yes.

12      Q.   In fact, in December of 1993 you did

13  the newsletter.

14      A.   Yes.

15      Q.   That was formerly done by Miss Iaia.

16          MR. DEL RUSSO:  Object to the form.

17          THE WITNESS:  Yes.

18      Q.   (MR. HANNAH)  That was the function

19  of the Director of Marketing and Public

20  Relations, correct?

21      A.   Correct.

22      Q.   Isn't it true that you actually found

23  out about this new job, that you were going to

24  have these new functions that you were going to

25  have prior to your performance evaluation?

112

1          MR. DEL RUSSO:  Object to the form.

2          THE WITNESS:  In some respects I

3     think so, yes.  When Mr. Sutphin asked me to

4     fill in.

5          Q.   (MR. HANNAH)  Well, you already knew

6     it as of January 2nd, 1994, correct?

7          MR. DEL RUSSO:  Object to the form.

8          THE WITNESS:  I guess.  The first

9     time I formally remember hearing it is at my

10    evaluation.

11         Q.   (MR. HANNAH)  You were already being

12    quoted in the newspaper in January of 1994.

13         A.   You can't believe everything you

14    read, can you?

15         Q.   Do you disagree that you were the

16    hospital's public relations director as of

17    January 2nd, 1994?

18         A.   Yes, I do.  I was not formally

19    offered that position until this evaluation was

20    presented to me.

21         Q.   Do you have any idea where the

22    newspaper could have come with up with that?

23         MR. DEL RUSSO:  Object to the form,

24    calls for speculation.

25         THE WITNESS:  No.

1          MR. HANNAH:  I've asked if she has

2  any idea.

3          MR. DEL RUSSO:  You asked her if she

4  had any idea.  That calls for speculation.

5          MR. HANNAH:  I'm asking her for her

6  knowledge.

7      Q.  (MR. HANNAH)  Anyway, were you aware

8  that as of November of 1993, that Jackie Iaia

9  had experience in running a Senior Friends

10  program or seniors program at a hospital?

11      A.  I believe she was the acting director

12  while the person Cindy Gates was out on medical

13  leave.

14      Q.  Did you know that back in the end of

15  1993 or is that something that you learned from

16  Mr. Del Russo?

17          MR. DEL RUSSO:  Excuse me?

18          THE WITNESS:  No.  I knew that.  I

19  worked with her at that time.  I was at a sister

20  hospital two miles down the road.

21      Q.  (MR. HANNAH)  Would you agree with me

22  that as of November 1993, that there was a

23  substantial difference between you and Jackie

24  Iaia as to the amount of public

25  relations/marketing experience that you had?

118

1           MR. DEL RUSSO:  Object to the form.

2           THE WITNESS:  I would think so, yes.

3      Q.   (MR. HANNAH)  Would you agree with me

4  that when you became the Director of Senior

5  Friends, marketing, along with being head of

6  the -- excuse me.  Strike that.

7           Isn't it true that when you assumed

8  these additional duties as Director of Public

9  Relations and Marketing in addition to your

10  duties as head of Senior Friends, that you took

11  over all the job duties and responsibilities

12  that were previously being performed by Jackie

13  Iaia when she was Director of Marketing and

14  Public Relations?

15           MR. DEL RUSSO:  Object to the form.

16           THE WITNESS:  I don't know about all

17  of them, but I mean --

18      Q.   (MR. HANNAH)  Most of them?

19      A.   Yes, I would assume most of them.

20      Q.   In fact, you got a raise in order to

21  do that, right?

22      A.   Yes.

23      Q.   You got a raise of 10 percent,

24  correct?

25      A.   Yes.



**GALEN** HEALTH CARE

## EMPLOYEE PERFORMANCE APPRAISAL

GA-431  3/93

*Management Employees Only*

| Employee Name | | Position Title |
|---|---|---|
| Monique Monteiro | | Mgr. Senior Friends |
| Department | | Social Security No |
| Senior Friends | | 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 |
| Period Covered | Date Due | Appraisal Type |
| From 12/2/92    To 12/2/93 | 12/2/93 | ☐ 3 MONTH  ☐ PROMOTION/TRANSFER<br>☒ ANNUAL  ☐ |

### INDICATORS OF PERFORMANCE LEVELS

5    OUTSTANDING    Performance far exceeds standards with minimal supervision

4    EXCELLENT    Performance consistently above standards with minimal supervision

3    SATISFACTORY PLUS    Performance above standards on a regular basis

2    SATISFACTORY    Performance fully meets minimum standards

1    SATISFACTORY MINUS    Performance falls below minimum standards

EXHIBIT 21

19

10-18-00

000112

## B. PERFORMANCE CHARACTERISTICS

| RATE THE FOLLOWING | CODE | COMMENTS |
|---|---|---|
| **1 PROFICIENCY IN FIELD/SPECIALTY** Degree of competence. Professional manner. | 5.0 | Comprehensive Knowledge of Community and seniors needs. Good Marketing skills with knowledge of available resources and associated costs. |
| **2 ADMINISTRATIVE EFFECTIVENESS** Skill in planning, organizing and implementing work assignments or projects. | 5.0 | Self motivator. Plans, organizes and implements with ease. Balancing her done daily with no evidence of stress. |
| **3 LEADERSHIP** Skill in getting work done through formal or informal direction of others. | 4.8 | Community leader with good organizational skills. Perceptive to the needs of seniors. Sensitive to their environment and growth. |
| **4 JUDGEMENT/DECISION MAKING** Degree of analysis, objectivity and foresight used to make decisions. | 4.8 | Good common sense approach. Even tempered yet enthusiastic. Patience and clarity when dealing with seniors. |
| **5 RELATIONSHIPS** Ability to work with subordinates, peers and superiors | 5.0 | Clearly seen as an upbeat sincere individual that has earned the respect of community and business leaders. Admired by the seniors members. |
| **6 INITIATIVE & RESOURCEFULNESS** Amount of drive and creativity. Ability to start and accomplish work. Degree of supervision needed | 4.8 | Creative - self motivates. Offers valuable input to overall marketing campaign of hospital. Advocate of Community involvement. |
| **7 SUPERVISORY SKILL** Demonstrated ability to select, train, motivate and develop subordinates. Degree of sustained contribution from work group. | 4.4 | Motivates and supplies required training to volunteers within her department. Developed collaborative relationships to effectuate good working ATM relationships |
| **8 COMMUNICATION** Expression of ideas verbally or written. Method and manner of speaking. Ability to observe and listen. | 5.0 | Articulate with infectious enthusiasm. Effervescent. Strong marketeer and motivational member of AD staff. |
| **9 PROFESSIONAL DEVELOPMENT** Commitment to professional growth through development of skills and knowledge. | 4.6 | Public relations responsibilities has broaden the scope of Monique's professional growth and allowed her creativity to come to full view. |
| **10 ADAPTABILITY** Efficiency under stress. Receptiveness to change/new ideas. Poise and/or courtesy in tough situations. | 5.0 | Recently Monique has accepted responsibility for PR/Public relations during a critical time for the hospital. She adapted quickly and with style. |
| **11 ATTITUDE & COOPERATION** Degree to which employee is supportive of organization's objectives, decisions and policies. Accepts and profits from constructive criticism | 5.0 | Very enthusiastic and supportive of organizations directives - very adaptable and motivates. |
| **OVERALL RATING** | 4.85 | Excellent addition to Executive team |

000113

## C. DEVELOPMENT SUMMARY

| SUMMARY OF STRENGTHS | SUMMARY OF DEVELOPMENTAL NEEDS |
|---|---|
| A. Energetic, bright, Organized (&) motivates | A. Expand upon Public Relations skill |
| B. Well entrenched in Community. | B. Continue Education on a graduate level with |
| C. Works well with Seniors with comprehension of their needs. | C. emphasis on Marketing |

Action to be taken to correct performance deficiencies where appropriate

2. Monique is of an effervescent Personality with limitless Potential for Growth. I would enjoy the opportunity to assist in this Process.

Rec. 5% Merit Increase + 10% adjustment for PR   15.87 → 18.00

| 3 | No. of In-Service Programs attended | | DID EMPLOYEE ATTEND ▶ | Safety Program ☐ YES ☐ NO | CPR ☐ YES ☐ NO | Infection Control ☐ YES ☐ NO | No. of Cont. Ed Prog. Attended | Contact Hrs |
|---|---|---|---|---|---|---|---|---|
| 4 | The position description for this employee has been reviewed and is current | | | ☐ YES ☐ NO | A revised position description has been attached. | | ☐ YES ☐ NO | |

## D. EMPLOYEE COMMENTS

Do you have any comments concerning this appraisal?
☒ YES ☐ NO

Being a part of Pembroke Pines Hospital for these past 3½ years has been a road of ups & downs. Building the Senior Program for the level, respect & exposure it has in the hospital & Community has been a tremendous Challenge as well as learning experience. I am now further Challenged with PR/Marketing & feel I'm ready to meet this Challenge head on with the close direction of our new Administrative team. There is A LOT I don't know about the hospital & it inner workings and am anxious to learn so that I can do my job the best I can.

000114

## D. EMPLOYEE COMMENTS (Continued)

**What do you feel you've accomplished during this evaluation period?**

Met & exceeded Corporate Goals for Growth & retention. Reached many seniors in the Community who needed us.

**Can you recommend any changes which would help you do your job?**

More hours in the Day!

**What are your future work plans with us? (Mention where appropriate relocation, career plans and whether present job is in line with career plans)**

I am proud to be a part of the Ad Staff team & heading up PR / Marketing. I plan to be here when this place is "Rocking" in the Community!

**Do you possess skills and aptitudes which are not fully utilized in your present position? (Mention foreign languages when appropriate)**

The new department is allowing me the opportunity to use skills I have not been able to use in the past

**What training and development do you need to do a better job in your current or future position?**

Marketing skills - that will come in time by doing & asking questions. Looking into taking Marketing Classes.

## E. EVALUATION SUMMARY

| FOR APPRAISAL PERIOD EMPLOYEES | FOR PERMANENT EMPLOYEES |
|---|---|
| ☐ SATISFACTORY COMPLETION OF APPRAISAL PERIOD | ☒ SATISFACTORY COMPLETION OF EMPLOYMENT YEAR |
| ☐ DELAY COMPLETION OF APPRAISAL RE-EVALUATION DATE → | ☐ DELAY CONTINUED REGULAR STATUS & RE-EVALUATE RE-EVALUATION DATE → |
| ☐ LESS THAN SATISFACTORY COMPLETION OF APPRAISAL. RECOMMEND TERMINATION. EFFECTIVE DATE → | ☐ CONTINUED UNSATISFACTORY PERFORMANCE. RECOMMEND TERMINATION. EFFECTIVE DATE → |

**SIGNATURES**

Employee _Monique J Montero_ Date 1/11/94

Manager _____ Date _____

Reviewing Manager _____ Date 1-11-94

The employee's signature means that the performance appraisal was reviewed with him/her. It does not necessarily indicate that he/she agrees with the appraisal

000115

ghbors

# Cancer victim fights for life

## Transplant is only chance

Hollywood resident **Barbara Plasker** is halfway through the fight of her life, and her mom is looking for foot soldiers to help finish the battle.

Plasker, 41, suffered from a rare strain of inoperable lung cancer that couldn't be eradicated through chemotherapy. Her only chance of survival was to get an even-rarer double-lung transplant.



**JORDAN BRESSLER**

FRIENDS AND NEIGHBORS

Plasker received the transplant early Thursday morning at Kirkland Hospital in Birmingham, Ala. Plasker, who was staying with relatives in Atlanta, received the call that a donor pair of lungs was located at 5:30 p.m. Wednesday.

By 7:30 p.m., she had been whisked by private jet to the hospital, by 10:30 she was in surgery, and by 6:30 a.m. Thursday, the donor lungs were in place.



**Plasker**

Though the next few weeks will be critical for her survival, they will be critical for the Plaskers' finances as well. Surgery and aftercare costs are expected to skyrocket to more than $300,000, only half of which will be covered by insurance.

That's where Plasker's mom, **Pearl Speert,** comes in. Speert, a resident of Davie's Rolling Hills, has joined with some of Plasker's friends to put together a surgery trust fund, administered by the National Heart Assist & Transplant Fund, a nonprofit agency.

Speert has been helping to feed and care for Plasker's children, **Staci,** 14, **Jonathan,** 11, and **Andrew,** 3, while their mother has been waging her war for survival.

"It's been rough. We're hoping [this] miracle will save her life," Speert said.

If you'd like to make a donation, send it to NHATF: Friends of Barbara Plasker Transplant Fund, P.O. Box 163, Haverford, Pa. 19041. Make checks payable to NHATF: Friends of Barbara Plasker. For information on the fund, call (215) 527-5056.

## Kids in Crisis, Part I

Managers and staff members at Pembroke Pines Hospital took to the streets last month — holding out bedpans and water containers to passersby at Sheridan Street and University Drive — and collected $1,772 for Kids in Crisis, a charity that assists abused children.

"It was very successful," said **Monique Monteiro,** the hospital's public relations director, who participated in the event. "Any time you can get that much money in three hours, it's a success."

Participants included **Scott Colton** of Pembroke Pines, **Pearl Magnus** of Pembroke Pines, **Barbara Laxon** of Miramar, **Bob Dickman** of Fort Lauderdale, **Rob Carrel** of Davie, **Marjorie Samerson** of Pembroke Pines, **Jane Hernandez** of Davie, **Mike Scialdone** of Coconut Creek, **Sharon O'Keefe** of Plantation, **Sandy Barrowman** of Hollywood, **Rosemarie Martineau** of Davie, **Marybeth Thompson** of Pembroke Pines and **Kay Bornstein** of Davie.

## Kids in Crisis, Part II

The biggest contribution, by far, to WAXY's one-day fund-raiser for Kids in Crisis was a $25,000 matching donation by Weston-based Pediatrix, a national firm that contracts out neonatal and pediatric care doctors and services to hospitals.

The donation, called in over the air to WAXY host and Davie resident **Rick Shaw,** came as a shock to those listening behind the scenes.

"We just all kind of gasped," said WAXY program director **Dave Denver.** "It was one of the most wonderfully incredible moments I've had as a broadcaster. We were all choked up."

Dr. **Roger Medel,** chief executive officer of Pediatrix, made the on-air presentation after the 160 employees of the company dug deep into their pockets.

"We all got together and decided to do something about this," said Dr. **Brian Udell,** chief medical officer of Pediatrix. "Abused children are one of our biggest problems, as far as follow-ups go. Medically we can have the answers, but we can't help the home situation. It's frustrating."

During the nine-hour radiothon, WAXY raised a little more than $80,000 — and, Shaw hopes, the consciousness of the public about the far-reaching effects of child abuse.

"The problem is not an ethnic problem, economic or social thing. It's all over," Shaw said. "It's your neighbors, the people right down the street. The horror is people don't know about it. This is our cause."

