UNITED STATES DISTRICT COURT FOR
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 00-6227-CIV-MORENO

JACQUELINE IAIA,

       Plaintiff,

vs.

GALEN HOSPITAL-PEMBROKE PINES,
INC., f/d/b/a PEMBROKE PINES
HOSPITAL,

       Defendant.

_____/

**NIGHT BOX**
**FILED**

APR 2 0 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA.

## DEFENDANT'S MOTION FOR REMITTITUR
## OR ALTERNATIVELY FOR NEW TRIAL

      The Defendant, GALEN HOSPITAL-PEMBROKE PINES, INC., F/D/B/A PEMBROKE

PINES HOSPITAL, by and through its undersigned counsel, and pursuant to Rule 59(a) of the

Federal Rules of Civil Procedure, requests that this Court order a remittitur of the jury's verdict on

the grounds that the amount is excessive as a matter of law. Galen Hospital ceased doing business

as of June 30, 1995, and Plaintiff is therefore precluded from recovering damages after this date.

The jury's verdict of $150,000 exceeded Plaintiff's damages through that date according to the

testimony of her own expert. As such, the verdict awards damages that are erroneous as a matter of

law. Defendant requests that this Court order a remittitur of the verdict to **$76,007.50,** which

represents the maximum amount Plaintiff can recover through June 30, 1995. Alternatively,

Defendant requests that this Court order a new trial conditioned on Plaintiff's refusal to accept the

remittitur.

The grounds for this Motion are fully set forth in the accompanying Memorandum of Law.

1. **EVIDENCE OF DEFENDANT'S CESSATION OF BUSINESS AS OF 6/30/95**

Galen Hospital was the owner and operator of Pembroke Pines Hospital. It employed all the staff at the hospital, including the Plaintiff, Ms. Iaia. *See* Pre-Trial Stipulation at p. 3. However, Galen Hospital ceased operating the hospital facility as of July 1, 1995, when it entered into a long term lease with the South Broward Hospital District (Memorial Healthcare). After that date, Galen Hospital continued to own the real property, but the South Broward Hospital District took over the operations of the hospital facility. Galen Hospital ceased doing business or operating the hospital, and ceased having any employees. In essence, Galen's business after that date was that of a landlord.

Those witnesses who were questioned on this subject consistently testified that Memorial took over the operations of Pembroke Pines Hospital on July 1, 1995. Some of those witnesses were terminated by Memorial at that time, such as Pam Corliss and Paula Adamson. Others continued at the hospital, such as Monique Monteiro and Maria Lomaga, but became employees of Memorial. None remained employed by Galen Hospital.

During its defense, Galen Hospital placed into evidence as Exhibit 40 (without objection) the June 8, 1995, Master Agreement (the "Agreement") between Galen Hospital and the South Broward Hospital District. (A copy of this document is attached to this Motion). The Agreement makes clear that the South Broward Hospital District took over all operations of Pembroke Pines Hospital as of July 1, 1995. The Agreement identifies the "Closing Date" as June 30, 1995, the "Leased Assets" as the hospital property, and all furniture, fixtures and equipment present, the "Landlord" as Galen Hospital, and the "Tenant" as the South Broward Hospital District. Among other things, the Agreement discusses how Galen Hospital leased the hospital facility to the South

Broward Hospital District, and how the South Broward Hospital District took over all aspects of the management, operation and control of the hospital.

Most significantly, Article V discusses the status of hospital employees as of the Closing Date. The Agreement is clear that the South Broward Hospital District may offer employment to any employees of Galen at its discretion, and that as of the Closing Date, "any Person who is an employee of Landlord as of the Closing Date shall be considered an employee of Tenant . . ." Paragraph 5.2(a) provides as follows:

> (a) Tenant acknowledges and agrees that for purposes of the WARN Act and applicable Florida law, any person who is an employee of Landlord as of the Closing Date shall be considered an employee of Tenant for purposes of the WARN Act on the Closing Date. . .

Additionally, subparagraph (b) provides that "[a]s of the Closing Date, Tenant may offer employment to any employees of Landlord working at the Hospital . . ." The paragraph goes on to discuss how the tenant covenants that it will agree to employ a sufficient number of Galen's employees so as to avoid the application of the WARN Act,[1] and further covenants not to take any action with respect to employees so as trigger application of the WARN Act. Additionally, the paragraph discusses how any employees of Galen who accept employment with the tenant shall be deemed "new employees" for purposes of determining benefits and seniority with the South Broward Hospital District.

Finally, in paragraph 5.13, Galen Hospital and its affiliates provided a covenant not to compete to the South Broward Hospital District for a six-mile radius surrounding the facility.

---

[1] The Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq*. provides certain notice requirements to employees in the case of a sale or closing of a covered employer's business, and restricts an employer's ability to terminate or lay off the staff for a period of sixty days after providing such notice.

It is undisputed that Galen Hospital ceased to operate Pembroke Pines Hospital after June 30, 1995. The South Broward Hospital District had the option of employing any or all of those employees working at the hospital as of the Closing Date. Indeed, the South Broward Hospital District may have elected to continue Plaintiff's employment had she not been eliminated in the RIF. However, whether the South Broward Hospital District chose to offer her employment after the Closing Date is irrelevant—either way, she would no longer have been employed by Galen Hospital.

## 2. EVIDENCE ON PLAINTIFF'S BACK PAY DAMAGES

Plaintiff's damage claim as submitted to the jury was for an award of back pay--her lost wages and benefits from the date of her termination through trial. This evidence was presented by Plaintiff's expert witness, Ronald Patella, CPA. Mr. Patella testified that Plaintiff's back pay damages were in the amount of $363,845, from January 1, 1994, through December 31, 2000.

On cross examination, Mr. Patella explained that he arrived at those numbers by calculating Plaintiff's projected wages and benefits had her employment continued, and then subtracting from them her actual wages and benefits obtained. His starting point was by using Plaintiff's 1993 salary of $42,877. From this, he assumed a five- percent annual increase for each year. Mr. Patella then calculated benefits based on his assumptions of insurance and retirement contributions, and thereafter assumed these figures would increase annually by ten percent. His assumed calculations for 1994 and 1995 in terms of Plaintiff's wages and wages plus benefits were as follows:

|      | Projected Wages Only | Projected Wages Plus Benefits |
|------|----------------------|-------------------------------|
| 1994 | $45,021              | $49,819                       |
| 1995 | $47,272              | $52,377                       |

From these amounts, Mr. Patella then subtracted what Plaintiff actually earned in each year, as reflected from Plaintiff's Federal Income Tax Returns (placed into evidence as Defendant's Exhibit 42). From this evidence, it is simply a mathematical calculation to determine Plaintiff's damages on an annual basis:

|      | Projected Wages and Benefits | Actual Wages | Annual Total |
|------|------------------------------|--------------|--------------|
| 1994 | $49,819                      | $7,212       | $42,607      |
| 1995 | $52,377                      | -$10,506     | $62,883      |

In order to calculate the damages from January 1, 1994, through the Closing Date in which Galen Hospital ceased operating the facility, this would again be simply a mathematical calculation consisting of 1994 plus one-half of 1995, for a total of **$74,048.50**. This assumes the maximum recovery to Plaintiff for lost wages/benefits through the Closing Date and without any reductions or offsets for mitigation. Additionally, this allows Plaintiff to subtract negative income in the calendar year 1995 in order to determine back pay for that year. This assumption itself is objectionable, since a party is not entitled to use negative income for purposes of calculating her actual income lost in a given year. *Cf. Stevning v. United States*, 1979 WL 1450 (C.D. Cal. 1979). If we calculate Plaintiff's damages from January 1, 1994, through the Closing Date, and assume zero wages and benefits earned in 1995, then the total amount of her damage claim would be **$68,795.50**. Under either scenario, the jury's verdict of $150,000 is substantially more than Plaintiff's permissible recovery through the Closing Date.

## ARGUMENT

A district court has the inherent authority to order a new trial if it determines that an award of damages is excessive, and remittitur has grown out of the court's authority to do so. "A court which

believes the jury's verdict is excessive may order a new trial unless the plaintiff agrees to remit a

portion of the jury's award." *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1328 (11th

Cir.), *cert. denied*, 120 S.Ct. 329 (1999). In making this determination, the court is required to use

its own independent judgment, weighing all evidence, to see if an award is against the clear weight

of evidence or is excessive as a matter of law. Indeed, "[i]f the amount of damages awarded is

excessive, it is *the duty of the trial judge* to require a remittitur or a new trial." *Linn v. United Plant*

*Guard Workers of America*, 383 U.S. 53, 65-66 (1966) (emphasis added).

If the court finds that a jury award is excessive, it must then determine the amount to be

remitted. In making this determination, the Eleventh Circuit follows the "maximum recovery" rule,

which requires that the jury award be remitted to the highest legal amount of damages supported by

the evidence. *See Warren v. Ford Motor Credit Co.*, 693 F.2d 1373, 1380 (11th Cir. 1982).

The specific issue of remittiturs has arisen in the context of ADEA claims within the Eleventh

Circuit. This is because an ADEA claim, unlike claims under other anti-discrimination statutes,

limits a plaintiff's recovery to back pay and benefits: there is no right to recover for compensatory

damages. Thus, the outer limits of back pay awards are generally ascertainable from the evidence,

as they were in this case. In *Goldstein v. Manhattan Industries, Inc.*, 758 F.2d 1435 (11th Cir. 1985),

an ADEA case, the Eleventh Circuit affirmed an order of remittitur on the grounds that the jury

award exceeded the limits of proof of damages offered at trial. In *Goldstein*, as in our case, the jury

was asked to consider only one count under the ADEA. The case did not include other claims with

different elements of damages. Thus, all damages would apply to the back pay calculation under the

ADEA claim, yet the jury award exceeded the proof by approximately 20 percent. *Id.* at 1448. In

affirming the order of remittitur, the Eleventh Circuit stated as follows:

> In general, a remittitur order reducing a jury's award to the outer limit
> of the proof is the appropriate remedy where the jury's damage award
> exceeds the amount established by the evidence.

*Id.* at 1448.

Similarly, in *Moses v. K-Mart Corp.*, 905 F.Supp. 1054 (S.Dist. Fla. 1995), another ADEA claim, the Court reduced an award of back pay that was not properly based on the evidence presented. The *Moses* plaintiff argued that a remittitur should only be appropriate when the evidence was so exorbitant as to shock the conscience or to indicate bias, passion or prejudice. *Id.* at 1057. In rejecting that argument, Judge Atkins held that "the standard for remittitur is, as it has always been, that it is the appropriate remedy when the jury's damage award exceeds the amount established by the evidence." *Id.*

In the instant case, it is clear that the jury's award of $150,000 extends back pay after the Closing Date of June 30, 1995. The issue that arises is whether, as a matter of law, Ms. Iaia can recover back pay from Galen Hospital even after Galen ceased to operate its business. The hospital was leased pursuant to the Agreement and a landlord and tenant relationship was created as of the Closing Date. Courts have confronted this issue in ADEA claims and have recognized that a damage award cannot extend after the claimant's job is eliminated or after the employer has ceased doing business.