NEIGHBORS

# Hometown Herald

9341 NW 57th St, Tamarac, FL 33351

| | | |
|---|---|---|
| ■ *Editor.* | Dorothy Klein | 985-4584 |
| ■ *Assistant Editor.* | Sandra Jacobs | 724-1512 |
| ■ *Reporters.* | Michelle Patterson | 724-1518 |
| | Doris Quan | 724-1514 |
| | Jordan Bressler | 724-1519 |
| ■ *Advertising* | Susan Kelly-Gilbert | 985-4547 |
| ■ *Classified.* | | 524-2535 |
| ■ *Subscription/Delivery Information* | | 462-3000 |



**EXHIBIT** 22
10-18-00

**ATTACHMENT / EXHIBIT** 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

COPY

JACQUELINE IAIA,

    Plaintiff,

vs.               CASE NO.: 00-6227-CIV-MORENO

COLUMBIA HEALTHCARE
CORPORATION d/b/a PEMBROKE
PINES HOSPITAL, a foreign
corporation,

    Defendant.
------------------------/


DEPOSITION TESTIMONY OF
MICHAEL SCIALDONE

DATE:            Friday, October 20, 2000

TIME:            2:46 p.m.

PLACE:          Osceola Regional Medical Center
                 700 West Oak Street
                 Kissimmee, Florida  34741

BEFORE:        RICHARD CASTILLO
                 Registered Merit Reporter
                 and Notary Public
                 State of Florida at Large



PLAINTIFF'S
EXHIBIT

D

2    A    Correct.

3    Q    All right.  Now going back to section

4    4.2.2, Layoff Sequence.  It indicates the order in

5    which personnel are to be laid of in connection with

6    the reduction in force, correct?

7    A    Yes, sir.

8    Q    Okay.  And first -- so under this layoff

9    sequence, the first individuals who would be laid off

10    would be volunteers?

11    A    Correct.

12    Q    Okay.  And after the volunteers would come

13    the temporary employees?

14    A    Correct.

15    Q    Okay.  And then after the temporary

16    employees would come appraisal period employees,

17    correct?

18    A    Correct.

19    Q    Okay.  And who are appraisal period

20    employees; what does that mean?

21    A    I believe they're referring to the

22    employees who were hired within the first ninety days

23    of their employment.

24    Q    Still under a probationary period?

     A    Correct.

2    employees -- excuse me -- employees who would be laid

3    off would be documented poor performers?

4        A    Correct.

5        Q    And according to this policy, those poor

6    performers were ones who had evaluation ratings under

7    two, correct?

8        A    Correct.

9        Q    Or had been specifically written up,

10    correct?

11        A    Correct.

12        Q    Okay.  And after those, that category of

13    employees was laid off, then the next category would

14    be -- it says, seniority, okay?

15        A    Okay.

16        Q    What is your understanding of how that

17    worked?

18        A    The employees who had the longest seniority

19    with the facility would be the ones that would be

20    later on in the process as far as consideration for a

21    layoff.  Those newer employees, the ones that were

22    most recently hired would be the first ones that

23    would be considered.

24        Q    Okay.  So the seniority was a factor that

25    had to be considered by management in determining

2    retained?

3         A    Yes, sir.

4              MR. DEL RUSSO:  Object to the form.

5         Q    And do you recall what other factors were

6    used with regard to the particular layoff in 1993,

7    other than seniority, to make a determination as to

8    which employees to lay off in the reduction of force?

9              MR. DEL RUSSO:  Object to the form.

10        Q    You could answer.

11        A    Specific job responsibilities.

12        Q    What do you mean by that?

13        A    We were ... we were going through a large

14   financial swing as far as the financial condition of

15   the facility, and it was felt that if there were

16   particular positions, or functions that were no

17   longer needed, or could be done without, that those

18   particular people should be considered as far as the

19   reduction in work force.

20        Q    Okay.  All right.  Now, one of the

21   individuals who was laid off back in 1993, pursuant

22   to this reduction in work force that occurred, was

23   Miss Iaia, correct?

24        A    Correct.

25        Q    Okay.  Do you recall specifically, how she

ATTACHMENT / EXHIBIT 5

*Director of Human Resources Manual*

# Manager's Manual

**Galen Health Care, Inc.**
**201 West Main Street**
**P.O. Box 740033**
**Louisville, KY 40201-7433**



EXHIBIT
1



PLAINTIFF'S
EXHIBIT
E

# 2. Recruitment and Transfer

All management decisions on hiring, promotions, transfers, training, and other personnel practices shall be made with integrity on a consistent basis, as outlined in this manual.

### Policy

- Any information submitted by an employee or prospective employee pertaining to employment must be factual. Falsified information is a justifiable reason for disciplinary action, up to and including immediate discharge.
- Both external and internal applicants shall be considered for open positions.
- All routine expenses related to an applicant's travel to interview for an open position, or to fill a position, are controlled by and charged to the hiring facility.
- An employee may not work at two Galen facilities without prior approval of the Level 4 Manager.

---

## 2.1  Position Control and Staffing

Each facility shall maintain the correct number of employees. Assistance in establishing this number can be derived from the Staffing Analysis System (SAS), a system based on workload volumes.

### Policy

- Staff addition/action shall be carried out in accordance with ongoing position control and an internal request procedure managed by the Facility Manager/Designee.

### 2.1.1  Positions Must Be Authorized

The addition of employees, increase or decrease in employee hours, or any other alteration of paid employee hours must conform with all productivity goals, as approved by Level 4 management.

Position vacancies requiring employment action will be determined by the immediate supervisor and Department Head in accordance with the department's authorized position listing and position control systems. These systems may allow for a Level 3 Manager's overall approval or position-by-position approval.

- Requests for staffing must be submitted in writing to the facility Human Resources Director prior to any hiring action. Forms most frequently used are:

  - *Personnel Action Request (GA-288)*, used for many personnel and payroll related activities, e.g. staffing requests, transfers, promotions, salary changes, vacations.
  - *Employee Requisition (GA-427)*, used for additional or replacement position requests.
  - *Position Description Form (C-0013)*, for preparing job specifications of positions to be filled.

- No applicants will be employed in positions that have not been authorized and approved properly.

### 2.1.2  Supplemental Staff

Outside supplemental staff and other non-payroll hours must be reported to the *Operating Statistics System* for inclusion in SAS reports. Outside supplemental staff refers to an agency, registry, or individual which provides professional services on an "as needed basis."

**Contract Service.** A *contract service* exists when a Galen facility signs a contract with an outside firm that will provide a service at the facility for a specific length of time.

Non-payroll hours for contract services are not recorded in the *Operating Statistics System* — unless the work is on an *as needed* basis and billed hourly by the individual.

### 2.1.3 Responsibility for Compliance

This subsection outlines the management responsibilities involved in staffing facilities.

**Corporate Management Engineering Department**

1. Works with facility and Regional Office to establish productivity goals.

2. Recommends appropriate levels to facility via the Regional Office.

3. Provides *Staffing Analysis System* program maintenance to ensure smooth operation.

**Level 4 Manager**

4. Reviews and approves annually all new and existing goals in each facility.

5. Assists Facility Manager with staffing-related problems.

6. Assists in special projects and analysis.

7. Audits compliance with productivity goals.

8. Assists facility in determining goals.

**Facility Manager**

9. Signs off annually on agreed-upon goals.

10. Determines extent of hiring, terminations, etc., needed for staffing goals and monitors such activity.

**Department Head**

11. Controls staffing daily by productivity needs.

## 2.2 Position Posting/Self-Nomination

The position posting system ensures that employees and management are aware of job openings, provides information on job qualifications, and encourages employees to nominate themselves for open positions.

The posting system is used to transfer or promote employees from one position to another. It does not apply to intra-department scheduling or moving an employee to another shift on a temporary basis.

*Policy*

- Galen shall promote and transfer employees from within when such action is consistent with Company objectives and the individual's career goals.

- Employees shall be encouraged to maximize their skills in order to take advantage of opportunities for advancement in the Company.

- Managers have a continuing responsibility for planning and developing their employees' careers and for encouraging self-nomination for more responsible positions in the Company.

- Both internal and external applicants shall be considered for an open position. Outside applicants usually are considered when:

  - The position requires a unique technical or professional skill.
  - The number of open positions exceeds the ranks of qualified internal candidates.
  - The open position is at the entry level.
  - The external candidate is better qualified than internal candidates. Generally, internal candidates are given consideration when they meet the minimum qualifications.

### 2.2.1 Job Posting Requirements

Job openings are posted on two lists:

- **Company List.** All key management, Human Resources Director, and Assistant Director of Nursing positions, and all corporate positions below management grade 10 must be placed on a company-wide open positions list to ensure consideration of internal candidates.

- **Facility List.** Facility positions must be placed on the applicable facility's open positions list.

Both lists must be posted at each Galen facility for a minimum of 5 calendar days. The most recent list should always be on the board.

Employees also may request from the Human Resources Department job postings of other Galen facilities.

All positions are included in the *self-nomination system*, with the exception of:

- Existing positions that are reevaluated upward, if the incumbent remains in the position.

- Positions opened as assignments for specialists and, when necessary, positions in which Specialist Program graduates are placed in their initial assignment.

- Positions filled by qualified candidates within the facility would not appear on the company-wide list.

## 2.2.2 'Positions Available' Listing

Open positions will be posted in a conspicuous place at each facility in order to give employees an opportunity to nominate themselves for openings. If no acceptable candidate is chosen via the self-nomination system, an acceptable external candidate will be chosen.

Job opportunities at facilities will be announced in the "Positions Available" listing. The listing will be posted for not less than 5 calendar days on employee bulletin boards, or in some place to which all employees have access. Each listing will include:

- Position title
- Location
- Job details (special shift, days of week, etc.)
- Grade (if available)
- Person to contact

Level 2 or 3 Managers at facility and Corporate levels will be responsible for initiating action to fill a position by submitting a completed *Employee Requisition (GA-427)* to the Human Resources Department.

## 2.2.3 Emergency Assignments Allowed

In an emergency situation, an employee may be assigned temporarily to a position; in this case, a position may be filled before the 5-day posting period has passed. When making temporary assignments to new positions, factors dealing with promotions and transfers must be considered.

## 2.2.4 Promotional Opportunities

Management shall make every effort to ensure that every employee has an opportunity to compete for promotional opportunities. To this end, the following guideline should be noted:

- An effective program to ensure non-discrimination shall be maintained by all Galen facilities. Management shall implement this program by identifying employees with potential for advancement, and by counseling and training them so their potential can be reached.

## 2.2.5 One-Year Waiting Period

Although the Company may request employees to fill open positions at any time, employees (all grades) may not nominate themselves for the positions until they have completed one year of service with the company. After the first year of employment, *non-management employees* must remain in positions at least 90 days before self-nominating for another position; *management employees* have no additional waiting period.

Exceptions to the foregoing requirements must be approved by the Regional Vice President for regional office employees; Facility Manager for facility employees; Corporate/Division Office Department Head for corporate/division office employees. Generally, conditions that might be considered exceptions are: Needs of current project; employee development; accomplishment of all major projects in current assignment; critical business need for employee's skills in the open position; other future business prospects and needs.

## 2.2.6 Self-Nomination Procedure

Employees interested in a posted position may *in confidence* obtain additional information (position requirements, salary range, reporting relationships, etc.) by contacting the recruiter listed on the posting.

However, before formally applying for the position, he/she must notify his/her supervisor of the intent to apply. The hiring manager and/or Human Resources Department will seek an evaluation of the employee from his/her immediate supervisor.

Internal candidates will be kept informed of their status by the Human Resources Department or supervisor. If an employee is not interviewed for the position or not selected after the interview, he/she will be told why the position was given to someone else.

## 2.2.7 Qualifications for New Positions

Promotion or reclassification of an employee shall be based on factors taken in the following order of importance:

1. Knowledge, training, demonstrated ability, skills, consistent attainment of measurable goals, and efficiency. One measure of these skills will be the employee's proficiency ratings as documented in the Employee Performance Appraisal Forms on file.

2. Length of service (seniority).

The Company is the sole judge of an employee's qualifications for a job opening.

If two or more employees are equally qualified, seniority will be the deciding factor.

## 2.2.8 Effective Date of New Position

The effective date of transfer or promotion will normally be as follows:

- Non-management employees, two weeks after acceptance.
- Management employees, one month after acceptance.

### 4.1.9 LOA for Key Personnel

When a formal LOA is granted to key facility personnel, the following policies shall be copied and sent to the employee with a letter of explanation:

- Leave of Absence
- Conflict of Interest

- Scientific and Technical Publication

Level 4 Managers or designees are responsible for providing the information required by this policy.

See Appendix A.8 for a sample letter to key facility employees on leave of absence.

---

## 4.2  Reduction in Work Force Leave

Galen strives to give full employment for all regular employees. But, if a reduction in work force is necessary, management shall utilize the layoff procedures outlined in this subsection. To facilitate the layoff process and guard against unfair or discriminatory acts, an Overview Committee comprising the key management staff, Human Resources Director, and others designated by the Facility Manager will be established to monitor specific steps in the layoff procedure. Certain responsibilities may be delegated to department heads or others, as indicated in these guidelines.

### Definitions

*Reduction in Work Force (Layoff).* Reduction of working hours to zero for any regular full-time or regular part-time employee, special pool status employee, or groups of employees, for a period that exceeds 14 calendar days and is less than 6 months.

*Operational Staffing Reduction/Adjustment.* Systematic reduction of total hours worked per shift on a classification, department, or facility-wide basis without reducing hours to zero the working hours of any employee or group of employees for a period of 14 calendar days or less. Such a decision is a prerogative of management and in no way affects an employee's status or seniority.

*Elimination of Position.* Deletion of a specific job title/position within a department or service that will not be replaced or reactivated in the foreseeable future. Employees affected will be placed on layoff status and will have recall rights.

### 4.2.1  Reduction in Work Force

When a work force reduction is required, the Facility Manager is responsible for:

- Communicating layoffs to employees
- Determining the number of employees and classifications to be reduced
- Compliance with guidelines for selecting employees for layoff
- Exit counseling for employees affected
- Maintaining and implementing recall procedures.

**Implementation Procedure:** At the earliest opportunity, the Facility Manager or Overview Committee should advise employees of conditions necessitating a layoff, along with plans for implementing the layoff and recall. Employees should be advised and updated throughout the process by the use of staff meetings, facility-wide meetings, newsletters, and bulletins.

**Determination of Positions:** The Facility Manager or Overview Committee shall determine the number and classifications that must be reduced in each department. Reductions should be planned with input from the department head, if appropriate.

**Implementation Strategy:** Given the classifications and number of employees to be affected, the Level 2 Manager will list employees to be laid off in the order indicated in the following Subsection 4.2.2. Regular full-time, regular part-time, and special pool status employees shall have equal seniority rights in layoffs. Staffing pool employees who work **as needed,** at management's discretion, may not be included in a layoff, but would have their hours reduced to zero.

The layoff list must be reviewed and approved by the Overview Committee.

**Note:** All departments should try to maintain established services and the skills (classification) mix to provide those services. Large departments with similar job classifications, such as Nursing, may be considered as a group, allowing qualified employees with seniority to assume responsibilities in other areas, if possible.

### 4.2.2  Layoff Sequence

Personnel should be laid off in the following sequence:

1. *Volunteers.* Departments should lay off volunteers in the affected classification. Those laid off should be advised that unemployment compensation will be allowed. Volunteers will be recalled by seniority.

2. *Temporary Employees.* Temporary employees in specific job classifications, regardless of departmental assignment, should be laid off as necessary.

3. *Appraisal-Period Employe*    nitial appraisal-period employees in speci classifications, in affected departments, should be laid off as necessary.