In *Munoz v. Oceanside Resorts, Inc.*, 223 F.3d 1340 (11th Cir. 2000), an employee terminated from his position as a room service waiter sued his employer, alleging age discrimination in violation of the ADEA. The district court awarded front pay to the employee, yet the employer contended on appeal that the employee was ineligible for this award because room service and room server positions had been eliminated prior to trial. *Id.* at 1349-50. The Eleventh Circuit recognized that

> the elimination of a plaintiff's former position prior to trial
> may preclude the receipt of front pay . . .Awarding front pay
> to a plaintiff who ultimately would have been terminated
> confers a windfall upon the plaintiff and contravenes the
> remedial purpose of the ADEA.

*Id.* at 1350. In determining whether damages can be awarded after the elimination of the position, the Court noted that an employer must show it would not have placed the employee in another position, or that reassignment was not feasible.[2] *Id.* at 1350-51. This was precisely the evidence in our case--Galen could not have placed Ms. Iaia in another position, nor was it feasible to do so, since Galen no longer operated the Hospital nor was the employer of the Hospital's employees. As addressed above, the Agreement carefully incorporated provisions pertaining to hospital employees in order to clarify that all remaining Hospital employees after the Closing Date would be deemed employees of the South Broward Hospital District.

Similarly, in *Sandlin v. Corporate Interiors, Inc.*, 972 F.2d 1212 (10th Cir. 1992), the Tenth Circuit found that neither front pay nor reinstatement of an ADEA plaintiff was possible where the defendant had ceased doing business. Consequently, "any award of front pay is limited by the estimated remaining tenure plaintiff would have enjoyed with his company absent the discriminatory conduct." *Id.* at 1215. The Court recognized that when the defendant company ceased to do business before judgment, plaintiff necessarily would have been discharged with the rest of the work force. As such, "reinstatement was impossible and front pay inappropriate." *Id.* at 1215.

The *Munoz* and *Sandlin* cases involved front pay claims, yet their rationale is equally applicable to back pay. These cases addressed front pay claims because that was the factual context in which

---

[2] The Court did not reverse the front pay award because the employer's only evidence on this issue was that it discontinued room service. There was no evidence that reassignment of the plaintiff was not feasible. In our case, Galen ceased doing business as a hospital and no longer had any employees. There were no other positions to which plaintiff could be reassigned.

they arose. If an employer ceased doing business, or if an employee's former position ceased to exist, an ADEA plaintiff's recovery cannot continue after that date. Otherwise, the plaintiff would be placed in a better position than the rest of the discharged workforce and would be receiving the "windfall" specifically rejected by the Eleventh Circuit in *Munoz*. *See Helbling v. Unclaimed Salvage and Freight Co.*, 49 F.Supp. 956 (E.D. Pa. 1980) (Title VII plaintiff's back pay award must be based on the period running from the date she should have been promoted to manager until the date business closed, since that is a period assumed she would have held the job).

It bears noting that Galen Hospital does not raise this issue for the first time in its post-trial motions. Galen specifically argued this to the jury--that any award must be limited to the period prior to Defendant's lease of the Hospital to the South Broward Hospital District. Since the verdict exceeds the amount for which Plaintiff may recover back pay, Defendant requests that this Court order a remittitur of the verdict to **$76,007.50** as the "maximum recovery" Plaintiff could have received through June 30, 1995. Alternatively, Defendant requests that this Court order a new trial on damages, conditioned on Plaintiff's refusal to accept the remittitur.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a copy of the foregoing was furnished via facsimile and U. S.

Mail this 20th day of April, 2001, to Roderick V. Hannah, Esq., Becker & Poliakoff, P.A., P.O. Box

9057, Ft. Lauderdale, Florida 33310-9057; and to John F. Jankowski, Jr., Esq., John F. Jankowski,

Jr., P.A., 2 South University Drive, Suite 265, Plantation, Florida 33324.

CARLTON FIELDS, P.A.
P.O. Box 150
West Palm Beach, FL 33402-0150
Telephone:        (561) 659-7070
Facsimile:         (561) 659-7368
Attorneys for Defendant

By: _____
Alexander D. del Russo
Florida Bar Number 350273

# MASTER AGREEMENT

## BETWEEN

## BROWARD HEALTHCARE SYSTEM, INC.,

## GALEN HOSPITAL - PEMBROKE PINES, INC.

### AND

## SOUTH BROWARD HOSPITAL DISTRICT

### DATED AS OF JUNE 8, 1995

ATTACHMENT / EXHIBIT ___1___

*Iuia v. Galen Hospital-Pembroke Pines,*
*Inc.;* Case No. 00-6227-Civ-Moreno
Defendant's Exhibit 40

TABLE OF CONTENTS

Page

**ARTICLE I**
**DEFINITIONS**

1.1    Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

**ARTICLE II**
**LEASE; PURCHASE AND SALE; AND**
**OTHER FINANCIAL ARRANGEMENTS**

2.1    Leased Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
2.2    Purchased Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
2.3    Excluded Assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
2.4    Assumed Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
2.5    Excluded Liabilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    6
2.6    Purchase Price . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    7
2.7    Inventory and Supplies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
2.8    No Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    8
2.9    Medicare, Medicaid and Third Party Payor Liability . . . . . . . . . . . . .    9

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF LANDLORD**

3.1    Organization and Good Standing of Landlord . . . . . . . . . . . . . . . . .    9
3.2    Consents, Authorizations and Binding Effect . . . . . . . . . . . . . . . . .    9
3.3    Governmental Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10
3.4    Recitals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    10

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF TENANT**

4.1    Organization and Good Standing of Tenant . . . . . . . . . . . . . . . . . .    10
4.2    Consents, Authorizations, and Binding Effect . . . . . . . . . . . . . . . .    10
4.3    Recitals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11

**ARTICLE V**
**COVENANTS**

5.1    Actions by Tenant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    11
5.2    Certain Employee Matters . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12
5.3    Taxes and Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    13

| 5.4 | Access to Leased Assets | 13 |
| 5.5 | Access to Corporate Services | 13 |
| 5.6 | Management Information Services | 14 |
| 5.7 | National Purchasing Agreements | 14 |
| 5.8 | Certificate of Need | 14 |
| 5.9 | Medical Staffs Matters | 15 |
| 5.10 | Preservation and Access to Records after the Closing | 15 |
| 5.11 | Cooperation by Tenant | 16 |
| 5.12 | Abstract and Survey | 16 |
| 5.13 | Covenant Not to Compete | 16 |
| 5.14 | The MOB Lease | 18 |

### ARTICLE VI
### CONDITIONS

| 6.1 | Conditions Precedent to Landlord's Obligations | 18 |
| 6.2 | Conditions Precedent to Tenant's Obligations | 19 |

### ARTICLE VII
### CLOSING

| 7.1 | The Closing | 20 |
| 7.2 | Documents to be Delivered to Tenant | 20 |
| 7.3 | Documents to be Delivered to Landlord | 21 |
| 7.4 | Prorations | 21 |
| 7.5 | Existing Hospital Patients | 21 |

### ARTICLE VIII
### COVENANTS AND AGREEMENTS REGARDING LIABILITIES

| 8.1 | Covenants and Obligation of Landlord | 22 |
| 8.2 | Covenants and Obligations of Tenant | 22 |
| 8.3 | Enforcement of Covenants | 23 |
| 8.4 | Survival of Obligations | 23 |
| 8.5 | Brokers' and Finders' Commission | 23 |

### ARTICLE IX
### TERMINATION

| 9.1 | Termination | 24 |
| 9.2 | Effect of Termination | 24 |

**ARTICLE X**
**MISCELLANEOUS**

10.1   Waivers and Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.2   Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
10.3   Headings; Terminology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
10.4   Parties in Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
10.5   Entire Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
10.6   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
10.7   Governing Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
10.8   Successors and Assigns . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
10.9   Counterparts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
10.10  Risk of Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
10.11  Survival . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
10.12  Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
10.13  Public Announcements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
10.14  Covenant of Good Faith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
10.15  Legal Fees and Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
10.16  Interpretation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
10.17  Relationship of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

| Exhibit A | - | Form of Assignment and Assumption Agreement |
| Exhibit B | - | List of Assumed Contracts |
| Exhibit C | - | Excluded Assets |
| Exhibit D | - | Lease Agreement |
| Exhibit E | - | Legal Description of Pembroke Pines Hospital |
| Exhibit F | - | **[Reserved]** |
| Exhibit G | - | Geographic Scope of Covenant Not to Compete |
| Exhibit H | - | **[Reserved]** |
| Exhibit I | - | Opinion of Counsel to Tenant |
| Exhibit J | - | Opinion of Counsel to Landlord |
| Exhibit K | - | December Balance Sheet |
| Exhibit L | - | MIS Agreement |
| Exhibit M | - | Medical Office Building Sublease |

# MASTER AGREEMENT

**THIS MASTER AGREEMENT** (this "Agreement") is made this 8th day of June, 1995, by and between BROWARD HEALTHCARE SYSTEM, INC., a Florida corporation ("BHSI"), GALEN HOSPITAL-PEMBROKE PINES, INC., a Florida corporation ("Landlord"), and SOUTH BROWARD HOSPITAL DISTRICT, a special tax district created and existing under the laws of the State of Florida ("Tenant").

## R E C I T A L S.

**WHEREAS**, effective as November 30, 1992, Landlord changed its name from Humana Hospital-Pembroke Pines, Inc. to Galen Hospital-Pembroke Pines, Inc.; and

**WHEREAS**, Landlord is a wholly-owned subsidiary of BHSI; and

**WHEREAS**, BHSI is controlled by Columbia/HCA Healthcare Corporation, a Delaware corporation ("Columbia"); and

**WHEREAS,** Landlord is willing to (i) lease to Tenant, and Tenant is willing to lease from Landlord, the Leased Assets (as hereinafter defined) and (ii) sell to Tenant, and Tenant is willing to acquire from Landlord, the Purchased Assets (as hereinafter defined), all in accordance with the terms and conditions hereinafter set forth.

**NOW, THEREFORE**, in consideration of the premises, the mutual benefits to be derived from this Agreement and the representations, warranties, covenants and conditions herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1**    **Definitions**.  Unless otherwise defined herein or unless the context otherwise requires, capitalized terms used in this Agreement shall have the following meanings:

"Action" shall mean any action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Entity.

"Affiliate" shall mean any Person that, directly or indirectly, controls, or is controlled by or under common control with, another Person. For purposes of this definition, "control" (including the terms "controlled by" and "under common control with"), as used with respect to any Person, means

the power to direct or cause the direction of the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or by contract or otherwise.

"Assignment and Assumption Agreement" shall mean the form of Assignment of Contracts and Leases and the form of Assumption Agreement attached hereto as Exhibit A, pursuant to which Landlord will assign to Tenant and Tenant will assume the rights and obligations accruing after the Closing Date in respect of the Assumed Liabilities.