4. *Documented Poor Performers*. Employees with current low evaluations (rating under 2); or those with written corrective discipline reports; or employees currently on a *Performance Improvement Plan* should be considered for layoff. The Overview Committee will review all impending layoffs in this category to assure facility-wide consistency.

5. *Seniority*. When performance is not a factor, on a departmental basis and within job classification, employees considered for layoff shall be those with least seniority, as defined in Subsection 7.1.3. Each department should recommend which of its employees are to be laid off.

## 4.2.3  Advance Notice of Layoff

Employees to be laid off should be notified in person by their Supervisor or Department Head. Layoff notice shall not be mailed unless there is no other means of contact. The notification should explain why the employee was selected for layoff; recall rights also should be explained.

The Worker Adjustment and Retraining Notification Act (WARN) requires, under specific conditions, employers with 100 or more full-time employees to provide a 60-day notice to employees prior to any facility closing or large layoff. Specific conditions are:

**Facility Closing.**  Notice must be given when a single employment site is shut down permanently or temporarily **and 50 or more full-time employees** will suffer an "employment loss" during any 90-day period.  An employment loss is defined as any of the following:

- Termination of employment (unless voluntarily or with cause)
- Layoff exceeding 6 months
- Reduction in work hours of more than 50% during a 6-month period.

**Large Employee Layoff.** Defined as an employment loss that is not the result of a facility closing, and:

- At least 33% of the work force is involved (the 33% must consist of at least 50 employees); or
- 500 or more employees will be laid off within a 30-day period.

**Affected Employees.**  Only full-time employees are considered in determining if 50 employees will suffer an *employment loss*.  However, part-time employees also must receive the notice if the 50-employee threshold is reached. For purposes of WARN Act application, a part-time employee is one who works less than 20 hours per week, or has worked less than 6 months, in the preceding 12-month period.

**Multiple Facility Markets.**  Facilities in close proximity may be considered a "single site" under certain circumstances, e.g. when they share staff. However, facilities in no ntiguous sites that do not share staff should not be considered a single site. e.g. two hospitals at different locations in the same town or county are not a "single site" when they do not share staff.

When the WARN Act is not required, notification for affected employees shall be as follows:

- **Management Personnel.** One month's notice (160 hours pay)
- **Other Regular Full-Time Employees.** Two weeks' notice required (up to a maximum 80 hours pay)
- **Part-Time Employees.** Two weeks' notice (up to a maximum 60 hours pay).
- **Appraisal-Period Employees.** No notice required.
- **Pool Employees.** No notice required.

The facility may grant wages in lieu of notice or allow affected employees to work during the notice period, depending on which option is most beneficial to the Company.  Employees who become disgruntled and disruptive while working the notice period may be terminated immediately without pay.

Whenever possible, staffing requirements should be satisfied by adjusting the employee work hours instead of reducing the work force.  This decision should be based on Company needs and overall impact on the facility.

## 4.2.4  Alternatives/Adjustments

The need for operational staffing reductions or adjustments can be minimized by adhering to the following guidelines:

- Proper forecast of activity
- Control of overtime
- Proper utilization of part-time employees (scheduled only as needed)
- Encouraging employees to take days off when activity is low
- Altering hours of work in non-critical areas
- Postponing non-essential tasks during low periods of activity
- "Freezes" in employment activity
- Closing non-critical departments
- Encouraging flexible staffing and "float" employees
- Minimizing and/or controlling paid non-productive time.

## 4.2.5  Recall Rights

Laid-off employees are considered to be on involuntary leave (non-paid) until they return to work.  A laid-off employee who is not recalled after 6 months shall be terminated.

The termination notice shall comply with Subsection 10.3.2, and inform the employee of his/her right to convert benefits as described in that section.

**Note:** At the time of layoff, *ersonnel Action Request (GA-288)* will be submitted as an "unpaid absence/RIF/LOA," using Code 52 to indicate layoff. If, at the end of 6 months, the employee has not returned, a *Personnel Action Request (GA-288)* will be submitted as "termination/work force reduction," using Code 40. *Termination codes will not be used at time of the initial layoff.*

The Human Resources Director will develop and maintain a recall list of all affected employees. Names on the list will be in reverse layoff sequence (last laid off, first recalled). While on the 6-month leave status, all employees will have recall rights. Openings will be offered to employees within a classification by department, then facility-wide. If no laid-off employee is available in a classification, other qualified employees will be offered the job. External candidates will be considered only if no qualified employee on current layoff status is available.

Laid-off employees who decline to accept comparable jobs offered, or fail to report within 48 hours, may be removed from the recall list and terminated, if the Overview Committee so directs.

**Recall Salary Factor.** If an employee is recalled to a lower salary grade position, the amount of salary decrease shall depend on the seniority of that employee and other employees in similar jobs; and the percentage of merit increase the employee would have received if he/she had not been laid off.

Salary review for a recalled employee will be 12 months from the effective date of his/her new position.

Seniority dates for employees returning from a layoff will be treated according to the LOA policies.

## 4.2.6  Benefits

Benefits during layoff shall be treated according to the policies stated in Subsection 4.1.6 and 4.1.7. Medical and dental insurance may be reinstated immediately upon return to work if the insurance was in force at the time of layoff. No waiting period or proof of insurability is required.

## 4.2.7  Layoff Counseling

The Overview Committee shall develop an exit interview process that will aid the employee during the layoff period. That process should include, but is not limited to, counseling on:

- Recall rights and procedures
- Information flow on job openings
- Employment with other health care facilities
- Transfer potential
- Unemployment compensation procedures
- Benefits status.

## 4.2.8  LOA/Paid Sick Time Implications

Employees who are absent from work due to leave of absence or paid sick time should not be considered during an initial layoff, but considered for layoff when they are prepared to return to work. These employees should be told that a layoff occurred and they will be advised of their status when possible.

**Military, Medical, or Family Leave/Workers' Comp/Paid Sick Time.** Due to Galen policy and/or legal requirements, employees in these categories, under certain circumstances, are guaranteed a job when returning to work. If a layoff affected their department and classification, on their return to work, they should be considered according to the same criteria (performance and seniority) used to select employees for layoff. If they meet the criteria, they should be laid off with recall rights according to policy. If they do not meet the criteria, they should be returned to work and another employee laid off, if necessary.

**Medical/Education/Personal Leaves.** Employees on LOA are not guaranteed jobs on their return. Normally, these employees should be placed on layoff when they give notice of intent to return. If a returning employee has skills unique to a specific area, or if a position has been held open, (i.e. Department Head), she/he may be returned to work with approval from the Level 3 Manager.

### Special Considerations

- Some states may have more restrictive regulations, particularly for maternity leave. The Human Resource Director should ensure that all facility actions comply with appropriate state laws.
- Layoff of employees with 15 or more years of seniority with Humana/Galen must be approved by the appropriate Level 4 manager (or Level 5 Manager if the layoff is authorized by a Level 4 Manager). Layoff of employees with 20 or more years of seniority must be approved by the Chairman of the Board.

# 7. Benefits

## 7.1 *Seniority, Employment Dates, Benefits*

This subsection defines and explains certain terms used frequently in discussion of benefits, including:

- Qualified Benefit Plan
- Other Non-Qualified Benefit Plans
- Seniority
- Employment date and other dates.

### Policy

- Employees scheduled to work at least 30 hours per week are considered full-time employees for purposes of non-qualified benefits. See Subsection 7.1.8 for additional information.
- Each employee's employment date shall be used to determine seniority and eligibility for service awards and *non-qualified* employee benefits.
- Each employee shall be eligible for *qualified plans*, as defined in this policy.

### 7.1.1 Qualified Benefit Plans

*Qualified benefit plans* are approved by the Internal Revenue Service as meeting requirements of Section 401(a) of the Internal Revenue Code. These plans receive tax advantages and must conform to special IRS rules and requirements.

The Galen qualified plan is the *Retirement and Savings Plan.*

### 7.1.2 Non-Qualified Plans

In addition to the qualified plan, other benefits provided by Galen include, but are not limited to:

- Paid vacation
- Sick time and holidays
- Life and accidental death insurance
- Medical and dental plans

- Disability income plan
- Business travel accident insurance
- Tuition reimbursement
- Adoption assistance

### 7.1.3 Seniority

#### Definition

*Seniority.* The length of time an employee has worked for Galen (since March 1, 1993) and all Humana service prior to March 1, 1993.

Seniority gives employees certain preferences or ranking for changes in status, work force reductions, and eligibility for various non-qualified benefits. Seniority is not affected by change in employment status, transfer from one department to another, or transfer to another facility.

Full-time and part-time employees with the same employment date have equal seniority regardless of hours worked.

### 7.1.4 Key Dates Defined

This subsection explains various dates that are important in determining seniority, salary reviews, and employee benefits.

**Employment Date** is the date on which a person started working with the Company. This date is not altered by a leave of absence and remains the same as long as the employee is continuously employed, regardless of hours worked.

**Note:** The employment date for employees at facilities acquired by Galen may be affected by terms of the acquisition agreement. Questions should be directed to Corporate Employee Relations.

ATTACHMENT / EXHIBIT 6

1         UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF FLORIDA
2        FT. LAUDERDALE DIVISION

3                 CASE NO. 00-6227-CIV-MORENO
                 Magistrate Judge:  Dube'

4

5  -  -  -  -  -  -  -  -  -
                    :
6  JACQUELINE IAIA,         :
                    :
7          Plaintiff,    :
                    :
8    -vs-             :
                    :
9  COLUMBIA HEALTHCARE CORPORATION :
   d/b/a PEMBROKE PINES HOSPITAL,  :
10  a foreign corporation,     :
                    :
11         Defendant.    :
                    :
12  -  -  -  -  -  -  -  -  -

13

14      Videotaped deposition of JERRY SUTPHIN

15      Taken on behalf of the Defendant

16      Date:  July 24, 2000

17      Place:  Norfolk, Virginia

18

19      APPEARANCES:

20      BECKER & POLIAKOFF, P. A.
        By:  RODERICK V. HANNAH, ESQUIRE
21           Counsel for the Plaintiff

22      LEVY, KNEEN, MARIANI, CURTIN,
      KORNFELD & DEL RUSSO, P. A.
23      By:  CHRISTOPHER C. COPELAND, ESQUIRE
            and
24      By:  SUE WILLIS-GREEN, ESQUIRE
           Counsel for the Defendant
25
     Reported by:  Penny Commander Wile, RMR

ASSOCIATED COURT REPORTERS, INC.
NORFOLK, VIRGINIA
(757) 622-3603

COPY

PLAINTIFF'S EXHIBIT
F

57

1    more so than anybody else.

2         Q.    Did you have any relationship with

3    Miss Monique Monteiro, other than a professional

4    relationship?

5         A.    No, sir.

6         Q.    Did you have any relationship with

7    any of the female directors and staff, other than

8    a professional relationship?

9         A.    No, sir.

10        Q.    To your knowledge, Mr. Sutphin, have

11   you ever made any comments while at Pembroke Pines

12   that were age-related comments to the effect that

13   you disfavored older people as opposed to younger

14   people?

15        A.    No, sir.

16        Q.    Have you ever made any comment to the

17   effect that it's time to go out with the old and

18   in with the new?

19        A.    I don't recall making that comment.

20        Q.    Okay.  Is it possible that comment of

21   that nature was made by you and you just don't

22   recall or --

23             MR. HANNAH:  Object to the form.

24             THE WITNESS:  I just don't know if I

25   made it or not.

58

```
 1   BY MR. COPELAND:
 2        Q.    Okay.  Do you recall ever making any
 3   comments to any of the directors or at any
 4   meetings at Pembroke Pines to the effect if you're
 5   not able to cut the mustard heads will roll?
 6        A.    I don't recall making that specific
 7   comment, no, sir.
 8        Q.    Okay.  Would it be unlike you to make
 9   that type of comment?
10              MR. HANNAH:  Object to the form.
11              THE WITNESS:  In a moment of
12   frustration, maybe not those words but the tone of
13   it, I could possibly have made that, yes.
14
15   BY MR. COPELAND:
16        Q.    Okay.  Do you know or recall if you
17   ever made a comment to other directors or
18   employees at Pembroke Pines that if your attitude
19   is old and/or complacent you are not going to make
20   it?
21        A.    No, sir, I don't remember making that
22   comment.
23        Q.    Okay.  Have you ever made any
24   comments to that effect dealing with an old
25   attitude?
```

59

```
 1        A.      Possibly, but I don't recall a
 2   specific case.
 3        Q.      Okay.  And what was it you would be
 4   referring to if you were referring to old
 5   attitude?
 6             MR. HANNAH:  Objection.  Calls for
 7   speculation.  Doesn't recall actually making those
 8   statements.
 9             THE WITNESS:  It would be -- I could
10   only guess that it would be something to do with
11   new ways of doing things.
12
13   BY MR. COPELAND:
14        Q.      Okay.  Would that --
15             MR. HANNAH:  Move to strike, by the
16   way.  Nonresponsive.  Speculation.  Guessing.
17
18   BY MR. COPELAND:
19        Q.      Would you ever have made a comment or
20   do you recall ever making a comment to the effect
21   if the attitude is old referring to the age of the
22   person?
23        A.      No, sir.
24        Q.      Now, Mr. Sutphin, was your decision
25   in keeping the Senior Friends director position in
```

60

1    any way tied to your decision to eliminate the
     director of marketing position?

2         A.    Not that I recall.

3         Q.    Did you subsequent to making the

4    decision to eliminate the director of marketing

5    position make any subsequent decisions to combine

6    any of those functions in conjunction with the

7    Senior Friends?

8         A.    Sir, I cannot remember doing that.

9         Q.    Okay.  Now, I want to get into the

10   specifics.

11               Who was the individual at the

12   hospital which would advise Mrs. Iaia that she was

13   being included in the reduction in force?

14        A.    That she was being included or in

15   fact she had been?

16        Q.    Had been included.

17        A.    Probably would have been me.

18        Q.    Okay.  Do you recall having a meeting

19   with her in order -- in what time you advised her

20   she was being included in --

21        A.    I don't recall the specifics of it,

22   but I'm sure I did meet with her.

23        Q.    Okay.  What is it that leads you to

24   believe that you did in fact meet with her?

25

67

1          Q.       Do you recall if Miss Iaia had any

2     contact with you after she was advised she was

3     included in the reduction in force?

4          A.       Not that I recall.

5          Q.       Do you recall any request by Miss

6     Iaia to be reimbursed for medical or dental

7     insurance?

8          A.       I do not recall that.

9          Q.       Who was your successor or -- let me

10    strike that.

11               At some point in time did you leave

12    the employment at Pembroke Pines as CEO?

13         A.       Yes, sir.  November of '93.

14         Q.       Would that have been shortly after

15    the reduction in force was implemented?

16         A.       I can't remember the exact date, but

17    it was right around the end of November.

18         Q.       Okay.  And under what circumstances

19    did you leave your employment with Pembroke?

20         A.       I had been offered a position with

21    Humana in Washington, D. C.

22         Q.       All right.  And what position was

23    that?

24         A.       As the executive director of Humana

25    Group Health Plan, which was under the process of

1          A.      I do not recall.

2          Q.      Don't know who that person was?

3          A.      The name rings a bell, but I can't

4     remember specifics.

5          Q.      Do you know the director of medical

6     records by the name of Cheryl?