"Assumed Contracts" shall mean all commitments, contracts, leases (which shall include, without limitation, all operating lease obligations in respect of equipment that is leased by Landlord) and agreements of Landlord outstanding in respect of the Leased Assets which are to be specifically assumed by Tenant and which are listed on Exhibit B hereto.

"Assumed Liabilities" shall have the meaning ascribed thereto in Section 2.4 herein.

"Closing" shall mean the consummation of the transactions between Tenant and Landlord contemplated hereby.

"Closing Date" shall mean 12.01 a.m. on June 30, 1995.

"Closing Date Balance Sheet" shall mean the adjusted balance sheet of Landlord in respect of the Hospital as of the Closing Date which shall be audited by Ernst & Young and which shall reflect (i) the current assets of Landlord that are to be purchased by Tenant, and (ii) the current liabilities of Landlord that are to be assumed by Tenant.

"Damages" shall have the meaning ascribed thereto in Section 8.1(a) herein.

"December Balance Sheet" shall mean the adjusted balance sheet of Landlord in respect of the Hospital as of December 31, 1994 (a copy of which is attached hereto as Exhibit K), which reflects (i) the categories of current assets of Landlord that are to be purchased by Tenant, and (ii) the categories of current liabilities of Landlord that are to be assumed by Tenant.

"Environmental Laws" shall mean any and all laws, statutes, ordinances, rules, regulations, orders or determinations of any Governmental Entity (including common law duties established by courts or other Governmental Entities) pertaining to the protection of human health and the environment in effect on the date of this Agreement in any jurisdiction, federal, state or local, in which the Leased Assets are located, including the Clean Air Act, as amended; the Comprehensive Environmental Response, Compensation and Liability Act, as amended; the Federal Water Pollution Control Act, as amended; the Resource Conservation and Recovery Act, as amended; the Safe Drinking Water Act, as amended; and the Toxic Substances Control Act, as amended.

"Estimated Purchase Price" shall have the meaning ascribed thereto in Section 2.6(a) herein.

"Excluded Assets" shall mean (i) any assets or properties of Landlord not used or held for use in connection with the Leased Assets, (ii) cash, bank accounts, negotiable instruments or other cash equivalents, (iii) all policy and procedure manuals developed by Landlord and all corporate records of Landlord, (iv) all assets of Landlord that are not included within the Purchased Assets and the Leased Assets, whether currently existing or hereafter arising, including, without limitation, all amounts payable to Landlord in respect of the Hospital relating to periods prior to Closing under the Medicare, Medicaid or other third party payor programs, and (v) the assets described in Exhibit C hereto.

"Excluded Liabilities" shall have the meaning ascribed thereto in Section 2.5 herein.

"GAAP" shall mean United States generally accepted accounting principles consistently applied to the accounts to which the principles are then to be applied.

"Governmental Entity" shall mean any court or any federal, state, or local legislative body or governmental department, commission, board, bureau, agency or authority.

"Hospital" shall mean the improvements currently known as Pembroke Pines Hospital, a 301-bed general acute care hospital located in Pembroke Pines, Florida.

"known" or "knowledge" shall mean, when used in a statement regarding the existence or absence of facts in this Agreement that is qualified by a phrase such as "to such Person's knowledge" or "known to such Person," (i) information actually known to (a) the person in a case of an individual, or (b) in the case of a corporation or other entity, an officer of such corporation or entity, and (ii) information which the individual or officer involved should reasonably be expected to have obtained as a result of undertaking an investigation of such a scope and extent as a reasonably prudent man would undertake concerning the particular subject matter in the particular circumstance.

"Landlord" shall mean Galen Hospital-Pembroke Pines, Inc. initially and in the event of the sale, assignment, or transfer by Landlord of its interest in the real property described on Exhibit E hereto (which Tenant acknowledges and agrees that Landlord has the right to do), Landlord shall, subject to the provisions of Section 5.13 applicable to Affiliates of Columbia, thereupon be released and discharged from all covenants and obligations of Landlord hereunder or thereafter accruing. Landlord shall provide Tenant with written notice of any sale, assignment or transfer of such real property.

"Lease" or "Lease Agreement" shall mean the Lease Agreement to be entered into between Landlord and Tenant pursuant to which Tenant shall lease the Leased Assets from Landlord, the form of which is attached hereto as Exhibit D.

"Leased Assets" shall mean:

(a)    the Hospital and the real property described on Exhibit E attached hereto;

(b)    the furniture, fixtures, and equipment that are owned by Landlord and described on Exhibit A to the Lease Agreement attached hereto and which as of Closing are located on the real property described on Exhibit E or in the Hospital; and

(c)    all records located at the Hospital, including, without limitation, patient, medical staff and personnel records, accounts receivable records, equipment records, medical and administrative libraries, medical records and patient billing records, but excluding all policy and procedure manuals developed by Landlord and all corporate records of Landlord.

"Legal Requirements" shall mean all orders, injunctions, writs, statutes, rulings, rules, regulations, requirements, permits, certificates, or ordinances of any Governmental Entity applicable to (and as enforced from time to time with respect to) the Leased Assets, the operation of the Hospital, Landlord, or Tenant, foreseen or unforeseen, and any of the aforesaid dealing with the design, construction, ownership, use, management, leasing, occupancy, possession, operation, maintenance, reimbursement for services provided to beneficiaries of the Medicare or Medicaid programs, service, alteration, repair, or reconstruction of real property, and zoning.

"Liens" shall mean all mortgages, deeds of trust, liens, security interests, pledges, conditional sale contracts, claims, rights of first refusal, options, charges, liabilities, obligations, easements, rights-of-way, limitations, reservations, restrictions and other encumbrances of any kind.

"Material Adverse Effect" shall mean (a) with respect to Tenant or Landlord, any change in the business, results of operations, financial condition, or liabilities (whether or not the result thereof would be covered by insurance) thereof that (individually or in the aggregate) is, or may reasonably be expected to be, material and adverse to Tenant and its subsidiaries, taken as a whole, or Landlord and its subsidiaries, taken as a whole, as the case may be, or (b) with respect to the Leased Assets, a change in the value, condition or use thereof that (individually or in the aggregate) is, or may reasonably be expected to be, material and adverse to the Leased Assets, taken as a whole; provided, however, that for all purposes under this Agreement, any actual or prospective change or changes that result directly from any change or changes in financial or market conditions, general economic conditions, or economic, market, legal, or regulatory changes affecting the healthcare industry shall not constitute a Material Adverse Effect.

"Permits" shall mean all permits, licenses, registrations, franchises, concessions, orders, certificates, consents, accreditations, authorizations and approvals of any Governmental Entity.

"Permitted Encumbrances" shall mean (a) Liens for current taxes and assessments not yet due and payable, including without limitation Liens for nondelinquent ad valorem taxes, and

-4-

nondelinquent statutory Liens arising other than by reason of any default on the part of Landlord, and (b) all matters filed of public record.

"Person" shall mean an individual, partnership, joint venture, corporation, limited liability company, bank, trust, unincorporated organization or a Governmental Entity.

"Purchased Assets" shall mean the current assets of Landlord in respect of the Leased Assets as of the Closing Date reflected on the Closing Date Balance Sheet which shall be (i) accounts receivable, (ii) prepaid expenses, and (iii) inventory and supplies; provided, however, that the Purchased Assets shall not include any of the Leased Assets or Excluded Assets. The categories of Landlord's current assets that are to be purchased by Tenant are reflected on the December Balance Sheet.

"Related Agreements" shall mean the Lease Agreement and all other agreements referenced herein that are to be executed and delivered by Landlord or Tenant at the Closing hereunder.

"Taxes" shall mean any federal, state, local or foreign income, profit, franchise (including those that are based on net worth, capitalization, income or total assets), sales, use, transfer, real property transfer, recording, value added, real or personal property or other taxes, assessments, fees, levies, duties (including customs duties and similar charges), deductions or other charges of any nature whatsoever (including interest and penalties) imposed by any law, rule or regulation.

"Title Commitment" shall have the meaning ascribed thereto in Section 5.12 herein.

"Value of Supplies" shall have the meaning ascribed thereto in Section 2.7 herein.

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, as amended.

## ARTICLE II
## LEASE; PURCHASE AND SALE; AND
## OTHER FINANCIAL ARRANGEMENTS

2.1    **Leased Assets.** Subject to the terms and conditions of this Agreement, at the Closing, Landlord and Tenant shall enter into the Lease Agreement pursuant to which Landlord shall lease, let, and demise to Tenant, free and clear of all Liens other than the Permitted Encumbrances and the Assumed Liabilities, and Tenant will lease and accept from Landlord, all of the Leased Assets subject to the Permitted Encumbrances and the Assumed Liabilities.

**2.2    Purchased Assets.**  Subject to the terms and conditions of this Agreement, at the Closing, Landlord shall sell, convey, transfer, assign, and deliver to Tenant, free and clear of all Liens other than the Permitted Encumbrances and the Assumed Liabilities, and Tenant will purchase from Landlord, all of the Purchased Assets subject to the Permitted Encumbrances and the Assumed Liabilities.

**2.3    Excluded Assets.**  Landlord shall be obligated hereunder to lease only the Leased Assets and sell only the Purchased Assets.  Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to lease or purchase, and Landlord shall not be obligated hereunder to lease or sell the Excluded Assets, or other assets or properties of Landlord that are not included in the Leased Assets or the Purchased Assets.

**2.4    Assumed Liabilities.**  As of Closing, Tenant shall assume and thereafter timely perform and satisfy the following obligations and liabilities of Landlord (collectively, the "Assumed Liabilities"):  (a) all obligations and liabilities arising under or in respect of the Assumed Contracts; and (b) all obligations and liabilities arising under or in respect of the current liabilities of Landlord outstanding in respect of the Leased Assets as of the Closing Date that are reflected on the Closing Date Balance Sheet which liabilities shall include, without limitation, accounts payable, assessments under the Public Medical Assistance Trust Fund and accrued expenses, including, without limitation, accrued wages and vacation pay of the Landlord's employees that are hired by Tenant as of Closing. The categories of Landlord's current liabilities that are to be assumed by Tenant are reflected on the December Balance Sheet.

**2.5    Excluded Liabilities.**  Tenant shall assume only the Assumed Liabilities and shall not assume any other liabilities of Landlord, whether known or unknown, fixed or contingent, currently existing or hereafter arising (the "Excluded Liabilities").  Landlord shall retain all liabilities and obligations arising in respect of the satisfaction and discharge of Landlord's obligations under contracts of Landlord that are not assumed by Tenant.  It is expressly understood that Tenant shall not assume any liabilities of Landlord relating to Medicare, Medicaid, other third party payor contracts, or liabilities or settlement of liabilities arising from malpractice, general liability, taxes (other than assessments under the Public Medical Assistance Trust Fund that are assumed by Tenant), or other liabilities of Landlord not assumed by Tenant at Closing, any of which arose from events or circumstances occurring prior to Closing.