7          A.      No.

8          Q.      Do you know if the director of

9     medical records was let go during the reduction in

10    force?

11         A.      I do not recall.

12         Q.      Now, Mr. Copeland showed you a

13    document before, I believe it was Exhibit Number

14    2, termination memoranda.

15         A.      Uh-huh.

16         Q.      Pull that out, please.

17         A.      (Witness complied.)

18                 This?

19         Q.      Yes.  What's the date on that?

20         A.      November the 11th, 1993.

21         Q.      Okay.  And in that termination

22    memorandum Miss Iaia was not actually terminated

23    from the hospital, was she?

24         A.      I would have to look at it and see.

25         Q.      Why don't you take a look at it?

80

1              MR. COPELAND:  Objection.  The

2    document speaks for itself.

3              THE WITNESS:  It says she will be

4    placed in an involuntary leave of absence.

5

6    BY MR. HANNAH:

7         Q.     So she was placed on a six-month

8    leave of absence at that time?

9         A.     That's the way the memo reads, yes.

10        Q.     Do you recall that actually

11   occurring, her being placed on a six-month leave

12   of absence?

13        A.     The specifics of what's in the memo,

14   no.

15        Q.     What was the purpose of putting her

16   on a leave of absence, if you recall?

17        A.     I don't recall.  It would be pure

18   speculation if I could sit here and guess.

19        Q.     You don't know if it was to try to

20   locate her another position at the hospital?

21        A.     I would guess that that would be the

22   case, but I don't know it for a fact.

23        Q.     Okay.  I would have this marked

24   Defendant's Exhibit Number 1.

25              THE REPORTER:  It would be

84

1    a leave of absence period, right?

2         A.    Yes.  I have seen that.

3         Q.    For the purposes of trying to put

4    them in another position?

5         A.    Find them another facility, something

6    of that nature.

7         Q.    And that was the case with regard to

8    Miss Iaia, correct?

9         A.    That's what the memo says, yes, sir.

10        Q.    You were copied on that memo?

11        A.    I'm -- my name is not on there to be

12   copied, no.

13        Q.    Didn't you actually sign that memo as

14   a witness?

15        A.    Yes.

16        Q.    Okay.  So you were aware of that

17   memo?

18        A.    Yes.

19        Q.    So you would have been aware of the

20   reason why Miss Iaia was being placed on a

21   six-month leave of absence, correct?

22        A.    At the time I probably was.

23        Q.    All right.  Today you don't remember

24   what the reason was?

25        A.    I don't recall.

88

1      Q.      So you had no idea what that

2    position -- whether or not that position was going

3    to stay the same or change after this reduction in

4    force?

5      A.      I just don't recall the circumstances

6    involving the director of public relations aspect

7    of it.

8      Q.      So you don't know if Ms. Monteiro

9    assumed the duties and responsibilities of the

10   director of marketing and public relations after

11   Miss Iaia was taken out of that position?

12     A.      I cannot recall the circumstances

13   behind that, no.

14     Q.      Was that your responsibility to

15   select the position of the person who was going to

16   continue on in the position of director of

17   marketing/public relations or Senior Friends?

18     A.      Yes.

19     Q.      Did you consider Miss Iaia for

20   continued employment in that position?

21     A.      As the Seniors Program?

22     Q.      No.  As director of marketing and

23   public relations and Senior Friends?

24     A.      Possibly eliminate the position.

25     Q.      It's your understanding the entire

89

1    position was eliminated?

2         A.     Yes, sir.

3         Q.     Okay.  And when did you leave

4    Pembroke Pines Hospital?

5         A.     November of '93.

6         Q.     So it was your understanding that

7    Pembroke Pines Hospital was no longer going to

8    have anyone doing any kind of marketing or public

9    relations for the hospital?

10        A.     I do not recall, while I was there, a

11   conversation assigning responsibilities for that

12   position after Ms. Iaia left.

13                MR. HANNAH:  Let's have this marked.

14                     (Plaintiff's Exhibit 2 was

15                      marked for identification.)

16

17   BY MR. HANNAH:

18        Q.     Why don't you take a look at what's

19   been marked Plaintiff's Exhibit Number 2?  Why

20   don't you read that document?

21        A.     (Witness complied.)

22        Q.     All I'm asking is for you to read

23   that document.

24        A.     Okay.

25        Q.     Now that you've read it, is that an

1    accurate statement of the facts as to what

2    happened with the director of marketing/public

3    relations position?

4         A.      This says that the position was

5    eliminated and it was combined with Mrs.

6    Monteiro's position.

7         Q.      Is that accurate?

8         A.      The position was eliminated.  I

9    cannot remember the specific circumstances where

10   Mrs. Monteiro may have taken over that position.

11        Q.      So you have no idea if she actually

12   took over any of those job duties --

13        A.      No.

14        Q.      Let me finish my question, please.

15               You have no recollection as we sit

16   here today whether or not Ms. Monteiro assumed job

17   duties and responsibilities that were formerly

18   performed by Ms. Iaia?

19        A.      No, sir.

20        Q.      Okay.  The reason why you don't know

21   that is because you left the hospital too quickly?

22        A.      Not only that, but it's been seven

23   years since the incident occurred.  I can't

24   remember the specifics of it.

25        Q.      So that could be correct?  That

1   information could be correct?

2        A.    I don't know.  I can't give you an

3   answer on something I can't remember.

4        Q.    All right.  And you can't remember

5   why Ms. Iaia was not considered for the combined

6   position of director of public relations and

7   Senior Friends?

8              MR. COPELAND:  Objection.

9   Argumentative.

10             THE WITNESS:  I don't know that that

11  was ever a consideration in that the Seniors

12  Program was a very intense, very well run program,

13  and, to the best of my knowledge, Ms. Iaia had no

14  experience in that.

15

16  BY MR. HANNAH:

17       Q.    To your knowledge, Ms. Iaia had no

18  experience in Senior Friends?

19       A.    Yes.

20       Q.    In running the Senior Friends

21  Program?

22       A.    That's right.

23       Q.    Were you actually aware she did

24  actually have that responsibility?

25       A.    No.

92

1      Q.     You have no idea?

2      A.     No.

3      Q.     Did you actually review her

4  qualifications at all to determine whether or not

5  she was the better person for the position after a

6  reduction in force than Monique Monteiro?

7      A.     I do not recall the specific

8  circumstances back then.

9      Q.     Okay.  Do you take any medication

10  that affects your memory?

11      A.     No, sir.

12      Q.     Do you take any kind of medication at

13  all?

14      A.     No, sir.

15      Q.     Do you drink alcoholic beverages?

16      A.     Occasionally.

17      Q.     What was the date you left?

18      A.     I believe it was November of '93.

19      Q.     Okay.  Who took over your position?

20      A.     O'Connell maybe.  I don't recall.

21      Q.     That's the last name, O'Connell?

22      A.     Yes.  I believe that was the case.

23      Q.     Was that a man or a woman?

24      A.     Don't recall.  Never met him.

25      Q.     Or her?

1       A.      Or her.

2       Q.      Did you review the qualifications on

3   Monique Monteiro in deciding whether to keep her

4   on as an employee of Pembroke Pines Hospital?

5       A.      I would have to answer the same way,

6   I don't recall looking at them seven years ago.

7       Q.      Did you review the performance

8   records of Jackie Iaia to determine whether or not

9   she should stay on as any kind of public relations

10  director or Senior Friends director?

11      A.      I don't recall.

12      Q.      So Miss Iaia's performance had no --

13  was not involved at all in any way in your

14  consideration whether or not to let her go?

15              MR. COPELAND:  Objection.

16  Argumentative.

17              THE WITNESS:  I can't recall that.

18  We eliminated the position.  That's the best I

19  recall.

20

21  BY MR. HANNAH:

22      Q.      Eliminated the position but combined

23  it with another position?

24              MR. COPELAND:  Objection.

25  Argumentative.

1              THE WITNESS:  I don't know.  I cannot

2    recall whether that was combined in there at the

3    time or not.

4

5    BY MR. HANNAH:

6         Q.    Tell me all the other people that

7    were involved in that decision-making process as

8    to reduction in force and combining positions,

9    eliminating positions.

10        A.    Would have been my department head,

11   department of human resources.

12        Q.    Who is that?

13        A.    Various department heads would have

14   been involved in employee reductions by supplying

15   names within their departments that could be

16   eliminated.

17        Q.    Claudia Jack, was she involved?

18        A.    I can't even recall whether she was

19   there at the time or not.

20        Q.    Well, certainly the human resources

21   director at the time would have been involved,

22   right?

23        A.    Yes.

24        Q.    What other department heads were

25   involved in the decision-making process?

97

1          Q.      Was it your understanding that the

2     Pembroke Pines Hospital would continue to have

3     some kind of marketing function --

4          A.      Sir --

5          Q.      -- after Ms. Iaia was let go?

6          A.      I cannot answer that question because

7     I do not remember having that discussion with

8     anyone.

9          Q.      Was her job an important job?

10         A.      To a certain extent, yes.

11         Q.      Okay.  And marketing and public

12    relations for a hospital is an important part of

13    the hospital, correct?

14         A.      Not necessarily.

15         Q.      Part of Pembroke Pines Hospital which

16    was losing beds, so to speak, or customers, wasn't

17    marketing and public relations of the hospital an

18    important function?

19         A.      Public relations aspects are a very

20    important aspect of hospitals, but marketing, such

21    as advertising, is not necessarily in that

22    situation.

23         Q.      Let's talk about public relations.

24    That's an important aspect of the hospital,

25    correct?

```
 1          A.      Uh-huh.

 2          Q.      Yes?

 3          A.      Yes.

 4          Q.      Okay.  And someone would need to

 5   continue performing that position after Ms. Iaia

 6   left, correct?

 7          A.      Possibly.

 8          Q.      You have no idea if that happened?

 9          A.      I have no idea what public relations

10   functions were performed after that.

11          Q.      Okay.  And you were not involved at

12   all in giving to Ms. Monteiro, after Ms. Iaia was

13   notified of her selection for reduction in force,

14   any marketing or public relations

15   responsibilities?

16          A.      Sir, I cannot remember having that

17   conversation with Mrs. Monteiro.

18          Q.      I didn't ask you if you had a

19   conversation about that.

20          A.      I don't remember signing any

21   paperwork relating to that.

22          Q.      You don't know if she continued to

23   perform those job duties and responsibilities?

24          A.      I do not recall after that, no.

25          Q.      Was there somebody else involved in
```

1    that process after you left?

2           A.     I have no idea.  I wasn't there.

3           Q.     Was one of Ms. Iaia's job duties and

4    responsibilities as director of marketing and

5    public relations to prepare a newsletter for the

6    hospital?

7           A.     Uh-huh.

8           Q.     Yes?

9           A.     If I recall, it was.

10          Q.     Okay.  Let me show you --

11                 MR. HANNAH:  Let's have this marked

12   Plaintiff's Exhibit Number 3, I believe, right?

13                      (Plaintiff's Exhibit 3 was

14                      marked for identification.)

15

16   BY MR. HANNAH:

17          Q.     Take a look at Plaintiff's Exhibit

18   Number 3.  Tell me if you recognize that.

19          A.     It's a newsletter put out by Pembroke

20   Pines Hospital.

21          Q.     Okay.  That was something that was

22   performed by Ms. Iaia when she was director of

23   public relations and marketing, correct?

24          A.     As best I can recall, yes.

25          Q.     In fact, it shows her name there as

1  the editor?

2      A.    Yes.

3      Q.    What's the date of that?

4      A.    March of '93.

5      Q.    Okay.  So one of the job duties and

6  responsibilities of the director of public

7  relations was to prepare this newsletter, correct?

8      A.    Yes, sir.

9      Q.    Let me show you this document,

10 Plaintiff's Exhibit Number 4.

11                     (Plaintiff's Exhibit 4 was

12                     marked for identification.)

13

14 BY MR. HANNAH:

15     Q.    If you'll look at Plaintiff's Exhibit

16 Number 4.  Does this appear to be the same

17 newsletter?

18     A.    Appears to be.

19     Q.    Who's the editor of that?

20     A.    Monique Monteiro.

21     Q.    What's the date of that newsletter?

22     A.    December of 93.

23     Q.    You had already left by that time?

24     A.    If I recall, that's correct.

25     Q.    Okay.  And that indicates Ms.

1    Monteiro was in December of 1993 performing one of

2    the job duties and responsibilities of the

3    director of marketing and relations -- marketing

4    and public relations that had previously been

5    performed by Jackie Iaia, correct?

6                    MR. COPELAND:  Objection.

7    Argumentative.

8                    THE WITNESS:  Appears that way.

9

10   BY MR. HANNAH:

11       Q.    Any reason to believe that Ms.

12   Monteiro also did not assume all of the other job

13   duties and responsibilities of Ms. Iaia commencing

14   in December of 1993?

15                   MR. COPELAND:  Objection.  Calls for

16   speculation.

17                   THE WITNESS:  I don't recall.

18

19   BY MR. HANNAH:

20       Q.    You wouldn't have any idea?

21       A.    Seven years ago, no.

22                   MR. HANNAH:  Let's have this marked

23   Plaintiff's Exhibit Number 5.

24                        (Plaintiff's Exhibit 5 was

25                         marked for identification.)

ATTACHMENT / EXHIBIT ⌐7

1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF FLORIDA
2             FORT LAUDERDALE DIVISION

3          CASE NO. 00-6227-CIV-MORENO
           Magistrate Judge Dube
4

5   JACQUELINE IAIA,                    )
                                        )      **ORIGINAL**
6              Plaintiff,               )
                                        )
7        vs.                            )
                                        )
8   COLUMBIA HEALTHCARE                 )
    CORPORATION d/b/a PEMBROKE          )
9   PINES HOSPITAL, a foreign           )
    corporation,                        )
10                                      )
               Defendant.               )
11  _____X

12                          Becker & Poliakoff, P.A.
                            500 Australian Avenue South
13                          Ninth Floor
                            West Palm Beach, Florida
14                          Tuesday, October 17, 2000
                            10:00 o'clock A.M.
15

16  APPEARANCES:

17         BECKER & POLIAKOFF, P.A.,
           BY: RODERICK V. HANNAH, ESQ.,
18         appearing on behalf of the Plaintiff.

19         LEVY, KNEEN, MARIANI, CURTIN,
           KORNFELD & DEL RUSSO, P.A.,
20         BY: ALEXANDER D. DEL RUSSO, ESQ.,
           appearing on behalf of the Defendant.
21

22                     ------------

23                      DEPOSITION

24                         OF

25              MARIA D. LOMAGA

1    personnel policy in place as to how to deal with

2    employees in connection with a layoff or a

3    reduction in force?

4         A.   No.

5         Q.   Have you at all, in connection with

6    this case, been asked to contact the Document

7    Bank to determine what documents still may be

8    there?

9         A.   Yes, I was.

10        Q.   Who did you speak to over there?

11        A.   I don't know the name.  I can't tell

12   you the name.  It's been several years since I've

13   learned about it in 1998, I think.  Early 1998 I

14   was asked to find the records, if there were any

15   records for Jackie Iaia, if they could be

16   located.  I contacted Document Bank.

17        Q.   Let me stop you there.  Who asked you

18   to do that?  If it's a lawyer who asked you to do

19   that, don't tell me.  If it was somebody other

20   than a lawyer who told you that, a lawyer for the

21   hospital.  Was it a lawyer for the hospital?