Except as otherwise provided herein to the contrary, no employee of either party shall have any claim under this Agreement or otherwise against the other party for vacation pay, paid sick leave, retirement benefits, social security, workers' compensation, health, disability, professional liability, or unemployment insurance benefits or other employee benefits of any kind earned or accrued while in the employ of the other party.  Except as otherwise provided herein to the contrary, each party hereto shall be solely responsible for payment of any employment-related taxes with respect to each

such party's employees whether such person is considered by the party as an employee or an independent contractor.

    **2.6**    **Purchase Price.**  The Purchase Price for the Purchased Assets shall be an amount equal to the difference between the value of the Purchased Assets reflected on the Closing Date Balance Sheet and the amounts outstanding in respect of the current liabilities of Landlord that are to be assumed by Tenant reflected on the Closing Date Balance Sheet.

    (a)    At the Closing, Tenant shall tender to Landlord in immediately available funds an amount equal to the difference between the value of the Purchased Assets and the amounts outstanding in respect of the current liabilities of Landlord that are to be assumed by Tenant, all as reflected on the December Balance Sheet (the "Estimated Purchase Price"). The December Balance Sheet shall not include any Excluded Assets or Excluded Liabilities.

    (b)    Within ninety (90) days from and after the Closing Date, Landlord shall deliver to Tenant the audited financial statements, including the audited Balance Sheet, of the Hospital for the period ended and as of the Closing Date. Such audited Balance Sheet shall include an estimate of net accounts receivable balances mutually agreed to by Landlord and Tenant and resultant from agreed upon audit procedures by Ernest & Young of accounts receivable balances. Within thirty (30) days from delivery of the audited Balance Sheet, Tenant shall deliver to Landlord such audited Balance Sheet adjusted to exclude current assets and liabilities that Landlord and Tenant agree are not to be assumed by Tenant, Excluded Assets, and the Excluded Liabilities. The result of such adjustments will be to produce the Closing Date Balance Sheet. The value of inventory reflected on the Closing Date Balance Sheet shall be the amount determined by the physical inventory described in Section 2.7 herein. To the extent that the difference between the value of the Purchased Assets and the current liabilities of Landlord that are to be assumed by Tenant, all as reflected on the Closing Date Balance Sheet, is greater than the Estimated Purchase Price, Tenant shall tender to Landlord an amount equal to such difference. To the extent that the difference between the value of the Purchased Assets and the current liabilities of Landlord that are to be assumed by Tenant, all as reflected on the Closing Date Balance Sheet, is less than the Estimated Purchase Price, Landlord shall tender to Tenant an amount equal to such difference. Any amounts due and payable as a result of such adjustment to the Estimated Purchase Price shall be due and payable within ten (10) days after the delivery of the Closing Date Balance Sheet (or after completion by Ernst & Young of its analysis of the accounts receivable) to Tenant or, if applicable, within ten (10) days after the resolution of any dispute as provided below.

    (c)    In the event that Landlord or Tenant shall dispute the calculation of the adjustments to the Estimated Purchase Price to be effected hereunder in writing within ten (10) days after delivery of the Closing Date Balance Sheet and such dispute is not resolved

to the mutual satisfaction of Landlord and Tenant within one hundred eighty (180) days from and after the Closing Date. Landlord and Tenant shall each have the right to require that such disputed determination be submitted to Ernst & Young, or to such other certified public accounting firm as Landlord and Tenant may then mutually agree, for computation or verification in accordance with the provisions of this Agreement. The results of such accounting firm's report shall be binding upon Landlord and Tenant; and such accounting firm's fees and expenses for each such disputed determination shall be borne by the party whose determination has been modified by such accounting firm's report or by both parties in proportion to the relative amount each party's determination has been modified. If Tenant does not notify Landlord in writing of any dispute over the calculation of the adjustments to the Estimated Purchase Price within ten (10) days after delivery of the Closing Date Balance Sheet, then Tenant shall be deemed to have accepted Landlord's determination of such adjustments.

     **2.7**   **Inventory and Supplies.** Immediately prior to the Closing Date, Landlord and Tenant shall jointly conduct a physical inventory of the inventory and supplies on hand at the Hospital as of the Closing Date and shall prepare a schedule thereof indicating the Value of Supplies. As used herein, the term "Value of Supplies" shall mean the aggregate value of the inventory and supplies on hand at the Hospital as of the Closing Date determined by the physical inventory and applying the same valuation methodology used by Landlord in connection with the preparation of the December Balance Sheet. The Value of Supplies shall be used in the preparation of the Closing Date Balance Sheet.

     **2.8**   **No Warranties.** **EXCEPT AS EXPRESSLY SET FORTH HEREIN OR IN THE LEASE AGREEMENT, TENANT ACKNOWLEDGES THAT LANDLORD HAS MADE NO, AND IS NOT MAKING ANY, REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) REGARDING THE PHYSICAL CONDITION OF THE LEASED ASSETS OR THE PURCHASED ASSETS OR THEIR SUITABILITY FOR ANY PARTICULAR PURPOSE AND TENANT AGREES THAT THE LEASED ASSETS AND THE PURCHASED ASSETS ARE TO BE LEASED AND SOLD TO TENANT IN THEIR THEN PRESENT CONDITION, "AS IS, WHERE IS AND WITH ALL FAULTS".**

     **2.9**   **Medicare, Medicaid and Third Party Payor Liability.** Landlord shall retain all liabilities and obligations arising in respect of the satisfaction and discharge of Landlord's obligations under Landlord's current Medicare/Medicaid Provider Agreement (the "Provider Agreement"), including liability for all overpayments received by Landlord, any of which arose from events or circumstances occurring prior to Closing. It is expressly understood that Landlord shall indemnify Tenant for any liabilities of Landlord or settlement of liabilities of Landlord relating to Medicare, Medicaid, or other third party payor contracts, any of which liabilities arose from events or circumstances occurring prior to Closing.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF LANDLORD

Landlord represents and warrants to Tenant as follows:

**3.1    Organization and Good Standing of Landlord.**  Landlord is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida.  Landlord has the corporate power and authority to own, lease or operate all properties and assets now owned, leased or operated by it.  Landlord represents and warrants that Landlord owns fee simple title to the real property described in Exhibit E free and clear of any mortgage.

**3.2    Consents, Authorizations and Binding Effect.**  Landlord has full corporate power and authority to carry out and perform its undertakings and obligations as provided herein.  This Agreement has been, and each Related Agreement when executed will be, duly executed and delivered by Landlord, and constitutes, or in the case of each Related Agreement will constitute, the legal, valid and binding obligation of Landlord, enforceable against Landlord in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws of general application relating to creditors' rights and subject to the availability of equitable remedies.   The execution, delivery and performance by Landlord of this Agreement and when executed each Related Agreement (a) have been, or in the case of each Related Agreement will be, duly and validly authorized by all proper and requisite corporate actions of Landlord; (b) will not conflict with or breach any provision of the articles of incorporation or bylaws of Landlord; (c) will not conflict with or breach or constitute any default under any contract, agreement or arrangement to which Landlord is a party or by which Landlord is bound other than any such conflict, breach or default that would not prevent or delay in any material respect the consummation of the transactions contemplated hereby or thereby or have a Material Adverse Effect on the Purchased Assets or the Leased Assets; (d) will not require any filing with, notification of or consent, approval or authorization of any Governmental Entity or any third Person or constitute a violation of any judgment, order or decree of any Governmental Entity, except for notifications to the State of Florida, the Florida Department of Business and Professional Regulation, the Florida Department of Health and Rehabilitative Services, the Health Care Financing Administration, the Florida Patient's Compensation Fund, the Federal Drug Enforcement Administration and the Florida Agency for Health Care Administration regarding the change in ownership of the Hospital attendant to the transactions described herein and except where the failure to make such filing or notification or to obtain such consent, approval or authorization would not prevent or delay in any material respect the consummation of the transactions contemplated hereby or thereby or have a Material Adverse Effect on the Purchased Assets or the Leased Assets; and (e) will not violate any federal, state, or local statute, ordinance or other law or any rule or regulation of any Governmental Entity applicable to Landlord or any of its assets, except for violations which would not prevent or delay in any material respect the consummation of the transactions contemplated hereby or thereby or have a Material Adverse Effect on the Purchased Assets or the Leased Assets.

**3.3**    **Governmental Notices.**  Notwithstanding any terms and provisions of Section 2.8 herein concerning exclusions or negations of any warranties or representations, expressed or implied, or the exculpation of Landlord from any liability for defects or deficiencies of any nature in any of the Leased Assets, Landlord acknowledges and agrees that prior to the execution of the Lease by the parties, Landlord shall provide to Tenant (a) copies of all written notices, correspondence, communications or documents, and (b) a written description of any oral communications or notices which Landlord has received concerning (i) any non-compliance with any Legal Requirements pertaining to any of the Leased Assets, (ii) any defective physical conditions of the Leased Assets, or (iii) any inoperative Leased Assets, to the extent that Landlord has received any such notice during the past three (3) years.

**3.4**    **Recitals.**  The Recital set forth above, insofar as same relate to Landlord and its Affiliates, are incorporated herein as if fully set forth herein and are true and correct.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF TENANT

Tenant represents and warrants to Landlord as follows:

**4.1**    **Organization and Good Standing of Tenant.**  Tenant is a special tax district duly created and validly existing under the laws of the State of Florida.  Tenant has the requisite power and authority to own, lease or operate all properties and assets now owned, leased or operated by it and to carry on its business as now conducted.

**4.2**    **Consents, Authorizations, and Binding Effect.**  Tenant has full constitutional and statutory power and authority to carry out and perform its undertakings and obligations as provided herein and in each Related Agreement.  This Agreement has been, and each Related Agreement when executed will be, duly executed and delivered by Tenant and constitutes, or in the case of each Related Agreement will constitute, the legal, valid and binding obligation of Tenant, enforceable against Tenant in accordance with its terms, except to the extent such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium and other laws of general application relating to creditors' rights and subject to the availability of equitable remedies.  The execution, delivery and performance by Tenant of this Agreement and when executed each Related Agreement (a) have been duly and validly authorized by all proper and requisite actions (constitutional, statutory or otherwise) of Tenant, (b) will not conflict with, violate or breach any provision of any organic document of Tenant, (c) will not conflict with or breach or constitute a default under any contract, agreement or arrangement to which Tenant is a party or by which Tenant is bound other than any such conflict, breach or default that would not prevent or delay in any material respect the consummation of the transactions contemplated hereby or thereby or have a Material Adverse Effect on Tenant or the Leased Assets or the Purchased Assets subsequent to Closing, (d) will not require any filing with,

notification of or consent, approval or authorization of any Governmental Entity or any third Person or constitute a violation or breach of any judgment, order or decree of any Governmental Entity, except for notifications to and filings with the State of Florida, the Florida Department of Business and Professional Regulation, the Florida Department of Health and Rehabilitative Services, the Health Care Financing Administration, the Florida Patient's Compensation Fund, the Federal Drug Enforcement Administration and the Florida Agency for Health Care Administration regarding the change in ownership of the Hospital attendant to the transactions described herein and necessary for Tenant to obtain a license to operate the Hospital, and except where the failure to make such filing or notification or to obtain such consent, approval or authorization would not prevent or delay in any material respect the consummation of the transactions contemplated hereby or thereby or have a Material Adverse Effect on Tenant or the Leased Assets or the Purchase Assets subsequent to Closing, and (e) will not violate any federal, state, or local constitutional provision, statute, ordinance or other law or any rule or regulation of any Governmental Entity applicable to Tenant or any of its assets.