22        A.   Yes.

23        Q.   This is back in when, 1998?

24        A.   Yes, early part of 1998.

25        Q.   They asked you to try to locate the

1       personnel records for Jackie Iaia?

2            A.    Yes.

3            Q.    How did you go about trying to locate

4       those records?

5            A.    I called the Document Bank and I gave

6       them the year when the documents could have been

7       shipped at the end of 1995 or whatever time.

8                  They have a pretty good system.  And

9       after they checked they said the documents of

10      Jackie Iaia were just destroyed because they just

11      hit the limitation of time at the end of 1997.

12           Q.    So they were destroyed at the end of

13      1997?

14           A.    Yes.

15           Q.    Did you contact the Document Bank to

16      find out if they had copies of the personnel

17      policies or manuals or handbooks that were being

18      used back in 1993?

19           A.    No.

20           Q.    So you never contacted them about

21      that?

22           A.    No.  I had no reason.

23           Q.    No lawyer asked you to look for those

24      documents?

25                 MR. DEL RUSSO:  Object to the form.  I

8


ATTACHMENT / EXHIBIT

# MARK E. EDWARDS
## ATTORNEY AT LAW

### 2501 PARK PLAZA
### NASHVILLE, TN  37203

MARK E. EDWARDS
JEANNE CASSTEVENS THOMAS
SARAH R. GALVARRO

KIP P. ROTH
SUE WILLIS-GREEN
ROBERT W. HORTON

**DATE:**    03/09/98

**TO:**    Ms. Linda Mathis, Investigator
FAX #:    850-488-5291

**FROM:**    Jacqueline W. Trice, Paralegal
(615) 344-2970
(615) 344-2200 (fax)

Total number of pages <u>including</u> this cover sheet: **3**

**COMMENTS:**

THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

000384



5

# Florida Commission on Human Relations

*ab, Governor*
*d M. McElrath, Executive Director*

# FAX SHEET

Date: 8-23-99

Recipient: Tony Bagdan

Recipient's Fax Number: (954) 731-1464

Sender: Jessie Stokes

Subject: Position Statement

Comments: Per Ms Jaia request, I am faxing
the position statement. Thank you.
Any question please call
(850) 488-7082, 1042

Number of pages being faxed, including cover sheet: ____3____

Originals are to follow:

By Courier _____
By mail _____
Not to follow ___✓___

This facsimile contains privileged and confidential information intended only for the use of the individual or entity named above. If the reader of this facsimile is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify us immediately by telephone and return the original to us at the above address via the U.S. Postal Service. Thank you.

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(850) 488-7082 • 1-800-342-8170 (Complaints Only Voice or TDD)
Investigation Fax (850) 488-5291 • Administration Fax (850) 922-3025
An Equal Opportunity Employer • Affirmative Action Employer

000385

# MARK E. EDWARDS
ATTORNEY AT LAW

MARK E. EDWARDS
JEANNE CASSTEVENS THOMAS
SARAH R. CALVARRO
KIP P. ROTH
SUE WILLIS-GREEN
ROBERT W. HORTON

WRITER'S DIRECT DIAL
(615) 344-2970

2501 PARK PLAZA
NASHVILLE, TENNESSEE 37203

(615) 344-2591
(615) 344-2200 FAX

March 6, 1998
Via Facsimile 850/488-5291

Ms. Linda Mathis, Investigator
Employment Investigation Unit
Florida Commission on Human Relations
325 John Knox Road, Suite 240, Building F
Tallahassee, Florida 32303-4149

Re:    *Iaia v. Galen Hospital - Pembroke Pines, Inc.*
       *f/d/b/a Pembroke Pines Hospital*
       *EEOC 15D971107 and FCHR No. 95-0414*

Dear Ms. Mathis:

This letter constitutes the Corporation's statement of position and response to the Commission's request for information.    Ms. Iaia alleged that she was discriminated against because of her age (49).    As discussed more fully below, this charge is without merit and should be dismissed.

Counsel has prepared this letter solely for your use in your investigation and evaluation of the above-captioned case.    Because counsel prepared this letter based on limited information, this statement and the representations herein are not based upon first-hand knowledge.    Accordingly, counsel does not authorize or intend this letter to be used for any purpose other than that described above.    The Corporation will cooperate in the investigation of this matter through counsel, and the undersigned will respond to any relevant questions or requests for information you may have now or later in your investigation.

The Corporation divested the assets relating to the Hospital in 1995. Therefore, this Corporation does not have much information relating to this matter.

The Corporation understands that Ms. Iaia was a long standing employee of the Hospital and worked for the Hospital as the Director of the Marketing Department.    In that capacity, she was primarily responsible for planning, organizing and directing the marketing function of the Hospital.    000387

Iaia v. Pembroke Pines Hospital
Charge No. 15D971107 and FCHR No. 95-0414
March 3, 1998
Page 2

From late 1993 through 1994, the Hospital initiated a necessary reduction in operating costs. As part of this reduction, Ms. Iaia's position was eliminated. During this period of time, the Hospital reviewed Ms. Iaia's position in the Marketing Department along with various other management level positions and determined that the function of the Marketing Department Director could be combined with the position of the Director of Public Relations and Senior Friends.

This decision was made because the employee performing the function of the Director of Public Relations and Senior Friends was capable of performing the duties and responsibilities of both areas. Ms. Iaia was not experienced in the area of Senior Friends and could not perform that function when the positions were combined. Consequently, her position was eliminated

In order to function in the changing healthcare environment, the Hospital had to reduce its expenses, including employment expenses. The Hospital selected positions for elimination to allow for the continued provision of quality patient care when staff was reduced. These positions were eliminated based on the Hospital's goal of reducing expense through the efficient and effective restructuring of job responsibilities that also ensured quality healthcare.

Clearly Ms. Iaia was not discriminated against based on her age (46). Following the elimination of her position, her job responsibilities were absorbed by another employee. Ms. Iaia was simply terminated because the Hospital determined that it was necessary to reduce expenses.

The Hospital denies that it discriminated against Ms. Iaia and respectfully requests that this charge be dismissed.

Sincerely,

Mark E. Edwards

MEE/JWT/gek

000388

7

ATTACHMENT / EXHIBIT

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

JACQUELINE IAIA,

      Plaintiff,

vs.                CASE NO. 00-6277-CIV-MORENO

COLUMBIA HEALTHCARE CORPORATION
d/b/a PEMBROKE PINES HOSPITAL,
a foreign corporation,

      Defendants.
_____/

| | |
|---|---|
| VIDEO DEPOSITION OF: | JOSEPH A. CASH |
| TAKEN AT THE INSTANCE OF | Attorneys for Defendant |
| DATE: | August 14, 2000 |
| TIME: | Commenced at 11:20 a.m.<br>Concluded at  1:15 p.m. |
| LOCATION: | 100 Salem Court<br>Tallahassee, Florida |
| REPORTED BY: | Carolyn L. Rankine<br>Notary Public in and for<br>the State of Florida at<br>Large |





12

1    Q    And does, sir, that refer to the date that we

2    discussed a moment ago in terms of when her complaint was

3    initially received by your offices?

4    A    Right, receive and filed.

5    Q    The next sentence goes on to say, "However,

6    Ms. Iaia's complaint was lost at some point after the

7    initial filing and had to be re-notarized in July of

8    1995." Do you see that language?

9    A    Yes, sir, I do.

10   Q    Were you aware of this fact at any point prior

11   to the time of this deposition today?

12   A    I think we had some problems with this case and

13   I do recall. And looking at it, I noticed that I made

14   some entries in this particular complaint and I vaguely

15   remember talking to the complainant some years ago about

16   this particular situation and I thought that it needed to

17   be cleared up. But to say it was lost is a little

18   different than saying that there may have been some

19   problems in our processing.

20   Q    All right. Well, the letter we just saw refers

21   to the complaint as being lost. My question is were you

22   aware of that fact prior to the time of your deposition

23   here today?

24   A    Well, the thing is I'm not comfortable saying

25   that it was lost and so I -- you know, to then go past

35

1    A    (Perusing document.)  That address looks like

2   one that was provide by the complainant that's on the

3   complaint form itself.  The name, however, of

4   Paula Adamson appears to be the name given by the

5   complainant on her affidavit.

6    Q    And what's the date of that affidavit?  Well,

7   let me ask you:  what was the date it was signed; and

8   then what was the date it was received by your agency?

9    A    (Perusing document.)  There's actually two --

10  looks like we received it twice.  We received it once in

11  the November of '94, which is -- but it doesn't show the

12  date it was signed.  This particular affidavit was

13  notarized without a date on it, but it looks like we

14  received that particular one in November of '94.

15   Q    Okay.  But as to the name of the representative

16  and the address, your file reflects that was information

17  provided by the complaining party, Ms. Iaia?

18   A    The Paula Adamson, yes, sir.

19   Q    Okay.  Now, going back to Exhibit 9, which is

20  this three-page log of complaint activities, could you

21  read for us the date and entry for the first -- for the

22  first line item on the log of activities?

23   A    It says 11/14/94.  Filed.

24   Q    And what is the next entry that's listed on

25  this log of activity?

36

1      A     9/26/97.  Docketed.

2      Q     All right.  And do you know, sir, if the reason

3  for the approximate three-year delay was because this

4  matter had been referred during the interim to the EEOC

5  for investigation?

6      A     I would say that's part of it.

7      Q     What's the other part of it?

8      A     Well, I mean, if we got it in -- we first got

9  it in November of '94, and we didn't get a perfected,

10  signed, notarized charge until July of '95, then that

11  accounts for some period right there.  I mean, that

12  should have been done quicker.

13          Then after July of '95, when we referred it, it

14  looks like the letter for referral didn't go out until

15  March of '96.  And then after March of '96, our

16  conclusion typically would be that EEOC would then handle

17  that matter.  And so we don't really have a lot of follow

18  up necessarily in a situation like this.

19      Q     How does your office typically learn that the

20  EEOC is referring a case back to you for investigation?

21      A     Usually, we'll get some kind of documentation

22  back from them, whether it's a FAX, whether it's

23  something that happened during the course of the

24  complaint.  The complainant calls and says what's the

25  status.  And we say, well, you need to call EEOC.  They

1    call EEOC and they say you call FCHR.  Sometimes it

2    happens that way that we get in communication from EEOC

3    just based on our dialogue with them.

4         We'll say, well, the complainant called and we

5    directed them to you because we referred it to you on

6    March 20, '96.  And they say, well, we don't have it.  We

7    referred it back to you.  Oh, you did.  Whatever.  We'll

8    usually get some kind of communication back that we

9    should be investigating it --

10        Q    Now --

11        A    -- usually in writing.

12        Q    All right.  Now, what about with respect to

13   this case specifically?  Does the file reflect how it was

14   that your office learned that the case was being sent

15   back from the EEOC to the Florida commission for

16   investigation?

17        A    I didn't see anything like that, that showed

18   from the EEOC that said this matter is being referred

19   back to you.

20        Q    Let me show you, Mr. Cash, a letter dated

21   September 26, 1997, from the EEOC to Columbia Health Care

22   Corp. d/b/a Pembroke Pines Hospital, ask you if your file

23   has a copy of that letter in it as well.

24             (Deposition Exhibit 10 marked for

25   identification.)

1    A    I don't think that happened until September of

2  '97.

3    Q    Does your file reflect any investigation that

4  was done by your offices with respect to Ms. Iaia's

5  complaint prior to September 26th, 1997?

6    A    Not an investigation into the merits of the

7  complaint; no, sir.

8    Q    In terms of the process that an investigation

9  goes through at what point -- or do you know at what

10  point an investigator is assigned to a particular case?

11    A    The persons who are working in the intake

12  section are investigators, have been for sometime, but

13  they wouldn't necessarily be conducting an investigation.

14  I think, what you're talking about, assigned to an

15  investigator and conducting an actual investigation in a

16  complaint may be two separate things.

17    Q    The reason I asked you that, Mr. Cash, is that

18  the first letter or the second letter that I showed you

19  from Linda Mathis identified her position as an

20  investigation specialist, and the positions of

21  Mr. Calhoun and Ms. Singleton, who we've discussed more

22  recently, were intake counselors or intake managers.  Is

23  there a difference or do you know if there's a difference

24  between an intake counselor and an investigator for

25  purposes of this investigatory process?

48

1    A    There is a difference but the working title of

2    intake counselor is just that, a working title.  Their

3    actual official position could be and they -- currently

4    they are investigation specialists, the same as the

5    investigator that you have listed there, Linda Mathis.

6    Q    Does an intake coordinator conduct any

7    investigation into the merits of the case?

8    A    Not the merits; no, sir.

9    Q    Well, what do they conduct an investigation

10   into, if anything?

11   A    Well, generally, their investigative process

12   would be more limited and more narrow focused and they

13   would really look at the face of the complaint to make

14   sure that it invokes our jurisdiction and not much more

15   than that.

16   Q    I'm going to go back to the document, Mr. Cash,

17   that I marked as Exhibit 9, it's the complaint -- log of

18   complaint activity, and I would like you to please look

19   on the third page of that document which are the entries

20   in November of 1997.

21   A    Yes, sir.

22   Q    Can you read the entry for the date of November

23   18, 1997?

24   A    November 18, '97.  Case assigned to

25   investigator.

49

1    Q    Do you know if that was Linda Mathis to whom it

2    was assigned?

3    A    Yes, sir.

4    Q    Do you know if anyone was assigned to be an

5    investigator on this file prior to the time that it was

6    assigned on November 18, 1997, to Ms. Mathis?

7    A    No, sir.

8    Q    Bad question.  No; you don't know, or no; no

9    one was previously assigned as an investigator?

10   A    No; it doesn't appear that anybody else was

11   assigned as an investigator.

12   Q    All right.  And can you read to me the next

13   entry as well?

14   A    12/1/98.  C -- wait.  11/21/98.  Initial

15   contact letter sent to Cp.

16   Q    Let me mark as Exhibit 14 a letter from

17   Linda Mathis to Jacquelyn Iaia dated November 21, 1997;

18   ask you if the copy I'm showing you is a true and

19   accurate copy of a letter that's in your files.

20        (Deposition Exhibit 14 marked for

21   identification.)

22   A    (Perusing document.)  Yes, sir, it is.

23   Q    The first sentence in this letter reads:  "I am

24   writing to let you know that your case has been assigned

25   to me for investigation."  Based upon your review of the

50

1  files, Mr. Cash, does it appear that Linda Mathis was the

2  first investigator to whom this case was assigned for

3  investigation?

4      A    Yes, sir.

5      Q    Do you know if there was a certain time period

6  within which your agency is required to investigate a

7  complaint and then make a determination as to the merits

8  of a complaint?

9      A    That matter is currently under review.  There

10  is no -- right now it's not clear.

11      Q    Well, what about back between 1994 and 1997,

12  during that time period, do you know if there was a

13  certain time frame within which your office was to

14  initiate an investigation and make a determination?

15      A    There was no policy regarding that, that we had

16  a specific time frame; no, sir.

17      Q    All right.  I'm going to show you, Mr. Cash, a

18  copy of the Florida Civil Rights Act, specifically

19  section 760.11, subsection 3, and I have highlighted in

20  yellow a particular sentence and I'm going to ask you,

21  sir, to please read that sentence aloud into the record.