**4.3    Recitals.** The Recitals set forth above, insofar as same relate to Tenant, are incorporated herein as if fully set forth herein and are true and correct.

**4.4.    Due Diligence.** Lessee acknowledges that Lessee conducted due diligence in respect of the Leased Assets and the Purchased Assets. In this regard, Lessee, at its sole cost and expense has engaged Law Engineering to prepare and deliver to Lessee (i) the Updated Report of a Phase I Environmental Site Assessment and Limited Testing Program dated as of March 3, 1995, and (ii) the Report of Limited Survey, Sampling, Assessment and Recommendations of Asbestos-Containing Materials dated March 3, 1995. Lessee acknowledges receipt of such reports and the matters referenced or disclosed therein.

## ARTICLE V
## COVENANTS

**5.1    Actions by Tenant.** Tenant agrees to take all actions necessary to obtain all Permits from Governmental Entities, to obtain all consents, approvals and authorizations from other Persons and to effect all filings, applications, registrations and notifications necessary in order to (a) fulfill all conditions precedent contained herein, (b) consummate the transactions contemplated hereby, and (c) operate the Hospital in the same manner as presently operated by Landlord.

**5.2    Certain Employee Matters.**

(a)    Tenant acknowledges and agrees that for purposes of the WARN Act and applicable Florida law, any Person who is an employee of Landlord as of the Closing Date shall be considered an employee of Tenant for purposes of the WARN Act on the Closing Date. With respect to such "deemed" employees, Tenant further agrees and acknowledges

that, to the extent required by law, Tenant will be responsible for all applicable notices and liabilities under the WARN Act and applicable Florida law, resulting from the termination of any such employees on and after the Closing Date.

(b)     As of the Closing Date, Tenant may offer employment to any employees of Landlord working at the Hospital (other than the Chief Executive Officer, the Chief Operating Officer and the Director of Nursing of the Hospital). Tenant shall provide Landlord with a written list of those employees of Landlord working at the Hospital who will not receive an offer of employment from Tenant at least ten (10) days prior to the Closing Date. Tenant covenants and agrees to offer employment to a sufficient number of Landlord's employees working at the Hospital so as to avoid the application of the WARN Act. Tenant further covenants and agrees that subsequent to Closing Tenant shall not take any action in respect of former employees of Landlord which may trigger application of the WARN Act within ninety (90) days after Closing. All employees of Landlord who are offered employment by Tenant subsequent to Closing will be offered a position and salary commensurate with their experience as compared with other employees of Tenant. Solely in respect of determining vacation and paid leave benefits available to employees of Landlord who are hired by Tenant, Tenant agrees to recognize the years of service of such employees while in the employ of Landlord when slotting such employees into Landlord's vacation and paid leave benefit programs. Except as provided herein, all employees of Landlord who accept employment by Tenant shall be deemed new employees of Tenant for purposes of determining health and welfare benefits, seniority (except for vacation or paid leave benefits) and other related matters. Notwithstanding the preceding sentence, (i) with respect to vacation days of employees of Landlord who are hired by Tenant that have been accrued up to and including the Closing Date but not used by such employees, Tenant agrees (A) that it will be liable to all of Landlord's employees for all vacation days accrued by such employees while in the employ of Landlord, (B) that such vacation days benefit will be in addition to any vacation days earned by such employees after the Closing Date as employees of Tenant, and (C) that accrued vacation days will not be eliminated by Tenant without due compensation to such employees, (ii) Tenant shall waive any preexisting condition requirements imposed by its health benefit plans in respect of Landlord's employees who are employed by Tenant (but only to the extent that an individual employee had qualified for the waiver of pre-existing conditions under Landlord's health benefits plan), (iii) Tenant shall credit such employees for any amount expended by such employees on medical expenses during the current calendar year against any deductible requirements imposed by Tenant's health benefit plans (but only to the extent that an individual employee received such credit under Landlord's health benefit plans); and (iv) Tenant shall honor all sick time earned and unused by such employees while in the employ of Landlord.

-12-

**5.3    Taxes and Expenses.**

(a)    Landlord shall pay all Taxes with respect to the business conducted by Landlord, the Leased Assets, and the Purchased Assets that are payable or become payable after the date hereof with respect to periods ending on or prior to the Closing Date. Tenant shall pay all Taxes with respect to the business conducted by Tenant, the Leased Assets, and the Purchased Assets that are payable or become payable with respect to periods commencing after the Closing Date. Landlord recognizes that Tenant is a Governmental Entity, and as such may not be required to pay any such Taxes.

(b)    Except as may otherwise be specifically provided herein, each party shall be responsible for its own expenses, including, without limitation, the fees of accountants and attorneys, which are incurred in connection with the negotiation and execution of this Agreement and the consummation of the transactions herein contemplated.

**5.4    Access to Leased Assets.** Provided that none of the following will interfere with the conduct of Landlord's business, prior to the Closing Landlord will, during normal business hours and upon reasonable notice (a) give Tenant's representatives access to all of the assets, properties, books, records, and agreements of Landlord relating to the Purchased Assets and the Leased Assets, (b) permit Tenant or its agents, at Tenant's sole cost and expense, to inspect and conduct nondestructive testing of any of the Purchased Assets and the Leased Assets, including, without limitation, an Environmental Phase I Site Assessment and termite inspection, (c) furnish to Tenant's representatives all information concerning the Purchased Assets and the Leased Assets as Tenant may reasonably request, and (d) permit Tenant access to the Leased Assets, to employees of Landlord in respect of the Hospital and to the medical staff of the Hospital (which shall include notices of any meeting of the medical staff or its committees) for purposes of ensuring a smooth transition of the operations and administration of the Hospital from Landlord to Tenant.

**5.5    Access to Corporate Services.** For and in consideration of the execution and delivery of this Agreement by Tenant and the base rent to be paid by Tenant under the Lease Agreement, Columbia shall provide to Tenant after Closing, and for so long as Tenant is not in default under the Lease Agreement (or for the periods otherwise defined in or provided for in the Lease Agreement), access to certain of the corporate management services that Columbia provides to its hospitals. Upon the request of Tenant, Columbia will provide, by and through its employees, assistance to Tenant, in connection with Tenant's operation of the Hospital, in the following areas and in a manner and at a level consistent with the provision of such services to Affiliates of Columbia: real estate, construction and design, purchasing/materials management, reimbursement (but such reimbursement assistance shall not include assistance in the preparation or review of cost reports or in the pursuit of appeals of notices of program reimbursement) and tax. Tenant understands and acknowledges that Columbia is not an "expert" in any of these areas, and that Columbia will incur liability for services provided if, and only to the extent that, such services are provided in a fraudulent or intentionally misleading

manner. Tenant understands and acknowledges that Columbia will not be required to incur any out-of-pocket expenses in connection with providing any of the foregoing corporate services requested by Tenant.

**5.6    Management Information Services.**  Columbia agrees to provide to Tenant in respect of its operations of the Hospital after Closing management information systems and services comparable to those currently provided by Columbia to the Hospital. Tenant shall enter into Columbia's standard management information services agreement, the form of which is attached as Exhibit L, and shall pay Columbia a fee for such management information services that is consistent with the fees historically paid by the Hospital and fees paid by similarly situated hospitals for such services. Tenant shall have the right to terminate any such management information services agreement upon thirty (30) days prior written notice.

**5.7    National Purchasing Agreements.**  For and in consideration of the execution and delivery of this Agreement by Tenant and amounts to be paid by Tenant under the Lease Agreement. Columbia agrees to use good faith efforts, and to the extent legally and contractually permissible, to cause the Hospital and the other hospitals owned and operated by Tenant to be included within Columbia's national purchasing contracts. If Columbia is able to cause the Hospital and the other hospitals owned and operated by Tenant to be included within Columbia's national purchasing contracts, and Tenant elects to participate in such national contracts, Tenant agrees that it will be bound by the terms and provisions of such national purchasing contracts and that it shall timely satisfy and perform all obligations thereunder, including, without limitation, obligations to make prompt payment for services provided. Tenant's right, if any, to participate in such national purchasing contracts shall terminate upon a default by Tenant under the Lease. In addition, after Closing, the Hospital, as an operating division of Tenant, shall have access to and participate in Tenant's purchasing agreements.

**5.8    Certificate of Need Matters.**  To the extent that Landlord has approved a capital expenditure or the addition or deletion of a service or program at the Hospital (all as required by the Lease Agreement), and the magnitude of such capital expenditure or such addition or deletion of a service or program requires Tenant to obtain a Certificate of Need from the Florida Agency for Health Care Administration, Landlord's approval of such capital expenditure or addition or deletion of a service or program shall not preclude BHSI or Affiliates of BHSI from opposing such Certificate of Need as permitted and provided by applicable Florida law.

**5.9    Medical Staffs Matters.**  From and after the Closing Date, the medical staff of the Hospital shall remain independent of, and separate and apart from, the medical staffs of the other hospitals owned and operated by Tenant, it being the intent of the parties that the medical staff of the Hospital shall remain an autonomous body. However, the medical staff and the operations of the Hospital shall, at all times, be subject to the oversight of the Board of Commissioners of Tenant in all respects, including, without limitation, policies which may be established from time to time relating

-14-

to medical staff privileges. Tenant shall use its best efforts to cause Memorial Physician Hospital Organization, Inc. ("Memorial PHO") to permit members of the Hospital's medical staff to become members of Memorial PHO and to become participating providers in the Memorial PHO network if they satisfy the criteria for membership therein applied on a consistent basis.

### 5.10    Preservation and Access to Records after the Closing.

(a)    After the Closing, Tenant shall keep and preserve all medical records and medical charts of patients admitted to the Hospital existing as of the Closing. Tenant acknowledges that as a result of entering into the Lease Agreement and operating the Hospital, it will gain access to patient and other information which is subject to rules and regulations concerning confidentiality. Tenant agrees to abide by any such rules and regulations relating to the confidential information it acquires. Tenant agrees after Closing to maintain the patient records at the Hospital in accordance with applicable law (including, if applicable, Section 1861(v)(i)(I) of the Social Security Act (42 U.S.C. § 1395x(v)(1)(I)) and requirements of relevant insurance carriers. Tenant will afford to the representatives of Landlord, including its counsel and accountants, full and complete access to, and copies of, any records of the Hospital at the Closing (including, without limitation, access to patient records in respect of patients treated by Landlord at the Hospital) during normal business hours after the Closing Date. In addition, Tenant shall cause its custodian of records to produce the original of any such patient records for purposes of pending litigation involving a patient to whom such records refer, as certified in writing by counsel retained by Landlord in connection with such litigation. Tenant shall cooperate with Landlord in such litigation. All confidential records of Tenant created after the Closing Date, including, without limitation, patient records will be made available pursuant to a lawful subpoena.