22      A    "Except as provided in subsection 2, the

23  commission shall investigate the allegations in the

24  complaint.  Within 180 days of filing of the complaint,

25  the commission shall determine if there is reasonable

LOG OF COMPLAINT ACTIVITY

DATE DUE: 04/13/95

FCHR No. 95-0414                    BASIS: age

EEOC No. 15D971107                  ISSUE: D2 ^ L1

COMPLAINANT(S)                      RESPONDENT(S)

Ms. Jacqueline Iaia                 Columbia Health Care Corp. d/b/a
                                    Pembroke Pines Hospital

ADDRESS                             ADDRESS
1113 S.W. 17th St.                  2301 University Drive

Boca Raton, FL 33486               Pembroke Pines, FL 33024

TELEPHONE                           TELEPHONE

561-750-0099                        305-962-9650

AUTHORIZED REPRESENTATIVE           AUTHORIZED REPRESENTATIVE

                                    Ms. Paula Adamson
                                    Personnel Director

ADDRESS                             ADDRESS

                                    2301 University Drive

                                    Pembroke Pines, FL 33024

TELEPHONE                           TELEPHONE

                                    305-962-9650

DATE        ACTION
11/14/94    FILED
09/26/97    DOCKETED
09/26/97    FCHR NOTICE OF RECEIPT MAILED TO COMPLAINANT
09/26/97    FCHR NOTICE OF FILING MAILED TO RESPONDENT
09/26/97    DUAL FILED WITH EEOC
09/26/97    EEOC NOTICE TO CP + RSP MAILED
09/26/97    EEOC FORM 212, 155 + COPIES OF NOTICES MAILED TO EEOC
09/26/97    DOCUMENT REQUEST LETTER MAILED TO COMPLAINANT
09/26/97    DOCUMENT REQUEST LETTER MAILED TO RESPONDENT
~~03/07/9~~  ~~AMENDED~~

--------------------------------------------------------------------

--------------------------------------------------------------------

--------------------------------------------------------------------



Exh. 1



STATE OF FLORIDA

# Florida Commission on Human Relations

*Lawton Chiles, Governor*
*Ronald M. McElrath, Executive Director*

January 2, 1998

Columbia Health Care Corp. d/b/a Pembroke Pines Hospital
c/o Mark E. Edwards, Esq.
2501 Park Plaza
Nashville, Tn. 37203

Dear Mr. Edwards:

RE:  JACQUELINE IAIA v. PEMBROKE PINES HOSPITAL
FCHR NO. 95-0414

I am writing to advise you that according to our records,
the Complainant filed her charge on November 14, 1994.  This
is the date which was recorded by the docketing office on the
Log of Complaint Activity in the file.
However, Ms. Iaia's complaint was lost at some point after
the initial filing and had to be re-notarized in July of
1995.

Therefore, please provide a response to the charge and
supporting documentation as soon as possible.

If you have any questions please call me at 850-488-7082
ext. 1029.

Sincerely,

Linda Mathis

Linda Mathis

Investigation Specialist II

00357

4



# STATE OF FLORIDA
## Florida Commission on Human Relations

n Chiles, Governor
d M. McElrath, Executive Director

March 20, 1996

Ms. Jacqueline Iaia
1113 S.W. 17 Street
Boca Raton, Florida 33486

Dear Ms. Iaia:

                    Re:  FCHR No. 95-0414

The Florida Commission on Human Relations is in receipt of your complaint of
employment discrimination.  Your complaint has been referred to the following
agency:

            Miami District Office
            Equal Employment Opportunity Commission
            One Biscayne Tower
            2 South Biscayne Blvd., Suite 2700 (27th Floor)
            Miami, Florida 33131

Your complaint of discrimination will be processed by the above-named agency
pursuant to the Age Discrimination in Employment Act and/or the Americans
with Disabilities Act.  The Florida Commission on Human Relations will
refrain from commencing an investigation into your complaint while it is
before the EEOC.  Within 35 days of notice of EEOC's Letter of
Determination regarding the above-referenced complaint, you may request the
Commission to review the final finding and orders of the EEOC and accord
them substantial weight in determining whether or not reasonable cause
exists to believe that the allegations made in your complaint are true.

You are therefore encouraged to cooperate fully with the EEOC.  The EEOC's
regulations require that you keep them informed of any change in address or
telephone number and that you advise them of any prolonged absence from your
current address.  Your cooperation in this matter is essential.

                              Sincerely,

                              Ronald M. McElrath

RM4/nw
cc: Columbia Health Care Corp. d/b/a
       Pembroke Pines Hospital

325 John Knox Road • Suite 240 • Building F • Tallahassee, Florida 32303-4149
(904) 488-7082 • 1-800-342-8170 (Complaints Only, Voice or TDD)
An Equal Opportunity Employer • Affirmative Action Employer

X #7

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

DATE **3-20-96**

EEOC CHARGE NO. _____

706 AGENCY
CHARGE NO. **95-0414**

Miami District Office
United States Equal Employment Opportunity Commission
One Biscayne Tower, Suite 2700
2 South Biscayne Boulevard
Miami, Florida 33131

RE: CHARGE TRANSMITTAL **Jacqueline Iaia**
(Charging Party)

**Columbia Health Care Corp.**
V. **d/b/a Pembroke Pines Hospital**
(Respondent)

Submitted herewith is a charge of employment discrimination initially received by the:

☐ EEOC  ☒ Florida Commission on Human Relations. **11-14-94**
(Name of 706 Agency)         (Date of Receipt)

Pursuant to the work-sharing agreement, this charge is to be initially processed by the EEOC.

Pursuant to the work-sharing agreement, this charge is to be initially processed by the 706 Agency.

The work-sharing agreement does not determine which agency is to initially process the charge.

☐ EEOC requests a waiver          ☒ 706 Agency waives

☐ No waiver requested          ☐ 706 Agency will process the charge initially

Please complete the bottom portion of this form to acknowledge receipt of the charge and, where appropriate, to state whether the 706 Agency will initially process the charge.

| NAME OF EEOC OR 706 AGENCY DIRECTOR | SIGNATURE |
|---|---|
| Ronald M. McElrath, Executive Director | *Ronald M McElrath* |

V.

(Charging Party)          (Respondent)

To whom it may concern:

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to initially process the charge.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention not to initially process the charge.

☐ This will acknowledge receipt of the referenced charge and indicate this Agency's intention to dismiss/close/ not docket the charge for the following reason: _____

| NAME OF EEOC OR 706 AGENCY DIRECTOR | SIGNATURE |
|---|---|
| Federico Costales | |

TO:

DATE _____

EEOC CHARGE NO. _____

706 AGENCY CHARGE NO.

19



# STATE OF FLORIDA
# Florida Commission on Human Relations

. Chiles, Governor
{ M. McElrath, Executive Director

NOTICE OF FILING OF
COMPLAINT OF DISCRIMINATION

September 26, 1997

Columbia Health Care Corp. d/b/a
  Pembroke Pines Hospital
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, FL 33024

Dear Sir or Madam:

Re:  Iaia v. Columbia Health Care Corp. d/b/a
     Pembroke Pines Hospital
     FCHR No. 95-0414

YOU ARE HEREBY NOTICED that the enclosed Charge of Employment Discrimination
has been filed against your company or organization.

The charge was filed under one or more of the following laws:  (a) The
Florida Civil Rights Act of 1992, as amended (Chapter 760, Florida Statutes);
(b) Title VII of the Civil Rights Act of 1964, as amended; (c) The Age
Discrimination in Employment Act (ADEA); and/or (d) The Americans with
Disabilities Act (ADA).

You are advised that the law prohibits retaliation against any person for
making a complaint, testifying, assisting or participating in an investigation,
proceeding, or hearing on an alleged unlawful employment practice.

In connection with the investigation of the above-referenced complaint of
discrimination, you are invited to attend and participate in a Mediation
Conference in an effort to expeditiously and amicably resolve this dispute.
The mediation process is offered as an alternative to investigation of this
complaint.  FCHR's mediation process is designed to allow the parties to
resolve this matter in a voluntary and informal process at the earliest stage
possible.  The mediation process is described in detail in the enclosed Fact
Sheet.  It is our experience that mediation results in reduced costs, avoids
protracted investigatory procedures, and leads to early resolutions in a
non-adversarial proceeding.

If you are agreeable to participating in a Mediation Conference, please call
the FCHR Mediation Coordinator, at 904/488-7082, no later than ten (10)
days of your receipt of this letter.  At the time of your call, please be
prepared to furnish a telephone number where you can be reached between
the hours of 8:00 a.m. and 5:00 p.m., Monday through Friday.



ice of Filing, FCHR No. 95-0414
e Two

the event you decide not to participate in the mediation process, pursuant
the provisions of Commission Rule 60Y-5.003, Florida Administrative Code,
ase furnish in writing the information and documents requested on the
losed list. Such information must be furnished within twenty-one (21) days
the receipt of this letter. In the event you have received this letter and
are not the authorized representative for this company or organization,
ase forward this correspondence to such person immediately. Also, the
losed "Affidavit to Authenticate Documents" should be completed and
urned along with the information and documents requested.

Document Request has been tailored to obtain relevant and necessary
ormation to evaluate the factual allegations made in the complaint of
scrimination. You are advised that failure to provide the requested
ormation may result in either adverse findings or the Commission may
oke its subpoena and enforcement powers. You are therefore urged
respond completely to each item of this Request for Information.
ARE ADVISED THAT THIS IS AN INITIAL INVESTIGATIVE INQUIRY AND
ITIONAL INFORMATION MAY BE REQUIRED IN THE FUTURE.

en corresponding with this Commission concerning this matter, please
fer to FCHR No. 95-0414 and EEOC No. 15D971107.

Sincerely,

Otis B. Mallory
Manager, Employment Investigation Unit

OBM/nw

closure

LOG OF COMPLAINT ACTIVITY

DATE DUE: 04/13/95

HR No. 95-0414                          BASIS: age

OC No. 15D971107                        ISSUE: D2 ^ L1

COMPLAINANT(S)                          RESPONDENT(S)

1. Jacqueline Iaia                      Columbia Health Care Corp. d/b/a
                                        Pembroke Pines Hospital


ADDRESS                                 ADDRESS
113 S.W. 17th St.                       2301 University Drive

Boca Raton, FL 33486                    Pembroke Pines, FL 33024

TELEPHONE                               TELEPHONE

561-750-0099                            305-962-9650

AUTHORIZED REPRESENTATIVE               AUTHORIZED REPRESENTATIVE

                                        Ms. Paula Adamson
                                        Personnel Director

ADDRESS                                 ADDRESS

                                        2301 University Drive

                                        Pembroke Pines, FL 33024

TELEPHONE                               TELEPHONE

                                        305-962-9650

| DATE | ACTION |
|------|--------|
| 11/14/94 | FILED |
| 09/26/97 | DOCKETED |
| 09/26/97 | FCHR NOTICE OF RECEIPT MAILED TO COMPLAINANT |
| 09/26/97 | FCHR NOTICE OF FILING MAILED TO RESPONDENT |
| 09/26/97 | DUAL FILED WITH EEOC |
| 09/26/97 | EEOC NOTICE TO CP + RSP MAILED |
| 09/26/97 | EEOC FORM 212, 155 + COPIES OF NOTICES MAILED TO EEOC |
| 09/26/97 | DOCUMENT REQUEST LETTER MAILED TO COMPLAINANT |
| 09/26/97 | DOCUMENT REQUEST LETTER MAILED TO RESPONDENT |
| ~~03/07/94~~ | ~~AMENDED~~ |

A # 9

CASE ACTIVITY LOG

FCHR NO. 95-0414

JACQUELINE IAIA

11/18/97 Case assigned to investigator.

11/21/98 Initial contact letter sent to Cp.

12/1/98 Cp called and we talked about her case.

3/18/98 Sent document request to Respondent. Called Mark Edwards office and they said that Respondent no longer owns the hospital but is still rresponsible for this case and the liabilities. The assetts were sold to another company in 1995.

6/17/98 Sent adverse inference letter to Respondent to get initial response.

6/23/98 Talked with Cp g gave status report.

7/27/98 Sent affidavit to Connie Viera, one of Cp's witnesses.

9/8/98 Received letter from Respondent, still have not received any personnel documentation on either Cp or Ms. MOntero. Respondent's rep stated that they still can not get anything from the hospital.

10/13/98 Submitted Ip to Ron Snell for approval.

10/20/98 Ip approved.

10/23/98 Called cp and left message for her to call me.

10/23/98 Im submitted to Case Review Team.

AUG-14-2000 02:05 KNFB MFRANI

414 Jacqueline Iaia Broward a
/06/97 66 Assessed - ditional investigation nee l
/06/97 JC
 response from Resp in file. Docketed: 9-26-97.
1 not go to mediation unit (ADEA case).
/09/97 53 Documentation rcvd from Resp/Rep
/09/97 DB
c'd notice of appearance.
/15/97 50 Phone call recvd from Cp/Rep
/15/97 JC
 called this date and we discussed negotiations - CP stated that she
tified Nina on
-1-97 for negotiations.



Miami District Office

1 Biscayne Tower, Suite 2700
2 South Biscayne Boulevard
Miami, FL 33131-1805
PH: (305) 536-4491
TDD: (305) 536-5721
FAX: (305) 536-4011

EEOC No. 15D971107
FCHR No. 95-0414
CHARGE FILING DATE: 11/14/94

Columbia Health Care Corp. d/b/a
Pembroke Pines Hospital
Ms. Paula Adamson
Personnel Director
2301 University Drive
Pembroke Pines, FL 33024

Re: Iaia v. Columbia Health Care Corp. d/b/a
Pembroke Pines Hospital

The EEOC has received and filed a copy of an age discrimination
charge filed with the Florida Commission on Human Relations. By
virtue of this action, the charging party's private suit rights
under the Federal Age Discrimination in Employment Act (ADEA) have
been preserved.

Unless you request otherwise, or unless the charging party
requests action by the Commission, we plan no action regarding
this charge under the ADEA, pending receipt of the results of
the Florida Commission's actions.

This Commission maintains a close working relationship with
state and local enforcement agencies with respect to the
settlement of charges of employment discrimination. Therefore,
we strongly encourage your cooperation with Florida state
officials on this matter.

Date: 09/26/97

SL-ADEA-N-2
6-82

FLORIDA COMMISSION ON HUM[...]
John Knox Road, Suite 240, Bui[...]
Tallahassee, Florida 32399-157[...]

*Cue discussed — Please type in [...] on the charge of discrimination. Also my Social Security # 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 and Date of Birth 6/28/48 Thanks! Jacqueline Iaia*

*FCHR 95-0414[...]*

## CHARGE OF DISCRIMINATION

me (Indicate Mr., Ms., or Mrs.)