(b)    After the Closing, Tenant shall keep and preserve all other records of the Hospital existing as of the Closing which are delivered to Tenant by Landlord and which are required to be kept and preserved by any federal or state law or regulation. After the Closing, upon reasonable written notice by Landlord to Tenant, Landlord or its agents shall be entitled, during regular business hours, to have access to and make copies of all records pertaining to the operation of the Hospital (other than medical records which shall be governed by the provisions of Section 5.10(a)) prior to the Closing for any lawful corporate purpose.

(c)    Tenant shall not, without ninety (90) days prior written notification (the "Destruction Notice") to Landlord, destroy any records of the Hospital. Within ten (10) days of the receipt of the Destruction Notice, Landlord shall have the right, to request Tenant to deliver any such records to Landlord at the sole cost and expense of Landlord.

### 5.11    Cooperation by Tenant. In the event Landlord is required to defend against any action, suit or proceeding arising out of a claim pertaining to the business or operations of the

-15-

Hospital, or desires to prosecute any claim or open cost report, Tenant shall provide such assistance and cooperation, including, without limitation, witnesses and documentary or other evidence as may reasonably be requested by Landlord in connection with its defense. Landlord shall reimburse Tenant for its reasonable out-of-pocket expenses incurred in providing such assistance and cooperation.

**5.12    Abstract and Survey.** Landlord, at Landlord's sole cost and expense, shall provide Tenant with (i) an abstract of the real property described on Exhibit E (which abstract shall confirm that there are no mortgages or unpaid assessments outstanding in respect of the Leased Assets) and (ii) an as-built survey of the real property described on Exhibit E attached hereto reflecting all improvements visible on the grounds and all easements, rights of way, encroachments and drainage ditches, whether abutting or interior, of record or on the grounds.

Tenant, at Tenant's option, may obtain a commitment (the "Title Commitment") from a title insurance company acceptable to Tenant to issue as of the Closing Date a lessee's title insurance policy for the real property described in Exhibit E hereto, together with improvements, buildings and fixtures thereon, in the customary form prescribed for use in the State of Florida. The Title Commitment shall provide for the issuance of said policy to Tenant as of Closing and shall insure leasehold title to the real property described in Exhibit E hereto in Tenant subject only to the Permitted Encumbrances. The costs of the Title Commitment and title policy shall be borne solely by Tenant.

**5.13    Covenant Not to Compete.** BHSI, Landlord and Columbia recognize that (i) Tenant's entering into this Agreement and the Lease Agreement is induced primarily because of the covenants and assurances made by BHSI, Landlord and Columbia, (ii) BHSI's, Landlord's and Columbia's covenants not to compete are necessary to insure the continuation of the business of Tenant in respect of the Leased Assets, and (iii) irreparable harm and damage will be done to Tenant in the event that Columbia or its Affiliates (including any other group or combination of Persons or Affiliates acting on behalf of BHSI, Landlord or Columbia) compete with Tenant within the area or areas described in Exhibit G attached hereto. Tenant and BHSI, Landlord and Columbia, on behalf of themselves and their Affiliates, acknowledge that the geographic area represented in Exhibit G starts from Pembroke Pines Hospital at the intersection of University and Sheridan Streets in Pembroke Pines, Florida (the "Intersection"), and extends a full three (3) miles to the East and a full three (3) miles to the West (for a total width of six (6) miles). In addition, the geographic area represented in Exhibit G extends North from the Intersection to the northern most jurisdictional boundary of South Broward Hospital District (as it exists as of the date of execution of this Lease Agreement), and South to the presently existing boundary between Dade and Broward Counties. In consideration of the premises and as an inducement for Tenant to enter into this Agreement and the Lease Agreement and to consummate the transactions contemplated herein, BHSI, Landlord and Columbia, on behalf of themselves and their Affiliates existing as of the date of execution of this Agreement and which may be established during the term of the Lease Agreement, agree that from and after the date hereof until June 30, 1995 and, if the term under the Lease Agreement commences,

-16-

thereafter for so long as an Event of Default (as such term is defined in the Lease Agreement) does not exist under the Lease Agreement, neither BHSI, Landlord, Columbia nor their Affiliates, nor any officer or director of BHSI, Landlord, Columbia or their Affiliates, acting within the scope of their employment or as agents for such entities, will, directly or indirectly, own, manage, or profit from any Person engaged in, or loan money to any Person for purposes of engaging in, any of the following businesses within the geographic area described on Exhibit G: hospitals, diagnostic centers, ambulatory surgical centers (as defined in Section 395.002(4), Florida Statutes, as same may be amended from time to time), oncology centers (including radiation therapy centers), rehabilitation centers (including sports medicine centers), birthing centers, urgent care centers and occupational medicine centers. In the event that BHSI, Landlord, Columbia or their Affiliates breach this Section 5.13, Tenant shall be entitled to injunctive relief without the necessity of posting a bond. BHSI, Landlord and Columbia and their Affiliates recognize that the covenants contained herein a) are not contrary to the public health, safety or welfare, and b) are not unreasonable, that the length of the term of the restrictions and the area are fair and reasonable and are not the result of duress or coercion, and that their observance of the covenant will not cause any undue hardship, financial or otherwise. In the event the Tenant seeks injunctive relief, Tenant shall give Landlord notice thereof and BHSI, Landlord and Columbia and their Affiliates hereby specifically waive the requirement that the Tenant prove irreparable injury or post a bond, and, in the event the Court determines a bond should be posted, agree that the amount of such a bond shall be not more than $5000.00. Landlord agrees that any Person that acquires substantially all of the assets of Landlord or that acquires the real property described in Exhibit E hereto shall, as a condition of acquiring such assets, agree to be bound by the provisions of this Section 5.13. In the event that any nonappealable court of competent jurisdiction holds that the length of the term of this covenant not to compete or the geographical area of the restrictions, or any other provision stated in this Section, constitutes an unreasonable restriction upon Landlord, BHSI, Columbia, or their Affiliates, then Landlord, BHSI and Columbia, on behalf of themselves and their Affiliates, hereby expressly agree that the provisions of this Section 5.13 shall not be rendered void, but shall apply as to length of the term or geographical are or to such other extent as such nonappealable court of competent jurisdiction may judicially determine or indicate constitutes a reasonable restriction under the circumstances involved. In the event that BHSI, Landlord, Columbia or their Affiliates no longer, directly or indirectly, controls, owns, manages or profits from Landlord or the real property described on Exhibit E hereto, then upon the expiration of five (5) years from after the date on which either of such events occurs, this Section 5.13 shall be null and void and no longer binding upon Landlord, BHSI, Columbia and their Affiliates.

    **5.14    The MOB Lease.**  As of the Closing Date Landlord shall sublease to Tenant Landlord's interest in the space that is the subject of that certain lease dated as of July 19, 1982, as amended (the "MOB Lease"), by and between P&L Associates ("Lessor") and Gateway Hospital Corporation East, the original lessee. Landlord is currently the lessee under the MOB Lease and holds a fifty percent (50%) ownership interest in Lessor. Landlord recognizes that Tenant, as a governmental entity cannot assume Landlord's ownership interest in Lessor, but desires to afford to Tenant the same or similar benefits and burdens as Landlord currently enjoys and is obligated to

-17-

perform under the MOB Lease. In this regard, the Sublease Agreement (the "Sublease Agreement") shall be upon terms and conditions that are mutually satisfactory to Landlord and Tenant, taking into consideration Tenant's status as a governmental entity and with the objective of placing Tenant in the same or similar economic position in respect of Lessor as Landlord currently enjoys. In the event that Landlord and Tenant cannot agree upon the terms and conditions of the Sublease Agreement, Base Rent (as defined in the Lease Agreement) will be adjusted for a period of time equal to the remaining term of the MOB Lease to reflect any change in the economics of the transactions described herein resulting from the parties' inability to agree upon the terms and conditions of the Sublease Agreement prior to Closing.

**ARTICLE VI**
**CONDITIONS**

**6.1    Conditions Precedent to Landlord's Obligations.** The obligation of Landlord to consummate the transactions provided for in this Agreement is, at the option of Landlord, subject to satisfaction of the following conditions at or before the Closing Date:

(a)    the representations and warranties made by Tenant in this Agreement and in each certificate, agreement, document, or instrument delivered pursuant hereto on or before the Closing Date shall be true and correct at and as of the Closing Date with the same force and effect as though such representations and warranties had been made at and as of the Closing Date. All of the covenants, terms, and conditions of this Agreement to be complied with or performed by Tenant at or before the Closing Date shall have been complied with and performed in all material respects. Tenant shall have delivered to Landlord a certificate to the foregoing effect dated the Closing Date and signed by an authorized officer of Tenant;

(b)    Tenant shall have executed and delivered each of the Related Agreements;

(c)    all material consents and approvals, if any, which are required from any Person (other than the approval of Landlord's Boards of Directors) in order to permit Landlord to consummate the transactions contemplated by this Agreement shall have been duly given;

(d)    on the Closing Date, there shall be in effect no injunction, order, or decree of any nature issued, ordered, or granted by any Governmental Entity of competent jurisdiction that restrains or prohibits in any material respect, or would award substantial damages in connection with, the consummation of the transactions contemplated hereby;

(e)    Tenant shall have executed (where appropriate) and delivered to Landlord the documents referred to in Section 7.3 herein;

-18-

(f)     Tenant shall have obtained all licenses, permits, Certificates of Need and all other approvals or consents from any Governmental Entity (or waivers in respect thereof) required for Tenant to operate the Hospital in substantially the same manner as Landlord; and

(g)     Landlord shall have received an opinion dated the Closing Date from counsel to Tenant, in form and substance substantially similar to the form attached as Exhibit I hereto.