~~a.~~ Jacqueline Iaia

reet Address

~~921 SW 44th  Place~~  1113 SW 17 St.

ty, State, and Zip Code

~~Pembroke Pines, Fl 33024~~  Boca Raton, Fl. 33486

ist the employer, labor organization, employment agency, apprenticeship [...] erson who discriminated against you.

| Name<br>Columbia Health Care Corp. d/b/a<br>Pembroke Pines Hospital | No. of Employees<br>15+ | Telephone No. (area code)<br>305-962-9650 |
|---|---|---|
| Street Address<br>2301 University Drive | City, State and Zip Code<br>Pembroke Pines, Fl 33024 | County<br>Broward |

| CAUSE OF DISCRIMINATION BASED ON (Check appropriate box(es)) | DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month, day, year) |
|---|---|
| ☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ HANDICAP ☐ NATIONAL ORIGIN ☑ AGE ☐ MARITAL STATUS ☐ RETALIATION | 05/11/94 |

THE PARTICULARS ARE (If additional space is needed, attach extra sheet(s)):

I. **PERSONAL HARM**
On May 11, 1994, I was terminated from my position as a Director of Marketing/Public Relations. Prior to this time I was given different terms and conditions of my employment. I have been employed for 2d years.

II. **RESPONDENT'S REASON FOR ADVERSE ACTION**
Mr. Jerry Sutphin, Executive Director, told me that I was being terminated because they were closing my department due to the necessity of the company to downsize.

III. **DISCRIMINATION STATEMENT**
I believe I have been discriminated against because of my Age (46 years old) in violation of the Florida Civil Rights Act of 1992 and the Age Discrimination in Employment Act.

I REQUEST THE FULL RELIEF TO WHICH I AM ENTITLED, UNDER THE LAW(S).

I will advise the agency if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures

SIGNATURE OF COMPLAINANT                DATE
7/25/95

NOTARY — (Required for filing)
SUBSCRIBED AND SWORN TO BEFORE ME
25 of July 19[...]

ANGELA V. MOORE
MY COMMISSION # CC396952 EXPIRES
August 5, 1998
BONDED THRU TROY FAIN INSURANCE, INC

COUNTY OF_____  _____

# AFFIDAVIT TO
## AUTHENTICATE DOCUMENTS

1.  **TRUE AND CORRECT COPIES**

    I (We),_____
    (Name(s) of custodian(s) of records)

    _____, _____,
    (Title(s) of such person(s))

    after being duly sworn, hereby attest that the attached documents are true and

    correct copies of the originals maintained by _____

    _____
    (Name of Respondent or Entity Keeping Documents)

    _____
    (Name of Section(s) or Division(s) Maintaining Records)

    _____
    Signature(s) of Custodian(s)

    Sworn to and Subscribed before me this

    _____ day of _____ 19____.

    _____
    Notary Public

    My Commission Expires:_____

2.  **ACCURACY OF ORIGINAL DOCUMENTS**

    I (We) _____
    (Name of person(s) generating documents or person(s) familiar with

    _____         _____
    events reflected in documents)         (Title(s) of such person(s))

    after being duly sworn, hereby attest that the originals of the attached docu-

    ments accurately reflect the events recorded on them.

    _____
    Signature(s) of Originator(s)

    Sworn to and Subscribed before me this

    _____ day of _____, 19____.

    _____
    Notary Public

    My Commission Expires:_____

Document/Information Request
FCHR No. 95-0414

1. What is the corporate legal name of your company or agency?

2. Describe your business operations or agency functions.

   (If you have had less than 15 employees for each workday in each of
20 or more calendar weeks in the current or preceding calendar year, the
complaint may be dismissed for lack of jurisdiction. If you claim less
than 15 employees, you must submit copies of your payroll records, a sworn
statement that you do not have interrelated operations with other entities,
and copies of your most recent IRS Form 940 or 941 and LES Form UCT-6 and
UCT-6W. Do not proceed further if you have less than 15 employees.)

3. Submit a statement that thoroughly addresses your position regarding
the events alleged by Complainant. Provide a direct response to each
allegation as stated on the complaint. Include any additional information
and explanation you consider relevant to the complaint.

4. Provide sworn statements or affidavits from the officials who were
responsible for the actions taken which led to this complaint, explaining
why they deemed the actions necessary. Send sworn statements from other
individuals who can verify the facts in support of your position.

5. Provide copies of documents from official records in support of your
position. Include copies of relevant personnel action forms and memoranda
from the personnel files of Complainant and any comparatives.

6. Send copies of appropriate sections of written rules, policies and
procedures or portions of policy manuals or employee handbooks which relate
to the issues raised in the complaint. Provide an explanation for any
unwritten policies or established practices which apply to the issues.

7. Give your total number of employees at the facility where
Complainant was employed, with a breakdown by race (white, black, Hispanic,
Asian, American Indian) and gender (male and female). Your latest EEO-1
report may be sent to meet this requirement. If this complaint is based on
disability, send the total number of employees with known disabilities and
omit race and gender.

8. If the complaint was based on a disability, pregnancy, or religion,
indicate what efforts were made to accommodate the condition/basis.
If no accomodation was made, please explain why.

   NOTE: "Current year" means the calendar year during which the most
recent personal harm occurred.

   NOTE: You are invited to submit any proposal that might be considered
for resolution of this complaint. This may be done now or at any time
during the investigation of this complaint.

AUG-14-2000 10:45 EEOC MIAMI DISTRICT 305 808 1831 P.15/31

THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

JACQUELINE IAIA

THIS (check one)
☐ CLAIMS TO BE AGGRIEVED
☐ IS FILING ON BEHALF OF ANOTHER

┌─────────────────────────────────┐
│ Columbia Health Care Corp.      │
│ d/b/a Pembroke Pines Hospital   │
│ Ms. Paula Adamson               │
│ Personnel Director              │
│ 12301 University Drive          │
│ Pembroke Pines, Fl 33024        │
└─────────────────────────────────┘

DATE OF ALLEGED VIOLATION
Earliest / /    Most Recent / /

PLACE OF ALLEGED VIOLATION

EEOC CHARGE NUMBER
15D971107

FEPA CHARGE NUMBER
95-0414

# NOTICE OF CHARGE OF DISCRIMINATION IN JURISDICTIONS WHERE A FEP AGENCY WILL INITIALLY PROCESS
(See attached information sheet for additional information)

YOU ARE HEREBY NOTIFIED THAT A CHARGE OF EMPLOYMENT DISCRIMINATION UNDER

☐ Title VII of the Civil Rights Act of 1964
☒ The Age Discrimination in Employment Act of 1967 (ADEA)
☐ The Americans with Disabilities Act

HAS BEEN RECEIVED BY

☐ The EEOC and sent for initial processing to _____
    Florida Commission on Human Relations       (FEP Agency)

☒ The ___ 325 John Knox Road ___ and sent to the EEOC for dual filing purposes.
    Suite 240, Building F (FEP Agency)
    Tallahassee, Florida 32303-4149

While EEOC has jurisdiction (upon the expiration of any deferral requirement if this is a Title VII or ADA charge) to investigate this charge, EEOC may refrain from beginning an investigation and await the issuance of the Agency's final findings and orders. These final findings and orders will be given weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by you to the Agency in the course of its proceedings will be considered by the Commission when it reviews the Agency's final findings and orders. In many instances the Commission will take no further action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This likelihood is increased by your active cooperation with the Agency.

☐ As a party to the charge, you may request that EEOC review the final decision and order of the above named Agency. For such a request to be honored, you must notify the Commission in writing within 15 days of your receipt of the Agency's final decision and order. If the Agency terminates its proceedings without issuing a final finding and order, you will be contacted further by the Commission. Regardless of whether the Agency or the Commission processes the charge, the Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained in the "EEOC Rules and Regulations" apply.

For further correspondence on this matter, please use the charge number(s) shown.

☐ An Equal Pay Act investigation (29 U.S.C. 206(d)) will be conducted by the Commission concurrently with the Agency's investigation of the charge.
☒ Enclosure: Copy of Charge

BASIS OF DISCRIMINATION

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NAT. ORIGIN ☒ AGE ☐ DISABILITY ☐ RETALIATION ☐ OTHER

CIRCUMSTANCES OF ALLEGED VIOLATION

Discharge/Layoff

| DATE | TYPED NAME/TITLE OF AUTHORIZED EEOC OFFICIAL | SIGNATURE |
|------|----------------------------------------------|-----------|
| 9-26-97 | Federico Costales Director | |

EEOC FORM 131-A (Rev. 06/92)

RESPONDENT'S COPY

## TION AND EXPLANATION

lorida Commission on Human Relations (FCHR)
es mediation conferences for new complaints of
ment discrimination pursuant to Sections 760.06(5)
0.11(11) of the Florida Civil Rights Act of 1992.
ion is a process in which an impartial person, the
or, helps the parties to resolve their dispute. The
:or may suggest ways of resolving the dispute but
ot make any judgement.

purpose of the mediation conference is to provide for
change of concerns from both parties and to work
d a possible resolution of the dispute. This informal
ence is an opportunity for the Complaining Party and
iployer (Respondent) to resolve their dispute prior to
ommission's investigation.

FCHR provides an impartial Commission
sentative to (1) conduct the mediation process, (2)
ict on-site mediation of complaints in accordance with
opriate procedures, and (3) issue and maintain all
priate documents in accordance with all statutory and
:dural requirements. In accordance with the
mission's rules, all communications at the conference
onfidential.

## SIBLE OUTCOMES

ne parties may enter into a Settlement Agreement prior
, or during the conference. If the parties reach a
attlement and execute a written agreement disposing of
ie dispute, the agreement is binding and enforceable in
ie same manner as any other written contract.

he mediator may declare that further efforts at
nediation are no longer worthwhile. If the parties fail to
esolve voluntarily the dispute, the case will be assigned
o an investigator for a thorough investigation of the
nerits of the complaint. A finding will then be made
based on an examination of the evidence.

The parties may complete the full mediation session, at
which time a written declaration of either party will be
made to the effect that the mediation proceedings are
terminated.

## PREPARING FOR A SUCCESSFUL CONFERENCE

### ~ COMPLAINANT ~

o It is suggested that you bring any information that you
wish to present at the conference concerning the reason(s)
you believe discrimination occurred. Limit your statements
to the issues raised in your complaint.

o Be prepared to state what you are requesting from the
Respondent. An itemized statement of losses would be
helpful. Be prepared to consider various ways to resolve
the complaint.

### ~ RESPONDENT ~

o It is suggested that you bring any information which
would support your position. Respondent's
representatives must have the authority to settle and all
persons necessary to the decision to settle should be
present. They should have direct knowledge of the
events and circumstances cited in the complaint. The
names and addresses of such persons shall be
communicated in writing to the Mediation Specialist.

## OTHER IMPORTANT POINTS

o Mediation sessions are private and confidential. The
parties and their representatives may attend mediation
sessions. Other persons may attend only with the
permission of the parties and with the consent of the
mediator.

o There shall be no stenographic record of the mediation
process and no person shall tape record any portion of the
mediation session.

o No subpoenas, summons, complaints, citations, writs, or
other process may be served upon any person at or near the
site of any mediation session upon any person entering,
attending or leaving the session.

o If mediation efforts are not successful within thirty (30)
days of the complaint being referred to the Mediation
Specialist, the case will be forwarded to appropriate
Commission personnel for conducting an investigation.

o Pursuant to the Florida Civil Rights Act of 1992, it is
unlawful employment practice to retaliate or discriminate
against a person who has opposes a discriminatory
practice or who has made or filed a complaint, testified,
assisted or participated in any manner in an investigation,
proceeding or hearing under this Act.



STATE OF FLORIDA

# Florida Commission on Human Relations

*Chiles, Governor*
*1. McElrath, Executive Director*

November 21, 1997

Ms. Jacqueline Iaia
1113 SW 17th St.
Boca Raton, fl. 33486

Dear Ms. Iaia

RE: IAIA v. COLUMBIA HEALTH CARE CORP. d/b/a PEMBROKE PINES
HOSPITAL
FCHR NO: 95-0414

I am writing to let you know that your case has been
assigned to me for investigation. I will be reviewing your
case file to see what additional information is needed and
will contact you by phone or by mail at a later date should
further information be required.

If you have any questions about your case, please call me at
904-488-7082 ext. 1029 and I will be happy to answer any
questions you may have.

Sincerely,


Linda Mathis

Investigation Specialist II





STATE OF FLORIDA
# Florida Commission on Human Relations

*ush, Governor*
*ld M. McElrath, Executive Director*

FCHR No. 95-0414
EEOC No. 15D971107

s. Jacqueline Iaia                    Complainant
113 S.W. 17th Street
oca Raton, FL 33486

olumbia Health Care Corp.             Respondent
/b/a Pembroke Pines Hospital
ark E. Edwards, Esquire
501 Park Plaza
ashville , Tennessee 37203


## NOTICE OF DETERMINATION:  CAUSE

PLEASE TAKE NOTICE  that a determination has  been made on the above-referenced
complaint that there is reasonable cause to believe that an unlawful employment
practice has occured. A copy of the Determination is attached.

During the following  30 days, you  are  invited  to  join the Commission in an
effort to reach a  just  resolution  of  this  matter through conciliation. The
30-day  conciliation  period  does  not,  however,  toll  (affect)  the 35-day
limitation period for filing a PETITION FOR RELIEF.

COMPLAINANT may request  an  administrative  hearing  by  filing a PETITION FOR
RELIEF within 35 days of the  date  of  this notice of DETERMINATION:  CAUSE or
COMPLAINANT may file a civil action  within one year of the date of this NOTICE
OF DETERMINATION:  CAUSE.

A petition for relief form is  enclosed  with  Complainant's  notice. It may be
beneficial for  Complainant  to  seek  assistance  from  legal counsel prior to
actually filing a Petition for Relief.

If the Complainant fails to  request  an  administrative hearing within 35 days
of the date of this notice,  the  administrative  claim under the Florida Civil
Rights Act of 1992, Chapter 760,  will be dismissed pursuant to section 760.11,
Florida Statutes (1992).

A copy of the Florida  Civil  Rights  Act of 1992  is enclosed for the parties'
information.

Pl Ex. #1

FCHR No. 95-0414
Page Two

## CERTIFICATE OF SERVICE BY AGENCY CLERK

    I HEREBY CERTIFY that a copy of the foregoing NOTICE OF DETERMINATION: CAUSE as served upon the above-named addressees this ___1st___ day of ___February___, 19 _99_, by U.S. Mail.

BY: _Sharon Moultry of_
           Clerk of the Commission



STATE OF FLORIDA
# Florida Commission on Human Relations

Bush, Governor
...ald M McElrath, Executive Director

FCHR No.: 95-0414
EEOC No.: 15D971107

MS. JACQUELINE IAIA      Complainant
1113 S.W. 17th Street
Boca Raton, Florida 33486

COLUMBIA HEALTH CARE CORPORATION,      Respondent
   d/b/a PEMBROKE PINES HOSPITAL
c/o Mark E. Edwards, Esquire
2501 Park Plaza
Nashville, Tennessee 37203

## DETERMINATION: CAUSE

On November 14, 1994, MS. JACQUELINE IAIA, Complainant, filed a Complaint of Discrimination with the Florida Commission on Human Relations (hereafter Commission) alleging that COLUMBIA HEALTH CARE CORPORATION, d/b/a PEMBROKE PINES HOSPITAL, Respondent, discriminated against her on the basis of age in violation of the Florida Civil Rights Act of 1992, sections 760.01-760.11, 509.092, Florida Statutes (1997 & Supp. 1998). An investigation of this matter has been concluded by the Commission's Office of Employment Investigations and Enforcement. The Commission's Office of General Counsel has read the Investigator's Memorandum (IM) and completed its review of the content of the case file.