**6.2     Conditions Precedent to Tenant's Obligations.**  The obligation of Tenant to consummate the transactions provided for in this Agreement is, at the option of Tenant, subject to satisfaction of the following conditions at or before the Closing Date:

(a)     the representations and warranties made by Landlord in this Agreement and in each certificate, agreement, document, or instrument delivered pursuant hereto on or before the Closing Date shall be true and correct at and as of the Closing Date with the same force and effect as though said representations and warranties had been made at and as of the Closing Date. All of the covenants, terms, and conditions of this Agreement to be complied with and performed by Landlord at or before the Closing Date shall have been complied with and performed in all material respects. Landlord shall have delivered to Tenant a certificate to the foregoing effect dated the Closing Date and signed by the President or a Vice President or other authorized officer of each entity constituting Landlord;

(b)     Tenant shall have obtained all licenses, permits, Certificates of Need and all other approvals or consents from any Governmental Entity (or waivers in respect thereof), required for Tenant to operate the Hospital in substantially the same manner as Landlord;

(c)     Landlord shall have executed and delivered each of the Related Agreements;

(d)     on the Closing Date, there shall be in effect no injunction, order, or decree of any nature issued, ordered, or granted by any Governmental Entity of competent jurisdiction that restrains or prohibits in any material respect or would award substantial damages in connection with, the consummation of the transactions contemplated hereby;

(e)     all material consents and approvals, if any, which are required from any Person (other than the approval of Tenant's Board of Commissioners) in order to permit Tenant to consummate the transactions contemplated by this Agreement to occur on the Closing Date shall have been duly given;

(f)     Landlord shall have executed (where appropriate) and delivered to Tenant the documents referred to in Section 7.2 herein;

-19-

(g)     Tenant shall have received an opinion dated the Closing Date from counsel to Landlord, in form and substance substantially similar to the form attached as Exhibit J hereto; and

(h)     Tenant shall have received from Landlord evidence that the real property on which the Hospital is located is zoned for, inter alia, hospital purposes.

## ARTICLE VII
## CLOSING

**7.1     The Closing.** The Closing shall take place at the offices of Landlord in Miami Lakes, Florida at 10:00 a.m. local time on June 29, 1995; however, the Closing shall not be finally consummated or effective until the Closing Date, unless the parties mutually agree to hold the Closing at another time or place or to have the Closing Date occur at another time. If all conditions precedent to the Closing have not been satisfied or waived by June 29, 1995, then either Landlord or Tenant may elect to extend the Closing to a date no later than July 31, 1995.

**7.2     Documents to be Delivered to Tenant.** Subject to the terms and conditions of this Agreement, at the Closing, Landlord will deliver, or cause to be delivered, to Tenant:

(a)     the Lease Agreement duly executed by Landlord;

(b)     a bill of sale, duly executed by Landlord, transferring to Tenant the Purchased Assets;

(c)     a certified copy of the resolutions of the Board of Directors of Landlord properly authorizing and approving this Agreement and the transactions contemplated hereby;

(d)     all documents required pursuant to Section 6.2 herein;

(e)     the Assignment and Assumption Agreement duly executed by Landlord;

(f)     such other documents and instruments as are customary under such circumstances or as may be reasonably requested by Tenant to consummate the transactions contemplated by this Agreement; and

(g)     possession of the Leased Assets and the Purchased Assets.

**7.3     Documents to be Delivered to Landlord.** Subject to the terms and conditions of this Agreement, at the Closing, Tenant shall deliver, or cause to be delivered, to Landlord:

-20-

    (a)    the Lease Agreement duly executed by Tenant;

    (b)    the Assignment and Assumption Agreement duly executed by Tenant;

    (c)    cash in the amount set forth in Section 2.4(b) for the acquisition of the Purchased Assets;

    (d)    a certified copy of the resolutions or orders duly adopted by the Board of Commissioners of Tenant properly authorizing and approving this Agreement and the transactions contemplated hereby;

    (e)    all documents required pursuant to Section 6.1 herein; and

    (f)    such other documents and instruments as are customary under such circumstances or as may be reasonably requested by Landlord to consummate the transactions contemplated by this Agreement.

    **7.4**    **Prorations**.  All normal and customarily proratable items, including utility bills, rents, and prepaid expenses (but excluding real estate and personal property taxes) shall be prorated as of the Closing Date, Landlord being charged and credited for all of same up to and including the Closing Date and Tenant being charged and credited for all of same after the Closing Date.  If the actual amounts to be prorated are not known as of the Closing Date, the prorations shall be made on the basis of the best evidence then available, and thereafter, when actual figures are received, a cash settlement will be made between Landlord and Tenant.  Landlord and Tenant shall use their best efforts to effectuate such settlement within six months after the Closing Date.  The provisions of Section 7.4 shall survive the Closing.

    **7.5**    **Existing Hospital Patients**.  Tenant acknowledges that as of the Closing Date there will be patients located in the Hospital and that as of the Closing Date, Tenant will accept such patients as patients of Tenant and will assume and accept (and hereby agrees to assume and accept) responsibility and liability for treating such patients commencing on the Closing Date.  Landlord shall retain liability for all activities in respect of such patients prior to Closing.

**ARTICLE VIII**
**COVENANTS AND AGREEMENTS REGARDING LIABILITIES**

    **8.1**    **Covenants and Obligation of Landlord.**  Landlord covenants and agrees that Landlord shall be and remain solely liable for and obligated to satisfy and discharge any and all claims, losses, costs, damages or Action in respect thereof (including interest, penalties and reasonable attorneys' fees and disbursements) of any kind or nature whatsoever (collectively "Damages") asserted by any third Person arising out, alleged to arise out of, or based upon:

(a)    the ownership, management, operation or use by Landlord of the Leased Assets or the Purchased Assets (including the business conducted by Landlord at the Hospital) prior to the Closing Date;

(b)    the acts or omissions of Landlord, Landlord's employees, agents or independent contractors occurring or alleged to have occurred prior to the Closing Date; and

(c)    any actual violation or noncompliance by Landlord of or with any statute, ordinance or other law, federal, state, local or foreign, or any rule or regulation of any Governmental Entity, including any Environmental Laws, in connection with the ownership, management, operation or use of the Leased Assets or the Purchased Assets prior to the Closing Date.

Landlord covenants and agrees that Landlord shall fully, aggressively and timely defend, satisfy and discharge any and all such Damages at the sole cost and expense of Landlord.

**8.2    Covenants and Obligations of Tenant.**  Tenant covenants and agrees that Tenant shall be and remain solely liable for and obligated to satisfy and discharge any and all Damages asserted by any third Person arising out, alleged to arise out of, or based upon:

(a)    the ownership, management, operation or use by Tenant of the Leased Assets or the Purchased Assets (including the business conducted by Tenant at the Hospital) on or after the Closing Date;

(b)    the acts or omissions of Tenant, Tenant's employees, agents or independent contractors occurring or alleged to occur on or after the Closing Date;

(c)    any actual violation or noncompliance by Tenant of or with any statute, ordinance, or other law, federal, state, local or foreign, or any rule or regulation of any Governmental Entity, including any Environmental Laws, in connection with the ownership, management, operation or use of the Leased Assets or the Purchased Assets on or after the Closing Date; and

(d)    to the extent Tenant is required by law to comply with the WARN Act, any actual violation or non-compliance by Tenant, whether prior to or after the Closing Date, of or with respect to the WARN Act, as amended, arising as a result of the transactions contemplated by this Agreement.

Tenant covenants and agrees that Tenant shall fully, aggressively and timely defend, satisfy and discharge any and all such Damages at the sole cost and expense of Tenant.

-22-

**8.3    Enforcement of Covenants.**  In the event that either party seeks to enforce the covenants and obligations of the other specified in this Article VIII, the party which is called upon to perform such covenants and obligations may assume (with legal counsel reasonably acceptable to the other party) the defense of any claim which is the subject of such enforcement action; provided that other party shall have the right at its own expense to participate jointly in the defense of any such claim. If a party elects to undertake the defense of any such claim hereunder, then other party shall cooperate in the defense or settlement of such claim. In addition, any claim that Landlord may have against Tenant under this Article VIII shall be without regard to any constitutional or statutory limitations on amounts that any Person may recover against Tenant.

**8.4    Survival of Obligations.**  The respective obligations of the parties hereto under Sections 8.1 and 8.2 herein shall survive the Closing and the termination of this Agreement.

**8.5    Brokers' and Finders' Commission.**  Landlord and Tenant each represent and warrant to the other that it has not engaged a broker in connection with the transactions described herein. Tenant covenants and agrees to be solely liable for and obligated to satisfy and discharge the payment of any and all brokers' and finders' commissions, fees and other similar forms of compensation that may be due and payable from or by Tenant, or may have been earned by any third party acting on behalf of Tenant in connection with the negotiation and execution of this Agreement and the consummation of the transactions herein contemplated, and Landlord covenants and agrees to be solely liable for and obligated to satisfy and discharge the payment of any and all brokers' and finders' commissions, fees or other similar forms of compensation that may be due or payable from or by Landlord, or may have been earned by any third party acting on behalf of Landlord in connection with the negotiation and execution of this Agreement and the consummation of the transactions herein contemplated.

**ARTICLE IX**
**TERMINATION**

**9.1    Termination.**  Between the date hereof and the Closing Date, this Agreement may be terminated by:

    (a)    The mutual consent of Tenant and Landlord;

    (b)    Landlord, at such time as any of the conditions to the obligations of Landlord provided in Section 6.1 herein cannot be satisfied and will not be waived by Landlord;

    (c)    Tenant, at such time as any of the conditions to the obligations of Tenant provided in Section 6.2 herein cannot be satisfied and will not be waived by Tenant;

-23-

(d)    either Landlord or Tenant pursuant to the last sentence of Section 10.10.

**9.2    Effect of Termination**.  In the event of termination pursuant to Section 9.1(a) - (d), inclusive, then this Agreement shall be null and void and no party shall have any rights or obligations under this Agreement, except that nothing herein and no such termination shall relieve any party from liability for misrepresentation or breach of a warranty or covenant contained herein.

## ARTICLE X
## MISCELLANEOUS

**10.1    Waivers and Amendments.**  Any waiver of any term or condition of this Agreement, or any amendment or modification of this Agreement, shall be effective only if set forth in a written document executed by a duly authorized officer of the waiving party in the case of a waiver and of each of the parties in the case of an amendment or modification.  A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive a party's other rights hereunder at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

**10.2    Notices.**  Any notice, request, instruction, demand or other communication to be given hereunder by either party hereto to the other shall be given in writing and shall be delivered either by hand, by telecopy or similar facsimile means, or by registered or certified mail, postage prepaid, return receipt requested, as follows:

(a)    If to BHSI, addressed to:

Broward Healthcare System, Inc.
7975 N.W. 154th Street, Suite 400A
Miami Lakes, Florida 33016
Attention:    Chief Financial Officer
Fax No.:        305/364-0922

With a simultaneous copy to:

Columbia/HCA Healthcare Corporation
201 West Main Street
Louisville, Kentucky 40202
Attention:    General Counsel
Fax No.:        502/572-2163

-24-

(b)    If to Landlord, addressed to:

Galen Hospital-Pembroke Pines, Inc.
7975 N.W. 154th Street
Suite 400A
Miami Lakes, Florida 33016
Attention: Chief Financial Officer
Fax No.: 305/364-0922

With a simultaneous copy to:

Columbia/HCA Healthcare Corporation
201 West Main Street
Louisville, Kentucky  40202
Attention:    General Counsel
Fax No.:    502/572-2163

(c)    If to Tenant, addressed to:

South Broward Hospital District
3501 Johnson Street
Hollywood, Florida 33021
Attention:    Chief Executive Officer
Fax No.:    305/985-1438

With a simultaneous copy to:

Blank, Rigsby & Meenan, P.A.
204 South Monroe Street
Tallahassee, Florida 32301
Attention:    F. Philip Blank, Esq.
Fax No.:    904/681-6713

and to:

South Broward Hospital District
Five East Tower, Room 533
Memorial Hospital
3501 Johnson Street
Hollywood, Florida 33021
Attention: Clarke Walden, General Counsel
Fax No.: 305/985-3482

-25-

or to such other address or number as either party shall have previously designated by written notice given to the other party in the manner hereinabove set forth. Notices shall be deemed given when received, if sent by telecopy or similar facsimile means, and when delivered and receipted for, if mailed or hand delivered.