### FINDINGS

1.     Complainant claims in her sworn Complaint of Discrimination that she was employed by Respondent as its Director of Marketing/Public Relations. Respondent asserts in its position statement that Complainant was its Director of Marketing.

2.     On November 11, 1993, Respondent placed Complainant on a reduction in workforce leave of absence for a period of six months. Exactly six months later on May 11, 1994, Complainant was terminated. Respondent claims it was unable to find Complainant another position.

3.     Complainant was in her mid-forties at the time of her termination.

4.     Complainant asserts she was terminated because Respondent wanted a "younger image." Respondent states Complainant's charge is without merit. Respondent claims that Complainant's position was eliminated because of a necessary reduction in operating costs. According to counsel for Respondent, the position of Marketing Department Director was combined with the position of Director of Public Relations and Senior Friends. Ms. Monique Monteiro had been Respondent's Seniors Program Director. Ms. Monteiro, who was in her mid-twenties, was given the new position involving the combination of positions.

Pl. Ex #2

FCHR No.: 95-0414
Page Two

5.  According to Respondent, Complainant was not given the new position because she did not have experience in the area of Senior Friends. Respondent felt Complainant would not be able to execute the job's duties and responsibilities.

6.  Ms. Pat Pierce, a former employee of Respondent contends in a sworn affidavit that Complainant had experience in managing a seniors program. In addition, according to the Commission's Investigation Specialist, evidence failed to indicate that Ms. Monteiro was qualified to perform Complainant's job duties. Ms. Pierce informed the Commission that Ms. Monteiro had no experience in marketing/public relations. Complainant had approximately twenty years of experience.

## ANALYSIS

7.  Section 760.10(1)(a), Florida Statutes (1997 & Supp. 1998) provides:

It is an unlawful employment practice for an employer:

To discharge or to fail or refuse to hire any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status.

8.  As the findings indicate, Complainant established a prima facie case of discrimination.

9.  In its position statement, Respondent states the following:

The Corporation understands that Ms. Iaia was a long standing employee of the Hospital and worked for the Hospital as the Director of the Marketing Department. In that capacity, she was primarily responsible for planning, organizing and directing the marketing function of the Hospital.

From late 1993 through 1994, the Hospital initiated a necessary reduction in operating costs. As part of this reduction, Ms. Iaia's position was eliminated. During this period of time, the Hospital reviewed Ms. Iaia's position in the Marketing Department along with various other management level positions and determined that the function of the Marketing Department Director could be combined with the position of the Director of Public Relations and Senior Friends.

This decision was made because the employee performing the function of the Director of Public Relations and Senior Friends was capable of performing the duties and responsibilities of both areas. Ms. Iaia was not experienced in the area of Senior Friends and could not perform that function when the positions were combined. Consequently, her position was eliminated.

10. The reason offered by Respondent for choosing Ms. Monteiro over Complainant appears to be a pretext for discrimination. The evidence indicates that Complainant had experience in managing a seniors program. In addition, evidence suggests that Ms. Monteiro lacked experience in marketing/public relations. Complainant, on the other hand, had twenty years of experience.

FCHR No.: 95-0414
Page Three

CONCLUSION

11.  Complainant, an individual, is a "Person" within the meaning of FLA. STAT. §760.02(6) (1997 & Supp. 1998).

12.  Complainant is an "Aggrieved person" within the meaning of FLA. STAT. §760.02(10) (1997 & Supp. 1998).

13.  Complainant is an "individual" within the meaning of FLA. STAT. §760.10(1)(a) (1997 & Supp. 1998).

14.  Respondent is a "Person" within the meaning of FLA. STAT. §760.02(6) (1997 & Supp. 1998).

15.  Respondent is an "Employer" within the meaning of FLA. STAT. §760.02(7) (1997 & Supp. 1998).

16.  The Complaint of Discrimination was filed in a timely manner pursuant to FLA. STAT. §760.11(1) (1997 & Supp. 1998).

17.  The Investigator's Memorandum has been submitted by the Office of Employment Investigations and Enforcement. The Office of General Counsel has reviewed the memorandum and agrees with the recommendation of Cause made therein.

Pursuant to the authority delegated to me by Rules 60Y-2.004(2)(e) and 60Y-5.004, Florida Administrative Code, it is my determination that there is reasonable cause to believe that an unlawful employment practice has occurred.

DATED: _February 01_____, 1999

EXECUTIVE DIRECTOR
Florida Commission on Human Relations

FILED: _February 01_____, 1999

BY: _____
Clerk of the Commission



ATTACHMENT / EXHIBIT 10



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Miami District Office**

One Biscayne Tower
2 South Biscayne Blvd., Suite 2700
Miami, FL 33131
PH: (305) 536-4491
TDD: (305) 536-5721
FAX: (305) 536-4011

EEOC Charge No:15D971107
FEPA Charge No:95-0414

Jacqueline Iaia                              Charging Party
1113 S.W. 17ᵗʰ Street
Boca Raton, FL 33486

Columbia Health Care Corporation             Respondent
d/b/a Pembroke Pines Hospital
c/o Mark E. Edwards, Esq.
2501 Park Plaza
Nashville, Tennessee 37203

## DETERMINATION

Under the authority vested in me by the Commission's Procedural Regulations, I issue on behalf of the Commission, the following determination as to the merits of the subject charge.

Respondent is an employer within the meaning of the ADEA and the timeliness, deferral and all other jurisdictional requirements have been met.

Having examined the Agency's findings and the record presented, I conclude that the evidence obtained does establish a violation of the statute(s).

A review of the record presented indicated that the agency was unsuccessful in its attempt to settle the matter. The Commission now invites the parties to join with it in a collective effort toward a just resolution of the matter. Within ten (10) days of receipt of this letter the parties may indicate their willingness to enter into conciliation discussions by contacting this office.

On behalf of the Commission:

SEP 2 8 1999
_____
Date

_____
Frederick Cerdales
District Director

Received 9/30/99



ATTACHMENT / EXHIBIT \_\_\_11\_\_\_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 00-6227-CIV-MORENO
Magistrate Judge: Dubé

JACQUELINE IAIA,

     Plaintiff,

v.

COLUMBIA HEALTHCARE
CORPORATION d/b/a PEMBROKE
PINES HOSPITAL, a foreign corporation

     Defendant.
_____/

## PLAINTIFF'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

Plaintiff, JACQUELINE IAIA, by and through her undersigned counsel and pursuant to Rule 34 of the Fed.R.Civ.P., requests Defendant, COLUMBIA HEALTHCARE CORPORATION d/b/a PEMBROKE PINES HOSPITAL, to produce the following documents per the requests attached hereto.

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of March, 2000 a true and correct copy of the foregoing was served via United States Mail, postage prepaid to the following: Alexander David Del Russo, Esquire, Levy Kneen Mariani, 1400 Centrepark Boulevard, Suite 1000, West Palm Beach, Florida 33401.

Roderick V. Hannah, Esquire
BECKER & POLIAKOFF, P.A.
Co-counsel for Plaintiff
P.O. Box 9057
Fort Lauderdale, Florida 33310-9057

John F. Jankowski, Jr., Esq., P.A.
Attorneys for Plaintiff
Cornerstone One, Suite 220
1200 South Pine Island Road
Plantation, Florida 33324-4402
Tel: (954) 370-1026

By:_____
    JOHN F. JANKOWSKI, JR.
    FLA. BAR NO. 833533



PLAINTIFF'S EXHIBIT
K

## DEFINITIONS

As used in these Request for Production, the following terms shall have the following meanings:

"**Communication**" means any form of non-written communication, including without limitation, the act or fact of communicating whether by correspondence, telephone, meeting, or any occasion of joint or mutual presence as well as the transfer of any documents from one person to another.

"**Document**" or "**Documents**" means any written instrument and includes without limitation, (i) contracts, (ii) memoranda, (iii) letters and other forms of correspondence, (iv) written memoranda or notes of telephone communications and memoranda or notes taken at conferences or meetings, (v) telex, telegraphic, telefaxed or other written forms of communication, (vi) drawing or any graphic matter however produced or reproduced, (vii) all paper materials of any kind, whether written, typed, printed, punched, filed or marked in any way, (vii) any recording tape or wire, film, photographs, movies, including without limitation all mechanical or electronic sound recordings or transcripts thereof, any and all types of electronic mail, E-mail, or other similar type of communication; in the actual or constructive possession, custody or control of Plaintiff, Plaintiff's counsel, or Plaintiff's representatives or agents, all of which Plaintiff or authorized representatives have knowledge.

"**Identify**":

(a) when used with respect to a natural person, shall mean "the legal name of such person, his/her occupation, employer, position with such employer, description of such persons, duties or responsibilities, length of time employed by such employer and residence address of such person" and any and all appropriate

Page 2

telephone numbers;

(b)  when used with respect to a partnership shall mean "the identity of all general and limited partners, the legal name of the partnership, the date upon which the partnership was founded or organized, the street address with all places of business maintained by such partnership, place at which the business records of the partnership are maintained and the identity of the person(s) who is (are) the keeper(s) of the records of such partnership" and any and all appropriate telephone numbers;

(c)  when used with respect to a corporation shall mean "the legal name of the corporation, all trade or other names under which the corporation does business, the state of incorporation, the date of incorporation, all jurisdictions in which said corporation is legally qualified to conduct its business, and the identity of its officers, directors and registered agent" and any and all appropriate telephone numbers;

(d)  when used in respect to a document shall mean "the date thereof, the identity of the preparer thereof, the identity of all addressees and recipients thereof, a summary of the contents thereof or in the alternative, attach a copy";

(e)  when used with respect to a communication shall mean "the date thereof, all persons present thereat, and a brief summary of what was said by each party thereto";

(f)  when used with respect to contract shall mean "the identity of the parties thereto, the date thereof and a summary of the contents thereof, or, in the alternative, attach a copy";

"**Person**" or "**persons**"  includes a corporation, partnership, other business association or entity, a natural person, and any government or governmental body, commission, board or agency.

Page 3

"**Subject Time Period**" is from 1993 through to the present.

"**You**" or "**Your**" means the person(s) responding to these Requests for Production of Documents for, or on behalf of the Defendant, and any of their agents, agencies, representatives or persons acting on its/their behalf.

CASE NO. 00-6227-CIV-MORENO

1.    All documents Defendant intends to mark for identification, refer to, offer into evidence, or publish during discovery or at the trial in this matter.

2.    All documents, including but not limited to communications, memoranda, diaries, journals, notes, and e-mail messages prepared by Defendant or any of its employees, agents, officers, or directors, which refer, relate or pertain to Plaintiff's employment with Defendant, including her termination therefrom.

3.    Any and all documents, including but not limited to communications, memoranda, diaries, journals, notes, and e-mail messages prepared by Defendant or any of its employees, agents, officers, and directors, that refer, relate or pertain to any of the issues in this case including, but not limited to: Monique Monteiro and the employment positions known as Director of Marketing/Public Relations and Director Senior Friends.

4.    All documents, except those prepared in anticipation of litigation, which in any way support Defendant's answer and any of its affirmative defenses in this case.

5.    All documents, correspondence, notes, memoranda, communications, and electronic mail messages, between Defendant and Plaintiff regarding Plaintiff's employment with Defendant and her termination therefrom.

6.    All documents, correspondence, notes, memoranda, communications, and electronic mail messages, between Defendant and Plaintiff regarding the employment of Monique Monteiro and any change of job description and responsibilities in any way related to the position or title of Director of Senior Friends and Director of Marketing/Public Relations.

7.    All employee handbooks, manuals, leaflets, procedures, guidelines, memoranda,

-2-

bulletins, directives and other documents which set forth Defendant's personnel policies, procedures, rules and regulations that were in effect during Plaintiff's employment with Defendant.

8.    Any and all documents that reflect, refer, relate and/or pertain to any procedures, policies, terms and/or conditions of employment upon which Defendant intends to rely in defense of this action.

9.    All documents given by Defendant to Plaintiff during her employment with Defendant, including but not limited to documents given to Plaintiff in connection with the termination of her employment.

10.    All documents, including but not limited to interoffice and intra-office memoranda, electronic mail, and correspondence that memorialize communications between Plaintiff and Defendant, or any of its employees, officers or directors.

11.    Plaintiff's complete personnel file.

12.    The complete personnel file for Monique Monteiro.

13.    Any and all electronic mail messages in unencrypted form, that in any way refer, relate or pertain to Monique Monteiro and her employment with Defendant, including but not limited to her hiring, transfers, promotion, and training.

14.    Any and all documents, internal memoranda, communications and e-mail that in any way refer, relate or pertain to Monique Monteiro and her employment with Defendant.

15.    If not contained in her personnel file, all of Defendant's disciplinary records for Plaintiff.

CASE NO. 00-6227-CIV-MORENO

16.     If not contained in her personnel file, all of Defendant's disciplinary records for Monique Monteiro.

17.     If not contained in her personnel file, all of Plaintiff's payroll records, including any summaries thereof.

18.     If not contained in her personnel file, all of Monique Monteiro's payroll records, including any summaries thereof.

19.     If not contained in her personnel file, all of Defendant's employee benefits records and documents provided to Plaintiff, including any and all documents setting forth the monetary values of those benefits.

20.     All written grievances and employment-related complaints regarding Plaintiff and her job performance during the course of her employment.

21.     All written grievances and employment-related complaints regarding Monique Monteiro and her job performance during the course of her employment.

22.     All witness statements, written or recorded, taken and/or obtained by Defendant or any of Defendant's representatives regarding Plaintiff, including but not limited to the allegations and defenses raised in the pleadings.

23.     Any and all documents, including but not limited to memoranda, notes, announcements, meeting minutes, and other verbal or written communications which in any way refer, relate or pertain to Plaintiff's termination of employment with Defendant.

CASE NO. 00-6227-CIV-MORENO

24.    Any and all documents, including but not limited to memoranda, notes, announcements, meetings, and other verbal or written communications which in any way refer, relate or pertain to offer(s) of employment, and transfers to other job positions communicated to Plaintiff.

25.    Any and all documents, including but not limited to memoranda, notes, announcements, meetings, and other verbal or written communications which in any way relate to offer(s) of employment, and transfers to other job positions communicated to Monique Monteiro.

26.    All documents which in any way refer, relate or pertain to Plaintiff's education, training and job experiences.

27.    All documents which in any way refer, relate or pertain to Monique Monteiro's education, training and job experiences.

28.    All documents identified in Defendant's answers to Plaintiff's First Set of Interrogatories.

29.    Any and all documents which support or in any way relate to the allegations set forth in Plaintiff's Complaint.

30.    All insurance policies that provide coverage, or may provide coverage, to Defendant for any claims made by Plaintiff.

31.    All documents submitted by Defendant to the EEOC, Florida Commission on Human Relations, and the State of Florida Division of Unemployment Compensation regarding Plaintiff.

32.    All written job descriptions for Plaintiff.

33.    All written job descriptions for Monique Monteiro.

-5-

CASE NO. 00-6227-CIV-MORENO

34.    All job postings and notifications of job openings for Plaintiff.

35.    All job postings and notifications of job openings for Monique Monteiro.

36.    All documents showing corporate interrelationships between Columbia Healthcare

Corporation, Galen Hospital - Pembroke Pines Inc., and Galen Hospital Corporation, Inc., including

but not limited to articles of merger, name change filings, written assignments of assets, claims and

obligations, and purchase and sale agreements.