    **10.3    Headings; Terminology.**    The Article and Section headings herein are for convenience only and shall not affect the construction hereof. Unless the context of this Agreement clearly requires otherwise, (a) pronouns, wherever used herein, and whatever gender, shall include natural persons and corporations and associations of every kind and character, (b) the singular shall include the plural and the plural shall include the singular wherever and as often as may be appropriate, (c) the word "includes" or "including" shall mean "including without limitation", (d) the word "or" shall have the inclusive meaning represented by the phrase "and/or", and (e) the words "hereof", "herein", "hereunder", and similar terms in this Agreement shall refer to this Agreement as a whole and not any particular section or article in which such words appear. All accounting terms not specifically defined herein shall be construed in accordance with GAAP. Unless otherwise specified, all references to a specific time of day in this Agreement shall be based upon eastern standard time or eastern daylight savings time, as applicable on the date in question.

    **10.4    Parties in Interest.**    This Agreement is made solely for the benefit of the parties hereto and their permitted successors and assigns, and no other Person shall acquire or have any right under or by virtue of this Agreement.

    **10.5    Entire Agreement.**    This Agreement, the Exhibits hereto and the Related Agreements constitute the entire agreement between the parties pertaining to the subject matter hereof and supersede all other prior and contemporaneous agreements and understandings, both oral and written, of the parties in connection therewith. No covenant or condition not expressed in this Agreement shall affect or be effective to interpret, change or restrict this Agreement.

    **10.6    Severability.**    If any term, provision, covenant or condition of this Agreement is held by any court of competent jurisdiction to be invalid, void or unenforceable in any respect, the remainder of such term, provision, covenant or condition in every other respect and the remainder of the terms, provisions, covenants or conditions of this Agreement shall continue in full force and effect and shall in no way be affected, impaired or invalidated, unless the invalid, void or unenforceable term, provision, covenant or condition is of such a material nature that one or both parties to this Agreement cannot obtain the benefit of their bargain (in which case this Agreement shall terminate).

    **10.7    Governing Law.**    THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA.

10.8    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that (i) Landlord may assign its rights and delegate its duties hereunder to an Affiliate of Landlord and (ii) this Agreement shall not be assigned by Tenant without the express prior written consent of Landlord.  If Landlord sells or transfers any of the Leased Assets to an Affiliate prior to the Closing, then such Affiliate shall acquire such Leased Assets subject to the terms of this Agreement.

10.9    **Counterparts.**  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.10    **Risk of Loss.**   In the event of any loss, damage, impairment, confiscation or condemnation of the Leased Assets, or any part thereof, prior to the Closing Date, the proceeds of, or any claim for any loss payable under any insurance policy, judgment or award with respect thereto shall be payable to Landlord.  In such event, if the damage would have a Material Adverse Effect on the Leased Assets, either party may terminate this Agreement.

10.11    **Survival.**  The covenants of Landlord and Tenant set forth in this Agreement shall survive the Closing.  All representations and warranties of the parties or any authorized representative thereof contained in this Agreement, or in any certificate, agreement, document or other instrument delivered in connection herewith shall, except for any bona fide claim theretofore asserted thereunder, terminate and be of no force and effect on the second anniversary of the Closing Date.  No loss, claim, damage, liability or Action in respect thereof may be asserted or brought under any representation and warranty contained in this Agreement until the aggregate amount of all such losses, claims, damages and liabilities thereunder shall exceed $50,000 and then only to the extent of such excess.

10.12    **Confidentiality.**   Tenant understands and acknowledges that the information, documents and instruments delivered to Tenant by Landlord or Landlord's agents in connection with the negotiation, execution and delivery of this Agreement are of a confidential and proprietary nature.  Except as required by law, Tenant agrees that both prior and subsequent to Closing it will maintain the confidentiality of all such confidential information, documents or instruments delivered to it by Landlord or Landlord's agents in connection with the negotiation of this Agreement or in compliance with the terms, conditions and covenants hereof and only disclose such information, documents and instruments to its duly authorized officers, directors, representatives and agents.  Tenant further agrees that if the transactions contemplated hereby are not consummated, it will return all such documents and instruments and all copies thereof in its possession to Landlord.  Tenant recognizes that any breach of this Section would result in irreparable harm to Landlord and its Affiliates and that therefore Landlord shall be entitled to an injunction to prohibit any such breach or anticipated breach, without the necessity of posting a bond, cash or otherwise, in addition to all of their other legal and equitable remedies available to Landlord.  Nothing in this Section, however, shall prohibit the use of

-27-

such confidential information, documents or information for such governmental filings as in the mutual opinion of Tenant's Counsel and Landlord's Counsel are (i) required by law or governmental regulations or (ii) otherwise appropriate.

10.13 **Public Announcements.** Landlord and Tenant mutually agree that no party hereto shall release, publish or otherwise make available to the public in any manner whatsoever any information or announcement regarding the transactions herein contemplated without the prior written consent of the other party, except as required by law and except for information and filings reasonably necessary to be directed to governmental agencies to fully and lawfully effect the transactions herein contemplated or required in connection with securities and other laws. Nothing herein shall prohibit either party from responding to questions presented by the press or media without first obtaining prior consent of the other party hereto.

10.14 **Covenant of Good Faith.** Landlord and Tenant each covenant and agree to act in good faith in carrying out the terms and provisions of this Agreement. In addition and except as otherwise specifically provided herein to the contrary, Landlord and Tenant each covenant and agree that when either is required or requested to consent to or approve the activities of the other or when this Agreement requires either party to exercise its discretion in making a decision, such consent or approval shall not be unreasonably withheld and such discretion shall be reasonably exercised.

10.15 **Legal Fees and Costs.** In the event either party elects to incur legal expenses to enforce or interpret any provision of this Agreement by judicial proceedings, the prevailing party will be entitled to recover such legal expenses, including, without limitation, attorney's fees, costs, and necessary disbursements, in addition to any other relief to which such party shall be entitled.

10.16 **Interpretation.** Both Landlord and Tenant and their respective legal counsel have participated extensively in the preparation, negotiation, and drafting of this Agreement. Accordingly, no presumption will apply in favor of either Landlord or Tenant in the interpretation of this Agreement or in the resolution of any ambiguity of any provision hereof.

10.17 **Relationship of the Parties.** It is expressly acknowledged by the parties hereto that pursuant to the Lease Agreement Landlord and Tenant will be engaged in a landlord/tenant relationship and the relationship of the parties will be that of Landlord and Tenant. Nothing in this Agreement or the Lease Agreement shall be construed to create an employer/employee or master/servant relationship or to create a relationship of a partner in a partnership or joint venturer in a joint venture.

-28-

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written.

**BHSI:**

BROWARD HEALTHCARE SYSTEM, INC.

By: _~signature~_
Name: Robert L. Newman
Title: Vice President

**LANDLORD:**

GALEN HOSPITAL-PEMBROKE PINES, INC.

By: _~signature~_
Name: Robert L. Newman
Title: Vice President

**TENANT:**

SOUTH BROWARD HOSPITAL DISTRICT

By: _~signature~_
Name: Frank V. Sacco
Title: ~~Vice President~~
Chief Executive Officer

-29-

Contingent upon the consummation of the transactions described herein and for the sole purpose of evidencing its agreement to comply with the provisions of Sections 5.5, 5.6, 5.7 and 5.13 herein, Columbia/HCA Healthcare Corporation has duly executed this Agreement as of the date first above written.

COLUMBIA/HCA HEALTHCARE
CORPORATION

By: _____

Name: _Jamie Hopping_____

Title: _Vice President_____

F: DD1047.COL884:95052\FINAL:MASTER8.AGT

-30-

# EXHIBIT A

## ASSUMPTION AGREEMENT

This **ASSUMPTION AGREEMENT**, dated as of the ___ day of _____, 1995 (the "Agreement"), is made and entered into by and between **GALEN HOSPITAL-PEMBROKE PINES, INC.**, a Florida corporation ("Landlord"), and **SOUTH BROWARD HOSPITAL DISTRICT**, a special tax district created and existing under the laws of the State of Florida ("Tenant").

### W I T N E S S E T H:

**WHEREAS**, Landlord and Tenant are parties to that certain Master Agreement dated as of _____, 1995 (the "Master Agreement");

**WHEREAS**, pursuant to the Master Agreement, Landlord has agreed to lease to Tenant and Tenant has agreed to lease from Landlord the assets constituting Pembroke Pines Hospital and Tenant has agreed to purchase certain assets and assume certain liabilities of Landlord.

**NOW THEREFORE**, for and in consideration of the premises and other good and valuable consideration, the receipt and adequacy of which are forever acknowledged and confessed, Landlord and Tenant hereby agree as follows:

1.    Definitions.  All capitalized terms used herein that are defined in the Master Agreement shall have the same meanings herein as therein defined.

2.    Assumed Liabilities.  Effective as of the date hereof, Tenant agrees to assume, pay, perform and discharge those liabilities of Landlord that are described in Section 2.4 of the Master Agreement, including those categories of liabilities described on Schedule 2.4 of the Master Agreement in the amounts to be determined in accordance with the Master Agreement.

3.    Landlord Excluded Liabilities.  Except as expressly provided to the contrary in Section 2 hereof or as otherwise provided for under the Master Agreement, Tenant shall not assume and under no circumstances shall Tenant be obligated to pay or assume any liability of Landlord, whether known or unknown, fixed or contingent, currently existing or hereafter arising.

4.    Successors and Assigns.  This Assumption Agreement shall insure to the benefit of and be binding upon Landlord and Tenant and their respective successors and assigns.

**IN WITNESS WHEREOF**, the parties hereto have caused this Assumption Agreement to be executed and delivered by their duly authorized representatives as of the ___ day of _____, 1995.

**LANDLORD:**                          **GALEN HOSPITAL-PEMBROKE PINES, INC.**

By: _____

Name: _____

Title: _____


**TENANT:**                          **SOUTH BROWARD HOSPITAL DISTRICT**

By: _____

Name: _____

Title: _____

F: DD1047 COL884-95052 FINAL EXHA.2